**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| **CAROL ANN SMITH,** | ) | Case No. 3:11 CV 00560 |
| | ) | |
| Plaintiff, | ) | Judge JACK ZOUHARY |
| | ) | |
| vs. | ) | <u>CAROL ANN SMITH AFFIDAVIT</u> |
| | ) | |
| **PERKINS BOARD OF EDUCATION, et al.,** | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | Attorney Edward G. Kramer |
| | ) | Counsel for Plaintiff |
| | ) | |
| _____ | ) | |

STATE OF OHIO       )
                        )SS:
COUNTY OF CUYAHOGA  )

      I, CAROL SMITH, being first duly sworn upon oath, deposes and say that I have personal knowledge about the following facts:

1.     I am the plaintiff in the above litigation and in September 1976, I started as a teacher with the Perkins Local School District as the business instructor at Perkins High

School.

2.   In 1980, I was awarded tenure and began a continuing contract with the Perkins Local School District.

3.   In addition to my responsibilities as the high school business instructor, I also taught American History at Briar Middle School.

4.   From the time of my initial hiring in 1976 until the hiring of James P. Gunner as superintendent for the Perkins Local School District in 2008, I always received uniformly positive performance evaluations, never subjected to any disciplinary action or reported as being excessively tardy to or falling asleep in class.

5.   Almost from the start Mr. Gunner's manner, statements and conduct toward me reflected his belief that I should retire from teaching because of my age and subsequently disability.

6.   I was the oldest teacher in the Perkin Local School District at the time of my firing.

7.   In 1992, medical testing performed in conjunction with surgery to repair an injury to my rotator cuff revealed that I had developed Type 2 diabetes.

8.   My diabetic condition was initially controlled by oral medication, but my condition deteriorated, and  around 1999, I was prescribed injected insulin.

9.   In July 2005, I had surgery to remove a cataract from my right eye; subsequent to the surgery, I suffered a serious staph infection and was on at least two occasions entirely without sight in the afflicted eye.

10.  After several surgeries, vision in my right eye was improved, but I remain highly sensitive to changes in light, which can require me to close my eyes for several minutes in order to adjust.

11.    The photographed taken on December 28, 2010 attached as Exhibit [a] is an accurate and true representation of how my eyes have looked at least since 2008. Often, because of my sensitivity to light and condition of my eyes it may appear I am sleeping.

12.    On September 29, 2008, I received a notice of a disciplinary conference to be held with regard to incidents in which accused me of sleeping on school premises during the school day while teaching at Briar Middle School.

13.    I was not sleeping but rather was exhibiting symptoms of high blood sugar resulting from my diabetic condition.

14.    The next day, September 30, 2008, I promptly furnished a letter documenting my disability and explaining its symptoms from her healthcare provider to Principal Stephen P. Finn of Briar Middle School.

15.    On October 6, 2008, ignoring my explanation, Principal Finn placed a written reprimand predicated on the alleged incidents in my personnel file.  This reprimand deliberately mischaracterizes my response to the allegations of sleeping on school premises and explanation of her disability.  The reprimand indicates that "you indicated that a medical condition, more specifically diabetes, might be a contributing factor to your falling asleep in class," when in fact I denied sleeping in class and explained that episodes of high blood sugar can cause me to appear to be sleeping even though that was not the case.

16.    On October 8, 2008, Plaintiff I received a memorandum informing me of a scheduled evaluation, the first of many that would be conducted over the subsequent eighteen (18) months in excess of the number of evaluations permitted for teachers on

continuing contracts under the terms of the *Collective Bargaining Agreement between the Perkins Educational Association and the Perkins Board of Education*. This was just another of ways I was being treated differently by Mr. Gunner and my supervisors because of my age, disability and subsequently in retaliation for my requesting reasonable accommodations.

17.   In order to protect myself, I retained Thomas J. Zraik, a disability rights attorney, to represent me.

18.    On October 14, 2008, Mr. Zraik submitted  a written rebuttal to the reprimand to be placed in her personnel file.  Exhibit [b] is a true and accurate copy of this letter sent by him.

19.   On the same date, Mr. Zraik formally requested in writing, that I be given reasonable accommodations for my disability pursuant to 42 U.S.C. 12101, et seq., and O.R.C. 4112.02(G). , to wit:

a.   that staff members and administrators of Perkins Local Schools who work directly or in association with Plaintiff be familiarized with the symptoms of diabetes;

b.   that if an individual observes Plaintiff appearing to be asleep, that individual approach her and ask if she requires assistance;

c.   that if Plaintiff responds affirmatively, she be assisted in obtaining water, juice, or candy to help adjust her blood sugar;

d.   that if Plaintiff does not respond, emergency medical assistance be summoned; and

e.   that Plaintiff be provided with five- to ten-minute breaks as necessary to inject herself with insulin.

Exhibit [c] is a true and accurate copy of this letter sent by him

20.     On November 18, 2008, Superintendent Gunner responded to Plaintiff's request for an accommodation as follows: (A) Plaintiff may keep snacks in the classroom and is permitted to inject herself with insulin in the event of an emergency if she first calls the office, waits for classroom coverage to arrive, and proceeds to the nurse's office to perform the injection; (B) Information will be provided to staff and to Plaintiff's students regarding diabetes, warning signs, and symptoms of low and high blood sugar levels. Superintendent Gunner's purported accommodations conspicuously failed to address my request that verbal confirmation be obtained in the event that I appear to be asleep in order to determine that if I was actually asleep and not merely undergoing an episode of high blood sugar; rather, the response specifically states that "further episodes of disorientation [or] sleepiness…would be treated as grounds for disciplinary action." Exhibit [d] is a true and accurate copy of this letter sent by Mr. Gunner.

21.     Perkins Schools, Mr. Gunner, Mr. Finn or any other employee implemented even the promised accommodations, but it felled to me to beg for assistance or just continue teaching when episodes occurred.

22.     Perkins Schools, Mr. Gunner, Mr. Finn or any other employee ever disseminated information on how to identify and assist a person with a diabetic disability to students and staff.

23.     Instead of assisting Defendant James P. Gunner and Defendant Stephen P. Finn exhibited very negative attitudes toward me trying to catch me sleeping so as to have an excuse for firing me as a teacher at the Perkins Local School District.

24.   I, therefore filed a timely charge of discrimination with the United States Equal Employment Opportunity Commission, charge number 471-2010-01950.  A true and accurate copy of the charge is attached as Exhibit e.

25.   I received a right to sue letter dated December 16, 2010. I filed my complaint within the time given in this Notice.

26.   In January 2009, I received notice that I was to be evaluated for the third time in the preceding seven months in violation of the CBA.

27.   Again, on or about March 3, 2009, I was notified  that another evaluation wpuld be done the next week.

28.   Upon receiving this notification, I contacted my Perkins Educational Association representative, John Gerber, and requested that he file a grievance on my behalf with respect to the excessive number of evaluations to which I was being subjected.

29.   Immediately after expressing my intent to pursue a grievance, I received a letter from Mr. Finn demanding that I account for my whereabouts during two class periods on February 25, 2009; I was informed that unnamed witnesses claimed to have seen me at a local fast food restaurant during the time in question. What really occurred was that my twin sister had been at the fast food place causing the confusion. However, looking back on the incident  this just shows how Mr. Finn and Mr. Gunner were scrutinizing me in order to force my retirement.

30.   On March 8, 2009, I provided the requested account in writing, denying being at the restaurant and explaining that I had been testing my sugar level via glucometer and injecting herself with insulin in my car in the school parking lot.

