**Page 1**

```
 1          IN THE UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF OHIO
 2                  WESTERN DIVISION

 3   CAROL ANN SMITH,           :

 4        Plaintiff            :

 5   -vs-                      :   No. 3:11-CV-00560

 6   PERKINS BOARD OF EDUCATION,:
     et al.,
 7                             :
          Defendants            - - - - -
 8
 9   Deposition of CAROL ANN SMITH, the Plaintiff

10   herein, taken by the Defendant as upon

11   cross-examination before Lori L. Delhees,

12   Stenotype Reporter and Notary Public in and for

13   the State of Ohio, at the Law Offices of Murray &

14   Murray Co., L.P.A., 111 East Shoreline Drive,

15   Sandusky, Ohio on January 24, 2014 at 9:30 a.m.

16   pursuant to Notice.

17                  - - - - -
18
19
20
21
22
23
24
25
```

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

**Page 2**

APPEARANCES:

Paul T. Belazis, Esquire
MALONE, AULT & FARELL
7654 W. Bancroft Street
Toledo, Ohio 43617

On behalf of Plaintiff

Teresa L. Grigsby, Esquire
SPENGLER NATHANSON, P.L.L.
Four SeaGate
Suite 400
Toledo, Ohio 43604-2622

On behalf of Defendants

ALSO PRESENT: Dr. Jim Gunner

- - - - -

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

**Page 3**

INDEX

Cross-examination by Ms. Grigsby        5

EXHIBITS
Defendants' Exhibits
1, Letter, 3/21/03                        46
2, Letter, 9/14/05                        49
3, Letter, 9/29/08                        82
4, Letter From Michele Poulos, 9/30/08    97
5, Letter, 10/6/08                        99
6, Letter, 10/14/08                       99
7, Letter, 10/6/08                        99
8, Letter, 10/14/08, Request For
   Reasonable Accommodation               114
9, Letter, 10/17/08                       115
10, Letter, 11/18/08                      116
11, Response To Interrogatories For
    Production Of Documents               129
12, Collective Bargaining Agreement       160
13, Letter, 3/15/09                       164
14, Letter, 3/8/08                        167
15, Letter, 3/27/09                       172

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

**Page 4**

Cont'd Defendants' Exhibits
16, Letter, 4/2/09                        175
17, E-mail, 5/27/09                       186
18, Letter, 6/1/09                        193
19, Letter, 6/5/09                        194
20, Letter, 6/15/09                       195
21, Letter, 6/19/09                       203
22, Letter, 7/8/09, Fit For Duty Examination 205
23, Letter, 6/19/09                       216
24, Photographs                           233
25, Letter, 7/8/09                        240
26, Letter, 7/28/09                       241
27, Letter, 3/29/10                       242
28, Letter, 3/30/10                       243
28A, Letter, 4/5/10                       252
29, Letter, 4/13/10                       248
30, Letter, 4/14/10                       257
31, Report & Recommendation of Referee Taich 258

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

5

1
2      **CAROL ANN SMITH**, of lawful age, the
3      Plaintiff herein, called by the Defendant
4      as upon cross-examination, pursuant to the
5      Rules of Civil Procedure, being first duly
6      sworn according to law, was examined and
7      testified as follows:
8      **CROSS-EXAMINATION OF CAROL ANN SMITH**
9      **BY MS. GRIGSBY:**
10 Q   Good morning, Mrs. Smith.
11 A   **Good morning.**
12 Q   We met before. I'm Teresa Gribsby. I am an
13      attorney in Toledo, Ohio, and I represent the
14      Perkins Local Schools. We're here today to take
15      your deposition. Have you ever been deposed
16      before?
17 A   **No.**
18 Q   Okay. I'm going to be asking you a series of
19      questions, I ask that you tell me if you don't
20      understand the question.
21 A   **Okay.**
22 Q   Otherwise I will assume that you do understand
23      the question. If at any time you need to take a
24      break, just ask me to do so and I'll be happy to
25      accommodate that. If you need to confer with

6

2      your attorney, please let me know that, but
3      answer the question that's pending before you do
4      so, fair enough?
5 A   **Yes.**
6 Q   Any questions about the procedure?
7 A   **No.**
8 Q   Is there any reason why you cannot give me full
9      and accurate testimony today?
10 A   **No.**
11 Q   Are you taking any medications that might prevent
12      you from being clear and accurate in your
13      testimony?
14 A   **Maybe.**
15 Q   Okay. If you feel that your medication is
16      inhibiting your ability to testify clearly and
17      accurate, will you tell me?
18 A   **Yes.**
19 Q   Because I'm happy to take a break at any time.
20 A   **Okay.**
21 Q   I'd like to start with a little bit of background
22      information. How old are you at present?
23 A   **75.**
24 Q   How old were you when your employment with
25      Perkins Schools terminated?
26 A   **71.**

7

1 Q   What is your current residential address?
2 A   **217 Michigan Avenue, Sandusky, Ohio, 44870.**
3 Q   Can you give me the dates, the time frame, during
4      which you were employed as a teacher at Perkins
5      Schools?
6 A   **September of 1976 to March of 2010.**
7 Q   Is that the date that you stopped working or the
8      date that you were actually terminated?
9 A   **The day that I stopped working.**
10 Q   And what was the date that you actually were
11      terminated?
12 A   **November.**
13        MR. BELAZIS: If you remember.
14        THE WITNESS: Pardon?
15        MR. BELAZIS: If you remember just tell
16      her; if you don't remember, tell her you don't
17      remember.
18 A   **Probably November of 2010.**
19 Q   November of 2010?
20 A   **Uh-huh.**
21 Q   Thank you. In what year did you receive a
22      continuing contract as a teacher at Perkins?
23 A   **I think in 1980.**
24 Q   Have you ever been employed by -- as a teacher,
25      by a school or a school district other than the

8

1      Perkins Local Schools?
2 A   **Yes.**
3 Q   Can you tell me what school employed you and the
4      time frame that that took place?
5 A   **St. Paul's High School in Norwalk from September**
6      **of '72 to June of '76 -- no, I'm sorry, '75.**
7 Q   And then is that the only school district that,
8      or school by which you've been employed, other
9      than Perkins?
10 A   **Yes.**
11 Q   Were it not for your termination what had been
12      your retirement plans?
13 A   **To teach until 2011.**
14 Q   Through the conclusion of the 2010-2011 school
15      year?
16 A   **Yes.**
17 Q   Now I need to ask you a couple questions and I
18      regret that I have to ask the question. It's my
19      understanding that your son, Christopher, has
20      passed away since the filing of this lawsuit?
21 A   **Yes.**
22 Q   And that he was formerly a member of the Board of
23      Education?
24 A   **Yes.**
25 Q   I want to tell you how sorry I am for your

**9**

1    loss --
2  A  Thank you.
3  Q  -- having a son myself.  But I need to ask you
4     whether you and Chris ever discussed the
5     allegations of this suit?
A  I don't understand what you're saying.
Q  Did you and he ever have conversations about the
8     issues involved in this lawsuit in which you
9     discussed what may have occurred in Board of
10    Education meetings?
11 A  No.
12 Q  Have you talked with anybody else, other than
13    your attorneys and your husband, about the
14    allegations that are involved in this lawsuit?
15 A  Yes.
16 Q  With whom have you spoken?
17 A  My children.
18 Q  And do any of your children, other than Chris,
19    did any of them have access to information
20    pertinent to the school's decision making
21    concerning your employment?
22 A  No.
23 Q  Have you spoken with anybody who is employed by
24    the Perkins Schools about the allegations of this
25    suit?

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

**10**

A  Pardon me?
2  Q  Have you spoken with anybody who's employed by
3     the Perkins Local Schools about the allegations
4     you're making in this suit?
5  A  You mean that work right at Perkins?
6  Q  Yes, ma'am.
7  A  Yes.
8  Q  And with whom have you spoken?
9  A  The union people.
10 Q  Okay.  About the fact that you were bringing this
11    lawsuit?
12 A  Well, I filed grievances.
13 Q  Okay.  You had conversations with union personnel
14    contemporaneous with the event about the
15    allegations of this suit?
16 A  Maybe.
17 Q  Okay.
18 A  I'm not sure if you -- I'm not sure.
19 Q  And so that would be your union president,
20    Mr. Gerber?
21 A  Yes.
22 Q  Anybody else?
23 A  Yes.
24 Q  Who else associated with the union did you speak?
A  Tom Kinsel.

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

**11**

1  Q  When did you speak with Tom?
2  A  When I was at the junior high.
3  Q  Would that have been the 2007-2008 school year?
4  A  No.
5  Q  No?
6  A  That would have been in 2008 to 2009.
7  Q  Okay.  And what was his role with the union at
8     that time?
9  A  He was -- I don't -- he was an officer, but I'm
10    not sure which one.
11 Q  During the period of roughly 2007 to 2010, was
12    Mr. Gerber president of the union the entire
13    time?
14 A  No.
15 Q  Okay.  What was --
16 A  You know, I'm not sure.
17 Q  Okay.
18 A  I'm going to qualify that.
19 Q  But Mr. Kinsel, he was in leadership, but you
20    just don't know his role?
21 A  That's correct.
22 Q  But am I correct in understanding that your
23    conversations with both Mr. Gerber and Mr. Kinsel
24    occurred at the time of the events in question
25    and have not occurred since your termination?

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

**12**

1  A  Yes.
2  Q  I'm correct in that understanding?
3  A  Yes.
4  Q  Okay.  Now, since you have left your employment
5     at Perkins how have you been spending your time?
6  A  This is four years now, almost.  I -- how have I
7     been spending my time?  Busy with grandchildren,
8     I go to Indiana to visit my son and his family,
9     I maintain my house, I help my children when they
10    need help, I like to participate and watch them
11    with sports, I -- what else do you need to know?
12 Q  Well, have you sought employment or been employed
13    since the --
14 A  No.
15 Q  -- termination of your employment?
16 A  No.
17 Q  The activities you just described, I assume them
18    to be rewarding and fulfilling?
19 A  Somewhat.
20 Q  What is your understanding of the claims that you
21    are pursuing in this lawsuit?
22 A  My understanding of the claims that I am
23    pursuing --
24     MR. BELAZIS:  What she's asking you
25 for, just to stand an objection, what she's

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

13

1  asking you for is really something that requires
2  an understanding of the law, in other words,
3  she's asking you for a legal conclusion. And
4  she's also asking you, she's using the word which
5  you referred to as a claim, assuming that you
   understand even what a claim is.
7        THE WITNESS: Yes.
8  A  **I understand that I did not get the**
9     **accommodations that I needed for some things that**
10    **are wrong with me.**
11 Q  Okay. Do you have an understanding of whether or
12    not there are any other concerns that are being
13    pursued in this lawsuit?
14       MR. BELAZIS: The same objection.
15 Q  I'm sorry?
16 A  **Other concerns that are being pursued in this**
17    **law?**
18 Q  Yes. Are there other concerns that you are
19    seeking to have re-addressed in this lawsuit?
20 A  **Other than?**
21 Q  Other than what you just told me.
22 A  **The accommodations, well, let me think here.**
23    **That I think they made it a little difficult**
24    **sometimes for me to do my job.**
25 Q  Okay. Again, related to a physical issue?
           HUNTLEY REPORTING SERVICE
                419-626-4039
                800-247-8360

14

1  A  **Yes.**
2  Q  Okay.
3  A  **And so -- yes.**
4  Q  Okay.
5        MR. BELAZIS: Also our claims are set
6  forth in our complaint.
7        MS. GRIGSBY: Understood. Well, I did
8  want to clarify on the record, that although your
9  Complaint, your amended Complaint contains a
10 claim for age discrimination, based upon the
11 Court of Appeal's ruling, my understanding is
12 that that is not going to be actively pursued?
13       MR. BELAZIS: That's right. Unless
14 there's some other legal basis that, that would
15 allow it and, you know, we can't -- I wouldn't
16 completely rule that out. But at least the
17 grounds asserted by the Court of Appeals, or
18 addressed by the Court of Appeals, those issues
19 have been resolved subject to, I suppose, to an
20 appeal to the United States Supreme Court, the
21 Sixth Circuit decision with regard to the age
22 discrimination issue.
23       MS. GRIGSBY: Okay.
24    BY MS. GRIGSBY:
   Q  Mrs. Smith, I know in your teacher termination
           HUNTLEY REPORTING SERVICE
                419-626-4039
                800-247-8360

15

1  hearing you described yourself, and you and your
2  family as Perkins people?
3  A  **Yes.**
4  Q  What did you mean by that? What did you mean
5  that "We're Perkins people?"
6  A  **We're very dedicated to the Perkins Schools**
7     **System.**
8  Q  How long have you and your family lived in the
9  Perkins School System?
10 A  **Since 1967.**
11 Q  And apart from your son, Chris, who did serve on
12    the school board and who was a coach, have others
13    been involved either as an employee or a
14    volunteer for the Perkins School?
15 A  **Yes. I know my daughter, Ros, takes a lot of**
16    **photographs for them and I know she's constantly**
17    **handing those pictures to the kids, giving them**
18    **to them. My daughter, Angie, was a volunteer**
19    **room mother and volunteered and those are the**
20    **three of my children that were involved in the**
21    **Perkins Schools.**
22 Q  So as a result, is it fair to say that you've
23    developed a lot of a close knit relationships
24    within the Perkins School community?
25 A  **You mean friendships?**
           HUNTLEY REPORTING SERVICE
                419-626-4039
                800-247-8360

16

1  Q  Relationships, close knit relationships?
2  A  **Well, maybe. You know, my main concern was**
3     **taking care of my family and going to work**
4     **everyday, I don't know if you have much time for**
5     **that.**
6  Q  Now, I think you told me earlier that it was in
7  November of 2010 that you were formally
8  terminated and you stopped working for Perkins
9  earlier in the year, I believe you said in March;
10 is that correct?
11 A  **I stopped working, yes.**
12 Q  During the period between the date that you
13    stopped working and the date you were actually
14    informed of your formal termination as a final
15    matter, were you, did you receive pay from the
16    Perkins Local Schools?
17 A  **I received -- yes, I received one check, I forgot**
18    **for how much, but it was -- I even forgot about**
19    **it, it wasn't for a lot of money, but.**
20 Q  When you were placed on suspension pending the
21    resolution of the termination proceedings, did
22    you continue to receive your salary, just for the
23    record?
24 A  **No.**
25 Q  Okay. Since the date of your termination, have
           HUNTLEY REPORTING SERVICE
                419-626-4039
                800-247-8360

17

1 you applied for and received retirement
2 from the State Teachers Retirement System?
3 A **Yes.**
4 Q What is the amount of your monthly pension
5 benefit?
6 A **Geez --**
7 MR. BELAZIS: If you remember.
8 A **It's around, it's a little over 4,000.**
9 Q Per month?
10 A **Uh-huh.**
11 Q What is the nature of your health insure benefit?
12 A **I have to pay for myself and my husband.**
13 Q How much do you pay per month?
14 A **You know, without my form -- I don't know, it's**
15 **over 400. It's between $400 and $500.**
16 Q Now, as to the nature of the benefits that you
17 receive, are the health benefits that you
18 received now in any way inferior to the benefits
19 that you received while you were employed?
20 A **No.**
21 Q Apart from your pension and, you know, the
22 availability of the health insurance for which
23 you pay roughly 400 a month, do you receive any
24 other benefits from the State Retirement System,
25 Teachers Retirement System?

18

1 A **No.**
2 Q And are the benefits that you're receiving part
3 of a defined benefit plan, to your understanding?
4 MR. BELAZIS: If you know what a
5 defined benefit plan is.
6 THE WITNESS: No, I don't.
7 BY MS. GRIGSBY:
8 Q You don't know one way or the other?
9 A **No.**
10 Q Okay. Since the date that you last received --
11 well, since the date that you were last employed
12 by Perkins, have you sought employment by any
13 other public entity so as to earn additional
14 service credits?
15 A **No.**
16 Q You've made no efforts to find such employment?
17 A **No.**
18 Q And I believe you told me earlier that you had
19 not sought any private employment; is that
20 correct?
21 A **Correct.**
22 Q Okay. Now, your complaint -- I'm sorry, go
23 ahead, if you want to amend that.
24 A **Yes, I do. I did apply at my church for a**
**bookkeeper's job.**

19

1 Q And what church was that?
2 A **St. Peter's and Paul's.**
3 Q In?
4 A **Sandusky.**
5 Q And did you receive that position?
6 A **No.**
7 Q Okay. Were you advised as to why you did not
8 receive the position?
9 A **Yes. She felt that somebody had more experience.**
10 Q In the --
11 A **Bookkeeper.**
12 Q -- area of the bookkeeping?
13 A **Uh-huh.**
14 Q When did you make that application?
15 A **Oh, gees. Oh --**
16 Q Roughly?
17 A **-- maybe September or October.**
18 Q Of this year?
19 A **No, last year.**
20 Q Okay. 2013?
21 A **Uh-huh.**
22 Q Of course. I'm sorry. But other than that
23 application to your church for the bookkeeper
24 position, you've made no applications for
25 employment?

20

1 A **No.**
2 Q Of any sort since your termination?
3 A **No.**
4 Q Your complaint refers to two particular physical
5 conditions, diabetes and then issues related to a
6 cataract surgery and subsequent --
7 A **Yes.**
8 Q -- follow-up problems. My first question to you
9 is, are you basing your disability claims in this
10 case on any other physical condition than those
11 two?
12 A **Mobility.**
13 Q Okay. You claim that you have mobility issues?
14 A **Uh-huh. Yes.**
15 Q Are those secondary to your diabetes?
16 A **No.**
17 Q Okay.
18 A **Oh, some are.**
19 Q Okay. Can you be very specific about the
20 mobility issues and what you believe are related
21 to the diabetes and what you believe are not?
22 MR. BELAZIS: Before you answer, you're
23 asking her for a -- your question calls for a
24 medical opinion, she's not qualified to provide
25 those. You can just tell her your understanding.

21

BY MS. GRIBSBY:

2 Q    That's what I'm looking for, your personal
3      understanding.
4 A    **The neuropathy in my feet.**
5 Q    Uh-huh.
6 A    **It's very bad in my feet and up my legs.**
7 Q    And that is secondary to diabetes, correct?
8 A    **No, I think it's caused from diabetes.**
9 Q    That's what I meant.
10 A   **Okay.  And in my arms.**
11 Q   So you have --
12 A   **Neuropathy.**
13 Q   -- neuropathy in both your lower extremities and
14     your hands, which are related to the diabetes?
15 A   **Yes.**
16 Q   When did those conditions first begin to manifest
17     themselves?
18 A   **Oh, boy.  Probably -- oh, it's been awhile now.**
19     **I can't give you an exact date, but it's been a**
20     **very long time.  If you want me to give you a**
21     **time frame --**
22 Q   That would be useful.
23 A   **-- probably in the late 90's, in the middle 90's,**
24     **late 90's.**
25 Q   And that would be with regard to both the hands

22

and the feet?

2 A    **No, the feet and the legs.**
3 Q    Okay.  And did that condition then progress and
4      become --
5 A    **Yes, it's, you know, the older you get it**
6      **progresses.**
7 Q    Right.  And then with regard to your hands, when
8      did you first begin to notice the symptoms?
9 A    **It's been a few years now.  I can't give you an**
10     **exact date.  You know, this is something I talk**
11     **about with my doctor.**
12 Q   Would that be before or after your termination
13     that you began to develop issues with your hands?
14 A   **It was manifesting itself before I left.**
15 Q   Okay.  Did you ever advise anybody at the Perkins
16     Local Schools that you had hand issues related to
17     your diabetes?
18 A   **Well, you know, I don't usually talk about my**
19     **personal health problems.  I do what I have to do**
20     **to survive, but I'm not a person who talks about**
21     **them very much.  I did mention to Mr. Gasteier**
22     **that I have neuropathy in my hands and feet,**
23     **mostly feet at that time, and he said to me that**
24     **he understands, he's diabetic.**
25 Q   He too is diabetic?

23

1 A    Uh-huh.
2 Q    Mr. Gasteier?
3 A    Uh-huh.
4 Q    When did you have that conversation with him?
5 A    **Oh, I think it was -- oh, boy, you ask for dates**
6      **on conversations here.**
7 Q    The best you can.
8 A    **Okay.  And this is going back to after my eye**
9      **surgeries.**
10 Q   And would that have been in the 2005 time frame?
11 A   **Maybe later.**
12 Q   Okay.  How much later do you think?
13 A   **Oh, not much later.  I knew that I had to wear a**
14     **patch for my eye and he asked me one day about**
15     **the patch and we were comparing health problems.**
16 Q   With diabetes?
17 A   **Uh-huh.**
18 Q   You both suffering from that?
19 A   **Uh-huh.**
20 Q   Okay.  And that was in the time frame when you
21     were wearing the patch as a result of the
22     cataract surgery complications?
23 A   **Yes.**
24 Q   Okay.
25 A   **It wasn't a result of the cataract surgery, it**

24

1      was a result of what happened after that.
2 Q    The staff infection that followed the surgery?
3 A    **Yes.**
4 Q    So in terms of your understanding of the physical
5      conditions that are the foundation for this suit,
6      it's the diabetes and the neuropathy and the eye
7      conditions?
8 A    **Diabetes, neuropathy, the eye conditions, and**
9      **part of the osteoarthritis.**
10 Q   So when were you diagnosed with arthritis?
11 A   **Probably, again, in the mid 90's.  I had to**
12     **resign tennis because of it.**
13 Q   Have you had any conversations with Perkins
14     Schools administrators about your arthritis
15     issues?
16 A   **I don't remember.**
17 Q   Okay.  Have you ever -- do you claim now or have
18     you ever claimed that you have a physical problem
19     that affects your sleeping, such as sleep apnea
20     or some other form?
21 A   **Yes.**
22 Q   Are you claiming in this lawsuit that you have a
23     physical problem that affects your sleeping?
24 A   **I'm claiming in this lawsuit things that led up**
25     **to all of these things, the bariatric surgery,**

25

| | |
|---|---|
| 1 | the osteo, the eye surgeries. Yes, I guess I |
| 2 | had sleep apnea, but I don't know how he wrote |
| 3 | the complaint. |
| 4 Q | Well, I'm asking your understanding. At the time |
| 5 | that you were employed by Perkins Schools, do you |
| 6 | consider that you had a physical disability |
| 7 | related to a sleeping problem? |
| 8 A | No. |
| 9 Q | And therefore, you never sought any |
| 10 | accommodations to deal with a sleeping problem, |
| 11 | correct? |
| 12 A | Well, yes. As far as the diabetes goes, is that |
| 13 | what you -- |
| 14 Q | Well, I'm separating diabetes and a sleeping |
| 15 | problem in which you -- a sleeping problem |
| 16 | which -- |
| 17 A | My sleeping problem was controlled. |
| 18 Q | Okay. So your sleeping problem was controlled |
| 19 | and was not the reason why you sought |
| 20 | accommodations rather? |
| 21 A | No. |
| 22 Q | Okay. Is my statement correct? |
| 23 A | No. |
| 24 Q | Okay. Did you seek accommodations as a result of |
| 25 | a physical problem related to sleeping as opposed |

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

26

| | |
|---|---|
| 1 | to diabetes? |
| 2 | MR. BELAZIS: Do you understand what |
| 3 | she's asking you? |
| 4 | THE WITNESS: No, I don't. |
| 5 | MR. BELAZIS: I think you're confusing |
| 6 | her. |
| 7 | BY MS. GRIGSBY: |
| 8 Q | Okay, well, let me put it -- I know the position |
| 9 | that you've taken in the past has been that you |
| 10 | have given the appearance of being asleep when |
| 11 | you're resting your eyes? |
| 12 A | Yes. |
| 13 Q | But you're not really sleeping? |
| 14 A | No. I know what's going on. |
| 15 Q | Okay. So with that being the case, that you're |
| 16 | not really sleeping, do you agree that you've |
| 17 | never sought accommodations because you have a |
| 18 | physical problem that causes you to actually |
| 19 | sleep? |
| 20 A | I still don't understand your question. Can you |
| 21 | say it in less words? |
| 22 Q | Yes, I'm going to try. Your position has always |
| 23 | been that when people accused you of sleeping -- |
| 24 A | Yes. |
| 25 Q | -- you've not really been asleep? |

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

27

| | |
|---|---|
| 1 A | That's correct. |
| 2 Q | Okay. Have you ever taken the position that "I |
| 3 | do fall asleep at inappropriate times and, |
| 4 | therefore, I need accommodations to deal with |
| 5 | that sleeping problem;" have you ever taken that |
| 6 | position? |
| 7 A | In the beginning Mr. -- no. |
| 8 Q | Okay. |
| 9 A | In my mind, no. |
| 10 Q | Okay. And so your consistent position has always |
| 11 | been "I don't have a problem falling asleep at |
| 12 | inappropriate times?" |
| 13 | MR. BELAZIS: I think she's already |
| 14 | answered that. |
| 15 | MS. GRIGSBY: I just want to make sure |
| 16 | I understand it again. |
| 17 Q | That is your position? |
| 18 A | Yes. |
| 19 Q | Okay. Now, concerning your diabetes, a few |
| 20 | generalized questions about -- |
| 21 A | Can we go back to that last question again? |
| 22 Q | Sure. We can have the reporter read it back. |
| 23 | THEREUPON, the Reporter read the requested |
| 24 | portion of the record. |
| 25 A | I don't have a problem falling asleep at |

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

28

| | |
|---|---|
| 1 | inappropriate times. |
| 2 Q | Is that a true statement? |
| 3 A | No, it's kind of a -- |
| 4 Q | Is it the way the statement is worded that you |
| 5 | find confusing? |
| 6 A | Yes. |
| 7 Q | Okay. Do you have a physical problem that causes |
| 8 | you to actually fall asleep at inappropriate |
| 9 | times, as opposed to giving the appearance of |
| 10 | sleeping? |
| 11 A | No. |
| 12 Q | Okay. |
| 13 A | Yes -- I still don't -- you're trying to -- |
| 14 Q | I'm not trying to confuse you, honestly, I'm not. |
| 15 | I want the record to be just as clear as you do. |
| 16 A | Okay. |
| 17 Q | Okay? |
| 18 A | Then could you reword that statement? |
| 19 | MR. BELAZIS: Can we just stipulate to |
| 20 | this, because I don't think there's that much of |
| 21 | an issue? |
| 22 | Ms GRIGSBY: Okay. Can we agree, |
| 23 | counsel, that -- |
| 24 | MR. BELAZIS: We're not claiming that |
| 25 | she has a physical problem -- |

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

29

```
1         MS. GRIGSBY:  Problem.
2         MR. BELAZIS:  -- that causes her to
3    fall asleep at inappropriate times and she's, to
4    the best of my knowledge, not sought
5    accommodations for that kind of problem.
6         MS. GRIGSBY:  Very good.  Thank you,
7    sir.
8    BY MS. GRIGSBY:
9  Q  Let's talk about your diabetes.
10 A  Okay.
11 Q  My understanding, based on some of the documents
12   that I've seen, is that you were diagnosed with
13   diabetes in 1992?
14 A  Yes, that's about the time.
15 Q  And from 1992 to 1999 that you were not insulin
16   dependant, that came about the 1999 time frame?
17 A  No.
18 Q  No?
19 A  It came a little sooner than that.
20 Q  When?
21 A  Maybe around '96 or '97.
22 Q  Okay.  At the point of your diagnosis did you
23   take any steps to inform your superiors at
24   Perkins of your condition?
25 A  Yes.
```

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

30

```
1  Q  Anything other than the conversation you had with
2    Mr. Gasteier that we spoke of earlier?
3  A  No.  I think I told -- I'm trying to think who
4    was principal.  Mr. Scheckelhoff knew.  Let's see
5    who was after Scheckelhoff, I'm trying to think.
6    Mr. Scheckelhoff knew and Mr. Gasteier knew.
7  Q  And in that mid 90's time frame they were made
8    aware?
9  A  In fact, all my principals knew that I was
10   diabetic from the time I was diagnosed.
11 Q  Okay.  And from the period of, let's say, the
12   decade of the 2000 through 2008, did your
13   diabetes limit your ability to perform your job
14   as a teacher?
15 A  I don't think so.
16 Q  Okay.
17 A  There are -- no.  No.
18 Q  Okay.  And prior to 2008, in the fall of 2008,
19   had you sought or requested any accommodations to
20   enable you to perform the functions of your job
21   as a result of your diabetes?
22 A  Yes.  I looked for accommodations to test my
23   sugar and take my insulin.
24 Q  And we're going to talk about that.  The requests
     that were made through your attorney, Mr. Zraik
```

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

31

```
1    is that what you're referring to?
2  A  No, I -- No, that's -- I needed a place to go and
3    test my sugar and take my insulin.
4  Q  And did you have conversations with the school
5    administrators about that prior to your, the
6    request that were made through Mr. Zraik?
7  A  Yes.
8  Q  Okay.  When did you make those requests?
9  A  Oh, geez.  Mr. Gasteier gave me an accommodation
10   at the high school and that was in -- I can't
11   remember the date.
12 Q  But it was sometime prior to the fall of 2008
13   when Mr. Zraik became involved on your behalf?
14 A  Yes, I had -- yes.
15 Q  And when you requested a place that you might go
16   to perform the insulin injections, what
17   accommodations were you given?
18 A  At the high school?
19 Q  Yes, ma'am.
20 A  Mr. Gasteier gave me the key.  There was an
21   upstairs bathroom not being used and he gave me
22   the key and it was very private --
23 Q  Okay.
24 A  -- and I was able to do very well there.
25 Q  Okay.  And was that accommodation ever withdrawn?
```

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

32

```
1  A  No.
2  Q  Okay.  I'd like to talk a bit about the issues
3    related to your eye condition.
4  A  Okay.
5  Q  Reviewing your discovery responses, it appears
6    that you've been treated by a Dr. Shields, a
7    Dr. Gans, and a Dr. Sears --
8  A  Uh-huh.
9  Q  -- for issues related to your eyes?
10 A  Yes.
11 Q  Can you tell me, you know, which -- what kind of
12   care was provided, or treatment was provided, by
13   each of these individuals?  I mean, is one an
14   optometrist, an ophthalmologist, can you kind of
15   just give me a little thumbnail sketch on what
16   each did you for you?
17 A  Dr. Shields removed the cataract.
18 Q  Uh-huh.
19 A  And four days later I went blind in that eye.
20 Q  In which eye was that?
21 A  The right eye.
22 Q  Okay.
23 A  And he did not know what he was looking at and
24   immediately sent me to the Cole Institute at the
25   Cleveland Clinic.
```

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

33

| 1 | Q | And that was in 2005? |
| 2 | A | That was in -- yes. |
| 3 | Q | The summer of 2005? |
| 4 | A | July of 2005. |
| 5 | Q | July of 2005. So after this complication that |
|   |   | followed removal of the cataract, you were sent |
|   |   | to the Cole Eye Clinic and who did you see there? |
| 8 | A | Dr. Ufret and Dr. Sears -- |
| 9 | Q | Okay. |
| 10 | A | -- first. |
| 11 | Q | And what did they do for you? |
| 12 | A | It was an intense, a very intense, program of |
| 13 |   | antibiotics in the eye every hour around the |
| 14 |   | clock, and I was there everyday of the week for |
| 15 |   | two weeks. |
| 16 | Q | Okay. Again, in the summer of 2005? |
| 17 | A | Yes. |
| 18 | Q | Okay. And were you released then after two weeks |
| 19 |   | from their care? |
| 20 | A | I have not been released since. |
| 21 | Q | Okay. So after the two-week regimen of |
| 22 |   | medication to deal with the infection, what |
| 23 |   | happened next concerning your eye? |
| 24 | A | It was the first day back to school, August 25th |
| 25 |   | of 2005, and I had a, just an intense pain behind |

34

| | | the eye, and my department head walked in and she |
| 2 | | said, "Carol, you look terrible." And I said, |
| 3 | | "Jan, I have pain," and she says, "Go call your |
| 4 | | doctor," and he made me come right there. |
| 5 | Q | Okay. |
| 6 | A | And that was the first emergency surgery. |
| 7 | Q | And that was the first day of school in the |
| 8 | | 2005-2006? |
| 9 | A | I had lost my sight until I got there again. |
| 10 | Q | Okay. And you had some emergency surgery in that |
| 11 | | late August time frame of 2005? |
| 12 | A | Yes. Uh-huh. |
| 13 | Q | Okay. How many other surgeries have you had |
| 14 | | since that one -- |
| 15 | A | In November -- |
| 16 | Q | -- concerning your eyes? |
| 17 | A | In November of 2005 I had, it's called a |
| 18 | | vitrectomy, and it -- they actually took the eye |
| 19 | | apart to remove a membrane and Dr. Sears said if |
| 20 | | they didn't get that off I would be permanently |
| 21 | | blind in that eye. |
| 22 | Q | So you had this vis -- |
| 23 | A | It's a vistrectomy. |
| 24 | Q | -- vistrectomy in August of 2005? |
|   | A | No, that was in November. |

35

| 1 | Q | November of 2005? |
| 2 | A | Uh-huh. |
| 3 | Q | That's your second emergency surgery? |
| 4 | A | That was not an emergency, he knew that he had to |
| 5 | | take that off -- |
| 6 | Q | Okay. |
| 7 | A | -- and he just set a date as it progressed. |
| 8 | Q | Okay. I see. Okay. Have you had any other |
| 9 | | surgeries? |
| 10 | A | On this eye? |
| 11 | Q | Or either of them. |
| 12 | A | Yes. In the following spring of 2006 the |
| 13 | | infection pushed the eye to the right and they |
| 14 | | had to operate on some muscles to put it back |
| 15 | | into place. |
| 16 | Q | To pull it into place? |
| 17 | A | Uh-huh. I forgot what it was called, I forgot. |
| 18 | Q | So is the 2006 surgery the last surgery you had |
| 19 | | concerning your eyes? |
| 20 | A | Yes, but he just informed me I'm going to need |
| 21 | | another one. |
| 22 | Q | And that's sometime here in 20 -- |
| 23 | A | It will be this year. |
| 24 | Q | -- 14? |
| 25 | A | Uh-huh. |

36

| 1 | Q | Okay. But from the time period of 2006, to your |
| 2 | | termination in 2010, you had no further eye |
| 3 | | surgeries? |
| 4 | A | No. |
| 5 | Q | Now, Dr. Sears, you told me about a Dr. Shields, |
| 6 | | who is Dr. Gans. |
| 7 | A | Dr. Gans did the first emergency surgery, the |
| 8 | | date, done August 25th. |
| 9 | Q | After your surgery in 2006, for, to pull the eye |
| 10 | | back into place -- |
| 11 | A | Uh-huh. |
| 12 | Q | -- how frequently did you seek treatment at the |
| 13 | | Cole Eye Institute? |
| 14 | A | Dr. Sears for two, I think it was two years after |
| 15 | | that saw me twice a year, and then last year and |
| 16 | | this year it's been once a year. |
| 17 | Q | Okay. So from the conclusion of your surgery in |
| 18 | | 2006 to 2010 you had two visits a year at the |
| 19 | | Cole Eye Institute? |
| 20 | A | No -- I don't know. Let's see, 2006, 7, 8. I |
| 21 | | know I had two visits. I can't remember 2009. |
| 22 | | In 2010 I think I only had one. |
| 23 | Q | Okay. And were those sort of checkups, just |
| 24 | | monitoring your condition? |
| 25 | A | Yes. The last couple have been, yes. |

37

1     MR. BELAZIS: Theresa, when you get

2 past the eye questions regarding the eye issue

3 can we take a break?

4     MS. GRIGSBY: We can do it right now.

5     THEREUPON, there was a brief recess.

6 Q  Okay, are you ready to resume?

7 A  **Yes.**

8 Q  What information, other than the conversation you

9 had with Mr. Gasteier concerning the patch, what

10 information did you provide school administrators

11 at Perkins concerning the eye surgeries and the

12 complications from the cataract removal?

13 A  **Well, since I wore the patch Mr. Gasteier asked**

14    **me why I wore the patch --**

15 Q  Sure.

16 A  **-- and I told him.**

17 Q  Okay. Did you have any other conversations with

18 other administrators concerning those issues?

