IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| CAROL ANN SMITH, Plaintiff | ) | Case No. CV 00560 |
| | ) | Hon. Jack Zouhary |
| vs. | ) | **PLAINTIFF'S RESPONSE TO DEFENDANTS' FIRST SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS** |
| PERKINS BOARD OF EDUCATION, et al., Defendants | ) | |

In accordance with Rules 33 and 34 of the Federal Rules of Civil Procedure, Plaintiff is filing her answers and responses to Defendants' First Set of Interrogatories and Requests For Production of Documents. In accordance with Fed. R. Civ. P. 26(e), these interrogatories will be promptly supplemented if new information or documents are discovered responsive to these interrogatories or requests.

## GENERAL OBJECTIONS

**Plaintiff objects to the extent that any of the instructions conflict with or alter the obligations imposed by the Federal Rules of Civil Procedure and the Case Management Order of this Court. Plaintiff will answer all interrogatories and document request in accordance with the Federal Rules of Civil Procedure and the Case Management Order of this Court.**

**1. In regard to the identification of witnesses, Plaintiff will provide the full name, business address, business phone number, home address, and home phone number if this information is known to the Plaintiff. If the information is unknown to Plaintiff, then the Defendants' are equally or more capable of tracking down these individuals.**

**2. Further, many of the requests to identify documents rest solely in the control by the defendants. Therefore, the defendants have superior access to this evidence regarding the acts and inactions involving this litigation. Folsom v. Bloom, 87 F.R.D. 443, 445 (S.D. N.Y. 1980)**



**3. Plaintiff preserves her right to object to the use of any of documents produced, in whole or part, at trial or any other proceeding of this litigation on any evidentiary grounds including relevance, privilege, or otherwise.**

**4. Plaintiff reserves the right to supplement any interrogatory answer or document request based upon evidence during this litigation.**

**5. Plaintiff's counsel will produce all documents in his client's possession responsive to Production Requests. However, the production requests propounded by the Defendants seek information which is overly broad and requests information outside the relevant time period of this litigation. They are not reasonable and burdensome to Mrs. Smith. Even with this objection all documents relevant to the subject matter of the plaintiffs' complaint are being produced on scanned disks subject to any of the general or specific objections. Certain personal and sensitive documents will not be produced until an appropriate Protective Order is entered into by the parties.**

**6. Plaintiff preserves her right to object to the use of any of these documents, in whole or part, at trial or or any other proceeding of this litigation on any evidentiary grounds including relevance, privilege or otherwise.**

**7. All relevant original documents will be made available for inspection and copying at 3214 Prospect Ave, Cleveland, Ohio 44115. An inspection can be arranged at a time that is acceptable to all parties and their counsel. Please contact Edward G. Kramer to make the arrangement for inspection. After selection of documents which you wish copied any third party copier service can be used to pick up, copy and return the selected documents.**

EDWARD G. KRAMER

<u>INTERROGATORY NO. 1:</u> Please identify, as that term is used in the Instructions for Responding, all medical doctors, physicians, psychologists, therapists, optometrists/opthalmologists and other health care providers who have provided any form of evaluation or treatment to Plaintiff from the year 2000 to present, and the nature of the condition or illness which that professional addressed.

<u>RESPONSE:</u>

Since the year 2000 to present I have been seen by my primary physician, Dr. Robert Vaschack, associated with NOMS (Northern Ohio Medical Specialists). This is

located at 2500 W. Strub Road, Sandusky, Ohio, 44870. The phone number is 419-626-0891. He has been treating me for diabetes since 2002 and continues to do so. Reports from all my other doctors are sent to him. My diabetes was discovered when I had rotator cuff surgery in 1991 at the Cleveland Clinic. Before Dr. Vaschack, I went to Dr. Richard Beeham in Toledo. His current address is 3140 West Central Ave, Toledo, OH 43606.

On July 6, 2005, I was treated by Dr. Harris Shield, 1200 Prospect St., Sandusky, Ohio, 44879, (phone 419-626-8181) who removed a cateract on the right eye at Firelands Regional Hospital. On July 8 my eye went blurry and until Dr. Shield saw me at 8:00a.m. on July 11, 2005, I was completely blind in that eye. He determined he could not identify what was wrong and by 11 :30a.m. I was at the Cole Eye Institute in the Cleveland Clinic where I was diagnosed and immediately treated for a psuedomonous infection that already did a lot of damage. The infection was treated but the problems were ongoing. Some of the sight did come back with treatment.

On August 25, 2005, the first day back to school that year, I was in my classroom with a lot of pain when my supervisor, Mrs. Zura came into the room. She suggested I call Cole Eye. Again, I lost all sight in this eye and had emergency laser surgery by Dr. Richard Gans, to open the pupil, and reduce the eye pressure. Again the sight slowly came back. Because of retina damage, Dr. Jonathan Sears did a vistrectomy in November of 2005. However, the infection also pushed the eye to the right causing double and triple vision. had to wear an eye patch from November, 2005 until May of 2006 when Dr. Elias Traboulsi performed a lateral rectus recession to put the eye back into place.

