## IN THE TERMINATION PROCEEDINGS OF CAROL SMITH

In the Matter of:                         )
                                          )
                                          )
CAROL SMITH                               )          Referee:    Harry H. Taich
                                          )
                                          )
and                                       )
                                          )
PERKINS LOCAL SCHOOL DISTRICT             )          **REPORT AND RECOMMENDATION**
                                          )          **OF THE REFEREE**

### PROCEDURAL HISTORY:

The above-captioned case was heard on July 21, 22 and August 11, 12, 2010, in Huron, Ohio.

Said case was before referee Harry H. Taich, pursuant to appointment by the State Superintendent of

Public Instruction of the Ohio Department of Education. This referee was advised by letter from

Kimberly L. Hall, Interim Chief Legal Counsel for the Ohio Department of Education received on

May 3, 2010, that the two parties in this possible termination matter mutually selected me to serve as

the referee in this matter, pursuant to R.C. § 3319.161.

This matter involves a termination proceeding by and between teacher Carol Smith

(hereinafter referred to as "Teacher", "teacher Smith" or "Mrs. Smith"), and the Perkins Local

School District Board of Education (hereinafter referred to as "District" or "Board"). Mrs. Smith

requested a hearing before an impartial referee pursuant to Ohio Revised Code § 3319.16. Mrs.

Smith was employed as a teacher under a continuing contract for the 2009-2010 school year. (Tr.

373) She was suspended without pay effective April 14, 2010, by the Board, during the pendency of

these proposed termination proceedings. (Ex. B-92, Tr. 385-386)

1 of 37

The Treasurer of the District mailed by certified and regular mail the original Resolution for the Termination with full specifications to Mrs. Smith at her residence, advising her that the resolution was adopted at the April 14, 2010, Board meeting, to suspend her without pay during the pendency of termination proceedings. (Exs. B-92, 93, Tr. 374-377) Said Resolution with full specifications stated that the Board intended to consider the termination of her teaching contract on the statutory ground of good and just cause. (Ex. B-92, Tr. 374-377) Numerous specifications were detailed with regard to the ground for termination in the Board Resolution. (Ex. B-92, Tr. 375) Mrs. Smith acknowledged that she received notice of her proposed termination with the ground and specifications. (Ex. B-94, Tr. 378) On April 16, 2010, Mrs. Smith demanded a hearing before a referee pursuant to O.R.C. § 3319.16 and 3319.161. (Ex. B-94, Tr. 378)

On April 27, 2010, the Ohio Department of Education, Interim Chief Legal Counsel, sent a list of potential referees to the parties and their representatives with instructions for the selection process. (Ex. B-97, Tr. 380) On April 30, 2010, the parties advised Kimberly L. Hall, Interim Chief Legal Counsel for the Ohio Department of Education, that the parties mutually agreed upon Harry H. Taich to serve as the referee in this matter. (Ex. B-98, Tr. 380-381) On May 3, 2010, I was advised that I had been appointed to serve as the referee in this matter pursuant to R.C. Section 3319.161. (Ex. B-98) On May 7, 2010, the parties orally agreed to reschedule the hearing from May 14, 2010, to the new dates that were mutually agreed upon and coordinated with the referee. On May 10, 2010, a written confirmation, being a Pre-Hearing Scheduling Order and Memorandum acknowledged the agreement to reschedule the hearing for July 7, 8, 21 and 22, 2010 to begin at 9:00 a.m. and conclude at 5:00 p.m. on each date.

On June 14, 2010, Teacher's attorney withdrew from representation of Mrs. Smith pursuant to Rule 1.16 (a)(1) of the Ohio Rules of Professional Conduct. On June 21, 2010, a new attorney filed his notice of appearance as counsel for Mrs. Smith in this matter. On June 22, 2010, the parties orally agreed to reschedule the previously set hearing dates of July 7, 8, 2010, to new dates that were mutually agreed upon and coordinated with the referee. On June 25, 2010, a written confirmation, being a Second Pre-Hearing Scheduling Order and Memorandum acknowledged the agreement to reschedule the hearing for July 21, 22 and August 11, 12, 2010, to begin at 9:00 a.m. and to conclude at 5:00 p.m.

A total of twenty-seven (27) witnesses were called and testified in this matter. The parties submitted a total of one-hundred and thirty-seven (137) exhibits, and one-hundred and twenty nine (129) were admitted into evidence during the hearing. The transcript consisted of one thousand two hundred and thirteen (1213) pages of testimony from the witnesses at this hearing.

**ISSUES:**

The District's stated ground for termination of the Teacher is Good and Just Cause. The specifics of the ground form the issues of this case and relate factually and legally to the following:

Section 1.     It is the intention of the Board of Education to consider the termination of the teaching contract, including any supplemental contracts, of Carol Smith ("Mrs. Smith") on the basis of good and just cause within the meaning of O.R.C. § 3319.16. The specification of grounds for such consideration is as follows:

    A.    Mrs. Smith engaged in inappropriate discussions with her high school social studies class regarding pornography;

    B.    Mrs. Smith repeatedly "dozed off" for several minutes at a time while supervising students during 5D Study Hall, thereby continuing a pattern of sleeping on the job and engaging in unprofessional conduct; and,

C.    Mrs. Smith repeatedly arrived tardy to her 5th Period History Class, thereby (a) leaving her students unattended, and (b) continuing a pattern of being tardy for her assigned duties and engaging in unprofessional conduct. (Ex. B-92)

## STANDARD AND BURDEN OF PROOF:

Ohio Revised Code Section 3319.16 states in pertinent part, as follows:

"The contract of any teacher employed by the board of education...may not be terminated except for good and just cause."

Other good and just cause has been determined by the Ohio Supreme Court to indicate "a fairly serious matter" that relates to some action or conduct of a teacher. See: Hale vs. Lancaster Board of Education, 13 OS 2d 92, 42 00 2d 286, 234 N E 2d 583 (1986). The conduct must be flagrant or outrageous or at the very least persistent.

R.C. § 3319.16 was amended in 2009, removing the grounds of "gross inefficiency", "immorality", and "willful and persistent violations of board regulation" from the prior statute for terminating a teacher's contract. Now, the only ground for terminating a teacher's contract under 3319.16 is for "good and just cause". The amendment of the statute did not change the standard for teacher termination cases, that said cases be limited to factual situations of a fairly serious matter.

The standard of proof which must be satisfied by the Board of Education to establish and justify the termination of a teacher's contract has been held to be by a preponderance of substantial, reliable and probative evidence. See: Graziano v. Board of Educ, 32 Ohio St 3d 289 (1987); Wells v. Madison Local Sch. Dist, 1985 WL 7682 (Ohio App. 12th Dist.); Applebaum vs. Wulff, 58 OLA

260, 42 OO 434 at 437,95 N E 2d 19 (1950). The Board of Education has the burden of proof in this matter to establish and prove the facts and the ground to support its intended action to terminate Teacher's contract by a preponderance of substantial, reliable and probative evidence.

**FACTUAL FINDINGS:**

I have reviewed and studied the written briefs of counsel for both parties in this matter numerous times. I have read and studied the transcript of this hearing thoroughly and often since the completion of the testimony in this case. The credibility of all of the witnesses has been considered by this referee. Based upon the presentation of all of the evidence at this hearing, including all of the admitted exhibits presented by both parties, I hereby make the following factual findings.

