Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

CAROL ANN SMITH,            :
        Plaintiff            :
    -vs-            :  No. 3:11-CV-00560
PERKINS BOARD OF EDUCATION,:
et al.,

        Defendants
        - - - - -

Deposition of CHRISTOPHER GASTEIER, a witness
herein, taken by the Plaintiff as upon
cross-examination before Lori L. Delhees,
Stenotype Reporter and Notary Public in and for
the State of Ohio, at the Law Offices of Murray &
Murray Co., L.P.A., 111 East Shoreline Drive,
Sandusky, Ohio on February 11, 2014 at 9:30 a.m.
pursuant to Notice.

        - - - - -

Page 2

1
2       APPEARANCES:
        Paul T. Belazis, Esquire
3       MALONE, AULT & FARELL
        7654 W. Bancroft Street
        Toledo, Ohio 43617
4
5           On behalf of Plaintiff
6       Teresa L. Grigsby, Esquire
        SPENGLER NATHANSON, P.L.L.
7       Four SeaGate
        Suite 400
8       Toledo, Ohio 43604-2622
9
            On behalf of Defendants
10
11
            - - - - -
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1
2               INDEX
3
4       Cross-examination by Mr. Belazis        5
5       Direct-examination by Ms. Grigsby        130
6       Recross Examination by Mr. Belazis        132
7       Further Recross Examination by Mr. Belazis   134
8
9               EXHIBITS
10      Plaintiff's Exhibits
11      1, Partial Arbitration Transcript        37
12      2, Affidavit of James P. Gunner        40
13      3, Letter, 9/29/08        63
14      4, Letter, 10/6/08        66
15      5, Letter, 3/27/08        69
16      6, Letter, 6/5/09        72
17      7, Letter, 6/15/09        72
18      8, Letter, 6/19/09,        72
19      9, Letter, 6/1/09        72
20      10, Letter, 6/19/09        80
21      11, Letter, 3/29/2010        85
22      12, Handwritten Notes, 3/9/2010        88
23      13, Documents, Events & Interviews        90
24      14, Handwritten Notes        92
25      15, E-mail, 9/15/09        93

Page 4

1
2       Cont'd Plaintiff's Exhibits
3       16, Photographs        105
4       17, Playgirl, Burt Reynolds        110
5       18, Playgirl, Harrison Ford        112
6       19, Roster        119
7       20, Observation/Evaluation Form, 6/6/07   121
8       21, Observation/Evaluation Form,        122
9       22, Observation/Evaluation Form        124
10      25, Administrator Evaluation        126
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1 (Pages 1 to 4)

## Page 5

1
2     CHRISTOPHER GASTEIER, of lawful age, the
3     Plaintiff herein, called by the Defendant
4     as upon cross-examination, pursuant to the
5     Rules of Civil Procedure, being first duly
6     sworn according to law, was examined and
7     testified as follows:
8     CROSS-EXAMINATION OF CHRISTOPHER GASTEIER
9     BY MR. BELAZIS:
10    Q    Pronounce your last name for me.
11    A    Gasteier.
12    Q    Okay. Mr. Gasteier, we met a moment ago and as
13         you know I represent Carol Smith in a lawsuit
14         that's pending against the Perkins School
15         District.
16    A    Yes.
17    Q    Have you read any of the materials related to the
18         lawsuit, for example, the Complaint? Have you
19         read that?
20    A    No.
21    Q    Have you reviewed anything in preparation for
22         today's deposition?
23    A    Yes.
24    Q    What did you review?
25    A    Some of the documents that were given at Sawmill

## Page 6

1         Creek, I believe, four years ago, 3 1/2 years
2         ago.
3    Q    And what would that include?
4    A    I think there were some things such as
5         evaluations, some e-mails, and some letters that
6         were written to Mrs. Smith.
7    Q    Have you ever reviewed Carol's personnel file?
8    A    No, I have not.
9    Q    And any other personnel files?
10   A    No, I have not.
11   Q    Okay. Have you reviewed the various disciplinary
12        letters, those kinds of things?
13   A    Some of them, yes.
14   Q    Did you review the transcripts from the hearing?
15   A    Mine.
16   Q    Your testimony?
17   A    Yes.
18   Q    Okay. And you were one of the witnesses at the
19        hearing at Sawmill Creek?
20   A    Yes.
21   Q    And by that, you're referring to the hearing
22        before the Referee Harry Taich, seeking; in which
23        the Board was to seek to terminate Carol's
24        employment?
25   A    Yes.

## Page 7

1    Q    Okay. And it's okay if I refer to Mrs. Smith as
2         Carol in the course of the deposition?
3    A    Yes.
4    Q    Tell me a little bit about your own background.
5    A    I'm 57 years old. I was born in Sandusky, I
6         attended Perkins Schools, graduated in 1975, was
7         a -- grew up on a farm, went to school in
8         Washington D.C., where I got my Bachelor's Degree
9         in History and Education, and started teaching at
10        Perkins in 1982 as the Vo-Ag teacher.
11            I taught Vo-Ag for four years, then
12        proceeded to teach Social Studies for the next
13        ten years, along with Vo-Ag, and then I became
14        Assistant Principal in 1996 and Principal in
15        2001, Director of Communications 2000 -- I have
16        to stop and think -- 2011, I believe, and this
17        year I became, in 2013, became Principal of
18        Meadowlawn School, Elementary School. That's
19        basically my work history.
20   Q    Okay. And how are you familiar with Carol Smith?
21   A    Two ways, one, as a teacher, fellow employee at
22        Perkins High School, and, secondly, I've known
23        her family for probably over 40 years. Her
24        youngest -- is it her youngest daughter? --
25        youngest daughter, Ros, worked with us out at our

## Page 8

1         family farm as a teenager.
2    Q    And you've known Mrs. Smith -- you've known Carol
3         throughout that time?
4    A    Yes. Not closely, but, yes, I have. Obviously
5         she would drive her out to the farm. And I
6         remember her family's catering business too.
7    Q    And you've been a colleague of hers since at
8         least 1982?
9    A    Yes, sir.
10   Q    And when did you begin working at the high
11        school?
12   A    1982.
13   Q    So you were at the high school the entire time?
14   A    Yes.
15   Q    And Mrs. Smith was at the high school the entire
16        time?
17   A    I believe so. I'm not exactly sure of her
18        schedule, but I think she was there at the time.
19   Q    Tell me a little bit about the responsibilities
20        of a Principal.
21   A    Aside from curriculum, discipline, attendance,
22        there's evaluation of staff, which includes
23        teachers and non-certified personnel.
24   Q    Okay. With respect to staff evaluations, tell me
25        about that.

Electronically signed by Lori Delhees (001-331-145-7890)                    506ce57f-9464-4a42-b46e-f05c965b0a0f

Page 9

1    A    Staff evaluation, up until recently with the
2         changes in the Ohio laws, used to involve us
3         doing evaluation of staff on a rotating basis,
4         rotating between the Assistant Principal and
5         myself. We would split up the duties of those
6         who needed to be evaluated. Some were on
7         permanent contracts and were evaluated less often
8         than others; some were on one year and were
9         evaluated every year; some were on two years and
10        were evaluated each year.
11   Q    You said "Until recently," what does that mean?
12   A    I'm not exactly sure of what the law was that was
13        passed, but now --
14   Q    When were the changes, I guess that's my --
15   A    Effective this year.
16   Q    So when you say, "Until recently," you mean what
17        you described, the evaluation on a rotating basis
18        was the practice and policy of your -- of the
19        District while you were Principal?
20   A    Yes.
21   Q    At the high school?
22   A    Yes.
23   Q    All right. And with respect to those who have
24        permanent contracts, by that you means those who
25        were tenured?

Page 10

1    A    Yes.
2    Q    And what kind of rotating basis -- on what kind
3         of a rotating basis were evaluations performed?
4    A    Three years.
5    Q    And to what extent was that -- that was the
6         policy, I take it?
7    A    That was the policy.
8    Q    To what extent was that policy implemented?
9    A    To the best of our ability. I can't say to
10        100 percent, but we would try to follow that
11        procedure.
12   Q    Okay. And if you had to -- I assume you had a
13        lot of teachers for which you were responsible as
14        Principal?
15   A    40 some.
16   Q    Right. Many of those tenured, I take it?
17   A    I don't know what the exact numbers would be.
18   Q    Would it be fair to say that you, in terms of
19        prioritizing to make sure that you evaluated
20        tenured faculty on a basis that reasonably
21        complied with policy; in other words, every three
22        years, that you focus on those that you
23        thought were mostly in need of an evaluation?
24   A    I probably focused more on the new ones.
25   Q    The new?

Page 11

1    A    The newer teachers, younger teachers.
2    Q    Well, I'm asking you about those who were
3         tenured.
4    A    Oh, excuse me.
5    Q    So with respect to those that were tenured, you
6         said that they were supposed to be evaluated
7         every three years, that was the policy?
8    A    Yes.
9    Q    And you tried to adhere to it as best you could?
10   A    Yes.
11   Q    And would it be fair to say that in terms of
12        trying to get to people and prioritizing who you
13        were going to -- who you were going to evaluate
14        for one of those that were tenured, that you
15        would focus your attention most on those who you
16        had perhaps the most concerns about?
17   A    I would, to the best of my ability, yes.
18   Q    Okay. So in other words, you would agree with
19        what I said?
20   A    Yes.
21   Q    All right. And your responsibilities relate to
22        curriculum?
23   A    Yes.
24   Q    Can you elaborate on that, please.
25   A    Along with the Curriculum Director, I would look

Page 12

1         at what new curriculum would be proposed. We
2         would then evaluate. And I would also have a
3         say, not complete say, but a partial say, in
4         textbook adoption, et cetera.
5    Q    Okay. And then once those curriculum changes
6         were made, how would those be implemented?
7    A    Well, there would be a group of teachers that
8         would come together, depending upon what
9         curriculum it was. It might be over certain
10        grade levels. It might be one particular class.
11        Some courses were singletons only, so only one
12        teacher would be responsible for that, along with
13        the Curriculum Director.
14             Then we would meet as a group with the
15        Curriculum Director, myself, that group of
16        teachers. There would be a choice made as far as
17        textbook adoption and other supplementals, and
18        then that would be recommended to the
19        Superintendent by the Curriculum Director.
20   Q    Okay. And now you mentioned discipline also as
21        being one of your responsibilities as Principal.
22        Could you give me a little bit more information
23        about that.
24   A    As Assistant Principal, discipline was mainly
25        combined to students. But as Principal there

Electronically signed by Lori Delhees (001-331-145-7890)    506ce57f-9464-4a42-b46e-f05c965b0a0f

Page 13

```
 1            would be times when the extracurriculars would
 2            come into play with students, as well as faculty.
 3    Q      Okay.  And what responsibilities did you have
 4            with respect to faculty discipline?
 5    A      We had a Progressive Disciplinary Policy in our
 6            contract, and it would be to follow that
 7            Progressive Disciplinary Policy.
 8    Q      By contract, you're talking about the contract
 9            with the --
10    A      PEA.
11    Q      -- Teacher's Union?
12    A      Yes, sir.
13    Q      The Perkins Educational Association?
14    A      Yes.
15    Q      And what in particular was -- what role in
16            particular did you take in manager related to
17            teacher discipline?
18    A      In my position it would usually be in the
19            Progressive Policy process, starting with a
20            verbal, then a written, and then working with --
21            as it got to an upper level, with the
22            Superintendent, at any level.  I don't -- excuse
23            me.  I don't exactly recall the stages, there
24            were a certain number of stages in the process.
25    Q      Okay.  But verbal, a verbal reprimand was one?
```

Page 14

```
 1    A      Yes.
 2    Q      A written reprimand was one?
 3    A      Yes.
 4    Q      Suspension may have been another?
 5    A      Yes.
 6    Q      Eventually getting up to termination; is that
 7            what you mean?
 8    A      Yes, I --
 9    Q      Okay, fair enough.  In terms of your role at any
10            given stage, what would that be -- well, strike
11            that.  Let me go back.  You said after, at some
12            point you would begin working with the
13            Superintendent?
14    A      Yes.
15    Q      And that would be after you got past the -- or
16            would that be after you got past the verbal and
17            written reprimand stage?
18    A      The verbal could be -- I might verbally notify
19            him that I had a verbal.  The written he would
20            probably get a copy of, or she, as it may be.
21    Q      And you were empowered to issue verbal reprimands
22            as Principal?
23    A      Yes.
24    Q      And you were empowered to issue a written
25            reprimand as Principal?
```

Page 15

```
 1    A      Yes.
 2    Q      Were you empowered to suspend?
 3    A      No.
 4    Q      Who had to do that?
 5    A      The Superintendent.
 6    Q      Okay.
 7    A      Excuse me, could I ask a question?
 8    Q      Sure.
 9    A      You're talking about teaching staff --
10    Q      Teaching staff.
11    A      -- in terms of suspension, because I wasn't
12            empowered to suspend students, but --
13    Q      These questions relate to the teaching staff.
14    A      Okay.
15    Q      And you wouldn't change any of your answer now
16            that we've clarified that?
17    A      Correct, I would not change my answers.
18    Q      Okay.  So from the point at which a disciplinary
19            action involving suspension or termination was
20            involved, that kind of discipline would have to
21            be imposed by the Superintendent; you weren't
22            able to do that?
23    A      That's correct.
24    Q      But I take it you still had a role in the
25            process?
```

Page 16

```
 1    A      Yes.
 2    Q      What was that?
 3    A      I would, as Principal, would probably -- well,
 4            not probably, excuse me -- would have the first
 5            several steps:  A verbal, a written, and then
 6            depending upon what the -- I'm trying to search
 7            for the right word here -- what the complaint
 8            was, what the --
 9    Q      Charge?
10    A      -- the charge was, would have conversations with
11            the Superintendent in regards to the process, in
12            regards to the charges.
13    Q      Okay.  So would it be fair to say that at any
14            stage, whether you actually impose the discipline
15            or whether it was the Superintendent, your role
16            was to investigate the charge and try to draw
17            some conclusions about what happened and whether
18            some disciplinary action is appropriate?
19    A      Depending upon the charge, yes.
20    Q      Okay.  Well, is there any kind of charge where
21            that would not be true?
22    A      If a complaint went directly to the
23            Superintendent.
24    Q      Okay.
25    A      Which is sometimes what happens.
```

Electronically signed by Lori Delhees (001-331-145-7890)          506ce57f-9464-4a42-b46e-f05c965b0a0f

Page 17

1  Q    But if it comes to you, then what I said would be
2       accurate?
3  A    I believe so, yes.
4  Q    All right.  And I take it that, that it was
5       important, both from your standpoint and from the
6       standpoint of the Superintendents with whom you
7       worked, to make sure they are kept abreast?  In
8       other words, that they are informed fully of
9       matters related to staff disciplinary matters?
10 A    I'm sorry, could you repeat that?
11 Q    Yes.  Sure.  I'm sorry, that wasn't a very good
12      question.  Would it be fair to say that you
13      regarded it as important to keep your
14      Superintendent fully informed of matters
15      involving staff discipline?
16 A    I've always tried to.
17 Q    Okay.  And as part of that, you would agree that
18      it would be important to make sure that any
19      salient facts; in other words, important facts
20      are brought to the attention of the
21      Superintendent so he understands what's going on?
22 A    I believe that's part of the job of a Principal,
23      yes.  I'm not sure that I've always done that in
24      a timely fashion, but I've tried to, yes.
25 Q    Okay.  And, of course, from the standpoint of

Page 18

1       your investigation, disciplinary action,
2       particularly with a tenured faculty member,
3       really for any faculty member, is it could be
4       pretty vitally important, I mean, it's their
5       livelihood, right?
6  A    Yes.
7  Q    And you've always, I take it, recognize the
8       importance of thoroughly investigating any
9       charges before recommending any disciplinary
10      action?
11 A    Yes.
12 Q    Okay.  And with respect to matters involving
13      suspension or termination, part of your job would
14      be to -- part of your role as Principal, would be
15      to recommend what kind of disciplinary action you
16      would think to be appropriate under the
17      circumstances?
18 A    I wouldn't categorize it as recommending, because
19      I would follow the process, and once in the
20      process, in my interpretation, it becomes my
21      superior, the Superintendent, their job in terms
22      of suspension, termination.
23 Q    To decide?
24 A    Yes.
25 Q    Okay.  Well, let me ask it a little differently.

Page 19

1       Would it be fair to say that that Superintendents
2       with you, with whom you have worked, have
3       routinely conferred with you before making a
4       decision about what disciplinary action to
5       impose?
6  A    Not also conferred, informed sometimes.  Not
7       always conferred, informed.
8  Q    All right.  Well, they at least find out from you
9       what the facts are?
10 A    Yes.
11 Q    Would it also be the case that if -- if faculty
12      or students are having any kind of a serious
13      medical issue that part of your responsibility as
14      Principal would be to make sure that the
15      Superintendent was kept informed of that?
16 A    I would try to, but not always.  I've had
17      students and faculty who had procedures that I
18      didn't know about.
19 Q    Well, assuming you were aware of it, then part of
20      your responsibility would be to make sure that
21      the Superintendent was kept informed?
22 A    I would look at that as a courtesy, not as a
23      requirement; but to, in general form of
24      communication, to keep him in the loop and
25      informed, yes.