31.     My prompt response was entirely ignored, with Mr. Finn sending me another letter on March 15, 2009, indicating that "Since I have not received the written response from you…I have no choice but to notify Superintendent, Mr. Jim Gunner, Perkins Local Schools of this situation." I believe this was just another step in a plan to fire me by creating a false and misleading paper trail.

32.     Based upon this allegation and explicitly without consideration of my explanation, Superintendent Gunner imposed a three-day unpaid suspension on April 2, 2009, bypassing the suspension with pay step of the progressive discipline policy as set forth in the *Collective Bargaining Agreement between the Perkins Educational Association and the Perkins Board of Education.*

33.     On April 7, 2009, I requested from Perkins Local Schools a copy of my personnel file; upon reviewing the file, I discovered that a number of documents had been placed therein without notice and an opportunity to respond as required by the *Collective Bargaining Agreement between the Perkins Educational Association and the Perkins Board of Education.*

34.     Mr. Gunner and Principals Finn and Gasteier working under his supervision made my coming to work stressful and did whatever they could to pressure me to retire from teaching. Examples of their conduct are:

        A .     In August 2009, Principal Gasteier changed my assigned room  to the worse in the building. Room 702 had broken chalk trays, tile coming up from the floors, it was next to a 36" fan on the building which caused terrible noise, the TV did not work, very little bulletin board space, the curtains were torn and hanging from the

rod and the furniture was old and in some cases broken and there was no storage

space . Unlike, other teachers I was simply told of the new assignment .

B.      I was scheduled to teach in distant locations of the buildings giving me

only 4 minutes to get to my next assignment which would make it difficult to reach

my assignment on time because of problems with my knees and eyes. My

granddaughter who went to this school would have to help me to get downstairs to

my next assignment.

C.      I asked Principal Gasteier if I could have my history classes upstairs so as

to solve the problems discussed in ¶B, but his response was simply "Social Studies is

downstairs."

D.      I had the honor for ten years in a row of leading the Senior Class during

commencement, but suddenly with no notice Principal Gasteier told me he got

someone else to do it.

35.     After my termination, Principal Gasteier was given a new position as Director of

Communications to permit him to completed his 30th year toward retirement by Mr.

Gunner.

36.     I was suspended without pay from August 25, 2009 to September 11, 2009 based on

"an ongoing problem" consisting of "the unprofessional conduct of falling asleep,"

again without any of the witnesses thereto having bothered to obtain

contemporaneous verbal confirmation that I was actually asleep and did not merely

appear to be so.  Further, Perkins ordered me to undergo a psychological examination.

This was another step to retaliate and embarrass me to retire or to fire me by creating

a false and misleading paper trail.

37. On or about March 19, 2010, I was engaged in a discussion with my history class regarding yellow journalism; as an example of same, I referred in passing to Playgirl and Playboy Magazines. This entire part of the class lasted no more than five minutes.

38. On March 29, 2010, upon arriving for my teaching duties, I was presented with a letter characterizing the above as "inappropriate discussions with your high school social studies class regarding pornography" and suspending me without pay, effective immediately.

39. On April 1, 2010, I met with the Perkins Educational Association representative and Superintendent Gunner, who informed me of his intention to recommend to the Perkins Board of Education at its next meeting on April 14, 2010 that my teaching contract be terminated based on the classroom discussion in which I had mentioned Playboy and Playgirl Magazines and the purported incidents of Plaintiff falling asleep during school hours.

40. I believe these reasons are just a pretext for firing me because of my age, I was 71 at that time, my disability and that I had requested reasonable accommodations.

41. On April 4, 2010, I spoke with Lisa Crescimano, Treasurer of the Perkins Board of Education, who informed me that the Board intended to terminate my teaching contract at their next meeting and encouraged me to instead retire.

42. The Board did in fact adopt a resolution terminating my teaching contract at its April 14, 2010 meeting.

43. I was informed of the Board's decision via a letter from the Board, signed by Crescimano, the next day, April 15, 2010.

44.   Upon receiving notice of the Board's intent to terminate my employment, I requested

a hearing under Sections 3319.16 and 3319.161 of the Ohio Revised Code, which

hearing was held on July 21-22 and August 11-12 of 2010 before referee Harry Taich.

45.   I did not hold out much hope for reinstatement under this administrative procedure

since the Perkins Educational Association and I had serious conflicts. They withdrew

their own counsel from representing me because of my stated belief that officers of

the union had participated in the plan to force me to retire or fire me. Exhibits [f - j]

are  true and accurate copies of these letters showing the conflict of interest between

the union and myself.

46.   I could not conduct discovery in this 3319.16 process or have my own attorney

represent me as I can in this lawsuit.

47.   I could not raise my claims of intentional infliction of emotional distress, violations of

both federal and state laws or show the alleged reasons for my termination were really

pretext for discrimination or retaliation for taking protected activity.

48.   Nor, in this administrative proceeding could I sue individuals like Mr. Gunner and

Mr. Finn like I am doing in this lawsuit.

49.   After the conclusion of the hearing, on October 9, 2010, the Report and

Recommendation of the Referee was issued, concluding that my termination for cause

was appropriate under the circumstances.

50.   This decision did not make any rulings on the claims being brought under this lawsuit

and it was not appropriate to raise the civil rights claims in this Complaint or  present

all the evidence on these issues for all the reasons discussed in ¶¶ 42-46.

51. Based on advice of my counsel, I elected not to seek judicial review of this tainted administrative proceeding electing to file this litigation instead since it provided me an opportunity to raise all of my claims and bring in individual defendants and request both compensatory and punitive damages not available before referee Taich.

52. The following is my sworn answer given to Defendants Interrogatory number five which is a true and accurate copy.

**INTERROGATORY NO. 5:** Please identify each and every alleged statement which you attribute to any of the named Defendants or their authorized representatives which Plaintiff contends evinces a discriminatory motive, intent or bias related to Plaintiff's age.

**RESPONSE:**

On or about March 6, 2009, I was in ISI duty at Briar when Mr. Finn came in and said he would stay with the kids. Mr. Gunner is in my office and wants to talk to you. I went to his office and he told me to sit down. He started off with, "Quite frankly we don't know what to do with you next year. Your keyboarding program is being eliminated and there are not enough business classes for full time." He proceeded to tell me that his discussions with EHOVE were not going well and he wanted EHOVE programs to be gone at Perkins the next year. I am giving you three choices for next year. You can teach the business classes in the morning and get certification for the DECCA program and we can start our own DECCA next year. The second choice is you can teach half-time business and half-time freshman world history classes. Your third choice is half-time business. He said to my face that he is offering two and a half options and quite frankly he can get two and a half teachers for me. I was quite shocked that he would say that but he did. He then asked me how much longer I planned on teaching. I explained that I wanted to stay until June, 2011 because that would give me the 35 years in the public school system needed for the next step on the retirement scale.

He then told me I had three weeks to think about it and I immediately told him I would be interested in the first option and would be willing to start immediately on the certification necessary to teach the DECCA program.

Two weeks later I got a letter from Mr. Gunner saying that I didn't respond and I would be bumping Jenny Mazza from social studies and be teaching three world history classes in the afternoon. Even though I expressed an interest in option 1, I still had no choice.

This caused much controversy among social studies teachers. They were upset that I bumped Jen Mazza. I believe that Mr. Gunner chose this position to create animosity against me with my fellow teachers.  Further, subsequently I found out they created a spot at the middle school for Jenny Mazza and never posted it or given me an opportunity to respond. During the 2009 - 2010 school year, I was back at the high school teaching half day business and half day world history. An incident occurred starting in November and continuing through February 1st and 2nd.  In the middle of November, a technology workshop was advertised in Columbus for February 1st and 2nd, 2010. I knew I needed to improve on technology, because according to Mr. Gasteier I needed more knowledge on the smartboard. However, I applied for this particular workshop because I knew I would learn a lot. I filled out the application before Thanksgiving and turned it in to Mr. Gasteier. During January there were three or four teachers, who were approved to go because they were talking about it in the faculty lounge.