19     MR. BELAZIS: At what point?

20     MS. GRIGSBY: At any time.

21 A  **With Dr. Gunner.**

22 Q  When did you have conversations with Dr. Gunner

23 about the complications from the cataract

24 surgery?

25 A  **When he asked me in his office.**

    HUNTLEY REPORTING SERVICE
    419-626-4039
    800-247-8360

38

1 Q  When did that happen?

2 A  **Oh, probably in -- I'm trying to think, '09, '08,**

3    **January of '08.**

4 Q  Was it during a meeting with Mr. Zraik, or some

5 other time?

6 A  **Yes.**

7 Q  You had a meeting at one point with Dr. Gunner

8 and your attorney, Mr. Zraik?

9 A  **Uh-huh.**

10 Q  And is it your testimony that during the course

11 of that meeting you mentioned that you have eye

12 issues that are related to the cataract removal

13 and subsequent complications?

14 A  **Geez, I don't remember all that.**

15 Q  Okay.

16 A  **I don't re -- I remember the meeting --**

17 Q  Okay.

18 A  **-- the actual meeting, but everything that was**

19    **said, I know that I told him the physical**

20    **problems that I had.**

21 Q  Did those problems -- I assume you reported about

22 the diabetes, you discussed that with him?

23 A  **The diabetes. Yes.**

24 Q  And do you have a specific recollection, one way

or the other, of whether or not you also talked

    HUNTLEY REPORTING SERVICE
    419-626-4039
    800-247-8360

39

1 about the issues related to the cataract removal

2 and the --

3 A  **Just, he talked mostly about the diabetes,**

4    **because he told me that he had a daughter that**

5    **was on the pump and he knew all about the**

6    **diabetes, and I could, that -- and he told me**

7    **pointblank that I -- he said I don't need to**

8    **explain the disease to him.**

9 Q  Because he had some understanding due to personal

10 experience?

11 A  **Yes.**

12 Q  Okay. But do you have any particular

13 recollection of a discussion concerning the

14 cataract removal and the subsequent

15 complications?

16     MR. BELAZIS: You mean at that

17 particular time?

18     THE WITNESS: A time with Mr. Zraik?

19 Q  At anytime with Mr. Gunner, or Dr. Gunner?

20 A  **Yes.**

21 Q  So was it during that meeting or another meeting?

22 A  **It was not with the meeting with Mr. Zraik, it**

23    **was another meeting, but I can't remember when.**

24 Q  Okay. And was it before or after the meeting

25 with Mr. Zraik?

    HUNTLEY REPORTING SERVICE
    419-626-4039
    800-247-8360

40

1 A  **After.**

2 Q  And was it in connection with your termination?

3 A  **Not on the day he made me leave the building.**

4 Q  It was sometime --

5 A  **Before that.**

6 Q  -- before that?

7 A  **Uh-huh.**

8 Q  Was it in connection with any particular

9 disciplinary incident?

10 A  **The termination?**

11 Q  No. No. This discussion that you had with

12 Dr. Gunner concerning the removal of the cataract

13 and subsequent complications?

14 A  **I believe it was at one of the disciplinary**

15    **conferences.**

16 Q  Do you know what issue of discipline was

17 discussed at that conference?

18 A  **That I was sleeping.**

19 Q  Do you know what incident in particular was

20 referenced?

21 A  **There were -- he accused me of so many incidents.**

22    **No, I can't remember, I'm sorry.**

23 Q  But one of these discussions about allegations

24 that you were sleeping, you believe you had a

25 conversation with Dr. Gunner concerning the

    HUNTLEY REPORTING SERVICE
    419-626-4039
    800-247-8360

41

1    cataract surgery?

2 A    **Uh-huh.**

3 Q    What was said and tell me everything you can

4    remember about that conversation?

5 A    **I can't re -- you know, I can't remember**

6    **everything we discussed in those meetings**

7    **anymore, this is four years now.  I think it was**

8    **the -- I think it was the meeting he had with me**

9    **in his office when he discussed my, the following**

10    **year possibilities, 2009-2010 possibilities,**

11    **because he asked me about my, he called them**

12    **handicaps.**

13 Q    Okay.  So you had a conversation with Mr. Finn

14    and Dr. Gunner in anticipation of the 2009-2010

15    school year?

16 A    **Not with Mr. Finn, with Dr. Gunner.**

17 Q    Was anybody else present for the conversation?

18 A    **Just Dr. Gunner and myself.**

19 Q    And you had a conversation in which you were

20    discussing what your teaching duties would be the

21    following year?

22 A    **Yes.**

23 Q    Okay.  And during the course of that conversation

24    there was some discussion of handicaps that you

25    might have?

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

42

1 A    **No.  Just briefly he mentioned my diabetes, my**

2    **eyes, and if it's affecting my teaching.**

3 Q    And he asked you that question?

4 A    **No, he commented on it, he did not make a**

5    **question.**

6 Q    What did he say?

7 A    **He says that, you know, he's concerned about a**

8    **lot of things, if I'm able do the job, because I**

9    **have all of these issues with diabetes, with**

10    **neuropathy, with eyes, and then he proceeded to**

11    **offer me two and a half opportunities.**

12 Q    Okay.  And how did you respond to his inquiry

13    about his concerns?

14 A    **I told him that my eyes are okay, I can see, and**

15    **I told him that my diabetes is under control, and**

16    **I told him that I was able to fulfill my teaching**

17    **duties.**

18 Q    Okay.  A side note, just, was it Dr. Elias

19    Traboulsi who performed --

20 A    **-- Dr. Traboulsi.**

21 Q    -- Traboulsi that performed the recision?

22 A    **Yes.**

23 Q    Okay.  I just wanted to make sure of that.

24 A    **I'm not sure how to say that.**

25 Q    Now, do you know what year Dr. Gunner arrived to

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

43

1    assume the position of superintendent?

2 A    **I believe it was in the summer of 2008.**

3 Q    Going into the 2008-09 school year.

4 A    **Yes.**

5 Q    Is it true that after you received a continuing

6    contract in 1980 you were actually not formally

7    evaluated each year?

8 A    **I think the contract said for continuing teachers**

9    **it was every three years.**

10 Q    And as a matter of fact, is it true, that you

11    were not formerly evaluated every single year

12    from 1980 forward?

13 A    **No, I was evaluated almost every year there for**

14    **awhile.**

15 Q    Were there years that you were not formerly

16    evaluated?

17 A    **Yes.**

18 Q    Based upon what I read in the transcript from the

19    termination hearing, it appeared that there were

20    no formal evaluations from 1999 to June 2007; is

21    that correct?

22 A    **I don't know.  I'm not sure.**

23 Q    Okay.  What is your recollection of evaluations

24    during the 1999 to June 2007 time period?

25 A    **I know that there were once or twice that I got a**

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

44

1    **notice that I was going to be evaluated.**

2 Q    And did that come to pass?

3 A    **You know, I can't remember, because Mr. Gasteier**

4    **was in my room a couple of times and I don't know**

5    **if he was there to evaluate or not.  I'm sure it**

6    **was -- I'm not sure.**

7 Q    Okay.  Is it fair to say, from 1999 to June of

8    2007, there were very few formal evaluations

9    conducted of you?

10 A    **Yes.**

11 Q    In retrospect, do you think that is, the failure

12    to conduct regular evaluations, was something

13    that the prior superintendent let drop?

14 A    **I don't think so, at all.**

15 Q    Okay.  You think that the prior superintendent

16    was, had no concerns with the fact that you had

17    very few evaluations during that time period?

18 A    **I don't know, I can't answer that.**

19 Q    Prior to Dr. Gunner's arrival did any school

20    administrator ever express any performance

21    concerns to you?

22 A    **Steve Finn did at the junior high.**

23 Q    What did Mr. Finn speak with you about?

24 A    **I only had one little tiny keyboarding class**

25    **there and he told me that I should be walking**

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

45

| | | |
|---|---|---|
| 1 | | around the room, that -- I can't remember, I |
| 2 | | would have to look at that evaluation. |
| 3 | Q | When did that evaluation take place? |
| 4 | A | That was one of them in the last year that I was |
| 5 | | there. |
| 6 | Q | What year was that? |
| 7 | A | 2000 -- or that was the second last year. |
| 8 | | 2008-2009. |
| 9 | Q | That would have been subsequent to Dr. Gunner's |
| 10 | | arrival? |
| 11 | A | No, it was after Dr. Gunner's arrival. |
| 12 | Q | It was after Dr. Gunner's arrival? |
| 13 | A | Yes. |
| 14 | Q | Okay.  And my question -- |
| 15 | A | Or it was 2 -- yeah, 2008-2009, it was when I was |
| 16 | | at the junior high, 2010. |
| 17 | Q | And I'm sorry, perhaps you misunderstood my |
| 18 | | question.  My question was, did any school |
| 19 | | administrators express performance concerns to |
| 20 | | you prior to Dr. Gunner's arrival? |
| 21 | A | No. |
| 22 | Q | Okay.  Did Assistant Principal Mark Dahlmann |
| 23 | | expressed concerns to you that you had left |
| 24 | | students unsupervised, instead of going to lunch, |
| 25 | | sometime in 2003? |

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

46

| | | |
|---|---|---|
| 1 | A | Where were they unsupervised? |
| 2 | Q | Maybe this will help. |
| 3 | | MS. GRIGSBY:  Let's mark this as an |
| 4 | | exhibit.  And let the record reflect there are |
| 5 | | some board exhibit numbers which should be |
| 6 | | disregarded.  We're going to utilize Defendants' |
| 7 | | Exhibit 1. |
| 8 | | THEREUPON, Defendants' Exhibit 1 was marked for |
| 9 | | identification. |
| 10 | Q | And tell me when you're ready. |
| 11 | A | Were you talking to me? |
| 12 | Q | Yes, ma'am. |
| 13 | A | I'm sorry. |
| 14 | Q | When you're ready, just let me know when you've |
| 15 | | had adequate time to review that. |
| 16 | A | You know, I don't remember three males and a girl |
| 17 | | sitting on my desk or around my desk.  I do |
| 18 | | remember my computer, which was not accessible to |
| 19 | | the kids, because every time I left my room it |
| 20 | | was off. |
| 21 | Q | Let me ask you a question. |
| 22 | A | What? |
| 23 | Q | Do you recognize this document? |
| 24 | A | Yes, I do.  Yes, I do. |
| 25 | Q | And is this a memorandum that -- |

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

47

| | | |
|---|---|---|
| 1 | A | That Mr. Dahlmann wrote to me. |
| 2 | Q | On the date of roughly March 21, 2003? |
| 3 | A | Yes. |
| 4 | Q | Okay. |
| 5 | A | And he saw me in the workroom upstairs, it was |
| 6 | | right next door to my room, I was copying some |
| 7 | | papers.  But, yes, I would sometimes run down to |
| 8 | | the lunch room and get something and run back |
| 9 | | upstairs to copy papers and to work and things. |
| 10 | Q | He's reporting about a situation in which you |
| 11 | | were in one room and the students were in another |
| 12 | | room? |
| 13 | A | Right next door, right. |
| 14 | Q | Okay.  And he's recounting what he observed -- |
| 15 | A | Uh-huh. |
| 16 | Q | -- when you were absent from the room? |
| 17 | A | Right. |
| 18 | Q | Okay. |
| 19 | A | But I don't remember four students in there, and |
| 20 | | I told him that when he went over this with me. |
| 21 | Q | Okay.  So you did go over these concerns with him |
| 22 | | and he reviewed -- |
| 23 | A | Well, he gave this to me to read -- |
| 24 | Q | Okay. |
| 25 | A | -- and I told him that I don't remember four |

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

48

| | | |
|---|---|---|
| 1 | | students being in there. |
| 2 | Q | Okay.  But this is something you received prior |
| 3 | | to Dr. Gunner's arrival? |
| 4 | A | Well, it says, "March 21, 2003." |
| 5 | Q | Okay.  Is there something about the memo you wish |
| 6 | | to elaborate on? |
| 7 | A | Yes.  It says, "The students in your room were |
| 8 | | playing games."  Did he say what kind of games? |
| 9 | | It certainly wasn't computer games. |
| 10 | | MR. BELAZIS:  Carol, just answer the |
| 11 | | question she's asking. |
| 12 | | THE WITNESS:  Okay.  I'm sorry. |
| 13 | A | What was the question? |
| 14 | Q | I'm going to give you another one in just a |
| 15 | | moment. |
| 16 | A | Okay. |
| 17 | Q | You may set that aside.  Hand this back to her. |
| 18 | | Make a stack there and she'll collect the |
| 19 | | originals when we're done. |
| 20 | A | Okay. |
| 21 | | MS. GRIGSBY:  I'd like to mark this as |
| 22 | | the next exhibit. |
| 23 | | /// |
| 24 | | /// |
| 25 | | /// |

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

49

1  THEREUPON, Defendants' Exhibits 2 was marked
2  **for identification.**
3  Q  Carol, would you take a moment and review what's
4  been marked as Exhibit 2 and tell me if you can
5  recognize that document?
6  A  **Yes.**
7  Q  Okay, what is that document?
8  A  **He told me that I shouldn't have showed the movie**
9  **"The Witness" to my business law class.**
10 Q  And this is Mr. Dahlmann again?
11 A  **Yes.**
12 Q  And this is an incident that occurred with
13 regard -- in the early part of the 2005-06 school
14 year?
15 A  **Yes.**
16 Q  The date. Okay. And that's all the questions I
17 have concerning that document. Did you have
18 conversations with Mr. Dahlmann during the second
19 half of the 2007-2008 school year in which he
20 reported that he had found some of your study
21 hall students working unsupervised in the
22 computer lab?
23 A  **Yes, once.**
24 Q  And you and he had a conversation about that
25 topic?

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

50

1  A  **Yes.**
2  Q  Okay. Is that the only conversation that you
3  remember with him concerning the issue of leaving
4  students unsupervised in the computer lab?
5  A  **Twice.**
6  Q  Twice?
7  A  **Twice.**
8  Q  Okay. And when was the second time?
9  A  **It was that same week, I think, when -- it was**
10 **that same week.**
11 Q  Wasn't there a third time, in the time frame of
12 May 23rd, 2008, in which Mr. Dahlmann brought to
13 your attention that he had found some students
14 working in computer lab unsupervised during
15 period 5D?
16 A  **That's -- no, I was in the lab with them, he did**
17 **not see me.**
18 Q  Okay. Now, those instances of leaving the
19 students unsupervised that you had conversations
20 with Mr. Dahlmann about --
21 A  **Right.**
22 Q  -- those had nothing to do with any physical
23 condition on your part, correct?
24 A  **No, I was in that room.**
25 Q  And the other times that you may have been next

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

51

1  door or were not in the room, you were not absent
2  from the room due to a physical condition, true?
3  A  **Not true.**
4  Q  You were gone from the room due to a physical
5  condition?
6  A  **I let myself -- there was once or twice when I**
7  **let myself into the bathroom to give myself an**
8  **injection.**
9  Q  Were those the incidents that caused Mr. Dahlmann
10 to speak with you about leaving students
11 unattended, or are those other incidents?
12 A  **One time was with these kids and one time I was**
13 **with them.**
14 Q  Okay. I want to make sure the record is clear on
15 that point.
16 A  **Uh-huh.**
17 Q  You can recall two situations in which you left
18 students unattended that Mr. Dahlmann spoke with
19 you about?
20 A  **Yes.**
21 Q  And there was a third situation in which you
22 actually were there?
23 A  **I was there, but --**
24 Q  He didn't see you?
25 A  **Yes, he did see me --**

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

52

1  Q  Okay.
2  A  **-- as I was coming back into the room. I -- they**
3  **were there, I was there with them, and I was**
4  **working on lesson plans and I ran to my regular**
5  **room, it was just two doors away --**
6  Q  Okay.
7  A  **-- and got some papers.**
8  Q  And then you returned?
9  A  **Yes.**
10 Q  Okay. Now, any of those three occasions in which
11 you've had discussion or dialog with Mr. Dahlmann
12 about leaving the students unsupervised --
13 A  **Uh-huh.**
14 Q  -- did you ever -- on any of those three
15 occasions had you left them because of a physical
16 condition?
17    MR. BELAZIS: Say that again.
18    THE WITNESS: Yes.
19 Q  Well, the one time you told me the reason you
20 left, it was to simply go get some materials?
21 A  **Yes.**
22 Q  The other two --
23 A  **Yes.**
24 Q  -- did you leave them because you had a physical
25 problem or did you leave them for a reason such

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

53

1   as to go get other materials or to check on
2   another student?
3   A   No.
4   Q   Okay.  No, there was no physical condition that
5   caused you to leave them unsupervised?
6   A   Not the first two.
7   Q   And the second and third one?
8   A   I just went to go get some materials.
9   Q   Okay, so --
10  A   But he still told me not to leave them
11      unsupervised.
12  Q   Okay.  Did you initiate a conversation with
13      Principal Gasteier, during the 2007-2008 school
14      year, in which you told him that you were
15      concerned because people were accusing you of
16      sleeping in class?
17  A   No, I did not.  I did not even know.
18  Q   You don't recall a conversation in which you
19      said, "I'm upset, people are talking about me
20      behind my back?"
21  A   No.
22  Q   Okay.
23  A   I do not.
24  Q   Did he ever, in the 2007-2008 school year, tell
25      you that he had been informed that you had been

54

1   observed sleeping in class?
2   A   Mr. Gasteier?
3   Q   Yes.
4   A   I don't remember.
5   Q   Okay.
6           MR. BELAZIS:  You don't remember that
7   he said that?
8           THE WITNESS:  I don't remember him ever
9   telling me that I was sleeping in class.
10  BY MS. GRIGSBY:
11  Q   Okay.  Or that he had received such reports?
12  A   He never discussed it with me --
13  Q   Okay.
14  A   -- until --
15  Q   Until other issues arose?
16  A   Yes.
17          MR. BELAZIS:  I just want to make sure
18  that she's --
19          MS. GRIGSBY:  Okay.  Sure.
20          THEREUPON, there was a brief recess.
21          MR. BELAZIS:  I just want to put on the
22  record that during the last series, the most
23  recent series of questions, I don't know exactly
24  when it began, but Ms. Smith was having some
    difficulty with her blood sugar which was causing

55

1   her to become shaky and interfering with her
2   concentration and I think impairing her ability
3   to answer some of the questions, so...
4           MS. GRIGSBY:  And what I'm going to
5   do --
6           MR. BELAZIS:  So if we need to go back
7   over those things, that's fine.
8           MS. GRIGSBY:  Let us do this, I'm going
9   to ask the Court Reporter to go back, and let me
10  go on the screen and see.  I'm going to have her
11  read the questions and answers --
12          THE WITNESS:  Okay.
13          MS. GRIGSBY:  -- and if there's
14  anything there that you believe is inaccurate
15  tell me.
16          THE WITNESS:  Okay.
17          THEREUPON, the Reporter read the requested
18          portion of the record.
19  Q   Is that correct?
20  A   Yes.
21          MS. GRIGSBY:  The next exchange.  The
22  topic before then was the various discussions you
23  had with Mr. Dahlmann about leaving students
24  unsupervised?
25  A   Right.

56

1   Q   Did you feel that you were able to answer those
2       questions correctly or did your condition --
3   A   Somewhat.
4   Q   Okay.
5   A   Somewhat.  I'm not sure what I said.
6   Q   Well, let me go back over that topic, okay?
7   A   Okay.
8   Q   We reviewed a couple memoranda that had been
9       issued by Dahlmann.
10  A   Okay.
11  Q   And then we began to talk about a couple of
12      conversations that you had with him that were not
13      documented, and they were conversations that had
14      to do with instances in which he perceived you to
15      have left students unsupervised.  Okay, first of
16      all, do you remember having conversations with
17      Mr. Dahlmann about leaving students unsupervised?
18      These conversation would have occurred in a time
19      frame prior to Mr. Gunner's arrival.
20  A   Yes.
21  Q   You do re --
22  A   Prior to, yes.
23  Q   Okay.  You recall having conversations with him?
24  A   Right.
25  Q   And --

57

| 1 | | MR. BELAZIS: With who? |
|---|---|---|
| 2 | | MS. GRIGSBY: Mr. Dahlmann. |
| 3 | | By MS. GRIGSBY: |
| 4 | Q | Correct? |
| 5 | A | Yes. |
| 6 | Q | Okay. And for the record, Mr. Dahlmann was the |
| 7 | | Assistant High School Principal? |
| 8 | A | Yes. |
| 9 | Q | Okay. |
| 10 | A | Before he got here? Before Mr. Gunner got here? |
| 11 | Q | Yes. |
| 12 | A | Let's see, I got to think about Mr. Dahlmann. |
| 13 | | Yes, I think so. |
| 14 | Q | Okay. Now, we spoke of three conversations that |
| 15 | | you've had with Mr. Dahlmann? |
| 16 | A | Right. |
| 17 | Q | And on one occasion he said to you, "I saw |
| 18 | | that" -- my understanding is that he said to you, |
| 19 | | "I believe you left students unsupervised" -- |
| 20 | A | Uh-huh. |
| 21 | Q | -- "in the computer lab?" |
| 22 | A | Uh-huh. |
| 23 | Q | And what is your recollection of that incident |
| 24 | | and that conversation? |
| 25 | A | In the computer lab? |

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

58

| 1 | Q | Yes. |
|---|---|---|
| 2 | A | Well, I know that once I was there and I went to |
| 3 | | my room to get some materials, and I know -- and |
| 4 | | then once I went to inject myself, and once I did |
| 5 | | leave them unsupervised. |
| 6 | Q | Okay. So in one of the instances you left the |
| 7 | | room to deal with a physical issue? |
| 8 | A | Yes. |
| 9 | Q | Okay. Tell me about the conversation you had |
| 10 | | with Mr. Dahlmann concerning that incident? |
| 11 | A | The one that -- |
| 12 | Q | In which you departed the room in order to inject |
| 13 | | yourself. |
| 14 | A | Well, he asked me where I was and I, then I, I |
| 15 | | think I said I was in the bathroom, I can't |
| 16 | | remember anymore, but upstairs there. |
| 17 | Q | Did you explain to him why you had gone to the |
| 18 | | bathroom? |
| 19 | A | Oh, yes. |
| 20 | Q | You explained to him -- |
| 21 | A | When I explain that I'm injecting myself, I will |
| 22 | | always tell him I'm injecting myself. |
| 23 | Q | Okay. You have a specific recollection of |
| 24 | | telling him that in this instance? |
| 25 | A | I -- it was one of those instances, I don't know |

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

59

| 1 | | which one. |
|---|---|---|
| 2 | Q | You have a specific recollection in one of the |
| 3 | | three instances in which Mr. Dahlmann cornered |
| 4 | | you about leaving students unattended? |
| 5 | A | Yes. |
| 6 | Q | That you told him on one of those occasions that |
| 7 | | you had gone to the bathroom? |
| 8 | A | I think I said I went to take insulin. |
| 9 | Q | Okay. And what was his response? |
| 10 | A | He didn't say anything. |
| 11 | Q | And were you disciplined for that incident? |
| 12 | A | No. |
| 13 | Q | Okay. |
| 14 | A | I -- he talked to me. |
| 15 | Q | Impressed upon you the importance of leaving |
| 16 | | students supervised? |
| 17 | A | That room I was in in the afternoon, all in the |
| 18 | | afternoon, that room that the kids were in |
| 19 | | typing. |
| 20 | Q | Okay. And was that a class period that -- or was |
| 21 | | it a supervised study hall or an in-school |
| 22 | | suspension? |
| 23 | A | No, it was not an in-school suspension. It was a |
| 24 | | supervised study hall. The first time the |
| 25 | | student asked me, he said he was very late in |

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

60

| 1 | | turning his paper in and he had no, no access to |
|---|---|---|
| 2 | | a computer or a typewriter, so I left him in |
| 3 | | there to type his paper. |
| 4 | Q | And that was not the incident in which you |
| 5 | | departed the class -- |
| 6 | A | The second time I -- |
| 7 | Q | -- for insulin purposes? |
| 8 | A | Because I was in there a lot on my conference |
| 9 | | period and I did leave to go inject myself the |
| 10 | | second time, when Mr. Dahlmann found the kid in |
| 11 | | there. |
| 12 | Q | And it's your testimony that you didn't receive a |
| 13 | | formal discipline as a result of that, correct? |
| 14 | A | No, but obviously I got some discipline here. |
| 15 | Q | Well, is it your testimony that this memo, this |
| 16 | | 2003 memo, relates to an incident in which you |
| 17 | | left to inject yourself with insulin? |
| 18 | A | I was copying papers. |
| 19 | Q | Okay. Let's go way back. We've talked about two |
| 20 | | documents, okay? One is a memo dated 2003 in |
| 21 | | which concerns are addressed by Mr. Dahlmann |
| 22 | | concerning leaving students unsupervised; one is |
| 23 | | a memo addressed in 2005 concerning the movie |
| 24 | | "Witness?" |
| 25 | A | Uh-huh. |

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

61

1  Q   Now, were there conversations that you had with
2      Mr. Dahlmann concerning students being left
3      unsupervised that do not relate to these two
4      memoranda, that occurred at different times?
5      That's what I thought we were talking about.
6  A   That's right.
7  Q   Okay.  So the three incidents that we just spoke
8      of, one of which you say you left students
9      unsupervised so that you could go inject
10     yourself, occurred sometime after 2005?
11 A   **Well, that's when -- I don't remember when they**
12     **happened.**
13 Q   Okay.
14 A   **Do you have dates?  I don't remember when.**
15 Q   Well, my understanding is that you had
16     communications during the second half of
17     2007-2008 school year with Mr. Dahlmann --
18 A   **Okay.**
19 Q   -- about three occasions in which you left
20     students unsupervised?
21 A   **Okay.**
22 Q   Does that comport with your recollection?
23         MR. BELAZIS:  If you recall.
24         THE WITNESS:  Yes.  Okay.
25     BY MS. GRIGSBY:

62

1  Q   You --
2  A   **I can't tell you the specific dates.**
3  Q   Okay.  But you do remember the general time
4      frame, of 2007-2008, having three conversations
5      with Mr. Dahlmann?
6  A   **I remember two.**
7  Q   You remember two?
8  A   **Uh-huh.**
9  Q   Okay.  Tell me about each of those two
10     conversations?
11 A   **The one he told me that I cannot leave the**
12     **students in the typing lab alone to type, and the**
13     **second one was, I know that I was in there**
14     **working on the computer myself, because I was in**
15     **both rooms, when I went to inject myself, because**
16     **I knew that I was getting shaky and I needed some**
17     **insulin.**
18 Q   With regard to the first one.
19 A   **Yeah.**
20 Q   That incident had nothing to do with your
21     diabetes, correct?
22 A   **No.**
23 Q   Okay.  No, it did not?
24 A   **No.**
25 Q   And the second one, you did leave them

63

1      unattended?
2  A   **Correct.**
3  Q   But the reason was that you needed to go inject
4      yourself?
5  A   **Right.**
6  Q   Did you express that to him?
7  A   **I think I did.  I think I told him I took**
8      **insulin.**
9  Q   And what was his response?
10 A   **He didn't say anything.**
11 Q   Okay.
12 A   **He just didn't say anything.**
13 Q   And you did not receive a written reprimand for
14     that, did you?
15 A   **I don't remember.  I don't remember.**
16 Q   Did you have any further conversations with
17     Mr. Gasteier or the superintendent about that
18     incident?
19         MR. BELAZIS:  About that incident?
20         MS. GRIGSBY:  Yes.
21 Q   About the conversation that you left students
22     unattended, but you explained that you went to
23     inject yourself, did you have any further
24     conversations with anybody about that matter in
25     the administration?

64

1  A   **I don't believe so.**
2  Q   Okay.
3  A   **Just with Mr. Dahlmann.**
4  Q   Did you make any further requests of Mr. Dahlmann
5      at that time?
6  A   **For?**
7  Q   For any particular need that you had related to
8      your diabetes?
9  A   **I already had the bathroom upstairs there for --**
10     **to use.**
11 Q   Okay.  And that was sufficient?
12 A   **Yeah -- well, I think Mr. Dahlmann knew that I**
13     **had that bathroom up there.**
14 Q   Okay.
15 A   **He had seen me go in and out of it, I know he**
16     **has.**
17 Q   So there was no need for you to ask him for
18     anything else at that time, correct?
19 A   **You mean like permission to go to inject myself?**
20 Q   Or any other needs that you might have associated
21     with your diabetes?
22         MR. BELAZIS:  Do you understand what
23     she's asking you?
24         THE WITNESS:  No, I don't.
25     BY MS. GRIGSBY:

65

1  Q   Once you told him, "I left the students
2      unattended because I had to go inject myself with
3      insulin," did you have further dialog with him
4      saying, in which you made requests of him, "I
5      need some other assistance concerning my
6      diabetes?"  Did you make any other requests?
7  A   No.
8  Q   Okay.
9  A   But I took care of it, I went to inject myself.
10         MR. BELAZIS:  Theresa, you started at a
11     certain point.
12         MS. GRIGSBY:  Yes.  Yes.  Let me go
13     back to the next topic.  We'll see what the next,
14     the immediately preceding, topic was.
15         **THEREUPON, the Reporter read the requested**
16     **portion of the record.**
17         MS. GRIGSBY:  Oh, we were talking about
18     evaluations.  That was the immediately preceding
19     discussion.  Okay.  I can go back over that
20     issue, okay?
21         THE WITNESS:  Okay.
22         MR. BELAZIS:  The evaluation is?
23         MS. GRIGSBY:  Formal evaluations.
24         MR. BELAZIS:  Okay.  Is that what we
25     started with after the break, after the first

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

66

1      break?  Why don't you just go through the
2      questions?  You don't have to go through the
3      answers, just go through the questions.
4          **THEREUPON, the Reporter read the requested**
5          **portion of the record.**
6          MS. GRIGSBY:  That was the topic about
7      whether or not she ever had any conversations
8      with Dr. Gunner about the eye surgery?
9          MR. BELAZIS:  Okay.
10         MS. GRIGSBY:  So let me -- why don't we
11     do this, we'll go back, I'll go through that
12     topic again with you, okay?
13         THE WITNESS:  All right.
14         MS. GRIGSBY:  And there are two topics
15     that preceded.
16         MR. BELAZIS:  And then what's the other
17     one?
18         MS. GRIGSBY:  The evaluation.
19     **BY MS. GRIGSBY:**
20  Q  My question to you, Mrs. Smith, is, did you ever
21     have conversations with Dr. Gunner in which you
22     raised issues concerning the fact that you had
23     had cataract surgery and there were some
24     resulting complications?
25  A   Yes.

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

67

1  Q   Okay.  Now, when did that conversations occur?
2  A   **It occurred in Mr. Finn's office and he knew**
3      **about it before that.  I think it was in a --**
4      **when he reprimanded me.**
5  Q   Okay.  So the conversation physically took place
6      in Mr. Finn's office?
7  A   **The one conversation did.**
8  Q   Did you have more than one conversation with
9      Dr. Gunner concerning the fact that you had eye
10     surgery for removal of a cataract which produced
11     complications?
12  A   **In his office.**
13  Q   In Mr. Gunner's office, Dr. Gunner's office?
14  A   **Yes.**
15  Q   You had a conversation with him there?
16  A   **When I, I think, I think it was about the first**
17     **3-day suspension.**
18  Q   Okay.  And did you have another conversation in
19     Mr. Finn's office about that?
20  A   **When he told me my choices for the following year**
21     **to teach, what to teach.**
22  Q   So you have a recollection of two times talking
23     with Dr. Gunner?
24  A   **Yes.**
25  Q   About the fact that you had had cataract surgery

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

68

1      and there were complications that had affected
2      you adversely?
3  A   **At least two, he knew I had an eye problem.**
4  Q   Okay.  So tell me about the first conversation
5      that you had in Dr. Gunner's office during the
6      disciplinary conference which ultimately produced
7      a three-day suspension?
8  A   **Oh, man.  Well, I think when I tried to tell him**
9      **he made a remark about -- I got to think how this**
10     **went.  He made a remark, I told him about my eye**
11     **problem and he knew I had the diabetes and when I**
12     **told him about the eye problem I think he said,**
13     **"Tell me another one."**
14  Q   Okay.  So this is --
15  A   **I don't think he believed that.**
16  Q   I'm sorry.
17  A   **I don't know if he believed me or not.**
18  Q   Well, what specifically did you tell him about an
19     eye problem?
20  A   **That I had light sensitivity, a lot of it, that**
21     **I'm constantly -- I didn't tell him specifically**
22     **that, that this eye closed, because, obviously,**
23     **people see it, because many times they look away.**
24     **They know I have a problem and they won't look me**
25     **in the face, and I know that it might upset them**

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

69

1      so I don't pursue it. And he never -- he knew,
2      he knew, he saw the eye closed. And I'm
3      constantly shielding myself from other light with
4      this hand.
5 Q  So is it your recollection that --
6 A  My eyes get tired.
7 Q  Okay. -- that during a conversation with
8      Dr. Gunner, in a disciplinary meeting, that was
9      called to discuss incidents in which you were
10      believed to have been sleeping, you told him that
11      you had light sensitivity?
12 A  Yes.
13 Q  Okay. And you recall him saying words to the
14      effect "Tell me another one?"
15 A  Uh-huh.
16 Q  Okay.
17 A  I don't know if he believed me or not.
18 Q  And that's all you remember about the
19      conversation concerning your eye in that meeting?
20 A  And that I was going to get a three-day
21      suspension.
22 Q  Okay. But any other details about the eye issue,
23      do you recall any other details about that?
24 A  No. You mean about me telling him about it?
25 Q  Right. About a discussion of your eye problem in

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

70

1      the meeting in which you were discussing --
2 A  In that meeting, after he told me "Tell me
3      another one," I didn't say anything else about
4      the eyes.
5 Q  Okay. Now, then we talked about a second meeting
6      and I think we talked about this before, that was
7      conducted in Mr. Finn's office?
8 A  Yes.
9 Q  In which you're talking about your assignment for
10      the upcoming year --
11 A  Yes.
12 Q  -- 2009-2010?
13 A  Yes.
14 Q  Now, what do you recall about that conversation
15      as it pertains to your eyes?
16 A  Well, it just, he started out, you know, "How are
17      you feeling? How is your eyes? How is your
18      diabetes?" And I don't know how to answer that,
19      you know, and then he proceeded to talk about my
20      option for the following year.
21 Q  And ultimately the assignment that you were given
22      was to go to the high school and teach business
23      half time and then a history course?
24 A  Yes.
    Q  Okay.