On May 27, 2008, I saw Laura E. Simonelli, PhD, at the Cleveland Clinic, for an evaluation regarding the psychological part of the bariatric surgery I had.

On January 15, 2009 I had a gasrectomy at the Cleveland Clinic performed by Dr. Phillip R. Schauers. Due to the nature of my health problems it was felt that this surgery would save my life. I am being seen by his partner, Dr. Karen R. Cooper. I am also being seen by Kathleen Ashton, PhD, Psychologist and continue to see her.

In August 2009, I was ordered by Dr. Gunner to have a physical check-up by Dr. Larry Kale at St. Lukes Hospital Occ. Health Clinic located at 28555 Starbright Blvd - Suite A, Perrysburg, OH 43551. The phone is 419-887-8771.

On January 4, 2010 I was seen by Dr. Joel Steinberg, Forensic Psychologist, 5370 S.O.M. Center Road in Willoughby, OH 44094, for an Independent Medical Evaluation. The phone is 440-946-4004.

The Cleveland Clinic, which also includes the Cole Eye Institute, is where Plaintiff was seen by all of the above doctors who do not have a private address listed. It is located at 9500 Euclid Avenue, Cleveland, OH 44195. This is the only address that the Plaintiff is aware of to contact these individuals.

**REQUEST FOR PRODUCTION NO. 1** Please produce the entire contents and complete chart and file, including all documents, test results, X-rays, progress notes, orders, and other materials generated or maintained by each health care professional identified in response to Interrogatory No. 1.

**RESPONSE:**

Dr. Robert Vaschack- Plaintiff is producing a letter dated 9/30/2008 from this doctor's Nurse Practitioner Michele Poulos describing my diabetes, and a computer disc that contains all medical records for Carol Smith available through Northern Ohio Medical Specialists (NOMS).

Dr. Richard Beeham- After a thorough search, Plaintiff has found no documents that are responsive to this request. Plaintiff is willing to execute a medical authorization and release, based on the stipulated protective order to be entered into in this litigation.

Dr. Harris Shield- After a thorough search, Plaintiff has found no documents that are responsive to this request. Plaintiff is willing to execute a medical authorization and release, based on the stipulated protective order to be entered into in this litigation.

Dr. Richard Gans- After a thorough search, Plaintiff is producing all documents in her possession from this physician, up through June 2010.

Dr. Jonathan Sears- After a thorough search, Plaintiff is producing all documents in her possession from this physician, up through June 2010.

Laura E. Simonelli, PhD- After a thorough search, Plaintiff is producing all documents in her possession from this physician, up through June 2010.

Dr. Elias Traboulsi- After a thorough search, Plaintiff is producing all documents in her possession from this physician, up through June 2010.

Dr. Phillip R. Schauers- After a thorough search, Plaintiff is producing all documents in her possession from this physician, up through June 2010.

Dr. Karen R. Cooper- After a thorough search, Plaintiff is producing all documents in her possession from this physician, up through June 2010.

Kathleen Ashton PhD- After a thorough search, Plaintiff is producing all documents in her possession from this physician, up through June 2010.

Dr. Larry Kale- The Plaintiff was required by the Perkins Local School District to meet with this physician in the summer of 2009. The Plaintiff never received any documents from Dr. Kale,

**REQUEST FOR PRODUCTION NO. 2** Please produce all records and documents pertaining to Plaintiff generated or maintained by each of the hospitals or care facilities identified in response to Interrogatory No. 2.

**RESPONSE:**

See response to Request For Production No. 1. Plaintiff, after a thorough search, has not located any additional documents responsive to this request. Plaintiff is willing to execute a medical authorization and release, based on the stipulated protective order to be entered into in this litigation.

**REQUEST FOR PRODUCTION NO. 3** Please produce a copy of the Independent Medical Evaluation of Joel S. Steinberg dated January 4, 2010 referred to in Plaintiff's Federal Civil Rule 26(a) disclosures.

**RESPONSE:**

Plaintiff is producing a copy of this report upon execution of a stipulated protective order in this litigation.

**REQUEST FOR PRODUCTION NO. 4** Please product all correspondence, including emails and other electronic correspondence, exchanged between Plaintiff and Christine Donovo, Shane Burrows, Eric Talbot, Donna Fry, and Tim Obergefell related to the issues in this lawsuit and the alleged differing treatment of these individuals as referred to in Plaintiff's Federal Civil Rule 26(a) disclosures.

**RESPONSE:**

Plaintiff has made a thorough search of both hard copies and electronic documents found on her home computer, and no documents have been found that are responsive to this request.