Carol Smith is a teacher with a permanent teaching license issued by the State of Ohio. (Ex. B-2, Tr. 373-374) Mrs. Smith is currently 71 years old and has taught in the Perkins Local School District for thirty-four (34) years. (Tr. 1035, 1038) Mrs. Smith was granted tenure in 1980. (Ex. B-1, Tr. 373, 1045) Teacher Smith had a continuing teaching contract of employment for the 2009-2010 school year. (Tr. 373) Teacher Smith taught mainly business courses at Perkins High School during her career, but during the 2008-2009 school year, she also taught keyboarding at Briar Middle School along with supervising In School Intervention ("ISI") classes. (Ex. T-29, Tr. 249-252) During the 2009-2010 school year, teacher Smith taught business courses in the morning and social studies in the afternoon at Perkins High School. (Ex. T-29, Tr. 1085) During many of her teaching years, Mrs. Smith had supplemental contracts for Senior Class Advisor and 50 % Academic Challenge Advisor. (Ex. T-22, T-23, Tr. 1066-1068) Teacher Smith has a Masters Degree plus fifteen (15) additional hours beyond her Masters. (Ex. T-28)

My recommendation to the Board will involve only evidence dealing with the specifications in the Board Resolution that was adopted on April 14, 2010. (Ex. B-92)

During the 2008-2009 school year, Principal Stephen Finn of the Briar Middle School testified that Mrs. Smith was sleeping while supervising students who were assigned to In School Intervention ("ISI") class. (Ex. B-12, Tr. 252-261) ISI were disciplinary classes for students serving in school suspensions. (Tr. 241-248) During the 2008-2009 school year, Mrs. Smith was assigned to the high school in the morning to teach business classes, and to Briar Middle School in the afternoon to teach one keyboarding class and to supervises three (3) ISI classes. (Ex. T-29, Tr. 249-251) Principal Finn testified that he observed her sleeping on the job on September 4, 2008, and September 9, 2008, while supervising students in the choir room, where the ISI disciplinary class was being held. (Ex. B-12, B-13, Tr. 252-259) He stated that he woke her up after visually seeing her sleeping with her eyes closed, leaning back in a real relaxed state with her mouth opened. (Tr. 252-259) He testified that he told her that he needed her to do something and "I don't expect you to be sleeping". (Tr. 252-259)

On September 22, 2008, assistant –principal Quisno of Briar Middle School went down to check on Mrs. Smith, at the request of Principal Finn, due to the prior incidents of her sleeping on the job in the ISI classes. (Tr. 268-269, 365-366) Once again, according to the testimony of assistant-principal Quisno, Mrs. Smith had her head back, eyes closed, and he walked right up to her at her desk, and she didn't wake up. (Tr. 268-269, 366-368, 1074-1075) The students in the ISI class looked at him and shook their heads. (Tr. 366) He testified that if these students are in an ISI

class, their unacceptable behavior caused them to be in the class in the first place. (Tr. 363) He stated that the safety of the students and the fact that they were not trustworthy were two reasons why they needed to be supervised at all times. (Tr. 363-364)

On October 6, 2008, Principal Finn issued a written reprimand to be placed in Mrs. Smith's personnel file for the sleeping incidents during September, 2008. (Ex B-13, Tr. 277-283) Both principal Finn and assistant principal Quisno testified that Mrs. Smith was sleeping when they observed her supervising the "ISI" class in September, 2008. (Tr. 252-259) Both testified that sleeping in class by a teacher is not acceptable conduct because of the safety of the students. (Tr. 240-241) According to the testimony of Principal Finn, teacher Smith admitted to him that she was sleeping in class on September 4, 2008, but denied that she was sleeping on the other dates. (Tr. 277-279) The Principal testified that Mrs. Smith stated that her diabetes caused her to sleep. (Tr. 277-279)

Principal Finn indicated that in all of his years in education that he never disciplined a teacher three (3) times in the same school year, like Mrs. Smith. (Tr. 325-326) One of Mrs. Smith's other disciplines involved a three (3) day unpaid suspension for failing to be present for two (2) periods at Briar Middle School for her assigned duties on February 25, 2009. (Ex. B-88, Tr. 301-325) February 25, 2009, was an early release day and Mrs. Smith was confused and did not appear for her 8th and 9th period "ISI" classes, leaving the children unattended. (Exs. B-19, B-21, B-22, B-23 and B-26, Tr. 301-325) Mrs. Smith admitted that missing 8th and 9th periods on February 25, 2009, was totally her error and responsibility. (Ex. B-21, Tr. 305-306) Superintendent Gunner issued a three-day suspension without pay for leaving students unsupervised and for previous warnings for unprofessional conduct. (Ex. B-23, B-26, Tr. 323-325)

At or near the conclusion of the 2008-2009 school year, principal Gasteier of the high school wrote to Mrs. Smith with regard to upcoming school year 2009-2010. (Ex. B-30) He directed her to spend several periods over two days with teacher Scott McVeigh, observing his Modern World History classes and to meet each day with teachers or the department chair after school, because she would be teaching social studies at the Perkins High School for the 2009-2010 school year. (Ex. B-30) Scott McVeigh, a high school social studies teacher testified that Mrs. Smith came to his classroom twice, per principal Gasteier's letter of June 1, 2009. (Ex. B-30, Tr. 416-418) Teacher McVeigh testified that Mrs. Smith observed two (2) classes, with one class being in the morning where she sat in the front of the class, and the second class in the afternoon where she sat in the back of the class. (Ex. B-33, B-34, B-35, Tr. 415, 420, 423) Mr. McVeigh testified that Mrs. Smith was sitting up front in his classroom facing the students and the children were motioning to him, pointing toward Mrs. Smith. (Tr. 424-426) Mrs. Smith was sleeping during his lecture and he did not wake her up. (Ex. T-36, Tr. 423-426) In his opinion, she did not appear to be in any medical distress and when she woke up nothing was said to him. (Tr. 426) Mrs. Smith also was 10 minutes late and fell asleep on her next observation of Mr. McVeigh's class in the afternoon, while he was lecturing during the last fifteen (15) minutes of class. (Ex. T-36, Tr. 427-428) Teacher McVeigh observed her eyes closed and sleeping and the children, once again, motioned to him to look at Mrs. Smith. (Tr. 428) His concern was that Mrs. Smith would be teaching a freshman course of social studies for the 2009-2010 school year and that class involved an OGT test. (Ex. T-36, Tr. 418, 429-430, 451) Teacher McVeigh testified that he agreed that "yellow journalism" is a form of "sensationalism" and

8 of 37

that yellow journalism is also called sensationalism. (Tr. 439, 452) Teacher McVeigh testified that the National Enquirer Magazine was sensationalism and he would not discuss pornography as sensationalism. (Tr. 439-440)

On June 5, 2009, principal Gasteier wrote Mrs. Smith with regard to a disciplinary conference to be held in his office on June 9, 2009, with regard to her falling asleep in Mr. McVeigh's classroom. (Ex. B-33, Tr. 543-544) On June 15, 2009, principal Gasteier wrote Mrs. Smith that as a result of her unprofessional behavior of falling asleep in Mr. McVeigh's social studies class, that he would recommend to the Superintendent an additional suspension be issued. (Ex. B-34, Tr. 545-548) On June 19, 2009, Superintendent Gunner advised Mrs. Smith by letter that he was issuing a 10-day unpaid suspension for her unprofessional conduct of falling asleep during Mr. McVeigh's class. (Ex. B-35, Tr. 548-549) Her ten-day unpaid suspension was to begin on August 25, 2009 and conclude at the end of the day on September 2, 2009. (Ex. B-35, Tr. 549-550)