Page 20

1  Q    And that's something that you try to do as much
2       as possible?
3  A    As much as possible, as I was aware, yes.
4  Q    Okay.  Let's talk a little bit about your
5       knowledge of Carol Smith during the period of
6       time that you worked together as colleagues,
7       including the time that you supervised her as
8       Assistant Principal or Principal.
9            Well, let me ask you, how would you
10      characterize her career at Perkins?
11           MS. GRIGSBY:  I'm going to object.  You
12      can answer the question.
13 A    I was going to ask you about characterize,
14      because I don't think that's my place to -- let
15      me answer it this way, I'll answer your, what I
16      perceive to be the question.
17           As a teacher for 14 years, my contact
18      with her was limited pretty much to being in the
19      same department for a number of years, which
20      would be the Vocational Department.  I taught at
21      one end of the building, she was in the middle of
22      the building, we didn't have a lot of contact.  I
23      had a very busy schedule.  I went from one end of
24      the building to the other teaching Social Studies
25      and Vocational Agricultural.  As the Principal,

HUNTLEY REPORTING SERVICE
1.800.247.8360

Electronically signed by Lori Delhees (001-331-145-7890)          506ce57f-9464-4a42-b46e-f05c965b0a0f

Page 21

1     Assistant Principal, it would be those
2     supervisory duties that I described before.
3    Q   Okay. You certainly were generally aware of the
4     reputation of the faculty with whom you worked
5     while you were at Perkins?
6    A   I don't know what you mean by "reputation."
7    Q   The ones that you worked closely with, like those
8     who were at the high school with you or at the
9     junior high with you.
10    A   I was aware of who I worked with, yes.
11    Q   Okay. Well, let me just -- let me just be more
12     direct.
13    A   Okay.
14    Q   Would it be fair to say that, based on your
15     understanding, Carol Smith was actively involved
16     in the Perkins educational community?
17    A   Yes.
18    Q   And she was involved in many, many different
19     kinds of extracurricular activities with her
20     students, including coaching; is that right?
21    A   Yes. Yes.
22      MS. GRIGSBY: We're talking about the
23     course of her career?
24      MR. BELAZIS: That's right. I'm
25     talking about the course of her career.

Page 22

1    A   Yes.
2     BY MR. BELAZIS:
3    Q   And certainly as advisor to numerous classes,
4     senior class advisor, junior class advisor?
5    A   I'm not aware of the junior class, but I know she
6     was senior class, I remember that.
7    Q   But she was advisor to one or more classes?
8    A   Yes.
9    Q   Over the course of your career, right?
10    A   Yes.
11    Q   She volunteered her time with the students
12     frequently for a number of different kinds of
13     activities?
14    A   She, when -- I remember having some of the same
15     students when I was teaching Vocational
16     Agricultural when she was teaching Business, yes.
17    Q   Okay. And --
18    A   She would volunteer her time with students then
19     and I think helped several students make it
20     through high school.
21    Q   She actively campaigned for the District whenever
22     there was a levy that was up?
23    A   To the best of my knowledge. I never campaigned
24     with her, but to the best of my knowledge --
25    Q   But --

Page 23

1    A   -- she was a school supporter.
2    Q   Right. And at least her reputation was that she
3     and her family very actively supported levies and
4     tried to encourage community support for those
5     levies?
6    A   I don't know about a reputation, but from my
7     perspective --
8    Q   That's correct?
9    A   -- yes.
10    Q   All right. And at least to the best of your
11     knowledge, within having worked with Carol, she
12     always kept the best interests of her students at
13     heart?
14      MS. GRIGSBY: Objection.
15    A   Yes, I don't know.
16     BY MR. BELAZIS:
17    Q   Well, you worked with her for all those years,
18     based on what you have seen, would it be a fair
19     statement that Carol, based on your observations,
20     that Carol always kept the best interests of her
21     students at heart?
22      MS. GRIGSBY: Objection.
23    A   I will say not always, in my perception. I think
24     that's a very strong word and there are several
25     instances when I had to meet with her and parents

Page 24

1     that were less than amicable.
2     BY MR. BELAZIS:
3    Q   And when was that?
4    A   There was a -- I don't recall when. I recall one
5     instance there was a student who was on the
6     tennis team and his mother came in because she
7     felt that there was a mix between tennis and the
8     classroom.
9    Q   Okay. Well, aside from that conflict that you
10     just described, would it be fair to say, in
11     general, that Carol Smith kept the best interests
12     of her students at heart --
13      MS. GRIGSBY: Objection.
14      MR. BELAZIS: I'm sorry.
15     BY MR. BELAZIS:
16    Q   -- as a teacher at Perkins?
17      MS. GRIGSBY: The same objection.
18    A   I think her heart was in the right place, yes.
19     BY MR. BELAZIS:
20    Q   All right. And I know that there were issues
21     about -- and we're going to talk about those in a
22     little bit, but there were issues about sleeping
23     that emerged toward the end of her career.
24      But what I want to ask you about is, up
25     until that point, would you agree with me -- and

Electronically signed by Lori Delhees (001-331-145-7890)     506ce57f-9464-4a42-b46e-f05c965b0a0f

## Page 25

```
 1      I've seen some correspondence in the file
 2   referring to Carol and members of her family,
 3   many of who -- strike that.
 4           Let me start again.  Besides Carol, her
 5   family also was actively involved in the Perkins
 6   School community.
 7   A    Her son was a member of the School Board.
 8   Q    In fact, he was President of the School Board
 9   for --
10   A    Could very well be, I don't know.  I do not
11   recall, excuse me.
12   Q    And that would have been her son, Chris?
13   A    Yes.
14   Q    And her son, Chris, was also the Cross Country
15   coach?
16   A    After he resigned from the School Board, yes.
17   Q    And her husband, Richard, Dick, was also actively
18   involved with the school?
19   A    As I recall, he used to do track meets and maybe
20   games as the announcer.
21   Q    He did that for decades?
22   A    A number of years.  I couldn't put a number on
23   it, but a number of years.
24   Q    And the entire family was involved in trying to
25   promote the schools?
```

## Page 26

```
 1   A    I don't know about the entire family.
 2   Q    At least those --
 3   A    Those that you've discussed, yes.
 4   Q    -- that we've talked about?
 5   A    Yes.  Yes.  Those that we mentioned, yes.
 6   Q    Okay.  And would you agree with me that Carol
 7   Smith had a great deal of respect within the
 8   Perkins School community over the course of her
 9   career?
10           MS. GRIGSBY:  Objection.  You can
11   answer, if you can.
12   BY MR. BELAZIS:
13   Q    I'm just asking for your understanding.
14   A    I think that depends on who you spoke to,
15   because --
16   Q    Okay.  I'm just asking about your understanding.
17   A    Right.  And I would still say I think that
18   depends to who you would speak to.
19   Q    And would you say that, from your perspective,
20   that that's a fair characterization?
21           MS. GRIGSBY:  Objection.
22           THE WITNESS:  Do I have to answer that
23   one?
24           MS. GRIGSBY:  Yes.  Unless I instruct
25   you not to answer, you need to answer.
```

## Page 27

```
 1           THE WITNESS:  Could you repeat that,
 2   please?
 3           MR. BELAZIS:  Well, never mind, I'll
 4   just withdraw the question.
 5           THE WITNESS:  Okay.
 6   BY MR. BELAZIS:
 7   Q    Now, you obviously worked in the same building
 8   with Carol during the time you were at the high
 9   school together?
10   A    Yes.
11   Q    And if you didn't see her daily, you saw her on
12   some regular basis, I assume?
13   A    I wouldn't say a regular basis.
14   Q    Well --
15   A    Maybe once a week, maybe once a month, sometimes.
16   Q    Okay.  But you both were working in the same
17   building, right?
18   A    Yes.
19   Q    And on some regular basis, whether it was once a
20   week or once a month, you saw her, at least with
21   that on a regularity, for approximately 25 years,
22   right?
23   A    Yes.
24   Q    Okay.  You were both relatively young people when
25   you first began working together; is that right?
```

## Page 28

```
 1   She's a little older than you?
 2   A    She's a little older than I am, I don't know her
 3   exact age, so I -- I was relatively young, yes.
 4   Q    And she was considerably young at the time, too?
 5   A    Yes.
 6   Q    That would be fair?
 7   A    Yes.
 8   Q    And over the course of the years that you worked
 9   together, I take it that it would be fair to say
10   that you observed that Carol's health began to
11   deteriorate in some respects; in other words, you
12   began to notice some changes?
13           MS. GRIGSBY:  Objection.
14   A    I wouldn't speculate as to her health
15   deteriorating.  We all have issues and she had
16   some, as well as myself.
17   BY MR. BELAZIS:
18   Q    As we get older many of us have health issues
19   that arise; is that right?
20   A    Yes.
21   Q    That's pretty common?
22   A    Yes.
23   Q    And some were more severe than others?
24   A    I would think so, yes.
25   Q    And in Carol's case, I assume you became aware
```

HUNTLEY REPORTING SERVICE
1.800.247.8360

Electronically signed by Lori Delhees (001-331-145-7890)          506ce57f-9464-4a42-b46e-f05c965b0a0f

Page 29

| | | |
|---|---|---|
| 1 | | that she had been diagnosed with diabetes? |
| 2 | A | Yes. |
| 3 | Q | And she had suffered from diabetes for a number |
| 4 | | of years and you were aware of that? |
| 5 | A | I was not aware of how many years.  I knew that |
| 6 | | we had a conversation at one time, because I have |
| 7 | | a family history of that as well. |
| 8 | Q | Okay.  And prior to that, prior to that |
| 9 | | conversation, were you aware that she had been |
| 10 | | diagnosed with diabetes? |
| 11 | A | I don't recall that I had. |
| 12 | Q | Do you remember when that conversation was? |
| 13 | A | I remember the place, but I don't remember a |
| 14 | | time.  You know, some things stick in your mind, |
| 15 | | I remember being outside of our office in the |
| 16 | | hallway by our teacher's workroom. |
| 17 | Q | Okay.  And roughly how many years, prior to the |
| 18 | | time of her termination, would that have been? |
| 19 | A | I really don't recall. |
| 20 | | MS. GRIGSBY:  Can we take a short, |
| 21 | | brief break? |
| 22 | | THEREUPON, there was a brief recess. |
| 23 | | BY MR. BELAZIS: |
| 24 | Q | Okay.  We were talking about health issues that |
| 25 | | emerged with Carol as over the years as you were |

Page 30

| | | |
|---|---|---|
| 1 | | working together with her in the Perkins District |
| 2 | | and at the high school.  We were just talking |
| 3 | | about that issue of diabetes, we just finished |
| 4 | | that.  You also, I take it, noticed that Carol |
| 5 | | began to suffer from extreme obesity? |
| 6 | A | I wouldn't characterize what "extreme obesity" |
| 7 | | is.  Her body figure changed. |
| 8 | Q | She put on a great deal of weight; would that be |
| 9 | | fair? |
| 10 | A | She put on weight. |
| 11 | Q | Well, how much weight would you say that she put |
| 12 | | on? |
| 13 | A | I wouldn't know. |
| 14 | Q | Do you know what I mean by obesity? |
| 15 | A | Yes.  By the doctor's definition I'm obese. |
| 16 | Q | Well, was Carol more obese than you? |
| 17 | A | I wouldn't make that characterization.  She |
| 18 | | was -- she had put on weight from the time I |
| 19 | | first started teaching, yes. |
| 20 | Q | All right.  And would it be incorrect, from |
| 21 | | your -- I'm just asking for your opinion.  Would |
| 22 | | it be incorrect, in your opinion, to say that she |
| 23 | | was extremely obese? |
| 24 | A | I'm not a medical doctor, I wouldn't know. |
| 25 | Q | I'm not asking you -- I'm asking, in your |

Page 31

| | | |
|---|---|---|
| 1 | | opinion -- I'm not asking you for a medical |
| 2 | | definition.  In your opinion, would it be |
| 3 | | incorrect to say that say Carol had become |
| 4 | | extremely obese? |
| 5 | A | Could you tell me what you mean by extremely |
| 6 | | obese? |
| 7 | Q | I'm just asking for whatever you, whatever you |
| 8 | | want to take that to mean. |
| 9 | A | I would not say that she was extremely obese. |
| 10 | Q | Okay.  Fair enough.  With her height and weight, |
| 11 | | would you think that 300 pounds would be |
| 12 | | extremely obese? |
| 13 | A | I did not know her height or weight, but if |
| 14 | | that's what you're saying as an example, that |
| 15 | | would be very large and obese. |
| 16 | Q | That would be extreme obesity, in your opinion, |
| 17 | | right? |
| 18 | | MS. GRIGSBY:  I think it calls for a |
| 19 | | characterization, you know -- |
| 20 | | MR. BELAZIS:  That's fine.  I'm just |
| 21 | | asking for his opinion. |
| 22 | | BY MR. BELAZIS: |
| 23 | Q | In your opinion, given her height, with 300 |
| 24 | | pounds, would you regard that as extreme obesity? |
| 25 | A | Not particularly. |

Page 32

| | | |
|---|---|---|
| 1 | Q | Okay.  You also became aware that Carol had had |
| 2 | | eye surgery in 2005; is that correct? |
| 3 | A | I was aware that she had a patch on and had eye |
| 4 | | surgery.  I forget which eye it was, but I |
| 5 | | remember she had an eye patch. |
| 6 | Q | And she was out of the building; in other words, |
| 7 | | away from work for some period of time during her |
| 8 | | recovery from her eye surgery; do you recall |
| 9 | | that? |
| 10 | A | I don't recall, but I know that she had the |
| 11 | | surgery. |
| 12 | Q | And do you recall that Carol parked in a |
| 13 | | handicapped spot at the high school?  You guys |
| 14 | | had a handicapped, designated handicapped spot, |
| 15 | | right? |
| 16 | A | Yes. |
| 17 | Q | And you recall that Carol parked there? |
| 18 | A | Yes. |
| 19 | Q | And she parked there for a number of years, up |
| 20 | | until the time she left? |
| 21 | A | I don't recall the number of years, but I know |
| 22 | | she had a sticker. |
| 23 | Q | And generally, when someone is qualified to park |
| 24 | | in a handicapped parking space, would it be fair |
| 25 | | to say that those stickers are issued because the |

HUNTLEY REPORTING SERVICE
1.800.247.8360

Electronically signed by Lori Delhees (001-331-145-7890)          506ce57f-9464-4a42-b46e-f05c965b0a0f

Page 33

1    individual has difficulty ambulating from a
2    normal spot, which is farther away, to the
3    building; would that be fair to say?
4  A    Truthfully, I don't know how the stickers are
5    given out.
6  Q    I'm just asking for your understanding.
7  A    I understand them to have some sort of
8    disability, possibly.
9  Q    Okay.  And all I'm asking is this, just yes or
10    no.  Would it be fair to say that authorization
11    to park in a specially designated -- well, let me
12    start again.  Would it be fair to say that the
13    handicapped parking spots are closer to the
14    building than most other spots?  In other words,
15    they're intended to get the individual with
16    the -- they're parked there closer to the
17    entrance of the building; would that be fair?
18  A    They're very close to the building, but not
19    closer than all.
20  Q    And those spots are reserved for those
21    individuals so they have a place to park that's
22    close to the building; would that be fair also?
23  A    Yes.
24  Q    Okay.  And the reason that they -- and would it
25    be fair to say, based on your understanding, that

Page 34

1    the reason they put them in a spot close to the
2    building is because they may have difficulty
3    otherwise getting from their car to the building;
4    that would typically be the way it works,
5    wouldn't it?
6  A    I wouldn't speculate as to the reason, but I
7    don't put them there, our building and grounds
8    personnel --
9  Q    I'm just asking for your understanding.  Would
10    that be a fair characterization of your
11    understanding?
12  A    Could you repeat that, please?
13       MR. BELAZIS:  Could you read it back
14    for me?
15       THEREUPON, the Reporter read the requested
16    portion of the record.
17  A    To the best of my understanding.
18  BY MR. BELAZIS:
19  Q    That's all I was asking for.  Now, you also had
20    a -- were involved in an incident with Carol
21    during the 2007-2008 school year during which she
22    failed to leave the building during a fire drill,
23    do you recall that?
24  A    I don't recall the exact year, but, yes, I do
25    recall the incident.

Page 35

1  Q    Okay.  And I believe, and I think you said you
2    reviewed your testimony of the hearing at Sawmill
3    Creek.  I believe your testimony was that she
4    told you that she had difficulty getting down the
5    steps; is that correct?
6  A    I believe so.
7  Q    And you offered to provide her with a wheelchair;
8    is that correct?
9  A    Yes.
10  Q    And you did provide her with a wheelchair; is
11    that correct?
12  A    Yes.
13  Q    So she would be able to get out of the building
14    using the wheelchair because of her difficulty
15    with issues of mobility, at least what she
16    expressed to you; is that right?
17  A    Yes.
18  Q    Now, the issue of Carol sleeping on the job,
19    during class; in other words -- well, strike
20    that.  Let me start again.
21       The question of whether Carol had slept
22    on the job began to emerge in the 2007-2008
23    school year, I think that was your testimony at
24    Sawmill Creek; would that be fair to say?
25       MS. GRIGSBY:  Objection.  You can

Page 36

1    answer, if you can.
2  A    I don't recall the year.
3  BY MR. BELAZIS:
4  Q    Well, you began to hear rumors that Carol had
5    been sleeping in class, right?
6  A    Yes.
7  Q    And you began to hear it from students and you
8    began to hear it from faculty; is that right?
9  A    No.
10  Q    From students?
11  A    No.
12  Q    From where?
13  A    Faculty.
14  Q    Okay.
15  A    And school staff.  I should say school staff.
16  Q    Okay.  So you began to hear rumors from school
17    staff that Carol had been sleeping on-the-job
18    basically?
19  A    Yes.
20  Q    Okay.  And it would be fair to say that that was
21    roughly in the 2007-2008 school year; is that
22    right?
23  A    I can't tell without looking back at the
24    documents.  I really don't recall.
25  Q    What documents would you have to look at?