It got to be one week before the workshop and I saw Mr. Gasteier in the hallway and I stopped him and said, "Chris I applied for the Columbus workshop and haven't heard anything one way or another about my application. He said I won't be going to Columbus. I explained that other teachers were going and I would like to know why I was refused. He really did not have an answer for me. But then he said there was a "free" workshop at the Holiday Inn in Independence, Ohio for the smartboard. If I wanted to I could go there. I told him I would probably get more out of the one in Columbus, Ohio and I know I had my application turned in long before many of the
others did.

He said that he would get my papers signed very quickly for the one in Independence so that is where I went to. This brief conversation ended. However, right after school I was in the records room near the office. Only the guidance secretary saw me. I was looking up names and addresses of the academic challenge team. I knew Mr. Dahlman was in the office. But then I heard Chris Gasteier come in and say to Mr. Dahlman. "Guess who I just had a conversation in the hallway with. Carol Smith. That old lady thinks she's going to Columbus to the technology seminar but I've been sitting on her application since she turned it in." Mr. Dahlman replied, "for how along, a year!" Since she turned it in last November. Who does that witch she think she is. Then someone came into the office and the phone rang. Gasteier answered the phone. Ten minutes later I came out of the records room and was heading to the library with the kids when Mr. Dahlman walked by me. I think he could tell I was crying. He just said, "He Carol", as he walked by me. The next day Mr. Gasteier told me I was going to the free workshop in Independence.  It was for two days, but I would have to go and come home, then go back. The school wouldn't pay for a room under 75 miles away. I talked to my husband about it and the weather happened to be snowy, blustery and cold. He told me to call the hotel and take advantage of the $80 a night rate for members to the conference. The irony was the hotel cost $160 but I got a check for gas and mileage for $155.

The Columbus seminar would have provided me the technology training, especially for the smartboard, that I had been told I was weak in by Mr. Gasteier.  The refusal to let me attend this seminar, and instead sending me to a seminar that was not appropriate, was part of an overall plan by Mr. Gunner and his agents to discourage me and attempt to force me to retire because of my age and disability.

In 2008, Mr. Gunner started the STEM School concept when he arrived at Perkins. He was sending people allover the country to observe STEM schools. Teachers were going to California, and other states they had to fly to. I don't fly to well, so I applied to go to State College, PA to observe but I was denied by Mr. Gunner. I was denied another observation also by Mr. Gunner.  My treatment by Mr. Gunner became worse after I had my attorney Tom Zraik filing a demand for reasonable accommodations.  It was clear to me that I was being treated differently than other teachers because of my age, disability, and taking action to request protection under the disability laws.

At the start of every class I tell my students I have a seeing problem but I still see what goes on in the room I explain I have a sight loss in the right eye and sometimes when they try to explain or show me their work that I have to get directly over it to see it. They either bring their work to my desk and allow me to stand directly over them. We have worked this out to a good understanding.  All of sudden at the end of the 2008 and start of the 2009 school years, there is a rumor I fall asleep in class. Some of the kids even asked me about it. The administration started to accuse me with NO advanced warning or verbal communication about this situation. All of a sudden I was sleeping in class and putting the students safety at risk.

It has always been my objective students first. In a letter dated September 29, 2008, it was stated that Mr. Gasteier and Mr. Dahlman verbally warned me when in fact, they never verbally communicated sleeping and student safety to me.

When I approached Mr. Gasteier about this letter written by Mr. Finn his comment to me was, "I wished he would have never written that." I asked Mr. Gasteier why he never approached me about this issue but he claimed he never had the proof. I replied that they must have had a lot of fun with this in his principal meetings, he claimed they never made fun of me, then he didn't say anything else. I did comment that I felt we were professional enough in the past to approach each other and I was disappointed about the handling of this.

This letter was written by Mr. Finn when he accused me of sleeping in the choir room and in fact, he never saw me asleep in the choir or ISI room nor did I ever sleep in the choir or ISI room. There are many inaccurate accusations in this particular letter. I wish to defend myself against this letter. I just started at the middle school --then the problems began. The rumors of my sleeping in class were the worse in that building and I just started. I knew then and there I was in for it. At this point I went to talk to a lawyer friend of mine, Mr. Thomas Zraik in Toledo, Ohio.

The harassment became constant. I knew I was being scrutinized, my teaching performance was being criticized (I only had one class at the middle school) and all of a sudden teachers and janitors were watching me.  Danielle Fanning claimed I was sleeping in room 115 on September 19, 2009 I shared this room with two other people, Ellen Drum and Tom LNU.  I don't think they ever accused me of sleeping in there. Ms. Fanning carne into that room only once while I taught in there and that was to give me a message that the carts

that the alpha-computers that the sixth graders learned keyboarding on, were being stored in her room because of some maintenance work going on.

After ISI duty started, Mr. Quizno walked into my room one day, walked halfway to my desk, I had my head back and was watching two kids, and I said Hi Mr. Quizno, but he turned around walked out, went to Mr. Finn and told him I was sleeping. He came back into my room ten minutes later, then reported to Mr. Finn that I was awake. After he left, one of the kids even said to me, "he sure doesn't like you does he.?"

When I read, my eyes will narrow, sometimes squint to see, and it looks like I am sleeping. One time in ISI a girl was brazen enough to come up to my desk and take my billfold out of the book bag and tried to take money out of it. It looked like I was sleeping but I watched every move she made. As she reached for the money, I quietly said don't do it and she dropped everything and ran back to her seat.
I reported this to Mr. Quizno but nothing was done. All he said was that she was there for stealing a cell phone from another girl What was she thinking of
When there were no kids in ISI, then I was either working on a computer in the computer lab or in the library where sometimes I was asked to help. There were no reports of my sleeping.

When I went into Mr. Quizno' s office to tell him about the girl taking money from me, Mr. Quizno had his head back on his chair and was snoozing. He never knew I was there. On way out Tammy Dideon, the secretary, said that was quick. I replied that he was snoozing and will be back later. This happened about Nov 5th or 6th of 2008 On Ash Wednesday, February 25, 2009 was a terrible day. I was just back three days from medical leave. I didn 't know the schedule was changing, so what happened was in essence, my own fault. When I realized the schedule changed, I called over to the middle school and asked Dawn Sullivan when my keyboarding class was. She said it was

When Mr. Gunner questioned me about it he didn't believe me that I had a twin sister. I did tell him though it was my fault that I messed up on the schedule. I didn't know we were on a different schedule that day. I simply messed up.

I had an appointment with Dr. Vaschack, and his concern was that I was injecting Myself with insulin in the same spots too many times. He showed me how to stretch out and inject in the groin. So two days later in the parking lot at the middle school, while still on my lunch hour, I stretched my seat out in the car, laid back and injected myself with a shot of insulin in the groin area. It only took about three or four minutes. But the janitor reported to Mr. Finn that I was sleeping in the parking lot. So I was accused of sleeping yet again.

In Mr. Gasteier's private notes about me he accused me of sleeping in an academic challenge practice. In fact, I was looking down and it did look like I was sleeping but I was working a crossword puzzle to ask kids words for vocabulary area of the competition.

In addition to the above statements, Plaintiff is relying on Rule 33(c) since she is producing documents which support her claim of discriminatory and retaliatory motive and bias based on the Plaintiff's age.