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

71

1 A  He gave me two and a half options.
2 Q  And that was a conversation in which you were
3      advised that the keyboarding class that you had
4      been teaching at the middle school was going to
5      be discontinued?
6 A  He told me they were disbanding that room.
7 Q  Okay. And you also were advised that the duty of
8      supervising in-school suspension was going to be
9      assumed by aids, as opposed to teachers?
10 A  I don't think he told me that.
11 Q  Okay.
12 A  I don't remember. I don't recall that.
13 Q  Okay. But the conversation, as it pertains to
14      your eyes, was involved remarks to his -- on his
15      part inquiring about your health in general?
16 A  Uh-huh.
17 Q  Yes?
18 A  Yes.
19 Q  And you made no particular request of Dr. Gunner
20      in that meeting --
21 A  Yes, I did.
22 A  Let me finish the question.
23 A  Okay.
24 Q  -- no particular request in that meeting
25      concerning accommodations to deal with your

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

72

1      eyesight?
2 A  Oh, no.
3       MR. BELAZIS: Which meeting are you
4      talking about?
5 Q  The meeting Mr. Finn's office in which you were
6      discussing your assignment for the upcoming year.
7 A  Okay. Yes.
8 Q  In that meeting did you make any particular
9      request of him concerning accommodations to
10      address your diabetes?
11 A  No.
12 Q  Did you make any particular request for
13      accommodations to address your eyesight?
14 A  No.
15 Q  Okay.
16 A  I made --
17       MR. BELAZIS: Just answer her question.
18       THE WITNESS: Okay.
19       MR. BELAZIS: All right.
20       THE WITNESS: Yes, I --
21       MR. BELAZIS: She asked you if you made
22      any request for accommodations, you already
23      answered it.
24       THE WITNESS: Yes.
25 BY MS. GRIGSBY:

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

73

1  Q    And the answer to the question was, "I made no
2       request for accommodation;" is that correct?
3  A    On that day at the junior high?
4  Q    In the meeting in which you were discussing your
5       assignment for the upcoming school year, did you
6       make any request for accommodations to assist you
7       with your physical conditions of diabetes or eye
8       problems?
9              MR. BELAZIS:  In Mr. Finn's office.
10             THE WITNESS:  In Mr. Finn's office.
11 A    No, because I never got the accommodations.
12             MR. BELAZIS:  Just --
13 A    No.
14 Q    Okay.  I also asked you, before our second break,
15      about evaluations.  I want to return to that
16      topic just to make sure that we're, we're on the
17      same page, okay?  You received a continuing
18      contract in 1980, and I also understand that you
19      began working a split schedule between two
20      buildings in 1989?
21 A    Yes.
22 Q    When you were at the middle school level did you
23      receive formal evaluations?
24 A    Yes.
25 Q    Okay.  How frequently --

74

1  A    Well -- no, go ahead.
2  Q    Okay.  How frequently did you receive formal
3       evaluations when were at the middle school?
4  A    I was never evaluated at the middle school.
5  Q    That's what I understood, I wanted to confirm
6       that.  You were never evaluated while you were at
7       the middle school?
8  A    No.
9  Q    Okay.  And that was from a period from 1989
10      through 2008-09 school year?
11 A    No.
12 Q    Okay.
13 A    It was more like 2005 or 6.
14 Q    Okay.  But your recollection is that while you
15      were at the middle school you received no formal
16      evaluations?
17 A    Correct.
18 Q    Okay.  Now, with regard to the general time
19      period, from 1999 through 2007, regardless of
20      what school you were at, did you receive formal
21      evaluations?
22 A    I think I had some.
23 Q    Can you tell me, were they, did you receive
24      annual performance evaluations in that '99 to
        2007 time frame?

75

1  A    No.
2  Q    So they were scattered?
3  A    I don't think I received any.
4  Q    That's what I thought.  You don't recall any
5       formal evaluations of your performance between
6       '99 and 2007, correct?
7  A    Correct.
8  Q    Okay.  It was after that we had a conversation
9       about formal evaluations that I then transitioned
10      to asking you questions about more informal
11      discussion that you had with Mr. Dahlmann, okay,
12      and --
13 A    Could you say that again, please?
14 Q    I'm just, so that you understood the sequence of
15      questions --
16 A    Okay.
17 Q    -- after I asked you about formal evaluations,
18      then I transitioned into asking you some
19      questions about more informal discussions that
20      you had with Mr. Dahlmann.
21 A    All right.
22 Q    And that's the sequence and we've been back
23      through that now?
24 A    Yes.
25 Q    So now I think we're caught back up.

76

1  A    Okay.
2  Q    Okay.  Is there anything else that you believe,
3       that we've talked about today, that you may have
4       been confused about or you wish to modify?
5  A    Do you have anything specific?
6  Q    No.  I just want to make sure you feel
7       comfortable that your testimony, with the
8       corrections we just made, is accurate?
9  A    Correct.
10 Q    You feel it is?
11 A    Yes.
12 Q    Okay.  Thank you.
13             MR. BELAZIS:  Do you feel all right?
14             THE WITNESS:  I'm nibbling on this
15      candy.
16             MS. GRIGSBY:  And let me emphasize
17      again, if you feel the need to take a break, you
18      tell me.
19             THE WITNESS:  I will.
20 BY MS. GRIGSBY:
21 Q    Did you fail to exit the school building during a
22      fire drill in the spring of 2008?
23 A    Yes.
24 Q    Okay.  Why did you not exit the building?
25 A    Because I knew that I needed a shot, because I

**77**

1     really felt bad and I knew I needed to use the
2     restroom, and I said to Nancy Kinsel, "I hope I
3     can make it out there and back in time."  And she
4     grabbed my students and my, my pad, the list with
5     my attendance sheet on, and she said, "I'll take
6     care of the kids, you get your shot," and I did.
7     I went into the bathroom and I took my
8     glucometer, took my sugar level, took my shot,
9     and went to the bathroom.
10 Q   Did you later then have a conversation with
11     Mr. Gasteier about that incident?
12 A   Yes.
13 Q   Tell me what you remember about the conversation
14     with Mr. Gasteier about that incident?
15 A   And I told him, I told him, "Chris," I says, "I
16     needed insulin," I explained the -- and I told
17     him, "and I didn't think that my knees were going
18     to get me way out there."  And he said, "You need
19     to let us know when it's that bad because we'll
20     get you a wheelchair."
21 Q   Okay.  So he told you, "When you have a problem
22     like that we'll try to help you?"
23 A   Yes.
24 Q   Okay.  And did he at one point actually even
25     place a wheelchair near the stairs to help you if

**78**

1     that ever happened again?
2 A   Yes.
3 Q   Other than that conversation that you had with
4     Mr. Gasteier pertaining to the fire drill, did
5     you ever ask anybody else in the administration
6     for assistance in helping you maneuver around the
7     building?
8 A   Yes.
9 Q   Did you ask?
10 A   Mr. Gasteier.
11 Q   And when did you ask, make a request of
12     Mr. Gasteier; another request?
13 A   In the last year I was there, in 2009 and '10.
14 Q   And tell me the circumstances which led you to
15     make this subsequent request?
16 A   Because my business classes were upstairs,
17     history was downstairs, and I knew I couldn't
18     lock my door and make sure the kids left with all
19     their stuff, turn the lights out, and lug
20     everything down there in four minutes, because it
21     was a very far hike.
22 Q   And what was -- so specifically what did you ask
23     of him?
24 A   I asked him if I could bring those history
25     classes upstairs.

**79**

1 Q   And what did he say?
2 A   He says, "History is downstairs."
3 Q   Did you make any other requests of him?
4 A   I made two.
5 Q   And what were they?
6 A   I asked him if I could bring those history
7     classes upstairs.
8 Q   Okay, we went through that one.
9 A   No, it's the same one.
10 Q   Okay.
11 A   One was at a different time in the hallway, when
12     I was accused of being late to class.  He stopped
13     me and asked me if I was interested in SMARTBoard
14     training and I asked him again, "Chris, let me
15     take my classes upstairs."  His comment was "I
16     want to keep the social studies department
17     together."
18 Q   Okay.  No.  My question -- and I appreciate that
19     information.  My question was not whether or not
20     you repeated the request to move the room --
21 A   Oh.
22 Q   -- but did you ask him to do anything other than
23     move the students upstairs?
24 A   I asked him twice if I can take those kids
25     upstairs to my room.

**80**

1 Q   Did you ask him to do anything else for you in
2     order to address the distance issue?
3 A   I'm not understanding your question here.
4 Q   Okay.  My understanding is that you were
5     concerned that you have trouble moving quickly --
6 A   That's correct.
7 Q   -- due to physical issues?  And you were
8     concerned about making the transition from the
9     business classroom to the history classroom in a
10     timely way?
11 A   That's right.
12 Q   And you did ask him to move the students and
13     history upstairs?
14 A   Yes.
15 Q   And he declined to do that?
16 A   Yes.
17 Q   Did you offer any other suggestions about how you
18     might deal with this difficulty in maneuvering in
19     a timely way?
20 A   Did I offer?
21 Q   Yes.  Did you make any other suggestions about
22     how you could address that concern?
23 A   You mean how I can get to 605 on time?
24 Q   Right.
25 A   Did I offer other suggestions?  No.  The best way

81

1        **was to bring those classes up to me in 701, the**
2        **one they actually converted to have the**
3        **SMARTBoard and everything else in them.**
4  Q  Did you ask that someone cover your room for a
5        period of a few minutes if it was going to be a
6        consistent pattern of you being late?
7  A  **Mostly almost every day I was either walking in**
8        **behind the kids or I was in front of the kids.**
9  Q  Okay.
10  A  **There was very few instances, like I said, one**
11       **was Mr. Gasteier stopped me.**
12  Q  In one instance he did stop you to dialog about a
13       particular topic?
14  A  **Uh-huh.**
15  Q  And that's a seminar pertaining to SmartBoards?
16  A  **Right.**
17  Q  But your testimony is that as a general matter,
18       despite the distance between those two rooms, you
19       were usually there arriving with the students or
20       immediately before them?
21  A  **Yes.**
22  Q  Okay. Mrs. Smith, I've got a series of documents
23       that we're going to talk about now.
24  A  **Okay.**
25  Q  But they all pertain to the same general time

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

82

1        frame, okay?
2  A  **Okay.**
3  Q  To set the stage here, we're going to talk now
4       about some disciplinary concerns that Mr. Finn
5       expressed to you in 2008, in late September --
6  A  **Okay.**
7  Q  -- which led to some disciplinary conferences in
8       October of 2008 and ultimately a meeting with you
9       and Mr. Zraik and Mr. Gunner, Dr. Gunner, okay?
10      Just to refresh your recollection, that's where
11      I'm going with this next series of questions.
12  A  **And we'll see if I can recollect.**
13  Q  Okay.
14       THEREUPON, there was a brief recess.
15       THEREUPON, Defendants' Exhibit 3 was marked for
16      identification.
17  Q  This will be -- I'm sorry. Carol, what is the
18      number?
19  A  **3.**
20  Q  3. Mrs. Smith, I'm placing before you a document
21      that's been marked as Exhibit 3. And, first of
22      all, I'd ask you to tell me whether or not you
23      recognize that document?
24  A  **Well, yes.**
25  Q  Okay. And is this a letter addressed to you by

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

83

1        Principal Steve Finn from the middle school dated
2        September 29, 2008, asking you to attend a
3        disciplinary conference?
4  A  **Yes.**
5  Q  Okay. And it appears from the letter that
6       Mr. Finn was concerned about what he had
7       identified as four instances of sleeping in the
8       classroom or at some location in the building,
9       correct?
10  A  **Correct.**
11  Q  Now, do you acknowledge today whether or not you
12      indeed were sleeping on any of the occasions
13      identified in this letter?
14  A  **In my mind, none of them.**
15  Q  Okay. You don't believe that in any of these
16      situations you were actually sleeping?
17  A  **I was not sleeping.**
18  Q  Okay. Now, the first one references an incident
19      that occurred involving the choir room on
20      September 4, 2008?
21  A  **Correct.**
22  Q  Do you remember that incident?
23  A  **Yes.**
24  Q  Tell me about it.
25  A  **I did not know where I was going to monitor the**

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

84

1        **ISP, or whatever they call it, the ISI kids.**
2  Q  These are in-school supervised suspensions?
3  A  **Yes.**
4  Q  Okay.
5  A  **So I walked -- and he told me the choir room and**
6       **I walked down there and I thought, "Wow, this is**
7       **a big room." And there was nobody in there on**
8       **the 4th, and I was in there, I had newspapers**
9       **with me, I was cutting out articles, business**
10      **articles for my Introduction to Business class at**
11      **the high school. And on -- and I was having**
12      **trouble with my insulin and I did not feel good,**
13      **and I walked down there and I thought, "Well,**
14      **Steve has nothing for me to do." So I walked**
15      **down there and I was cutting out the things, I**
16      **took my insulin and I felt lethargic and I might**
17      **have dosed a minute or two, but I felt lethargic,**
18      **and all of the sudden he yelled from out in the**
19      **hall, he says, "Carol are you in here?" And I**
20      **says, "Yes, Steve." And he said, "What are you**
21      **doing?" I said, "I'm cutting out articles." And**
22      **he says, "Well, why are you back here?" And I**
23      **says, "If this is going to be my assigned room, I**
24      **just came down here to do some work and see where**
25      **I was going to be working." And he says, "You**

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

85

1  don't have to come down here when we don't have
2  students back here."  So I said to him, "What do
3  you want me to do?"  And he said, "I want you to
4  go in and out of teacher's classrooms, ask them
5  if they need stuff to be copied, if they need
6  papers graded."  And I thought, "Well, I can't do
7  that, that would intimidate them, I think, a
8  little bit."  And I did work in the computer lab
9  and -- but I was not sleeping in the choir room,
10  I was cutting out articles.
11 Q  Did you doze at all?
12 A  I closed my eyes until the insulin took hold.
13 Q  Did you sleep at all during that incident?
14 A  If you mean, did I put my head down and snored?
15  No, I did not.  I took my insulin.  There was
16  nobody back there, it was a quiet place to test
17  and take my insulin --
18 Q  I understand.
19 A  -- because I knew that I was getting lethargic
20  and not feeling good.
21 Q  But is it your testimony that you never dozed off
22  or that you did doze off during that incident?
23 A  I was lethargic.  I might have closed my eyes, if
24  that's dozing, then I dozed off, but I was
25  lethargic.

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

86

1 Q  Do you know one way or the other whether you were
2  sleeping?
3 A  I was not sleeping.  I knew I was -- I was busy
4  and I did not feel good.
5 Q  Okay.
6 A  I needed to do something.
7 Q  So then there's a second incident also referred
8  to as happening in the choir room during period
9  9.  What do you remember about that incident?
10 A  On September 9th I was not even in the choir
11  room.  After Steve walked down and seen me on the
12  4th and there were no kids there on the 9th, I
13  went to the library and I helped the librarian.
14 Q  So is it, do you believe that this second bullet
15  point, this second reference to sleeping in the
16  choir room is --
17 A  I was not in there until -- I was not in there at
18  all on that day.
19 Q  What do you think -- have you ever come to any
20  conclusions as to what this reference pertains
21  to?
22 A  No.
23 Q  Okay.  Then the third one refers to September 9,
24  2008, an incident --

BELAZIS:  September 19th?
HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

87

1  MS. GRIBSBY:  Yes, I'm sorry.
2 Q  -- 19, 2008, period 6, room 115, what do you
3  remember about that incident?
4 A  Believe me, I had 26 of those 6th graders in
5  there, trust me, I was not sleeping.
6 Q  Okay.
7 A  It says, "Room 115," but, you know, on my
8  original -- never mind.
9 Q  Is this an incident which Danielle Fanning
10  claimed to have witnessed you sleeping?  Is that
11  your understanding?
12 A  You know, I didn't even know Danielle Fanning,
13  except that she taught next door to me.
14 Q  And it's your testimony you were not sleeping?
15 A  In period 6 I had 26 kids in there.
16 Q  Did you do anything in the room that might cause
17  you to appear as if you were sleeping?
18 A  Not -- nope.  We -- I had to pass out those
19  little computers and I had to collect them and
20  stack them on the carts.  No.  I was busy in that
21  period.
22 Q  If Danielle Fanning claims to have witnessed you
23  sleeping on that date --
24 A  Uh-huh.
25 Q  -- would it have been inappropriate for Mr. Finn

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

88

1  to inquire about it?
2 A  Not if she asked -- not if she said that to him.
3 Q  So you agree that if she made the statement "I
4  saw Mrs. Smith sleeping," he should follow-up and
5  review that incident with you?
6 A  Yeah.
7 Q  Okay.  And then the final incident refers to
8  "Period 8, sleeping in the choir room again,"
9  under a date of September 22, 2008.  Is this an
10  incident in which Mr. Quisno claimed to have
11  observed you sleeping?
12 A  I think that's the one.
13 Q  Right.  You are aware that Mr. Quisno made a
14  report that he had observed you sleeping?
15 A  Oh, yes, I saw him come in.
16 Q  Do you know how many times he came into your
17  classroom that day?
18 A  He came in half way through -- no, it was
19  probably -- yes, half way through, and then he
20  came in again about 30 minutes later.
21 Q  So you were aware that he came into your
22  classroom twice?
23 A  Yes.
24 Q  Okay.  Now, did you have any conversations with
25  Mr. Quisno?

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

89

1   A    I think he only came in once.  I think Mr. Finn
2        came in the second time.
3   Q    Okay.  Let me give you a moment to think about
4        that.
5   A    Yes, I am.  In my mind he came in once and I'm
6        very positive Mr. Finn came in the second time.
7   Q    Okay.  Now, did you have conversations with
8        either Mr. Quisno or Mr. Finn?
9   A    Well, I said hi to Mr. Quisno and he turned
10       around and walked out, he never acknowledged it.
11       And Mr. Finn came in and -- he just came in and
12       looked around and left.
13  Q    What were you physically doing when Mr. Quisno
14       came in?
15  A    I think I was like this, (indicating.)
16  Q    In other words, you were seated up and you had
17       you're left hand cradling your forehead?
18  A    No.
19            MR. BELAZIS:  If you remember.
20            THE WITNESS:  I don't remember.
21            MR. BELAZIS:  I don't want you to
22       speculate.
23            THE WITNESS:  Yes.  I don't remember.
24       I don't -- that's tough.
25  BY MS. GRIGSBY:

90

1   Q    Were your eyes open or closed when Mr. Quisno
2        came in?
3   A    Well, I'm going to say open, but open as much as
4        they could be.
5   Q    And when Mr. Finn came in were your eyes open or
6        closed?
7   A    They were open -- well -- yes, they were open.
8   Q    Okay.
9   A    In my mind they were open.
10  Q    Well, to an outside observer, were your eyes open
11       or closed?
12  A    If somebody came in and saw me like this,
13       (indicating,) what would you think?  I don't
14       know.
15  Q    Okay.  You believe your eyes were open?
16  A    Yes.
17  Q    But do you acknowledge that someone might have
18       perceived your eyes to be closed?
19  A    Yes.
20  Q    Both when Mr. Quisno came in and when Mr. Finn
21       came in?
22  A    Well, yes.
23  Q    Okay.  Now, upon receipt of this letter, this
24       September 29, 2008 letter, did you have
25       conversations with anybody at the administration

91

1        prior to the October 2, 2008 meeting that's
2        referenced?
3   A    Can you repeat that, please?
4   Q    Yes.  I'm just trying to find out, this letter
5        says that you're going to be asked to come to a
6        disciplinary conference on October 2nd?
7   A    Uh-huh.
8   Q    Did you have conversations with anybody in the
9        administration before that meeting?
10  A    That I had conversations?
11  Q    With anybody in the school administration,
12       principal, superintendent, assistant principal,
13       prior to the meeting?  I'm just trying to make
14       sure --
15  A    I don't remember.
16  Q    Okay.  Because I know you had a meeting on
17       October 2nd, I just want to make sure there was
18       no intervening conversation.
19  A    Right.
20  Q    You don't recall any?
21  A    No.
22  Q    Now, you had a meeting on October 2, 2008,
23       correct?
24  A    Yes.
25  Q    And who all was in attendance at that meeting?

92

1   A    Oh, boy.  Mr. Gunner and myself, and I think
2        maybe John Gerber, and I don't know if Char
3        Shuman was at that one or not.  I don't think so.
4        I'm not sure.
5   Q    You're certain that Dr. Gunner was at that first
6        meeting?
7   A    Yes, I think so.
8   Q    Okay.
9   A    It was in his office, I think.
10  Q    So Mr. Finn, Dr. Gunner, Mr. Gerber, and
11       yourself?
12  A    Uh-huh.
13  Q    Okay.  And Mr. Gerber, again, was the union
14       president at the time?
15  A    I don't remember if Mr. Finn was there or not.
16  Q    Okay.  Well, he is the author of the letter --
17  A    Yes.
18  Q    -- and he requests your presence?
19  A    Yes.
20  Q    Does that refresh your recollection as to whether
21       he was there?
22  A    2008.  I don't remember.
23  Q    Okay.  You had a meeting with school officials on
24       October 2, 2008 to discuss these four incidents?
25  A    Yes.

93

| 1 | Q | Can you tell me what you remember being discussed |
| 2 | | at that meeting? |
| 3 | A | **That I was sleeping in the choir room.  That I'm** |
| 4 | | **sleeping.** |
| 5 | Q | And how did you respond to that? |
| 6 | A | **I told them I wasn't sleeping.** |
| 7 | Q | On any of the incidents? |
| 8 | A | **Yes.** |
| 9 | Q | Did you request that anybody do anything on your |
| 10 | | behalf because of a physical condition? |
| 11 | A | **Yes.** |
| 12 | Q | What did you request? |
| 13 | A | **I remember filing a grievance with John Gerber.** |
| 14 | Q | With regard to this incident? |
| 15 | A | **Well, you mean these incidents?** |
| 16 | Q | Yes.  And this event of inquiry and discipline |
| 17 | | which involved multiple incidents. |
| 18 | A | **What was your question again?** |
| 19 | Q | Did you make any -- |
| 20 | | MR. BELAZIS:  Are you doing all right? |
| 21 | | THE WITNESS:  No, I'm not. |
| 22 | | MR. BELAZIS:  No? |
| 23 | | THE WITNESS:  No. |
| 24 | | MS. GRIGSBY:  I'll tell you what, why |
| 25 | | don't we take a lunch break, why don't we do |

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

94

| | | that -- |
| 2 | | THE WITNESS:  All right. |
| 3 | | MS. GRIGSBY:  -- and then it's -- well, |
| 4 | | let me see.  It's 11:40, why don't we come back |
| 5 | | here at 1 o'clock and give you plenty of time to |
| 6 | | make sure that you feel comfortable, okay? |
| 7 | | THE WITNESS:  All right. |
| 8 | | MS. GRIGSBY:  Let's do that and then |
| 9 | | we'll come back to this issue. |
| 10 | | THE WITNESS:  Okay. |
| 11 | | **THEREUPON, there was a brief lunch recess.** |
| 12 | | **THEREUPON, the Reporter read the requested** |
| 13 | | **portion of the record.** |
| 14 | Q | Mrs. Smith, when we broke we were talking about a |
| 15 | | meeting that you had in response to this letter, |
| 16 | | the letter we marked as Exhibit 3. |
| 17 | A | **Right.** |
| 18 | Q | And it was a meeting that took place on |
| 19 | | October 2, 2008. |
| 20 | A | **Uh-huh.** |
| 21 | Q | And I believe you indicated that Mr. Gunner was |
| 22 | | at the meeting, Dr. Gunner was at the meeting, |
| 23 | | your union representative was at the meeting, you |
| 24 | | were at the meeting, you were not sure whether |
| | | Mr. Finn was at the meeting? |

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

95

| 1 | A | **I don't remember.** |
| 2 | Q | Okay.  You're certain Dr. Gunner was at that |
| 3 | | meeting? |
| 4 | A | **Yes.  October 2nd.** |
| 5 | Q | October 2, 2008, which would have been prior to |
| 6 | | the date that your attorney, Mr. Zraik, sent |
| 7 | | correspondence on your behalf. |
| 8 | A | **I'm pretty sure that Mr. Gunner was at this** |
| 9 | | **meeting.** |
| 10 | Q | Okay.  Now, again, for the record, what do you |
| 11 | | remember as having been discussed at the |
| 12 | | October 2, 2008 meeting? |
| 13 | A | **Whether I was sleeping in these classes.** |
| 14 | Q | Correct. |
| 15 | A | **And my diabetes, for one thing, and -- let's see,** |
| 16 | | **and my eyes, my diabetes, about the discipline,** |
| 17 | | **the disciplinary action that would be taken** |
| 18 | | **against me if anything else went wrong.** |
| 19 | Q | Okay.  Now, you said you had a conversation in |
| 20 | | this meeting about your diabetes and your eyes? |
| 21 | A | **Uh-huh.** |
| 22 | Q | Tell me everything you can remember being |
| 23 | | discussed about the diabetes and your eyes in the |
| 24 | | October 2, 2008 meeting. |
| 25 | A | **I really can't remember much from this meeting.** |

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

96

| 1 | | **I remember Steve accusing me -- or I remember** |
| 2 | | **these four things that Steve accused me of being** |
| 3 | | **talked about.** |
| 4 | Q | Uh-huh. |
| 5 | A | **And I remember the diabetes was a very big issue** |
| 6 | | **and about what kind of accommodation that I may** |
| 7 | | **need.** |
| 8 | Q | Okay.  So what do you remember about the |
| 9 | | discussion concerning accommodations that took |
| 10 | | place in this meeting? |
| 11 | A | **He told me that --** |
| 12 | Q | He, being who? |
| 13 | A | **I'm pretty sure it was Mr. Gunner, that I could** |
| 14 | | **use the nurse's office, that there would be** |
| 15 | | **education of me.  The nurse, they would talk to** |
| 16 | | **the nurse to put together a program for diabetes** |
| 17 | | **to educate the teachers and the students, and** |
| 18 | | **that accommodations would be made for me to take** |
| 19 | | **my insulin and check my sugar.** |
| 20 | Q | Okay.  Well, I'm going to hand you a couple other |
| 21 | | documents and see if perhaps they refresh your |
| 22 | | recollection a bit. |
| 23 | A | **All right.** |
| 24 | Q | Well, first of all, let me mark this one. |
| 25 | | /// |

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

97

1     THEREUPON, Defendants' Exhibit 4 was marked for
2     identification.
3  Q  Carol, can you identify the document that's been
4     marked as Exhibit 4?
5  A  Yes, this was written by Michele
6     Poulos.
7  Q  Who is Michele Poulos?
8  A  She is Dr. Vaschack's nurse practitioner.
9  Q  And is he your primary care physician?
10 A  Yes.
11 Q  Did she write this document at your request?
12 A  I think I went to her, because I had an
13    appointment for diabetes, and, yes, I asked her
14    to write a letter explaining what my symptoms
15    would be for highs and lows.
16 Q  And did you take this document with you when you
17    went to the October 2, 2008, meeting?
18 A  I don't remember if I took it or if she mailed
19    it.
20 Q  Was it discussed at the October 2, 2008 meeting?
21 A  I don't remember that.  I honestly don't.
22 Q  Okay.  Did you provide the document to school
23    officials sometime after its date, which is
24    September 30, 2008?
25 A  I think I gave this -- no, I can't remember.  I

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

98

1     don't know if they mailed it to Mr. Finn or if I
2     gave it to him.
3  Q  And --
4  A  I don't know who I gave it to, to be honest, to
5     be truthful.  I can't remember.
6  Q  And you don't know whether -- you don't know one
7     way or the other whether it was talked about at
8     your October 2nd meeting, 2008?
9  A  Yes, it was.
10 Q  Okay.
11 A  Not this letter, but the diabetes.
12 Q  Okay.  And whether or not this letter
13    specifically was discussed, you don't recall?
14 A  I don't recall.
15 Q  And you don't recall any details about the
16    discussion of diabetes that occurred in the
17    October 2nd meeting?
18 A  Well, yes, I recall that, you know, that they
19    realized I was diabetic and that my highs and
20    lows were not -- they were off.
21 Q  And you believe that was in that meeting then you
22    talked about the accommodation of going to the
23    nurse's office and so forth?
24 A  They did not say -- they wrote that in a letter
25    to me.

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

99

1  Q  Okay.  We may come back to that.
2  A  Okay.
3  Q  Let's go to a couple other documents that may
4     help.  I'm going to give you a couple at the same
5     time, because we're looking at them together,
6     okay?
7     THEREUPON, Defendants' Exhibit 5 was marked for
8     identification.
9  A  Okay.
10 Q  Why don't you put them in order.
11 A  Okay.
12 Q  5.
13 A  5 being the highest.  This is the same thing as
14    3.
15 Q  No.
16 A  No.
17 Q  The dates are different.
18 Q  Okay.  Yes, they are.
19 Q  Okay.
20 A  I'm sorry, I didn't read it.
21 Q  That's okay.
22    MS. GRIGSBY:  This is 6 and this is 7.
23    THEREUPON, Defendants' Exhibits 6 and 7 were
24    marked for identification.
25 Q  Now, Carol, I've sent to you, or provided you

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

100

1     with three documents and one is a document marked
2     Exhibit 5?
3  A  Yes.
4  Q  And first of all, can you tell me, did you
5     receive this document?
6     MR. BELAZIS:  Were you able to read
7     both of them?
8     THE WITNESS:  No.  She just asked me
9     about Exhibit 5 again, I just went back to them.
10    MR. BELAZIS:  Do you want her to review
11    both of these?
12    MS. GRIGSBY:  No.
13 BY MS. GRIGSBY:
14 Q  For right now just have them in front of you.
15 A  Okay.
16 Q  Take a look at 5 for me.
17 A  All right.
18 Q  And my question to you simply is, this letter is
19    addressed to you by Mr. Finn?
20 A  Yes.
21 Q  Did you receive this document?
22 A  Well, yeah, I did.
23 Q  And this refers to a disciplinary conference held
24    on October 2, 2008, correct?
25 A  Yeah.

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

101

1  Q   And it also references his determination that you
2      should be given a written reprimand?
3  A   Uh-huh.
4  Q   Now, there's a discussion at the very bottom of
5      the page which says, "During the conference you
6      indicated that a medical condition, more
7      specifically diabetes, might be a contributing
8      factor to your falling asleep in class."  Did you
9      state that?
10 A   Did I state that I had diabetes?
11 Q   Well, not that you had diabetes, but that the
12     diabetes might be a contributing factor to you
13     falling asleep in class?
14 A   I can't remember.  I just -- I don't remember.  I
15     don't remember the discussion --
16 Q   Okay.
17 A   -- that much, that well, that specific.
18 Q   And it says then, "We would encourage you to seek
19     medical attention for any condition that may
20     impact your ability to teach and supervise
21     students effectively."
22 A   Okay.
23 Q   Do you remember that conversation?
24 A   You're asking if I remember?  I don't remember.
25 Q   Okay.

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

102

1  A   I remember the discussion that there was some
2      diabetes involved.  I do remember they asked me
3      if I was being treated for diabetes and I said,
4      "Yes."
5  Q   And did you offer any further information about
6      your medical condition?
7  A   I think I answered what they asked me.
8  Q   Do you remember any of the specific questions
9      that they asked you?
10 A   No, I don't remember.
11 Q   It goes on to say, "The Perkins School District
12     would support a medical leave of absence if
13     prescribed by your treating physician until such
14     time that your medical condition would not
15     interfere in your ability to properly teach and
16     supervise students."
17 A   Okay.
18 Q   Were you given an option of a medical leave
19     during the October 2nd meeting?
20 A   No.  They said, they told me they would support a
21     medical leave if --
22 Q   If you requested one?
23 A   Well, yes.
24 Q   And at that time did you think that your diabetes
25     was impacting your ability to teach and supervise

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

103

1      students effectively so that you should seek such
2      a leave?
3  A   I felt it was not impacting my teaching ability,
4      but I did feel that it was impacting how I felt
5      from morning until noon until I left.  You know,
6      the highs and lows affect how you feel.
7  Q   So you felt that you maybe were fatigued and
8      didn't feel your best?
9  A   At times.
10         MR. BELAZIS:  I object to the form.
11         THE WITNESS:  Yes.
12 BY MS. GRIGSBY:
13 Q   But with regard to the request for medical leave,
14     did you indicate that would be something that you
15     might be interested in?
16 A   At that time?
17 Q   Yes.
18 A   I don't know, I didn't, I never thought about it.
19 Q   Okay.  After you received this letter did you
20     give it some thought?
21 A   No.
22 Q   Okay.  And that's not something that you went
23     back to Mr. Finn and requested, was it?
24 A   No, because he told me he would give me an
25     accommodation.

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

104

1  Q   Okay.  If we set that one aside and -- actually,
2      they're out of -- I am sorry, I should have
3      marked 6 7 and 7 6.  But take a look at the
4      document that's been marked as Exhibit 7.  You
5      may just -- yes, put the ones that you're not
6      using to the side.  Do you recognize this letter
7      that's been marked as Exhibit 7?
8  A   This is Mr. Zraik's letter.
9  Q   Now, you're referring to Thomas Zraik, Attorney
10     At Law?
11 A   Yes.
12 Q   And did you -- I don't want to -- if I ask a
13     question that to refers to Mr. Zraik, I don't
14     want to know any private conversations that you
15     had with him.
16 A   Okay.
17 Q   You and he together, that's an attorney and
18     client.
19 A   Okay.
20 Q   But can you tell me, did you ask for Mr. Zraik's
21     assistance after you received the letter from
22     Mr. Finn advising that you were going to be
23     subject to a written reprimand?
24 A   Did I ask for his help in writing this letter,
25     that's what you're asking me?

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

105

1    Q    Yes.  Did you ask him to come in and help you and
2         represent you after --
3    A    Yes.
4    Q    -- you received the written reprimand?
5    A    Yes.
6    Q    Okay.  And did you have an opportunity to review
7         this letter before Mr. Zraik sent it to
8         Dr. Gunner on your behalf?
9    A    I don't remember that.  I know I saw the letter,
10        but I don't remember if it was before or after.
11   Q    Did you approve him sending such a letter?
12   A    Well, yes, I did.
13   Q    And is there anything in this letter that in
14        retrospect you believe is inaccurate?
15   A    In this letter?
16   Q    Yes.
17   A    May I look at it again?
18   Q    Sure.
19   A    Yes.
20   Q    What is inaccurate in the letter?
21   A    The date here, September 22, 2008.
22   Q    Okay.  Is the date wrong or is the statement that
23        is made there wrong?  "While Mrs. Smith
24        strenuously denies ever putting any of her
25        students at risk, she acknowledges that one

106

2         occasion she did fall asleep due to a drop in
3         blood sugar," and he references September 22,
3         2008.
4    A    Yes.
5    Q    Is that inaccurate?
6    A    Yes, the date is inaccurate.
7    Q    Okay.  Do you acknowledge falling asleep on one
8         occasion?
9    A    Well, I told Steve Finn that I must have been
10        dosing on September 4th.
11   Q    Okay.  And were you or were you not sleeping on
12        September 4, 2008?
13   A    If -- define sleeping.
14   Q    Well --
15   A    If I was lethargic, yes, I was.  If I went back
16        there to, because I didn't feel good and to test
17        my sugar and take my insulin, yes, I did.  If I
18        got lethargic and closed my eyes and dozed a
19        second, yes, I did.  But I did not sleep, per se,
20        put my head on the desk and sleep.
21   Q    Okay.  When you say the word "sleep" what do you
22        mean?
23   A    Usually in those diabetic, especially the highs,
24        I get lethargic, very lethargic sometimes.  I'm
25        aware of what's going on.