**REQUEST FOR PRODUCTION NO. 5** Please produce all documents in Plaintiff's possession which tend to support or negate Plaintiff's claim that she was treated differently than

Christine Donovo, Shane Burrows, Eric Talbot, Donna Fry, and Tim Obergefell.

**RESPONSE:**

See responses to Requests For Production No 3, 6, 8, 12, 13, and 14. Also see EEOC charge #471-2010-01950 (Detroit District Office). Plaintiff believes that documents which are in the possession of the defendants, and will be produced in response to her discovery requests, will be responsive to this request. However, Plaintiff will not be producing any documents that are already in the possession of the Defendant and have or will be produced in response to either a formal or an informal request for documents. See Notice of Disciplinary Conference dated September 29, 2008, alleging that the Plaintiff was found to be sleeping on school premises. See letter from Nurse Practitioner Michele Poulos, Northern Ohio Medical Specialists Healthcare, dated September 30, 2008. Written reprimand from Stephen Finn to Plaintiff, dated October 6, 2008. Memorandum from Stephen Finn dated October 8, 2008, requiring additional evaluations which was in violation of the collective bargaining agreement. Tom Zarik reasonable accommodation letter, dated October 14, 2008. November 18, 2008 letter from Mr. Gunner granting in part and ignoring in part the request for accommodations for the Plaintiff. See evaluations in Plaintiff's personnel file for 2008 and 2009. See collective bargaining agreement from Perkins Education Association and Perkins Board of Education, dated July 1, 2008-June 30, 2011. Letter from Stephen Finn to Plaintiff unknown date. See Plaintiff's letter to Stephen Finn dated March 8, 2009. March 15, 2009 letter from Stephen Finn to Plaintiff. See Mr. Gunner disciplinary action dated April 2, 2009. See Perkins Local Schools personnel file on Plaintiff. See letter from Mr. Gunner to plaintiff dated March 29, 2010, suspending her based on inappropriate discussions with her high school social studies class regarding pornography. See Board of Education resolution terminating Plaintiff's employment contract, dated April 14, 2010. See Arbitration Transcripts Volume I dated July 21, 2010, II dated July 22, 2010, III dated August 11, 2010, and IV, dated August 12, 2010, before referee Harry H. Taich, by Janice M. Rogers, and hearing exhibits for both Plaintiff and Defendant School.

**REQUEST FOR PRODUCTION NO. 6** Please produce the school yearbooks, school map layout, and class schedules referred to in Plaintiff s Federal Civil Rule 26(a) disclosures.

**RESPONSE:**

Plaintiff will make available for inspection at her counsel's office, at an agreed upon time, copies of the following yearbooks in her possession:

Perkins High School Yearbook Volume 41, dated 2001
Perkins High School Yearbook Volume 42, dated 2002
Perkins High School Yearbook Volume 43, dated 2003
Perkins High School Yearbook Volume 44, dated 2004
Perkins High School Yearbook Volume 45, dated 2005

Perkins High School Yearbook Volume 46, dated 2006
Perkins High School Yearbook Volume 47, dated 2007
Perkins High School Yearbook Volume 48, dated 2008
Perkins High School Yearbook Volume 49, dated 2009
Perkins High School Yearbook Volume 50, dated 2010

**REQUEST FOR PRODUCTION NO. 7** Please produce all documents exchanged between Plaintiff and the State Teachers Retirement system or any other State agency responsible for administering benefits of any nature.

**RESPONSE:**

Objection. This request is overbroad and burdensome, since it does not have any start or ending date, and the Plaintiff has been a member of STRS for over 34 years. Even with this objection, Plaintiff will produce documents responsive to this request from the date of her notice of termination on April 14, 2010 to the present.

Edward G. Kramer

Notwithstanding this objection, Plaintiff has produced STRS salary related estimates, which were prepared for the Plaintiff, and will make available for inspection at her counsel's office, at an agreed upon time, copies of the public documents and brochures produced by STRS.

**REQUEST FOR PRODUCTION NO. 8** Please produce all documents tending to support or negate Plaintiff's claim that she has incurred damages related to reduced retirement or disability benefits.

**RESPONSE:**

See responses to Requests for Production No 1, 3, 6, 7, 12, 13, and 14.

**REQUEST FOR PRODUCTION NO. 9** Please produce a copy of Plaintiff's driver's licenses for the past 10 years.

**RESPONSE:**

Plaintiff is producing a copy of her current driver's license, but does not have copies of previous driver's licenses.

**REQUEST FOR PRODUCTION NO. 10** Please produce a copy of Plaintiff's driving record for the past 10 years obtainable through the Ohio Department of Public Safety, Bureau of Motor Vehicles, or alternatively, please provide Defendants with a copy of the personal information and a release which will allow Defendants to obtain this information.