On or about June 16-17, 2009, two (2) teachers reported to assistant-principal Dahlmann that teacher Carol Smith was sleeping during the MAC computer technology training session. (Exs. B-39, 40, 41, Tr. 169-174, 396-405, 697-702) Teacher Shana DeRose-Smith testified that someone nudged her and said look at Mrs. Smith. (Tr. 400) She turned around and saw Mrs. Smith with her eyes closed for minutes, with no movement of her body, and her chin was down (Tr. 401-403) She appeared to be sleeping, but she doesn't know if she was asleep. (Tr. 402, 410) She also testified that she witnessed Mrs. Smith appear to be sleeping at a faculty meeting. (Tr. 405) Teacher Nancy Kinsel also testified that she saw Mrs. Smith sleeping in a general faculty meeting in the last two (2) years and at the June 16, 2009 MAC training workshop. (Ex. B-41, Tr. 695-702) At the MAC training on June 16, 2009, she observed Mrs. Smith with her eyes closed, head back and in her

opinion, Mrs. Smith appeared to be sleeping for at least an hour on and off. (Ex. B-41, Tr. 700-702) Teacher Kinsel spoke to and than e-mailed assistant principal Mark Dahlmann about Mrs. Smith, pursuant to his request. (Ex. B-41, Tr. 701) On cross-examination, teacher Kinsel acknowledged that Mrs. Smith had her eyes closed, head back and she may or may not be sleeping. (Tr. 705-706)

On or about June 19, 2009, Superintendent Gunner requested Mrs. Smith attend a disciplinary conference with him on July 7, 2009, to discuss her unprofessional conduct of falling asleep for an extended period of time during the technology training on June 16-17, 2009. (Ex. B-42) On July 8, 2009, Superintendent Gunner deducted an hour of pay for both June 16 and June 17, 2009, for falling asleep at the in-service technology training. (Ex. B-43) Superintendent Gunner, in his letter to Mrs. Smith on July 8, 2009, warned her in **bold print** right above his signature, as follows: "After four separate incidents this year, any further incidents of unprofessional behavior will result in a recommendation for the termination of your employment". On August 31, 2009, Superintendent Gunner wrote to PEA President John Gerber with a copy to Mrs. Smith that in response to the Level One-Grievance Report Form regarding the "pay dock for technology training" that had this sleeping while on professional duty occurred in her classroom rather than a professional development activity, he would have recommended termination of her employment to the Board. (Ex. B-45) He once again warned her in writing that future incidents of unprofessional conduct will lead to a recommendation to the Board for her termination of employment. (Ex. B-45)

The schedule for Mrs. Smith during this past school year of 2009-2010, involved teaching a business class during period four (4) in room 702. (Ex. T-29) Modern World History aka "social

10 of 37

studies" was period 5 (A/B) in room 605. (Ex. T-29) Lunch was period 5 (C ) and she supervised a study hall for period 5 (D) , with all of the fifth period classes in room 605 of the high school. (Ex. T-29).

Principal Gasteier and assistant-principal Dahlmann both testified that teachers must be present in the classroom when the bell sounds to supervise their students at all times. (Tr. 113, 507) They further stated that if students are not supervised at all times, that harm can come to students and school safety is of utmost importance. (Tr. 113, 507-508) Study halls are the same as other classes and supervision by a teacher is required at all times. (Tr. 113, 512-514) Teachers must pay attention in study hall and the Principal impressed upon Mrs. Smith not to sleep in class. (Tr. 512-514, 519-520)

On or about September 10, 2009, principal Gasteier requested his secretary contact Mrs. Smith regarding her return to school tomorrow, because he had not heard from her in the past two weeks. (Tr. 47, 551-552) Mrs. Smith was out of school for the first seven days of school year 2009-2010 due to her ten (10) day unpaid suspension. (Ex. B-35, Tr. 549-550, 864) Shortly after she returned to school, she was late for class on September 14, 2009, and a Mrs. Malott covered for her, but the Principal said she could not depend on that everyday. (Ex. B-48, Tr. 554-555) The Principal testified that Mrs. Smith never made a request to him, for her to change rooms at any time during the 2009-2010 school year. (Tr. 556)

On or about March 19, 2010, a para-professional named Beth Martinez, who was assigned to a student with an IEP in Mrs. Smith's class, told the Principal about a pornography discussion in Mrs. Smith's 5th period class. (Ex. B-51, Tr. 556) On or about March 29, 2010, a formal investigation was started by the Principal and Superintendent with regard to Mrs. Smith's alleged

inappropriate discussions regarding pornography with her high school social studies class. (Ex B-55, Tr. 560-562)

The alleged inappropriate discussions with regard to pornography took place on Friday, March 19, 2010, but the formal interviewing of students took place on Monday, March 29, 2010, because principal Gasteier was in California during that time period. (Tr. 557-561, 563-572, 619-620) However, the Principal and Superintendent Gunner spoke by telephone with regard to this incident and set-up the investigation for March 29, 2010. (Tr. 558-559) On March 29, 2010, teacher Smith was relieved of her duties with pay, pending the outcome of the investigation into allegations of inappropriate discussions in social studies class with regard to pornography. (Ex. B-55, Tr. 560-562) The investigation involved calling students down to the office in groups of three (3) to four (4) at a time and requesting individual statements and then interviews with the Principal and Superintendent taking notes. (Exs. B-51, B-54, B-57 – B-86, Tr. 563-568) Both the Principal and Superintendent took notes and some interviews took place the following morning with the Principal. (Exs. B-54, B-57-B-86, Tr. 566-572)  All of the students in the social studies class were interviewed, except the Teacher's grandson. (Tr. 587-588) One student did not want to be involved and that person did not give a statement or be interviewed. (Tr. 633) As a result of the investigation, many students stated that Mrs. Smith was often late to class and slept in social studies and study hall. (Tr. 589-590) The notes of the Principal and Superintendent of the interviews, along with the written statements of the students, were admitted into evidence in this case, solely to establish that an investigation took place by the administrators, and not for the truth of the matters contained in the statements of the students and notes of the administrators. (Exs. B-51, B-54, B-57-B-86, Tr. 591-595) The Principal testified that prior to March 19, 2010, in the 2009-2010 school year, he did not

receive any complaints that he can recollect about Mrs. Smith sleeping in social studies class and study hall. (Tr. 610-611, 616)

Many students from Mrs. Smith's 5 (A/B) social studies class and 5D study hall in school year 2009-2010, testified in this matter. (Tr. 10-107, 178-231) The students will not be identified by name, but rather by Student I, Student II, Student III, etc. (Tr. 10-47, 48-74, 75-107) All of these children were 9th grade freshman students in the 2009-2010 school year and were in Mrs. Smith's social studies class for period 5 (A/B) and 5 (D) study hall. (Tr. 10-107, 178-231) Only testimony from students who testified at the hearing of this matter was considered by this referee. Students who wrote statements, but did not testify, and interview notes of the Administrators, were not considered by this referee, except for the limited purpose to establish that some type of an administrative investigation took place. (Exs. B-51, B-54, B-57-B-86, Tr. 591-595)

Student I testified that Mrs. Smith was late to social studies class every day and once in awhile, during social studies class, she would close her eyes for five (5) minutes at a time. (Tr. 12, 16) In his opinion, Mrs. Smith was 10-15 minutes late every day to social studies class. (Tr. 13, 45) During study hall, Student I testified that Mrs. Smith would doze off fifteen to twenty (20) minutes at a time, three times a week, and she was not resting her eyes, because she stayed in the same position without moving. (Tr. 16-17, 46) Student I took pictures of Teacher to show to his mother, because his mother did not believe that Teacher falls asleep during study hall. (Ex. B-56; 1st two pages, Tr. 17-19) This Student stated that while Teacher slept during study hall, they played games on laptops, talked to friends in the classroom and in hallway and did whatever they wanted to do. (Tr. 22) Student did not remember the date of his social studies class, but Mrs. Smith talked about newspapers, Playboy, pornography and yellow journalism (Tr. 22-23, 37) She talked about yellow

journalism and sensationalism and that pornography was a form of sensationalism. (Tr. 37-39) She spoke about Playboy and Playgirl magazines and that everybody looked at them. (Tr. 23, 40-41) He stated that Mrs. Smith let him leave during study hall to go to the wrestling room and he did not have any problems with her. (Tr. 43)