Electronically signed by Lori Delhees (001-331-145-7890)                    506ce57f-9464-4a42-b46e-f05c965b0a0f

Page 37

| | | |
|---|---|---|
| 1 | A | If there are any that I said that I noted the |
| 2 | | year. |
| 3 | Q | Well, let's see here.  Can you think of anything |
| 4 | | that would suggest that those rumors were |
| 5 | | circulated prior to the 2007-2008 school year? |
| 6 | A | No. |
| 7 | Q | All right. |
| 8 | | MR. BELAZIS:  Let's mark this as 1. |
| 9 | | THEREUPON, Plaintiff's Exhibit 1 was marked for |
| 10 | | identification. |
| 11 | | BY MR. BELAZIS: |
| 12 | Q | Okay.  If you would look, please, at what's been |
| 13 | | marked as Plaintiff's Exhibit No. 1, and that's a |
| 14 | | partial transcript of the -- well, that's a |
| 15 | | transcript of the testimony that you gave at |
| 16 | | Sawmill Creek during the disciplinary hearing; |
| 17 | | would that be fair to say?  You can look at it, |
| 18 | | if you want. |
| 19 | A | It appears to be. |
| 20 | Q | Okay.  And if you would look at page 518. |
| 21 | A | Yes. |
| 22 | Q | And if you look down at line 14, the attorney for |
| 23 | | the -- that was questioning you at that point, |
| 24 | | asks you about an encounter you had with Carol |
| 25 | | during which she approached you "In passing about |

Page 38

| | | |
|---|---|---|
| 1 | | her health issues and closing her eyes because |
| 2 | | she had some surgery"; do you see that? |
| 3 | A | Yes. |
| 4 | Q | And you related the conversation, as best you can |
| 5 | | recall it, and you indicated that you were |
| 6 | | talking about supervision and she mentioned that |
| 7 | | there were people who were saying that she was |
| 8 | | sleeping.  "That wasn't true, because she had one |
| 9 | | eye that she was almost blind in, and that she |
| 10 | | could -- she would occasionally close the other |
| 11 | | eye to rest it"; do you see that? |
| 12 | A | Yes. |
| 13 | Q | And then down below it, line 17, page 519 -- |
| 14 | | MS. GRIGSBY:  Let me just object.  I |
| 15 | | don't see the reference in here to that she |
| 16 | | stated that -- oh, there, I see it.  Oh, that's |
| 17 | | fine then.  Okay.  I'm sorry. |
| 18 | | MR. BELAZIS:  No problem. |
| 19 | | BY MR. BELAZIS: |
| 20 | Q | And on page 519, you get down to line 17, it says |
| 21 | | "It would have been during the school year prior |
| 22 | | to 2008-2009."  "Sometime during the 07-08 school |
| 23 | | year"; do you see that? |
| 24 | A | Yes, I do. |
| 25 | Q | And that's what you indicated.  And if you go to |

Page 39

| | | |
|---|---|---|
| 1 | | the next page. |
| 2 | A | 520? |
| 3 | Q | I'm sorry.  And on that same page it indicates |
| 4 | | what your response to her was, and you indicated, |
| 5 | | that your response was, "That we had to make sure |
| 6 | | that we were not sleeping in class and that we |
| 7 | | were supervising students at all times," right? |
| 8 | | Do you see that line? |
| 9 | A | Yes. |
| 10 | Q | Line 10? |
| 11 | A | Line 10. |
| 12 | Q | Page 519? |
| 13 | A | Yes. |
| 14 | Q | And that's what you remember of that |
| 15 | | conversation? |
| 16 | A | At that time I remember, yes. |
| 17 | Q | All right.  Now, and at that point in time it |
| 18 | | would be fair to say, I take it, that you had |
| 19 | | also heard, as we discussed a moment ago, rumors |
| 20 | | from faculty at the high school who had been |
| 21 | | saying that they observed Carol sleeping, right? |
| 22 | A | I don't recall anybody on the faculty telling me |
| 23 | | that at that time.  I do recall this |
| 24 | | conversation -- |
| 25 | Q | Okay. |

Page 40

| | | |
|---|---|---|
| 1 | A | -- with Mrs. Smith. |
| 2 | Q | Okay.  But as we had said earlier, you had heard |
| 3 | | rumors from faculty that told you that, that they |
| 4 | | had -- that they believe that they had seen |
| 5 | | Ms. Carol Smith sleeping on the job, right?  We |
| 6 | | talked about that a little bit ago. |
| 7 | A | It would be after this time frame. |
| 8 | Q | Okay.  Do you recall that specifically or you're |
| 9 | | just not sure? |
| 10 | A | I could not give you the date, I don't recall. |
| 11 | Q | And that's fair enough.  It could have been a |
| 12 | | little bit before or it could have been a little |
| 13 | | bit after, right? |
| 14 | A | I don't think so. |
| 15 | | MS. GRIGSBY:  Objection. |
| 16 | Q | All right. |
| 17 | | MR. BELAZIS:  Well, let me mark this. |
| 18 | | THEREUPON, Plaintiff's Exhibit 2 was marked for |
| 19 | | identification. |
| 20 | | BY MR. BELAZIS: |
| 21 | Q | I've handed you what's been marked as Plaintiff's |
| 22 | | Exhibit No. 2.  And as you can see that's an |
| 23 | | Affidavit of James Gunner, whose the |
| 24 | | Superintendent of the schools, right? |
| 25 | A | That's his signature, yes. |

10 (Pages 37 to 40)

Electronically signed by Lori Delhees (001-331-145-7890)          506ce57f-9464-4a42-b46e-f05c965b0a0f

Page 41

1   Q   Have you seen this affidavit before?
2   A   No.
3   Q   If you look at what's identified on the first
4       page as No. Paragraph 1, it says, it indicates
5       that Mr. Gunner began serving as Superintendent
6       on May 1, 2008; is that right?
7   A   Yes, I believe so.
8   Q   Okay.  And then it indicates in paragraph 2 --
9       I'm sorry, in paragraph 3, he says, "Shortly
10      after I became Superintendent, I received reports
11      of teacher Carol Smith sleeping when she was
12      supposed to be teaching or otherwise supervising
13      students."  So he goes on to describe that this
14      has been a problem since at least the 2007-2008
15      school year; do you see that?
16  A   Yes.
17  Q   And he also discusses the fact that, that
18      Mrs. Smith had refused to exit the high school
19      during a fire drill during the 2007-2008 school
20      year resulting in a citation against the
21      District, do you see that?
22  A   Yes.
23  Q   Do you recall that the Superintendent began his
24      employment before the end of 2007-2008 school
25      year?

Page 42

1   A   Yes.
2   Q   Okay.  And that would have been -- May 1 is
3       before the school year ends?
4   A   Yes.
5   Q   And, of course, he wanted to know any important
6       facts about your faculty at the high school; is
7       that right?  In other words, as part of his
8       orientation he was trying to get his arms around
9       what's going on in the District; is that right?
10          MS. GRIGSBY:  Objection.
11          BY MR. BELAZIS:
12  Q   Let me ask it, let me ask the question a little
13      differently.  Would it be fair to say that you
14      discussed with him, shortly after he became
15      Superintendent, the fact that there had been
16      issues about whether or not Carol Smith had been
17      sleeping?
18          MS. GRIGSBY:  Objection.
19          BY MR. BELAZIS:
20  Q   Do you recall?
21  A   I don't recall having that conversation with the
22      Superintendent.
23  Q   Okay.  Do you know how else he would have gotten
24      that information?
25  A   May I refer to something else down here?

Page 43

1   A   Sure.
2   A   The next paragraph.
3   A   Uh-huh.
4   A   Paragraph 4.
5   Q   Okay.  But asking --
6   A   That does not go back to May, I understand that.
7   Q   Right.  I'm just asking you whether, as part of
8       your -- strike that.
9           You've already told me that part of
10      your responsibility was to advise the
11      Superintendent of any problems related to staff,
12      right?
13  A   Yes.
14  Q   And if it had come to your attention that Carol
15      Smith may have been sleeping on-the-job, that is
16      a concern that you would have certainly wanted
17      the Superintendent to be aware of; would that be
18      fair?
19  A   I had never seen her sleeping in class, so I
20      would not feel that I could say something to the
21      Superintendent to that regard.
22  Q   All right.  Fair enough.  But apparently from
23      what you told me, you were certainly aware of the
24      issue of the fire drill?
25  A   Yes.

Page 44

1   Q   And did you tell the Superintendent about that?
2   A   I don't recall that I did.
3   Q   Do you know how he would have otherwise learned
4       about it?
5           MS. GRIGSBY:  Objection.
6   A   It could have been in an administrative meeting
7       that we discussed it.  It could have been
8       somebody else that discussed it.
9           BY MR. BELAZIS:
10  Q   So in other words --
11  A   It could have been the parapro that discussed it
12      with him -- excuse me, not the parapro, our SRO.
13  Q   In other words, you might have discussed it with
14      him during that administrative meeting?
15          MS. GRIGSBY:  Objection.
16  A   I don't recall.
17          BY MR. BELAZIS:
18  Q   But you had administrative meetings, I take it?
19  A   Yes.
20  Q   And those administrative meetings began as soon
21      as he became Superintendent or shortly after
22      that?
23  A   I don't know exactly when they began.  I believe
24      we probably had some in May and June.
25  Q   All right.  And there were a wide variety of

HUNTLEY REPORTING SERVICE
1.800.247.8360

Electronically signed by Lori Delhees (001-331-145-7890)                    506ce57f-9464-4a42-b46e-f05c965b0a0f

Page 45

| | | |
|---|---|---|
| 1 | | topics discussed, right? |
| 2 | A | Yes. |
| 3 | Q | Including staff issues, right? |
| 4 | A | Most of the staff issues would have been |
| 5 | | one-on-one with him. |
| 6 | Q | I think I've asked you this, but do you recall |
| 7 | | that Carol had her eye surgery resulting in some |
| 8 | | serious complications in the summer of 2005? |
| 9 | A | No. I don't recall the date, I recall her having |
| 10 | | the surgery and I recall her wearing an eye |
| 11 | | patch. |
| 12 | Q | All right. And do you recall that she had a |
| 13 | | series of procedures to correct the eye problem |
| 14 | | after it originally occurred? |
| 15 | A | No, I do not. |
| 16 | Q | Okay. Well, let's just assume that she had -- |
| 17 | | that she initially had this surgery in or about |
| 18 | | July of 2005, and that she had a series of |
| 19 | | procedures after that going into the spring or |
| 20 | | summer of 2006, okay? Let's just assume that for |
| 21 | | a moment. Prior to that time, when she began |
| 22 | | having this eye problem, would it be fair to say |
| 23 | | that you never heard anything from anyone about |
| 24 | | Carol Smith sleeping on-the-job? |
| 25 | A | I don't recall. |

Page 46

| | | |
|---|---|---|
| 1 | Q | You don't recall that that ever came to your |
| 2 | | attention; is that right? |
| 3 | A | I don't recall the time frame. |
| 4 | Q | Well, I'm just asking you, sitting here today, do |
| 5 | | you recall that anyone ever, prior to July of |
| 6 | | 2005, came to you and said Carol Smith is |
| 7 | | sleeping on-the-job? |
| 8 | A | I do not recall getting anything specific from |
| 9 | | anyone prior to 2005. |
| 10 | Q | Okay. And would you agree with me also that if |
| 11 | | someone is -- strike that. Let me start again. |
| 12 | | Now, as we discussed a moment ago, your |
| 13 | | recollection of this conversation with Carol |
| 14 | | Smith, in the 2007-2008 school year, was that she |
| 15 | | told you that she closed her eyes periodically to |
| 16 | | rest them, right, because of her eye problem? |
| 17 | A | I believe that's what I had said in the |
| 18 | | testimony, yes. |
| 19 | Q | Okay. And you would agree with me that if |
| 20 | | someone is closing their eyes or even just |
| 21 | | lowering their eyelids, because of an eye |
| 22 | | problem, for a few minutes at a time, it might |
| 23 | | appear to, at least to some people, as though |
| 24 | | they are sleeping? |
| 25 | A | I believe that closing your eyes for several |

Page 47

| | | |
|---|---|---|
| 1 | | minutes at a time, when in a classroom situation, |
| 2 | | can be not good supervisory. |
| 3 | Q | That's fine. I understand that the District will |
| 4 | | take that position, but that wasn't my question. |
| 5 | | My question is, would you agree with me |
| 6 | | that if someone is closing their eyes or lower |
| 7 | | their lids, because of an eye problem for a few |
| 8 | | minutes, it might be perceived by some that that |
| 9 | | person is sleeping? |
| 10 | | MS. GRIGSBY: Objection. |
| 11 | A | I'm not a sleep expert to know, without |
| 12 | | physically standing in front of somebody, whether |
| 13 | | they're sleeping or just closing their eyelids. |
| 14 | | BY MR. BELAZIS: |
| 15 | Q | And that would be true of most people, right? |
| 16 | | MS. GRIGSBY: Objection. |
| 17 | A | In terms of if I'm looking in the classroom, I |
| 18 | | think I'd be able to tell the difference. I'm |
| 19 | | not sure I've answered your question or what your |
| 20 | | question was. |
| 21 | | BY MR. BELAZIS: |
| 22 | Q | My question was this, if someone is closing their |
| 23 | | eyes for several minutes, because of an eye |
| 24 | | problem, it might appear to others that they are |
| 25 | | sleeping; would that be fair? |

Page 48

| | | |
|---|---|---|
| 1 | | MS. GRIGSBY: Objection. |
| 2 | A | That's an appearance that, you know, I'd have to |
| 3 | | make on my own, a recognition of an appearance |
| 4 | | that I'd have to make on my own. I can't imagine |
| 5 | | what other people would do. |
| 6 | | BY MR. BELAZIS: |
| 7 | Q | So, in other words, you'd have to see it |
| 8 | | yourself? |
| 9 | A | Yes. |
| 10 | Q | Okay. And you wouldn't know whether someone |
| 11 | | else, and what they perceived, whether it was |
| 12 | | accurate or not? |
| 13 | A | If they had seen it themselves and told me that |
| 14 | | it was, then I'd have to take them at their word. |
| 15 | Q | Okay. All right. And how would you know that |
| 16 | | whether they were accurate or not in their |
| 17 | | determination? |
| 18 | A | In their determination of? |
| 19 | Q | Of whether an individual with their eyes closed |
| 20 | | is sleeping? |
| 21 | A | Again, I would have to take them at their word. |
| 22 | Q | In other words, if they told you that they |
| 23 | | thought the person appeared to be sleeping, |
| 24 | | that's good enough for you? |
| 25 | A | That's their word. Again, I made several trips |

HUNTLEY REPORTING SERVICE
1.800.247.8360

Electronically signed by Lori Delhees (001-331-145-7890)          506ce57f-9464-4a42-b46e-f05c965b0a0f

Page 49

1    down to Mrs. Smith's room to see if that was the
2    case.
3    Q    And you never saw her sleeping, did you?
4    A    I did not.
5    Q    Let's just assume for a moment that Carol or
6    anyone else closes their eyes for a few minutes
7    each day, because of an eye problem, and that
8    others perceive that as causing -- as sleeping,
9    okay, let's assume that.  That would certainly be
10   the basis for rumors to begin about whether that
11   person is sleeping?
12        MS. GRIGSBY:  Objection.
13   A    I'm not going to speculate as to the beginning of
14   rumors.
15   BY MR. BELAZIS:
16   Q    Okay.  Well, you're the Chief Administrator in
17   your building, okay, and you -- let's just take a
18   hypothetical and just tell me how you would deal
19   with this.  You're the Chief Administrator in
20   your building and all of your, many of your staff
21   observed someone with their eyes closed due to
22   the fact that they have an eye problem and
23   conclude that that person is sleeping, and they
24   come to you and they tell you "I've seen this
25   individual sleeping." And you investigate and

Page 50

1    determine that, in fact, they have an eye problem
2    that causes them to close their eyes making them
3    to appear as though they are sleeping, what would
4    you do about that as an Administrator?
5         MS. GRIGSBY:  I'm going to object.
6    A    I don't deal in hypotheticals.
7         MS. GRIGSBY:  I'm going to object.  The
8    fact that the hypothetical do not match the case
9    here and I think it is calling for him to
10   speculate on a set of facts that do not match
11   what we know to be the facts in this case.
12        MR. BELAZIS:  That's fine.
13   BY MR. BELAZIS:
14   Q    But answer the question, please.
15        MS. GRIGSBY:  If you're capable of
16   answering the question, you can.  If you are
17   incapable of answering, you can answer --
18        MR. BELAZIS:  Now, you don't need to
19   tell him how to answer the question.
20   A    I'm not going to speculate on hypotheticals,
21   because I did not have a number of people come
22   and tell me that she was sleeping.
23   BY MR. BELAZIS:
24   Q    We're just talking about a hypothetical now,
25   okay?  And I think the facts that I gave you are

Page 51

1    fairly clear, if they're not let me know.  You
2    have an individual who closes their eyes every
3    day for a few minutes, because of an eye problem,
4    a member of your staff observed that and
5    concluded that the individual is sleeping and
6    they come to you and report it to you.  You
7    investigate and determine that, in fact, the
8    individual has eye problems simply causes them to
9    close their eyes for a few minutes each day, so
10   how do you deal with that with your staff?
11        MS. GRIGSBY:  I'm going to object.
12   BY MR. BELAZIS:
13   Q    If you have those, if you had that scenario
14   presented to you, how would you deal with it with
15   your staff?
16   A    It would be an individual situation.
17        MR. GRIGSBY:  I'm going to -- let me
18   just, yes, interpose the objection again.
19        MR. BELAZIS:  Good enough.
20   BY MR. BELAZIS:
21   Q    Under those circumstances, what would you do?
22   A    It's a hypothetical situation that's never
23   happened.
24   Q    Okay.  Well, let's assume it does happen, tell me
25   how --

Page 52

1    A    I don't deal on assumptions or hypotheticals.
2    Q    Well, I'm asking you to.  I'm asking you to
3    answer the question.  I'm not asking you to
4    refuse to answer the question.  I'm giving you a
5    set of facts, I'm asking how you would deal with
6    it as an Administrator?
7    A    How do those --
8         THE WITNESS:  Can I ask a question?
9         MS. GRIGSBY:  I'm going to object
10   again.  You are asking him to speculate on
11   something he never --
12        MR. BELAZIS:  You can have a standing
13   objection that I'm asking him to speculate.
14   BY MR. BELAZIS:
15   Q    So go ahead.
16        MS. GRIGSBY:  On the set of facts that
17   are irrelevant to this.
18        MR. BELAZIS:  That's good.  That's
19   fine.
20   BY MR. BELAZIS:
21   Q    Go ahead.
22   A    I don't know how to answer that given the fact
23   that it's irrelevant to what we're here for
24   today.
25   Q    I don't care if you think it's irrelevant or not.