All of the following show the disparity in how Carol Smith was treated:

Christine Dinovo - the PEA and the Perkins Board of Education agreed to allow Ms. Dinovo to extend beyond her FMLA rights. Ms. Dinovo had some type of medical condition which forced her inability to work. If a bargaining unit was extended special benefits, why was that not extended to the Plaintiffs condition? The lawyers will need to research a special Memorandum of Understanding that was written specifically for Ms. Dinovo.

Shane Burrows - was disciplined based on a community member describing an incident to which Mr. Burrows was reportedly speaking poorly of administration. This community member chose to remain anonymous. Mr. Burrows discipline was removed based on hearsay. The Plaintiff was reportedly at Wendy's during her lunch period, yet there is no documentation to support this allegation, as the person reporting chose to remain anonymous. This was never removed from the Plaintiffs file. The Lawyers will have to question Mr. Burrows.

Eric Talbot - was a certified teacher at another school district, yet coached during the Perkins Education Association work stoppage in 2006. The Perkins Board of Education agreed to a no retaliation clause at the end of the strike with the Perkins Education Association (PEA). The Perkins Board of Education placed all non Perkins teaching personnel they would be terminated from their positions if they did not report for duty during the strike. Mr. Talbot did not report for duty and subsequently was terminated from his contract. The PEA chose to take their case all the way to a State Employee Relations Board (SERB) for a person that the PEA does not even represent. From this action, it is apparent to the Plaintiff that the PEA had a conscience knowledge and awareness of their ability and responsibility to represent the Plaintiff. This can be found on file in the SERB office.

Jeff Printy - who is the brother of the Board President, was given the opportunity to substitute teach as a full time substitute. This was so Mr. Printy could reach the minimum of 120 days of work to qualify for his 35th year of teaching. This position was created and agreed to, yet the position was never posted as directed to in the Collective Bargaining Agreement. The Plaintiff was never given this opportunity to reach her 35th year of teaching under this arrangement. This is in a special Memorandum of Understanding that should be on file with the Perkins Board of Education.

Donna Fry - Home Ec. Teacher repeatedly reported to her first period class late. This was evidenced by the Plaintiff's granddaughter Hannah Smith and others. The action was so

common and egregious that over time Mr. Chris Gasteier, building principal and immediate supervisor, actually covered for Ms. Fry from time to time. Plaintiff was never given this same level of support, even to the extent that Mr. Gasteier waited for the plaintiff in her room to show up tardy. This can be evidenced by testimony from students in Ms. Fry's first period class and the Plaintiff personnel file.

Tim Obergefell- chose to show a beheading to a high school social studies class under the auspices of current events. This beheading was of American Hostage, Timothy Berg after the US led invasion of Iraq. This incident was picked up by local, regional and national news outlets. However, Mr. Obergefell only received a letter of reprimand for his lack of judgement. The Perkins Board Of Education chose to publicly humiliate the Plaintiff by attempting to terminate her contract for false claims of pornography. This letter can be found in Mr. Obergefell's file.

See responses to Requests for Production No 1, 3, 6, 7, 12, 13, and 14.

FURTHER AFFIANT SAYETH NOT

_Carol Smith_

CAROL SMITH

SWORN TO BEFORE ME and subscribed in my presence at Cleveland, Ohio, this 15th day of October 2011.

NOTARY PUBLIC

EDWARD G. KRAMER
Attorney At Law
NOTARY PUBLIC
STATE OF OHIO
My Commission Has
No Expiration Date
Section 147.03 O.R.C.

EXHIBIIT a



Exhibit b

# THOMAS J. ZRAIK
## ATTORNEY AT LAW

2524 SECOR ROAD
P.O. BOX 2627
TOLEDO, OHIO 43606

PHONE (419) 724-9811
FAX (419) 724-9812
E-MAIL: zraiklaw@bex.net

October 14, 2008

Stephen P. Finn, Principal,
Briar Middle School
3700 South Avenue
Sandusky, Ohio 44870

Re: Carol Smith

### <u>REBUTTAL TO REPRIMAND</u>

Dear Principal Finn:

This letter is a response and rebuttal to your October 6, 2008 "reprimand" of Carol Smith, wherein you determined that my client is guilty of "unprofessional" conduct associated with "sleeping" during class periods.

As my client informed you at the time of your October 2, 2008 conference with her, she has been diagnosed with a disease, specifically "diabetes", which is not altogether controlled with medication at the present time. See letter, attached, from Certified Nurse Practitioner Michele Poulos, R.N., M.S.N., C.N.P., of Northern Ohio Medical Specialists Healthcare. When Mrs. Smith's blood sugar runs too high or too low her body reacts in a manner that can result in symptoms including lethargy, irritability, nausea, sweating, and mood changes. Mrs. Smith is aware of her condition and has consistently worked to control this disease. At times, particularly if she is experiencing elevated blood sugar, Mrs. Smith may appear to be sleeping even though she is awake and fully aware of her surroundings. At such times, she may require simple treatment such as eating a candy bar or, in the event of a more serious reaction, she could require medical attention. However, by working closely with her treating physician and constantly self-monitoring, Mrs. Smith's current medications have been reasonably effective in controlling her symptoms.

Please be advised that Mrs. Smith's diabetes has never prevented her from performing the essential functions of her job, nor has she ever placed any of her students at risk or in harms way as a result of her diabetic symptoms. While she may, at times, have appeared to be "sleeping", she has always been aware of what is going on in the classroom. In particular, Mrs. Smith expressly denies sleeping on the dates identified in your letter of reprimand, with the exception of the September 4, 2008 date. On that day, although she did sleep for approximately ten minutes, she was alone in the choir room at the time and

there were no students present.  Thus, no students were left unsupervised.  In fact, that situation is no different, for example, than you taking a power nap in the middle of the day.  The only difference is that Mrs. Smith cannot close the door.

Instead of reprimanding my client for experiencing symptoms of a medical condition that is difficult to control, it would be far more beneficial to all concerned to provide an accommodation for her in the event her sugar becomes too high or too low. Specifically, if Mrs. Smith appears to be "sleeping" someone such as a teacher or administrator could simply ask if she is okay or if she needs a candy bar or juice.  Sometimes, if her sugar is too low, she may need to take a break to inject herself with insulin.  In a situation like that, Mrs. Smith may need an adult to take her place for five or ten minutes in order to go to a private place to inject herself.  In addition, it would be extremely beneficial for you and your staff to obtain some minimal training on recognizing the signs of Diabetes and understanding its symptoms since to an uninformed person what appears to be drunkenness, sleeping, awkwardness or disorientation are in fact symptoms of uncontrolled blood sugar.

Furthermore, at this time and unless her medical condition becomes far more severe, Mrs. Smith does not require a medical leave.  She is fully capable of performing all the essential functions of her job.  What she does require, however, is to be provided with the relatively simple and reasonable type of accommodation suggested above.  Any further disciplinary action arising out of or in response to knowledge of the symptoms associated with her disability will be considered harassment and/or retaliation.

Finally, please assure a copy of this rebuttal statement is included in Mrs. Smith's employment file and do not hesitate to contact my office if you have any questions.  Your cooperation in this matter will be appreciated.


Respectfully,


Thomas J. Zraik

Cc:
Carol Smith
Superintendent James Gunner
John Gerber, PEA President

Exhibit C

# THOMAS J. ZRAIK
ATTORNEY AT LAW

2524 SECOR ROAD
P.O. BOX 2627
TOLEDO, OHIO 43606

PHONE (419) 724-9811
FAX (419) 724-9812
E-MAIL: zraiklaw@bex.net

October 14, 2008

Superintendent James Gunner
Perkins Local School District
3700 South Avenue
Sandusky, Ohio 44870

Re:   Request for Reasonable Accommodation on Behalf of Carol Smith

Dear Superintendent Gunner:

Pursuant to Title I of the Americans with Disabilities Act, 42 U.S.C. 12101 *et seq.*, and R.C. 4112.02(G) of the Ohio Revised Code, this letter is being sent on behalf of the above named individual, an employee of the Perkins Local School District and member of the Perkins Educational Association ("PEA") to request that the Perkins Local School District ("PLSD") provide Mrs. Smith, a person with a disability, with a reasonable accommodation in order to allow her to perform the essential functions of her duties as teacher in the PLSD.