107

1    Q    So you separate lethargy from sleeping?
2    A    I do.
3    Q    Okay.  And what's the difference between the two?
4    A    Sleeping is sleeping, and lethargic is when
5         you're just kind of not feeling good, and you
6         know, and you have that urge, you just might want
7         to go home and go to bed, period, because you
8         just don't feel good.
9    Q    How does lethargy affect your keeping your eyes
10        open and your awareness of surroundings?
11   A    Well, I know where I'm at.  I definitely know
12        where I'm at.  Even earlier here I didn't really
13        feel good, but I knew where I was at.
14   Q    Okay.  Other than that issue, that modification,
15        is there anything else in Exhibit 7 that you
16        think is inaccurate?
17   A    I think it's pretty accurate --
18   Q    Okay.
19   A    -- except for that date.
20   Q    Okay.  If you would set that one aside, please?
21   A    Just put No. 6 on top here?
22   Q    Yes.
23   A    Okay.
24   Q    Now, if you would take a look at -- well, one
25        more question on that document.  The purpose of

108

1         that letter was to ask for a meeting, wasn't it,
2         in order to discuss accommodations?
3    A    I don't know if it specifically asked for a
4         meeting, but it is requesting that we work
5         together.
6    Q    "I am also requesting that you take measures to
7         assure that a plan is developed among school
8         officials, Mrs. Smith" --
9    A    Where?
10   Q    I'm looking at the bottom of 7 -- "and
11        Mrs. Smith's physician, that will satisfy the
12        District's legitimate interests as well as
13        addressing Mrs. Smith's needs."
14   A    Uh-huh.
15   Q    "Finally, I ask that you provide me with adequate
16        notice in the event you decide to schedule a
17        meeting."
18   A    Okay.
19   Q    Okay?
20   A    And it says, "You decide to schedule a meeting."
21   Q    Okay.  And you were hoping, by sending this
22        letter, such a meeting would be scheduled,
23        correct?
24   A    Probably, yes.
25   Q    And, in fact, a meeting was scheduled and held,

109

| | |
|---|---|
| 1 | wasn't there? |
| 2 A | **Is that this one?** |
| 3 Q | No. But based upon your recollection, there was |
| 4 | a meeting held, wasn't there, with you and |
| 5 | Mr. Zraik and Dr. Gunner, to discuss your |
| 6 | request? |
| 7 A | **I don't think a specific meeting was held to** |
| 8 | **discuss this request.** |
| 9 Q | You don't believe there was a meeting held to |
| 10 | discuss? |
| 11 A | **I think there was a meeting held, yes, but I** |
| 12 | **think there was one on reprimand and he discussed** |
| 13 | **it at that meeting.** |
| 14 Q | Was there a meeting in which you were present, |
| 15 | Mr. Zraik was present and Dr. Gunner was |
| 16 | present -- |
| 17 A | **Uh-huh.** |
| 18 Q | -- that followed the sending of this letter? |
| 19 A | **This one here, No. 6?** |
| 20 Q | Yes. That followed the sending -- I'm sorry, No. |
| 21 | 7. |
| 22 A | **No. 7.** |
| 23 Q | Mr. Zraik's letter to Dr. Gunner, did a meeting |
| 24 | follow in the wake of that letter at which time |
| 25 | the issue of your diabetes was discussed among |

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

110

| | |
|---|---|
| 1 | you, Dr. Gunner, and Mr. Zraik? |
| 2 A | **You know, I honestly don't remember. If we had a** |
| 3 | **meeting just to discuss the accommodation, I** |
| 4 | **don't remember.** |
| 5 Q | Okay. |
| 6 A | **I mean, just a --** |
| 7 Q | Okay. Let me ask you about Exhibit 6 -- |
| 8 A | **Okay.** |
| 9 Q | -- and then we'll go back to that issue. |
| 10 A | **All right.** |
| 11 Q | Can you identify the document that's been marked |
| 12 | as Exhibit 6, dated October 14, 2008, on the |
| 13 | letterhead of Thomas Zraik? |
| 14 A | **Yes, "Rebuttal To Reprimand."** |
| 15 Q | What is this document? |
| 16 A | **It's the letter that Mr. Zraik wrote in answer to** |
| 17 | **my -- to the reprimand.** |
| 18 Q | Was he requesting that this rebuttal to the |
| 19 | reprimand be included within your file? |
| 20 A | **Well --** |
| 21 | MR. BELAZIS: I think the letter will |
| 22 | speak for itself. |
| 23 | THE WITNESS: Speaks for itself, yes. |
| 24 | BY MS. GRIGSBY: |
| Q | Was that your understanding of the purpose of it, |

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

111

| | |
|---|---|
| 1 | that it would be placed in your file so that |
| 2 | there would be a counter to the letter of |
| 3 | reprimand? |
| 4 A | **I am probably aware that anything that went back** |
| 5 | **and forth to anybody would have gone into my** |
| 6 | **file.** |
| 7 Q | Okay. Did you see this letter before it was |
| 8 | sent? |
| 9 | MR. BELAZIS: Asked and answered. |
| 10 | MS. GRIGSBY: Well, this is a different |
| 11 | letter. |
| 12 | MR. BELAZIS: The Zraik letter? |
| 13 | MS. GRIGSBY: This is the second, |
| 14 | there's two Zraik letters. |
| 15 | THE WITNESS: She got it mixed up. |
| 16 | MS. GRIBSBY: There are two Zraik |
| 17 | letters. |
| 18 | MR. BELAZIS: Did you give me that? |
| 19 | THE WITNESS: No. Then were on this |
| 20 | one here, I think. |
| 21 | MS. GRIGSBY: Yes, we're talking about |
| 22 | No. -- |
| 23 | THE WITNESS: And this should have been |
| 24 | 6. |
| 25 | MR. BELAZIS: Which one did you answer |

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

112

| | |
|---|---|
| 1 | first? |
| 2 | MS. GRIGSBY: The one identified -- |
| 3 | THE WITNESS: She gave me -- she |
| 4 | numbered them wrong. This should be 7 and this |
| 5 | should be 6. |
| 6 | MR. BELAZIS: You originally handed |
| 7 | her -- |
| 8 | THE WITNESS: This was one we were |
| 9 | talking about. |
| 10 | MS. GRIGSBY: Right. I originally |
| 11 | handed her the one marked 7, but it's |
| 12 | chronologically earlier than 6. |
| 13 | MR. BELAZIS: Let me just read this. |
| 14 | MS. GRIGSBY: Okay. |
| 15 BY MS. GRIGSBY: | |
| 16 Q | And while your counsel is doing that you can take |
| 17 | a moment to review it as well. |
| 18 | MR. BELAZIS: But she's answered |
| 19 | questions about the one dated the 6th already? |
| 20 | MS. GRIGSBY: No. She answered |
| 21 | questions about the one -- yes. Yes, the one |
| 22 | dated the 6th. |
| 23 | MR. BELAZIS: She acknowledged an |
| 24 | inaccurate date. |
| 25 | MS. GRIGSBY: I'm now asking her about |

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

113

1      Exhibit 6 dated October 14th.
2          MR. BELAZIS: Okay, I got it. Let me
3   read it, so hold on.
4          THE WITNESS: Yes.
5          MR. BELAZIS: Okay.
6   **BY MS. GRIGSBY:**
7 Q   Tell me when you're ready.
8 A   **Okay.**
9 Q   Okay. First question, were you aware that
10   Mr. Zraik was going to be preparing and sending
11   this "Rebuttal to Reprimand" on your behalf?
12 A   **At this point in time, I was.**
13 Q   Did you approve the content of this letter?
14 A   **He sent me a copy of it.**
15 Q   And did you disagree with anything he proposed to
16   communicate?
17 A   **No, this time the date was correct.**
18 Q   Okay. Now, in the third paragraph of the letter,
19   down at the bottom, the statement is made,
20   "Please be advised that Mrs. Smith's diabetes has
21   never prevented her from performing the essential
22   functions of her job, nor has she ever placed any
23   of her students at risk or in harms way as a
24   result of her diabetic symptoms." Is that a
25   correct statement?

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

114

1 A   **Yes.**
2 Q   Okay.
3 A   **I don't think I've ever put anybody in harms way.**
4 Q   And it's true that your diabetes never prevented
5   you from performing the essential functions of
6   your job, correct?
7 A   **Yes, I believe that's true.**
8 Q   Okay.
9      **THEREUPON, Defendants' Exhibit 8 was marked for**
10   **identification.**
11 Q   Carol, do you recognize the document that's been
12   placed before you and marked as Exhibit 8?
13 A   **Okay.**
14 Q   Okay. My question again, do you recognize the
15   document that's been marked as Exhibit 8?
16 A   **Yes.**
17 Q   What is it, please?
18 A   **It's a letter from Mr. Zraik, again, a Request**
19   **for Reasonable Accommodation.**
20 Q   And this is a letter which you approved, you
21   approved the sending of this letter?
22 A   **I must have, yes.**
23 Q   Okay. And it was addressed to Dr. Gunner,
24   Superintendent of Perkins Local Schools?
25 A   **Okay.**

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

115

1 Q   Correct?
2 A   **Yes.**
3 Q   Okay. As a result of this letter, do you know
4   following this letter, whether a meeting was held
5   to discuss the request made in this letter?
6          MR. BELAZIS: Carol, are you okay?
7          THE WITNESS: Yes, I'm okay, I'm just
8   dimming the light.
9 A   **You know, I can't remember. I think there was a**
10   **meeting, but I can't remember exactly.**
11 Q   Okay. Let me try to refresh your recollection.
12      **THEREUPON, Defendants' Exhibit 9 was marked for**
13   **identification.**
14 Q   Mrs. Smith, if you would take a minute to look at
15   Exhibit 9 and tell me if you recognize it?
16 A   **Okay.**
17 Q   Do you recognize the document that's been marked
18   as Exhibit 9?
19 A   **Yes.**
20 Q   Is this a letter that you received from
21   Dr. Gunner requesting you to attend a meeting to
22   discuss Mr. Zraik's request for accommodation?
23 A   **Yes.**
24 Q   And he invites Mr. Zraik's attendance at the
25   meeting as well, correct?

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

116

1 A   **Yes.**
2 Q   And he's proposing that the meeting take place on
3   October 23, 2008, at 4 o'clock at the
4   Administrative Service Center?
5 A   **Yes.**
6 Q   Does that refresh your recollection as to whether
7   or not there was a meeting held between you and
8   Mr. Zraik and Dr. Gunner to discuss your request
9   for accommodation?
10 A   **Yes.**
11 Q   And do you recall that such a meeting, in fact,
12   took place on October 23, 2008?
13 A   **Yes.**
14 Q   Okay.
15      **THEREUPON, Defendants' Exhibit 10 was marked**
16   **for identification.**
17 Q   Could you take a moment, Mrs. Smith, and review
18   Exhibit 10?
19 A   **Yes.**
20 Q   Are you ready?
21 A   **Uh-huh.**
22 Q   Now, after reviewing Exhibit 10, is your
23   recollection refreshed as to what happened at the
24   October 23, 2008 meeting?
25 A   **Yes.**

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

117

1  Q   Okay.  Does this letter accurately summarize the
2      discussions that occurred between you and your
3      attorney, Mr. Zraik, and Dr. Gunner at that
4      meeting?
5  A   Yes.
6  Q   The first sentence of the letter indicates that
7      "This letter is a follow up to our meeting held
8      on Thursday, October 23rd regarding your request
9      for accommodations with your job because of
10     ongoing diabetes care."  Is that an accurate
11     statement?
12 A   Yes.
13 Q   And the accommodations requested at that meeting
14     all pertain to the issue of a need to accommodate
15     your diabetes?
16 A   Yes.
17 Q   Was there any discussion at that meeting
18     concerning the cataract surgery that you had and
19     the resulting complications?
20 A   At this particular meeting, I don't believe so.
21 Q   Okay.  Now, according to this letter there were
22     certain job accommodation that Dr. Gunner agreed
23     to as a result of the meeting, correct?
24 A   Yes.
25 Q   And does this letter accurately set forth the
            HUNTLEY REPORTING SERVICE
                 419-626-4039
                 800-247-8360

118

1      accommodations that he agreed to provide?
2  A   No.
3  Q   What is in error in this letter?
4  A   Classroom coverage.
5  Q   Okay.  Go ahead.  It states that "Mrs. Smith will
6      be permitted to ask for classroom coverage when
7      it is necessary to perform an insulin injection."
8  A   He said that I should call the office and ask the
9      secretary to send somebody down, and most of the
10     time there was nobody, they could send nobody
11     down.
12 Q   Okay.  And I want to draw a distinction here
13     between what you understood was agreed to and the
14     later implementation of it, okay?
15 A   Yes.
16 Q   So I'm talking right now about what you
17     understood was the agreement concerning the
18     accommodations?
19         MR. BELAZIS:  Wait a minute.  I'm going
20     to object to your characterization, because
21     that's not what this says.  This says -- if you
22     could just let her read that first paragraph.
23         MS. GRIGSBY:  Sure, that is fine.
24     BY MS. GRIBSBY:
25 Q   I want to make sure you understand --
            HUNTLEY REPORTING SERVICE
                 419-626-4039
                 800-247-8360

119

1         MR. BELAZIS:  You're suggesting there
2      was an agreement with the parties.
3         MS. GRIGSBY:  Okay, I understand what
4      you're saying.
5      BY MS. GRIGSBY:
6  Q   Two things, first of all, in this meeting there
7      was a discussion and Dr. Gunner says in the
8      letter that he agreed to the following
9      accommodations.  So my question to you is, is it
10     true -- is the description of the accommodations
11     to which he agreed at that meeting accurately set
12     forth in this letter?
13 A   You mean to what he said that I could have?
14 Q   Yes.
15 A   Is that what you're saying?
16 Q   Right.  Does this accurately reflect what he said
17     he would do?
18 A   Yes.
19 Q   Okay.  Okay.  Is there anything that he said he
20     would do with respect to your diabetes that is
21     not set forth in this letter?
22         MR. BELAZIS:  Isn't that the same as
23     the first question you asked?
24         THE WITNESS:  Yes.
25         MS. GRIGSBY:  I'm just asking whether
            HUNTLEY REPORTING SERVICE
                 419-626-4039
                 800-247-8360

120

1      it's complete?
2         THE WITNESS:  I'm confused again.
3         MR. BELAZIS:  I think she asked the
4      same question as before, so presumably it would
5      be the same answer as before.
6         THE WITNESS:  Yes.
7      BY MS. GRIGSBY:
8  Q   This is not only accurate, but it's complete?
9      There's nothing more that was talked about, that
10     he said he would do, other than what's set forth
11     in this letter, right?
12 A   No.  He said that he was going to provide some
13     education.  Is that in this letter?
14 Q   Yes, that is discussed in the letter, if you'll
15     refer to the final bullet point.
16 A   And I think he also said to the staff and to the
17     students --
18 Q   Uh-huh --
19 A   -- because there are kids that just did not
20     understand.
21 Q   Okay.  So you would say his statement that he
22     would provide information about diabetes involved
23     not just the staff, but also students?
24 A   Yes.
25 Q   And is there anything else that he may have said
            HUNTLEY REPORTING SERVICE
                 419-626-4039
                 800-247-8360

121

1    he would do that is not in this letter?
2  A  **Oh, the nurse's office thing there.  He told, he**
3     **said that I can go to the nurse's office whenever**
4     **I needed to, and he said that here, but the**
5     **nurse's office was not always available.**
6  Q  Okay.  Now, did you or your attorney, Mr. Zraik,
7     ever send anything in writing to Dr. Gunner or
8     anybody else at the school in response to this
9     letter, this, meaning Exhibit 10?
10 A  **I'm not sure.  I don't remember.**
11 Q  Sitting here today, you don't recall any --
12 A  **No.**
13 Q  -- writings being issued?
14 A  **Not unless I have everything in front of me.**
15 Q  Okay.  I will tell you that I have not seen one.
16 A  **Uh-huh.  I probably haven't seen it then either.**
17 Q  Okay.  You can't, you don't believe -- is it true
18    that you don't believe a letter was sent in
19    response to this one?
20 A  **By Mr. Zraik?**
21 Q  Or by yourself.
22 A  **No, because I think at that meeting we agreed to**
23    **these things and then here he put it in writing.**
24 Q  Okay.  Is it your understanding that this later
25    letter of November 18th, that's marked as

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

122

1     Exhibit 10, this is just simply confirming the
2     discussions that you had in the meeting?
3  A  **The discussions.**
4  Q  Okay.  Now, during the courses of the meeting was
5     there anything that you discussed with Dr. Gunner
6     or Mr. Zraik, on your behalf, that you wanted to
7     be done on your behalf concerning your diabetes,
8     that he said, "We can't do that" or "I reject
9     that idea?"
10    MR. BELAZIS:  Carol, why don't you look
11    at that letter that Tom wrote and see if there's
12    anything on that.
13    THE WITNESS:  Yes, I -- that was the
14    thing of discussion.
15 A  **They were supposed to work with me to help**
16    **develop a plan to give to the teachers and the**
17    **students, and I was never asked and as far as I**
18    **know that never happened.**
19 Q  Okay.
20 A  **And I was never asked to be involved in helping**
21    **with that plan.  This part about appearing to be**
22    **asleep, I appeared to be asleep quite a bit and**
23    **sometimes some of my students would say to me,**
24    **"Hey, Mrs. Smith, are you okay?"  And I'd say,**
      **"Yeah, I'm fine."  But as far as, you know,**

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

123

1     **nobody ever really approached me and said, "Are**
2     **you okay?  Are you asleep or are you a wake?"**
3     **you know, as far as that goes.**
4  Q  Is that -- let me ask you about that particular
5     issue for a moment.  During the meeting with
6     Mr. Zraik and Dr. Gunner, in which you discussed
7     your accommodations, did you make a specific
8     request that if you appeared to be asleep that
9     people make inquiry of you and ask if you need
10    assistance?  Is that what you were asking for?
11 A  **No, that's what they said should happen.**
12 Q  Okay.  Did you make a request that, of any sort,
13    that when you appeared to be asleep that some
14    particular accommodation be provided?
15 A  **You have to rephrase that.  Ask me that again.**
16 Q  Sure.
17 A  **If I'm asleep I can't ask for it.**
18 Q  I'm asking in a situation in which you appeared
19    to be asleep, did you ask that something happen,
20    that the school do something for you in
21    circumstances in which you appear to be asleep?
22 A  **Did I ask for it?**
23 Q  Yes.  Or you or your attorney, did you make a
24    request that the school do something in
25    particular?

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

124

1  A  **Yes, to monitor, to go to monitor my, my sugar**
2     **levels and take insulin if needed.**
3  Q  Okay.  Did you make a request that when you
4     appeared to be asleep that people be required to
5     rouse you?
6  A  **Well, I personally, specifically --**
7     MR. BELAZIS:  Let me -- wait a second.
8     THE WITNESS:  I'm confused here.
9     MR. BELAZIS:  Are you talking about the
10    letter Mr. Zraik sent?
11    MS. GRIBSBY:  I'm talking about the
12    meeting.  I'm talking about the meeting that they
13    had on October 23rd.
14    THE WITNESS:  That's this one right
15    here.
16    MS. GRIGSBY:  Right.
17 BY MS. GRIGSBY:
18 Q  And was there a discussion in that meeting, about
19    a request on your part, that if you appear to be
20    asleep that someone rouse you?
21 A  **Or else somebody ask me if I'm okay, yes.**
22 Q  You had a discussion of that sort?
23 A  **Based -- it was brief, it was right, you know.**
24 Q  And what did Dr. Gunner say about that issue?
25 A  **He really didn't say anything, that wasn't a big**

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

125

| | |
|---|---|
| 1 | topic of discussion. He just, you know, if I |
| 2 | seem to be asleep then somebody should ask me if |
| 3 | I'm okay. |
| 4 Q | Did you say that or he say that? |
| 5 A | No. I don't remember. |
| 6 Q | Okay. |
| 7 A | All I remember is the topic came up of arousal. |
| 8 Q | Okay. Uh-huh. And you don't remember who said |
| 9 | what about it? |
| 10 A | No, not six years later, I'm sorry. |
| 11 Q | Okay. |
| 12 A | I don't remember. I know we had a very big |
| 13 | discussion on what to do about, about if I was |
| 14 | having any problems. |
| 15 Q | And -- |
| 16 A | And basically, you know, it's here. |
| 17 Q | You said, "Basically it's here," you're referring |
| 18 | now to Exhibit 10? |
| 19 A | Yeah, what he said. |
| 20 Q | And is it your position that Exhibit 10 is a |
| 21 | pretty thorough description of the -- |
| 22 A | No. |
| 23 Q | Okay. Well, tell me, tell me what you meant when |
| 24 | you said, "Basically it's here?" |
| 25 A | We discussed that, you asked me that. |

HUNTLEY REPORTING SERVICE<br>
419-626-4039<br>
800-247-8360

126

| | |
|---|---|
| 1 Q | Okay. |
| 2 A | And I told you here, that I did not get classroom |
| 3 | coverage, that I did not get access to the |
| 4 | nurse's office. |
| 5 Q | Okay. And I'm talking about what was said in the |
| 6 | meeting, not what happened later, okay? Not what |
| 7 | happened later. I want to know what happened in |
| 8 | the meeting. |
| 9 A | In this meeting of October 23rd -- |
| 10 | MR. BELAZIS: Let me just interject. |
| 11 | You've asked her that on other questions several |
| 12 | times. |
| 13 | THE WITNESS: Yes. |
| 14 | MR. BELAZIS: She's given you bits and |
| 15 | pieces of information about it, and now you're |
| 16 | asking her to summarize, and I just want the |
| 17 | record made clear that she's already given you |
| 18 | some of that information before. So to the |
| 19 | extent that she -- that you're asking her to |
| 20 | summarize, I think, you know, she's already given |
| 21 | you some of that. |
| 22 | BY MS. GRIGSBY: |
| 23 Q | I just want to make sure we're thorough. And so |
| 24 | if there's more about that meeting that you |
| 25 | remember that you haven't told me, particularly |

HUNTLEY REPORTING SERVICE<br>
419-626-4039<br>
800-247-8360

127

| | |
|---|---|
| 1 | on this issue of arousal, I want to hear about |
| 2 | it. |
| 3 A | Okay. |
| 4 Q | Okay. Is there more that you can remember about |
| 5 | what was said at the meeting, not what happened |
| 6 | later, what was said at the meeting on the issue |
| 7 | of arousal? |
| 8 A | I really can't remember. |
| 9 Q | Okay. Now, let's talk, you've alluded to this |
| 10 | briefly as we've gone along. This November 18th |
| 11 | letter, Exhibit 10, states "That the school nurse |
| 12 | will conduct an informational session with staff |
| 13 | where general information on diabetes will be |
| 14 | shared with staff to increase awareness of the |
| 15 | disease, warning signs, and typical symptoms of |
| 16 | low and high blood sugar." And I believe you |
| 17 | told me that it was your understanding that a |
| 18 | similar session was going to be had with |
| 19 | students, correct? |
| 20 A | Correct. |
| 21 Q | Did you ever have a discussion or send |
| 22 | communication to the nurse or to Dr. Gunner, or |
| 23 | anybody else in administration, concerning what |
| 24 | personal medical information you would permit to |
| 25 | be disseminated? |

HUNTLEY REPORTING SERVICE<br>
419-626-4039<br>
800-247-8360

128

| | |
|---|---|
| 1 | MR. BELAZIS: Where are you looking at? |
| 2 | I'm sorry. |
| 3 | THE WITNESS: Yes. |
| 4 Q | I'm now just asking a general. After that |
| 5 | meeting -- |
| 6 A | Did I give them information? |
| 7 Q | -- did you give them information and did you say, |
| 8 | "I will permit this aspect of my personal medical |
| 9 | information to be discussed?" |
| 10 A | I told Steve Finn I would help him in any way to |
| 11 | give him any information he needs to help put |
| 12 | this plan together. |
| 13 Q | Okay. And did you tell him specifically what |
| 14 | personal medical information you would allow to |
| 15 | be discussed? |
| 16 A | His answer to me was he will get it to the school |
| 17 | nurses. |
| 18 Q | Okay. Did you ever have -- do you recall a |
| 19 | discussion, in the course of the October 23rd |
| 20 | meeting, about HIPAA restrictions and the |
| 21 | limitations about what might be discussed |
| 22 | concerning your personal medical information |
| 23 | without your approval? |
| 24 A | I think I made a remark that HIPAA protects |
| 25 | people unless I give them information. |

HUNTLEY REPORTING SERVICE<br>
419-626-4039<br>
800-247-8360

129

1  Q   And did you ever advise the school in writing
2      that you had given such permission?
3  A   No, nobody never asked me after that.
4  Q   Now in your discovery responses you indicate that
5      there was a meeting held --
   A   Okay.
   Q   -- with you and Mr. Finn to discuss putting
8      together a program about diabetes.
9  A   Uh-huh.
10 Q   Now, was there such a meeting?
11 A   Yes. That was when he said that he'll give it to
12     the school nurses when I told him I'd be willing
13     to give him everything.
14 Q   Okay. So were you asked by Mr. Finn to compile
15     some information about diabetes?
16 A   He never asked for me to get it personally, he
17     just simply told me he'll have the school nurses
18     put the plan together.
19 Q   Well, let me just take a moment, please.
20     THEREUPON, Defendants' Exhibit 11 was marked
21     for identification.
22 Q   Carol, I'm handing you what's been marked as
23     Exhibit 11, which are your responses to
24     Interrogatories and Requests For Production Of
25     Documents.

131

1  Q   Well, you have some general knowledge of the
2      disease of diabetes --
3  A   Of course.
4  Q   -- by virtue of the fact that you suffer from it,
5      correct?
6  A   Correct.
7  Q   And you've had numerous conversation with your
8      doctors about diabetes, correct?
9  A   Yes.
10 Q   And did you think that the program of diabetes
11     education was to be provided to students and
12     staff needed to include more in-depth information
13     than you personally knew?
14 A   The medical part, yes.
15 Q   You believe that be that in-depth?
16 A   I can tell you what my blood sugars are from
17     since I test six to eight times a day, but I
18     can't tell you exactly what causes them to go up
19     or down.
20 Q   And when Mr. Finn asked you to assist in
21     compiling information on diabetes for this
22     program, you responded by saying, "I don't know
23     where to go to get the information?"
24 A   No. I told him I don't have a medical
25     background. I asked where he wanted me to go for

130

   A   Uh-huh.
2  Q   Do you remember assisting your former attorney,
3      Mr. Kramer, with the preparation of these
4      responses?
5  A   Yes.
6  Q   And do you remember signing these responses?
7  A   Yes.
8  Q   Would you turn to page 16 and your Response to
9      Interrogatory No. 7?
10 A   Okay.
11 Q   Referring to the second paragraph of your
12     Response to Interrogatory No. 7. Is it true that
13     Mr. Finn called you into his office on
14     November 24, 2008 and told you to start putting
15     together materials for a program about diabetes?
16 A   Uh-huh.
17 Q   That's a true statement?
18 A   Yes.
19 Q   Okay. And did he ask you to provide and
20     accumulate material about the disease?
21 A   He asked me -- I think he was talking about more
22     about the personal aspect of the disease from me.
23 Q   Okay.
24 A   But as far as getting the medical part of it, I
       didn't know where to go except to a library.

132

1      the information and he could have suggested, but
2      he did not respond and he didn't say anything.
3  Q   Does he have a medical background?
4  A   No.
5  Q   Okay.
6  A   At least I don't think so.
7  Q   Okay. Now, as far as you know, was there ever
8      meetings or communications made with staff
9      members and students about diabetes?
10 A   No.
11 Q   The fact that those meetings did not occur, did
12     that prevent you from teaching and monitoring
13     students?
14 A   Monitoring them?
15 Q   Yes. The fact that those meetings did not occur,
16     did that in any way inhibit your ability to
17     teach?
18 A   No. Only -- well, there were times I did not
19     feel good, but I got through the program.
20 Q   Okay. And the fact that they never had such a
21     meeting, did that in any way prevent you from
22     supervising students?
23 A   You mean the nurses had a meeting with the
24     students?
25 Q   The fact that this meeting to disseminate

133

1   information about diabetes --
2  A   Okay.
3  Q   -- the fact that that did not happen --
4  A   Right.
5  Q   -- did that in any way prevent you from
    appropriately supervising students?
7  A   No.  Sometimes I would take a piece, a candy bar
8      or something, and a kid says, "We're not allowed
9      to eat in class," and I would explain that I was
10     diabetic and they have to indulge, and if I had
11     enough I would hand them out to them.
12 Q   So, you, in fact, then communicated with students
13     on an as needed basis about --
14 A   On an as needed base.
15 Q   -- about the effects of your condition?
16 A   It was not my place to educate them though.
17         THE WITNESS:  May I say something or
18     maybe not?
19         MR. BELAZIS:  No, you may not.  Just
20     answer her questions.
21         THE WITNESS:  Okay.
22     BY MS. GRIGSBY:
23 Q   Did you ever get back to Mr. Finn with
24     information that you thought might be useful to
25     use at a meeting to educate students and staff

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

134

2      about diabetes?
3          MR. BELAZIS:  I think that's been asked
4      and she's answered.
5          THE WITNESS:  Yes.
6      BY MS. GRIGSBY:
6  Q   You did come back and provide him information?
7  A   Yes, you asked me that.  And did I give him
8      handouts to disseminate?
9  Q   Or any information.
10 A   If he asked me how I felt I would say sometimes
11     I, you know, I feel, you know, pretty good.
12 Q   Okay.  I did ask you questions earlier about
13     whether or not you gave him, or anybody at the
14     administration, information about what personal
15     information you wanted released?  We did discuss
16     that.
17 A   Yes.
18 Q   But now I'm talking more generally about
19     diabetes, the disease --
20 A   Okay.
21 Q   -- in general terms.  Did you ever provide him
22     any information that you thought would be
23     appropriate to include in a meeting or a
24     discussion about diabetes with staff and
       students?

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

135

1  A   I was in the library one time helping put books
2      away and there was a book on medical things and
3      it just so -- and I just looked up the diabetes
4      thing and he walked by and I said, "Here's some
5      information for you," and he just kept going.
6  Q   You gave him the book?
7  A   No, he just kept going.
8  Q   Okay.  Did he respond to your --
9  A   No.
10 Q   And you don't know whether he heard you or not?
11 A   I thought he did, because I was loud enough.
12 Q   Okay.  Now after the November 18, 2008 letter was
13     issued, did you ever make a request for classroom
14     coverage --
15 A   Is it this one?
16 Q   Yes.  Yes, ma'am.  Did you ever make a request
17     for classroom coverage in order to depart the
18     classroom and make an insulin injection --
19 A   Yes.
20 Q   -- in which, and the response to the request was,
21     "No, you may not have coverage?"
22 A   Yes.
23 Q   Okay.  Who told you that?
24 A   I was to call the school office.  There was
25     phones in the classroom and I was to call the

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

136

1      office and they would tell me they'll send
2      somebody down.
3  Q   Did you ever make that request and nobody came?
4  A   One time, and when they did get there they said
5      that somebody stopped them.
6  Q   Okay.  So you recall -- but the person ultimately
7      did make it to the room?
8  A   Yes, but I got so sick that I -- Chuck Teagarden
9      walked by and stood there for me for ten minutes
10     while I went and tested my sugar and took
11     insulin.
12 Q   Okay.  So if I'm understanding you correctly,
13     there was an occasion that you called to the
14     office for coverage of your classroom?
15 A   Several.
16 Q   Well, you've made several requests for classroom
17     coverage?
18         MR. BELAZIS:  Is this at the junior
19     high you're talking about?
20         THE WITNESS:  Yes.
21     BY MS. GRIGSBY:
22 Q   Okay.  And were there times that coverage came?
23 A   Yes.
24 Q   Okay.  Were there times that coverage did not
25     come?

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

137

1    A    Yes.
2    Q    How many times did coverage not come?
3            MR. BELAZIS: Carol, if you remember.
4            THE WITNESS: Yes, I'm trying to count
5    here who I asked and what happened.
6    A    **Seven that I can think of.**
7    Q    Okay. You say -- if there were seven times that
8         coverage did not come, how many times did it
9         come?
10   A    **I have to think again.**
11   Q    Okay.
12   A    **Probably six or seven.**
13   Q    Okay. Now, let's talk about the seven times when
14        coverage did not come.
15   A    **Uh-huh.**
16   Q    Did those all happen at the junior high, the
17        middle school building?
18   A    **Yes.**
19   Q    Okay. And this would have been in the school
20        year 2008-2009?
21   A    **Yes.**
22   Q    Okay. Because we know 2009-2010 you were at the
23        high school?
24   A    **Right.**
25   Q    So seven times during 2008-2009 you called to the

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

138

1    office and said, "I need someone to cover my
2    classroom because I need to depart to make an
3    injection?"
4    A    **Yes.**
5    Q    Okay. And can you tell me when the first
6         occasion occurred or the circumstances
7         surrounding the first occasion?
8    A    **I felt sick to my stomach and got very lethargic,**
9         **again, I called the office and said, "Dawn, I**
10        **need to -- I think I need a shot here," and she**
11        **said, "I'll get somebody down there." Are you --**
12        **this is the first time somebody did come down?**
13   Q    No, somebody did not. I'm only interested right
14        now about the times that somebody did not.
15   A    **Okay. And I, finally I thought I was actually**
16        **going to throw up and there was a girl's restroom**
17        **just the next, two doors away, the 8th grade**
18        **girl's restroom, and I grabbed my glucometer and**
19        **my insulin and I ran down there and I actually**
20        **did throw up and I took my -- I spread toilet**
21        **paper on the floor, because it was so dirty in**
22        **there, I finally spread out my things and the --**
23        **it was, 348 was my sugar level that day. And I**
24        **took my shot and went right back into the room.**
25   Q    When you went back into the room was somebody

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

139

1    covering the classroom?
2    A    **No.**
3    Q    Okay.
4    A    **I had no choice.**
5    Q    Did you follow up and inquire why nobody came in
6         response to your request?
7    A    **Yes.**
8    Q    What did you learn?
9    A    **I learned that every time they asked somebody to**
10        **come down, nobody would come, they couldn't come.**
11   Q    So that they did request people to go?
12   A    **Yes.**
13   Q    And no one was available to come?
14   A    **I don't know why nobody came.**
15   Q    Is that what you were informed?
16   A    **A couple times they told me there was nobody**
17        **available to get down there.**
18   Q    Okay. On this particular occasion, were you told
19        that they had asked people to go and they were
20        unable to get there?
21   A    **No, they said they'll try and send somebody down.**
22   Q    More quickly?
23   A    **Well, as soon as they can.**
24   Q    Okay. Did they give you any other explanation as
25        to why nobody came on that occasion?

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

140

1    A    **No.**
2    Q    Tell me about the second -- and do you have an
3         estimate of the date of that event?
4    A    **Oh, God. That event, that particular event was**
5         **in November. I remember that because it was**
6         **raining outside and I felt so bad that as soon as**
7         **the class was over, and I didn't care if I have**
8         **to walk across that parking lot, I happen to walk**
9         **over from the high school and I knew that I was**
10        **just -- I was so sick I just got back to my car**
11        **in the rain, I didn't care if it was raining or**
12        **not.**
13   Q    Now, on that occasion did you speak with Dawn in
14        the --
15   A    **Dawn or Tammy.**
16   Q    Now, are those two secretaries that work in
17        the --
18   A    **In the office.**
19   Q    -- in the middle school office?
20   A    **Uh-huh.**
21   Q    And when you first made the request Dawn advised
22        you they'll send somebody down?
23   A    **Not on that occasion.**
24   Q    Okay.
25   A    **She said she'll try to get somebody down there.**

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

141

1  Q    Okay.
2  A    When they weren't sure that somebody could come
3       down, they would always try to get -- they'd
4       always say, "We'll try to get somebody down
5       there."  A couple times they said they could not
6       find anybody to come down.
7  Q    On this one they said "We'll try to get somebody
8       down there?"
9  A    Uh-huh.
10 Q    And after nobody came and you were forced to go
11      to the 8th grade restroom, did you go to Mr. Finn
12      and say, "Look, I requested assistance and nobody
13      came?"
14 A    No, I left then and walked right back down to my
15      car and went home, I was feeling that terrible.
16 Q    On the next day --
17 A    The next day I told, I -- one time I said to him,
18      and I can't remember if it was that occasion or
19      not, "That nobody was available to come down to
20      my room for if I needed insulin."
21 Q    And --
22 A    And he said he'll try.
23 Q    He said --
24 A    He said he'll try to see to it that there's
25      somebody there.

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

142

1  Q    Okay.  Do you have any reason to know whether
2       Dawn informed him on that event --
3  A    No, I don't know.
4  Q    -- that you had made the request?
5  A    I wasn't in the office, I don't know.
6  Q    Okay.  Now, you said there were six other times?
7  A    About six, I think, that I can recollect here.
8  Q    Okay.
9           MR. BELAZIS:  Can I make a couple quick
10      calls before you go through these six?
11          MS. GRIGSBY:  Sure thing.  Yes.  Yes.
12          THEREUPON, there was a brief recess.
13 Q    Carol, when we broke we were speaking about
14      incidents in which you requested classroom
15      coverage --
16 A    Right.
17 Q    -- at the middle school, and you recalled seven
18      incidences in which you requested coverage and it
19      did not come.
20 A    Approximately seven, I don't Know if I recall
21      each time.
22 Q    Okay.  You described the first one for me, one
23      that occurred in November of 2008, can you
24      remember the next time that you --
25 A    It was in November.