**RESPONSE:**

Plaintiff has produced an abstract driver's record. However, she does not have in her possession a record that goes back 10 years. Plaintiff has executed a BMV Form 1173, and will provide this to the Defendant based on the stipulated protective order to be entered into in this litigation.

**INTERROGATORY NO. 3:** If you intend to obtain deposition or trial testimony from any of the following persons during the proceedings in this case, please identify the facts to which you believe they will testify:

Sherry Buccereri
Tom Zraik
Ed Palowski
Chris Smith
Grace Brammer
Dean Idrissi
Katie Burg
Darlene Salzigraber
Dennis Folz
Danik Kumar
Ashley Geisert
Cory P Farmer
Caleb Hoty
Maddie Torres

**RESPONSE:**

Objection. This interrogatory seeks evidence beyond the scope of the Federal Rules of Civil Procedure, since a party may not be required to list the items of evidence or to state what witnesses will be called at trial. See B & S Drilling Company, Inc. v. Halliburton Oil Well Cementing Co., 24 F.R.D. 1, 3 (S.D. Texas, 1959); McNamara v. Erschen, 8 F.R.D. 427, 428-429 (D. Delaware 1948); Fidelis Fisheries v. Thorden, 12 F.R.D. 179, 180 (S.D.N.Y., 1952);

Cogdill v. Tennessee Valley Authority, 7 F.R.D. 411, 415 (E.D. Tenn. 1947), Robbins v. Camden City Bd. Of Educ., 105 F.R.D. 49. (D.C. N.J., 1985).

This interrogatory seeks work product information, inasmuch as it seeks to discover the thought process of plaintiffs' counsel as to which witnesses counsel will choose to have testify in a deposition or at the trial of this matter. This request for information seeks privileged information about what may be the subject matter of a deposition undertaken by counsel.

Edward G. Kramer

Without waiving the objection, at the present time, Plaintiffs' counsel has not identified any witnesses who will be called other than the Plaintiffs and the Defendants. This answer will be supplemented at the time required under the Federal Rules of Civil Procedure and the Case Management Plan after undertaking discovery in this matter.

**REQUEST FOR PRODUCTION NO. 11** Please produce copies of any witness statements or affidavits in Plaintiff's possession, or the possession of her attorneys or agents, which pertain to her claims in this case.

**RESPONSE:**

Plaintiff, at the present time, has no responsive documents to this request.

**INTERROGATORY NO. 4:** Please identify the alleged speaker, and the date, location, and circumstances including all persons present, of the purported comment "we have a business teacher who won't be with us much longer" referred to in item 8, page 2 of Plaintiff's Federal Civil Rule 26(a) disclosures, and to which you claim Katie Burg was privy.

**RESPONSE:**

Katie Burge made this comment in the Spring of 2010 concerning her sister who had been interviewed for a special education teacher position at the Perkins Local Schools. This conversation with Ms. Burge occurred with my daughter-in-law Christine Smith. I have no personal knowledge because the comment was not made to me.

**INTERROGATORY NO. 5:** Please identify each and every alleged statement which you attribute to any of the named Defendants or their authorized representatives which Plaintiff contends evinces a discriminatory motive, intent or bias related to Plaintiff's age.

**RESPONSE:**

On or about March 6, 2009, I was in ISI duty at Briar when Mr. Finn came in and said he would stay with the kids. Mr. Gunner is in my office and wants to talk to you. I went to his office and he told me to sit down. He started off with, "Quite frankly we don't know what to do with you next year. Your keyboarding program is being eliminated and there are not enough business classes for full time." He proceeded to tell me that his discussions with EHOVE were not going well and he wanted EHOVE programs to be gone at Perkins the next year. I am giving you three choices for next year. You can teach the business classes in the morning and get certification for the DECCA program and we can start our own DECCA next year. The second choice is you can teach half-time business and half-time freshman world history classes. Your third choice is half-time business. He said to my face that he is offering two and a half options and quite frankly he can get two and a half teachers for me. I was quite shocked that he would say that but he did. He then asked me how much longer I planned on teaching. I explained that I wanted to stay until June, 2011 because that would give me the 35 years in the public school system needed for the next step on the retirement scale.

He then told me I had three weeks to think about it and I immediately told him I would be interested in the first option and would be willing to start immediately on the certification necessary to teach the DECCA program.

Two weeks later I got a letter from Mr. Gunner saying that I didn't respond and I would be bumping Jenny Mazza from social studies and be teaching three world history classes in the afternoon. Even though I expressed an interest in option 1, I still had no choice.