Student II testified that Mrs. Smith was late to social studies class two to three times a week by 10-15 minutes. (Tr. 52, 67-68) The students waited for Mrs. Smith to arrive for class and this Student described 5th period as unruly. (Tr. 49, 52) Because of Teacher's late arrival, the students did whatever they wanted to do. (Tr. 52) Due to her late arrival, it took an additional five to ten minutes to get the class under control. (Tr. 53) This student testified that because of Mrs. Smith's late arrival, it was very difficult to focus and learn in her class. (Tr. 53) Student II stated that Teacher fell asleep during class two to three times a week for ten to fifteen minutes. (Tr. 54) She described Mrs. Smith sleeping by her eyes being closed, with her head back, leaning back in her chair, with occasional snoring. (Tr. 55) She further stated that Mrs. Smith was not just resting her eyes, because the class was too loud, some horse play, students were texting in class and laptops were all opened and not in the closed position. (Tr. 55-56) The students did not wake her up, because they could do whatever they wanted to do, since they were not being supervised by Teacher. (Tr. 58) This student took a picture of Mrs. Smith sleeping. (Ex B-56; page 3, Tr. 57) Student II testified that the Principal and Superintendent did not say Mrs. Smith was in trouble or describe only the bad things in their interview of this student with regard to Teacher. (Tr. 67) Student II stated that while they waited for Mr. Smith to get to class, some kids would be arguing, pushing each other and messing around. (Tr. 73)

Student III testified that Mrs. Smith was late for social studies class about once a week for 5 minutes and was on time the rest of the week. (Tr. 77-78) He testified that it took the class approximately five (5) to six (6) minutes to settle down, because the class was rowdy waiting for Teacher to arrive for class. (Tr. 77-78) He further testified that during social studies, Mrs. Smith went to sleep once a week. (Tr. 79-80) He described her sleeping position as elbows out and head back, with her hands behind her head, with her eyes closed. (Tr. 80-81) In his opinion, she was not resting her eyes, because Teacher was not in touch with the class, and students were playing games on their laptops and talking while Mrs. Smith slept. (Tr. 80-81) This student further testified that during study hall after lunch, Mrs. Smith fell asleep twice a week, and Students threw plastic bottles into the wastebasket, students talked louder, and children moved to different desks. (Tr. 81-82) When this Student was shown Exhibit B-56, he testified that her position was familiar to him and the picture depicted her sleeping. (Ex. B-56, Tr. 83-84)

This Student III when further questioned about her sleeping, said it could be accurate that during study hall she "nodded off" but did not fall completely asleep. (Tr. 97) Student III testified that Mrs. Smith talked about yellow journalism and sensationalism with pornography, after a boy in the back of the room yelled "porn". (Tr. 99-100) Mrs. Smith said Playboy and Playgirl magazines were an example of sensationalism. (Tr. 100)

Student IV testified that Mrs. Smith was normally tardy to social studies class three to four times a week. (Tr. 180-181) The class was very loud with talking the first ten minutes, because she was late to class. (Tr. 181) It took additional time for the class to settle down. (Tr. 181) Mrs. Smith told the class that she was late, because it's hard for her to go down stairs. (Tr. 196) Student IV testified that Board Exhibit 56 depicted how Mrs. Smith slept in study hall. (Tr. 185) She further

testified that Mrs. Smith slept three (3) or four (4) times per week in class and students did not wake her up. (Tr. 185-186) The reasons for not waking her up were the students could text, play on their laptops, go to lockers, and go to other rooms. (Tr. 186) Mrs. Smith did not know that students left the room. (Tr. 186) Additionally, Student IV testified that at the end of social studies class, Mrs. Smith would sometimes sleep, after she taught the class. (Tr. 187) This witness also testified when further questioned on cross-examination, that Mrs. Smith would close her eyes, but she wasn't certain if she was sleeping. (Tr. 190)

Student IV did not remember the term "yellow journalism", but "sensationalism" did come up. (Tr. 193-194) Mrs. Smith said everyone looked at Playboy and Playgirl magazines and that made this witness feel uncomfortable. (Tr. 188) She testified that the students started laughing and Mrs. Smith turned the conversation back to talking about social studies. (Tr. 195)

Student V testified that Mrs. Smith arrived up to five (5) minutes late to social studies class almost everyday. (Tr. 200-201) Further, it took an additional ten (10) minutes before she started to teach the class. (Tr. 201) He testified that none of his other teachers were late to class. (Tr. 202) There was "chaos" before Mrs. Smith arrived at class, because everyone was talking. (Tr. 201) He stated that Mrs. Smith supervised the study hall only when she was awake. (Tr. 202-203) During study hall, Mrs. Smith would close her eyes, lay back in the chair with her head back, and not move her body. (Tr. 203) In his opinion, she was sleeping, not just resting her eyes. (Tr. 204) Students would take out their cell phones, text, play games on the computer, talk to people across the room, take pictures of her sleeping, and she did not stop it. (Tr. 203) On one occasion, someone threw a plastic bottle. (Tr. 204) The students did not wake her up, because they could do whatever they wanted to do. (Tr. 205-206) During the class in question, they discussed "sensationalism" and she

brought up Playboy and Playgirl magazines. (Tr. 207) He heard someone say "porn" and Mrs. Smith said yes, pornography can be a type of sensationalism, and then she mentioned the magazines. (Tr. 211-212) He concluded his testimony by saying that he didn't know why she would be late for class, because he travels a much greater distance. (Tr. 214) In his opinion, she was never more than five (5) minutes late to class. (Tr. 215)

Student VI testified that Mrs. Smith was late to social studies class three days a week by up to five (5) minutes. (Tr. 220) It took Mrs. Smith five to ten more minutes to calm the students down, because students were wild and loud, doing whatever they wanted to do, texting, and out of their seats. (Tr. 220-221) Mrs. Smith did not supervise the students very well and students took note of when she was sleeping. (Tr. 221-223) This witness also testified that Students would not wake her up, so they could text, throw papers, get out of their seats and talk. (Tr. 224-225) The class on one occasion, discussed yellow journalism, and that it was sensationalism. (Tr. 225-226) Mrs. Smith explained to the class what it meant by using the examples of Playboy and Playgirl magazines. (Tr. 225-226) Mrs. Smith mentioned that she viewed Playgirl when she was younger. (Tr. 226) The students laughed at the mention of Playboy and Playgirl magazines. (Tr. 229-230) In his opinion, Mrs. Smith was 1 or 2, up to 5 minutes late to class, because Mrs. Smith is older and maybe it took her longer to go between classes. (Tr. 228-229)

Student VII testified that Mrs. Smith was late to 5th period social studies class four out of every five days by a few minutes. (Tr. 953) Further, this witness did not know if Mrs. Smith was sleeping in study hall, but she did see her with her eyes closed for maybe ten (10) minutes, like Board Exhibit 56. (Ex. B-56, Tr. 947, 950-952) Additionally, this Student stated that Teacher did not talk with her eyes closed. (Tr. 951) When Mrs. Smith closed her eyes, the students in the study

hall played games on their computers, played music and talked to friends. (Tr. 952-953) This witness did not have any other teachers that closed their eyes. (Tr. 952)

Mrs. Smith used pornography as an example of yellow journalism and the students in the class laughed about it, according to Student VII. (Tr. 945-946) The discussion about pornography lasted about seven (7) minutes. (Tr. 945-946)

Student VIII stated that Mrs. Smith did not sleep in study hall and was late 1 or 2 minutes to Modern World History (Social Studies) about ten (10) times from September to March in the 2009-2010 school year. (Tr. 956-957) However, on cross-examination, Student VIII acknowledged when looking at the pictures in Board Exhibit 56, that her eyes were closed and she was leaning back in the chair. (Ex. B-56, Tr. 964-965) He had seen her in that position, but not may times during the 2009-2010 school year. (Ex. B-56, Tr. 965) He testified that her eyes hurt and students asked her if she was sleeping. (Tr. 966)