HUNTLEY REPORTING SERVICE
1.800.247.8360

Page 53

1    I've just given you a set of facts and I've asked
2  you how you would deal with that scenario.
3         MS. GRIGSBY:  Well, you're asking him
4  to imagine a scenario where people have falsely
5  made a report to him.  That is not a scenario he
6  has dealt with.
7         MR. BELAZIS:  Wait a minute.  Wait a
8  minute.  Teresa, now you're testifying.  If you
9  have an objection, say you have an objection.
10        MS. GRIGSBY:  I think it's an unfair
11  question.
12        MR. BELAZIS:  Well, you may think it's
13  an unfair question and your objection is noted.
14  This is a deposition and you can't have speaking
15  objections to coach him about how to answer,
16  okay?  It's not proper.
17        MS. GRIGSBY:  I think the question is
18  not proper.
19        MR. BELAZIS:  Well, that's fine and you
20  object, and then it's on the transcript and then
21  the court can deal with it, okay?  That's how we
22  do these things.
23        THE WITNESS:  But it never happened.
24        MR. BELAZIS:  That's fine, I understand
25  you think it never happened.

Page 54

1      BY MR. BELAZIS:
2  Q    Now, can you answer the question?
3  A    No, not if it never happened, because you're
4     putting me in a position where I'm going to give
5     you some sort of textbook answer in a situation
6     that's --
7  Q    That's what I'm asking.
8  A    -- not reality.
9  Q    That's what I'm asking for.  I'm asking for your
10    textbook answer, how would you deal with that
11    situation?
12  A    I'd investigate it.
13  Q    And if you concluded that, in fact, it was not
14    sleeping -- it was not a case involving sleeping
15    and it was simply an individual resting their
16    eyes because of an eye problem, then what would
17    be an appropriate response?
18  A    I think you're leading me in the answer.
19  Q    Well, the answer would be -- well, maybe I am, so
20    let me ask the next question.
21        Would it be reasonable to advise those
22    faculty who observed it that the individual has
23    an eye problem and indeed they are not sleeping?
24  A    I don't deal with other peoples's medical
25    problems, nor do I go around discussing them with

Page 55

1     other staff.  Specifically, I would talk to the
2     individual.
3  Q    Okay.  All right.  The individual being, the
4     individual who accused --
5  A    Who has the medical issue.
6  Q    And then what?
7  A    I would talk to them about the medical, but I
8     would not go around making a general statement
9     about that person's health.
10  Q    All right.  And how would you go about -- when
11    you say you would talk to the individual, what
12    would you want to do?
13        MS. GRIGSBY:  I mean, now we're
14  speculating about a conversation that never
15  occurred and what he would do in response to it.
16  I think we're way far beyond responding to your
17  hypothetical.  Now we're hypothetical, upon
18  hypothetical, upon hypothetical and I think it's
19  improper.
20      BY MR. BELAZIS:
21  Q    Okay.
22  A    Again, I'd go back and talk to the individual.
23  Q    And for what purpose?
24  A    Probably, you know, just about their health
25    issues.

Page 56

1  Q    You want to find out more, right?
2  A    No, I would tell them "Do you have a health
3     issue?"  I'd ask them.
4  Q    And assuming they said, "Yes, I have a health
5     issue, I have an eye problem that causes me to
6     close my eyes for a few minutes each day?"
7  A    I would think that at some point that individual
8     would tell me that prior to my going and asking
9     them.
10  Q    Okay.  And if they did that, then what?
11  A    I would think that that would happen in the
12    confines of my office and in a one-on-one
13    meeting.
14  Q    Okay.  And then assuming that happened, then
15    what?
16  A    That would be it.
17  Q    Okay.  And then would that be the end of it?
18  A    That would be it.
19  Q    Okay.
20  A    That would be it.
21  Q    Okay.  So much for speculative questions and
22    answers.
23        MS. GRIGSBY:  Let's just take two
24  minutes.
25        THEREUPON, there was a brief recess.

HUNTLEY REPORTING SERVICE
1.800.247.8360

Electronically signed by Lori Delhees (001-331-145-7890)                              506ce57f-9464-4a42-b46e-f05c965b0a0f

Page 57

BY MR. BELAZIS:

1
2  Q   Okay. Let's move on to lighter subjects, like
3      disciplinary actions. By the way, were you
4      involved in the -- well, obviously you were
5      involved in the strike, the teacher's strike that
6      occurred in 2006, 5, 6?
7  A   I do not know the exact date, but I was Principal
8      at the time.
9  Q   Okay. And it was pretty ugly, wasn't it?
10 A   It depends which side you were on.
11 Q   Well, it was unpleasant for both sides?
12 A   Yes, it was unpleasant, but we ran the school
13     very effectively, I think, given the
14     circumstances.
15 Q   It was extremely contentious; would that be fair?
16 A   By the strikers and I think some of the
17     community.
18 Q   The strike, the teachers that were striking were
19     contentious, is that what you meant, in other
20     words, they were angry?
21 A   Looking from the outside -- or inside outside I
22     saw them striking, but I did not have any
23     communication with them during the time.
24 Q   But I said, "Was it contentious?" and you said,
25     "For the teachers, it was," I think that's what

Page 58

1      you said a moment ago?
2  A   Because of the strike, anytime because of the
3      strike I think there would be some contentious,
4      yes.
5  Q   Okay. Strikes are always -- always generate or
6      at least typically would be expected to generate,
7      anger?
8  A   I've only been involved in one.
9  Q   At least in that instance it appeared to generate
10     anger amongst those who were striking?
11 A   Everybody has their reasons. I don't know what
12     exactly, you know, some of the individual ones
13     were.
14 Q   At that time Carol Smith's son was School Board
15     President during the strike?
16 A   I know he was on the Board, I don't know if he
17     was President or not. I don't recall.
18 Q   All right. And the strikers were --
19         MR. BELAZIS: I'm sorry, strike that.
20     Strike that question about the strike.
21     BY MR. BELAZIS:
22 Q   The Board took a pretty hard position against the
23     union?
24         MS. GRIGSBY: Objection.
25 A   I was not involved in the negotiations.

Page 59

BY MR. BELAZIS:

1
2  Q   Okay. Would it be fair to say that the members
3      of the Teacher's Union, at least many of them,
4      were not happy with the Board or the
5      Administration?
6          MS. GRIGSBY: Objection.
7  A   I wasn't part of the union to know what their
8      conversations were.
9  BY MR. BELAZIS:
10 Q   Do you know whether the Teacher's Union felt any
11     animosity towards Carol Smith as a result of her
12     son's involvement as President of the Board or
13     just as a member of the School Board?
14         MS. GRIGSBY: Objection.
15 A   I don't -- I did not meet with the strikers at
16     that time and I don't know what their feelings
17     were.
18 BY MR. BELAZIS:
19 Q   Were you aware that Ms. Smith's daughter and
20     husband crossed the picket line and went into the
21     school to assist with the ongoing operations of
22     the school during the strike?
23 A   Who would that be?
24 Q   Roslyn. Do you know Roslyn?
25 A   Did she come into the high school?

Page 60

1          MS. GRIGSBY: Objection. Answer the
2      question, if you can, if you don't know --
3      BY MR. BELAZIS:
4  Q   I'm just asking.
5  A   No, I'm not aware. I don't recall.
6  Q   Okay. Would it be fair to say, that if that were
7      the case, that that kind of action on her part
8      might be viewed negatively by those who were
9      striking?
10         MS. GRIGSBY: Objection.
11 A   I think any time a picket line is crossed there
12     might be some who view it negatively.
13 BY MR. BELAZIS:
14 Q   And if striking teachers were yelling profanities
15     at Ms. Smith's daughter during that period of
16     time, that might support the idea that she was
17     viewed as having -- the action was viewed
18     negatively?
19         MS. GRIGSBY: Objection. By particular
20     individuals or?
21         MR. BELAZIS: Those who were yelling
22     profanities on the picket line.
23 A   I think people who yell profanities sometimes do
24     so in anger.
25 BY MR. BELAZIS:

15 (Pages 57 to 60)

Electronically signed by Lori Delhees (001-331-145-7890)          506ce57f-9464-4a42-b46e-f05c965b0a0f

Page 61

1  Q    Okay.  Did you ever become familiar with or aware
2       of the "Wall of Shame" over at the Union Hall?
3       Does that ring any bells?
4  A    No.
5  Q    A picture of Roslyn up on the "Wall of Shame?"
6  A    Unaware.
7  Q    A picture of her son up on the "Wall of Shame?"
8  A    Unaware.  I never went to the Union Hall.
9  Q    That might also suggest negative feelings on the
10      part of the strikers toward Carol's family?
11 A    I never went there.
12 Q    All right.  How many years were you in
13      administration at the high school?
14 A    15.
15 Q    Okay.  And during that 15-year period, was any
16      tenure faculty member terminated, other than
17      Carol Smith; that you can recall?
18 A    I don't recall.
19 Q    You don't recall any, other than Carol, right?
20 A    Correct.  Not at the high school, I'm not aware
21      of any others.
22 Q    That's all I was asking you about.  Well, let me
23      take it a step further.  Were you aware of any at
24      the junior high?
25 A    I don't recall any.

Page 62

1  Q    Did the District have an EEO policy?  Do you know
2       what I mean by that, Equal Employment Opportunity
3       policy?
4  A    I would imagine that they would.  I'm not
5       familiar with --
6  Q    You're not familiar with -- if it does exist,
7       you're not familiar with it?
8  A    No, I'm not familiar if it exists.
9  Q    Ever received any training on EEO issues?
10 A    I'd ask for an explanation of what EEO is before
11      I answer that.
12 Q    Equal Employment Opportunity.
13 A    So quality amongst gender, races?
14 Q    Treatment of employees in a policy that would
15      ensure that employees were treated in a way that
16      it conforms with the Equal Opportunities Laws of
17      the State and Federal Government?
18 A    Yes.
19 Q    When was that?
20 A    We had it during one of our in-services before
21      school one year, I don't recall the date.
22 Q    Do you recall roughly how many years ago?
23 A    No, I do not.
24 Q    More than five?
25 A    It could be.

Page 63

1  Q    More than ten?
2  A    Ten would be -- again, I don't recall.
3  Q    Okay.  But that was the only instance that you
4       recall?
5  A    I've attended -- I recall going to a place south
6       of Cleveland and taking, I believe it was very
7       similar to that, a workshop for a day.
8  Q    Okay.  And a workshop dealing with Equal
9       Employment Opportunity issues?
10 A    Yes.
11 Q    And that was while you were Principal?
12 A    Yes.
13 Q    But you don't recall any policy that is
14      implemented and in place at the Perkins School
15      District?
16 A    I don't recall any specific policy.
17 Q    Any written procedures?
18 A    I would have to look at Board policy.
19          MR. BELAZIS:  Just off the record.
20      THEREUPON, there was a discussion off the
21      record.
22      THEREUPON, Plaintiff's Exhibit 3 was marked for
23      identification.
24 BY MR. BELAZIS:
25 Q    You've been handed what's marked as Plaintiff's

Page 64

1       Exhibit 3.  Have you seen that before?
2  A    Yes, I believe I saw it in review.
3  Q    And that is, it's actually two different pieces
4       of related correspondence, right?
5  A    Yes.
6  Q    Related to a disciplinary action that was taken
7       against Mrs. Smith by Principal Finn while she
8       was assigned to the middle school, right?
9  A    It appears to be, yes.
10 Q    And the allegations relate to whether or not she
11      was sleeping on several occasions in a classroom
12      or choir room; is that right?
13 A    Yes.
14 Q    And I take it you became aware of this at the
15      time?
16 A    After the fact, yes.
17 Q    By after the fact, what do you mean?
18 A    After these were sent out.
19 Q    Okay.  Soon after?
20 A    I don't recall the exact date.
21 Q    Was it a matter of a year or was it a matter of a
22      couple --
23 A    I would think it was before a year, it was
24      probably a couple months, but after the fact, if
25      not before.

HUNTLEY REPORTING SERVICE
1.800.247.8360

Electronically signed by Lori Delhees (001-331-145-7890)                    506ce57f-9464-4a42-b46e-f05c965b0a0f

Page 65

1  Q    How would you have found -- if not before?
2       MS. GRIGSBY:  If not earlier?
3       THE WITNESS:  If not earlier, yes.
4       BY MR. BELAZIS:
5  Q    And how did you become aware of them?
6  A    I would imagine maybe through conversation with
7       Mr. Finn.
8  Q    And these also went to the Superintendent; is
9       that right?
10 A    Yes.
11 Q    At any point, after you became aware of these,
12      did you bring to the Superintendent's attention
13      the fact that -- or the Assistant Principal
14      Finn's attention, that Carol Smith had an eye
15      problem that may be causing her to close her
16      eyes?
17 A    I don't recall.
18 Q    You don't recall having done that or you don't
19      recall whether you did?
20 A    I don't recall having done that.
21 Q    Does that mean you don't know one way or the
22      other, or are you saying that you didn't do it,
23      period?
24 A    I don't know one way or the other whether I did
25      or not.

Page 66

1       THEREUPON, Plaintiff's Exhibit 4 was marked for
2       identification.
3       MS. GRIGSBY:  So this is like a
4       composite No. 4.
5       MR. BELAZIS:  Yes.  I tried to group
6       the documents together that were related to the
7       same disciplinary action; if that's all right?
8       MS. GRIGSBY:  Yes.
9       BY MR. BELAZIS:
10 Q    Okay.
11 A    I didn't read the first couple of pages, but I
12      looked.
13 Q    You mean, today you mean?
14 A    No, I've never seen --
15 Q    Oh, I see.
16 A    -- some of this.
17 Q    Okay.  So let's just take them one at a time.
18      You've been handed what's been marked as
19      Plaintiff's Exhibit No. 4.  And we can all agree
20      today that these are -- that these reflect
21      correspondence from an attorney representing
22      Carol Smith, as well as some correspondence back
23      from the District, right?
24 A    Yes.
25 Q    And you indicated that some of them you had seen

Page 67

1       previously, some not, right?
2  A    No, I don't recall having seen any correspondence
3       from -- such as this before.  I don't recall.
4  Q    Okay.  In other words, the correspondence from
5       Mr. Zraik you had not previously seen?
6  A    That's correct.
7  Q    Did you become aware that it had been sent by
8       Mr. Zraik?
9  A    Not this particular correspondence, no.
10 Q    Well, what do you mean by that?
11 A    I've never seen these before, these documents.
12 Q    I get that.  But what I'm -- my question was
13      whether you became aware at the time that there
14      had been correspondence sent by, on behalf of
15      Mrs. Smith, requesting accommodations?
16 A    I don't recall.
17 Q    Did anyone make you aware that the Superintendent
18      had agreed to provide certain accommodations for
19      Mrs. Smith?
20 A    Could you repeat that, sir?
21      MR. BELAZIS:  Could you read it back,
22      please?
23      THEREUPON, the Reporter read the requested
24      portion of the record.
25      BY MR. BELAZIS:

Page 68

1  A    I believe so, I don't recall at what time.
2  Q    Had you previously seen the letter, dated
3       November 18, 2008 from Superintendent Gunner,
4       that's attached as part of this exhibit?
5  A    I don't recall.
6  Q    You don't recall having seen it?
7  A    No.
8  Q    All right.  Did you get anything in writing to
9       outline to you what job accommodations the
10      Superintendent had agreed to provide?
11 A    I don't recall.
12 Q    You don't recall having received any?
13 A    No.
14 Q    And you don't recall how, if at all, you found
15      out about the accommodations that were agreed to
16      by Mr. Gunner?
17 A    No.
18 Q    Did you provide or make arrangements for
19      Mrs. Smith to be able to access the, either the
20      nurse's clinic or the bathroom in the nurse's
21      clinic to take insulin injections?
22 A    There's a bathroom on the second floor that I
23      provided her with a key.  Can I -- her room was
24      here (indicating) on the same floor, there was a
25      bathroom down on the same side of the hall.