As you are aware, Mrs. Smith has diabetes.  This is a disease that negatively affects her body's ability to regulate insulin and, as a result, even with medication her blood sugar can on occasion range from abnormally low levels to abnormally high levels.  See letter, attached, from Certified Nurse Practitioner Michele Poulos, R.N., M.S.N., C.N.P., of Northern Ohio Medical Specialists Healthcare.  Occasionally, albeit not frequently, when Mrs. Smith's blood sugar goes beyond normal ranges, she may experience symptoms such as lethargy and disorientation; while if her blood sugar drops too low, she may experience sweating, nausea, irritability or mood swings.  At times, particularly if she is experiencing elevated blood sugar, she may appear to be sleeping even though she is awake and fully aware of her surroundings.

As you know, Principal Stephen P. Finn of Briar Middle School has recently reprimanded Mrs. Smith based on allegations, which Mrs. Smith denies, that she has been observed "sleeping" on multiple occasions.  See Rebuttal, attached.  As a result, and in order to forestall further disciplinary action being taken based on symptoms and/or manifestations of her disability, Mrs. Smith is hereby requesting PLSD to provide a reasonable accommodation such as that outlined below, to wit:

<u>REASONABLE ACCOMMODATION</u>

1. All staff and administrators of PLSD who work directly or in association with Mrs. Smith will become familiar with and trained in recognizing symptoms of diabetes and, when necessary, providing minimal treatment as outlined below.
2. If an individual observes or is informed that Mrs. Smith appears to be asleep, the individual should approach and quietly ask Mrs. Smith if she is in need of assistance.
3. If she responds, ask what she needs or offer to provide her with a drink of water, a candy bar, or juice to help adjust blood sugar.
4. If Mrs. Smith does not respond, repeat step # 2 and, if no further response is made, seek immediate medical assistance by calling 911.
5. If at any time Mrs. Smith is in need of insulin, she may request and will be provided a five to ten minute break in order to inject herself with her insulin medication in privacy.

Please understand these are suggested accommodations and not set in stone.  However, in the event you believe these proposed accommodations are not acceptable, we do request that you initiate further negotiation with Mrs. Smith through this office and with her medical providers in order to develop reasonable accommodations satisfactory to all parties concerned.

Please do not hesitate to contact me if you have any questions regarding this matter. Your cooperation is appreciated.

Respectfully,

Thomas J. Zraik

Cc: Mrs. Carol Smith
Enclosure

# Perkins Public Schools

*Our mission:*   **Perkins Schools.....an exceptional education in a safe, caring environment.**

**Jim Gunner, *Superintendent***                          **Lisa M. Crescimano, *Treasurer***

November 18, 2008

Mrs. Carol Smith
Briar Middle School

Dear Mrs. Smith:

This letter is a follow up to our meeting held on Thursday, October 23rd regarding your request for accommodations with your job because of ongoing diabetes care.  In the meeting, I agreed to the following accommodations as requested:

**Job Accommodations for Mrs. Carol Smith**
- Mrs. Smith will be permitted to ask for classroom coverage when it is necessary to perform an insulin injection.  Insulin injections may be given in the nurse's office to maintain privacy. Mrs. Smith should call the office and ask for a school administrator to cover her class during this time period.
- If Mrs. Smith is having a medical reaction to either a low or high blood sugar, class coverage will be provided until Mrs. Smith feels her blood sugar is under control.  She simply needs to call the office and ask for assistance.
- Mrs. Smith is permitted to conduct blood glucose tests as necessary to monitor her blood glucose level.  The school nurse will conduct an informational session with all of Mrs. Smith's students about diabetes, insulin control, and glucose monitoring to minimize student curiosity in the future.
- Mrs. Smith is permitted to have snacks within her classroom to assist in adjusting for low blood sugar reactions.
- General information on diabetes will be shared with all staff to increase awareness of the disease, warning signs, and typical symptoms of low and high blood sugar levels.

It was emphasized during the meeting that reasonable accommodations such as those listed above would be taken by the school district to assist Mrs. Smith in her diabetic care while teaching. Through these accommodations it was thought that further episodes of disorientation, sleepiness, or verbal outbursts towards students during the supervision of her classes could be avoided. Any further episodes of disorientation, sleepiness or verbal outbursts directed at students on Mrs. Smith's part that impedes her ability to be alert, in charge of her classroom, and respectful of students would be treated as grounds for disciplinary action, or placement on a medical leave of absence to assist in overall better control of her diabetes.

Sincerely,

James P. Gunner

Exhibit d

XC:   Personnel File, Stephen Finn, Principal
      Thomas J. Zraik, Attorney at Law

1210 E. Bogart Road, Sandusky Ohio  44870-6411     Phone: 419-625-0484     Fax: 419-621-2052
Treasurer's Office Phone: 419-625-1261                                      www.perkins.k12.oh.us

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Presented to: Agency(ies) Charge No(s): |
|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC   471-2010-01950 |

Ohio Civil Rights Commission and EEOC
_State or local Agency, if any_

| Name (indicate Mr. Ms. Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| Mrs. Carol Smith | (419) 626-0620 | 08/15/1938 |

| Street Address | City, State and ZIP Code |
|---|---|
| 217 Michigan Avenue | Sandusky, Ohio 44870 |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I believe Discriminated Against Me or Others. (if more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| Perkins Local Schools | More than 300 | (419) 626-0484 |

| Street Address | City, State and ZIP Code |
|---|---|
| 1210 East Bogart Road | Sandusky, Ohio 44870 |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

| DISCRIMINATION BASED ON (Check appropriate box(es).) | DATE(S) DISCRIMINATION TOOK PLACE |
|---|---|
| __ RACE __ COLOR __ SEX __ RELIGION __ NATIONAL ORIGIN<br><br>__ RETALIATION __ AGE [X] DISABILITY __ OTHER (Specify below.) | Earliest: 09/29/2008   Latest: 06/05/2009<br><br>[X] CONTINUING ACTION |

THE PARTICULARS ARE (If additional paper is needed, attached extra sheet(s):

DETROIT DIST. OFFICE
2010 APR -2  A II: 14
EEOC

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLANANT<br><br>_Carol A. Smith_ |
| 3-25-2010     _Carol A. Smith_<br>Date         Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year)<br>3/25/2010 |

Exhibit e

GOVERNMENT OF THE UNITED STATES OF AMERICA
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

In the Matter of:     **Carol Smith v. Perkins Local Schools**

Docket Number:

## COMPLAINT

1.   The Complainant herein is:

    NAME:    Carol Smith

    ADDRESS:   217 Michigan Avenue
                 Sandusky, Ohio 44870

2.   The Respondent is:

    NAME:    Perkins Local Schools

    ADDRESS:   1210 East Bogart Road
                 Sandusky, Ohio 44870

3.   Complainant alleges that Respondent violated Title I of the Americans with
Disabilities Act of 1990, 42 U.S.C. § 12101, et seq. ("ADA"), as amended by the
ADA Amendments Act of 2008, P.L. 110-325 ("ADAAA"), and the Ohio Civil
Rights Act of 1959, O.R.C. 4112.01, et seq., as follows:

    a.   From August 25, 2009 to September 2, 2009 Complainant was suspended
without pay on the basis of her disability.