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

143

1  Q    Another incident in November?
2  A    At the end of the month.
3  Q    Okay.
4  A    And the reason I knew that, is because we were
5       breaking for Thanksgiving and, and I just, I knew
6       I needed a shot and Dawn answered the phone and
7       she was very busy, she was in the office by
8       herself --
9  Q    Uh-huh.
10 A    -- and she says, "I have nobody to send down."
11 Q    What was your response to that?
12 A    I waited for as long as I could.
13 Q    When she said, "I have nobody to send down," how
14      did you -- did you verbalized a response to her?
15 A    No.
16 Q    Okay.
17 A    I said I needed somebody, but that was it.
18 Q    Okay.  And so when you waited and nobody came,
19      then what did you do?
20 A    When I waited and nobody came, at that time it
21      was towards the end of the day and knew I'd make
22      it until after the kids left, and as soon as that
23      boy left then I quick took my sugar and took my
24      insulin.
25 Q    Okay.  Did you bring to the attention, to

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

144

1       Mr. Finn's attention, the fact that you made a
2       request for coverage and Dawn the told you there
3       was nobody available?
4  A    No.
5  Q    Did you bring it to Mr. Gunner, or Dr. Gunner's
6       attention?
7  A    No.  Was I supposed to bring all of these things
8       to their attention?
9  Q    I'm just asking if you did?
10 A    Oh, okay.
11 Q    Now, that's the second occasion.  Do you remember
12      the next occasion in which you requested coverage
13      of your classroom in the middle school and
14      somebody did not come?
15 A    Yes.  They said the guidance counselor will be
16      right down and then he got way late.
17 Q    Who is the guidance counselor?
18 A    John Stradtman.
19 Q    So you were informed by the office that someone
20      was coming?
21 A    Yes.
22 Q    Did they identify it as John?
23 A    Yes, they told me Mr. Stradtman will be down.
24 Q    And you later learned that he got diverted?
25 A    Yes.

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

145

| | | |
|---|---|---|
| 1 | Q | What were you told? |
| 2 | A | He told me right after school, he said, "Carol, |
| 3 | | somebody stopped me and I just couldn't get down |
| 4 | | there, because it was very important." That's |
| 5 | | all he said to me. |
| 6 | Q | So he essentially apologizing to you? |
| 7 | A | Yes. |
| 8 | Q | Did you bring that issue to the attention of |
| 9 | | Mr. Finn or Dr. Gunner? |
| 10 | A | No. |
| 11 | Q | Okay. Do you remember the next time, the fourth |
| 12 | | time, that you requested coverage and nobody |
| 13 | | came? |
| 14 | A | Yes, I do. |
| 15 | Q | When did that happen? |
| 16 | A | That happened, it was in December, I think, it |
| 17 | | was in the beginning. It was after we came back, |
| 18 | | it was in December. |
| 19 | Q | 2008? |
| 20 | A | Uh-huh. |
| 21 | Q | What happened in that circumstance? |
| 22 | A | Well, this is very embarrassing. I'm not sure -- |
| 23 | Q | We will think nothing of it. Don't feel |
| 24 | | uncomfortable. |
| 25 | A | Not only did I feel like I needed an insulin |

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

146

| | | |
|---|---|---|
| 1 | | shot, but I also had to use the restroom -- |
| 2 | Q | I understand. |
| 3 | A | -- and nobody was available to come down, and I |
| 4 | | actually did not make it to the restroom. |
| 5 | Q | Okay. Now, you made a phone call to the office? |
| 6 | A | Yes. |
| 7 | Q | And who did you speak with? |
| 8 | A | I spoke with Dawn. |
| 9 | Q | And what did Dawn say? |
| 10 | A | Dawn said she'll try to get somebody down there. |
| 11 | Q | Okay. And you waited for a few moments and |
| 12 | | nobody came? |
| 13 | A | That's correct. |
| 14 | Q | Okay. And then what happened, you lost control? |
| 15 | A | Yes. |
| 16 | Q | Okay. |
| 17 | A | And, I mean, I had a bottle water on the table |
| 18 | | and I knocked the water over and asked the |
| 19 | | janitor, I told him I spilled water. |
| 20 | Q | Uh-huh. Now, all of these occasions, these first |
| 21 | | four that we've spoken about, what classroom were |
| 22 | | you in when you made the request? Was it always |
| 23 | | the same classroom? |
| 24 | A | Yes. |
| 25 | Q | What classroom was that? |

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

147

| | | |
|---|---|---|
| 1 | A | That was the music room. |
| 2 | Q | In the middle school? |
| 3 | A | Yes. |
| 4 | Q | And this, we sometimes refer to it as the choir |
| 5 | | room? |
| 6 | A | Yes. |
| 7 | Q | And this is the room where your duty was to -- |
| 8 | A | Sit there for the kids. |
| 9 | Q | -- to supervise in-school suspended students? |
| 10 | A | Yes. |
| 11 | Q | And on this particular event, when you were |
| 12 | | unable to get anybody there promptly, how many |
| 13 | | students were in the room? |
| 14 | A | One. One or two, I should say. |
| 15 | Q | And were they aware that you had this problem of |
| 16 | | losing control? |
| 17 | A | Losing control of when I had that accident? |
| 18 | Q | Yes. Right. |
| 19 | A | There was one in there that time and, trust me, I |
| 20 | | did not get up out of that seat. |
| 21 | Q | Okay. |
| 22 | A | I knocked my bottle of water over and said, "I |
| 23 | | knocked the water over." |
| 24 | Q | And that's how you explained situation? |
| 25 | A | Yes, I was very embarrassed. |

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

148

| | | |
|---|---|---|
| 1 | Q | Did you later have any conversations with Dawn as |
| 2 | | to why nobody came? |
| 3 | A | Yes, I did. As a matter of fact, not on that |
| 4 | | date but -- |
| 5 | Q | At some point? |
| 6 | A | Yeah. And she said there's just simply nobody to |
| 7 | | send down there, everybody is busy. |
| 8 | Q | And so did she indicate that she had tried to get |
| 9 | | somebody? |
| 10 | A | One time Mr. Finn came down. |
| 11 | Q | One time he did? |
| 12 | A | Yes. |
| 13 | Q | And you called down and he personally responded? |
| 14 | A | Yes. |
| 15 | Q | On this particular occasion, this fourth occasion |
| 16 | | that we're taking about, did she tell you that |
| 17 | | she had requested somebody to come and they were |
| 18 | | unavailable or how did she process your request? |
| 19 | A | She said, "There's nobody that I can send down |
| 20 | | there." |
| 21 | Q | Okay. Did you, upon getting that information |
| 22 | | from Dawn, indicate to Mr. Finn or Dr. Gunner |
| 23 | | that "This process doesn't always work, I need a |
| 24 | | change in it?" |
| 25 | A | Well, no, I did not. I said, I did say to Dawn |

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

149

1 and to Tammy, I said, "Something has got to give
2 here, girls."
3 Q And how did they say -- or how did they respond?
4 A They laughed and said, "Usually there's somebody
5 to send down, Carol."
6 Q Okay. And in that particular circumstance there
7 was not?
8 A No.
9 Q Okay. Do you remember the fifth time that you
10 called for coverage and it was not provided?
11 A Oh, I don't know. That might have been in or
12 around January.
13 Q Of 2009?
14 A Yeah. In fact, I called down there and they said
15 nobody was available. And I waited, it was about
16 ten minutes, and the janitor happen to come in,
17 and I said, "Could you stay here for just
18 five minutes?" And he did, he stood there and I
19 quick ran to the restroom and took an insulin
20 shot.
21 Q And the person who said there's nobody available,
22 was Dawn or Tammy?
23 A Usually Dawn.
24 Q Okay. It was --
25 A Tammy answered the phone once or twice.

150

1 Q On this incident in which you had the janitor --
2 A Uh-huh.
3 Q -- monitor for a period, did you make Mr. Finn or
4 Dr. Gunner aware of that incident?
5 A No.
6 Q So the sixth time that you recall seeking
7 assistance and nobody coming, can you tell me
8 about that?
9 A I'm just trying to remember all of these
10 incidents, incidences. Yes, it was two girls
11 were in there, happen to be in there, and what I
12 did was I just took them to the restroom with me.
13 Q Is that a circumstance in which you called down
14 first for assistance?
15 A Yes.
16 Q And you spoke with Dawn or Tammy?
17 A I spoke with Dawn.
18 Q And you told Dawn you needed some coverage?
19 A Yes.
20 Q And what did she say?
21 A And she says, "There's nobody available, Carol."
22 Q Okay. And you said?
23 A And I says, "Okay," but because they were both
24 girls I just made them use the restroom, go there
25 with me.

151

1 Q Okay. And then the last time, the seventh time,
2 can you tell me about it?
3 A Yes. It just, I was able to hang on on that
4 occasion. That, in fact, I think that was in
5 March, because it was getting kind of nice out
6 and I was able to hang on. And when Dawn just
7 said there was nobody available, and then I just
8 waited until the end and went to my car and took
9 my insulin.
10 Q Okay. Now, I've heard you say that on all of
11 these seven incidents you spoke with Dawn --
12 A And Tammy, too.
13 Q -- and Tammy, but you never spoke directly with
14 Mr. Finn or Dr. Gunner about the fact that nobody
15 came?
16 MR. BELAZIS: Objection. That's
17 inconsistent with her earlier testimony.
18 MS. GRIGSBY: Okay.
19 Q Well, let me ask it to you this way --
20 MR. BELAZIS: She's already testified
21 about that issue.
22 MS. GRIGSBY: If she did, you know, I
23 need to ask you again, because I'm not
24 understanding.
25 BY MS. GRIGSBY:

152

1 Q Can you tell me of those seven incidents how many
2 times you reported to Mr. Finn or Dr. Gunner, or
3 anybody else at the administration, that you had
4 summoned for assistance or coverage and it had
5 not come?
6 A I didn't -- one time I said to Steve that I
7 needed somebody and nobody came, and he said,
8 "I'm sorry," and that was just in a conversation.
9 Q Okay.
10 A But, you know, it's part of the job, I guess, I'm
11 not sure. They couldn't send anybody down and I
12 can't go after them for that.
13 Q Okay.
14 A They were just trying to do their jobs the best
15 they could.
16 Q And there were numerous times, I believe you
17 indicated six or seven, that you did call for
18 assistance and they did some?
19 A And they came down, Mr. Finn came once.
20 Q Okay.
21 A Maybe even more than that, they came quite a few
22 times.
23 Q Okay. Now, the accommodations that we spoke
24 about earlier also included a discussion of you
25 using the nurse's office as a private place where

153

1        you might --
2    A   Uh-huh.
3    Q   -- inject yourself with insulin.  In your
4        Interrogatory responses you indicated that there
5        were three times that you went to the nurse's
         office and she was there with students?
7    A   Uh-huh.
8    Q   Now, on those occasions, did you nevertheless ask
9        to use the office, the nurse's office to --
10   A   Yes.
11   Q   -- inject yourself?
12   A   You mean when the kids were in there?
13   Q   Yes.
14   A   No, I didn't do that then.
15   Q   Okay.  So you saw the kids were in with the
16       nurse --
17   A   Yes.
18   Q   -- and you decided not to utilize that facility?
19   A   Yes.
20   Q   Because you didn't want to take her away from the
21       students?
22   A   I didn't want to take the students away from her.
23   Q   Okay.  Okay.  And did you have any conversation
24       with her to the effect -- by the way, who is the
25       nurse?

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

154

1    A   I don't know.
2    Q   You don't remember?
3    A   Huh-uh.
4    Q   Okay.  Did you have any conversation with the
5        nurse indicating, "You know, it's imperative that
6        I use this office to inject myself?
7    A   I never talked with the nurse, Mr. Finn told me
8        that I would be using the nurse's office.
9    Q   Okay.  And on these three occasions, when you
10       went there, she was --
11   A   She was in there with kids.
12   Q   -- with kids?  Okay.  And what did you do then
13       when she was in there with the kids?
14   A   Well, luckily it was right after lunch and I had
15       a few minutes to get to the music room, so I went
16       to the facility lounge and -- I mean, to the
17       facility restroom, and I used that.
18   Q   Okay.
19   A   Which was just next to the, almost to the nurse's
20       station.
21   Q   Okay.  In the nurse's station, can you describe
22       that, is that a classroom size?
23   A   No.
24   Q   Okay.
     A   It's just a little room across the hall from the

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

155

1        main office --
2    Q   Okay.
3    A   -- and it's kind of planted.
4    Q   Okay.  Are there any dividers in there that you
5        can separate it into segments?
6    A   I saw the kids -- I didn't -- you could see into
7        that room there.
8    Q   Okay.  After you were unable to use the nurse's
9        station on these three occasions, did you tell
10       Mr. Finn or Dr. Gunner, you know, that the
11       station was unavailable despite your need for it?
12   A   Would you --
13   Q   Sure.  After you were unable to use it, because
14       there were students in there with the nurse, did
15       you bring that to the attention of Mr. Finn or
16       Dr. Gunner?
17   A   Yes, and -- yes.
18   Q   And what was their response?
19   A   He'll give me a key.
20   Q   Okay.  And was that satisfactory to you?
21   A   I never got the key.
22   Q   Did you follow-up and asked for it again?
23   A   I asked Tammy Dideon one time and she was going
24       to give me the key to use it and then she got
25       busy.  And I needed to get to the ISI room so I

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

156

1        wouldn't be accused of being late, and so I said,
2        "Tammy, I'll take care of it later."
3    Q   Okay.  And did you do so?
4    A   Yes, that was one of the times that somebody came
5        down.
6    Q   I'm sorry, what do you mean by that, "That was
7        one of the times that somebody came down?"
8    A   Came down, I called later, after I got to the ISI
9        room, and Dawn sent somebody down.
10   Q   Okay.
11   A   Uh-huh.
12   Q   You mean to provide you coverage?
13   A   Yes.
14   Q   So that you could then go --
15   A   Yes.
16   Q   -- to inject yourself?
17   A   Yes.
18   Q   And where did you go?
19   A   To the 8th grade restroom.
20   Q   Okay.  That was because you had not yet received
21       the key?
22   A   Right.
23   Q   Did you ultimately receive the key?
24   A   No.
25   Q   And why is that?

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

157

1   A   I don't know.
2   Q   Did you make an additional request for the key?
3   A   I can't remember that.
4   Q   Okay. You don't remember one way or the other?
5   A   I don't remember. Uh-huh.
6   Q   Did you ever ask to be given other private space
7       after you had these three incidents in which
8       students were in the nurse's office? Did you
9       ever asked to be given other private space where
10      you might inject yourself?
11  A   Did I ask for it? No.
12  Q   And you indicate in your discovery responses
13      there were three times the nurse's office was
14      locked?
15  A   Uh-huh.
16  Q   Is that what prompted you to request a key?
17  A   Yes.
18  Q   Or to be told that you would be provided the key?
19  A   Uh-huh. Well, Mr. Finn told me that he would
20      give me a key and that prompted me to remind him.
21  Q   Okay. And although you were not given the key,
22      you don't recall whether or not you made a
23      subsequent request for it?
24  A   I can't remember.
25  Q   Okay.

158

1   A   I don't honestly remember.
2   Q   Now, we discussed this briefly, I want to just
3       follow up on one respect, the meeting that you
4       had with Mr. Zraik and Dr. Gunner which you ask
5       for accommodation. During the course of that
6       meeting was there dialog, give and take, back and
7       forth between yourself and Mr. Zraik on the one
8       hand and Dr. Gunner on the other?
9   A   Could you repeat that again?
10  Q   Sure. I mean --
11          MR. BELAZIS: You mean did they both
12      talk?
13  Q   Well, did you make proposals and he respond and
14      he make proposals and you respond, was there a
15      dialog about that?
16          MR. BELAZIS: In other words, how did
17      it go during the meeting?
18          MS. GRIGSBY: Yes.
19          THE WITNESS: When Mr. Zraik was there
20      setting up these accommodations?
21          MS. GRIGSBY: Uh-huh.
22  A   No, I think Mr. Zraik and Mr. Gunner did a lot of
23      the talking.
24  Q   They went back and forth?
25  A   They talked.

159

1   Q   Okay. And you don't believe that you were denied
2       the opportunity to have input into that
3       discussion, do you?
4           MR. BELAZIS: Objection. Do you mean
5       did her lawyer keep her from having input?
6   Q   Or did anybody prevent you from expressing what
7       you'd like to say and what you'd like to see
8       happen?
9   A   No, I think I answered questions when he asked
10      me.
11  Q   And so there was an interactive exchange going on
12      between the three of you?
13          MR. BELAZIS: Objection. What do you
14      mean by that?
15          MS. GRIGSBY: Well, I'm using it in the
16      common layperson's understanding of interactive.
17  BY MS. GRIGSBY:
18  Q   Your complaint makes allegations concerning the
19      interactive process and I just want to make sure
20      that this meeting that they had --
21          MR. BELAZIS: Uh-huh.
22  Q   -- between Mr. Zraik and yourself and Dr. Gunner,
23      everybody participated and everybody had input?
24  A   I think so.
25  Q   Okay.

160

1           THEREUPON, Defendants' Exhibit 12 was marked
2       for identification.
3   Q   Carol, my question to you about Exhibit 12 is,
4       whether or not you can recognize this as the
5       Collective Bargaining Agreement in place between
6       the Perkins Education Association and the Perkins
7       Board of Education from July 2008 to June 30,
8       2011?
9   A   Uh-huh.
10  Q   You do recognize the document to be that,
11      correct?
12  A   Yes.
13  Q   Would you please turn to Section 13.03?
14  A   Okay.
15  Q   Okay. This section of the Collective Bargaining
16      Agreement talks about the formal observation and
17      evaluation procedure for teachers, correct?
18  A   Uh-huh.
19  Q   Okay. What is, based upon the language of the
20      document, isn't it true that for persons under a
21      continuing contract the evaluation procedure is
22      quote, "1 formal observation (minimum) every
23      three years" --
24  A   Uh-huh.
25  Q   -- "evidence of Professional growth is required

161

1  each year, excluding the observation year,"
2  correct?
3  A  Uh-huh.
4  Q  You need to say yes or no.
5  A  Yes.
6  Q  Its difficult for her to take down huh-uhs and
7  uh-huhs.
8  A  Okay.  Yes.
9  Q  Okay.
10  A  Yes.
11  Q  Can you point to me in any language in this
12  entire section, 13.03, which continues to the
13  next page, which imposes a maximum number of
14  evaluations that may be conducted on teachers
15  holding a continuing contract?
16  A  What was your question?
17  Q  My question was, can you point to me to any
18  provision within Section 13.03, which imposes a
19  maximum number of evaluations which maybe
20  conducted on teachers holding a continuing
21  contract?
22  A  Right here.
23       MR. BELAZIS:  It speaks for itself.
24       THE WITNESS:  Yes.
25  Q  You're pointing to the language which says, "1

162

1  formal observation (minimum) every three years?"
2  A  Yes.
3  Q  Is it your belief that that language sets forth a
4  maximum of one formal evaluation every three
5  years?
6  A  I don't know what it means since I didn't help
7  write this.
8  Q  How many times did a school administrator sit in
9  your classroom and evaluate your teaching
10  performance between the fall of 2008 and the date
11  of your termination?
12  A  In 2008 and 9 twice, and a notice for the third
13  one.
14  Q  In 2008 and 9?
15  A  Uh-huh.
16  Q  What about 2009-2010?
17  A  2009-2010, I think I had a notice that I was
18  going to be observed once.
19  Q  Did that actually happen?
20  A  I can't remember.  I remember the note, but I'm
21  not sure.
22  Q  Okay.  During the 2008-2009 -- I'm sorry, go
23  ahead.
24  A  No, you go ahead.
25  Q  Did you recall something?

163

1  A  No.
2  Q  I don't want to cut you off.
3  A  No, you didn't.
4  Q  Okay.  The 2008-2009 time frame, when you say you
5  had two formal evaluations and one that was
6  noticed, who did those evaluations?
7  A  Mr. Finn.
8  Q  Both times?
9  A  Uh-huh.
10  Q  And when did they occur in the school year,
11  roughly?
12  A  One, I got one -- let's see, I have to think,
13  2008-2009.  One was before 2009 and one was after
14  2009.
15  Q  Okay.  So one in the first part of the school
16  year and one in the second part of the school
17  year?
18  A  (Nod indicating yes.)
19  Q  The latter part?  And you said you received a --
20  A  Not the latter part, because the latter part is
21  when I got notice that I was going to be observed
22  at the high school.
23  Q  Okay.  So sometime after the calendar turned --
24  A  Uh-huh.
25  Q  -- you had the second one?

164

1  A  Uh-huh.
2  Q  Now, the third one you received notice of, what
3  did that pertain to, an observation plan for your
4  day at the high school?
5  A  Yes.
6  Q  So were you actually evaluated for your
7  performance in teaching at the high school --
8  A  No.
9  Q  -- during 2008-2009?
10  A  No.
11  Q  Okay.  And you did not receive an evaluation at
12  the high school level in 2010, 2009-2010?
13  A  No.
14  Q  When you were there full-time?
15  A  No.
16  Q  Okay.  I think we, for now were done with that.
17       MS. GRIGSBY:  Let's mark the next one
18  as 13.
19    THEREUPON, Defendants' Exhibit 13 was marked
20  for identification.
21  Q  Mrs. Smith, take a look at Exhibit 13 --
22  A  Uh-huh.
23  Q  -- and refresh yourself with that document.
24  A  Yes.
25       MR. BELAZIS:  I'm sorry.

165

1  THE WITNESS: It's right here.
2  MR. BELAZIS: This one here?
3  THE WITNESS: Yep.
4  BY MS. GRIGSBY:
5  Q  Mrs. Smith, do you recognize the document that's been marked as Exhibit 13?
7  A  Yes, I do.
8  Q  Okay. This is correspondence sent to you by
9    Principal Stephen Finn from the middle school to
10   you dated March 15, 2009?
11 A  Yes.
12 Q  Correct?
13 A  Yes.
14 Q  And in this letter he makes reference to an
15   incident on February 25, 2009, correct?
16 A  Yes.
17 Q  And this was a day he says, that he claims, that
18   you were absent from your classroom duties during
19   8th and 9th period?
20 A  Yes.
21 Q  And it indicates in this letter that you and he
22   had discussed the incident, because it refers to
23   "At our last meeting I indicated to you that a
24   staff member observed you in the parking lot in
25   your car and another staff member saw you at

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

166

1  Wendy's restaurant." And did you indeed have an
2  oral conversation prior to this letter with him
3  about those two incidents?
4  A  Yes.
5  Q  And he asked you to provide something in writing,
6    correct?
7  A  Yes.
8  Q  And as of this date he had not yet received it,
9    correct?
10 A  No, he received it.
11 Q  He says in the first sentence, "As of yet, I have
12   not received a written response I have requested
13   of you."
14 A  Yes, I sent him a letter.
15 Q  Okay.
16 A  He wanted it in writing.
17 Q  Okay. Do you know how you delivered the letter
18   to him?
19 A  I think I put it on his desk, I took it to him
20   personally.
21 Q  When did you take it to him?
22 A  It was -- oh, I don't know. I think it was
23   before -- I don't know.
24 Q  Okay. Well --
25 A  You mean what time of the day?

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

167

1  Q  No, what day? Because you -- he says, "I have
2    not yet received -- as of yet, I have not
3    received the written response I have requested."
4    I mean, can we assume that he wouldn't have
5    written that had he actually received it?
6  A  I don't know.
7  Q  Okay.
8  A  Assume is not a good word.
9  Q  He --
10 A  I'm not assuming anything here. What's the date
11   of my letter?
12 Q  Well, I'm going to give that to you next.
13 A  Okay.
14 Q  And that's why I'm a bit confused --
15 A  Uh-huh.
16 Q  -- and I want to see if we can clarify.
17   THEREUPON, Defendants' Exhibit 14 was marked
18   for identification.
19 Q  Mrs. Smith, do you recognize Exhibit 14?
20 A  Yes.
21 Q  And this is a letter dated March 8, 2008 --
22 A  8th, right.
23 Q  -- addressed to Mr. Finn from you?
24 A  Yes.
25 Q  Now, we also have looked at a letter that --

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

168

1  A  It says, "Received March 1, 2009."
2  Q  Well, I'm not so sure that's what it says, but
3    perhaps it does, it's not clear. I mean --
4  A  I know that I gave him the letter.
5  Q  Okay. You gave him the letter at some point?
6  A  Before March the 15th.
7  Q  And you believe it was before March 15th?
8  A  Yes.
9  Q  Okay. In any event, he requested a writing, you
10   provided him this writing?
11 A  Yes.
12 Q  Which is Exhibit 14?
13 A  Yes.
14 Q  And in this letter you talk about the fact that
15   you were missing from periods 8 and 9 of
16   in-school suspension on February 25th, and you
17   acknowledged that that was an error and it's your
18   responsibility. There was some confusion about
19   the schedule, correct?
20 A  Yes. I was just back to school from stomach
21   surgery.
22 Q  Okay. Now, you also discuss the allegation that
23   you were at Wendy's?
24 A  Yes.
25 Q  And you wanted to make it clear to him that you

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

169

| | | |
|---|---|---|
| 1 | | were not there? |
| 2 | A | **I was not at Wendy's.** |
| 3 | Q | And at some point I believe that you indicated |
| 4 | | that perhaps someone may have confused you with |
| 5 | | your sister? |
| | A | **I have an identical twin sister.** |
| 7 | Q | I do too. |
| 8 | A | **Do you?** |
| 9 | Q | Yes, I do. |
| 10 | A | **Life cannot be easy.** |
| 11 | A | But it's so much richer. |
| 12 | A | **Yes, it is.** |
| 13 | Q | You indicated to him that you were not at |
| 14 | | Wendy's, him being Mr. Finn, and at some point |
| 15 | | you indicated to somebody, was it Mr. Finn or |
| 16 | | another member of the administration, that |
| 17 | | perhaps there was confusion with your sister? |
| 18 | A | **I didn't admit -- I didn't say that at all.** |
| 19 | Q | You don't, you never communicated that? |
| 20 | A | **I didn't know she went to Wendy's until after I** |
| 21 | | **put it all together and got home and called her.** |
| 22 | Q | You later learned that she was there? |
| 23 | A | **Yes.** |
| 24 | Q | Okay.  And in retrospect -- |
| 25 | A | **It was Ash Wednesday, she went and got a fish** |

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

170

| | | |
|---|---|---|
| 1 | | sandwich. |
| 2 | Q | And in retrospect, you now think that whoever may |
| 3 | | have reported you there confused you with your |
| 4 | | sister? |
| 5 | A | **Well, obviously.** |
| 6 | Q | Okay.  What I'm getting at is, that nobody just |
| 7 | | simply made that up, there was a basis for the |
| 8 | | individual who reported your presence there to |
| 9 | | think it might be you? |
| 10 | A | **It was not a good day.  I totally screwed up the** |
| 11 | | **schedule and I admitted it to everybody that it** |
| 12 | | **was totally my fault.** |
| 13 | Q | Okay.  I understand that.  I'm breaking this |
| 14 | | incident into the three segments. |
| 15 | A | **Yes.  Okay.** |
| 16 | Q | And we've talked about the confusion on the |
| 17 | | schedule? |
| 18 | A | **Yes.** |
| 19 | Q | Now, we're talking about that fact that somebody |
| 20 | | reported seeing you at Wendy's? |
| 21 | A | **Yes.** |
| 22 | Q | And would you agree that, that because your |
| 23 | | sister was there, that that person, there may |
| 24 | | have been a legitimate reason for that person to |
| | | think it was you? |

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

171

| | | |
|---|---|---|
| 1 | A | **I don't agree with that at all.** |
| 2 | Q | Okay.  You believe that that person just made up |
| 3 | | the story about seeing you at Wendy's? |
| 4 | A | **No.** |
| 5 | Q | What do you -- |
| 6 | A | **Maybe she saw Gracie, but I just want to know who** |
| 7 | | **was watching me.** |
| 8 | Q | Okay.  Were you informed of who made that report? |
| 9 | A | **No, never.** |
| 10 | Q | Okay.  And then there's another concern about a |
| 11 | | staff member seeing you, observing you in the |
| 12 | | parking lot in the car? |
| 13 | A | **Yes.** |
| 14 | Q | Okay.  And you also address that issue in your |
| 15 | | letter of, which is Exhibit 14? |
| 16 | A | **Uh-huh.** |
| 17 | Q | Okay.  Now, after you sent the letter to |
| 18 | | Mr. Finn, was there a meeting at which you |
| 19 | | discussed these issues? |
| 20 | A | **Yes.** |
| 21 | Q | And who all was present at that meeting? |
| 22 | A | **Dr. Gunner, Steve Finn, myself.** |
| 23 | Q | Okay. |
| 24 | | /// |
| 25 | | /// |

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

172

| | | |
|---|---|---|
| 1 | | **THEREUPON, Defendants' Exhibit 15 was marked** |
| 2 | | **for identification.** |
| 3 | Q | Mrs. Smith, I handed you Exhibit 15.  Is this |
| 4 | | letter a document you received from |
| 5 | | Superintendent Gunner asking you to attend a |
| 6 | | disciplinary conference to be held on Tuesday, |
| 7 | | March 31st? |
| 8 | A | **Yes.** |
| 9 | Q | With respect to the incidence that occurred on |
| 10 | | February 25th? |
| 11 | A | **Yes.** |
| 12 | Q | And does that refresh your recollection as to |
| 13 | | when the meeting occurred? |
| 14 | A | **Yes.** |
| 15 | Q | In fact, the meeting did take place on March 31, |
| 16 | | 2009? |
| 17 | A | **Yes.** |
| 18 | Q | And I believe you said that Dr. Gunner was there |
| 19 | | and Mr. Finn was there, correct? |
| 20 | A | **Yes.** |
| 21 | Q | And was Mr. Gerber there, I see he's copied on |
| 22 | | the letter? |
| 23 | A | **Yeah.** |
| 24 | Q | You believe he was? |
| 25 | A | **Yes.** |

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

173

| 1 | Q | Okay. What do you remember about the meeting |
| 2 | | which occurred on March 31, 2009? |
| 3 | A | That Dr. Gunner did not believe I had a twin |
| 4 | | sister. |
| 5 | Q | Okay. And what else do you remember? |
| 6 | A | That I tried to tell him it was all my fault and |
| 7 | | my responsibility that I screwed up the |
| 8 | | schedule -- |
| 9 | Q | Uh-huh. |
| 10 | A | -- and that I tried to explain why I put the seat |
| 11 | | back, in the car, to inject myself, when somebody |
| 12 | | said I was sleeping in the car. |
| 13 | Q | Do you think it was wrong or improper for |
| 14 | | Mr. Finn and Dr. Gunner to follow-up on these |
| 15 | | reports that you had been in the car and you had |
| 16 | | been at Wendy's? |
| 17 | A | Well, the 30 minutes that I was in the car |
| 18 | | injecting myself was my time. They knew that I |
| 19 | | had just come back from bariatric surgery and |
| 20 | | there was no way I could even eat the Wendy's |
| 21 | | food yet, I was still on protein drinks and soft |
| 22 | | food. |
| 23 | Q | So if they received reports from two staff |
| 24 | | members that you, one, that you were at Wendy's |
| 25 | | and, one, that you were in the car in the parking |

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

174

| 1 | | lot during a school day, should they have -- in |
| 2 | | your opinion, was it wrong for them to ask you to |
| 3 | | come to a meeting to discuss these issues? |
| 4 | | MR. BELAZIS: I think she answered |
| 5 | | that. You asked her the same question you asked |
| 6 | | a moment ago. |
| 7 | | THE WITNESS: Yes. |
| 8 | Q | You think it was wrong? |
| 9 | A | Yes, I answered the question. |
| 10 | Q | Okay. Well, he's not, told you not to answer the |
| 11 | | question. |
| 12 | | MR. BELAZIS: Tell her whether you |
| 13 | | thought it was wrong. Did you think it was |
| 14 | | wrong? |
| 15 | | THE WITNESS: I just wondered why all |
| 16 | | these people were watching me, that's all. |
| 17 | | MY MS. GRIGSBY: |
| 18 | Q | And is that issue -- |
| 19 | A | Is it normal for staff teachers to watch each |
| 20 | | other and call and tell every little misdeed? |
| 21 | Q | Did you talk about that issue, that concern, |
| 22 | | about people watching you at the meeting? |
| 23 | A | They didn't want to talk to me about it. |
| 24 | Q | Did you raise it? |
| | A | Yes. |

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

175

| 1 | Q | What did -- |
| 2 | A | You mean people watching me? |
| 3 | Q | Yes. |
| 4 | A | No, I did not. |
| 5 | Q | Okay. |
| 6 | A | I have asked several times who is talking about |
| 7 | | me, but I got no answers. |
| 8 | Q | During the course of that meeting did you ask who |
| 9 | | made this report about Wendy's? |
| 10 | A | Yes. |
| 11 | Q | And what were you told? |
| 12 | A | Nothing. |
| 13 | Q | They declined to tell you who? |
| 14 | A | Yes. |
| 15 | Q | And did you make a request to know who had made |
| 16 | | the report about the car incident or you being in |
| 17 | | the car? |
| 18 | A | Yes, they said a janitor. |
| 19 | Q | Okay. |
| 20 | | THEREUPON, Defendants' Exhibit 16 was marked |
| 21 | | for identification. |
| 22 | Q | During the course of this meeting on March 31st, |
| 23 | | with Mr. Finn and Dr. Gunner, did you ask for any |
| 24 | | particular accommodations to deal with your |
| 25 | | diabetes or any other physical condition? |

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

176

| 1 | A | At this meeting? |
| 2 | Q | Yes, ma'am. |
| 3 | A | I have to read this. |
| 4 | | MR. BELAZIS: I'm sorry, could you read |
| 5 | | that back? |
| 6 | | THEREUPON, the Reporter read the requested |
| 7 | | portion of the record. |
| 8 | | MR. BELAZIS: She, are you asking that |
| 9 | | question in reference to the April 2nd letter |
| 10 | | that you just handed out? |
| 11 | | MS. GRIGSBY: Yes, I mean, just -- |
| 12 | | MR. BELAZIS: Okay. I'm going to have |
| 13 | | her look at it. |
| 14 | | MS. GRIGSBY: I'm actually asking her |
| 15 | | does she remember any conversation? |
| 16 | | BY MS. GRIGSBY: |
| 17 | Q | And if this helps you refresh your recollection |
| 18 | | feel free to review it. |
| 19 | A | This was when they told me that I was going to |
| 20 | | be, have a three-day suspension because of what |
| 21 | | happened. Now -- |
| 22 | | BY MS. GRIGSBY: |
| 23 | Q | So my question, my first question was, in the |
| 24 | | meeting on March 31, 2009, did you ask for any |
| 25 | | particular accommodations to deal with your |

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

177

1      diabetes or physical problem?

2 A    **I guess I assumed that I was still going to get**

3      **them, that we had already discussed previously.**

4 Q    The previous accommodations were still in effect?

5 A    **Yes.**

6 Q    Okay. So you didn't ask for anything new or additional?

7      additional?

8 A    **No.**

9 Q    Now, as you look at paragraph 1 of the letter,

10      Exhibit 16 --

11 A    **Uh-huh.**

12 Q    -- it says that, "I have reviewed and considered

13      the information shared at your disciplinary

14      conference held on Tuesday, March 31, 2009. This

15      information included your written and verbal

16      admittance that the failure to be present at

17      Briar Middle School for your assigned duties on

18      Wednesday, February 25, 2009 was entirely your

19      fault." And, in fact, that's true --

20 A    **Yes.**

21 Q    -- you made that admission at the meeting?

22 A    **I admitted that. It was my, what, second or**

23      **third day back from the surgery --**

24 Q    And --

25            MR. BELAZIS: Let her finish.

            HUNTLEY REPORTING SERVICE

               419-626-4039

               800-247-8360

178

1    BY MS. GRIGSBY:

2 Q    I'm sorry.

3 A    **-- and I called, I called over to Dawn. I knew**

4      **that we were on a schedule at the high school, a**

5      **different schedule, and I called Dawn and I says,**

6      **"Dawn, when is my typing class at the junior**

7      **high?" And she looked at me and said, "At the**

8      **same time, at 11:15." So I assume, again, it's a**

9      **bad word, and I assumed that the schedule was the**

10      **same there. So I thought I have an hour and**

11      **20 minutes here to -- and because I had work to**

12      **do, I was grading papers and inputting them into**

13      **the computer, and I looked at the clock and got**

14      **to the junior high. And I knew I had a few**

15      **minutes and I stretched out in my car to give my**

16      **shot in my groin, and Steve was waiting for me at**

17      **the door.**

18 Q    Okay. Now, you said that Dawn said my class is

19      at 11:15?

20 A    **It's at the same time, she said the same time,**

21      **11:15.**

22 Q    Now, during the meeting with Mr. Finn and

23      Dr. Gunner, did you tell them that Dawn gave you

24      incorrect information?