This caused much controversy among social studies teachers. They were upset that I bumped Jen Mazza. I believe that Mr. Gunner chose this position to create animosity against me with my fellow teachers. Further, subsequently I found out they created a spot at the middle school for Jenny Mazza and never posted it or given me an opportunity to respond. During the 2009 - 2010 school year, I was back at the high school teaching half day business and half day world history. An incident occurred starting in November and continuing through February 1st and 2nd. In the middle of November, a technology workshop was advertised in Columbus for February 1st and 2nd, 2010. I knew I needed to improve on technology, because according to Mr. Gasteier I needed more knowledge on the smartboard. However, I applied for this particular workshop because I knew I would learn a lot. I filled out the application before Thanksgiving and turned it in to Mr. Gasteier. During January there were three or four teachers, who were approved to go because they were talking about it in the faculty lounge.

It got to be one week before the workshop and I saw Mr. Gasteier in the hallway and I stopped him and said, "Chris I applied for the Columbus workshop and haven't heard anything one way or another about my application. He said I won't be going to Columbus. I explained that other teachers were going and I would like to know why I was refused. He really did not have an answer for me. But then he said there was a "free" workshop at the Holiday Inn in Independence, Ohio for the smartboard. If I wanted to I could go there. I told him I would probably get more out of the one in Columbus, Ohio and I know I had my application turned in long before many of the

When I approached Mr. Gasteier about this letter written by Mr. Finn his comment to me was, "I wished he would have never written that." I asked Mr. Gasteier why he never approached me about this issue but he claimed he never had the proof. I replied that they must have had a lot of fun with this in his principal meetings, he claimed they never made fun of me, then he didn't say anything else. I did comment that I felt we were professional enough in the past to approach each other and I was disappointed about the handling of this.

This letter was written by Mr. Finn when he accused me of sleeping in the choir room and in fact, he never saw me asleep in the choir or ISI room nor did I ever sleep in the choir or ISI room. There are many inaccurate accusations in this particular letter. I wish to defend myself against this letter. I just started at the middle school --then the problems began. The rumors of my sleeping in class were the worse in that building and I just started. I knew then and there I was in for it. At this point I went to talk to a lawyer friend of mine, Mr. Thomas Zraik in Toledo, Ohio.

The harassment became constant. I knew I was being scrutinized, my teaching performance was being criticized (I only had one class at the middle school) and all of a sudden teachers and janitors were watching me. Danielle Fanning claimed I was sleeping in room 115 on September 19, 2009 I shared this room with two other people, Ellen Drum and Tom LNU. I don't think they ever accused me of sleeping in there. Ms. Fanning came into that room only once while I taught in there and that was to give me a message that the carts that the alpha-computers that the sixth graders learned keyboarding on, were being stored in her room because of some maintenance work going on.

After ISI duty started, Mr. Quizno walked into my room one day, walked halfway to my desk, I had my head back and was watching two kids, and I said Hi Mr. Quizno, but he turned around walked out, went to Mr. Finn and told him I was sleeping. He came back into my room ten minutes later, then reported to Mr. Finn that I was awake. After he left, one of the kids even said to me, "he sure doesn't like you does he.?"

When I read, my eyes will narrow, sometimes squint to see, and it looks like I am sleeping. One time in ISI a girl was brazen enough to come up to my desk and take my billfold out of the book bag and tried to take money out of it. It looked like I was sleeping but I watched every move she made. As she reached for the money, I quietly said don't do it and she dropped everything and ran back to her seat.
I reported this to Mr. Quizno but nothing was done. All he said was that she was there for stealing a cell phone from another girl What was she thinking of
When there were no kids in ISI, then I was either working on a computer in the computer lab or in the library where sometimes I was asked to help. There were no reports of my sleeping.

When I went into Mr. Quizno' s office to tell him about the girl taking money from me, Mr. Quizno had his head back on his chair and was snoozing. He never knew I

was there. On way out Tammy Dideon, the secretary, said that was quick. I replied that he was snoozing and will be back later. This happened about Nov 5th or 6th of 2008
On Ash Wednesday, February 25, 2009 was a terrible day. I was just back three days from medical leave. I didn 't know the schedule was changing, so what happened was in essence, my own fault. When I realized the schedule changed, I called over to the middle school and asked Dawn Sullivan when my keyboarding class was. She said it was

When Mr. Gunner questioned me about it he didn't believe me that I had a twin sister. I did tell him though it was my fault that I messed up on the schedule. I didn't know we were on a different schedule that day. I simply messed up.

I had an appointment with Dr. Vaschack, and his concern was that I was injecting Myself with insulin in the same spots too many times. He showed me how to stretch out and inject in the groin. So two days later in the parking lot at the middle school, while still on my lunch hour, I stretched my seat out in the car, laid back and injected myself with a shot of insulin in the groin area. It only took about three or four minutes. But the janitor reported to Mr. Finn that I was sleeping in the parking lot. So I was accused of sleeping yet again.

In Mr. Gasteier's private notes about me he accused me of sleeping in an academic challenge practice. In fact, I was looking down and it did look like I was sleeping but I was working a crossword puzzle to ask kids words for vocabulary area of the competition.