Student VIII further testified that the topic of yellow journalism was discussed with sensationalism and rallying Americans. (Tr. 958) Mrs. Smith used the example of Playboy and Playgirl magazines, as examples of sensationalism, and the students laughed. (Tr. 958) The discussion lasted 5-10 minutes and then the discussion returned to Modern World History. (Tr. 958-959)

Teacher Edwin Pawlowski, a longtime English instructor at Perkins High School, testified that he never heard Mrs. Smith discuss pornography. (Tr. 1021) He testified that she did not have a reputation for teaching anything inappropriate. (Tr. 1021) Teacher Dean Idrissi, a foreign language teacher, testified that he never heard Mrs. Smith discuss pornography. (Tr. 1022-1023) In his opinion, she did not have a reputation of teaching inappropriate subjects. (Tr. 1024)

Teacher Darlene Salzgaber also testified that she never heard Mrs. Smith discuss pornography. (Tr. 1027) Mrs. Smith, according to this teacher, did not have a reputation of teaching inappropriate subjects. (Tr. 1027) However, assistant-principal Dahlmann testified that on September 14, 2005, he sent Mrs. Smith a memo about an "R" rated movie she showed her class that did not fall within the course objectives of her business classes. (Ex. B-5, Tr. 131-135)

Dr. James Gunner, the Superintendent of the District, acknowledged on cross-examination that prior to the pornography discussion on March 19, 2010, Mrs. Smith had no propensity of teaching any sexual material. (Tr. 866-867) Further, he agreed that the allegations of teaching pornography by Mrs. Smith were out of character for this long time teacher. (Tr. 867) Dr. Gunner further stated that the students informed him that the pornography discussion lasted about five (5) to ten (10) or fifteen (15) minutes and that it was one discreet incident on March 19, 2010. (Tr. 868-869) Prior to March 29, 2010, when his formal investigation of the incident began, he had not received any complaints from Parents about the March 19, 2010, pornography incident. (Tr. 911)

However, Superintendent Gunner had received an e-mail on March 25, 2010, from Board of Education Vice-President Steven Schuster about pornography being taught in Mrs. Smith's social studies class. (Ex. B-32, Tr. 791) Dr. Gunner met with four randomly selected students from the class on March 26, 2010, and after the meeting, he determined that a thorough investigation of this matter was required. (Tr. 912-914) He believed that based upon the pornography discussion in class, and teacher Smith's prior disciplines for improper conduct, that he needed to thoroughly

investigate the matter and speak to Mrs. Smith. (Tr. 917-918) He made the decision prior to March 29, 2010, to relieve Mrs. Smith of her duties with pay and to investigate the matter (Tr. 797-798) Dr. Gunner hand delivered his letter to Mrs. Smith on March 29, 2010 and sent her home with pay. (Ex. B-55, Tr. 797-799, 801, 919)

Carol Ann Smith has thirty-four (34) years in public education and wants to teach one (1) more year prior to retiring. (Tr. 1090-1091) She testified that her pension would be nine hundred dollars ($900.00) more per month with thirty-five (35) years, versus her present thirty-four (34) years. (Tr. 1091) Mrs. Smith had cataract surgery on her right eye on July 6, 2005 and developed a staph infection to that eye. (Tr. 1060-1061) She had two additional surgeries to that eye with the last one during May of 2006. (Tr. 1172-1176) According to Mrs. Smith, her eye doctor does not recommend any further treatment with regard to the eye, but for the past five (5) years she squints the right eye due to light sensitivity. (Tr. 1177-1182) Teacher testified that if lights are too bright, she must close her eyes and it takes her a couple of minutes to adjust to lights. (Tr. 1062) Mrs. Smith also has a history of diabetes and needs to test her sugar level and inject herself with insulin. (Ex. B-15, Tr. 1060)

By way of history, prior to the 2008-2009 school year, Principal Gasteier had discussions with Mrs. Smith about her supervision of students and to make sure that she was not sleeping in class. (Tr. 518-520) Assistant Principal Dahlmann, prior to the 2008-2009 school year, gave Mrs. Smith a written directive with regard to her failure to properly supervise students. (Ex. B-4, Tr. 126) On September 14, 2005, Mr. Dahlmann gave her a second written directive about showing an R-rated move in her classroom that didn't align with the curriculum, and that she failed to notify the parents. (Ex. B-5, Tr. 131-135) Mr. Dahlmann spoke to Mrs. Smith about another supervision issue

on or about May 23, 2008, with regard to her allowing students to work in the computer lab without adult supervision. (Ex. B-9, Tr. 139-141) Additionally, about two or three school years ago, assistant principal Dahlmann heard that Mrs. Smith was occasionally late to class at the beginning of the day, when it was time to report to work. (Tr. 141-143) He was told that she was not in the room one morning and he went to her room to cover it until she arrived. (Tr. 142-143) She walked in with Mr. Dahlmann in her classroom, so he was sure that Mrs. Smith knew she was tardy to school. (Tr. 142-143) He reported Mrs. Smith's conduct to the principal. (Tr. 143)

During the 2008-2009 school year Mrs. Smith received a written reprimand on October 6, 2008, for falling asleep and unprofessional conduct at Briar Middle School on four (4) separate dates in September, 2008. (Ex. B-12, B-13, Tr. 1073-1076) Mrs. Smith admitted that she was sleeping in the choir room during school hours and was caught by Principal Finn. (Exs. B-12, B-13, Tr. 1073-1075) Mrs. Smith denied that she was sleeping on the other three dates in September 2008. (Exs. B-12, B-13, Tr. 1073-1075)    In Exhibit B-12, Principal Finn states that high school administrators Gasteier and Dahlmann had previously verbally warned her about similar concerns regarding her professional conduct at the high school while responsible for the supervision of students. (Ex. B-12) Mrs. Smith testified that she didn't feel well due to her high sugar level and put her head on the desk and fell asleep on September 4, 2008. (Ex. B-15, Tr. 1073-1074) She denied sleeping on September 22, 2008, when assistant-principal Quisno came into her room and she said, "hi Mr. Quisno" and he turned around and left the room. (Tr. 1074-1075, 1189-1190) She testified several times that Mr. Quisno only came into her room once on that date and she spoke to him. (Tr. 1074-1075, 1189-1190) However, assistant-principal Quisno testified that on that date he went down to check on Mrs. Smith, at the request of Principal Finn, and she had her head back, eyes closed and he walked right

up to her desk and she did not wake up. (Tr. 268-269, 365-368) He reported back to Principal Finn

that she was sleeping and he was told to go back down there and wake her up. (Tr. 268-269, 366-

368) By the time he went back down there, she was awake and they had a short conversation. (Tr.

268-269, 365-368, 1074-1075) In my opinion, Mrs. Smith was not aware of Mr. Quisno's first visit,

because she was sleeping. (Tr. 268-269, 365-368, 1074-1075, 1189-1190) Principal Finn testified

that he personally observed her sleeping on the job on September 4, 2008 and September 9, 2008,

while supervising students in the choir room. (Ex. B-12, B-13, Tr. 252-259) Mrs. Smith admitted she

was sleeping on September 4, 2008, but denied sleeping on September 9, 2008. (Ex. B-12-, B-13,

Tr. 252-259, 1073-1074)

The next incident took place on February 25, 2009, when Mrs. Smith failed to be present for

her assigned duties during two (2) periods at Briar Middle School. (Ex. B-21, Tr. 1077-1080) She

took full responsibility for missing the two "ISI" classes, because she was mixed up over the high

school and middle school schedules. (Ex. B-21, Tr. 1077-1080) Mrs. Smith received a three (3) day

unpaid suspension for failing to appear for her 8th and 9th period "ISI" classes, leaving the children

unattended. (Ex. B-19, B-21, B-22, B-23, B-26, Tr. 305-306, 1077-1080)

During June, 2009, Mrs. Smith denied that she fell asleep on either day of her observations of

Scott McVeigh's Modern World History classes. (Exs. B-30, B-34, B-35, T-36, Tr. 1086-1087) Mrs.