HUNTLEY REPORTING SERVICE
1.800.247.8360

Electronically signed by Lori Delhees (001-331-145-7890)          506ce57f-9464-4a42-b46e-f05c965b0a0f

Page 69

```
1    Q    And that would be 701?
2    A    701 was her classroom, yes.  And the 700 wing
3         also had a bathroom that was locked except for
4         faculty.
5    Q    Okay.  And that key was provided during the
6         2009-2010 school year?
7    A    I don't recall when the year was.
8    Q    You just don't recall one way or the other?  You
9         know you provided it, but you don't know when?
10   A    Yes.
11   Q    Okay.  Do you recall when Carol was out having
12        bariatric surgery?
13   A    No, I do not.
14   Q    Well, maybe I didn't ask the question right.
15        Do you recall that Carol was out having
16        bariatric surgery at some point?
17   A    No, I do not.
18   Q    Do you recall that she had any kind of a surgery
19        in order to help her reduce her weight?
20   A    No.
21        THEREUPON, Plaintiff's Exhibit 5 was marked for
22        identification.
23        BY MR. BELAZIS:
24   Q    Okay.  You've been handed what's been marked as
25        Exhibit 5.  Have you seen that before?
```

Page 70

```
1    A    I don't recall seeing it.
2    Q    There are two pieces or correspondence related to
3         discipline at the middle school related to the
4         issue of failing to supervise students, right?
5    A    Yes.
6    Q    Do you know what this relates to?
7    A    I don't recall.
8    Q    Do you recall an issue arising as to whether or
9         not Carol got confused about the schedule on a
10        day when you had a short day?
11   A    No, I do not.
12   Q    Okay.  Do you recall an issue related to her
13        failure to appear for a couple of study halls
14        that she was assigned to?
15   A    At the beginning of a year, and I think that --
16        let's see, that would have been the following
17        fall of this year at the high school.
18   Q    But you don't remember this at the junior high?
19   A    No.  Only in as much as that she was half-time in
20        my building and in this building, so she would
21        have had -- I was probably aware that she was
22        out, because I would have had to provide
23        coverage.
24   Q    Okay.
25   A    But I do not remember the specific instance.
```

Page 71

```
1    Q    You continued to be her, Carol Smith's,
2         supervisor during the time that she was half-time
3         at the middle school and half-time at the high
4         school?
5    A    Until 2011, yes.
6    Q    Okay.  And if a faculty person is shared -- well,
7         let me ask you this.
8         Was Mrs. Smith, at all times during
9         your tenure as high school Principal, assigned
10        principally to the high school?
11        MS. GRIGSBY:  I'm sorry, can you
12        restate that?
13   A    Was she assigned --
14        BY MR. BELAZIS:
15   Q    To the high school.
16   A    -- all times during my tenure?  There was a year
17        when she was half and half.
18   Q    Okay.  So if a faculty person is half and half,
19        how is the evaluation process supposed to unfold?
20   A    We make an arrangement between principals.
21   Q    What does that mean?
22   A    Since she's at your building you can do her
23        evaluation.
24   Q    Would you both provide input into the evaluation?
25   A    No.
```

Page 72

```
1    Q    So I guess I wasn't clear on what you were
2         saying.  Would you simply take responsibility for
3         doing the evaluation, even though she was
4         half-time at someone else's building?
5    A    We would determine as a Principal team who was
6         going to do the evaluation.
7    Q    Okay.  And what would go into that determination,
8         you and the other principal?
9    A    "You may do the evaluation."
10   Q    Okay.  But I guess what you're -- if I understand
11        what you're saying is, that if a faculty person
12        or a faculty member is shared half-time in the
13        high school and half-time at the junior high, the
14        two principals would confer and make a
15        determination as to who was going to prepare the
16        evaluation for that faculty member if an
17        evaluation was going to be prepared?
18   A    The four principals would confer, being the
19        Principal and the Assistant Principal at each
20        building, and then depending upon the contract of
21        that individual whether an evaluation would have
22        to be made or not.
23   Q    Okay.
24        THEREUPON, Plaintiff's Exhibits 6, 7, 8 and 9
25        was marked for identification.
```

Electronically signed by Lori Delhees (001-331-145-7890)                    506ce57f-9464-4a42-b46e-f05c965b0a0f

Page 73

1    BY MR. BELAZIS:
2    Q    You've been handed what has been marked
3        Plaintiff's Exhibits 6 through 9, and if you can
4        identify them?
5            MS. GRIGSBY:  Perhaps take them one and
6        in order.
7    A    6, 7, 8, 9.
8    BY MR. BELAZIS:
9    Q    Okay.  Well, let's just take them one at a time.
10       9 is correspondence that you sent to Mrs. Smith
11       giving her certain instructions related to
12       getting up-to-speed in advance of her teaching
13       Social Studies at the middle school; is that
14       correct?
15   A    Yes.
16   Q    And --
17   A    Excuse me.  At the middle school?
18   Q    I'm sorry, at the high school.
19   A    Yes, at the high school.  This is sent out at the
20       end of one year for the next year.
21   Q    And then 8 is correspondence that you sent -- I'm
22       sorry.  6 is correspondence that you sent asking
23       for a disciplinary conference related to the
24       instructions that you had given Mrs. Smith in the
25       June 1, 2009 correspondence that's marked as

Page 74

1        Exhibit 9; is that right?
2    A    Yes.  6.  That was 9.
3    Q    So Exhibit 6 was your correspondence that was
4        sent to Mrs. Smith after your correspondence of
5        June 1, 2009?
6    A    Correct.
7    Q    And then 7 is follow-up correspondence that you
8        sent to Mrs. Smith under Mr. Gunner's signature,
9        right?
10   A    Yes.
11   Q    Reflecting the results of your investigation of
12       some of the charges that had been brought up in
13       Exhibit 6, right?
14   A    Yes.
15   Q    And then 8, Exhibit 8 is correspondence from
16       Dr. Gunner imposing certain discipline associated
17       with these incidents that are the subject that we
18       just went over, right?
19   A    Yes.
20   Q    And, in essence, why don't you tell me your
21       understanding what the discipline was that was
22       imposed and why?
23   A    It was the result of Mrs. Smith's failure to
24       comply with my requests to observe Social Studies
25       classes that she would be teaching for the

Page 75

1        following school year.
2    Q    Okay.  What in particular did you and Dr. Gunner
3        determine had been -- she had done or not done, I
4        mean, in the end?  I know there was some
5        allegations in the beginning --
6    A    Right.
7    Q    -- some of them were pushed off the table, I
8        think, right?  So what was the final
9        determination as to what she had done or not
10       done?
11   A    Sleeping in class.
12   Q    Okay.  And can you be more specific about that?
13   A    Sleeping in Mr. McVeigh's class.
14   Q    And can you provide any more detail?
15   A    During a video --
16   Q    All right.
17   A    -- and at other times, as I understood it, during
18       his classroom where she was assigned that day to
19       observe him teaching Social Studies so she could
20       prepare for the following year.
21   Q    Okay.  And you got that information from
22       Mr. McVeigh?
23   A    Yes.
24   Q    Did you have a conference with Mrs. Smith about
25       it?

Page 76

1    A    I don't recall.
2    Q    Okay.  So, in other words, in advance of the
3        disciplinary action that was taken, as reflected
4        in Plaintiff's Exhibit 8, you don't recall
5        whether you had a conference with her?
6    A    I do not.
7    Q    And thus, I take it, you don't recall what, if
8        anything, would have been discussed during any
9        such conference had it occurred?
10           MS. GRIGSBY:  I'm just going to note
11       that the record, or Exhibit 8 does reflect that a
12       disciplinary conference --
13           MR. BELAZIS:  You are, you're giving a
14       speaking objection again and -- all I want to
15       know --
16           MS. GRIGSBY:  No, I just want the --
17           MR. BELAZIS:  -- all I want to know is
18       what his memory is, and that's all I asked.
19           THE WITNESS:  You're asking me if,
20       prior to June 19th, I had any conversation with
21       her or had any communication with her; is that
22       correct?
23           MS. GRIGSBY:  Yes.
24   BY MR. BELAZIS:
25   Q    Whether you had a conference with her to

19 (Pages 73 to 76)

Electronically signed by Lori Delhees (001-331-145-7890)          506ce57f-9464-4a42-b46e-f05c965b0a0f

Page 77

1   discuss --
2   A   Exhibit 7.
3   Q   I'm just asking you what your recollection is of
4       a conference with Mrs. Smith in advance of the
5       time that the disciplinary action was imposed, as
6       reflected in Exhibit 8, and I think your answer
7       was that you don't recall?
8   A   I was gone at that time, out of the District.
9   Q   Okay.  So I think you've already answered this.
10      And I'm not trying to trick you, I just want to
11      know what your memory is.  If I understand what
12      you said, we already know that there was
13      disciplinary action taken as reflected in Exhibit
14      A, right?
15  A   Yes.
16  Q   I asked you earlier if you recall whether you had
17      a conference with Mrs. Smith, regardless of what
18      the other correspondence might say.  My question
19      is, if you recall whether you had a conference
20      with Mrs. Smith to discuss the discipline prior
21      to the time that Exhibit 8 was issued?  I think
22      your answer was you didn't recall.  Fair enough?
23      Is that accurate?
24  A   Yes.
25  Q   Okay.  At any point, prior to the issuance of

Page 78

1       Dr. Gunner's June 19, 2009 letter, reflected in
2       Exhibit 8, did you bring to his attention that
3       Carol Smith had advised you of an eye problem
4       that caused her to close her eyes in order to
5       rest them?
6   A   At any time?
7           MR. BELAZIS:  You want to read it back,
8       please.
9       THEREUPON, the Reporter read the requested
10      portion of the record.
11  A   I don't recall.
12          THE WITNESS:  Can I go back to a
13      previous statement?
14          MS. GRIGSBY:  If you need to correct
15      something, go ahead.
16          THE WITNESS:  I'm confused by the
17      presentation, that's why I had these dated over
18      here.  If I answered that I did not recall the
19      conference, obviously there's a disciplinary
20      conference that was here on Exhibit 6.
21          MR. BELAZIS:  Yes.  I think we've noted
22      for the record that there is a correspondence.
23      Your Counsel pointed out that there is
24      correspondence that she believes reflects a
25      conference and that really wasn't my question.

Page 79

1       My earlier question had to do with your memory of
2       it.
3           THE WITNESS:  Okay.
4           MR. BELAZIS:  And I think we went
5       through that.
6           THE WITNESS:  Okay.
7           MR. BELAZIS:  All right.  So I'm done
8       with these.  Give these to the Court Reporter.
9       BY MR. BELAZIS:
10  Q   Mr. Gasteier, one of the exhibits I showed you
11      earlier, Exhibit 8, dated June 19, 2009, refers
12      to the, apparently the termination made by
13      Mr. Gunner that he was going to direct Mrs. Smith
14      before returning to work, after being suspended
15      for ten days, requiring her to undergo a physical
16      and mental capacity examination; in other words,
17      a Fitness For Duty Exam; do you see that?
18  A   Yes.
19  Q   Do you recall discussing that with Dr. Gunner?
20  A   Only that she was --
21  Q   Going to be directed to do that?
22  A   Yes.
23  Q   Okay.
24      ///
25      ///

Page 80

1           THEREUPON, Plaintiff's Exhibits 10 was marked
2       for identification?
3       BY MR. BELAZIS:
4   Q   You've been handed what's marked as Plaintiff's
5       Exhibit 10, which includes a letter dated
6       June 19, 2009, and another letter dated July 8,
7       2009, both from Mr. Gunner to Mrs. Smith,
8       correct?
9   A   Yes.
10  Q   And you've seen these before?
11  A   Yes.
12  Q   You were copied on both of them, correct?
13  A   Yes.
14  Q   All right.  And these arise from allegations that
15      Mrs. Smith was sleeping during a technology
16      training that she attended on June 16th and 17th,
17      right?
18  A   Yes.
19  Q   Were you involved at all in the investigation of
20      this?
21  A   No.  I believe I was still on vacation.
22  Q   Did you discuss this with Mr. -- or Dr. Gunner
23      while you were on vacation?
24  A   No.
25  Q   By the time you got back had these letters

HUNTLEY REPORTING SERVICE
1.800.247.8360

Electronically signed by Lori Delhees (001-331-145-7890)                    506ce57f-9464-4a42-b46e-f05c965b0a0f

Page 81

1   already been issued?
2   A   That I can't recall, but at least by the July 8th
3   I was back, yes.
4   Q   At any point, either before or after these
5   letters were issued, did you advise Mr. Gunner or
6   anyone else that Mrs. Smith suffered from an eye
7   problem that caused her to close her eyes in
8   order to rest them?
9   A   I don't recall.
10  Q   Going back to what was previously marked as
11  Plaintiff's Exhibit 8. On the first page toward
12  the bottom, as I noted previously, this is a
13  letter from Dr. Gunner, right?
14  A   Yes.
15  Q   And towards the bottom of the first page,
16  Dr. Gunner notes, "You claim that you have 80
17  percent of blindness in your right eye and you
18  are simply resting your eyes and totally aware of
19  all class activities during the time in
20  question." Do you see that?
21  A   Yes, I do.
22  Q   I may have already asked you this, but either
23  before or after this letter, Plaintiff's
24  Exhibit 8, was issued by Dr. Gunner, did you
25  discuss with him that the question of

Page 82

1   Mrs. Smith's eye problem causing her to need to
2   rest her eyes?
3   A   I don't recall. I know it's here and I know it's
4   dated, but I don't recall.
5   Q   And you don't recall whether you brought to his
6   attention that she had informed you of the same
7   thing earlier, right? In other words, you don't
8   recall one way or the other?
9   A   That she had informed me of the same thing?
10  Q   Well, did you either before or after the issuance
11  of Exhibit 8, the June 19, 2009 letter, advise
12  Dr. Gunner that Carol Smith had also told you,
13  sometime during the 2007-2008 school year, that
14  she suffered from an eye problem that caused her
15  to close her eyes to rest them?
16  A   I do not recall any specific time.
17  Q   Just going back to Exhibit 9, the letter that you
18  sent to Mrs. Smith giving her certain
19  instructions as to what she was to do to bring
20  herself up to speed with the Social Studies.
21  A   Yes.
22  Q   Did you ever take a look to see whether -- strike
23  that, let me ask it again.
24      You initially charged Mrs. Smith with
25  not following your directions by not staying

Page 83

1   after class to meet with Mr. McVeigh and
2   Mr. Bores to discuss performance indicators and
3   other relevant materials for preparation to teach
4   Social Studies, right?
5   A   Yes.
6   Q   Basically that was the charge of insubordination,
7   right? She didn't follow your instructions;
8   would that be fair?
9   A   Not following instructions is not always grounds
10  for insubordination, I think it would be lax not
11  to have done so.
12  Q   Okay. Did you ever inquire as to whether or not,
13  because Mr. McVeigh and Mr. Bores got copies of
14  this correspondence --
15  A   I'm sorry, got what?
16  Q   Mr. McVeigh and Mr. Bores --
17  A   Got copies of this.
18  Q   -- received copies of this?
19  A   Yes.
20  Q   And they were aware of what you wanted all of
21  them to do, including Carol, Mr. McVeigh, and
22  Mr. Bores, right? There are certain specific
23  things that you had directed them to do?
24  A   Yes.
25  Q   And that included staying after class and

Page 84

1   providing certain instructions to Mrs. Smith
2   related to Social Studies, right?
3   A   Yes.
4   Q   And that didn't happen?
5   A   That's correct.
6   Q   Did you ever inquire as to the reason?
7   A   From any of them or from Mrs. Smith, or?
8   Q   From any of them.
9   A   I do not recall doing so.
10  Q   And I take it that you did not issue any
11  discipline of any kind against Mr. McVeigh or
12  Mr. Bores based on their failure to stay after
13  class and work with Carol Smith on the Social
14  Studies issues that you had outlined in your
15  letter?
16  A   It was their classrooms that they were in.
17  Q   Well, I understand that. But you had given
18  certain specific instructions about what the
19  three of them were supposed to do in order to get
20  her ready to teach?
21  A   Yes.
22  Q   And that didn't happen?
23  A   She left the area.
24  Q   Well, who told you that?
25  A   They did.

21 (Pages 81 to 84)

Electronically signed by Lori Delhees (001-331-145-7890)                    506ce57f-9464-4a42-b46e-f05c965b0a0f

Page 85

1   Q    So you remember that that's what they said?
2   A    I remember that they told me that she did not
3   stay.
4   Q    And did you ask Carol?
5   A    No, I did not.
6   Q    And if Carol said that they refused, said they
7   didn't want to stay and sent her home, then would
8   that be grounds for discipline against
9   Mr. McVeigh?
10  A    Part of it was during the day.
11  Q    I'm sorry?
12  A    Part of it was during the day, so they could not
13  have sent her home.
14  Q    Well, maybe sent her home was the wrong term.
15  Sent her away.
16  A    I would hope that they would not have done that.
17  Q    All right.
18       THEREUPON, there was a brief recess.
19       THEREUPON, Plaintiff's Exhibit 11 was marked
20  for identification.
21  BY MR. BELAZIS:
22  Q    You've been handed what's been marked as
23  Plaintiff's Exhibit 11. Have you had a chance to
24  review it?
25  A    Yes.

Page 86

1   Q    And this is a series of correspondence related to
2   the sequence of the events that resulted in the
3   District's recommendation to terminate
4   Ms. Smith's contract; is that correct?
5   A    Yes.
6   Q    And all of these letters are from Dr. Gunner?
7   A    Yes.
8   Q    And I think you had seen them before?
9   A    Yes.
10  Q    And you were copied on them when they were
11  issued?
12  A    Not the last one.
13  Q    Okay.
14  A    The last two --
15  Q    You're saying your name doesn't appear on the
16  copy list, or you didn't receive it on or about
17  that time?
18  A    It does not appear on the copy list.
19  Q    Yes. But did you see this? Did you get it?
20  A    I don't think I would have.
21  Q    All right. You were aware that there was going
22  to be a recommendation to terminate --
23  A    Yes.
24  Q    -- Mrs. Smith's teaching contract?
25  A    Yes.

Page 87

1   Q    There were essentially three grounds that were
2   articulated; is that correct? That's the basis
3   for the action that was going to be taken? And I
4   think that they are outlined in the
5   correspondence dated April 13, 2010, which is
6   part of this exhibit?
7   A    On March 30th -- okay, yes. On April 13th, yes,
8   I see those.
9   Q    And that's consistent with your understanding of
10  the grounds that were the basis for the
11  District's action?
12  A    Yes.
13  Q    Before any action was taken -- well, Mrs. Smith
14  was immediately suspended from her duties; is
15  that correct?
16  A    As of March 29th.
17  Q    Was she suspended with pay or without?
18  A    I believe with pay.
19  Q    Okay. But she was relieved of her duties?
20  A    Yes.
21  Q    As of March 29, 2010?
22  A    Yes.
23  Q    And then after that time you and Dr. Gunner
24  conducted an investigation; is that correct?
25  A    Yes.