       (1)   Complainant commenced employment with Respondent in or
around September of 1976.

       (2)   In or around 1980, Respondent issued Complainant a continuing
contract to perform teaching duties at Perkins High School, located
at 3714 South Campbell Street, Sandusky, Ohio 44870.

       (3)   At various times thereafter, Complainant's responsibilities were
periodically increased to include teaching duties at Perkins Middle
School, located at 3700 South Avenue, Sandusky, Ohio 44870.

       (4)   Complainant has been diagnosed with diabetes, a condition which
she has had for approximately seventeen (17) years.

(5)     At all relevant times hereto, and throughout her tenure of employment with Respondent, Complainant was qualified to perform the duties of her positions and carried out such duties in a satisfactory manner.

(6)     By way of illustration and amplification, throughout her employment with Respondent, Complainant consistently received favorable performance reviews and salary increases commensurate with her tenure.

(7)     On September 29, 2008, Complainant received notice of a disciplinary conference to be held with regard to incidents in which Respondent alleged she was found to be sleeping on school premises during the school day.

(8)     Complainant in fact was not sleeping during any of the purported incidents but rather was exhibiting symptoms of high blood sugar due to her diabetic condition.

(9)     The next day, September 30, 2008, Complainant promptly furnished a letter from her healthcare provider to Respondent documenting her disability and explaining its symptoms.

(10)    Nevertheless, on October 6, 2008, Respondent placed a written reprimand predicated on the alleged incidents in Complainant's personnel file.

(11)    Further, on October 8, 2008, Complainant received a memorandum informing her of a scheduled evaluation, first of the many that would be conducted during the time period pertinent hereto in excess of the number of evaluations permitted for teachers on continuing contracts under the *Collective Bargaining Agreement between the Perkins Educational Association and the Perkins Board of Education.*

(12)    On October 14, 2008, Complainant, by and through counsel, submitted a written rebuttal to be placed in her personnel file with the reprimand.

(13)    On the same date, Complainant, by and through counsel, formally requested in writing that reasonable accommodation be made for her disability pursuant to 42 U.S.C. 12101, et seq., and O.R.C. 4112.02(G), to wit:

    (a)    that staff members and administrators of Respondent who work directly or in association with Complainant be made familiar with the symptoms of diabetes;

    (b)    that if an individual observes Complainant appearing to be asleep, that individual approach her and ask if she requires assistance;

    (c)    that if Complainant responds affirmatively, she be assisted in obtaining water, juice, or candy to help adjust her blood sugar;

    (d)    that if Complainant does not respond, emergency medial assistance be summoned; and

    (e)    that Complainant be provided with five- to ten-minute breaks as necessary to inject herself with insulin.

(14)    On November 18, 2008, Respondent responded to Complainant's request for an accommodation as follows:

    (a)    Complainant may keep snacks in the classroom and is permitted to inject herself with insulin in the event of an emergency if she first calls the office, waits for classroom coverage to arrive, and proceeds to the nurse's office to perform the injection;

    (b)    Information will be provided to staff and to Complainant's students regarding diabetes, warning signs, and symptoms of low and high blood sugar levels.

(15)    Respondent's purported accommodation conspicuously failed to address Complainant's request that verbal confirmation be obtained in the event that she appears to be asleep; rather, the response specifically states that "further episodes of disorientation [or] sleepiness...would be treated as grounds for disciplinary action."

(16)    Further, Respondent failed to disseminate information on Complainant's disability as it had agreed, instead informing Complainant that it was her responsibility to do so.

(17)    In or around January of 2009, Complainant received notice that she was to be evaluated for the third time in the preceding seven months.

(18)    Complainant requested that her union representative, John Gerber, file a grievance on her behalf with respect to the excessive number of evaluations that were being conducted in order to uncover pretext for subjecting her to adverse employment action on the basis of her disability.

(19)    Gerber failed to respond to Complainant's request or to pursue the grievance.

(20)    On or about March 3, 2009, Complainant was notified yet again that she would be evaluated the following week; again she requested that a grievance be filed and again Gerber took no action.

(21)    Two days later, on March 5, 2009, Complainant received a letter from Perkins Middle School Principal Stephen Finn demanding that she account for her whereabouts during two class periods on February 25, 2009; Complainant was contemporaneously verbally informed that witnesses claimed to have seen her at a local fast food restaurant during the time in question.

(22)    Complainant provided the requested account in writing on March 8, 2009, explaining that she had been testing her sugar level via glucometer and injecting herself with insulin.

(23)    Despite this prompt response, on March 15, 2009, Complainant received another letter from Finn stating that "Since I have not received the written response from you…I have no choice but to notify Superintendent, Mr. Jim Gunner, Perkins Local Schools of this situation."

(24)    Based upon this allegation, and explicitly without consideration of Complainant's explanation, Respondent imposed a three-day unpaid suspension on April 2, 2009, bypassing the suspension with pay step of its progressive discipline policy.

(25)    Complainant again requested that John Gerber grieve the suspension on her behalf but received a noncommittal response and the grievance was not pursued.

(26)    On April 7, 2009, Complainant requested from Respondent a copy of her personnel file; upon reviewing the file she discovered that a number of documents had been placed therein without notice and an opportunity to respond in violation of the Collective Bargaining Agreement.

(27)  Complainant again requested that a grievance be filed on her behalf and again received no response from Gerber.

(28)  Finally, Complainant was suspended without pay from August 25, 2009 through September 2, 2009 based upon "an ongoing problem" consisting of "the unprofessional conduct of falling asleep," again without any of the witnesses thereto having bothered to obtain contemporaneous verbal confirmation that she was actually asleep and did not merely appear to be so. Respondent further ordered Complainant to undergo a psychological examination.

(29)  The actions of Respondent herein, specifically including but not limited to the imposition of suspensions and the harassing conduct to which Complainant has been subjected, constitute adverse employment actions.

(30)  Complainant's disability was a motivating factor in each of the adverse employment actions described herein, and but for Complainant's disability she would not have been subjected to such actions.

(31)  Respondent fabricated bases for subjecting Complainant to adverse employment actions based upon her disability.

(32)  Respondent's articulated bases for subjecting Complainant to adverse employment actions are pretext, the true motivation being her disability.

(33)  The actions and inactions also violated 42 U.S.C.A. § 12203(b) since they were an attempt to interfere, coerce and intimidate the Complainant for her requesting reasonable accommodations.

b.  Complainant is presently facing termination of employment based upon her disability, retaliation and interference, coercion, or intimidation

(1)  On or about March 26, 2010, Complainant was engaged in a discussion with her class regarding sensationalistic journalism; as an example of same, Complainant referred in passing to Playboy magazine.

(2)  On March 29, 2010, upon arriving for her teaching duties, Complainant was presented with a letter characterizing the above as "inappropriate discussions with your high school studies class regarding pornography" and suspending her with pay effective immediately.

(3)     Respondent's gross mischaracterization of the discussion in question is merely another pretext for subjecting Complainant to adverse employment actions based upon her disability.