25 A    **She gave me correct information, because I asked**

            HUNTLEY REPORTING SERVICE

               419-626-4039

               800-247-8360

179

1      her what time my typing class was and she gave me

2      the correct information, but I just didn't

3      realize that the other two classes, that the

4      periods were short and I just assumed that they

5      were on the same schedule.

6 Q    Okay.

7 A    **And when I asked Mr. Finn who took those two**

8      **classes and he said, "I did."**

9 Q    Okay. So you're not telling me today anything

10      different than you told them then?

11 A    **No.**

12 Q    Which was, "It was my mistake and I failed to

13      cover the classes?"

14 A    **Yes.**

15 Q    Okay. Now, that's what you were disciplined for,

16      correct?

17           MR. BELAZIS: Objection. She

18      doesn't -- you're asking her to -- what was in

19      the mind of this man right here.

20 Q    Well, what was your understanding of why you were

21      disciplined?

22           MR. BELAZIS: What was in the letter?

23 A    **That's right, right here.**

24 Q    Okay. You're understanding, the reason why you

25      were disciplined is --

            HUNTLEY REPORTING SERVICE

               419-626-4039

               800-247-8360

180

1 A    **Uh-huh.**

2 Q    -- is for the reason set forth in this letter?

3 A    **That's right.**

4 Q    Did you fail to attend a Firelands Challenge

5      Spring Advisor's meeting on May 4, 2009?

6 A    **May 4, 2009?**

7 Q    Yes, ma'am.

8 A    **It depends on what day of the week that was,**

9      **because we had co-advisors and they wouldn't let**

10      **both of us go, one went and one didn't.**

11 Q    Do you know whether John Gerber, the union

12      president, ever advised the high school principal

13      that you did not attend a meeting you were

14      supposed to attend, a Spring Advisor's, the

15      Firelands Challenge Spring Advisor's meeting?

16           MR. BELAZIS: You mean John Gerber, the

17      union president?

18           MS. GRIGSBY: Yes.

19           THE WITNESS: He was also co-advisor.

20 A    **No, I don't remember that.**

21 Q    Okay. You don't remember that he made that

22      report about you?

23 A    **No, I don't.**

24 Q    Okay.

25 A    **I did not know he made that report about me.**

            HUNTLEY REPORTING SERVICE

               419-626-4039

               800-247-8360

181

1 Q  What is your understanding of what a grievance
2    is?
3 A  **It's to inform my union representative that I'm**
4    **being treated unfairly, that I think I'm being**
5    **treated unfairly.**
6 Q  Okay. Give me just one moment, I'm looking for a
7    particular document. Here it is. Would you,
8    again, direct your attention, Mrs. Smith, to
9    Exhibit 12, and I'm referring now to page 2 of
10   that document.
11 A **12, this is --**
12 Q  Is the Collective Bargaining Agreement and I'm
13   referring to page 2 of that document.
14 A **Page 2. Okay.**
15 Q  Okay. And if you'll take a look at Section 4.2A,
16   under the title "Definitions," do you see that?
17 A **Yes.**
18 Q  It says there, "A," quote, "grievance," end
19   quote, is a claim by a member of the bargaining
20   unit, that there has been a violation,
21   misapplication, or misinterpretation of one or
22   more of the provisions of this agreement." Do
23   you agree that's how the term grievance is
24   defined there?
25 A **Okay.**

182

1 Q  You'll agree with that?
2 A  **Yes.**
3 Q  Okay. Now using that definition as a grievance,
4    okay, can you tell me prior to April 7, 2009, had
5    you or your union representatives filed any
6    formal grievances concerning your claim that a
7    provision of the Collective Bargaining Agreement
8    had been violated, misapplied, or misinterpreted?
9 A  **Will you repeat that back?**
10 Q  Sure. Prior to April 7, 2009, did you or your
11   union representatives ever file a grievance in
12   which you said, "A provision of the Collective
13   Bargaining has been violated or misapplied or
14   misinterpreted concerning me?"
15      MR. BELAZIS: You mean, did she use
16   those words?
17      MS. GRIGSBY: No. No.
18 Q  But did you file that kind of grievance?
19      MR. BELAZIS: Well, then you're asking
20   her to --
21      MS. GRIGSBY: I mean, you --
22      MR. BELAZIS: You're asking her to
23   interpret a contractual provision.
24      MS. GRIGSBY: No.
         MR. BELAZIS: So I object to the form

183

1    of the question.
2       MS. GRIBSBY: That's fine.
3 **BY MS. GRIGSBY:**
4 Q  A moment ago you told me you thought a grievance
5    was any time that you had been treated improperly
6    or unfairly?
7 A  **Yes.**
8 Q  Under the Collective Bargaining Agreement it uses
9    a different definition, okay?
10 A **Yes.**
11 Q  It uses a definition that says, "A grievance is a
12   violation, a misapplication, or misinterpretation
13   of one of the provisions of the Collective
14   Bargaining Agreement, correct?
15 A **Yes.**
16 Q  Now, I'm talking about that kind of grievance,
17   okay?
18 A **Okay.**
19      MR. BELAZIS: Again, I'm making the
20   same objection as before. You're asking her to
21   draw a legal conclusion about a contractual
22   provision and interpret what it means and it's
23   not an appropriate question for this witness to
24   answer.
25      MS. GRIGSBY: I'm not asking her to

184

1    interpret that provision.
2 Q  I'm simply asking, did you file a grievance in
3    which you claimed the Collective Bargaining
4    Agreement had been violated, misapplied, or
5    misinterpreted --
6       MR. BELAZIS: The same objection.
7 Q  -- as opposed to saying, "I've been mistreated?"
8       MR. BELAZIS: The question doesn't make
9    any sense. If you want to ask her if she filed
10   any grievances or asked the union to file a
11   grievance on her behalf, then ask her and she can
12   tell you. But if you're asking her to try to
13   interpret this contract and figure out what it
14   means and whether she used language of the
15   contract in asking for the grievance be pursued?
16   Or if you're asking her to try to figure out
17   whether she used the right language or whether
18   her request was properly within the scope of this
19   grievance? That's outside the scope of this
20   witness's ability to answer and she should not.
21      MS. GRIGSBY: Let me rephrase the
22   question.
23 **BY MS. GRIGSBY:**
24 Q  My question to you is, how many grievances have
25   you filed or been filed on your behalf?

185

| 1 | A | 15 or 16. |
|---|---|---|
| 2 | Q | Okay. And how many since the 2008-2009 school |
| 3 | | year? |
| 4 | A | Probably two-thirds or most of them. |
| 5 | Q | Okay. Now, I'm going to focus in on the date of |
| 6 | | April 7, 2009 and I'll tell you why. |
| 7 | A | Okay. |
| 8 | Q | My understanding is that that is the date on |
| 9 | | which you reviewed your personnel file. |
| 10 | A | I -- at where, the Board office or in school or? |
| 11 | Q | Well, let me ask you. Did you, in the spring of |
| 12 | | 2009, review your personnel file? |
| 13 | A | Boy, I honestly don't remember on that date. |
| 14 | Q | I'm talking just in general time frame of the |
| 15 | | spring 2009, did you have occasion to go to the |
| 16 | | administration office and review your personnel |
| 17 | | file? |
| 18 | | MR. BELAZIS: Do you remember if it was |
| 19 | | in the spring? Do you remember? |
| 20 | | THE WITNESS: I don't remember even |
| 21 | | seeing it until later. |
| 22 | | MR. BELAZIS: Until later? |
| 23 | | BY MS. GRIGSBY: |
| 24 | Q | Well, at some point you reviewed your personnel |
| 25 | | file? |

186

| 1 | A | Okay. |
|---|---|---|
| 2 | Q | Well, did you? |
| 3 | A | I must have. |
| 4 | Q | Well, you just said, "Until later?" |
| 5 | A | Well, later, after everything was said and done. |
| 6 | Q | You mean after your termination? |
| 7 | A | Uh-huh. |
| 8 | Q | Okay. Do you remember ever reviewing your |
| 9 | | personnel file prior to your termination? |
| 10 | A | No, I don't. |
| 11 | Q | Okay. |
| 12 | A | I must have. I must have. |
| 13 | | MR. BELAZIS: Carol, knock it off. |
| 14 | | THE WITNESS: I know, I know. |
| 15 | | THEREUPON, Defendants' Exhibit 17 was marked |
| 16 | | for identification. |
| 17 | Q | Carol, have you ever seen this document before, |
| 18 | | Exhibit 17. This is, purports to be an e-mail |
| 19 | | sent to Dr. Gunner from John Gerber? |
| 20 | A | Right. |
| 21 | Q | Okay. Have you ever seen this before? |
| 22 | A | No, I have not. |
| 23 | Q | Okay. I want to direct your attention to the |
| 24 | | third paragraph. |
| 25 | A | Yes. |

187

| 1 | Q | And it says there, "I" -- John Gerber is |
|---|---|---|
| 2 | | speaking. |
| 3 | A | Uh-huh. |
| 4 | Q | -- "I had asked Carol to be sure she viewed her |
| 5 | | personnel file at ASC," the Administrative |
| 6 | | Service Center, "so I could better represent her |
| 7 | | in the grievance process. She indicated that she |
| 8 | | viewed her personnel file at ASC in the presence |
| 9 | | of Lisa." Do you know the Lisa he's referring |
| 10 | | to? |
| 11 | A | Yes. |
| 12 | Q | Who is that? |
| 13 | A | Lisa Crescimano. |
| 14 | Q | Right. "She also indicated that there were no |
| 15 | | disciplinary items in it from the previous few |
| 16 | | years." |
| 17 | A | Okay. |
| 18 | Q | Okay. Now, do you have reason to think that John |
| 19 | | Gerber's e-mail to Dr. Gunner, on May 2, 2009, |
| 20 | | that we're looking at, is inaccurate or false on |
| 21 | | this point? |
| 22 | | MR. BELAZIS: On which point? |
| 23 | | MS. GRIGSBY: On the point we just |
| 24 | | read. |
| 25 | A | No, he's not inaccurate. He was not with me. |

188

| 1 | Q | Okay. So do you now remember having looked at |
|---|---|---|
| 2 | | your personnel file? |
| 3 | A | I did not look at it, Lisa had it in front of her |
| 4 | | and was going through it with me. |
| 5 | Q | Okay. And did Lisa indicate to you there were no |
| 6 | | disciplinary items in it from the previous few |
| 7 | | years? |
| 8 | A | Yes. |
| 9 | Q | Okay. In your complaint you make an allegation |
| 10 | | that documents were placed in your personnel file |
| 11 | | inappropriately, and can you tell me what |
| 12 | | documents were inappropriately placed in your |
| 13 | | file? |
| 14 | A | Is that in here? |
| 15 | Q | No, I'm referring to an allegation in your |
| 16 | | complaint. |
| 17 | | MR. BELAZIS: The complaint that we |
| 18 | | filed. |
| 19 | | THE WITNESS: Yes. |
| 20 | | MR. BELAZIS: Or that was originally |
| 21 | | filed. |
| 22 | | MS. GRIGSBY: Right. |
| 23 | | THE WITNESS: And what did I say? |
| 24 | Q | You made an allegation that documents were placed |
| 25 | | in your file inappropriately and I'm simply |

189

1  asking what documents were placed in your file
2  inappropriately?
3  A  **Placed in my personnel file at the ASC?  I think**
4  **the things that Mr. Gasteier, he was keeping a**
5  **file at the high school and I felt that, that**
6  **maybe those were what I was referring to, that**
7  **maybe if they were in my personnel file they**
8  **shouldn't have been in there.**
9  Q  Well, do you have any evidence or proof that
10  indeed the documents that you're referring to,
11  that Mr. Gasteier was keeping, were placed in
12  your personnel file?
13  A  **You mean when Lisa was going through it with me?**
14  Q  At any time.
15  A  **Oh, I can't remember that.**
16  Q  Okay.
17  A  **I can't remember.  I need to know what documents**
18  **you're referring to.**
19  Q  Well, I'm inquiring about the allegation in your
20  complaint --
21  A  **Uh-huh.**
22  Q  -- that some documents were inappropriately put
23  in your personnel file.
24  A  **Right.**
25  Q  And I guess I'm asking you, have you personally

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

190

1  ever seen documents in your personnel file that
2  should not have been there?
3  MR. BELAZIS:  She's asking what you
4  remember, as you're sitting here today.  If you
5  don't remember then tell her.
6  A  **I don't remember.  I just don't remember.**
7  BY MS. GRIGSBY:
8  Q  Did anybody tell you that, "Hey, I've looked at
9  your personnel file and there's some documents
10  that shouldn't be in there?"
11  A  **Nobody ever told me that.**
12  Q  Okay.  Now, I understand, and I think we talked
13  about this briefly earlier, that both 2007-08 and
14  2008-09 you were a split schedule with half your
15  time at the high school and half of your time in
16  the middle school?
17  A  **Yes.**
18  Q  And in the morning you were at the high school
19  where you taught Accounting and Introduction to
20  Business, and then you had lunch, and after lunch
21  you went to the middle school and you taught
22  Keyboarding, you had three periods of supervision
23  of suspended students, and that's correct,
24  correct?
A  **Uh-huh.**

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

191

1  Q  Now, we talked earlier about a meeting in which
2  you discussed with Dr. Gunner your assignments
3  for the 2009-10 coming school year?
4  A  **Yes.**
5  Q  Correct?
6  A  **Yes.**
7  Q  Did he make you aware that the keyboarding class
8  was being eliminated in the middle school?
9  A  **He made me aware of that before that day.**
10  Q  So you were aware of that?
11  A  **Uh-huh.**
12  Q  Did you understand the reason for that to be that
13  the middle school was transitioning to a
14  One-to-One Laptop Program?
15  A  **Yes.**
16  Q  Okay.
17  A  **The middle school or the high school.**
18  Q  Okay.
19  A  **That's all right.**
20  Q  And did you understand that it was because of
21  those, that change that there would no longer be
22  a need for you to teach Keyboarding?
23  A  **Uh-huh.**
24  MR. BELAZIS:  You mean as far as what
25  was expressed to her?

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

192

1  MS. GRIGSBY:  Yes.
2  A  **No, I always felt there was a need to teach**
3  **keyboarding.**
4  Q  Were you ever advised that because of changes in
5  the curriculum that that class was not going to
6  be held?
7  A  **Yes.**
8  Q  And did you understand that those changes to
9  curriculum had to do with different computerized
10  technology and so forth?
11  A  **Yes.**
12  Q  Okay.  So the fact that you were not going to be
13  teaching Keyboard in the coming year had nothing
14  to do with your disability, did it?
15  MR. BELAZIS:  Objection.  You're asking
16  her to speculate about what was in the mind of
17  the people who made the decision.
18  Q  Well, in your view, did the fact that you were
19  not going to be teaching Keyboard have anything
20  to do with your disability, your diabetes?
21  A  **Well, no.**
22  Q  Okay.  And did you understand that non-teaching
23  personnel were going to be doing the supervision
24  of ISI?  Were you told that that was what was
25  going to happen?

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

193

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | And were you told why that was going to happen? |
| 3 | A | I think Dr. Gunner told everybody in a teacher's |
| 4 | | meeting. |
| 5 | Q | And what did he say? |
| 6 | A | He said they'll utilize, better utilize us |
| 7 | | teachers. |
| 8 | Q | That he didn't want teachers doing supervision? |
| 9 | A | Right. |
| 10 | Q | And that people who were, had lesser |
| 11 | | qualifications than teachers were going to be |
| 12 | | doing that, correct? |
| 13 | A | Yes. |
| 14 | Q | Okay. |
| 15 | | THEREUPON, Defendants' Exhibit 18 was marked |
| 16 | | for identification. |
| 17 | Q | Carol, do you recognize Exhibit 18? |
| 18 | A | Yes. |
| 19 | Q | And can you confirm that to be a letter that the |
| 20 | | high school principal, Chris Gasteier, sent to |
| 21 | | you on June 1, 2009, concerning your schedule for |
| 22 | | the upcoming year? |
| 23 | A | Yes. |
| 24 | Q | Do you have any reason to believe anything in |
| 25 | | this letter is false? |

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

194

| | | |
|---|---|---|
| 1 | A | No. |
| 2 | Q | Okay. |
| 3 | | THEREUPON, Defendants' Exhibit 19 was marked |
| 4 | | for identification. |
| 5 | Q | Carol, do you recognize the document that's been |
| 6 | | marked as Exhibit 19? |
| 7 | A | Yes. |
| 8 | Q | Did you receive this letter on or about the date |
| 9 | | of June 5, 2009? |
| 10 | A | Yes. |
| 11 | Q | And this letter references a series of three |
| 12 | | incidents in early June 2009, correct? |
| 13 | A | Yes. |
| 14 | Q | Now, one involved you being late to a class, |
| 15 | | period three class, and you indicated that you |
| 16 | | were delayed because of a meeting with a student, |
| 17 | | correct? |
| 18 | A | Yes. |
| 19 | Q | Isn't it true that Mr. Gasteier later informed |
| 20 | | you that he spoke to the student involved and |
| 21 | | learned indeed there had been a conversation? |
| 22 | A | Yes. |
| 23 | Q | And you were not disciplined as a result of that |
| 24 | | incident, were you? |
| 24 | A | I don't know. |

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

195

| | | |
|---|---|---|
| 1 | Q | Okay. |
| 2 | | THEREUPON, Defendants' Exhibit 20 was marked |
| 3 | | for identification. |
| 4 | | MR. BELAZIS: Before you get to the |
| 5 | | next sequence can we just take a short break? |
| 6 | | MS. GRIGSBY: Sure. |
| 7 | | THEREUPON, there was a brief recess. |
| 8 | Q | We may come back to that one. But right now, |
| 9 | | Carol, can I direct your attention to Exhibit 20? |
| 10 | A | Yes. |
| 11 | Q | Do you recognize that letter as one that you |
| 12 | | received from Principal Gasteier on or around |
| 13 | | June 15, 2009? |
| 14 | A | Yes. |
| 15 | Q | Okay. And directing your attention to the second |
| 16 | | paragraph of that letter. Mr. Gasteier states in |
| 17 | | the second sentence, "I understand that you were |
| 18 | | late to class because you met with a student. I |
| 19 | | spoke with the student who confirmed your |
| 20 | | conversation. I want to emphasize that being on |
| 21 | | time and in attendance at the beginning of a |
| 22 | | class a good professional conduct and that |
| 23 | | student meetings must be scheduled accordingly." |
| 24 | A | Uh-huh. |
| 25 | Q | And is that the essence of the conversation that |

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

196

| | | |
|---|---|---|
| 1 | | you had with him? |
| 2 | A | With Mr. Gasteier? |
| 3 | Q | Yes. |
| 4 | A | No, he stopped me to ask me why I was late and I |
| 5 | | told him I wouldn't have been late if one of the |
| 6 | | students hadn't stopped me to discuss something, |
| 7 | | and I always put the students first, and then |
| 8 | | Mr. Gasteier asked me why I was late. |
| 9 | Q | Okay. And was that a separate conversation you |
| 10 | | had? You said he stopped you, but this letter |
| 11 | | refers to a meeting held in his office. |
| 12 | A | No, the student stopped me in the hallway. |
| 13 | Q | Oh, okay. I apologize. |
| 14 | A | Yeah. |
| 15 | Q | Okay. So you did have a meeting in his office, |
| 16 | | and with you and Mr. Gerber and Mr. Gasteier, in |
| 17 | | which he confirmed that he had talked to the |
| 18 | | student who said, "Yes, indeed there was a |
| 19 | | discussion?" |
| 20 | A | Yes. |
| 21 | Q | Okay. And he did though want to emphasize with |
| 22 | | you the importance of being in class and to |
| 23 | | schedule student meetings accordingly, correct? |
| 24 | A | Uh-huh. |
| 25 | Q | Yes? |

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

197

1  A  Yes. I'm sorry.
2  Q  Now, turning back to Exhibit 19, another issue of
3     concern raised there had to do with whether you
4     attended a discussion that was to be held in
5     Mr. McVeigh's fifth period study hall to discuss
6     curriculum, correct?
7  A  On the second one?
8  Q  I'm going back to 19.
9  A  Right. And you are referring to the second
10    bullet?
11 Q  No, I'm not, I'm referring to the third bullet.
12 A  "Wednesday and Thursday, leaving class during --
13    discovery of pertinent." (Reading document to
14    herself.) Leaving class during the study hall
15    portion, no, that's absolutely untrue, because
16    Mr. McVeigh told me to leave. He told me after
17    the class that there was no reason for me to stay
18    there.
19 Q  Okay. Now, if you refer back to Exhibit 20.
20 A  Okay.
21 Q  And refer to the third paragraph of that
22    letter -- the fourth paragraph.
23 A  Uh-huh.
24 Q  Could you read that out loud?
25 A  "With regard to the second area of concern I

198

1     have" --
2  Q  No. No. The next one, the fourth paragraph.
3  A  "With regard to the final area of concern, I
4     acknowledge that you were not specifically
5     instructed to remain in Mr. McVeigh's fifth
6     period study hall to discuss curricular matters."
7  Q  So Mr. Gasteier there is acknowledging that he is
8     not pursuing discipline related to that third
9     bullet point, correct?
10 A  Correct.
11 Q  Okay. Then the remaining incident had to do with
12    the middle bullet point?
13 A  That's correct.
14 Q  Okay. And they had to do with some allegations
15    from your fellow teachers that you were observed
16    sleeping in social studies classes that you had
17    been assigned to observe, correct?
18 A  There's only two of them and one I was ten
19    minutes late to, that was the first bullet, and
20    the second one is a perfectly -- it's untrue.
21 Q  Okay.
22 A  I was awake the whole period, I sat in the front
23    of the class.
24 Q  Okay. This is a class you were observing,
       because the next year you were going to be

199

1     teaching --
2  A  Yes.
3  Q  -- social studies? And do you deny that fellow
4     teachers made a report that you were sleeping in
5     that class?
6     MR. BELAZIS: Objection.
7     THE WITNESS: Fellow teachers.
8     MR. BELAZIS: If you want to ask her if
9     she has some personal knowledge of what the
10    teachers reported, that's fine, but you haven't
11    established that.
12 Q  Is it your understanding, based upon
13    communications you've had with others?
14 A  The only teacher in there was Mr. McVeigh.
15 Q  Have you been informed that Mr. McVeigh made a
16    report that you were sleeping in that class?
17 A  Yes.
18 Q  And do you agree that -- do you have any problem
19    with the administration, the principal or the
20    superintendent, following up Mr. McVeigh's report
21    and investigating Mr. McVeigh's report that you
22    were sleeping in the classroom?
23 A  That's his job.
24 Q  Okay.
25 A  But unfortunately --

200

1     MR. BELAZIS: Just -- you answered the
2     question.
3     THE WITNESS: Yes.
4  BY MS. GRIGSBY:
5  Q  Now, Exhibit 19 references a request that you
6     attend a disciplinary conference on June 9, 2009.
7  A  Okay.
8  Q  And do you remember was there, in fact, a
9     disciplinary conference on June 9, 2009 to
10    discuss those three incidents?
11 A  Yes.
12 Q  Now during that meeting what explanation did you
13    provide with regard to the issue of, or the
14    allegation that you had been sleeping in
15    Mr. McVeigh's classroom?
16 A  I was in the front of the class looking at the
17    screen, he showed two movie clips, one of Vietnam
18    and one of Korea, or Korea first and then
19    Vietnam. And he -- and I'm just sitting there
20    and the room is light and dark and I'm sitting
21    like this to adjust my eyes, I'm up in the chair,
22    I'm sitting and watching and paying attention,
23    I'm wondering what he's going to do, and he
24    walked in front of me and I saw him go to his
25    desk and rearrange the computer to show the next

201

1 movie clip, and he said I was sleeping.
2 Q And you provided that explanation of your conduct
3 in the meeting on June 9, 2009 to Mr. Gasteier
4 and Dr. Gunner? Mr. Gasteier was there?
5 A Mr. Gasteier wrote this letter, it looks like,
signed by Mr. Gunner.
7 Q Just so the record is clear, at the June 9, 2009
8 meeting, you were there?
9 A That's this one.
10 Q And Dr. Gunner was there?
11 A Dr. Gunner was there --
12 Q And do you recall --
13 A -- and Mr. Gerber was there.
14 Q -- Mr. Gerber? Do you recall Mr. Gasteier being
15 there?
16 A No, I don't.
17 Q Okay. But in any event, to Dr. Gunner who was
18 there, you offered the explanation that you just
19 provided to me?
20 A Yes.
21 Q Okay.
22 A I was not sleeping.
23 Q Okay.
24 A When you're sitting that close to the screen your
25 eyes get tired.

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

202

1 Q So were your eyes closed?
2 A This one closes, I got to give it a rest because
3 it takes the burden.
4 Q And so you said, "I'm not sleeping, but my eyes
5 were closed" --
6 A Yes.
7 Q -- "due to resting?"
8 A Yes.
9 Q Okay. During the course of that June 9, 2009
10 meeting, you were there and Mr. Gerber was there,
11 did you request any particular accommodations as
12 a result of the need to rest your eye?
13 A No.
14 Q And also with regard to that meeting, that
15 June 9, 2009 meeting, did you have any particular
16 discussions in that meeting about the cataract
17 surgery that you had had and the resulting
18 complications?
19 MR. BELAZIS: She's already answered
20 that.
21 THE WITNESS: Yes.
22 A No, not in that particular meeting.
23 Q Okay.
24 ///
///

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

203

1 THEREUPON, Defendants' Exhibit 21 was marked
2 for identification.
3 Q Mrs. Smith, do you recognize the letter that's
4 been marked as Exhibit 21?
5 A Yes.
6 Q Okay. Is this a letter that you received from
7 Superintendent Gunner on or around June 19, 2009?
8 A Yes.
9 Q Or shortly thereafter June 19th? Okay. Among
10 other things, this letter refers, on page 2, the
11 last paragraph, to a requirement that you undergo
12 a complete physical and psychological
13 examination --
14 A Yes.
15 Q -- at the Board of Education's expense to
16 determine your physical and mental capacity to
17 continue to teach for the Perkins Local School
18 District, correct?
19 A Yes.
20 Q Okay. And, in fact, did you submit to such an
21 examination?
22 A A physical.
23 Q Was there ever a psychological examination?
24 A No.
25 MR. BELAZIS: Now, that was requested

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

204

1 by me in my discovery, if you're about to hand
2 her the report?
3 MS. GRIGSBY: Uh-huh.
4 MR. BELAZIS: And you haven't provided
5 it in the advance of the deposition, apparently
6 you've had it. So I'd like to review it first --
7 MS. GRIGSBY: Sure.
8 MR. BELAZIS: -- and I'd like to
9 consult with her before she answer any questions
10 about it.
11 MS. GRIGSBY: I believe that this was
12 among documents that were --
13 MR. BELAZIS: Requested in my
14 discovery.
15 MS. GRIGSBY: Yes, and I believe they
16 were. You don't believe you were provided this?
17 MR. BELAZIS: You haven't given me
18 anything so far, correct?
19 MS. GRIGSBY: Oh.
20 MR. BELAZIS: In response to my
21 discovery requests?
22 MS. GRIGSBY: Well, the documents that
23 were voluntarily produced to you.
24 MR. BELAZIS: I don't believe it was in
25 there.

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

205

1  MS. GRIGSBY:  I think it was, but if
2  not, please take all the time you need.
3  **THEREUPON, Defendants' Exhibit 22 was marked**
4  **for identification.**
5  **THEREUPON, there was a brief recess.**
   **BY MS. GRIGSBY:**
7  Q  Mrs. Smith, have you seen the document that has
8  been marked as Exhibit 22 prior to today?
9  A  **No.**
10 Q  Do you know whether this copy, a copy of this
11 document was ever given to any of your prior
12 attorneys, either Mr. Zraik or the folks who
13 represented you in connection with the
14 termination, or Mr. Kramer?
15 A  **No, I don't know.**
16 Q  Okay.
17 A  **I don't know if Mr. Kramer asked for a copy.**
18 Q  Okay.  In any event, I'm going to ask you a
19 couple questions about the document or things
20 said in the document.  There's reference in the
21 document to a sleep apnea condition?
22 A  **Yes.**
23 Q  Okay.  Prior to the date -- let me back up.  This
24 document is dated August 7, 2008, but it's my
25 belief that that's an inaccurate date, that it

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

206

1  actually was August 7, 2009, would you agree with
2  that?
3  A  **No, I think it was 2008.**
4  Q  Well, the reason I say that is, because if you
5  look at the prior letter which orders or requests
6  the examination it's dated June 19, 2009?
7  A  **Uh-huh.**
8  Q  And this -- so obviously the examination had to
9  occur after that date?
10 A  **I don't know.**
11 Q  So I believe that your examination actually took
12 place on August 7, 2009.
13 A  **Okay.**
14 Q  Would you agree with that?
15 A  **I'm not sure.  There's a conflict here, I'm not**
16 **sure.**
17 Q  Okay.
18 A  **I guess the only way is to call the doctor's**
19 **office.**
20 Q  Okay.  Well, in any event, there is reference in
21 the report to a sleep apnea condition.  And my
22 question to you is, prior to the date of the
23 examination had you ever advised anybody at
24 Perkins that you had a sleep apnea condition?
   A  **You mean as far as administration?  I think I**

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

207

1  **might have told Chris one time, Gasteier.**
2  Q  Okay.  Do you know when you had a conversation
3  with Mr. Gasteier about that topic?
4  A  **No, I think we were just kind of conversing.**
5  **But, I don't talk about it, that's all.**
6  Q  So you never went out of your way to advise
7  people at the administration of Perkins Schools
8  that you had a sleep apnea condition?
9  A  **No.**
10 Q  Okay.
11 A  **Actually the subject never came up.**
12 Q  Okay.  But in the course of communicating your
13 history to the physician who conducted this
14 examination, who is Dr. Kale --
15 A  **Yes.**
16 Q  -- you advised him of that fact?
17 A  **Yes.**
18 Q  Okay.  There's also reference in this document to
19 the fact that you underwent a, were a participant
20 in a sleep study at the Cleveland Clinic?
21 A  **Yes.**
22 Q  Okay.  Now, prior to the date of the examination
23 had you ever advised the administration at
24 Perkins that you had been a participant in the
25 sleep study?

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

208

1  A  **That was in the summertime, I think, I'm pretty**
2  **sure, the sleep study, and I just didn't talk to**
3  **anybody.**
4  Q  Yes.  Okay.  So, and because it was during the
5  summer you didn't feel the need to --
6  A  **Right.  Yes.**
7  Q  -- to discuss that?
8  A  **I didn't take any time off from school for that.**
9  Q  Okay.  Now, what kind of problems were you having
10 with your sleep that prompted you to take part in
11 a sleep study?
12 A  **Mostly breathing probably, breathing, you know,**
13 **and, you know, how you gasp for air.**
14 Q  When did the sleep study take place?
15 A  **Oh, boy.  This was before my bariatric surgery, I**
16 **know that, way before, and -- oh boy, this is**
17 **years ago.**
18 MR. BELAZIS:  If you don't remember,
19 tell her you don't remember.
20 A  **I don't remember.**
21 Q  In trying to at least ball park it, do you know
22 whether it was before or after Dr. Gunner became
23 superintendent of schools?
24 A  **Oh, before.**
25 Q  Now, who was the doctor in charge of that study?

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

209

| | | |
|---|---|---|
| 1 | A | I was just trying to think, he was a German man |
| 2 | | with a thick accent, but he retired right after |
| 3 | | that and moved to California, and it was a German |
| 4 | | name and I can't think of it. |
| 5 | Q | That was conducted at the Cleveland Clinic? |
| 6 | A | Yes. |
| 7 | Q | What were the results of that study as they |
| 8 | | pertain to you? |
| 9 | A | They did a U -- a UTTP or they remove my ovula, |
| 10 | | the tonsils -- |
| 11 | Q | Okay. |
| 12 | A | -- that kind of stuff. |
| 13 | Q | So as a result -- |
| 14 | A | Up there, took everything out. |
| 15 | Q | Okay.  So as a result of that sleep study you |
| 16 | | were determined to need some surgery? |
| 17 | A | Yes. |
| 18 | Q | And then you had that surgery? |
| 19 | A | Yes. |
| 20 | Q | And it involved removing your tonsils and |
| 21 | | adenoids? |
| 22 | A | And my ovula. |
| 23 | Q | Okay. |
| 24 | A | And then for awhile I had a BIPAP machine, but I |
| 25 | | started losing weight then that all went away. |

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

210

| | | |
|---|---|---|
| 1 | Q | Okay.  And what kind of -- you said that you had |
| 2 | | trouble, you would have trouble breathing at |
| 3 | | night? |
| 4 | A | When I was sleeping, I didn't -- I would breathe, |
| 5 | | you just skip heartbeats -- |
| 6 | Q | Okay. |
| 7 | A | -- because of the breathing. |
| 8 | Q | Did you have any other symptomology that was |
| 9 | | related to your sleep or your sleep patterns that |
| 10 | | prompted this, the sleep study? |
| 11 | A | The breathing mostly. |
| 12 | Q | Okay.  Anything else? |
| 13 | A | Because, you know, that would wake you up. |
| 14 | Q | Okay.  When was the surgery that you had? |
| 15 | A | I'm just trying to think.  It's awhile ago.  It's |
| 16 | | ten years ago, anyway. |
| 17 | Q | So maybe 2004? |
| 18 | A | I don't know. |
| 19 | Q | In that time frame? |
| 20 | A | Yes, probably. |
| 21 | Q | Just quickly, is the doctor who conducted the |
| 22 | | sleep study and the doctor who did the surgery, |
| 23 | | as a result, were those two different |
| 24 | | individuals? |
| | A | Yes. |

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

211

| | | |
|---|---|---|
| 1 | Q | Are there names among those listed in response |
| 2 | | to -- |
| 3 | A | Vaschack. |
| 4 | Q | -- your Interrogatories -- I mean, your Request |
| 5 | | For Production of Documents of your care |
| 6 | | providers? |
| 7 | A | He is not on here. |
| 8 | Q | Okay.  So do you have any records which would |
| 9 | | tell us the name of your -- of those two doctors? |
| 10 | A | I had records, but -- |
| 11 | | MR. BELAZIS:  We can get those for you. |
| 12 | | MS. GRIGSBY:  Okay.  I just want to |
| 13 | | make sure if there are not here, then they |
| 14 | | haven't been compiled.  Mr. Kramer didn't compile |
| 15 | | them, so I'd like for those to be compiled as |
| 16 | | well. |
| 17 | | MR. BELAZIS:  The bariatric surgery, |
| 18 | | and I think that was done, was that at Firelands? |
| 19 | | THE WITNESS:  No, everything was done |
| 20 | | at Cleveland.  The only thing at Firelands was |
| 21 | | the cataract. |
| 22 | | MR. BELAZIS:  Was that in 2005? |
| 23 | | THE WITNESS:  No. |
| 24 | | MR. BELAZIS:  Earlier? |
| 25 | | THE WITNESS:  That.  The surgery she's |

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

212

| | | |
|---|---|---|
| 1 | | talking about was earlier. |
| 2 | | MR. BELAZIS:  Okay. |
| 3 | | MS. GRIGSBY:  Right. |
| 4 | | BY MS. GRIGSBY: |
| 5 | Q | So my understanding is that you had the bariatric |
| 6 | | surgery a couple years after this incident with |
| 7 | | the sleep -- |
| 8 | A | Yes. |
| 9 | Q | -- and the sleep study?  So there must be another |
| 10 | | set of records concerning the sleep study and the |
| 11 | | result the surgery, or two sets? |
| 12 | A | We'll probably have to go to the Cleveland Clinic |
| 13 | | for that. |
| 14 | Q | Right, which are not listed here, so we would |
| 15 | | just like those to be produced. |
| 16 | A | All right. |
| 17 | Q | Okay.  Now, did you provide -- the information in |
| 18 | | the report, 22, indicates that you did not |
| 19 | | provide Dr. Kale with your medical records? |
| 20 | A | No, because he was asking me all kinds of |
| 21 | | questions.  Dr. Vaschack -- |
| 22 | | MR. BELAZIS:  Just -- her only question |
| 23 | | was -- |
| 24 | | THE WITNESS:  No. |
| 25 | | MR. BELAZIS:  -- did you provide your |

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

213

| | | |
|---|---|---|
| 1 | | medical records to the doctor? |
| 2 | | THE WITNESS: No. |
| 3 | | MR. BELAZIS: And I think you already |
| 4 | | answered that. |
| 5 | | THE WITNESS: Yes. No. |
| 6 | | BY MS. GRIGSBY: |
| 7 | Q | On page 3 of his report he indicates "Ms. Smith |
| 8 | | would not allow access to her personal medical |
| 9 | | records;" is that a true statement? |
| 10 | A | No. |
| 11 | Q | Okay. |
| 12 | A | If he would have told me bring them, I would have |
| 13 | | brought them. |
| 14 | Q | Did he ask you during the course of the study |
| 15 | | that he'd like to review your records? |
| 16 | A | No. |
| 17 | Q | Do you have any explanation as to why he would |
| 18 | | state, "Ms. Smith would not allow access to her |
| 19 | | personal medical records?" |
| 20 | A | Where are you seeing that? |
| 21 | Q | The bottom of page 3. |
| 22 | A | The bottom of page 3. |
| 23 | Q | The very bottom. |
| 24 | A | "And therefore today's was based totally on her |
| 25 | | history and clinical examination." I think it's |

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

214

| | | |
|---|---|---|
| 1 | | mostly because I didn't have them.  If he would |
| 2 | | have said, "Can I have your records?"  I don't |
| 3 | | know how I would have gotten them, but I would |
| 4 | | have got them and sent them to him. |
| 5 | Q | Okay.  Now -- |
| 6 | A | You realize after that -- never mind. |
| 7 | | MR. BELAZIS: Did you just stop |
| 8 | | yourself from answering a question that wasn't |
| 9 | | asked? |
| 10 | | THE WITNESS: Yes. |
| 11 | | BY MS. GRIGSBY: |
| 12 | Q | If you'll turn to page 4, Carol, of the document. |
| 13 | | And I direct your attention to the latter part of |
| 14 | | the first paragraph on page 4, okay? |
| 15 | A | Okay. |
| 16 | Q | It says, "Given all the positive changes in her |
| 17 | | status, it is my medical opinion that her medical |
| 18 | | conditions do not absolutely preclude her," |
| 19 | | referring to Carol Smith, "from continuing to |
| 20 | | teach at this time."  Do you agree with that |
| 21 | | assessment? |
| 22 | A | Yes. |
| 23 | Q | So as of the date of the examination -- |
| 24 | A | Uh-huh. |
| 25 | Q | -- you feel that you could teach adequately? |

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

215

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | And would you require any accommodation to |
| 3 | | enabled to you teach adequately? |
| 4 | A | Just the accommodations that they gave me for |
| 5 | | diabetes. |
| 6 | Q | To inject yourself? |
| 7 | A | Uh-huh. |
| 8 | Q | And those that were outlined in the letter that |
| 9 | | we spoke of earlier? |
| 10 | A | Yes. |
| 11 | Q | Okay.  By the way, did you have an objection to |
| 12 | | the fact that you -- did you ever issue an |
| 13 | | objection in writing or verbally to Dr. Gunner |
| 14 | | about the fact that you were required to undergo |
| 15 | | this Fit For Duty Examination? |
| 16 | A | Yes. |
| 17 | Q | Did you filed a grievance concerning it? |
| 18 | A | I filed a grievance concerning the psychological |
| 19 | | exam. |
| 20 | Q | And, in fact, you were never forced to submit to |
| 21 | | the psychological exam? |
| 22 | A | Not after I filed that grievance. |
| 23 | Q | In June, mid June of 2009, did you attend a |
| 24 | | technology seminar with other teachers? |
| 25 | A | Yes. |

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

216

| | | |
|---|---|---|
| 1 | Q | June 16th, 17th time frame 2009? |
| 2 | A | Yes, four days. |
| 3 | Q | Did it ever come to your attention that other |
| 4 | | teachers at the seminar said you had been |
| 5 | | sleeping during the seminar? |
| 6 | A | Yes. |
| 7 | | THEREUPON, Defendants' Exhibit 23 was marked |
| 8 | | for identification. |
| 9 | Q | Do you recognize the document that's been marked |
| 10 | | as Exhibit 23? |
| 11 | A | Yes. |
| 12 | Q | This document requests your attendance at a |
| 13 | | disciplinary conference on July 7, 2009 to |
| 14 | | discuss these accusations -- |
| 15 | A | Yes. |
| 16 | Q | -- of sleeping at a technology seminar?  Did you, |
| 17 | | in fact, sleep during the technology seminar? |
| 18 | A | Not one second. |
| 19 | Q | Why is it that you -- do you have an explanation |
| 20 | | as to why these reports would have been made that |
| 21 | | you were sleeping? |
| 22 | A | No, but others were sleeping. |
| 23 | Q | Was Dr. Gunner in attendance at this seminar? |
| 24 | A | Yes, the first day and the last day. |
| 25 | Q | Okay.  Were any of your other administrators |

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

217

1      present?