In addition to the above statements, Plaintiff is relying on Rule 33(c) since she is producing documents which support her claim of discriminatory and retaliatory motive and bias based on the Plaintiff's age.

All of the following show the disparity in how Carol Smith was treated:

Christine Dinovo - the PEA and the Perkins Board of Education agreed to allow Ms. Dinovo to extend beyond her FMLA rights. Ms. Dinovo had some type of medical condition which forced her inability to work. If a bargaining unit was extended special benefits, why was that not extended to the Plaintiffs condition? The lawyers will need to research a special Memorandum of Understanding that was written specifically for Ms. Dinovo.

Shane Burrows - was disciplined based on a community member describing an incident to which Mr. Burrows was reportedly speaking poorly of administration. This community member chose to remain anonymous. Mr. Burrows discipline was removed based on hearsay. The Plaintiff was reportedly at Wendy's during her lunch period, yet there is no documentation to support this allegation, as the person reporting chose to remain anonymous. This was never removed from the Plaintiffs file. The Lawyers will have to question Mr. Burrows.

Eric Talbot - was a certified teacher at another school district, yet coached during the Perkins Education Association work stoppage in 2006. The Perkins Board of Education agreed to a no retaliation clause at the end of the strike with the Perkins Education Association (PEA). The

Perkins Board of Education placed all non Perkins teaching personnel they would be terminated from their positions if they did not report for duty during the strike. Mr. Talbot did not report for duty and subsequently was terminated from his contract. The PEA chose to take their case all the way to a State Employee Relations Board (SERB) for a person that the PEA does not even represent. From this action, it is apparent to the Plaintiff that the PEA had a conscience knowledge and awareness of their ability and responsibility to represent the Plaintiff. This can be found on file in the SERB office.

Jeff Printy - who is the brother of the Board President, was given the opportunity to substitute teach as a full time substitute. This was so Mr. Printy could reach the minimum of 120 days of work to qualify for his 35th year of teaching. This position was created and agreed to, yet the position was never posted as directed to in the Collective Bargaining Agreement. The Plaintiff was never given this opportunity to reach her 35th year of teaching under this arrangement. This is in a special Memorandum of Understanding that should be on file with the Perkins Board of Education.

Donna Fry - Home Ec. Teacher repeatedly reported to her first period class late. This was evidenced by the Plaintiff's granddaughter Hannah Smith and others. The action was so common and egregious that over time Mr. Chris Gasteier, building principal and immediate supervisor, actually covered for Ms. Fry from time to time. Plaintiff was never given this same level of support, even to the extent that Mr. Gasteier waited for the plaintiff in her room to show up tardy. This can be evidenced by testimony from students in Ms. Fry's first period class and the Plaintiff personnel file.

Tim Obergefell- chose to show a beheading to a high school social studies class under the auspices of current events. This beheading was of American Hostage, Timothy Berg after the US led invasion of Iraq. This incident was picked up by local, regional and national news outlets. However, Mr. Obergefell only received a letter of reprimand for his lack of judgement. The Perkins Board Of Education chose to publicly humiliate the Plaintiff by attempting to terminate her contract for false claims of pornography. This letter can be found in Mr. Obergefell's file.

See responses to Requests for Production No 1, 3, 6, 7, 12, 13, and 14.

**INTERROGATORY NO. 6:** Please state the factual basis and evidence upon which you base the claim that age was a substantial or motivating factor in the decision to terminate Plaintiff's employment, as alleged in Paragraph 55 of the Complaint.

**RESPONSE:**

See answer to Interrogatory No. 5.

**INTERROGATORY NO. 7:** Please state the factual basis and evidence upon which you base the claim that Defendants failed to grant reasonable accommodations to Plaintiff as alleged in Paragraph 60 of the Complaint.

**RESPONSE:**

The factual basis and evidence that I was not granted reasonable accommodations is based on Mr. Gunner's November 18, 2008 letter for accommodations. The only thing that happened was he said I could use the nurses office. I went to the nurses office six times. Three times the nurse was in there with students. Three times the room was locked. I was therefore forced to go to the students restroom or faculty lounge, spread toilet paper on the floor and spread out my materials and insulin to measure. That's how I did it most of the time.

After discussing that Mr. Finn would get with the school nurse to put together a program to train students about diabetes, he called me into his office on Nov. 24, 2008 and told me to start putting together material for a program about diabetes. I was asked to provide/accumulate material about this disease. I told him I do not have a medical background. I asked where he wanted me to go for the information. He did not respond and ignored his responsibility to get with the school nurse since she is the one with the medical background and knowledge. As a result there was no educational material given to the teachers or the students, as was a part of the reasonable accommodation agreement that was never implemented.