Smith received a ten (10) day unpaid suspension for her unprofessional conduct of falling asleep

during Mr. McVeigh's classes. (Ex. B-35) She was expected to be observing his class instruction, to

help prepare for her new social studies teaching assignment next year. (Ex. B-35) The final incident

during the 2008-2009 school year occurred at the MAC training session on June 16-17, 2009. (Tr.

1087) Mrs. Smith denied that she slept at any time during the entire training session. (Tr. 1087)

Two teachers testified that, in their opinions, Mrs. Smith appeared to be sleeping at the MAC training sessions. (Exs. B-39, B-40, B-41, Tr. 169-174, 396-405) On July 8, 2009, Superintendent Gunner deducted an hour of pay for both June 16, 2009 and June 17, 2009, for falling asleep at the in-service technology training. (Ex. B-43)

Mrs. Smith testified that she started the 2009-2010 teaching year on September 14, 2009, due to the prior year 10-day suspension. (Tr. 1096) Mrs. Smith stated that her 4th period introduction to business class was in room 702 and her 5th period social studies class was in room 605. (Tr. 1094-1096) Mrs. Smith testified that when the bell rang, she made sure the room was clear prior to locking the door. (Tr. 1094, 1099-1101) Mrs. Smith testified that by rushing to room 605, she arrived when the bell rang several times. (Tr. 1101) She estimated she was probably one (1) minute late a half dozen times during the year. (Tr. 1101-1102) Mrs. Smith stated that she spoke with principal Gasteier in the hallway one day and informally asked if she could take her social studies class upstairs to room 702 or 705 in the afternoon. (Tr. 1102-1103) According to Mrs. Smith, the principal said no, because the social studies classes should all stay downstairs where the smart board is located. (Tr. 1102, 1160) Principal Gasteier testified that Mrs. Smith never made a request of him to change room assignments at any time during the 2009-2010 school year. (Tr. 556)

On March 19, 2010, Mrs. Smith testified that the class was discussing yellow journalism and the Spanish American War and how it created sensationalism. (Ex. B-53, Tr. 1103-1104) Mrs. Smith said that Student IV asked her, "what does sensationalism mean?" and some student yelled in a muffled voice "porn" . (Tr. 1104) Mrs. Smith stated to the class that there is a fine line between sensationalism and pornography. (Tr. 1104-1105) She went on to discuss Playboy and Playgirl magazines and that she had looked at a Burt Reynolds centerfold in Playgirl when she was much

younger. (Tr. 1105-1106) She discussed how the magazine centerfolds "jump started" the career of Burt Reynolds and these magazines were a form of sensationalism. (Tr. 1105-1106) Mrs. Smith testified that hindsight is better than foresight, and she didn't realize it would escalate to this. (Tr. 1107)

Teacher Smith testified when shown Exhibit B-56 that her eyes were closed in the pictures, but she was not sleeping. (Ex. B-56, Tr. 1110) She testified that the bottom picture shows her watching two (2) kids out of their seats. (Ex. B-56, Tr. 1111) The pictures were taken in winter time, because it was cold in the room and that is why she had her hands in the sweat shirt. (Ex. B-56, Tr. 1111) Mrs. Smith testified that she was not sleeping in these pictures. (B-56, Tr. 1110-1112)

Dr. James Gunner, the Superintendent of the Perkins Local School District since May 1, 2008, testified that the expectations of the District for teachers are that they supervise their students by being observant, awake and keeping the students under control, so that teaching time is maximized. (Ex. B-100 #5, Tr. 714) In the Superintendent's opinion, a teacher leaning back and closing their eyes is not permitted to meet his expectations, with or without students in the classroom. (Tr. 718-719) The Superintendent did acknowledge on cross-examination that there is not a specific board policy about a teacher closing their eyes in the classroom. (Tr. 870-871) The safety and welfare of the students in the classroom applies at all times, to properly supervise the children, according to Dr. Gunner. (Tr. 715-716) He stated that a teacher being tardy to class is unacceptable conduct, because the students require adult supervision at all times and there is a limited amount of instruction time. (Tr. 721)

Dr. Gunner met with attorney Zraik with regard to the attorney's letter in rebuttal to the reprimand given to Mrs. Smith on October 6, 2008, for sleeping during class periods. (Ex. B-15, Tr. 732-733) Mr. Zraik's letter said that the diabetes made her appear to be sleeping, even though she is awake and fully aware of her surroundings. (Ex. B-15, Tr. 733-734) Mr. Zraik did not write or say anything with regard to an eye problem or any claim of resting the eyes, even though Mrs. Smith consistently made claims in all of her future meetings with the Superintendent that she was "resting her eyes" (Ex. B-15, Tr. 735-736) The Superintendent discussed his discipline for Mrs. Smith when she received a three (3) day suspension without pay for her admission that she missed two (2) class periods at the Middle School and left the students without supervision. (Tr. 748-749) The Superintendent explained that Mrs. Smith had received prior written and verbal warnings about her unprofessional conduct and she needed to realize the seriousness of her repeated infractions at the District. (Tr. 749) The Superintendent testified that in his opinion, Mrs. Smith did not realize that there was a serious problem. (Ex. B-26, Tr. 752-753)

On April 2, 2009, Dr. Gunner wrote Mrs. Smith a three (3) day suspension letter and warned her that "Further incidents of unprofessional behavior will result in additional disciplinary action up to and including a recommendation for termination of employment." (Ex. B-23, Tr. 748, 753-754)

During late spring in the 2008-2009 school year, the District hired a sub for Mrs. Smith so she could attend a two (2) day observation of a social studies teacher to help prepare her for the next year teaching assignment. (Tr. 759-761) After considering all of the evidence gathered by Principal Gasteier, Dr. Gunner determined that Mrs. Smith fell asleep during the social studies teacher observations. (Tr. 762-769) He disciplined her with a ten (10) day unpaid suspension to start at the beginning of the next school year. (Ex. B-35, Tr. 771-772) The Superintendent stated that this was

the first time Mrs. Smith brought up an eye problem of one eye resting and the other eye closed. (Tr. 768-769) Mrs. Smith did not mention a diabetes problem for the claim of sleeping during the observations, but for the first time her defense was that she was resting her eyes. (Tr. 768-769)

According to the Superintendent, as part of her discipline, Mrs. Smith was required to have a medical exam to determine if she was medically fit to teach school. (Tr. 771-772) The Superintendent testified that the medical exam did not establish a present problem with her diabetes or an eye problem that would prevent her from teaching school. (Tr. 772-774) The ten (10) day suspension letter, once again, warned Mrs. Smith about termination of employment for further incidents of unprofessional behavior. (Tr. Ex. B-35, Tr. 776) Dr. Gunner testified that had this incident occurred in her classroom, he would have considered termination. (Ex. B-35, Tr. 776)

The next incident occurred at the MAC training session, where two (2) teachers verified to him that Mrs. Smith, in their opinions, was sleeping during the training. (Exs. B-39, B-40, B-41, Tr. 169-174, 396-405, 777-783) Once again, according to the Superintendent, Mrs. Smith said she was not sleeping, but only resting her eyes. (Ex. B-42, B-43, Tr.786) Board Exhibit forty-three (B-43) sent to Mrs. Smith for her discipline, has a three line warning in bold letters, that "Any further incident of unprofessional behavior will result in a recommendation for the termination of your employment." (Ex. B-43, Tr. 788)