Page 88

1   Q    And your investigation consisted of interviewing
2   all of the students in her 5D Study Hall and
3   fifth period History class; is that correct?
4   A    All but one.
5   Q    All but one. And the one was her --
6   A    Grandson.
7   Q    -- grandson, is that right, because he was in
8   that class?
9   A    Yes.
10       MR. BELAZIS: Just off the record for a
11  second here.
12       THEREUPON, there was a discussion off the
13  record.
14       THEREUPON, Plaintiff's Exhibit 12 was marked
15  for identification.
16  BY MR. BELAZIS:
17  Q    Let me first hand you what's been marked as
18  Plaintiff's Exhibit 12. Those are notes from
19  your investigations when you interviewed the
20  students, right?
21  A    No.
22  Q    Well, the first page. Why don't you tell me what
23  it is.
24  A    This is notes after I had spoken with
25  Mrs. Martinez at the end of the day on the 19th.

22  (Pages 85 to 88)

Electronically signed by Lori Delhees (001-331-145-7890)                    506ce57f-9464-4a42-b46e-f05c965b0a0f

Page 89

```
 1   Q   Okay. Mrs. Martinez is who?
 2   A   She was a parapro at that time, someone who was
 3       working one-on-one with a student.
 4   Q   And she was approached by a couple of the
 5       students?
 6   A   I believe these two, yes.
 7   Q   But not present on the day in question?
 8   A   Not present.
 9   Q   Well, how did she happen to fit into this, if at
10       all?
11   A   Mrs. Martinez?
12   Q   Yes.
13   A   She told me that students have approached her and
14       told her about Mrs. Smith and these instances.
15       Mrs. Martinez approached me at the end of the
16       school day and told me, gave me this information.
17   Q   Oh, okay. All right. So, and basically it's
18       what's reflected on page 1 of Exhibit 12?
19   A   Yes.
20   Q   All right. And then the second and third and
21       fourth pages of the exhibit, whose handwriting is
22       that?
23   A   I do not know.
24   Q   Would you recognize Dr. Gunner's handwriting if
25       you saw it?
```

Page 90

```
 1   A   I wouldn't recognize it over anybody else's.
 2   Q   Okay. Fair enough. All right. And then in the
 3       course of the investigation conducted by you and
 4       Dr. Gunner together, Dr. Gunner took some notes
 5       that he jotted on his laptop as the students were
 6       being interviewed; is that correct?
 7   A   I know that he was taking -- I know that he was
 8       typing on his laptop while we were talking with
 9       the students, yes.
10       THEREUPON, Plaintiff's Exhibit 13 was marked
11       for identification.
12       BY MR. BELAZIS:
13   Q   Well, let me ask you, have you seen the
14       documents, any of the pages marked Plaintiff's
15       Exhibit 13, prior to today?
16   A   I think I probably did the first time around, I'm
17       not sure.
18   Q   You mean when these events were transpiring?
19   A   When -- no. When I -- at Sawmill Creek.
20   Q   Okay. Did you see them prior to that; in other
21       words, in connection with the determination about
22       whether to take any disciplinary against
23       Mrs. Smith?
24   A   I don't recall.
25   Q   But you were present during, with Dr. Gunner
```

Page 91

```
 1       during all of the interviews, is that correct,
 2       with the kids?
 3   A   The two of us were not together during all the
 4       interviews. We were together for a portion of
 5       them and then was gone for a period of time,
 6       which I finished up the remainder of the
 7       interviews.
 8   Q   Okay. And in connection with those interviews
 9       did you take any notes?
10   A   Yes.
11       MR. BELAZIS: Do we have those, Teresa?
12       MS. GRIGSBY: Every note that we have,
13   you've got.
14       BY MR. BELAZIS:
15   Q   Are they part of the exhibit there?
16   A   Yes. Yes.
17   Q   So maybe you can point to it?
18   A   Yes, I can. Everything -- well, I don't know
19       about everything; but these pages that are on
20       notebook paper, one, two, three, four pages is my
21       handwriting.
22   Q   Why don't you just mark them with, just initial
23       them, maybe that's the easiest way.
24   A   Put my initials there?
25       MS. GRIGSBY: Yes, just put "CG."
```

Page 92

```
 1       THE WITNESS: Okay. (Drawing.)
 2       MR. BELAZIS: Let's mark these also.
 3       THEREUPON, Plaintiff's Exhibit 14 was marked
 4       for identification.
 5       BY MR. BELAZIS:
 6   Q   Okay. So now I've handed you what's been marked
 7       as Plaintiff's Exhibit 14. And as I understand
 8       it, those are also your handwritten notes?
 9   A   Yes.
10   Q   Can you tell if they're the same as the
11       handwritten notes in Exhibit 13 that you just
12       initialed a few moments ago?
13   A   The same, meaning the handwriting?
14   Q   The same notes.
15   A   The same notes. Let me look. These are
16       different notes.
17   Q   They're different, okay. Do you know whether
18       there's any others beside these?
19   A   No, I do not.
20   Q   In the notes that you initialed that are part of
21       Exhibit 13, it looks like at the top of each page
22       you have a student's first name?
23   A   Yes.
24   Q   Okay. And those that would be the first name of
25       the student that you were interviewing, right?
```

HUNTLEY REPORTING SERVICE
1.800.247.8360

Electronically signed by Lori Delhees (001-331-145-7890)

506ce57f-9464-4a42-b46e-f05c965b0a0f

Page 93

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | Well, and the handwritten notes would reflect what you |
| 3 | | understood them to say when you were questioning? |
| 4 | A | Some were just parts of the question; but, yes, |
| 5 | | that, yes, I was taking notes on what they were |
| 6 | | saying. |
| 7 | Q | Do you remember how many students you interviewed |
| 8 | | by yourself, without Dr. Gunner, after he left |
| 9 | | town? |
| 10 | A | No, I do not. |
| 11 | Q | But the only students you interviewed alone were |
| 12 | | those that, that were interviewed after |
| 13 | | Dr. Gunner left town, because you were left alone |
| 14 | | to finish the interview process? |
| 15 | A | I don't know if he left town. |
| 16 | Q | He just left you to finish it up? |
| 17 | A | Well, I don't know where he went.  I don't |
| 18 | | recall.  And I don't recall exactly how many were |
| 19 | | left, but I know that I was going to call down |
| 20 | | the remainder of the students, with the exception |
| 21 | | of the one student, Brian Kurtz. |
| 22 | Q | Okay. |
| 23 | | THEREUPON, Plaintiff's Exhibit 15 was marked |
| 24 | | for identification. |
| 25 | | BY MR. BELAZIS: |

Page 94

| | | |
|---|---|---|
| 1 | Q | Can you identify what's been marked as |
| 2 | | Plaintiff's Exhibit 15? |
| 3 | A | It appears -- it's an e-mail from me to |
| 4 | | Mrs. Smith with a BCC to Dr. Gunner. |
| 5 | Q | You sent this e-mail after you determined that |
| 6 | | she was not getting to her -- well, to which |
| 7 | | class on time? |
| 8 | A | Fifth period. |
| 9 | Q | And that would be the Study Hall; in other words, |
| 10 | | downstairs at -- |
| 11 | A | In 605. |
| 12 | Q | In Room 605? |
| 13 | A | Yes. |
| 14 | Q | She was moving from Room 701 to Room 605 and not |
| 15 | | getting there on time, that was your observation, |
| 16 | | right? |
| 17 | A | I believe it was 5C and 5D, not 5A and 5B. |
| 18 | Q | Okay.  What's the significance of that? |
| 19 | A | She would be there at 5A and 5B for the class, 5C |
| 20 | | she would have lunch, the students would have |
| 21 | | lunch -- |
| 22 | Q | Uh-huh. |
| 23 | A | -- and 5D would be the Study Hall portion. |
| 24 | Q | Okay.  But the point is, this relates to her |
| 25 | | getting from Room 701 to 605 in a timely fashion, |

Page 95

| | | |
|---|---|---|
| 1 | | regardless of what period it was? |
| 2 | A | Well, it makes a difference, because lunch was 5C |
| 3 | | and then Study Hall 5D. |
| 4 | Q | Okay.  So which one was she not getting to on |
| 5 | | time? |
| 6 | A | That's what I believe it was, was it would be the |
| 7 | | Study Hall 5D. |
| 8 | Q | And what room was that in? |
| 9 | A | 605. |
| 10 | Q | And she was coming from Room 701? |
| 11 | A | No. |
| 12 | Q | 702? |
| 13 | A | At that time she would have been in 601 and then |
| 14 | | gone to lunch or whatever. |
| 15 | Q | Oh, I see.  So this was an occasion in which she |
| 16 | | was already in 605, she went somewhere and didn't |
| 17 | | get back on time? |
| 18 | A | That's what I believe, yes. |
| 19 | Q | Okay.  That's your recollection, but is that what |
| 20 | | this says? |
| 21 | A | Well, it says fifth period meets 5A and B with |
| 22 | | lunch during 5C and Study Hall 5D.  And then it |
| 23 | | goes on about Miss Malott being there. |
| 24 | Q | Okay.  But in any event, what you're trying to do |
| 25 | | is reconstruct what you meant by this memorandum, |

Page 96

| | | |
|---|---|---|
| 1 | | it sounds like you don't have a specific |
| 2 | | recollection? |
| 3 | A | It was during, I believe, 5D.  There was |
| 4 | | confusion, I believe, on her part as to when the |
| 5 | | Study Hall was and the lunch. |
| 6 | Q | Oh, this would have been at the beginning of the |
| 7 | | year; is that what you mean? |
| 8 | A | 9/15, yes. |
| 9 | Q | I see. |
| 10 | A | Yeah, and she had just come back a week or so |
| 11 | | prior to that. |
| 12 | Q | Okay.  And had you also mentioned to her about |
| 13 | | getting to Room 605 on time when she was coming |
| 14 | | from Room 701? |
| 15 | A | I had that conversation, yes. |
| 16 | Q | Because you had observed her getting in late? |
| 17 | A | I was in the hallway when she was coming down, |
| 18 | | yes. |
| 19 | Q | And did you also stand in the hallway a number of |
| 20 | | times after that to make sure that she was |
| 21 | | getting to her class on time? |
| 22 | A | Not in particularly for her, I would be in the |
| 23 | | hallway between classes, not just during fifth |
| 24 | | period. |
| 25 | Q | And you would observe that she was getting there |

HUNTLEY REPORTING SERVICE
1.800.247.8360

Electronically signed by Lori Delhees (001-331-145-7890)                    506ce57f-9464-4a42-b46e-f05c965b0a0f

Page 97

| | | |
|---|---|---|
| 1 | | at the bell or sometime after the bell? |
| 2 | A | I didn't specifically set out to -- |
| 3 | Q | I understand that. I'm just asking if you |
| 4 | | observed that she was getting there at the bell |
| 5 | | or after the bell on a number of occasions while |
| 6 | | you were standing there, for whatever reason? |
| 7 | A | I heard that she was getting there. |
| 8 | Q | Who did you hear it from? |
| 9 | A | From -- I'm trying to think. I can't recall who. |
| 10 | Q | Okay. So now let me go back to my original |
| 11 | | question. You've already said that you were |
| 12 | | standing out in the hallway for reasons unrelated |
| 13 | | to watching her. |
| 14 | A | I was talking with other teachers, yes. |
| 15 | Q | My question is, while on those occasions, when |
| 16 | | you were standing in the hallway where you could |
| 17 | | see Mrs. Smith entering her 605 classroom, did |
| 18 | | you observe her on some occasions arriving at the |
| 19 | | bell or after the bell? |
| 20 | A | No. |
| 21 | Q | How many times did you stand there like that and |
| 22 | | observe her? |
| 23 | A | I would nominally not stand down in the 600 |
| 24 | | hallway, but in the aisle by the ramp, which |
| 25 | | would be the main hallway. |

Page 98

| | | |
|---|---|---|
| 1 | Q | I think you were asked this in your testimony at |
| 2 | | Sawmill Creek, but did Mrs. Smith ever ask you to |
| 3 | | move her classroom, Social Studies classroom, |
| 4 | | from 601 to, up to the second floor, either 701 |
| 5 | | or 702 or 707? |
| 6 | A | No. |
| 7 | Q | Did she ever have a conversation with you telling |
| 8 | | you that she was incapable of making it to her |
| 9 | | 605 class within the four minute time allowed? |
| 10 | A | No. |
| 11 | Q | And if she says that she did, would you dispute |
| 12 | | that? |
| 13 | A | I would repeat my answer. |
| 14 | Q | And is your answer that -- are you positive that |
| 15 | | she did not, or that you don't really recall one |
| 16 | | way or the other? |
| 17 | A | I do not recall ever having that conversation. |
| 18 | Q | Okay. There's a memorandum that I saw where you |
| 19 | | make the observation that Mrs. Smith, without |
| 20 | | telling anyone, took her -- what period is |
| 21 | | that where she had Social Studies? |
| 22 | A | Fifth period. |
| 23 | Q | -- where her fifth period Social Studies class |
| 24 | | was moved up to her room in 702, I think it was, |
| 25 | | on a number of occasions; do you remember that? |

Page 99

| | | |
|---|---|---|
| 1 | A | The Assistant Principal was made aware when he |
| 2 | | went looking for a student that that had |
| 3 | | happened. |
| 4 | Q | And he brought it to your attention? |
| 5 | A | Yes. |
| 6 | Q | And he told you that it had happened on a number |
| 7 | | of occasions? |
| 8 | A | Several. Several. |
| 9 | Q | And did you inquire her as to why? |
| 10 | A | No, I did not. |
| 11 | Q | Did you review the responses given by -- or maybe |
| 12 | | you answered this already, but did you review the |
| 13 | | responses given by the students in connection |
| 14 | | with the investigation; in other words, their |
| 15 | | written, their written summaries that should have |
| 16 | | been provided? |
| 17 | A | I don't recall reviewing them all. I looked at |
| 18 | | my notes and probably discussed with Dr. Gunner |
| 19 | | what he had heard. |
| 20 | Q | Okay, let me, just for the record, go back. |
| 21 | | Referring again to Plaintiff's Exhibit 13. The |
| 22 | | typewritten -- |
| 23 | A | Are not mine. |
| 24 | Q | -- documents, those are not yours? |
| 25 | A | (Nod indicating yes.) That's correct, yes. |

Page 100

| | | |
|---|---|---|
| 1 | Q | And can we assume that those are Dr. Gunner's |
| 2 | | notes that he was tapping on his laptop? |
| 3 | A | I won't assume, but they're not mine. |
| 4 | Q | You don't know, okay. And then there are a |
| 5 | | number of handwritten statements on long paper, I |
| 6 | | guess that are part of the exhibit, and they are, |
| 7 | | they appear to be signed by the students, right? |
| 8 | A | Correct. |
| 9 | Q | And those are the statements that were collected? |
| 10 | A | The legal pad, yes. The length, legal pad |
| 11 | | length. |
| 12 | Q | And did you review those? |
| 13 | A | I might have. |
| 14 | Q | Okay. If you review the statements provided by |
| 15 | | the students, including those on Dr. Gunner's, if |
| 16 | | we presume that the typewritten part of this |
| 17 | | exhibit is Dr. Gunner's, there's a pretty wide |
| 18 | | variety of observations made by the students, |
| 19 | | some said that she slept every day, some said |
| 20 | | that she never slept at all; did you note that? |
| 21 | | MS. GRIGSBY: Objection. |
| 22 | A | I did not note that. I started at the beginning |
| 23 | | to keep a tally and I stopped doing that during |
| 24 | | the interviews. |
| 25 | | BY MR. BELAZIS: |

25 (Pages 97 to 100)

Electronically signed by Lori Delhees (001-331-145-7890)   506ce57f-9464-4a42-b46e-f05c965b0a0f

Page 101

```
 1   Q   So assuming that some students were informing you
 2       and Dr. Gunner that they never saw Mrs. Smith
 3       sleeping during either Study Hall or the Social
 4       Studies class, and other students said that they
 5       did see that kind of occurrence, how would you
 6       reconcile that?
 7           MS. GRIGSBY: Objection.
 8       BY MR. BELAZIS:
 9   Q   In your mind.
10   A   I think that some people were paying closer
11       attention than others.
12   Q   That's how you would reconcile it. Okay. And
13       there were some students, I think you might have
14       noted, that indicated that Mrs. Smith would
15       arrive with the bell, others within a minute or
16       two after the bell, others 15 to 20 minutes after
17       the bell. A pretty wide range of observations;
18       you probably noted that, right?
19   A   I saw that there was a range.
20   Q   And how would you reconcile that?
21   A   Again, some people pay closer attention to time
22       than others.
23   Q   Okay. One of the students said under oath, when
24       asked, that she was told by you and -- that this
25       is what the instruction that she received from
```

Page 102

```
 1       you and Dr. Gunner. She was told that, quote,
 2       "Mrs. Smith has done something wrong and we're
 3       investigating, and we want you to know -- and we
 4       want to know as much about it as you can tell
 5       us."
 6   A   I don't recall that ever being said.
 7   Q   Well, she said it under oath.
 8   A   I understand that.
 9   Q   It would be your position that she was lying?
10   A   I did not -- I was not here -- or there to hear
11       her say that, and I don't recall ever having said
12       that.
13   Q   One thing I don't see in any of the interview
14       notes is anything, any information secured from
15       Daniel Malott. Do you know who she was?
16   A   Yes.
17   Q   Who was she?
18   A   Daniel Malott was an intervention specialist
19       teacher.
20   Q   Okay. And she was assigned to that classroom?
21   A   Yes.
22   Q   And she was in that classroom on a regular basis?
23   A   On a regular basis.
24   Q   Did you interview her?
25   A   No, I did not.
```