(4)     A disciplinary hearing regarding the matter is set for April 1, 2010



*Attorneys & Counselors At Law*

5550 W. Central Avenue
P.O. Box 352170
Toledo, OH 43635-2170
(419) 537-1954
1-800-537-1954
Fax (419) 535-7732
www.kiflaw.com

4981 Cascade Rd. S.E.
Grand Rapids, MI 49546
(616) 940-1911
1-800-538-1954
Fax (616) 940-1942
www.kiflaw.com

Krista D. Abbott***
Robert Epstein
Jay E. Feldstein*
Donato S. Iorio*
Fillipe S. Iorio**

Ted Iorio*
Christine A. Reardon
Edward J. Stechschulte
Bethany German Zivtski

All Admitted in Ohio except,
* Admitted in Ohio and Michigan
** Admitted in Michigan and Illinois only
*** Admitted in Michigan only

PLEASE RESPOND TO:

P. O. Box 352170
Toledo, Ohio 43635-2170

May 28, 2010

*Via U.S. Postal Service*
*Express Mail*
Ms. Carol Smith
217 Michigan Avenue
Sandusky, OH 44870-5766

Re:     Status of Representation Question

Dear Ms. Smith:

I attempted to reach you by phone today to report on the status of our efforts to resolve the representation/conflict issue. This will provide an update in the event we are unable to speak before the long weekend.

This firm's research confirms that we have a conflict in representing you in your termination matter. We are researching whether other options are viable. That is taking a bit of time, but we are mindful of your desire to move forward quickly so that your termination hearing may be concluded before the beginning of the 2010-2011 school year. I expect to have more definitive information to you by the middle of next week.

Meanwhile, the Referee set a June 1 date for the disclosure of any expert witnesses. Though this date is not called for under 3319.16 (the statute governing termination) and is not referenced in the Referee's pre-hearing order, in order to protect your interests while the representation matter is being addressed, I did not want the deadline to pass without taking any action. Accordingly, I have sent a fax to the Referee (copy enclosed) to move this date.

Exhibit F

Burton A. Kalniz Inactive in Ohio

Ms. Carol Smith
May 28, 2010
Page 2

Thank you for your patience as we address this representation matter.

Very truly yours,

**KALNIZ, IORIO & FELDSTEIN, CO., L.P.A.**

By: _Christine A. Reardon_

Christine A. Reardon

CAR/smf
Enclosure
cc:     Airica Clay
        Rose Keller (09695z)

Mrs. Carol Smith
217 Michigan Avenue
Sandusky, Ohio 44870-5766

June 1, 2010

Ms. Christine A. Reardon, Esq.
Kalniz, Iorio & Feldstein, Co., L.P.A.
5550 West Central Avenue
P.O. Box 352170
Toledo, Ohio 43635-2170

*Via Facsimile (419) 535-7732*

Re:     **Status of Representation Question**

Dear Ms. Reardon:

I am in receipt of your letter of May 28 in which you claim that you have a conflict of interest with respect to representing me in the arbitration styled *In the Matter of Carol Smith and Perkins Local School District*. I find this assertion to be simply unbelievable. I do not see how the union's failure to adequately represent me in prior disciplinary hearings could possibly relieve it of its obligation to provide representation for the arbitration, nor do I understand how the union's attorney could have a conflict of interest with regard to a matter in which the union is not a party. I request that I be provided with the bases for these conclusions as soon as possible.

Nevertheless, given that you refuse to assist me, I request that the representation issue be resolved by permitting me to hire private counsel at the OEA's expense, thereby satisfying both the union's obligation to provide representation and my own need for an advocate who will work to protect my interests. Please advise immediately as to whether this will be possible and, if so, the steps I will need to take in order to secure an agreement with the OEA to this effect.

Sincerely,

Carol Smith

Exhibit g



Attorneys & Counselors At Law

5550 W. Central Avenue
P.O. Box 352170
Toledo, OH 43635-2170
(419) 537-1954
1-800-537-1954
Fax (419) 535-7732
www.kiflaw.com

4981 Cascade Rd. S.E.
Grand Rapids, MI 49546
(616) 940-1911
1-800-538-1954
Fax (616) 940-1942
www.kiflaw.com

Krista D. Abbott****
Robert Epstein
Jay E. Feldstein*
Donato S. Iorio*
Filipe S. Iorio**

Ted Iorio*
Christine A. Reardon
Edward J. Stechschulte
Bethany German Zivíski

All Admitted in Ohio except,
* Admitted in Ohio and Michigan
** Admitted in Michigan and Illinois only
*** Admitted in Michigan only

PLEASE RESPOND TO:    **P. O. Box 352170
Toledo, Ohio 43635-2170**

June 1, 2010

Ms. Carol Smith
217 Michigan Avenue
Sandusky, OH 44870-5766

Re:    **Representation Issue**

Dear Ms. Smith:

I regret to inform you that Kalniz, Iorio & Feldstein, Co. L.P.A. will not be able to provide you with any further legal advice in regard to your R.C. 3319.16 termination hearing, and this firm must withdraw from representing you.

The first basis for this action is this firm's conflict of interest. On May 19, 2010, you confirmed that you wish to present certain allegations and arguments in the course of your R.C. 3319.16 hearing—specifically, arguments related to an insurance matter involving other Perkins teachers who were clients of this office and arguments concerning the Perkins Education Association's representation of you after the strike. In view of these allegations and arguments, this firm's representation of you would give rise to a conflict of interest in relation to past clients, and in relation to our continuing representation of the Ohio Education Association (OEA) and its affiliate, the Perkins Education Association (PEA).

The second basis for this action is a conflict under the terms of the OEA/NEA Legal Services Program (Revised August 2008) (hereinafter "Program document"). This firm consulted with Rachelle Johnson, Esq., OEA Assistant Executive Director Member Services-Program and Director of Legal Services. Ms. Johnson confirms, and has authorized this office to advise you, that all OEA program attorney law firms would have a conflict under the OEA/NEA Legal Services Program to the extent your arguments support a position contrary to the PEA or other PEA members. These general exclusions are addressed in Article I.F.1. of the Program document.[1] As a result, if you intend to

---

[1] *See* Appendix A, attached hereto.

Burton A. Kalniz Inactive In Ohio

Exhibit 4

Ms. Carol Smith
June 1, 2010
Page 2

advance arguments contrary to the PEA or other PEA members, the OEA Legal Services Program is unable to simply assign this matter to another OEA program attorney law firm.  We have been authorized by the OEA to advise you that you will have to retain private counsel outside of the OEA Legal Services Program.

**As it relates to the OEA Legal Services Program's determination, you have the right to appeal that decision pursuant to Article XI of the Program document[2] within thirty days after the date that you receive this letter.** Please feel free to contact Rachelle Johnson at OEA Legal Services (614-227-3016) with any questions concerning your appeal rights or the Legal Services Program's coverage.

In theory, it **may** be possible to draft a waiver agreement wherein you agree to forego the arguments giving rise to the conflict and have Kalniz, Iorio & Feldstein Co. L.P.A. (or another OEA program attorney law firm) represent you in the termination hearing without making the specified arguments. The agreement would also have to waive any claims against the firm and the OEA and its affiliates for not raising these particular arguments on your behalf at the termination hearing. However, in order to explore this option, you would need to retain **independent legal counsel** at your cost to advise you as to whether such an agreement is in your best interests, and to advise you regarding the terms that must be included in such an agreement to adequately protect you.

In summary, if you wish to be represented by legal counsel in the R.C. 3319.16 hearing, you will need to retain private counsel. That counsel may (1) take over your representation entirely, or (2) work with this office toward a waiver agreement that would allow Kalniz, Iorio and Feldstein, Co. L.P.A. (or another OEA program attorney law firm) to represent you without addressing the conflict-generating arguments.

Please know that this decision was not made lightly by either this office or the OEA. Every effort was made to find a way to continue representation in a manner that would protect the interests of all parties and be consistent with the Rules of Professional Responsibility and the OEA/NEA Legal Services Program.

If the hearing dates or other timelines related to your hearing need to be moved in order for you to secure counsel and/or discuss a waiver agreement, this office will inform the referee that an issue has arisen and more time is needed, and will take all other steps necessary to protect your interests in the pending termination matter.

---

[2] *See* Appendix B, attached hereto.