2  A   **I think Mr. Gasteier came in one time.**

3  Q   Do you know how long Dr. Gunner was present at

4      the seminar?

5  A   **The first day just to hand out papers that we**

6      **needed to fill out saying that we were there and**

7      **the pay scale and I think at the end just to**

8      **collect them.**

9  Q   So he was not participating in the seminar?

10  A   **He did not participate.**

11  Q   And did not, you know, attend it for educational

12      purposes himself?

13  A   **No, it was an excellent seminar.**

14  Q   Okay. And I was about to ask you, do you have an

15      explanation as to why your fellow teachers would

16      have reported you to have been sleeping?

17  A   **No, I don't.**

18  Q   During the meeting on July 7, 2009, to discuss

19      those allegations, did you offer an explanation

20      as to your conduct?

21  A   **To Dr. Gunner?**

22  Q   Yes, ma'am.

23  A   **Yes, I did.**

24  Q   And what did you tell him?

25  A   **I told him I wasn't sleeping.**

218

1  Q   And did you indicate that you may have given the

2      appearance of sleeping?

3  A   **I didn't give the appearance. I -- my eye, this**

4      **eye closes, I'm looking at the computer, I was**

5      **not sleeping.**

6  Q   Okay.

7  A   **I was working on a project almost for four days.**

8  Q   Okay. Do you feel there was anything improper

9      with Dr. Gunner asking you to explain your view

10      of the events in a disciplinary meeting?

11  A   **No, that's his job.**

12  Q   And did you tell him that you needed any kind of

13      accommodation to participate fully in the

14      seminar?

15  A   **This was -- I'll tell you why the seminar was so**

16      **good, because we got breaks in the morning and we**

17      **had an hour and a half lunch in the afternoon, we**

18      **went back from 1:00 to 3:00, and he usually left**

19      **us out at 11:30.**

20  Q   Uh-huh. So based upon that --

21  A   **I was able to take care of my needs because I had**

22      **a lot of time.**

23  Q   Okay. Did you have conversations with any of

24      your fellow teachers about the fact that it had

25      been reported that you had been sleeping?

219

1  A   **No. You mean during that week?**

2  Q   At any time.

3  A   **No.**

4  Q   Do you know who the teachers were who made the

5      reports?

6  A   **I think Nancy Kinsel.**

7  Q   Okay.

8  A   **I think Shana DeRose-Smith, who sat directly down**

9      **in front of me. I don't know, there might have**

10      **been some more, but I don't know who they were.**

11  Q   Do you have reason to think that those teachers

12      had a motive to report falsely about you?

13  A   **I -- no. I don't know, okay?**

14  Q   Okay. And so if those teachers came to

15      Dr. Gunner and said, "We observed Carol Smith

16      sleeping," and you said to him, "I wasn't

17      sleeping," he was faced with a decision as to who

18      he had to believe, correct?

19  A   **That's correct.**

20  Q   And do you consider there to be anything

21      inherently wrong with the fact that Dr. Gunner,

22      in this situation, chose to believe the other

23      teachers as opposed to you?

24  A   **Dr. Gunner can believe whoever he wants.**

25  Q   Now, in your discovery responses there was some

220

1      discussion of the fact that you were not allowed

2      to go to a technology seminar in Columbus?

3  A   **That's correct.**

4  Q   And instead you went to one in Independence,

5      Ohio?

6  A   **Yes.**

7  Q   And you indicated that was because of a plan to

8      get rid of you? That's what your discovery

9      responses indicate.

10  A   **I don't think that he wanted to spend the money**

11      **for me to go to Columbus because he might have**

12      **thought I might be leaving.**

13  Q   Okay. Do you have any evidence to base that,

14      to --

15  A   **Yes.**

16  Q   -- back up that belief?

17  A   **Yes, I do.**

18  Q   What would that evidence be?

19  A   **Because at one of -- at a meeting with**

20      **Mr. Gasteier, this was, I think, the 1st, started on the**

21      **conference was, I think, the 1st, started on the**

22      **1st day of February and --**

23  Q   The one in Columbus?

24  A   **Yes. And I told Mr. Gasteier in October, as soon**

25      **as he made it public, you know, about this**

221

1 conference, that I would like to go. And he
2 never answered me, he never answered me. In the
3 middle of January I asked him, I said, "Chris,
4 I'd like to go to that conference in Columbus on
5 February 1st and I have not heard anything." And
6 he didn't answer me, he says, "Let me look into
7 it." And then on the, the end of January, before
8 the conference, I said to Chris one more time,
9 "Am I going to Columbus or not?" And he said to
10 me, "How would you like to go to a free
11 conference in Independence, Ohio on February 1st
12 and 2nd?" or the same time basically. And I
13 says, "Well, I'd like to go to Columbus, to the
14 one in Columbus," I says, "I think I'll learn
15 more. You're accusing me not understanding the
16 SMARTBoard and I think I'll learn more down
17 there." And he says, "There's a free one in
18 Independence." And he left me out of school for
19 two days to -- and since Independence is less
20 than 75 miles I had to pay my own expenses.
21 Q You were excused from school for two days to
22 attend the Independence seminar?
23 A Yes.
24 Q If there was a plan in place to try to get rid of
25 you, why would the school district have bothered

222

1 to send you to any seminar at all?
2 A Well, that's a good question. Fair. I don't
3 know.
4 Q Do you know how many people applied to go to the
5 Columbus seminar?
6 A Several.
7 Q Did they all get to go?
8 A Yes.
9 Q Do you know of anybody who applied who didn't get
10 to go?
11 A No.
12 Q Okay.
13 MR. BELAZIS: Theresa, when you're done
14 with this line there's one thing I got to confirm
15 with her about.
16 MS. GRIGSBY: Just a couple more. No,
17 that's fine, I think those questions go off in a
18 different direction, so that's fine.
19 THEREUPON, there was a brief recess.
20 Q Hopefully we won't be that much longer.
21 A That's fine.
22 Q You feel good?
23 A Yes, I just used the restroom.
24 Q Okay, thank you. When we broke, Carol, we were
25 talking about a technology seminar in

223

1 Independence and we talked about that?
2 A Right.
3 Q My understanding, as well, is that there were
4 various STEM school seminars that were made
5 available for staff to attend?
6 A Uh-huh.
7 Q Did you make a request to attend any particular
8 of these STEM seminars?
9 A Yes.
10 Q How many requests did you make?
11 A One for sure that I can remember. I think I
12 might have wanted to go to two, but I went to
13 one.
14 Q Did you actually attend one STEM seminar?
15 A Yes.
16 Q Where was that at?
17 A In Cleveland at Neil Heights, General Electric.
18 Q Do you recall any others that you wish to attend
19 that you didn't?
20 A Well, I think there was, it was in Kentucky or
21 Tennessee, that I would have liked to have gone
22 to, so.
23 Q Are any others that you recall that you wanted to
24 go to?
25 A No, just those two.

224

1 Q Okay. And you did end up going to the one in
2 Cleveland?
3 A Yes.
4 Q But you did not go to the one in Kentucky?
5 A No.
6 Q Why was that?
7 A Because they said -- they turned me down, my
8 application down.
9 Q Do you know how many slots were available for
10 teachers to attend the various seminars?
11 A No.
12 Q Do you know whether other teachers ever made
13 requests to attend particular STEM seminars and
14 were turned down?
15 A No.
16 Q You don't know that they were?
17 A No, I don't know --
18 Q One way or the other?
19 A -- what they applied and were turned down.
20 Q I just want to make sure, you're not saying
21 others were not turned down, you just don't know
22 one way or the other?
23 A That's right.
24 Q Okay. Have you ever utilized FLMA leave?
25 A No.

225

| | | |
|---|---|---|
| 1 | Q | Okay. |
| 2 | A | **That's what, family medical?** |
| 3 | Q | Family Medical Leave Act? |
| 4 | A | **No.** |
| 5 | Q | Okay.  And so I take it that if you've never |
| | | utilized that leave, you've never had a request |
| | | or an extension of that leave denied? |
| 8 | A | **Right.** |
| 9 | Q | Do you have any personal knowledge of the |
| 10 | | circumstances surrounding an FLMA leave |
| 11 | | circumstance involving Christine Donovo? |
| 12 | A | **No.  I know she was gone for quite awhile.** |
| 13 | Q | But do you have any knowledge of those |
| 14 | | circumstances involving her being gone? |
| 15 | A | **I don't know why she was gone.** |
| 16 | Q | Okay.  Do you believe that in some way you've |
| 17 | | been treated differently than Christine? |
| 18 | A | **Well, I never applied for an FLM -- whatever you** |
| 19 | | **call it --** |
| 20 | Q | Okay. |
| 21 | A | **-- family leave medical thing.  I don't know if** |
| 22 | | **that makes us different.** |
| 23 | Q | Okay.  Is there a reason that you believe that |
| 24 | | she was treated more favorably than you in some |
| 25 | | respect? |

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

226

| | | |
|---|---|---|
| 1 | A | **I don't even know Christine Donovo.** |
| 2 | Q | Do you think Shane Burrows was in some way treat |
| 3 | | more favorably than you? |
| 4 | A | **Shane Burrows?** |
| 5 | Q | Uh-huh. |
| 6 | A | **Let's see, I got to think who Shane is.  He's the** |
| 7 | | **Phys Ed teacher, right?  I don't -- maybe in some** |
| 8 | | **respects, I can't tell you exactly.  I think the** |
| 9 | | **union helped him more.** |
| 10 | Q | Okay.  As regards to his interaction with the |
| 11 | | school administration, however, do you think the |
| 12 | | school administration treated him in a better way |
| 13 | | than you? |
| 14 | A | **Shane Burrows?** |
| 15 | Q | Yes. |
| 16 | A | **I don't know.** |
| 17 | Q | Okay.  Eric Talbot? |
| 18 | A | **Eric Talbot?** |
| 19 | Q | Yes.  Who is Eric Talbot? |
| 20 | A | **I don't know.** |
| 21 | Q | Okay. |
| 22 | A | **I think he was a football coach.** |
| 23 | Q | Do you have any evidence that would suggest that |
| 24 | | he was similarly situated than you, to you, and |
| | | treated better by the school administration? |

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

227

| | | |
|---|---|---|
| 1 | A | **I don't -- did he teach at Perkins?  I don't know** |
| 2 | | **much about his history.** |
| 3 | Q | Okay.  Jeff Printy, do you know the name Jeff |
| 4 | | Printy? |
| 5 | A | **Oh, yes.** |
| 6 | Q | Now, who was Jeff Printy or is Jeff Printy? |
| 7 | A | **He was the OWA teacher.** |
| 8 | Q | Uh-huh.  At Perkins? |
| 9 | A | **At Perkins.** |
| 10 | Q | And do you know how many days Jeff Printy had to |
| 11 | | reach his 35 years of teaching at the time he |
| 12 | | became a full-time substitute? |
| 13 | A | **Oh, maybe a month or two.** |
| 14 | Q | Okay.  As of the date of your suspension from |
| 15 | | work, how much longer would you have had to work |
| 16 | | to reach 35 years? |
| 17 | A | **Another year.** |
| 18 | Q | A full year? |
| 19 | A | **Uh-huh.** |
| 20 | Q | Did you ever make a proposal to Dr. Gunner or |
| 21 | | anybody in the administration, during any of the |
| 22 | | disciplinary conferences we've talked about, that |
| 23 | | you become a full-time substitute? |
| 24 | A | **No, I did not.** |
| 25 | Q | Okay.  Who is Donny Fry? |

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

228

| | | |
|---|---|---|
| 1 | A | **Donny Fry?** |
| 2 | | MR. GUNNER:  Donna. |
| 3 | Q | Yes.  Or Donna Fry? |
| 4 | A | **She's the Home Ec teacher that taught, she taught** |
| 5 | | **across the hall from me on the 600 wing.** |
| 6 | Q | Did you ever observe Donna Fry sleeping in class? |
| 7 | A | **Well, I wasn't in her class the same time I was** |
| 8 | | **in mine.** |
| 9 | Q | Or in any school function? |
| 10 | A | **I wasn't -- she just taught across the hall from** |
| 11 | | **me.** |
| 12 | Q | Do you know whether Donna Fry has ever been |
| 13 | | accused of sleeping in class at all? |
| 14 | A | **No, I don't.** |
| 15 | Q | Do you believe that Donna Fry has some way been |
| 16 | | treated more favorably by the school |
| 17 | | administration than you? |
| 18 | A | **Yes, I do.** |
| 19 | Q | What do you believe she was treated better, in |
| 20 | | what regard?  How, I should say? |
| 21 | A | **On her lateness to class.** |
| 22 | Q | What do you know about Donna Fry being late to |
| 23 | | class? |
| 24 | A | **Well, I know that Mr. Gasteier was there one** |
| 25 | | **time, it was that late.** |

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

229

1 Q And so he had to take over the class one time?
2 A Uh-huh.
3 Q Do you know of any other occasion?
4 A Just -- no, not -- I know she was late a few
5 times from being in the building.
6 Q Do you know whether or not there were ever
7 warnings issued to her concerning her tardiness?
8 A No, I don't.
9 Q What building was that?
10 A The high school, in the 600 wing.
11 Q And the occasion that, or occasion or occasions
12 that you saw her being tardy, what year was that?
13 A The last year, 2009.
14 Q 2009 and 2010. Who is Tim Obergefell?
15 A Obergefell is a Political Science teacher in the
16 Social Studies Department.
17 Q Do you know whether Tim was ever reprimanded?
18 A Yes.
19 Q Do you know how many times he was reprimanded?
20 A No.
21 Q Do you know the subject matter of his reprimand?
22 A One was to show a video of "The Beheading."
23 Q And when did that occur?
24 A When did "The Beheading" occur? I don't
25 remember, probably 2008 or 9.

230

1 Q And it's your understanding that he indeed was
2 disciplined for that?
3 A It is not my understanding.
4 Q What is your understanding?
5 A That he was admonished, but I don't know if he
6 was disciplined.
7 Q Okay. It may have been an informal reprimand as
8 opposed to a formal reprimand?
9 A I don't know.
10 Q Okay. Now, you've become aware in the last few
11 years that there were students in your history
12 class, in the high school, that made some,
13 expressed some complaints about a discussion that
14 took place that stemmed from the topic of yellow
15 journalism, correct?
16 A Yes.
17 Q Were you ever made aware that students had
18 expressed those concerns to a teacher and the
19 teacher in turn expressed those concerns to a
20 board member?
21 A Mr. Gasteier told me.
22 Q That that sequence of events occurred?
23 A Yes.
24 Q Were you aware that that Board member then
25 communicated that information to the

231

1 superintendent?
2 A No.
3 Q You were never advised of that?
4 A No.
5 Q If that happened, and that is if a Board member
6 reported a concern about something that happened
7 in a classroom, an inappropriate discussion, an
8 allegation of an inappropriate discussion, would
9 you agree that the superintendent then would have
10 a duty to follow up and look into that
11 allegation?
12 A Maybe.
13 Q Okay. So in this case, do you believe there was
14 anything improper about Dr. Gunner following up
15 and investigating these concerns that were
16 expressed by these students about the discussion?
17 A No.
18 A It was his job?
19 A Yes.
20 Q Okay. Did it ever come to your attention that
21 during the course of investigating those
22 concerns, about the discussion in class, that the
23 students then raised other issues concerning your
24 supervision of the class?
25 A That class was supervised.

232

1 Q I understand that that is your position, that you
2 adequately supervised --
3 A Yes.
4 Q -- but are you aware that students made
5 allegations to the contrary?
6 A Yes.
7 Q Okay. And they made allegations that you were
8 not properly supervising the class?
9 A Okay.
10 Q Correct? Is that your understanding?
11 A To me personally?
12 Q No, ma'am. That during the course of the
13 investigation of the discussion concerning yellow
14 journalism/pornography, that the students also
15 expressed concerns to Dr. Gunner about
16 supervision in the class, are you aware of that?
17 MR. BELAZIS: I'm just going to object
18 to on the grounds that whatever they said, is I
19 think the documents will speak for themselves, so
20 however those are characterized.
21 THE WITNESS: Uh-huh.
22 MS. GRIGSBY: Okay.
23 BY MS. GRIGSBY:
24 Q And during the course of the termination
25 proceeding that ultimately occurred, you heard

233

| 1 | | some of those students testify, didn't you? |
|---|---|---|
| 2 | A | Yes. |
| 3 | Q | And you heard them express concerns that you were |
| 4 | | not appropriately supervising the class, correct? |
| 5 | A | Yes. |
| 6 | Q | And you heard them express testimony that they |
| 7 | | observed you sleeping in class, in their opinion? |
| 8 | A | Yes. |
| 9 | Q | Okay.  Now, if they had made those allegations or |
| 10 | | made those statements to Dr. Gunner before the |
| 11 | | termination proceeding, again, would you agree |
| 12 | | that he would have a duty to look into that |
| 13 | | issue? |
| 14 | A | Yes. |
| 15 | | **THEREUPON, Defendants' Exhibit 24 was marked** |
| 16 | | **for identification**. |
| 17 | | MS. GRIGSBY:  Off the record for a |
| 18 | | minute. |
| 19 | | **THEREUPON, there was a discussion off the** |
| 20 | | **record**. |
| 21 | Q | Mrs. Smith, are you aware that students took |
| 22 | | pictures of you? |
| 23 | A | Yes.  Yes, these were consecutive pictures here. |
| 24 | Q | Okay.  And just so the record is clear, in what |
| 25 | | class, during what class period would the |

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

234

| 1 | | pictures of you have been taken? |
|---|---|---|
| 2 | A | **This was probably when they came back from lunch.** |
| 3 | Q | Okay.  And you're looking now at an exhibit |
| 4 | | that's been marked as No. 24.  And are these the |
| 5 | | pictures that you have come to understand were |
| 6 | | taken of you one day after lunch? |
| 7 | A | **Yes.** |
| 8 | Q | And would that have been a study hall period? |
| 9 | A | **Yes.** |
| 10 | Q | Okay. |
| 11 | A | **No, this was as they were coming in from lunch.** |
| 12 | Q | Coming in from lunch? |
| 13 | A | **Right.** |
| 14 | Q | For your history class? |
| 15 | A | **Yeah.** |
| 16 | Q | Okay.  Now, looking at Exhibit 24, we have three |
| 17 | | pages of photos? |
| 18 | A | **Yeah.** |
| 19 | Q | Not using their last names, can you identify the |
| 20 | | student, the student whose on, is most |
| 21 | | prominently displayed to page 1 of 24? |
| 22 | A | **That's Brian.** |
| 23 | Q | Okay. |
| 24 | | MR. BELAZIS:  You know, I think the |
| 25 | | photos probably aren't going to -- if you have |

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

235

| 1 | | their picture it doesn't matter if their names |
|---|---|---|
| 2 | | are there. |
| 3 | | MS. GRIGSBY:  Well, let's go off the |
| 4 | | record. |
| 5 | | **THEREUPON, there was a discussion off the** |
| 6 | | **record**. |
| 7 | | MR. BELAZIS:  Why don't we just agree |
| 8 | | that the, if it's okay, the court reporter can |
| 9 | | keep the last names of the students out when it's |
| 10 | | transcribed. |
| 11 | | THE WITNESS:  I'm sorry. |
| 12 | | MS. GRIGSBY:  It's okay. |
| 13 | | MR. BELAZIS:  It's not your fault. |
| 14 | | BY MS. GRIGSBY: |
| 15 | Q | So Brian is the individual, the student on, who |
| 16 | | is most prominently displayed on the pictures on |
| 17 | | page 1 and page 2? |
| 18 | A | Yes. |
| 19 | Q | And the first name of the young lady who is on |
| 20 | | page 2 is what? |
| 21 | A | I think that's Amanda. |
| 22 | Q | Okay.  And are you depicted in these photos? |
| 23 | | First directing your attention to page 1 of 24, |
| 24 | | are you depicted in page 1? |
| 25 | A | Yes. |

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

236

| 1 | Q | And where are you located? |
|---|---|---|
| 2 | A | **I'm slouched down in my, in the teacher's chair.** |
| 3 | Q | And you're the lady with the glasses on slouched |
| 4 | | down in the chair? |
| 5 | A | **Yes.** |
| 6 | Q | Okay. |
| 7 | A | **I'm watching the kids take the pictures there.** |
| 8 | Q | Okay.  How are the pictures taken? |
| 9 | A | **Well, I got mad at Brian and Amanda, because I** |
| 10 | | **told them, he was showing her her camera at one** |
| 11 | | **point.  These two, by the way, I think are the** |
| 12 | | **same picture here, one is just bigger than the** |
| 13 | | **other one.** |
| 14 | Q | It could be. |
| 15 | A | **Yes.** |
| 16 | Q | The bottom of page 1 of Exhibit 24 is the same as |
| 17 | | the top picture of page 2. |
| 18 | A | **You know, I was just kind of sitting there** |
| 19 | | **watching them come in and I was watching him to** |
| 20 | | **see what he do with the camera here.  I just** |
| 21 | | **untangled my jacket from the floor, and then, and** |
| 22 | | **he had his arm around her and was taking a** |
| 23 | | **picture of the two of them and I told him,** |
| 24 | | **starting right here, that "Brian, you need to put** |
| 25 | | **that away because you're not allowed to have cell** |

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

237

| | |
|---|---|
| 1 | phones out in the classroom." And here he did |
| 2 | put it away. |
| 3 Q | And you're talking about? |
| 4 A | Or somebody. |
| 5 Q | Which particular photo are you referring to now? |
| 6 A | The bottom of page 2. |
| 7 Q | Okay. |
| 8 A | He was putting it away. And No. 3 I finally sat |
| 9 | up in the chair and told him to "make sure that |
| 10 | you keep that in your pocket or I can confiscate |
| 11 | it." |
| 12 Q | You're referring now to a cell phone? |
| 13 A | Yes. |
| 14 Q | About the size of my cell phone here? |
| 15 A | Yes. |
| 16 Q | Okay. And sitting here today, you're still of |
| 17 | the belief that these photos were taken with a |
| 18 | cell phone? |
| 19 A | That's what I saw him have in his hand. |
| 20 Q | Okay. |
| 21 A | And then the other girl that's not in these |
| 22 | pictures, she had one too. |
| 23 Q | Okay. |
| 24 A | These were taken all together here. |
| 25 Q | In one time period? |

238

| | |
|---|---|
| 1 A | Because he put the cell phone away then. And |
| 2 | Mr. Crabtree came and got him. |
| 3 Q | Mr. Crabtree came and got what? |
| 4 A | Brian out, Brian out of his study hall? |
| 5 Q | That -- in that very day? |
| 6 A | Yes. Right after this, after I told him to put |
| 7 | the cell phone away. |
| 8 Q | And Mr. Crabtree is who? |
| 9 A | His wrestling coach. |
| 10 Q | And why did he come to take Brian away? |
| 11 A | I don't know, he just wanted -- just took him |
| 12 | out. |
| 13 Q | Okay. You don't know whether it had anything to |
| 14 | do with this incident? |
| 15 A | I don't think so, just right after that he left. |
| 16 Q | Okay. Well, if a school principal or a school |
| 17 | administrator were provided these photos during |
| 18 | the investigation of the discussion of yellow |
| 19 | journalism or pornography -- |
| 20 A | Right. |
| 21 Q | -- you would agree he would have a duty to follow |
| 22 | up and make inquiry of these? |
| 23 A | Of course. |
| 24 Q | Prior to this point you had been advised, had you |
| 25 | not, that if there were other incidents of |

239

| | |
|---|---|
| 1 | unprofessional behavior it could lead to |
| 2 | termination? |
| 3 A | Yes. |
| 4 Q | Okay. And, in fact, after being given that |
| 5 | notice, isn't it true that there was another |
| 6 | intervening incident, that is the tech seminar |
| 7 | allegation of sleeping that we talked about |
| 8 | earlier, but you were not immediately terminated, |
| 9 | were you? |
| 10 A | After the tech seminar? |
| 11 Q | Right. |
| 12 A | No. |
| 13 Q | You were docked pay, correct? |
| 14 A | Yes. |
| 15 Q | Did you view that as some kind of reprieve or |
| 16 | grace that you had not been terminated? |
| 17 A | I don't understand your question. |
| 18 Q | Well -- |
| 19 | MR. BELAZIS: Did you feel like you |
| 20 | were lucky you didn't get fired? |
| 21 | THE WITNESS: No, I had no reason to be |
| 22 | fired. |
| 23 Q | Even though it was an intervening incident after |
| 24 | being warned the next incident could lead to |
| 25 | termination? |

240

| | |
|---|---|
| 1 A | Yes. |
| 2 Q | Okay. |
| 3 A | My eyes looked like I am asleep all the time. |
| 4 Q | And just going back to Exhibit 24, it's your |
| 5 | testimony you were not asleep in this photo? |
| 6 | This photo does not depict -- |
| 7 A | It is my testimony. This one here, I'm looking |
| 8 | right at Brian to make sure that he put his phone |
| 9 | away. This is where I noticed he had it up in |
| 10 | the air and that's how I see things. |
| 11 | THEREUPON, Defendants' Exhibit 25 was marked |
| 12 | for identification. |
| 13 Q | Okay. Focusing not so much on your eyes, but |
| 14 | your body posture, is that typically how you sit |
| 15 | in your classroom? |
| 16 A | The kids were just coming in here, that was from |
| 17 | lunch yet. When they started coming in I'm |
| 18 | starting to sit up in the chair at this point, |
| 19 | you can see, I'm higher here and I'm up here. |
| 20 | MS. GRIGSBY: Okay. Just one moment. |
| 21 | (Telephonic Interruption in proceedings.) |
| 22 Q | Do you recognize the letter that's been marked as |
| 23 | Exhibit 23? |
| 24 A | Yes. |
| 25 Q | Is it 23? 25, I'm sorry. And did you, you |

241

1   received this letter approximately July 8, 2009?
2  A   Yes.
3  Q   And I just want to direct your attention to the
4      last paragraph of that letter, because it
5      pertains to the matter we were just discussing.
6      As of July 8, 2009, you had been warned that any
7      further incidence of unprofessional behavior
8      would result in recommendation for termination of
9      your employment, correct?
10 A   Yes.
11 Q   Okay.  This is just a cleanup document here just
12     to clarify something we spoke of earlier.
13         THEREUPON, Defendants' Exhibit 26 was marked
14     for identification.
15 Q   Carol, looking at Exhibit 26, does that refresh
16     your recollection as to the actual date that the
17     Fitness For Duty Examination would have taken
18     place?
19 A   Yes.
20 Q   Indeed, based upon this, do you recall that it
21     occurred in August of 2009?
22 A   2009.
23 Q   Correct?
24 A   Uh-huh.
25         ///

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

242

1         THEREUPON, Defendants' Exhibit 27 was marked
2      for identification.
3  Q   I'm sorry, if you would pass that to your
4      counsel, No. 27, it's the same.  Mrs. Smith, do
5      you recognize the document that's been marked as
6      Exhibit 27?
7  A   Yes.
8  Q   This was a document that you received signed by
9      Dr. Gunner and you acknowledged receipt of it,
10     correct, in writing?
11 A   Yes.
12 Q   Advising you that you were relieved of your
13     duties pending outcome of the investigation
14     pertaining to an inappropriate discussion in the
15     Social Studies class, correct?
16 A   Yes.
17 Q   And at this point Dr. Gunner does not tell you
18     that he's going to recommend your termination,
19     does he?
20 A   Not in this letter.
21 Q   Okay.  Were you asked to provide lesson plans?
22 A   Yes, I had them in my -- in fact, I started
23     typing them but they weren't complete --
24 Q   Okay.
25 A   -- and I told him I was finishing them, because

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

243

1      he wanted me to leave, and I said, "I'll finish
2      them and my husband would run them back," but my
3      husband would not run them back.
4  Q   So your husband just declined to do that?
5  A   That's correct.
6  Q   Did you take it upon yourself to deliver those?
7  A   No, he told me not to set foot back in there.
8  Q   Did you call him to try to make other
9      arrangements for the lesson plans?
10 A   No, my husband told me I couldn't.
11         THEREUPON, Defendants' Exhibit 28 was marked
12     for identification.
13 Q   Mrs. Smith, do you recognize the document that's
14     been marked as Exhibit 28?
15 A   Yes.
16 Q   This is a letter that you received from
17     Dr. Gunner, correct?
18 A   Yes.
19 Q   And it schedules a disciplinary conference on
20     April 1, 2010 concerning engaging in
21     inappropriate discussion in a high school Social
22     Studies class, dozing off for several minutes
23     while supervising study hall and arriving tardy
24     at history, those are the three topics of
25     discussion?