In addition, what was agreed to was inadequate. A comparison of Mr. Gunner's November 18th letter and Mr. Zraik's request for accommodation shows that many of the requests were ignored or refused to be provided to me, therefore denying me a reasonable accommodation for my disability.

See responses to Requests for Production No 1, 3, 6, 7, 12, 13, and 14.

**INTERROGATORY NO. 8:** Please state the factual basis and evidence upon which you base the claim that Defendants failed to implement reasonable accommodations that had been agreed upon by the parties, as alleged in Paragraph 60 of the Complaint.

**RESPONSE:**

No one ever approached me at the middle school to check if something was wrong. In the letter of accommodation it said I should call the office if I needed to check my sugar or take insulin. Many times I did that and the secretary said there was no one to relieve me and she didn't have time to look into it. Once the guidance counselor came down. I was in the ISI room every

day for two and a half hours at a time, which negatively impacted my disability. There were a few times when I did have an emergency situation. One time Mr. Teagarden relieved me as he was going down the hall. I was shaking so bad, I begged him to please stay with the kids just for five minutes. He didn't like it but he could see I was in trouble. One time the janitor came in for something and I begged him to just stand there for five minutes while I took a shot. The school never looked into implementing the accommodations or offering a medical leave of absence for me.

See answer to Interrogatory No. 7 and responses to Requests for Production No 1, 3, 6, 7, 12, 13, and 14.

**INTERROGATORY NO. 9:** Please state the factual basis and evidence upon which you base the claim that Stephen P. Finn acted willfully, maliciously, with spite and ill-will and/or with reckless disregard for Plaintiff's legal rights.

**RESPONSE:**

Some of the accusation that I went to Wendy's and he called me a liar; told me not to worry about the email from the seventh grade parent then writing FYI and sending it out to Mr. Gunner. When I sincerely asked him how I could improve my keyboarding classroom performance and he gave me a book that offered no help on how to teach keyboarding to sixth graders; and telling me to get the materials to put together a program to educate teachers and students about diabetes, when in fact he was supposed to do this with the school nurse.

Stephen Finn acted out the plan by Mr. Gunner to force me into early retirement. Mr. Gunner's attitude was that I was the oldest teacher and too expensive, and he could have two and a half teachers for my salary. When I showed the need for a reasonable accommodation, Mr. Finn and Mr. Gunner instead refused to grant an effective reasonable accommodation, and chose to ignore completely their much more limited accommodation.

Mr. Finn was involved in violating my collective bargaining rights by conducting multiple evaluations in violation of the CBA. He made false statements about Mr. Gasteier and Mark Dahlman regarding me. When I approached Mr. Gasteier, he said that he wished Stephen Finn had not written the letter.

Mr. Finn saw me at the high school with the academic challenge team after school. In the beginning of my year at Briar Middle School, I would tell him I would have to get back to the high school immediately. But I don't think he believed me. There were times when I was sure he followed me over there to see if I was doing my job.

The Wendy's episode is a good example of the attempts by Mr. Finn to assist Mr. Gunner to create situations to drive me to retire because of my age, disability and taking protected

In addition to the statements in the above answers, Mr. Gunner violated the collective bargaining agreement by demanding that I take a psychiatric examination by a school paid consultant. I had to grieve this to protect my contractual rights.

When I explained I also had a serious eye problem, he told me to, "tell me another one." I had to wear an eye patch for ten months. He did not believe I had a twin sister and accused me of being a liar, rather than asking someone to verify it. He treated me as an old relic instead of a valuable, long-term employee.

The series of suspensions by Mr. Gunner against me were baseless, and only used to further his plan to force me to retire or be used as the reason for my ultimate termination. Instead of trying to help me and provide reasonable accommodations, he just recklessly disregarded my rights under the law.

The placement of my teaching which required me to go from one floor to the other with only four minutes between classes. My granddaughter had to help me try to walk between classes because I had to wait until all my students had left to lock the room and then try to still be in the next class all in 4 minutes. There was no help for me by Mr. Gunner and his assistants ---just another way to pressure me to retire or make up a reason for discipline and termination.

Mr. Gunner publicly accused me of pornography in order to force my termination. He slandered a good name that took me years to build and also, in my opinion, gave a black eye to the Perkins School System.

I always considered it an honor and a privilege to help with the senior class. It was an honor to lead them to their graduation. When they reduced senior class advisors to one, I volunteered to keep helping Ed Pawlowski. He took away this honor the last two years by assigning Joe Bores to lead the class with no help for Mr. Pawlowski.

With the approval of Mr. Gunner, Mr. Gasteier participated in many of the following actions. Without asking me he took me out of my classroom (Room 701) and put me in the worst room on that floor (Room 702). It was next to the roof with a very loud fan, tiles coming up from the floor, chalk trays broken, TV didn't work, and no bulletin board space. The room was in dire need of new curtains and painting. I reported to school to fix up my room before I started my ten day suspension in Aug/Sept. of 2009 and Mr. Gasteier told me my room changed.