The last incident occurred on March 19, 2010, and the Superintendent received an e-mail on March 25, 2010, from Board of Education vice-president Schuster, about a discussion with regard to pornography that Mrs. Smith shared with her social studies class. (Tr. 790-791) Some students had a level of discomfort with the discussion about pornography. (Ex. T-32, Tr. 791) Superintendent Gunner testified in great detail and length about his investigation with the students in Mrs. Smith's

5th period social studies class. (Tr. 792-821) The thorough investigation uncovered allegations of her discussing pornography, sleeping in class and frequent tardiness to the 5th period class. (Exs., B-55, (B-57) – (B-86), Tr. 558-562, 792-829) Dr. Gunner testified that 14-15 year old students are too young to discuss pornography. (Tr. 814-815) In his opinion, the discussion was not appropriate and not part of the social studies curriculum. (Tr. 814-815) He stated that pornography does not fit into the discussion of yellow journalism. (Tr. 835) Dr. Gunner testified that the pictures taken by students in Board Exhibit 56, showed Mrs. Smith's eyes closed and her hands are folded up in a sweat shirt for a stay warm pose. (Tr. 819-820) In his opinion, she was not aware of what was going on in the classroom, because she would have not permitted the students taking pictures. (Tr. 819)

Some of Dr. Gunner's serious concerns after his investigation involved children clearly unsupervised, because of her routine tardiness and sleeping in class. (Tr. 822-823) Students were misbehaving, off-task, and missing an estimated 36 hours of teaching time for the year in an OGT course. (Tr. 823-824) The Superintendent had concern about District's potential liability for an accident. (Tr. 822-823) Further, the Superintendent did not see any connection between pornography, sensationalism, and yellow journalism. (Tr. 835)

According to the Superintendent, at the disciplinary conference, Mrs. Smith admitted to closing her eyes for a second or two, and that she was late 2-3 times a week to 5th period social studies class. (Tr. 838-840) Mrs. Smith also admitted that she had not requested a change in room assignments, other than a casual conversation in the hallway. (Tr. 839-840) The Superintendent had an additional meeting on April 14, 2010 with Airica Clay, the OEA representative, Mrs. Smith and Tom Kinsel, the PEA representative, to continue the disciplinary conference held on April 1, 2010.

(Exs. B-89, B-91, Tr. 846)  The Superintendent determined that he would recommend that the Board

adopt a resolution at its next regular meeting to consider the termination of her teaching contract on

the basis of good and just cause.  (Ex. B-91, Tr. 846-847)

## DISCUSSION AND CONCLUSIONS FROM THE FACTS:

The District's stated ground for the termination of Mrs. Smith's teaching contract is based

upon the claim of good and just cause.  As previously stated, the District has the burden of proof in

this matter to establish by preponderance of substantial, reliable and probative evidence that teacher

Smith's contract should be terminated.  The issues of this case are the three specifications set forth as

A, B, and C in Section 1 of the Board's "Resolution of Intention to Consider Termination of

Teaching Contract".  (Ex. B-92)

The issues in this case were extremely serious and there was a voluminous amount of

evidence (both in testimony and exhibits) that certainly needed to be considered before I could render

a recommendation in this matter.  As the trier of the facts, I studied the admitted exhibits from the

four (4) day hearing, weighed and considered the testimony of the witnesses and determined which

witnesses were credible in their testimony at the hearing.

Specification "A" states that Mrs. Smith engaged in inappropriate discussions with her high

school social studies class regarding pornography.  Three teachers testified on behalf of Mrs. Smith

with regard to her teaching reputation at Perkins High School.  All three teachers testified that they

never heard her discuss pornography and she did not have a reputation for teaching inappropriate

subjects.  The Superintendent acknowledged that prior to March 29, 2010, some ten (10) days after

the March 19, 2010 pornography discussion, he had not received any complaints from parents about the class discussion. The Superintendent saw assistant-principal Dahlmann on March 26, 2010, and Mr. Dahlmann did not have any knowledge about the March 19, 2010 pornography discussion.

The vast majority of the students who testified at the hearing stated that Mrs. Smith talked about the subject of "yellow journalism" being sensationalism, and that pornography was an example of sensationalism. Some students and Mrs. Smith heard a student say "porn" prior to her pornography discussion, but other students thought Mrs. Smith brought up the example of pornography. Some of the students felt "uncomfortable" with Mrs. Smith's comment that everybody looked at the magazines and with her discussion of Playboy and Playgirl magazines. Most students who testified stated that students were laughing during the discussion. Several students stated that Mrs. Smith mentioned that she viewed Playgirl magazine when she was younger. Most of the students expressed their opinion that Mrs. Smith used Playgirl and Playboy magazines, as examples of sensationalism, and the entire discussion lasted approximately ten (10) minutes. Teacher McVeigh, an experienced social studies teacher, stated that "yellow journalism" is a form of sensationalism, and that yellow journalism is also called sensationalism. Mr. McVeigh brought up the "National Enquirer" magazine as a better example of sensationalism, and that pornography was not a relevant example of any subject matter the social studies department teaches.

I agree with Mr. McVeigh that the "National Enquirer" magazine is a better example of sensationalism, rather than Playboy or Playgirl magazines. Further, I agree with Superintendent Gunner, that the Playboy and Playgirl examples used by Mrs. Smith in her discussion of yellow journalism and sensationalism does not conform in any way to the social studies course of study. Additionally, I agree with the Superintendent that the age of the students should have been

considered by Mrs. Smith. I further agree with the Superintendent that Playboy and Playgirl magazines are not a form of sensationalism, although others may have a different viewpoint. I believe that the Playboy and Playgirl discussion in a 9th grade social studies class was not appropriate.

However, in listening to the testimony of all of the students and Mrs. Smith with regard to this incident, it certainly appears very clear to this referee that the ten (10) minute discussion using Playboy and Playgirl magazines as examples of sensationalism was an honest mistake made by Mrs. Smith.

I believe that all of the testimony in this case indicated that Mrs. Smith does not have a reputation for teaching inappropriate subjects. I am certain that she now probably realizes that these magazines were poor and inappropriate examples of sensationalism. I believe that she regrets the discussion and it would probably never happen again.

Certainly, the Superintendent and Principal Gasteier should have conducted a thorough investigation of this matter. The overwhelming majority of the evidence at the hearing established that the investigation conducted by the administrators was properly handled and extremely fair to Mrs. Smith. In my opinion, Mrs. Smith's discussion of Playboy and Playgirl magazines was an honest mistake and a poor example, but it was not an intentional teaching of an inappropriate subject. Mrs. Smith did engage in an inappropriate discussion with her high school social studies class with regard to the magazines. However, based upon all of the evidence, Mrs. Smith's conduct with regard to Specification "A" was not conduct that was flagrant, outrageous, or persistent, to justify the termination of her teaching contract for good and just cause.

Specification "B" states that Mrs. Smith repeatedly "dozed off" for several minutes at a time while supervising students during 5D Study Hall, thereby continuing a pattern of sleeping on the job and engaging in unprofessional conduct. The evidence was overwhelming through the students' near unanimous testimony and exhibit B-56, that Mrs. Smith did "doze-off" or sleep on numerous occasions during the 2009-2010 school year. Exhibit B-56, which depicts Mrs. Smith with her head back and eyes closed is certainly visual evidence of a teacher not properly supervising her students. Mrs. Smith's testimony, by itself, with regard to her diabetes and the eye surgeries five years ago was inadequate to explain or excuse her conduct. Student testimony describing Mrs. Smith and her 5D study hall supervision included the following: eyes closed, mouth open, head back, sleeping, snoring, not talking and her body not moving for several minutes at a time. The witness testimony of all of the students who testified in this matter, clearly established that Mrs. Smith was not adequately supervising her class. The testimony from Students I through VII was quite clear and convincing that Mrs. Smith frequently had her eyes closed and head back for several minutes at a time in the study hall. While Mrs. Smith was in that position, the study hall students did the following: played games on their laptops, talked to friends in the classroom and hallway, texted friends, went to their lockers, went to other rooms and did whatever the students wanted to do, without supervision. The students convinced this referee that they did not wake her up, so they could continue to do whatever they wanted to do. The testimony of the students was nearly unanimous that Mrs. Smith was frequently sleeping or dozing in study hall for several minutes at a time and not just resting her eyes. The students knew Mrs. Smith was asleep, because the class was too loud, rowdy, and the children were leaving the room without her stopping them. When the students were shown Board Exhibit 56, the vast majority indicated that this was a familiar and frequent sight in study hall. A couple of students

testified that her eyes were closed and she wasn't moving, but they couldn't be certain that she was sleeping. However, those same students indicated that they could do whatever they wanted to do when her eyes were closed.