Page 103

```
 1   Q   Do you know if Dr. Gunner interviewed her?
 2   A   No, I do not.
 3   Q   The students who indicated to you that they saw
 4       Mrs. Smith sleeping during Study Hall, there were
 5       a number of those, right?
 6   A   Yes.
 7   Q   Can you tell me how many times they made that
 8       observation?
 9   A   How many times, pardon?
10   Q   They made the observation.
11           MS. GRIGSBY: You mean during the
12       course of the interview or the number or --
13           THE WITNESS: Yes, I'm unclear as to
14       how many times.
15       BY MR. BELAZIS:
16   Q   Well, to the extent that any student said that "I
17       saw her sleeping in class," did you try to pin
18       down how many times they made that observation?
19           MR. BELAZIS: Let me withdraw that
20       question and ask a different one.
21   Q   Did you ask any of the students what time it was
22       when they observed Mrs. Smith sleeping; in other
23       words, what part of the Study Hall period?
24   A   I've got one stating here -- two students on my
25       handwritten notes, that I notated, that said she
```

Page 104

```
 1       was dozing off during Study Hall.
 2   Q   Okay. My question is, what time did that occur?
 3       Was it at the very beginning of the Study Hall,
 4       the very end of the Study Hall, the middle of the
 5       Study Hall, as they were walking in?
 6   A   I don't recall asking that.
 7   Q   Okay. Good enough.
 8           MR. BELAZIS: Let's mark these.
 9       BY MR. BELAZIS:
10   Q   By the way, just back to your earlier question
11       about some students paying closer attention. Did
12       you conclude that the students, who made the
13       statement that they saw Mrs. Smith sleeping, were
14       paying closer attention?
15   A   Closer attention to what?
16   Q   I'm just parroting what said. You said the
17       students -- I asked you how you could reconcile
18       the fact that some students said they never saw
19       her sleep and other students who said that she
20       slept regularly? And I asked you how you
21       reconciled that? And your answer was some
22       students were paying closer attention.
23   A   To Mrs. Smith.
24   Q   Right. So my question is, was it your conclusion
25       that those students who said they saw Mrs. Smith
```

HUNTLEY REPORTING SERVICE
1.800.247.8360

Electronically signed by Lori Delhees (001-331-145-7890)          506ce57f-9464-4a42-b46e-f05c965b0a0f

Page 105

1   sleeping must have been paying closer attention?
2  A  To Mrs. Smith, that's my answer.
3  Q  That was your conclusion?  That was your
4     conclusion, right?
5  A  Yes.
6        THEREUPON, Plaintiff's Exhibit 16 was marked
7     for identification.
8  Q  Handing you what's been marked as Plaintiff's
9     Exhibit 16.
10        MS. GRIGSBY:  Is that an extra copy?
11        MR. BELAZIS:  Yes.  It's not like you
12     haven't seen these.
13        MS. GRIGSBY:  True.
14  BY MR. BELAZIS:
15  Q  Have you seen these photos before?
16  A  Yes.
17  Q  And these were photos provided to you by students
18     in the class, right?
19  A  Yes.
20  Q  And they said that they took those during the --
21     well, what did they say?
22  A  These are students that are in her fifth -- that
23     were in her fifth period class.
24  Q  And the photographs, according to the students,
25     if you recall, were taken during what?  Oh, by

Page 106

1     fifth period.
2  A  During fifth period.
3  Q  And that would be the Study Hall?
4  A  I don't know exact time as to when they were
5     taken, but part of that period, but it would be
6     during that class, class period.
7  Q  And that -- but that would include the Study
8     Hall?
9  A  Yes, it would.
10  Q  And you don't know what day these were taken?
11  A  No, I do not.
12  Q  You don't know if they were all taken on the same
13     day?
14  A  It appears that these two, and that's just an
15     appearance to me because --
16  Q  I'm just asking you if you know?
17  A  No.
18  Q  And you don't know what time these were taken?
19  A  No.
20  Q  Mrs. Smith had a lunch period right before the
21     Study Hall began?
22  A  That's correct.
23  Q  Okay.  Is there any rule against sleeping during
24     your lunch period?
25  A  For a teacher?

Page 107

1  Q  For a teacher.
2  A  No.
3  Q  All right.  Do you know whether the bell had
4     already rung when these photographs were taken?
5  A  No.
6  Q  And you didn't ask that question?
7  A  I'd have to go back and look.
8  Q  Feel free.
9  A  I believe -- could you -- specifically you're
10     asking about these pictures?
11  Q  These pictures.  Just so I'm clear here, without
12     looking in your notes, you don't have a
13     recollection one way or the other?
14  A  I'm looking for a specific student, this specific
15     student to see.
16  Q  Okay.  I see you're looking at typewritten notes?
17  A  Yes.
18  Q  Which you didn't prepare?
19  A  That's correct.
20  Q  And you're using those to refresh your
21     recollection?
22  A  I was present while they were interviewed.
23  Q  Okay.
24  A  For this particular student who we interviewed on
25     the 29th, he had "Sleeping during Study Hall, not

Page 108

1     during class, arms folded and head back several
2     times a week, and photo booth pictures," which I
3     believe that's the computer program that was used
4     to take that picture.
5  Q  All right.  It doesn't say whether the photo was
6     taken before the bell or after the bell, right?
7  A  No, it does not.
8  Q  And you don't recall that being asked, right?
9  A  No, I do not.
10  Q  And I know you already said that you were present
11     or conducted some interviews that Dr. Gunner was
12     not present for, correct?
13  A  That's correct.
14  Q  But you were present for all of the interviews
15     that Dr. Gunner was there for?
16  A  Yes.
17  Q  You make the assignments related to classroom, I
18     think that was your testimony during the Sawmill
19     Creek hearing?
20  A  Myself and the Assistant Principal, yes.
21  Q  And would it be -- would you agree with the
22     proposition that it would be inappropriate as a
23     High School Principal to assign a teacher to walk
24     a long distance if you know that she had this
25     physical disability that prevents her from

27 (Pages 105 to 108)

Electronically signed by Lori Delhees (001-331-145-7890)          506ce57f-9464-4a42-b46e-f05c965b0a0f

## Page 109

1      walking that distance?
2 A   If I knew that, yes.
3 Q   The discussion related to pornography, are you
4      familiar with -- you know what I'm talking about?
5 A   Yes.
6 Q   All right.  Would you characterize any allusion
7      to Playboy or Playgirl as being pornographic?
8 A   It depends upon the context.
9 Q   Okay.  Are there some circumstances where you
10      would not consider it to be pornographic?
11 A   It depends upon what the conversation --
12 Q   I understand that.  So can I assume from that
13      that you would agree, at least under some
14      circumstances, an allusion to Playboy or Playgirl
15      would not be pornographic, in your opinion?
16 A   It would be very narrow circumstances in school.
17 Q   Okay.  Would you regard an allusion to Nick Nolte
18      and his appearance as a centerfold in Playgirl,
19      as a way to jump start his career; would you
20      consider that to be pornographic, in that
21      context?
22 A   Personally or professionally?
23 Q   Either one.
24 A   Personally, what the person does with their own
25      time is okay; but in school I have to have

## Page 110

1      consideration of what's being shown to students.
2 Q   That's fine.  But my question was about a --
3      MR. BELAZIS:  Read back my question.
4      THEREUPON, the Reporter read the requested
5      portion of the record.
6      BY MR. BELAZIS:
7 Q   And by allusion, I mean, I speak to reference,
8      not pulling out the centerfold?
9      MS. GRIGSBY:  A reference made in
10      school?
11      MR. BELAZIS:  Yes.
12 A   I think it's very -- I think it's not
13      appropriate.
14      BY MR. BELAZIS:
15 Q   Were you around when -- by the way, do you
16      consider that to be pornographic?
17 A   No.
18 Q   Okay.
19      MR. BELAZIS:  Let's mark that.
20      THEREUPON, Plaintiff's Exhibit 17 was marked
21      for identification.
22      BY MR. BELAZIS:
23 Q   That's Burt Reynolds, right?
24 A   I believe so.
25 Q   What the students said was that Mrs. Smith refers

## Page 111

1      to the fact that Nick Nolte and Burt Reynolds had
2      both jump started their careers by appearing in
3      Playgirl; is that correct?
4 A   I don't recall that conversation.
5 Q   All right.  I don't have a copy of this, but I'm
6      just going to hand you what I think you can
7      properly identify is the yearbook for the Perkins
8      School District for 1984.  And I wonder if you
9      could look at the bottom left hand corner of the
10      page, which is page 50, and describe it for the
11      record.
12 A   The bottom of page 50 shows, I think, three girls
13      with their hands over their mouths looking into
14      what appears to be Playgirl Magazine.
15 Q   And the inference is they're are looking at
16      nudity, perhaps the centerfold, right?
17      MS. GRIGSBY:  Objection.
18 A   I wouldn't begin to know what the inference is.
19      BY MR. BELAZIS:
20 Q   Okay.  Now, this didn't sneak in by accident, did
21      it?
22 A   I was not an administrator at the time.
23 Q   Would you regard this as pornographic?
24 A   I would regard it in poor taste for a high school
25      yearbook.

## Page 112

1 Q   Do you know whether Mrs. Smith was around at the
2      time?
3      MS. GRIGSBY:  Objection.
4 A   I believe we covered that earlier in terms of
5      28 years and I started in 1982.
6      THEREUPON, Plaintiff's Exhibit 18 was marked for
7      identification.
8      MS. GRIGSBY:  I'm going to object to
9      the authenticity of the two documents.
10      MR. BELAZIS:  That's fine.  Go ahead.
11      BY MR. BELAZIS:
12 Q   Now, I've handed you what's been marked as
13      Plaintiff's Exhibit 18.  Is that the same
14      Playgirl Magazine that appeared in the Perkins
15      1983 yearbook?  Would you like to take a look?
16 A   Yes, please.
17      MS. GRIGSBY:  Well, then I particularly
18      object, because if we don't know this is
19      authentic, then I don't know that we can know
20      that that is.
21      MR. BELAZIS:  Okay, you can object
22      away.  You know, every time I look for it I can't
23      find it.
24      THE WITNESS:  Wasn't there a --
25      MR. BELAZIS:  Oh, I lost that too.  Oh,

Electronically signed by Lori Delhees (001-331-145-7890)

506ce57f-9464-4a42-b46e-f05c965b0a0f

Page 113

1  it was on page 50 though, isn't it?  Here we go.
2        THE WITNESS:  I can't see the date on
3  it, but.
4  BY MR. BELAZIS:
5  Q   I'm just asking.
6  A   It does appear to be Harrison Ford in both.
7  Q   Mr. Obergefell?
8  A   Obergefell.
9  Q   Right.  I know you were asked about him at
10  Sawmill Creek?
11  A   Yes.
12  Q   And you were asked questions about the video
13  involving the death of Daniel Perlman, right?
14  A   I don't recall the name of the death of the
15  individual.
16  Q   Okay.  Well, you do recall that he showed a video
17  in his class of a beheading?
18  A   Yes.
19  Q   Human beheading?
20  A   Yes.
21  Q   But you don't know which, which beheading that
22  was?
23  A   Which --
24  Q   Is that fair?
25  A   -- individual was beheaded, I do not know that

Page 114

1  name.
2  Q   You didn't conduct any investigation?
3  A   I spoke to him, because he came down and spoke to
4  me.
5  Q   I understand that.  But you didn't conduct any
6  investigation as to the nature of the video that
7  he showed to his class?
8  A   I spoke with him afterwards about what had
9  happened.
10  Q   Did you look at the video?
11  A   No, I did not.
12  Q   So you don't know how --
13  A   I did not see the video.
14        MS. GRIGSBY:  Graphic?
15        MR. BELAZIS:  Graphic, thank you.
16  BY MR. BELAZIS:
17  Q   You don't know how graphic the video was?
18  A   I did not see the video.
19  Q   And you did not interview any of the students in
20  his class to find out how uncomfortable that made
21  them feel?
22  A   I took his word that he had shown it.
23  Q   I understand that.  But you didn't interview any
24  of the students in his class to find out how they
25  responded to it?

Page 115

1  A   No.
2  Q   And you didn't talk to -- you didn't find out
3  whether he had gotten permission from any of the
4  parents to show it?
5  A   I did ask him and he did not.
6  Q   He did not.  And you didn't view the video
7  yourself to determine how appropriate or
8  inappropriate it had been?
9  A   No, I did not.
10  Q   And you didn't take any disciplinary action
11  against him?
12  A   Yes, we did.
13  Q   Well, let me ask you a question, I'm glad you
14  reminded me.  Because I've got Mr. Obergefell's
15  personnel file and there's no disciplinary action
16  in there related to this, at least that I saw.
17  Is there any reason to think that your
18  disciplinary actions are not included in the
19  teacher's personnel file?
20  A   Because of progressive discipline there might be
21  a reason why it was removed after a certain
22  period of time.
23  Q   Did you give him a verbal reprimand or a written
24  reprimand?
25  A   No, it was a written.

Page 116

1  Q   What, is there a policy on removal of
2  disciplinary, written disciplinary materials?
3  A   I believe there was at the time in the contract.
4  Q   What was it?
5  A   After X number of years, if there are no further
6  incidences, that there would be removal of the
7  letter.
8  Q   Okay.  Can I assume that during the time when you
9  and Dr. Gunner were interviewing these students
10  about who witnessed Mrs. Smith Social Studies and
11  Study Hall, that you didn't advise any of them
12  that Mrs. Smith had an eye problem that caused
13  her to periodically close her eyes; you didn't
14  bring that to their attention?
15  A   To?
16  Q   The students, did you tell any of the students?
17  A   I did not.
18  Q   Did Dr. Gunner?
19  A   I do not know.
20  Q   Do you recall hearing him tell any of them?
21  A   Could you repeat the question, please?
22  Q   Let me restate it.  Do you recall hearing
23  Dr. Gunner tell any of these students that
24  Mrs. Smith had an eye problem that caused her to
25  periodically close her eyes?

Electronically signed by Lori Delhees (001-331-145-7890)                    506ce57f-9464-4a42-b46e-f05c965b0a0f

Page 117

1   A    No, I do not.
2   Q    Is there a business teacher or a teacher that
3        teaches business classes at Perkins High School
4        currently?
5   A    Yes.
6   Q    And who is that?
7   A    I do not know, I haven't been there.
8   Q    Oh, that's right.  Well, does Carol Styles ring a
9        bell?
10  A    Yes.
11  Q    And she was there and hired while you were still
12       there?
13  A    Yes.
14  Q    And she was recommended by you and the high
15       school committee?
16  A    By the committee, yes.
17  Q    What exactly did she teach, at least that first
18       year, while you were still there?
19  A    I'd have to look back at the -- I don't recall.
20       I'm sure it was Accounting.  Probably a Business
21       class, but I'd have to look back at the syllabus.
22  Q    Was she a full-time member of the teaching
23       facility?
24  A    I do not recall.
25  Q    Any reason to think she was not a full-time

Page 118

1        member of the teaching facility?
2   A    Enrollment was low in Business classes.
3   Q    That's my point.  So do you know whether she was
4        a full-time or part-time member of the teaching
5        faculty?
6   A    I'd so have to look back at our syllabus.
7   Q    Okay.  Do you know if she taught anything other
8        than Business classes?
9   A    No, I don't recall.
10  Q    You don't recall that she did teach anything
11       different?
12  A    Other than Business classes.
13  Q    All right.
14  A    Are --
15  Q    You can ask a question if you need clarification.
16  Q    Is Marketing the same as Business?
17  Q    You tell me.
18  A    There's a difference between Accounting and
19       Business, Marketing.
20  Q    Does she teach Marketing, too?
21  A    I don't know.
22  Q    All right.  If you could, there was a point at
23       which Keyboarding was eliminated?
24  A    Yes.
25  Q    Was it replaced with anything?

Page 119

1   A    Nothing in terms of similar to that.
2   Q    There was nothing that would allow the students
3        to learn how to type?
4   A    No.
5   Q    Do you know why it was eliminated?
6   A    We figured that we, with our One-to-One Program,
7        that they were learning at an early age and that
8        there was not the need for Keyboarding.
9   Q    Well, why don't you, if you don't mind, try to
10       interpret that for me?  That was provided to me
11       by the District through your counsel?
12            MS. GRIGSBY:  May I?
13            MR. BELAZIS:  Oh, I'm sorry.
14            THEREUPON, Plaintiff's Exhibit 19 was marked
15       for identification.
16  Q    You've been handed what's been marked as
17       Plaintiff's Exhibit 19.  And that's a roster, at
18       least according to the discovery responses
19       received from the District, this is a roster of
20       Mrs. Smith's class, and it would appear to be for
21       the 2008-2009 school year, and also for 2009-2010
22       school year; is that correct?
23  A    Is it a roster or is it a request, course
24       request?
25  Q    Well it's --

Page 120

1   A    It only says, "Roster."
2   Q    Well, I asked for a roster and it says, "Roster."
3        Okay.
4   Q    So I don't know, because I didn't prepare this.
5        Who would have prepared this?
6   A    I don't know.
7            MR. BELAZIS:  Do you know who?
8            MS. GRIGSBY:  I don't know who printed,
9        the button to, you know.
10           MR. BELAZIS:  Can we get them down here
11       real quick?
12           MS. GRIGSBY:  No.
13  A    I'm unsure as to whether it's a roster or whether
14       it's a course request.
15  BY MR. BELAZIS:
16  Q    All right.  That's fair enough.  One thing I'm
17       unclear about is, is that by 2008-2009 school
18       year I thought Keyboarding had already been
19       eliminated, no?
20  A    I don't know.
21  Q    Maybe this was at the --
22           MS. GRIGSBY:  I think it's 09-10.
23           MR. BELAZIS:  Uh-huh.
24           MS. GRIGSBY:  Off the record.
25           ///

30  (Pages 117 to 120)

Electronically signed by Lori Delhees (001-331-145-7890)          506ce57f-9464-4a42-b46e-f05c965b0a0f

Page 121

1  THEREUPON, there was a discussion off the
2  record.
3  MR. BELAZIS:  Let's mark that, please.
4  THEREUPON, Plaintiff's Exhibit 20 was marked
5  for identification.
6  BY MR. BELAZIS:
7  Q   Can you identify that, please?
8  A   It is an evaluation form dated June 6th through
9  the evaluation of 2007, and June 6th -- June 7th
10  of '07 for the final review.
11  Q   That's an evaluation of Carol Smith?
12  A   Carol Smith, yes.
13  Q   That you carried out?
14  A   For Keyboarding at Perkins High School --
15  Q   And you prepared it?
16  A   -- that I prepared.
17  Q   And you signed it?
18  A   And signed.
19  Q   Okay.  And it would be safe to say that she met
20  the standards of the District as a classroom
21  teacher, almost -- well, really in every respect,
22  right?
23  A   There are four categories and many of them are,
24  most of them are M's for Meets, there's a couple
25  of MIR's, and a couple of E's.