Ms. Carol Smith
June 1, 2010
Page 3

I will be happy to explain the matters set forth in this letter to you or your independent counsel, and to specify the steps that will need to be taken to protect your interests in regard to the R.C. §3319.16 referee's hearing (e.g., a request for postponement of timelines for exchange of witnesses/documents and/or hearing dates). In the course of doing so, I will not be able to provide further legal advice.

Very truly yours,

KALNIZ, IORIO & FELDSTEIN, CO., L.P.A.

By: _Christine A. Reardon_____
      Christine A. Reardon

Attachments
cc:   Airica Clay
     Rose Keller (09695z)

F. <u>General Exclusions</u>

1.  In addition to the coverage limitations described in the appropriate section, in general, legal services under the program will not be provided in any matter which involves support of a position contrary to the policies of the OEA, the NEA, or their affiliates, or in any judicial or administrative proceeding where the adverse parties are one or more of the following: affiliated districts, affiliated locals; employees, officers, agents, or members of affiliated districts or locals, except when acting as an administrative officer of the employer; the OEA; employees, officers, or agents of the OEA; the NEA; employees, officers, or agents of the NEA; members of the OEA or NEA, except when acting as an administrative officer of the employer. Requests for OEA/NEA financial or legal assistance in such cases shall be made in writing, decided upon by the Program Director or his/her designee, and are subject to appeal in accordance with the procedures described in Section XI herein.  Provided, however, that when a member or non-member brings an administrative or judicial action against an affiliated local; officers or members of affiliated locals; and/or members of the affiliated local, the OEA or NEA, and the basis for such action is the charge that there has been a failure or breach in their duty to fairly represent all public employees in a bargaining unit, then legal services will be provided under the program to the party or parties charged.

# Appendix A

XI. Appeals Procedures

A. If an affiliate or member believes that an OEA employee has not complied with the policy provisions of this program or that the decision made by an OEA employee or agent was arbitrary or capricious, the affiliate or member may appeal the alleged noncompliance or alleged arbitrary and capricious decision as follows:

1. If an application for first-level assistance, as defined in Section 1 (D), was rejected, the appeal request must be submitted within thirty (30) days of the date of the denial notification at each appeal level.

2. If an application for the appeal of an adverse decision is rejected under Section IX of the Legal Services Program, the appeal request must be submitted within ten (10) days of the date of the denial notification at each appeal level.

3. Such appeal shall be communicated by the affiliate or member to the office of the OEA/NEA Legal Services Program. The OEA Executive Director, the OEA President, and the OEA Vice-President shall consider an appeal and make a determination of the issue within a reasonable time. If the affiliate or member so requests, if possible, the determination shall be reported to the affiliate or member within 24 hours of the receipt of the appeal in the office of the OEA Executive Director.

4. In the event the affiliate or member finds the determination rendered by the individuals in (3) above unacceptable, the affiliate or member may request the OEA Board of Directors to make a final determination of the issue at its next meeting. The Business/Support/Administration Core Function Committee of the Board of Directors shall review the request and make a recommendation to the OEA Board of Directors before a final determination is made.

B. Affiliates or members shall be promptly informed of the determination made pursuant to (A) (3) of this section and informed of the right to appeal the determination to the OEA Board of Directors under (A) (4) of this section if the (A) (3) determination is unacceptable. Affiliates or individual applicants shall be promptly informed of the determination of the OEA Board of Directors made pursuant to (A) (4) of this section. If the OEA Board of Directors denies the appeal, the applicant shall be informed of the right to appeal to the NEA within 90 days of the date on which the OEA Board of Directors made its decision, and on the sole ground that the OEA failed to process the application for legal assistance in accordance with the provisions of its legal services program.

C. The Program Director or his/her designee shall promptly send copies of all rejected applications for legal assistance to the NEA, and, if requested by the NEA, supporting materials.

# Appendix B



**OHIO EDUCATION ASSOCIATION**

Patricia Frost-Brooks, President
William Leibensperger, Vice President
Jim Timlin, Secretary-Treasurer
Larry E. Wicks, Executive Director

*The OEA will lead the way for continuous improvement of public education while advocating for members and the learners they serve.*

June 4, 2010

Ms. Carol Smith
217 Michigan Avenue
Sandusky, OH  44870-5766

Re:    Your June 1, 2010 letter to Kalniz, Iorio & Feldstein Co., L.P.A.

Dear Ms. Smith:

Kalniz, Iorio & Feldstein Co., L.P.A., has forwarded a copy of your above-referenced letter. It appears that your letter was sent before you would have received the firm's June 1, 2010 letter, which provides further information regarding the basis of the conflict and process for appeal. You should have received that letter via overnight mail on June 2, 2010.

I would like to clarify that the Legal Services Program assigned Kalniz, Iorio & Feldstein Co., L.P.A. to represent you in the R.C. §3319.16 statutory hearing procedure. The R.C. §3319.16 statutory hearing is not an "arbitration." Legal representation in a statutory termination hearing is a benefit of membership under the OEA Legal Services Program. The Legal Services Program's benefits are separate from the Local Association's representation and contract enforcement responsibilities under the collective bargaining agreement.

An exception to the Program's coverage arises when a potentially adverse party is an OEA/NEA affiliated local association and/or a member of an OEA/NEA affiliated local association. It is a rare occurrence when such a conflict arises, and it is unfortunate that it has occurred in your case. As a result, the OEA cannot provide legal services, nor does the policy provide funding for services by an outside attorney where this type of conflict has arisen.

Please feel free to contact me or to have your legal counsel do so if you wish to discuss the matter further.

Very truly yours,

OHIO EDUCATION ASSOCIATION

Rachelle E. Johnson, Esq.
Assistant Executive Director - Member Services/Program

cc:  Christine Reardon, Esq.
     Rose Keller, Manager of Legal Services
     Airica Clay, LRC

*Exhibit i*

225 E. Broad St., Box 2550, Columbus, OH 43216 ■ PHONE: (614) 228-4526 or 1-800-282-1500 ■ FAX: (614) 228-8771
An Affiliate of the National Education Association

*Kramer & Associates,* A Legal Professional Association

The Jeremiah Ensworth House • 3214 Prospect Avenue, East
Cleveland, Ohio 44115-2601
(216) 431-5300 • Facsimile: (216) 431- 6149

June 11, 2010

Ms. Rachelle E. Johnson, Esq.
Assistant Executive Director – Member Services/Program
Ohio Educational Association
225 East Broad Street, Box 2550
Columbus, Ohio 43216

*Via Facsimile (614) 228-~~1526~~ 8771* jb

**Re:    Carol Smith**

Dear Ms. Johnson:

I am writing to request clarification and reconsideration of your letter of June 4 informing Ms. Smith that the OEA will not provide her with representation at her R.C. § 3319.16 statutory hearing based on a purported conflict of interest.

First, can you please provide me with the pertinent provisions of the Legal Services Program policies and procedures?  The basis for the conflict of interest is entirely unclear as no "OEA/NEA affiliated local association and/or a member" of same is a "potentially adverse party" in this matter.  It seems fairly obvious that the only adverse party to Ms. Smith's termination proceeding is her employer.  Can you please explain the interest OEA has in this proceeding which you claim to be adverse to that of Ms. Smith?

Secondly, is there a procedure for appealing the OEA's decision with regard to this matter?

Finally, does the NEA have an equivalent legal services program of which Ms. Smith may be able to avail herself?

Thank you for your prompt attention to this matter.  As you know, time is very much of the essence.  Should you have any questions or concerns, please do not hesitate to contact me directly at (216) 645-5675.

Sincerely yours,

Michael Aten
Of Counsel

Exhibit j