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

244

1  A   Yes.
2  Q   That you were informed that would be discussed?
3  A   Yes.
4  Q   Okay.  Do you think it was inappropriate in any
5      way for Dr. Gunner to have scheduled this
6      conference?
7  A   Yes.
8  Q   Why so?
9  A   Because I didn't think that I did these things.
10 Q   Okay.  If Dr. Gunner received reports that you
11     had done these things, would it have been
12     inappropriate, in your view, for him to have
13     scheduled a conference?
14 A   Would you mind repeating that?
15 Q   Sure.  Let's assume that Dr. Gunner did hear from
16     students that you engaged in inappropriate
17     discussion concerning pornography, that you had
18     dozed off while supervising study hall, and that
19     you arrived tardy at history.
20 A   Uh-huh.
21 Q   If he had received those reports, would it have
22     been inappropriate for him to schedule this
23     conference to discuss them with you?
24 A   No.
25 Q   And do you have any reason to think that these

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

245

| | | |
|---|---|---|
| 1 | | were not the true reasons for -- |
| 2 | A | **Yes.** |
| 3 | Q | -- for his decision to schedule the conference? |
| 4 | A | **Yes.** |
| 5 | Q | You have reason to believe that he did not |
| 6 | | receive such reports? |
| 7 | A | **No.** |
| 8 | Q | Okay. |
| 9 | A | **I'm sure he received the reports.** |
| 10 | Q | Okay. And I'm not arguing with you or |
| 11 | | questioning you about whether the incidents |
| 12 | | occurred. |
| 13 | A | **Uh-huh.** |
| 14 | Q | Do you have reason to believe that he knew they |
| 15 | | didn't occur and was using them simply to engage |
| 16 | | in a discussion with you concerning discipline? |
| 17 | A | **You have to say that again.** |
| 18 | Q | Sure. Do you think that he was using these |
| 19 | | bullet points as a pretext simply to get you into |
| 20 | | a discussion of discipline that could lead to |
| 21 | | your termination? |
| 22 | | MR. BELAZIS: In other words, did he |
| 23 | | have an ulterior motive? |
| 24 | | THE WITNESS: Yes. |
| 25 | Q | What evidence do you have to suggest that he was |

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

246

| | | |
|---|---|---|
| 1 | | not truly interested in investigating these |
| 2 | | issues, but had an ulterior motive? |
| 3 | A | **What evidence?** |
| 4 | Q | Yes. |
| 5 | A | **I don't know what you mean by evidence, but. . .** |
| 6 | Q | What proof? |
| 7 | A | **Because I had repeatedly told him that I was not** |
| 8 | | **sleeping. I tried to explain to him about my** |
| 9 | | **eyes, the doctor, I thought the doctor's report** |
| 10 | | **was fairly good, pretty good.** |
| 11 | Q | The one we just reviewed, Dr. Kale's report? |
| 12 | A | **Yes. Because I am conscientious about my** |
| 13 | | **students and I have been for 38 years.** |
| 14 | Q | So can I take it from that that you were aware of |
| 15 | | Dr. Kale's report and seen it? |
| 16 | A | **No, I just read it.** |
| 17 | Q | Okay. |
| 18 | A | **Well, that's not true, I was aware of his report.** |
| 19 | Q | Okay. |
| 20 | A | **Dr. Gunner did show me the report at one time and** |
| 21 | | **he told me that I would get a copy of it --** |
| 22 | Q | Okay. |
| 23 | A | **-- but I never did.** |
| 24 | Q | Okay. Do you know -- I think you said earlier |
| 25 | | you don't know whether your lawyers did or did |

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

247

| | | |
|---|---|---|
| 1 | | not get a copy? |
| 2 | A | **I do not know if my lawyer got a copy. You mean** |
| 3 | | **Mr. Kramer?** |
| 4 | Q | Or any of your prior lawyers? |
| 5 | A | **No, I don't know if they did or didn't.** |
| 6 | Q | Okay. So for those reasons you believe that he |
| 7 | | wasn't really truly motivated to have this |
| 8 | | conference because of a desire to learn more |
| 9 | | about these allegations? |
| 10 | A | **Oh, I'm sure that's why he scheduled the** |
| 11 | | **conference.** |
| 12 | Q | Okay. Now, in looking through the documents it |
| 13 | | appeared to me that there was a need to |
| 14 | | reschedule the conference a couple times, is that |
| 15 | | your recollection? |
| 16 | A | **This conference?** |
| 17 | Q | Yes, that there may have been a need to engage in |
| 18 | | it on a date other than April 1, 2010? |
| 19 | A | **2010 at 4:00 p.m. Well, I must have been there** |
| 20 | | **at some point, because I got fired.** |
| 21 | Q | Well, let me ask it a different way. No, let me |
| 22 | | strike that. Was there a meeting on April 1, |
| 23 | | 2010 to discuss your potential disciplinary |
| 24 | | action related to the allegations that you had |
| 25 | | engaged in inappropriate discussion? |

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

248

| | | |
|---|---|---|
| 1 | A | **Dr. Gunner personally brought this letter to my** |
| 2 | | **door, front door.** |
| 3 | Q | And we're talking now about 28? |
| 4 | A | **Twenty --** |
| 5 | Q | The Exhibit No. 28? |
| 6 | A | **Yes.** |
| 7 | Q | Okay. Okay. And that advises of a meeting on |
| 8 | | April 1st? |
| 9 | A | **Well, my husband told me that I could not talk to** |
| 10 | | **him.** |
| 11 | Q | Okay. |
| 12 | A | **My husband took the letter.** |
| 13 | Q | Okay. And -- go ahead. |
| 14 | A | **And I, I must have been there, because I got** |
| 15 | | **fired.** |
| 16 | Q | Okay. Well, I'm going to show you another letter |
| 17 | | that -- |
| 18 | A | **Okay.** |
| 19 | Q | -- that we're going to talk about next. That |
| 20 | | will be 29. |
| 21 | | THEREUPON, Defendants' Exhibit 29 was marked |
| 22 | | **for identification.** |
| 23 | Q | Do you recognize the letter that's been marked as |
| 24 | | Exhibit 29? |
| 25 | A | **Yeah, this is April 13th.** |

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

249

| | | |
|---|---|---|
| 1 | Q | Okay.  And you did indeed receive this letter |
| 2 | | from Dr. Gunner? |
| 3 | A | **I don't remember him hand delivering two letters.** |
| 4 | Q | If you'll turn to the second page of it, there's |
| 5 | | some handwriting at the bottom, if you'll look at |
| 6 | | that. |
| 7 | A | **"Letter received," that's me.** |
| 8 | Q | That's your handwriting? |
| 9 | A | **Yes.  That's the one that --** |
| 10 | Q | Could you read the -- |
| 11 | A | **And he did not hand deliver this one, then it was** |
| 12 | | **this one.** |
| 13 | Q | Okay.  Well, the one that is marked as |
| 14 | | Exhibit 29, could you read your handwriting at |
| 15 | | the bottom of it? |
| 16 | A | **Yes, I just told you that's my signature.** |
| 17 | Q | Yes.  It says, "Letter received," can you tell me |
| 18 | | -- "12:45 p.m.," but what is the date that you've |
| 19 | | written there? |
| 20 | A | **April 13th.** |
| 21 | Q | Okay.  The letter states on paragraph 1 that |
| 22 | | there was a meeting held on April 1, 2010 with |
| 23 | | you and your PEA representative? |
| 24 | A | **Yes.** |
| 25 | Q | And do you remember that meeting? |

250

| | | |
|---|---|---|
| 1 | A | **Yes.** |
| 2 | Q | Tell me what happened at that meeting? |
| 3 | A | **I think that Airica Clay was with me and John** |
| 4 | | **Gerber was there -- no, it was not John Gerber,** |
| 5 | | **it was Tom Kinsel, I think, and Dr. Gunner told** |
| 6 | | **me and them that I was being terminated.** |
| 7 | Q | Did he tell you that you were, he was making a |
| 8 | | recommendation for your termination? |
| 9 | A | **Yes.** |
| 10 | Q | And there were three grounds specified for the |
| 11 | | recommendation? |
| 12 | A | **Yes.** |
| 13 | Q | One of which was the engaging in inappropriate |
| 14 | | discussion? |
| 15 | A | **Yes.** |
| 16 | Q | One of which was repeated dozing off incidents -- |
| 17 | A | **Yes.** |
| 18 | Q | -- while supervising Study Hall? |
| 19 | A | **Yes.** |
| 20 | Q | And one of which was arriving tardy? |
| 21 | A | **Yes.** |
| 22 | Q | Okay.  During the course of this meeting did you |
| 23 | | express that you had a medical problem, diabetes, |
| 24 | | or some other -- |
| 25 | A | **At this meeting?** |

251

| | | |
|---|---|---|
| 1 | A | Yes, at this meeting. |
| 2 | A | **I didn't talk at that meeting.** |
| 3 | Q | Okay. |
| 4 | A | **Airica Clay talked.** |
| 5 | Q | Well, did you or your representatives make any |
| 6 | | statements at the meeting that said to the |
| 7 | | effect, "Mrs. Smith has a medical problem which |
| 8 | | is causing her difficulty in being able to |
| 9 | | supervise students?" |
| 10 | | MR. BELAZIS:  Who is Airica Clay? |
| 11 | | THE WITNESS:  Yes. |
| 12 | | MR. GUNNER:  She's the OEA rep. |
| 13 | | MR. BELAZIS:  Oh. |
| 14 | | BY MS. GRIGSBY: |
| 15 | Q | And she was there with you? |
| 16 | A | **She went with me to that meeting.** |
| 17 | Q | Right.  Did anybody on your behalf at that |
| 18 | | meeting make a statement to that effect? |
| 19 | A | **No, I don't think so.** |
| 20 | Q | Okay. |
| 21 | A | **I think maybe Dr. Gunner might have brought it** |
| 22 | | **up.** |
| 23 | Q | Okay.  What do you recall Dr. Gunner saying on |
| 24 | | that topic? |
| 25 | A | **About -- you know, that maybe the, my problems** |

252

| | | |
|---|---|---|
| 1 | | **were just maybe too much to handle, I think it** |
| 2 | | **was basically that I wasn't competent.** |
| 3 | Q | And that's the gist of the statements that you |
| 4 | | recall him making? |
| 5 | A | **Yes.  I don't see her that -- now, I'm not --** |
| 6 | | **scratch all that.  I need to look at this letter** |
| 7 | | **very carefully and I need to think in my mind.** |
| 8 | Q | Okay.  Sure.  Go ahead. |
| 9 | | **THEREUPON, there was a brief recess.** |
| 10 | | MS. GRIGSBY:  Well, actually I want to |
| 11 | | mark another exhibit and I want to mark this 28A. |
| 12 | | **THEREUPON, Defendants' Exhibit 28A was marked** |
| 13 | | **for identification.** |
| 14 | Q | Now, I'm going to ask you some questions about |
| 15 | | 28A in a moment, Carol.  But -- |
| 16 | A | **All right.** |
| 17 | Q | -- back to the meeting that was held on |
| 18 | | April 1st.  During the course of that meeting did |
| 19 | | you or your representatives ask to see the |
| 20 | | statements that were made, the written statement |
| 21 | | that were made by various students; do you |
| 22 | | remember anything about that? |
| 23 | A | **You mean at this meeting?** |
| 24 | Q | The April 1, 2010. |
| 25 | A | **The April 1st meeting, where is that?** |

253

| | | |
|---|---|---|
| 1 | Q | The April 1, 2010 meeting is the one that is |
| 2 | | called for in Exhibit 28, you were given notice |
| 3 | | of that meeting on Exhibit 28. |
| 4 | A | **Right here.  All right, so that's Exhibit 29** |
| 5 | | **you're looking at?** |
| 6 | Q | Yes.  Well, now we're looking at 28A. |
| | A | **Okay.** |
| 8 | Q | Because my understanding is that the meeting did |
| 9 | | go forward on April 1, 2010, we just talked about |
| 10 | | it, right? |
| 11 | A | **Yes.** |
| 12 | Q | And I'm asking you during the course of that |
| 13 | | meeting did you have discussions with Mr. Gunner |
| 14 | | in which you said, or your representative said, |
| 15 | | "May I see the statements that the students have |
| 16 | | given?" |
| 17 | A | **Airica Clay was my representative then?** |
| 18 | Q | Yes. |
| 19 | A | **Yes, and she, her and Mr. Gunner got into some** |
| 20 | | **kind of an exchange --** |
| 21 | Q | Okay. |
| 22 | A | **-- and I don't know what he wouldn't give to her,** |
| 23 | | **but I know it got heated.  And it's just like, it** |
| 24 | | **was obvious he knew that I had an eye problem, he** |
| 25 | | **knew I had diabetes, he knew I had a mobility** |

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

254

| | | |
|---|---|---|
| | | **problem, and she got upset that he didn't have** |
| | | **something there that she wanted.** |
| 3 | Q | Okay.  Well, I asked you specifically about the |
| 4 | | student's statements. |
| 5 | A | **Yeah, the student's statements at that time.** |
| 6 | Q | Do you recall Mr. Gunner advising your |
| 7 | | representatives that due to privacy concerns he |
| 8 | | needed to check with legal counsel to determine |
| 9 | | whether or not the names of the students needed to |
| 10 | | be redacted or any information about the |
| 11 | | students needed to be redacted? |
| 12 | A | **Okay.** |
| 13 | Q | Do you recall that discussion? |
| 14 | A | **Somewhat.** |
| 15 | Q | Okay.  And do you recall that he then said that |
| 16 | | you could meet at another time to discuss those |
| 17 | | statements? |
| 18 | A | **But we did not.** |
| 19 | Q | Well, take a look at Exhibit 28A, if you would. |
| 20 | | And it states at the top, "I have scheduled a |
| 21 | | second disciplinary conference with you for |
| 22 | | Monday, April 12th?" |
| 23 | A | **Yes.** |
| 24 | Q | Does that refresh your recollection as to whether |
| 25 | | a second disciplinary conference was held? |

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

255

| | | |
|---|---|---|
| 1 | A | **Well, on April 12th?** |
| 2 | Q | At some point later. |
| 3 | A | **Well, I don't remember.** |
| 4 | Q | You don't remember whether there were one or two |
| 5 | | conferences? |
| 6 | A | **April 12th, April 13th, April 5th here, you know,** |
| 7 | | **obviously we met on all of those dates, it says** |
| 8 | | **so right here.** |
| 9 | Q | Well, how many meetings did you have with |
| 10 | | Dr. Gunner and your representatives prior to this |
| 11 | | pornography issue coming up, but before your |
| 12 | | termination recommendation was made to the board? |
| 13 | A | **I had no meetings with Dr. Gunner when the** |
| 14 | | **pornography issue, and Airica Clay.  You're** |
| 15 | | **asking specifically about pornography?** |
| 16 | Q | Well, were there disciplinary conferences held |
| 17 | | after allegations were made that you engaged in |
| 18 | | inappropriate discussion of pornography with you |
| 19 | | and your representatives and Dr. Gunner? |
| 20 | A | **Yes.** |
| 21 | Q | How many such conferences took place? |
| 22 | A | **I can't remember how many.  If they're all here,** |
| 23 | | **this many.** |
| 24 | Q | You personally don't have a recollection as to |
| 25 | | whether there was one or more than one? |

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

256

| | | |
|---|---|---|
| 1 | A | **It got to be quite frequent.  With the** |
| 2 | | **pornography issue itself?** |
| 3 | Q | That's what I'm limiting this to, I'm just |
| 4 | | talking -- |
| 5 | A | **Okay.  I did not know I was getting released for** |
| 6 | | **pornography until March the 29th.** |
| 7 | Q | And my question to you is, how many meetings did |
| 8 | | you have subsequent to March 29th, disciplinary |
| 9 | | conferences between you and Dr. Gunner and any |
| 10 | | representatives on your behalf? |
| 11 | A | **For pornography?** |
| 12 | Q | For any issue concerning -- subsequent to the |
| 13 | | March 29, 2010? |
| 14 | A | **Subsequent -- well, should we go through here and** |
| 15 | | **look?** |
| 16 | Q | If that will help you. |
| 17 | A | **Yes, it will.** |
| 18 | Q | Okay, feel free. |
| 19 | A | **There's six or seven here, so.** |
| 20 | Q | I'm not talking about the number of letters, I'm |
| 21 | | talking about the number of conferences. |
| 22 | | MR. BELAZIS:  Do you remember the |
| 23 | | number of conferences? |
| 24 | | THE WITNESS:  No, I don't. |
| 25 | | BY MS. GRIGSBY: |

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

257

1 Q  Okay. Do you recall that there was a meeting
2    scheduled, a disciplinary meeting, scheduled
3    after April 1, 2010, which ultimately did not go
4    forward because your representatives were
5    confused about the date and that it was
6    rescheduled, do you recall that?
   A  Yes.
8 Q  Okay. And so was this second conference then
9    rescheduled and conducted?
10 A  Yes.
11 Q  Okay.
12       THEREUPON, Defendants' Exhibit 30 was marked
13    for identification.
14 Q  Carol, taking a look at Exhibit 30. Does this
15    document -- first of all, can you acknowledge
16    receipt of this document? If you'll turn to the
17    second page.
18 A  I received this on April 14th at 2:00 p.m.
19 Q  Okay. It says in the first paragraph that on
20    April 14, 2010, at one 1:00 p.m., Dr. Gunner met
21    with you and your PEA representative to conduct a
22    disciplinary conference as a follow-up to the
23    conference held on April 1, 2009; do you see
24    that?
25 A  "On April 14th at 1:00 p.m. I met with you and

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

258

1    your Perkins representation to conduct a
2    disciplinary to follow-up to conference held on
3    Thursday" -- yes.
4 Q  Did you provide, or your representative provide
5    Dr. Gunner any additional or new information, or
6    make any new or additional request of him on
7    April 14, 2010?
8 A  I don't remember. I don't remember how this
9    went.
10 Q  Okay. You simply, sitting here today, don't have
11    a recollection of the substance of the meeting on
12    April 14, 2010?
13 A  Well, I was letting -- you know what, I didn't
14    even say hardly anything at these meetings, I
15    left it up to my representatives.
16 Q  And you don't recall, sitting here today, what
17    your representatives said on your behalf at the
18    meeting?
19 A  No --
20 Q  Okay.
21 A  -- I don't.
22       THEREUPON, Defendants' Exhibit 31 was marked
23    for identification.
24 Q  Carol, do you recognize the document that's been
     marked as Exhibit 31?

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

259

1 A  This is a termination procedure, Mr. Taich's
2    report.
3 Q  Do you understand this to be a report and
4    recommendation by Referee Harry Taich which
5    followed a hearing held concerning your potential
6    termination?
7 A  Yes.
8 Q  Okay. And did you sit through all of the hearing
9    before Referee Taich?
10 A  Yes.
11 Q  And during that hearing was evidence presented as
12    to whether or not there was good and just cause
13    for your termination?
14       MR. BELAZIS: Objection as to what the
15    nature of that evidence was. If you want to ask
16    her if evidence was presented, you can ask her
17    that?
18 BY MS. GRIGSBY:
19 Q  Let me ask it this way: What do you understand
20    the purpose of the hearing before Referee Taich
21    to be?
22 A  To see if I should be terminated.
23 Q  Okay. And did you understand he was going to be
24    hearing evidence and then making a
25    recommendation?

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

260

1 A  Yes.
2 Q  Okay. And the document that's been marked as
3    Exhibit 31, you understand he wrote that after
4    considering all the evidence?
5 A  Yes.
6 Q  And this report and recommendation makes certain
7    statements about his understanding of the
8    evidence, doesn't it?
9 A  Well, you know, I -- I would have to read this
10    again to answer that question.
11 Q  Let me --
12 A  Would you like me to read this?
13 Q  Well, let me ask it to you this way.
14 A  Okay.
15 Q  In the past have you read this report and
16    recommendation?
17 A  When I first got it.
18 Q  And if these questions are such that you need to
19    re-read this entire document, I'll give you time
20    to do that, but in an effort to try to expedite
21    let me ask you this: Do you recall reading in
22    this document that Referee Taich found that
23    Mrs. Smith's testimony by itself, with regard to
24    her diabetes and the eye surgeries five years
25    ago, was inadequate to explain or excuse her

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

261

1     conduct? Do you have reason to debate or dispute
2     that that statement is contained in this
3     document?
4 A  **I'd have to read this again.**
5 Q  Okay. Maybe we can do it this way.
6        MS. GRIGSBY: Counsel, I've got a
7     number of statements from this report, that are
8     quoted from this report, that perhaps we could
9     stipulate are contained in this report?
10        MR. BELAZIS: You marked it as an
11     exhibit, I'm not going to stipulate to anything.
12     Whatever it says, it says.
13        MS. GRIGSBY: Okay.
14     **BY MS. GRIGSBY:**
15 Q  Well, let me ask you this: Do you have any
16     factual basis to believe that the Board of
17     Education decided to terminate you for reasons
18     other than those set forth in Exhibit 31?
19 A  **Factual?**
20 Q  Right.
21        MR. BELAZIS: You mean did they have an
22     ulterior motive?
23        MS. GRIGSBY: Right.
24 Q  Do you have any reason to think that they were
25     making a decision to terminate you for reasons

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

262

1     other than the recommendation and the report made
2     by the referee?
3        MR. BELAZIS: Didn't you already ask
4     her the ulterior motive question?
5        THE WITNESS: Yes.
6        MS. GRIGSBY: Well, with regard to a
7     different event.
8        THE WITNESS: You're asking me to read
9     somebody's mind and I can't do that.
10     **BY MS. GRIGSBY:**
11 Q  Well, in your complaint you've made allegations
12     that certain --
13        MR. BELAZIS: She didn't prepare the
14     complaint.
15 Q  There are allegations in your complaint that
16     certain conduct was perpetual, that certain
17     actions taken by the defendants in this case were
18     not made for the stated or true reason.
19 A  **Can you specifically say?**
20 Q  Well, that's what I'm here to find out about
21     you --
22 A  **Oh.**
23 Q  -- to find out from you. That you've made
24     allegations that your termination was made for
25     improper reasons?

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

263

1 A  **Did I ever read that complaint?**
2 Q  Well, let me ask you, did you read the complaint?
3 A  **I don't remember reading the complaint.**
4 Q  But a complaint and an amended complaint was
5     filed in this case on your behalf, correct?
6 A  **By Mr. Belazis?**
7 Q  Yes. An amended complaint of the original.
8 A  **Oh, the original complaint I did not read.**
9 Q  Okay. And did you read the amended complaint
10     before it was filed?
11 A  **No.**
12 Q  Okay.
13 A  **So you're asking me to say things here that I**
14     **don't know what to say.**
15 Q  Well, my job is to discover the factual basis for
16     your complaint and there are allegations in your
17     complaint that certain actions were taken by the
18     defendants and that they were a pretext for
19     improper discriminatory conduct. And so with
20     regard to the actual action of termination, do
21     you have a factual basis to believe that the
22     Board based its decision to terminate you for the
23     improper reason of discriminating against you, as
24     opposed to the reasons that are set forth in this
25     report?

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

264

1        MR. BELAZIS: Okay. I'm going to
2     object to the question, because you've got --
3     it's an improper question. You're asking her
4     about matters that are within the province of
5     counsel. It's not she who is amassing evidence
6     in this case, it is counsel. If you want to ask
7     her whether she believes that the district had an
8     ulterior motive for her termination, that's fine.
9     You can say that, and eventually we will put on
10     our case, we will show it through the evidence
11     that we present and the judge will be able to
12     evaluate, but it's not for her to -- it's not her
13     responsibility to amass that evidence, it's
14     counsel's responsibility.
15        MS. GRIGSBY: But I do have the right
16     to ask her what evidence she knows of?
17        MR. BELAZIS: Well, she may or may not
18     be aware of it. But I certainly don't want her
19     to respond to the question in doing so provide
20     information that's based on a conversation with
21     counsel, because that's --
22        MS. GRIGSBY: I agree with that.
23        MR. BELAZIS: -- because that's work
24     product and it's attorney/client privilege.
25        MS. GRIGSBY: I don't want you to talk

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

265

1 about that.
2 THE WITNESS: But I don't understand
3 what you're getting at.
4 BY MS. GRIGSBY:
5 Q Okay. Do you personally have knowledge of facts
6 or evidence that would indicate the Board of
7 Education made its decision to terminate you for
8 a discriminatory reason?
9 A The Board of Education itself, do I have
10 knowledge of their understanding? No.
11 Q Do you have knowledge of facts or evidence which
12 would indicate that they terminated you for a
13 reason based upon discrimination?
14 MR. BELAZIS: Do you know anything
15 about the discussions with the board?
16 THE WITNESS: No.
17 MR. BELAZIS: All right.
18 THE WITNESS: No, I don't.
19 BY MS. GRIGSBY:
20 Q Do you personally hold the opinion that you were
21 terminated because of a desire to discriminate
22 against you?
23 A Do I personally hold that opinion?
24 Q Yes.
25 A I'm not sure.

267

1 termination for that reason?
2 A Maybe.
3 Q Okay.
4 A I'm not sure yet, there's things I need to sort
5 out in my mind.
6 Q Okay. Is it true that you haven't formed an
7 opinion one way or the other on that at this
8 point?
9 MR. BELAZIS: Do you understand the
10 question, Carol?
11 THE WITNESS: No, I don't. I don't.
12 MR. BELAZIS: She's asking you if you
13 believe that Dr. Gunner had a discriminatory
14 motive? In other words, do you believe that he
15 terminated you on the basis of your disability?
16 THE WITNESS: Yes, I do.
17 BY MS. GRIGSBY:
18 Q Okay. Now, what do you base that opinion on?
19 A I base it on the fact that every time he
20 mentioned why I'm being disciplined, it was
21 because I was sleeping in class, and my eyes are
22 closed all the time, because I was late to class
23 and my mobility issues are great, the neuropathy
24 in my feet is serious at this point, and I'm
25 basing it on the fact of my diabetes.

266

1 Q Okay.
2 A I'm not sure.
3 MR. BELAZIS: Are you talking about
4 with respect to the Board members?
5 THE WITNESS: That's what I think she's
6 talking about.
7 Q Well, they made the decision to terminate.
8 A Yes, I'm not sure.
9 Q Okay.
10 A There's only one board member that I knew.
11 Q And we talked about that earlier.
12 A Don't make me cry again, please.
13 Q I have no desire to do that.
14 A Thank you.
15 Q Do you hold the opinion that Dr. Gunner made the
16 recommendation for your termination due to a
17 desire to discriminate against you because of
18 your disability, related to your diabetes?
19 MR. BELAZIS: She's talking about
20 Dr. Gunner now.
21 THE WITNESS: Yes, I know.
22 A Do I hold that opinion?
23 Q Yes.
24 A That he discriminated against me?
25 Q That he made the recommendation for your

268

1 Q Okay. And you believe that he is prejudice
2 against you because you have diabetes?
3 A Not at all.
4 Q You don't believe that?
5 A No, I don't believe that.
6 Q As a result of the termination and the
7 allegations that have been made in the complaint,
8 have you consulted with a mental health
9 counselor?
10 A You know --
11 MR. BELAZIS: That's, I think that's a
12 matter of work product --
13 THE WITNESS: Yes.
14 MR. BELAZIS: -- and attorney/client
15 privilege.
16 MS. GRIGSBY: I'm going to the issue of
17 her claim for intentional infliction of emotional
18 distress.
19 MR. BELAZIS: Yes.
20 MS. GRIGSBY: And I believe I have the
21 right to inquire as to whether or not she sought
22 treatment for emotional distress?
23 MR. BELAZIS: Okay. Go ahead.
24 A Yes, I did.
25 Q Okay. With whom have you treated for emotional

**269**

1  distress issues?
2 A **Dr. Vaschack who put me on Prozac.**
3 Q When did you begin consulting with him?
4 A **I've been consulting with Dr. -- and he's my**
5  **internal -- my endocrinologist, my internalist.**
6 Q And when did he first prescribe the Prozac?
7 A **Right after these allegations started and I was**
8  **getting very -- and he says, "Let's get you**
9  **calmed down a little bit."**
10 Q And was that before or after your termination?
11 A **It was right before when things were getting**
12  **heated up.**
13 Q Before or after the referee's hearing?
14 A **It was before the referee's hearing.**
15 Q And do you remain treating with that doctor for
16  emotional distress issues?
17 A **I have asked him to take me off of Prozac now.**
18 Q When did you make that request?
19 A **Just recently.**
20 Q Okay. As a result of the emotional distress that
21  caused you to seek treatment, were you unable to
22  perform your duties and your functions as a wife
23  or a mother or grandmother?
24 A **I darn near had a nervous breakdown that summer.**
25 Q Were you hospitalized for emotional distress?

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

**270**

1 A **I was not hospitalized.**
2 Q Okay. But my question was, were you able to
3  continue in the performance of your functions as
4  a wife and a mother and a grandmother?
5  MR. BELAZIS: I think she answered that
6  question.
7  THE WITNESS: I did.
8  MS. GRIGSBY: Well, she said she darn
9  near had a nervous breakdown, but that didn't
10  answer my question of whether or not --
11  MR. BELAZIS: I think it did in her
12  mind.
13  MS. GRIGSBY: Okay.
14 BY MS. GRIGSBY:
15 Q Were you able to continue to perform those
16  functions?
17 A **If you mean if I cleaned the house? Yes, I did.**
18  **If I cooked dinner? Yes, I did, so.**
19 Q And you were able to attend family functions?
20 A **Most of the time.**
21 Q Okay.
22 A **If I was upset I just didn't go.**
23 Q You say that in your complaint that Dr. Gunner
24  and Mr. Finn, acting as co-conspirators,
25  conducted a campaign to harass you. Who are the

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

**271**

1  co-conspirators that you're referring to in the
2  Complaint?
3  MR. BELAZIS: That Complaint is
4  prepared by counsel and she's already said she
5  hasn't read it, so.
6 Q Well, do you believe that other people worked
7  together with Dr. Gunner and Mr. Finn in a
8  calculated way to harass you?
9 A **I can't answer that. I can't speak for people,**
10  **what they say or do when I'm not there.**
11 Q Would you believe that there was a campaign
12  designed to harass you?
13 A **Maybe not harass me, but to get me out of there**
14  **earlier.**
15 Q Why do you think you --
16 A **I don't know.**
17 Q You believe that there was a campaign to get you
18  out of there earlier?
19 A **Uh-huh.**
20 Q What do you mean, to --
21 A **To make me retire.**
22 Q Okay. And what do you think was the motivation
23  behind that campaign?
24  MR. BELAZIS: That's been asked and
25  answered.

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

**272**

1  MS. GRIGSBY: No, this is the first
2  time I've asked about the campaign of harassment.
3  THE WITNESS: What's the difference
4  between that and asking me if the Board or
5  Dr. Gunner or Mr. Finn, if I feel I'm being
6  harassed by them?
7  MS. GRIGSBY: Well, because there's a
8  separate legal claim in your Complaint on that
9  topic.
10 BY MS. GRIGSBY:
11 Q So my question to you very simply is, if there
12  was a campaign to harass you, what makes you
13  think that --
14  MS. GRIGSBY: Well, read the last
15  question back.
16  **THEREUPON, the Reporter read the requested**
17  **portion of the record.**
18  MR. BELAZIS: Asked and answered, the
19  same objection.
20  THE WITNESS: Yes.
21 A **I can't answer that. It seems like we're going**
22  **in circles here.**
23 Q Well, you've made a serious allegation that
24  people have conspired to harass you and I'm
25  simply asking, why would they do such a thing?

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

273

| 1 | A | Well, that might be a good question for them -- |
| 2 | Q | Okay. |
| 3 | A | -- the same people that you're talking about. |
| 4 | Q | Okay. Can you tell me, in your opinion or your |
| 5 | | understanding of the job description, what you |
| 6 | | understand to be the essential duties of an ISI |
| | | supervisor? |
| 8 | A | To make sure that they do the work that the |
| 9 | | teachers hand me for them, to make sure that they |
| 10 | | do not disrupt other children, to make sure that |
| 11 | | when -- that they take care of their personal |
| 12 | | needs, to, just to make sure they get the work |
| 13 | | done, and, you know, it's up to Mr. Finn to ask |
| 14 | | them why they're there. |
| 15 | Q | Do you believe that part of your duties as an ISI |
| 16 | | supervisor are to monitor and keep tabs on the |
| 17 | | conduct of the students in that class? |
| 18 | | MR. BELAZIS: You mean outside of |
| 19 | | classroom or while in there? |
| 20 | | MS. GRIGSBY: While in the classroom. |
| 21 | A | Yes. |
| 22 | Q | Okay. Now, as a diabetic you've been prescribed |
| 23 | | certain medications, certain regimens, health |
| 24 | | regimens, it includes insulin injection and |
| 25 | | medications. Have you always been very careful |

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

274

| | | to follow doctor's orders concerning your health |
| | | regimen? |
| 3 | A | Yes. |
| 4 | Q | Can you think of any other instance that we |
| 5 | | haven't talked about today in which you made |
| 6 | | requests for accommodations, as a result of your |
| 7 | | physical conditions, to administrators of Perkins |
| 8 | | Schools? |
| 9 | A | At the high school. |
| 10 | Q | Okay. That we haven't talked about? |
| 11 | A | No, that Mr. Gasteier met my requests. |
| 12 | Q | Okay. And we talked about that earlier, related |
| 13 | | to the fire drill? |
| 14 | A | Yeah. |
| 15 | Q | Okay. Now, my question is, is there anything |
| 16 | | that we have not talked about today that you can |
| 17 | | think of that constitutes a request on your part, |
| 18 | | that you be accommodated because of your physical |
| 19 | | conditions, that we haven't talked about yet? |
| 20 | A | Not that I can think of. |
| 21 | Q | Okay. So we have exhausted that topic? |
| 22 | A | Yes. |
| 23 | Q | Okay. Let me consult with Dr. Gunner just |
| 24 | | briefly and see if there's anything else we need |
| | | to discuss, but otherwise I think we're close to |

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

275

| 1 | | being done, okay? |
| 2 | A | All right. Uh-huh. |
| 3 | | MS. GRIGSBY: Give us just a moment and |
| 4 | | we'll step out. |
| 5 | | THEREUPON, there was a brief recess. |
| 6 | | MS. GRIGSBY: Just one last question. |
| 7 | | BY MS. GRIGSBY: |
| 8 | Q | Do you mind if I stand? |
| 9 | A | No. |
| 10 | Q | I don't mean to be rude. Mrs. Smith, do you know |
| 11 | | of any time that you were summoned to a |
| 12 | | disciplinary conference or disciplined by |
| 13 | | Dr. Gunner in which his actions had not been |
| 14 | | precipitated by a complaint made by somebody |
| 15 | | else? |
| 16 | A | Do I know -- say that again. |
| 17 | Q | You've had a number of incidents in which you've |
| 18 | | been disciplined by Dr. Gunner -- |
| 19 | A | Uh-huh. |
| 20 | Q | -- and a number of times in which you've sat in |
| 21 | | disciplinary conferences with Dr. Gunner? |
| 22 | A | Uh-huh. |
| 23 | Q | Do you know whether any of those occasions, any |
| 24 | | of those disciplines or any of those conferences, |
| 25 | | were ever not preceded by a complaint concerning |

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

276

| 1 | | your behavior or actions made by a third party? |
| 2 | A | I'm very sure that there had been people |
| 3 | | reporting to him. |
| 4 | Q | Okay. And so as far as you know, he never called |
| 5 | | you to a disciplinary conference or imposed |
| 6 | | discipline without first having received a report |
| 7 | | from somebody who was alleging that you did |
| 8 | | something improper? |
| 9 | | MR. BELAZIS: If you know. |
| 10 | | THE WITNESS: If I know. |
| 11 | A | The only one that I was really concerned about |
| 12 | | was on March the 29th and I had no notice of him |
| 13 | | being there. |
| 14 | Q | And which incident is that? |
| 15 | A | When he made me leave the building. |
| 16 | Q | Oh, the last incident? |
| 17 | A | Yes. There was no notice. |
| 18 | Q | The pornography and the -- |
| 19 | A | Yes. |
| 20 | Q | But other than that -- and with regard to that |
| 21 | | incident, you are aware that students had made |
| 22 | | concerns or made complaints about this |
| 23 | | discussion? |
| 24 | A | If they did. |
| 25 | Q | Okay. Do you have any reason to doubt that |

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

277

```
 1    nobody made those complaint?
 2           MR. BELAZIS: I don't -- I think she's
 3    asking you about your understanding, as opposed
 4    to your personal knowledge.
 5           THE WITNESS: Oh, yes.
      MS. GRIGSBY:
   Q  Okay.
 8 A  Well, it's my understanding, because they told it
 9    to me, was, yes, they did.
10 Q  Okay.
11           MS. GRIGSBY: I think I have no further
12    questions and I want to thank you for your time.
13    I know it's been a long day and a difficult day
14    and I truly appreciate it. Thank you very much.
15           MR. BELAZIS: We'll reserve.
16           THEREUPON, the deposition concluded at
17    5:30 p.m.
18
19
20                /S/ _____
21
22
23
24
25
```

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

278

```
 2           C O R R E C T I O N S
 3    PAGE      LINE     CORRECTION/COMMENTS
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

279

```
 1                   CERTIFICATE
 2    STATE OF OHIO  )
                     ) ss.
 3    COUNTY OF ERIE )
 4
 5        I, Lori L. Delhees, Stenotype Reporter and
      Notary Public within and for the State aforesaid,
 6    duly commissioned and qualified, do hereby
      certify that the within named CAROL ANN SMITH was
 7    by me, before the giving of her deposition, first
      duly sworn to testify the truth, the whole truth
 8    and nothing but the truth in the cause aforesaid;
      that the deposition as above set forth was
 9    reduced to writing by me by means of
      Computer-Aided Transcription; that the said
10    deposition was taken pursuant to Notice and was
      completed without adjournment; that I am not a
11    relative or attorney of either party or otherwise
      interested in the eventual outcome of this
12    action.
13        IN WITNESS WHEREOF, I have hereunto set my hand
      and seal of office at Sandusky, Ohio this ___
14    day of _____, 2014.
15
16                    _____
17                    HUNTLEY REPORTING SERVICE
                      Lori L. Delhees
                      Notary Public
18                    P. O. Box 1067
                      Sandusky, Ohio  44870
19
20                    My commission expires 11/24/2017
21
22
23
24
25
```

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360

280

```
 1                   CERTIFICATE
 2    STATE OF OHIO
 3    COUNTY OF
 4
 5        I certify that this deposition was
 6    signed in my presence by CAROL ANN SMITH on the _____
 7    day of _____, 2014.
 8        IN WITNESS WHEREOF, I have hereunto set my
 9    hand and affixed my seal of office at _____,
10    Ohio on this _____ day of _____,2014.
11
12
13                    _____
14                    Notary Public
15
16
17
18
19
20
21
22
23
24
25
```

HUNTLEY REPORTING SERVICE
419-626-4039
800-247-8360