When he dismantled the typing lab (Room 707), he gave the smartboard to the Math Department when it belonged to the business department. I used it in my keyboarding classes all the time even though r was accused of not knowing how to use it. Room 707 was open all afternoon, and I asked to bring my World History classes up there and it had a smartboard I could use, but they made me walk to the end of the 600 wing which was a little difficult for me. They denied me the use of Room 707.

I was refused a technology workshop in Columbus, Ohio which would have been very beneficial for me.

At an Academic Challenge match in Willard in November of 2009, I had an accident and they had to get an ambulance. We have Emergency Medical Sheet' on file in the office for the faculty and it was not honored. My husband was the person to call and they called my son instead. The hospital asked for my insurance cards and I gave it to them. Unfortunately, it should have been a Workman's Comp complaint but they took my insurance cards and caused a lot of trouble getting this straightened out and somehow I figured it would be my fault. Nobody even followed up on my injuries.

Mr. Gunner hand delivered a letter to my home at 217 Michigan Ave., Sandusky, Ohio 44870 dated April 15, 2010 and demanded I sign it immediately, when in fact it should have been delivered VIA CERTIFIED and REGULAR US. MAIL. I was upstairs, just getting out of the shower. The man stood at my door and refused to move I told my husband to tell him to leave or I will have him arrested for trespassing. He then left. There is no reason to hand deliver a letter of that nature when every other letter I received from him was by CERTIFIED MAIL. This was harassment.

**INTERROGATORY NO. 12:** Please identify each and every event or action taken by James Gunner which was part of the "campaign to harass Mrs. Smith" as alleged in Paragraph 69 of the Complaint.

**RESPONSE:**

See answer to interrogatory 11.

**REQUEST FOR PRODUCTION NO. 12** If not embraced by a prior request, please produce each and every email or other form of correspondence exchanged by Plaintiff with any third party that relates to the allegations of her Complaint.

**RESPONSE:**

After a thorough search, including using Google Desktop with keywords pertinent to this lawsuit, Plaintiff has no documents that are responsive to this request, other than those already produced under other requests for production of documents.

**REQUEST FOR PRODUCTION NO. 13** If not embraced by a prior request, please produce all documents which tend to support Plaintiff's various claims of damages in this case.

**RESPONSE:**

After a thorough search, including using Google Desktop with keywords pertinent to this lawsuit, Plaintiff has no documents that are responsive to this request, other than those already produced under other requests for production of documents.

**INTERROGATORY NO. 13:** You have stated in your Rule 26(a) disclosures that certain personnel files identified in those disclosures contain documents which may be relevant to Plaintiff's claims. Have you reviewed the personnel files of any of the following individuals? If yes, please identify the particular or specific documents contained in the personnel files of the individuals identified below which you believe support Plaintiff's claims:
- James Gunner,
- Stephen Finn,
- Chris Gasteier,
- Mark Dahlmann,
- Gary Quisno,
- Danielle Mallot,
- Christine Donovo,
- Shane Burrows,
- Eric Talbot,
- Donna Fry,
- Tim Obergefell.

**RESPONSE:**

See response to Interrogatory No. 5. Plaintiff has not had the opportunity to review the personnel files to determine all the specific documents that may be contained in those files that are relevant to this lawsuit.

**REQUEST FOR PRODUCTION NO. 14** Please produce copies of all documents in your possession relevant to the persons identified in Interrogatory No. 13 which are in Plaintiffs possession and which tend to support or negate Plaintiff's claims.

**RESPONSE:**

We have produced all documents responsive to this request in previous requests.

**REQUEST FOR PRODUCTION NO. 15** Please produce all documents and tangible things which Plaintiff may use to support her claims at a trial of this action, if not previously produced.

**RESPONSE:**

Objection: Plaintiffs' counsel has not identified exhibits that will be used at trial, but it is probable that many of the documents identified in the answer to Interrogatories or other Request for documents will be used at trial. Plaintiff will supplement at the appropriate time as provided for under the Federal Rules of Civil Procedure and the Case Management Plan as adopted in this litigation.

Edward G. Kramer

EDWARD G. KRAMER (0024873)
Kramer & Associates L.P.A.
3214 Prospect Avenue, East
Cleveland, Ohio 44115
(216) 431-5300
Fax – (216) 431-6149
Kramere7@aol.com
Attorney for Plaintiff

**CERTIFICATE OF SERVICE**

I hereby certify that on the 22 day of August, 2011, the foregoing was sent by regular U. S. mail to Teresa L. Grigsby, Spengler Nathanson P.L.L., Four SeaGate, Suite 400, Toledo, OH 43604-2622 and also by e-mail transmission to Ms. Grigsby's e-mail address.

EDWARD G. KRAMER (0024873)