There certainly was overwhelming reliable, substantial, and probative evidence to convince this referee that Mrs. Smith was sleeping or "dozing off" for several minutes at a time at least once or twice per week in 5 D study hall. The testimony of Students I-VII clearly established that Mrs. Smith was not properly supervising the students in 5 D study hall, because of her sleeping or dozing off for several minutes at a time. The students in 5 D study hall could do whatever they wanted to do and Mrs. Smith was not alert to stop their improper conduct.

Mrs. Smith had a history during school year 2008-2009 of sleeping on the job. During September, 2008, Principal Finn and Assistant Principal Quisno found Mrs. Smith sleeping during two separate "ISI" classes. During June, 2009, Mrs. Smith was sleeping in Mr. McVeigh's class during two separate periods over two days, while she was observing his Modern World History classes. Mr. McVeigh's testimony was very credible and convincing to this referee. On or about June 16-17, 2009, two teachers reported to assistant principal Dahlmann that Mrs. Smith appeared to be sleeping during the MAC computer training session. Teacher Shana DeRose-Smith testified that Mrs. Smith's eyes were closed for several minutes, with her chin down and no movement of her body. Teacher Nancy Kinsel testified that, in her opinion, Mrs. Smith appeared to be sleeping and e-mailed assistant-principal Dahlmann that she appeared to be sleeping on and off for at least an hour. Both teachers were very credible, reliable and convincing in their testimony at the hearing. Mrs.

Smith testified that she was not sleeping, except for the first incident involving Principal Finn. However, the District's evidence was overwhelming in establishing that Mrs. Smith was sleeping on the job.

The District was extremely lucky during the 2009-10 school year that Mrs. Smith's lack of supervision in 5 D study hall did not result in some type of accident or liability to the District. Mrs. Smith's failure to properly supervise her students during 5 D study hall jeopardized the safety, security and welfare of the students.

Mrs. Smith repeatedly committed the acts and conduct listed in Specification "B" during the 2008-2009 and 2009-2010 school years. The District established by a preponderance of substantial, reliable and probative evidence that Mrs. Smith frequently slept for several minutes at a time during 5 D study hall and at the other times detailed in this opinion. Mrs. Smith's persistent, flagrant and outrageous conduct of sleeping on the job, causes this referee to recommend to the Perkins Board of Education that her teaching contract should be terminated for good and just cause.

Specification "C" states that Mrs. Smith repeatedly arrived tardy to her 5th period History Class, thereby (a) leaving her students unattended, and (b) continuing a pattern of being tardy for her assigned duties and engaging in unprofessional conduct.

The testimony from the students in her 5th period social studies class was nearly unanimous that Mrs. Smith was tardy to class on a regular basis and the students were left unsupervised during that time period. Students I thru VII all testified that Mrs. Smith was late to class on a very regular basis that ranged from 2 to 15 minutes late, approximately 2 to 4 times per week. Student VIII stated that Mrs. Smith was tardy about 10 times during the year. My concern was not the precise number of minutes late per class or the specific number of times per week, but the near unanimous testimony of

all of the students that she was regularly tardy to class. The students were left unsupervised during the time period Mrs. Smith was late to class. Another concern to this referee was Mrs. Smith's tardiness resulted in students being loud and rowdy. Therefore, an additional amount of teaching time was lost on a regular basis to calm the class to prepare the students for learning. I certainly do not understand why Mrs. Smith did not meet with administrators and request a change in teaching assignments to alleviate her students being regularly left unattended for a period of time. One student testified that it was very difficult to learn in her class because of her late arrival. Another student testified that there was "chaos" in the room before she arrived for class. Another student testified that while they waited for Mrs. Smith to arrive, some kids would be arguing, pushing each other and messing around. Clearly, Mrs. Smith's practice of being late to class on a regular basis was unprofessional conduct. Once again, the District was very lucky a student was not hurt while the children were left unattended. The testimony of the students established by a preponderance of substantial, reliable and probative evidence that Mrs. Smith regularly arrived tardy to her fifth period Social Studies class and left her students unattended, as detailed in Specification C. Mrs. Smith's defense that she was late due to her classroom duties and the distance she had to travel between rooms has no merit. Mrs. Smith failed to handle her responsibility of meeting with her supervisors to resolve her problem and protect her students. During the 2008-2009 school year, Mrs. Smith left children unattended for two periods at the Perkins Middle School on February 25, 2009, when she became confused about her early release schedule.

Leaving middle school and high school children unattended without adult supervision is an accident waiting to happen. Mrs. Smith's practice of being tardy to 5th period social studies class violated the District's obligation to provide safety and security for these students. The District escaped potential liability for children being left unattended by a teacher who was regularly tardy to class. After hearing all of the students testify in this matter, there was no question or conflict in my mind with regard to my decision. Mrs. Smith committed the acts and conduct listed in Specification "C", by putting these children in danger of many types of harm due to her regular late arrival to class. Mrs. Smith's practice of being regularly late to social studies class was clearly persistent, outrageous, flagrant and unprofessional conduct. Her conduct of being regularly late to 5th period social studies class and leaving her students unattended causes this referee to recommend to the Board that Mrs. Smith's teaching contract should be terminated for good and just cause with regard to Specification "C".

I considered that Mrs. Smith is a 34-year educator at the District, with a good teaching record and satisfactory evaluations. The loss of $900.00 per month in pension benefits by not completing her 35th year of teaching is a significant amount of money to lose. However, I cannot recommend to the Board to let her teach one more year, with the safety, security, welfare and education of the students at issue.

I find by a preponderance of substantial, reliable and probative evidence that the District established that Mrs. Smith committed the acts and conduct detailed in Board Specifications "A", "B" and "C" of Section 1 of Board Exhibit 92. Because of her committed acts and conduct listed in

Specifications "B" and "C", I recommend to the Board that Mrs. Smith should be terminated as of her April 14, 2010 suspension date on the ground of good and just cause. My recommendation to terminate includes her conduct that was totally unprofessional, inappropriate, unsafe, outrageous, flagrant, and persistent and threatened the safety, security and welfare of the students.

Respectfully Submitted,

Referee Harry H. Taich

## CERTIFICATE OF SERVICE

A copy of the foregoing Report and Recommendation of the Referee was served upon the following on this ___9th___ day of October, 2010:


James Gunner, Superintendent
Perkins Local School District
1210 East Bogart Road
Sandusky, OH 44870-6411

Mrs. Carol Smith
217 Michigan Ave.
Sandusky, OH 44870


Lisa M. Crescimano, Treasurer
Perkins Local School District
1210 East Bogart Road
Sandusky, OH 44870-6411

Christian M. Williams, Esq. &
Donna M. Andrew, Esq.
Pepple & Waggoner, Ltd.
5005 Rockside Road, Suite 260
Cleveland, OH 44131-6808


Grant D. Shoub, Esq.
Hunter, Carnahan, Shoub & Byard
3360 Tremont Rd. , 2nd Floor
Columbus, OH 43221


_____
HARRY H. TAICH, Referee