Page 122

1  Q   E meaning Excellent, right?
2  A   Yes.  M meaning Meets, MIR meaning Meets with
3  Improvement Recommended.
4  Q   And the number that --
5  A   I don't have it counted, the totals.
6  Q   The number indicating Meets with Improvement
7  recommended is not an unusual number, right,
8  relatively few?
9  A   Nobody is perfect, so.
10  Q   And you've had a number of those yourself over
11  the course of your career?
12  A   Yes, I would imagine.
13  Q   And you're still employed, right?
14  A   I would like to go back and look at mine before I
15  make that re -- or make that confirmation.
16  Q   Go back and look to see if you're still employed,
17  you mean?
18  A   No, to go back and look and see how many Meets,
19  MIR's.
20  Q   Depending on how you answer it, I mean.
21  A   Thank you.
22  Q   Well --
23  THEREUPON, there was a discussion off the
24  record.
25  THEREUPON, Plaintiff's Exhibit 21 was marked

Page 123

1  for identification.
2  BY MR. BELAZIS:
3  Q   You've had a chance to review what's been marked
4  as Plaintiff's Exhibit 21?
5  A   Yes.
6  Q   And, again, this is a Performance Evaluation
7  completed by you with regards to Mrs. Smith,
8  right?
9  A   Yes.
10  Q   And it relates to the -- well, you prepared it on
11  November 28, 2008 and had a final review with
12  Mrs. Smith on December 2, 2008; is that correct?
13  A   I have Tuesday, November 18, 2008.
14  Q   That's when you prepared it, right?
15  A   Correct.
16  Q   And then you had a final sign on and review --
17  A   A final review on December 2nd --
18  Q   -- on December 2nd?  Okay.
19  A   -- of 2008, yes.
20  Q   And, again, the same thing, there's Excellent,
21  Meets but Requires Improvement, and Doesn't Meet,
22  in other words, unacceptable?
23  A   Yes.
24  Q   And, again, in general, this is, you found
25  Mrs. Smith to meet standards with a couple of

Page 124

1  exceptions where you thought she needed
2  improvement?
3  A   Yes.  This time there were X's in two categories
4  of Planning and Professionalism at the back.
5  Q   Okay.  And, of course, in this document there's
6  no reference anywhere to sleeping on the job?
7  A   I see none.
8  THEREUPON, Plaintiff's Exhibit 22 was marked
9  for identification.
10  BY MR. BELAZIS:
11  Q   Okay.  So now we get to what's been marked as
12  Plaintiff's Exhibit 22, which is a Performance
13  Evaluation dated March 4, 2009, prepared by
14  Mr. Finn, who is the Principal at the middle
15  school; is that right?
16  A   That's correct.
17  Q   And in it there's quite a significant departure
18  from previous evaluations, in that she,
19  Mrs. Smith, is found to be In Need of Improvement
20  on -- in most areas; is that right?
21  A   In looking at the last page, 4 out of the 6, yes.
22  Q   And Keyboarding is a class that Mrs. Smith had
23  been teaching for years; is that correct?  Many
24  years?
25  A   At the high school, yes.

31  (Pages 121 to 124)

Electronically signed by Lori Delhees (001-331-145-7890)                    506ce57f-9464-4a42-b46e-f05c965b0a0f

Page 125

```
 1   Q    And she had never been found to be deficient in
 2        any significant way by anyone during all of the
 3        years that she had been teaching Keyboarding; is
 4        that correct?
 5            MS. GRIGSBY:  Objection.
 6        BY MR. BELAZIS:
 7   Q    To the best of your recollection?
 8   A    Nothing that I've seen in any evaluations.
 9   Q    And you had been evaluating, or you or your
10        assistant, for 15 years, right, prior to this
11        time?
12   A    I was not always the one to evaluate her.
13   Q    You or your assistant, right?
14   A    Well, when I was Assistant it would have been the
15        Principal, yes.
16   Q    Okay.  And for some reason Mr. Finn, rather than
17        you, is selected to prepare the evaluation, this
18        evaluation, right, even though she was part-time
19        at the high school?
20   A    Yes.
21   Q    And you had been cautioned a number of times by
22        Dr. Gunner that he didn't think you were
23        sufficiently aggressive in evaluating and
24        criticizing staff, in particular Mrs. Smith;
25        isn't that true?
```

Page 126

```
 1   A    I don't recall that.
 2   Q    Did you have any discussion about that?  Do you
 3        recall it appearing in your evaluations
 4        eventually?
 5   A    Probably in terms of evaluating people we can
 6        always improve.
 7   Q    How about "There's one staff member in particular
 8        that a variety of information has filtered to you
 9        as Principal about ongoing issues within the
10        classroom, especially of ongoing issues of
11        sleeping in class.  I would ask you to consider
12        if you have done everything in your authority to
13        follow up with these concerns."  That's pretty
14        specific, isn't it?
15   A    Yes.
16            MR. BELAZIS:  I'm going to make these
17        one composite exhibit.
18            THEREUPON, Plaintiff's Exhibit 25 was marked
19        for identification.
20            MS. GRIGSBY:  Is this your only set?
21            MR. BELAZIS:  Yes, that's my only set.
22            THEREUPON, there was a discussion off the
23        record.
24        BY MR. BELAZIS:
25   Q    If you look at the composite exhibit marked
```

Page 127

```
 1        Plaintiff's Exhibit 25.  These are all
 2        evaluations that you received, evaluations and
 3        correspondence related to the performance that
 4        you received over the course of your employment
 5        with Perkins School District.  And just so the
 6        record is clear, this is not necessarily all of
 7        them; in other words, there are other evaluations
 8        that are not included here.
 9            You've had a chance to review all of
10        the documents associated with Exhibit 25?
11   A    Yes.
12   Q    And they are all personnel records related to
13        your personal history at Perkins School District?
14   A    Yes.
15   Q    Without going into the details of all of them,
16        Mr. Gasteier, it would be safe to say you had a
17        number of bumps in the road yourself during the
18        course of your employment?
19   A    Only of which came under one particular
20        Superintendent at a very trying time for the
21        School District.
22   Q    And you still have your job?
23   A    Yes.
24   Q    And, in fact, you were allowed to retire and then
25        you were rehired?
```

Page 128

```
 1   A    Yes.
 2   Q    Did Dr. Gunner tell you that he was going to
 3        remove you as Principal from the high school if
 4        you did not move to a different position?
 5   A    I'm sorry?
 6   Q    You moved from Principal to your -- you moved
 7        from Principal to, I think, Communications
 8        Director?
 9   A    Yes.
10   Q    Did Dr. Gunner tell you that if you didn't move,
11        he would remove you?  In other words, did he give
12        you a choice?
13   A    We discussed the matter and it was agreed that we
14        would go that direction.
15   Q    He didn't want you there anymore though, did he?
16   A    I don't know, he never said that.
17   Q    Well, did he tell you that you were going to be
18        removed by him if you didn't leave that position
19        on your own?
20   A    He told me he was going to make a change.
21   Q    Okay.  And a big part of that was his displeasure
22        with the way you evaluated the staff?
23   A    He never told me that.
24   Q    Did he give you any other reason?
25   A    We talked about some things, yes.
```

32  (Pages 125 to 128)

Electronically signed by Lori Delhees (001-331-145-7890)                    506ce57f-9464-4a42-b46e-f05c965b0a0f

Page 129

| | | |
|---|---|---|
| 1 | Q | Anything that was not related to Carol Smith? |
| 2 | A | The schedule. |
| 3 | Q | The schedule.  What schedule? |
| 4 | A | The high school schedule in terms of moving on |
| 5 | | with a change into teaming. |
| 6 | Q | And Carol Smith was discussed as well, right, in |
| 7 | | your handling of that? |
| 8 | A | I don't recall that, it was more about the |
| 9 | | schedule. |
| 10 | Q | I don't understand how the schedule has anything |
| 11 | | to do with it? |
| 12 | A | We are moving from grades 9, 10, 11, and 12 into |
| 13 | | a teaming aspect where certain members of the 9th |
| 14 | | grade would now team in their teaching. |
| 15 | | Eventually the 10th grade would do the same, |
| 16 | | which they are now doing, and then there would be |
| 17 | | academies at grades 10 and 11 -- or excuse me, 11 |
| 18 | | and 12. |
| 19 | Q | And how did that figure into your continued |
| 20 | | service as Principal of the high school? |
| 21 | A | The schedule? |
| 22 | Q | Uh-huh. |
| 23 | A | He made it very clear that he was not happy with |
| 24 | | where we were at that point. |
| 25 | Q | You kept a private file related to Carol? |

Page 130

| | | |
|---|---|---|
| 1 | A | No. |
| 2 | Q | Well, I think you said in your testimony at |
| 3 | | Sawmill that you had kept a separate file? |
| 4 | A | I kept copies of the evaluations. |
| 5 | Q | And I think you also testified that there were |
| 6 | | some documents that were in your file that were |
| 7 | | personnel nature that had not been shared with |
| 8 | | her? |
| 9 | A | I'd have to go back and review. |
| 10 | Q | And, in any event, you kept some file with her |
| 11 | | personnel records? |
| 12 | A | I would keep a copy of what I sent to the Board |
| 13 | | office. |
| 14 | Q | Did you keep that for every teacher in the |
| 15 | | school? |
| 16 | A | Yes. |
| 17 | | MR. BELAZIS:  Thank you, Mr. Gasteier. |
| 18 | | MS. GRIGSBY:  I have just a couple |
| 19 | | follow-ups.  I won't be long. |
| 20 | | DIRECT-EXAMINATION OF CHRISTOPHER GASTEIER |
| 21 | | BY MS. GRIGSBY: |
| 22 | Q | Mr. Gasteier, can you personally tell the |
| 23 | | difference between a circumstance in which an |
| 24 | | individual is sleeping and a circumstance in |
| 25 | | which the individual is resting their eyes? |

Page 131

| | | |
|---|---|---|
| 1 | A | Yes, I believe I can. |
| 2 | Q | Do you think that this is something -- is it your |
| 3 | | belief that others can generally make the |
| 4 | | distinction between sleeping and resting of eyes? |
| 5 | A | Yes. |
| 6 | Q | You testified earlier that you had been in |
| 7 | | Mrs. Smith's classroom and had not seen her |
| 8 | | sleeping.  Did you ever see her resting her eyes? |
| 9 | A | No. |
| 10 | Q | You make reference in your testimony at Sawmill |
| 11 | | Creek, and there was discussion of it here today, |
| 12 | | about a conversation that you had with Mrs. Smith |
| 13 | | in which she reported to you certain rumors about |
| 14 | | people saying that she was sleeping? |
| 15 | A | (Nod indicating yes.) |
| 16 | Q | Can you tell me, as specifically as you can, what |
| 17 | | you remember about that conversation? |
| 18 | A | I don't remember the time, but I do remember the |
| 19 | | place.  I believe it was outside of our office by |
| 20 | | the workroom, the teacher workroom, and this was, |
| 21 | | I think, around the time of her eye problem and |
| 22 | | wearing a patch and her surgery.  Go ahead. |
| 23 | Q | You're recounting for me what you recall about |
| 24 | | that conversation in which she reported to you |
| 25 | | certain rumors? |

Page 132

| | | |
|---|---|---|
| 1 | A | People were accusing her of sleeping. |
| 2 | Q | Was it a lengthy conversation? |
| 3 | A | No. |
| 4 | Q | Did she ask for you to help her in any way? |
| 5 | A | No. |
| 6 | Q | Did she request accommodations of any sort at |
| 7 | | that time due to an eye problem? |
| 8 | A | No. |
| 9 | Q | Did she ever come back to you on another occasion |
| 10 | | and that because of an eye problem she needed |
| 11 | | some kind of help or assistance or accommodation? |
| 12 | A | No. |
| 13 | | MS. GRIGSBY:  That's all I got. |
| 14 | | MR. BELAZIS:  Excuse me for just one |
| 15 | | second.  Okay, once again I've lost something. |
| 16 | | Here we go.  How about we take a quick break so I |
| 17 | | can find what I'm looking for. |
| 18 | | MS. GRIGSBY:  Sure. |
| 19 | | THEREUPON, there was a brief recess. |
| 20 | | RECROSS EXAMINATION OF CHRISTOPHER GASTEIER |
| 21 | | BY MR. BELAZIS: |
| 22 | Q | If you would look, please, Mr. Gasteier, at your |
| 23 | | deposition testimony from Sawmill Creek marked as |
| 24 | | Exhibit 1 -- |
| 25 | A | 1. |

33  (Pages 129 to 132)

HUNTLEY REPORTING SERVICE
1.800.247.8360

Page 133

1  Q   -- and turn to page 642 and 643.
2  A   642 and 643?
3  Q   Yes, please.  And if you would begin on line 9 of
4      642 and read the line 6 of 643, please.  Just
5      read it to yourself.
6  A   Yes.
7  Q   Okay.  And in that segment you're being asked
8      about that same conversation where Mrs. Smith
9      approached you and told you about her surgery and
10      the fact that it caused her to rest her eyes; is
11      that correct?
12          THE WITNESS: Could you repeat the
13      question again, please?
14          THEREUPON, the Reporter read the requested
15      portion of the record.
16  A   I'm trying to look at the context, but I believe
17      so, yes.
18  BY MR. BELAZIS:
19  Q   And would you read for the record, please, that
20      portion of your response that begins on line 3 of
21      page 643?
22  A   "Its hard for me to tell whether someone is
23      resting their eyes -- someone is resting when
24      their eyes are closed or whether they're
25      sleeping."

Page 134

1  Q   Thank you.  And as far as your, the conversation
2      with Mrs. Smith during that 2007-2008 school
3      year, when she approached you, that we've been
4      talking about, the conversation was basically as
5      you described it in your testimony at Sawmill
6      Creek, right?  I mean, you explained what she
7      said and what you responded?
8  A   I believe so, yes.
9  Q   Okay.
10          MR. BELAZIS:  That's all I have.
11      Thanks.
12          THEREUPON, there was a discussion off the
13      record.
14          MR. BELAZIS:  Can we go back on.  One
15      last question.
16          MS. GRIGSBY:  Okay.
17  FURTHER RECROSS-EXAMINATION OF CHRISTOPHER
18  GASTEIER
19  BY MR. BELAZIS:
20  Q   After Mrs. Smith was fired, after she lost her
21      job, there were -- do you recall that there was
22      what has been characterized as some student
23      protest over her termination?
24  A   No, I don't recall.
25  Q   Do you recall that a number of students wore

Page 135

1      t-shirts to school?
2  A   I don't recall those.
3  Q   Okay.
4  A   I don't.
5  Q   All right.  That's fair enough.
6          MS. GRIGSBY:  Okay.
7          THEREUPON, the deposition concluded at
8      2:20 p.m.
9
10
11          /S/
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 136

1          C O R R E C T I O N S
2
3      PAGE       LINE       CORRECTION/COMMENTS
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

HUNTLEY REPORTING SERVICE
1.800.247.8360

Electronically signed by Lori Delhees (001-331-145-7890)     506ce57f-9464-4a42-b46e-f05c965b0a0f

Page 137

```
1              CERTIFICATE
2   STATE OF OHIO  )
                   ) ss.
3   COUNTY OF ERIE )
4
5       I, Lori L. Delhees, Stenotype Reporter and
    Notary Public within and for the State aforesaid,
    duly commissioned and qualified, do hereby
6   certify that the within named CHRISTOPHER
    GASTEIER was by me, before the giving of his
7   deposition, first duly sworn to testify the
    truth, the whole truth and nothing but the truth
8   in the cause aforesaid; that the deposition as
    above set forth was reduced to writing by me by
9   means of Computer-Aided Transcription; that the
    said deposition was taken pursuant to Notice and
10  was completed without adjournment; that I am not
    a relative or attorney of either party or
11  otherwise interested in the eventual outcome of
    this action.
12
13      IN WITNESS WHEREOF, I have hereunto set my hand
    and seal of office at Sandusky, Ohio this
14          day of        , 2014.
15
16
        HUNTLEY REPORTING SERVICE
17      Lori L. Delhees
        Notary Public
18      P. O. Box 1067
        Sandusky, Ohio 44870
19
        My commission expires 11/24/2017
20
21
22
23
24
25
```

Page 138

```
1              CERTIFICATE
2   STATE OF OHIO
3   COUNTY OF
4
5       I certify that this deposition was
6   signed in my presence by CHRISTOPHER GASTEIER on
7   the        day of        , 2014.
8       IN WITNESS WHEREOF, I have hereunto set my
9   hand and affixed my seal of office at        ,
10  Ohio on this        day of        , 2014.
11
12
13              Notary Public
14
15
16
17
18
19
20
21
22
23
24
25
```

35 (Pages 137 to 138)

Electronically signed by Lori Delhees (001-331-145-7890)          506ce57f-9464-4a42-b46e-f05c965b0a0f