PLAINTIFF'S
EXHIBIT
4
2-11-2014

## ARBITRATION - VOLUME II

### Page 502

1  much.
2  THE WITNESS: Thank you.
3  (Recess had.)
4  CHRIS J. GASTEIER, called for
5  examination, after being first duly
6  sworn, was examined and testified as
7  follows:
8  EXAMINATION OF CHRIS J. GASTEIER
9  BY-MR.WILLIAMS:
10  Q. Can you state your name,
11  please.
12  A. Chris J. Gasteier, James,
13  middle name.
14  Q. How do you spell Gasteier?
15  A. G A S T E I E R.
16  Q. Who is your employer, Mr.
17  Gasteier?
18  A. Perkins Public Schools.
19  Q. And how long have you worked
20  for Perkins?
21  A. I've completed 28 years
22  there.
23  Q. What position do you
24  currently hold at Perkins?
25  A. Perkins High School

### Page 503

1  principal.
2  Q. How long have you held that
3  position?
4  A. Since 2001, nine years.
5  Q. Okay. So prior to being
6  high school principal, what position did
7  you hold?
8  A. Assistant principal for five
9  years, and I taught prior to that since
10  1982.
11  Q. What did you teach?
12  A. I started out teaching
13  vocational agriculture for four years.
14  Then I taught U.S. history, social
15  studies and agriculture for the next 10
16  years.
17  Q. What teaching certifications
18  or licensure do you hold?
19  A. I still have my ag. license.
20  I have my U.S. history or my social
21  studies, comprehensive social studies
22  license. I hold a principal certificate
23  and superintendent's license.
24  Q. Have you worked for any
25  other school districts besides Perkins?

### Page 504

1  A. Prior to working at Perkins,
2  I subbed for a number of schools in
3  Erie and Huron County.
4  Q. Okay. Where did you grow
5  up?
6  A. 6712 Portland Road in Perkins
7  school district?
8  Q. So you attended Perkins as a
9  student, as well?
10  A. Yes, I graduated there in
11  1975, spent K through 12 there.
12  Q. And went to college and then
13  came back to teach?
14  A. Yes.
15  Q. What grades are at the high
16  school?
17  A. 9 through 12.
18  Q. And what age range of
19  students are we talking about in grades
20  9 through 12?
21  A. 14 through 19, sometimes a
22  little older.
23  Q. Okay. About how many
24  students currently at the high school?
25  A. Approximately 800, give or

### Page 505

1  take a few.
2  Q. And how many teachers?
3  A. About 40 plus, 42, depending
4  upon the part-time -- flex by our
5  part-time that we share with other
6  buildings.
7  Q. Like, for instance, with the
8  middle school?
9  A. Yes.
10  Q. Including those teachers,
11  about 42, maybe a few more?
12  A. 42 full-time, about five I
13  think this past year that we shared with
14  Briar and Meadowlawn, when you include
15  the band.
16  Q. Okay. As principal what are
17  your duties with respect to the teachers
18  that teach in your building?
19  A. Oversee the curriculum and
20  instruction.
21  Q. Do you have any supervisory
22  or evaluation duties?
23  A. Certainly evaluation in those
24  areas, as well.
25  Q. Okay. And briefly what are

**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY

1.800.694.4787   www.cefgroup.com   fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 • 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 • 330.253.8119

Court Reporting • Video Conferencing • Legal Video Production • Investigations
Claims Services • Process Service • Record Retrieval • Document Management • Trial Graphics

## ARBITRATION - VOLUME II

**Page 506**

1 those evaluation supervisory duties?
2     A. Drawing up a list of
3 teachers who are due for their
4 evaluation, which I share with the
5 assistant principal, Mr. Dahlmann. Then
6 we split those duties up during the
7 course of the year and we'll evaluate
8 teachers. Not every teacher is
9 evaluated every year. We have a cycle
10 that we go through.
11     Q. Do you have any duties with
12 respect to supervision and discipline of
13 teachers?
14     A. Yes.
15     Q. And what would those be?
16     A. If there is an issue, it
17 would ultimately come to me as the
18 principal of the building. And then I
19 would follow through with that
20 communicating to the superintendent.
21     Q. Okay. Do you have any
22 expectations regarding teachers when it
23 comes to their supervision of students
24 in the classroom?
25     A. Yes.

**Page 507**

1     Q. And what are those?
2     A. We have bell times. And as
3 teachers, I encourage them to be in the
4 hallways between bell times and be in
5 the classrooms when the bell rings for
6 the students.
7     Q. Okay. And what do you
8 expect them to do once they're in the
9 classroom supervising students?
10     A. There should be no disruption
11 of class. Different teachers handle it
12 in different ways in terms of the voice
13 level. It depends upon what is being
14 taught at the time.
15     But students should not be left
16 alone. Students should be under the
17 supervision of the teacher during the
18 class time.
19     Q. At all times?
20     A. At all times.
21     Q. And why is it, why is the
22 supervision of students at all times
23 important?
24     A. We're talking about high
25 school adolescents who are not adults.

**Page 508**

1 And it is important that they be
2 supervised, because there are some
3 things that could happen that could
4 either harm students or be inappropriate
5 actions by students at the time.
6 Therefore, we rely on the adults, the
7 teachers to be in charge of the
8 supervision.
9     Q. Okay. Do you have the same
10 expectations of teachers who are
11 supervising students in a study hall?
12     A. Yes.
13     Q. And why is that?
14     A. Once again we're talking
15 about adolescents. We're talking about
16 school safety for the students. And
17 whether they're in a classroom or study
18 hall, if they're supervising students,
19 the expectations would be the same.
20     Q. Okay. If you could turn to
21 the large notebook in front of you.
22 Not that one, the other one. If you
23 could turn, please, to tab 3, which is
24 Board Exhibit 3. It's a pretty lengthy
25 document. If you could take a moment

**Page 509**

1 to see if you can identify that document
2 as a whole?
3     A. It looks like what would
4 come out of our teacher handbook in
5 terms of our directory and assignments.
6     Q. Okay.
7     A. As a matter of fact, as I go
8 on, it looks like the teacher handbook.
9     Q. Okay. And what is --
10 briefly, what is the -- what's the
11 purpose of the teacher handbook?
12     A. The teacher handbook is very
13 similar to the student handbook, and
14 it's the guidelines for the teachers to
15 follow during the course of the year.
16 And it has a number of listings in
17 terms of what is taught, the
18 expectations of the teachers,
19 directories, et cetera.
20     Q. Okay. Helpful information
21 about bell schedules, directories of
22 teachers, that kind of information?
23     A. Yes.
24     Q. Okay.
25     A. And guidelines.

**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY
1.800.694.4787    www.cefgroup.com    fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 · 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 · 330.253.8119

Court Reporting • Video Conferencing • Legal Video Production • Investigations
Claims Services • Process Service • Record Retrieval • Document Management • Trial Graphics

## ARBITRATION - VOLUME II

### Page 510

1   Q.  And guidelines.  There is --
2   and unfortunately the pages aren't
3   numbered, so I'll have to give a
4   description of the page.
5       But there's a page about
6   two-thirds of the way through this book.
7   And at the top of the page it says,
8   school duty, hours for professional
9   staff.  Do you have that page?
10      A.  Yes.  It says school duty
11  hours and underneath student study
12  halls.
13      Q.  Okay.
14      MR. SHOUB:  I'm sorry.  Just a
15  minute.  Two-thirds of the way back?
16      MR. WILLIAMS:  Yeah, two-thirds
17  of the way back.  It says school duty
18  hours.
19      THE WITNESS:  It looks like this.
20      MR. SHOUB:  I've seen it.
21      THE ARBITRATOR:  Who didn't
22  number the pages?
23      MR. WILLIAMS:  They don't come
24  numbered apparently.
25      THE WITNESS:  I can take that

### Page 511

1   under advisory for the future.
2       MR. SHOUB:  Is it after the
3   master schedule?
4       MR. WILLIAMS:  Yes.
5       THE WITNESS:  If you go to the
6   back and start forward, it might be
7   better.  If you look at the telephone
8   directory.  And then --
9       MR. SHOUB:  Yes.
10      MR. WILLIAMS:  It's seven or
11  eight pages.
12      THE WITNESS:  It's two pages
13  passed the telephone.
14      MR. SHOUB:  School duties,
15  professional staff.
16      MR. WILLIAMS:  Yes.
17      THE ARBITRATOR:  What it's
18  called?
19      MR. WILLIAMS:  It says school
20  duties hours, professional staff at the
21  top.
22      THE ARBITRATOR:  Okay.
23      Q.  On this page, what's being
24  set forth with respect to student study
25  hall, why is that in here?

### Page 512

1       A.  To make sure that all of our
2   teachers handle it in the same and
3   similar fashion and what our
4   expectations as the administration is.
5       Q.  Okay.  So this sets forth
6   expectations of teachers in their
7   supervision of study halls?
8       A.  Yes, sir.
9       Q.  Okay.  And the numbers
10  there, are those options for what can
11  occur in study hall?
12      A.  Yes.
13      Q.  And then that next paragraph
14  where there's some bolded language, what
15  is that -- what's the purpose of that
16  language for teachers?
17      A.  I'm going to answer, it's to
18  not have any of that happen, with the
19  exception that in May of this past year,
20  we did allow electronic devices, so that
21  second sentence.  We sent home an
22  advisory to parents, but otherwise, all
23  that bold was not to occur during study
24  hall.
25      Q.  Okay.  So no card playing?

### Page 513

1       A.  They were supposed to be
2   studying, and in groups, or taking
3   advantage of one of those numbers 1
4   through 4 above that, not doing the
5   bold.
6       Q.  Okay.  And the groups, when
7   would it be permissible for students to
8   be in groups in study hall?
9       A.  With permission of the
10  teacher or the supervisor in the study
11  hall.
12      Q.  Okay.  And what were they to
13  be doing in groups?
14      A.  Studying.
15      Q.  Okay.  Engaging in a study
16  related purpose --
17      A.  Yes, sir.
18      Q.  -- as a group project?
19      A.  Group project, collaborative
20  learning.
21      Q.  Okay.
22      A.  Quizzing one another.
23      Q.  Okay.  Would it be
24  permissible for students to play video
25  games in study hall?



**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY

1.800.694.4787     www.cefgroup.com     fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 · 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 · 330.253.8119

Court Reporting · Video Conferencing · Legal Video Production · Investigations
Claims Services · Process Service · Record Retrieval · Document Management · Trial Graphics

ARBITRATION - VOLUME II

**Page 514**

1    A. No electronic devices would
2  have taken care of that.
3    Q. Okay. Would it be
4  permissible for a student to leave the
5  classroom without permission in study
6  hall?
7    A. No, sir. No.
8    Q. Or to throw papers --
9    A. No.
10   Q. -- or plastic bottles in
11  study hall?
12   A. No.
13   Q. Is it permissible for
14  teachers to sleep during study hall?
15   A. No.
16   Q. What about during class?
17   A. No.
18   Q. And why not?
19   A. Supervisory conditions would
20  not be occurring, if the monitor, the
21  teacher, whoever was in charge of
22  watching the study hall was not paying
23  attention.
24   Q. Okay. Are you familiar with
25  who Carol Smith is?

**Page 515**

1    A. Yes, I am.
2    Q. And who is Carol Smith?
3    A. She's sitting to my left.
4    Q. Okay. And she --
5    A. She is a teacher, had been a
6  teacher at Perkins High School for a
7  number of years.
8    Q. Okay. How long during the
9  time you've been there has she been
10  there?
11   A. I believe all 28 years.
12   Q. Okay. How long have you --
13  is that how long you've known Mrs.
14  Smith?
15   A. I've known her longer than
16  that.
17   Q. How is it you've known her?
18   A. She has children that are
19  roughly my age, and at least one of
20  those when I was a teenager worked on
21  our farm picking strawberries.
22   Q. And you were in his -- and
23  her -- her son --
24   A. Roz.
25   Q. -- or her daughter?

**Page 516**

1    Okay. Her daughter?
2    A. Roz.
3    Q. You knew her daughter?
4    A. Yes.
5    Q. Do you know her son, Chris
6  Smith?
7    A. Yes, I do.
8    Q. And who is he?
9    A. He's currently our cross
10  country coach. Prior to that I've known
11  Chris for a long time, too. He
12  graduated after I started teaching, I
13  believe, in 1984. And he was a Perkins
14  school board member for a number of
15  years, I don't recollect how many.
16   Q. Okay. How many members are
17  on the board of education?
18   A. Five.
19   Q. Okay. So he would have been
20  one of those five members of the board
21  of education?
22   A. Correct.
23   Q. And do you have any
24  understanding as to what the role of the
25  members of the board of education is?

**Page 517**

1    A. They're to set policy for
2  the school district.
3    Q. Do they ultimately approve
4  any hiring of employees?
5    A. Yes. Yes, they do, as per
6  the recommendation of the school
7  superintendent.
8    Q. Approval all of contracts?
9    A. Yes.
10   Q. Did Mrs. Smith work in your
11  building?
12   A. Yes, she did.
13   Q. And what did she teach in
14  your building?
15   A. This past year it was
16  business classes, accounting classes and
17  social studies, modern world history.
18   Q. Okay. Is that what she
19  always taught or did she teach something
20  different --
21   A. No.
22   Q. -- prior to this?
23   A. That was her schedule this
24  year in my building.
25   Prior years, it was mostly

**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY

1.800.694.4787     www.cefgroup.com     fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 • 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 • 330.253.8119

Court Reporting • Video Conferencing • Legal Video Production • Investigations
Claims Services • Process Service • Record Retrieval • Document Management • Trial Graphics

## ARBITRATION - VOLUME II

**Page 518**

1  business. She had been a shared teacher
2  with Briar for a year prior to this
3  past year. And I believe a number of
4  years ago she had also been at Briar,
5  as well.
6      Q. Okay.
7      A. I believe that -- I'm not
8  sure, but I believe that was prior to
9  my administrative time.
10      Q. Okay. And when she had
11  taught prior to this year, it was
12  business classes, you said?
13      A. At the high school, yes.
14      Q. Okay. Prior to the
15  2008/2009 school year, which would have
16  begun late August of 2008, had you ever
17  had any discussions with Mrs. Smith
18  regarding her sleeping on the job?
19      A. She had in passing about her
20  health issues and closing of her eyes,
21  because she had some surgery, I believe.
22      Q. Okay. What do you recall of
23  that conversation?
24      A. As best I can, it was that
25  she -- we were talking about I think

**Page 519**

1  supervision. And she mentioned that
2  there were people who were saying that
3  she was sleeping, and that wasn't true,
4  because she had one eye that she was
5  almost blind in, and that she would
6  occasionally close the other eye to rest
7  it.
8      Q. Okay. And what did you say
9  in response to her then?
10      A. That we had to make sure
11  that we were not sleeping in class, that
12  we were supervising students at all
13  times.
14      Q. Okay. So she -- do you
15  recall about when this conversation
16  occurred?
17      A. It would have been during
18  the school year prior to the 08/09 year.
19      Q. So sometime during the 07/08
20  school year?
21      A. Yes.
22      Q. Okay. And she had said to
23  you that she had heard other people were
24  saying that she appeared to be sleeping
25  in class? You have to say yes or no.

**Page 520**

1      A. Yes. I'm sorry.
2      Q. That's okay.
3      A. I was shaking my head.
4      Q. Yeah, she can take down the
5  words we say, but not so much the
6  gestures.
7      A. Yes.
8      Q. You said what she had said
9  to you. Had you similarly heard that
10  reports in your position --
11      A. Yes.
12      Q. -- as the principal, that
13  she had been observed possibly
14  sleeping --
15      A. Yes.
16      Q. -- or appearing to be
17  sleeping in class?
18      Okay. So as a result of that
19  conversation you -- if I understand your
20  testimony, you impressed upon her the
21  importance of not sleeping in class?
22      A. Yes.
23      Q. Okay. What is a fire drill?
24      A. An evacuation of the
25  building.

**Page 521**

1      Do you want to know what our
2  fire drills are?
3      Q. Yes. For Perkins High
4  School, what's the procedure for a fire
5  drill?
6      A. That's gone back and forth
7  for a number of years. But three or
8  four years ago we settled that we were
9  going to have one evacuation drill.
10  That was going to cover fire,
11  evacuation, whatever, so we called it an
12  evacuation drill.
13      We have two areas that we go to.
14  One is called Scott Fry Lane where a
15  portion of the building evacuates their
16  classrooms and goes down Scott Fry Lane.
17  Another goes to the north end of the
18  building, which we call the -- there's a
19  walkway that goes around, a path, a walk
20  path that goes around towards Marshall
21  Avenue, and the other half of the
22  building goes down there.
23      When we evacuate the buildings,
24  every teacher has to carry a plastic
25  folder. In that they have their class

**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY
1.800.694.4787    www.cefgroup.com    fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 · 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 · 330.253.8118

Court Reporting · Video Conferencing · Legal Video Production · Investigations
Claims Services · Process Service · Record Retrieval · Document Management · Trial Graphics

## ARBITRATION - VOLUME II

### Page 522

1  rosters and attendance. They take
2  attendance. It's on a half sheet of
3  paper. It's color coded by the area of
4  the building that they're in.
5        They hand that to an evacuation
6  captain who then gives it to Mr.
7  Dahlmann or myself at the conclusion of
8  the evacuation drill.
9        Q. Okay. Are all people within
10  the building expected to leave during
11  the fire drill?
12        A. If it's a drill, everyone is
13  expected to leave, except for me, and
14  SRO possibly and one of the fire people
15  to walk through the building to make
16  sure that there aren't other people --
17  that there are no other people in the
18  building. That includes cooks,
19  cafeteria workers, custodians, everybody
20  is expected to go.
21        Q. What's an SRO?
22        A. School resource officer.
23        Q. Is that an employee
24  of the district or is that an actual
25  police officer?

### Page 523

1        A. It's an actual police
2  officer.
3        Q. Okay. Someone who --
4        A. Currently there's an
5  agreement, I believe, with the board of
6  education. I don't know how their
7  salaries are paid. But it is an actual
8  police officer, and they were employed
9  by the Perkins Police Department.
10        Q. Okay. And perhaps there's a
11  reimbursement, if you're suggesting that
12  the district provides, because that
13  person is in the school all day?
14        A. I'm not privy to that
15  information, but.
16        Q. Okay.
17        A. Yes.
18        Q. The teacher's role, if I
19  understood what you said, was to have a
20  plastic binder?
21        A. Yes.
22        Q. And to -- what are the
23  teacher's duties with respect to the
24  individual students in his or her
25  classroom?

### Page 524

1        A. Once they're out to those
2  areas -- well, first of all, they're
3  supposed to accompany their students
4  down, whether it's the stairwell, the
5  hallway, close the windows, close the
6  doors, shut the lights off. Accompany
7  the classroom down to that area, then
8  take attendance once they're there.
9        Any student who might be in their
10  room that was not supposed to be there
11  on a regular basis, but might have been
12  visiting getting help or assistance,
13  they notate that on the list as somebody
14  who's not usually there, so that we can
15  check the other sheets.
16        If somebody is missing from the
17  classroom, during the evacuation drill,
18  that's also noted.
19        MR. SHOUB: I'd just like to
20  raise an objection about this testimony,
21  Mr. Taich. Again this is not something
22  that's part of the charges against Mr.
23  Smith. We had this issue come up
24  yesterday, I believe, as well. And I
25  just want to renew the objection.

### Page 525

1        THE ARBITRATOR: All right.
2  Where in the charges?
3        MR. WILLIAMS: The basis for
4  asking these questions is that in the
5  superintendent's recitation of prior
6  discipline which had occurred with Mrs.
7  Smith, one of them dealt with failure to
8  leave as part of the fire drill. And
9  again looking at the overall record of
10  the teacher was something that had been
11  again put as part of the letters of
12  discipline.
13        THE ARBITRATOR: Is this going
14  into -- what school year are we talking
15  about?
16        MR. WILLIAMS: The end of the
17  07/08, I believe May of 08.
18        THE ARBITRATOR: So this is going
19  to the pattern of conduct, but not the
20  pattern of conduct with regard to
21  tardiness and sleeping?
22        MR. WILLIAMS: Correct.
23        THE ARBITRATOR: All right. I'll
24  hear it. Don't spend a lot of time on
25  this, to be honest.

**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY

1.800.694.4787    www.cefgroup.com    fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 • 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 • 330.253.8119

Court Reporting • Video Conferencing • Legal Video Production • Investigations
Claims Services • Process Service • Record Retrieval • Document Management • Trial Graphics

## ARBITRATION - VOLUME II

**Page 526**

1  MR. SHOUB: Can I have a
2  continuing objection to the testimony?
3  MR. WILLIAMS: Sure.
4  THE ARBITRATOR: Go on.
5  Q. Did you learn of an incident
6  where Mrs. Smith had not left the school
7  building as part of the fire drill?
8  A. Yes.
9  Q. Okay. And what did you
10 learn?
11 A. I was contacted by Tanya
12 Corben or school resource officer that
13 said she had not left.
14 Q. Okay. Is that acceptable
15 for a teacher to not leave the building
16 during the fire drill?
17 A. No.
18 Q. Was that then discussed with
19 Mrs. Smith?
20 A. Yes.
21 I received a letter from the fire
22 department. And it noted that we had
23 -- that that was an issue for us.
24 I then talked to Mrs. Smith.
25 She was having difficulty getting up and

**Page 527**

1  down the steps. I said I would place a
2  wheelchair at the bottom of the steps,
3  so that if we ever needed to get her
4  out in a speedier time, that we could
5  do that. And I did so.
6  Q. Okay. With Mrs. Smith not
7  leaving the room, what did her students
8  do? Did her students stay with her or
9  did they leave?
10 A. There was an attendance sheet
11 given to another teacher that was handed
12 in for that particular drill.
13 Q. Okay.
14 A. That's one of the reasons --
15 that's one of the ways I learned of it,
16 as well.
17 Q. Okay. So she had not
18 supervised her students --
19 A. Correct.
20 Q. -- as part of that
21 evacuation?
22 A. Yes.
23 Q. All right. And then in your
24 discussion with her, I take it you
25 talked about that supervision issue?

**Page 528**

1  A. Yes.
2  Q. Okay. I'd like to turn your
3  attention to June of 2009. As I
4  understand it, in the 08/09 school year,
5  and there's been plenty testimony on
6  this issue, regarding her assignment
7  being a half time Briar Middle School,
8  half time Perkins High School. Is that
9  your understanding, as well?
10 A. Yes.
11 Q. Okay. Why was that her
12 assignment for the 08/09 school year?
13 A. Okay. Let me pause for a
14 second, just so I make sure I get these
15 right, since we went from 07/08. And
16 now you're talking 08/09?
17 Q. Correct, from August of 08
18 through --
19 A. And last year 09/10. Okay.
20 So we're talking the previous year?
21 Q. Yes.
22 A. That's the year when she was
23 at Briar for a half time.
24 We had low enrollment in the
25 business classes, not enough students to

**Page 529**

1  occupy full time for her classes.
2  Therefore, she was going to have to be
3  issued another assignment.
4  Q. Okay. And then so what was
5  that other assignment?
6  A. The other assignment would be
7  that she would be teaching social
8  studies, because that was her other
9  certification. Looking for
10 certifications, those were the areas
11 that we had to choose from.
12 Q. Okay. Was that for the
13 08/09 school year she was teaching
14 social studies or for the 08/09 school
15 year was she half time at the middle
16 school?
17 A. Wait a minute. Okay.
18 That's what I was -- yeah. Okay.
19 There was contemplation about her
20 teaching social studies --
21 Q. Okay.
22 A. -- for the 08/09 school
23 year.
24 Q. But ultimately she did not?
25 A. But she did not.

**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY

1.800.694.4787    www.cefgroup.com    fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 • 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 • 330.253.8119

Court Reporting • Video Conferencing • Legal Video Production • Investigations
Claims Services • Process Service • Record Retrieval • Document Management • Trial Graphics

**Page 530**

1      Q. Okay.
2      A. Because she only had a half
3 time assignment at the high school, and
4 there was a need at the middle school
5 that was discussed during our meetings,
6 our administrative team meetings. It
7 was determined that she would spend half
8 time there at the middle school. I
9 believe they were still teaching
10 keyboarding at the time.
11      Q. Okay. And so she would
12 spend half the day at the middle
13 school --
14      A. Yes.
15      Q. -- and half the day at the
16 high school?
17      At the end then of the 2008/2009
18 school year, was that arrangement then
19 discussed again as to whether she would
20 continue teaching --
21      A. Yes.
22      Q. -- that load?
23      Okay. And what was that
24 discussion?
25      A. I believe I sent a letter to

**Page 531**

1 her stating that she would be half time
2 at the high school and half time at the
3 middle school.
4      Q. At the end of the 2008/2009
5 school year?
6      A. I don't recall.
7      Q. Okay.
8      A. I'm having difficulty
9 recalling the timeframe.
10      Q. If you could turn, please,
11 to Exhibit 30.
12      A. Okay.
13      Q. Are you able to identify
14 that document?
15      A. Okay. Yes.
16      Q. Okay. And what's the date
17 of that document?
18      A. June 1, 2009.
19      Q. Okay. And who wrote that?
20      A. That's my handwriting or my
21 signature.
22      Q. Okay. And is the letter to
23 Carol Smith?
24      A. Yes, it is.
25      Q. And what is it you are

**Page 532**

1 informing Mrs. Smith of in this letter?
2      A. That she will be teaching
3 social studies at the school.
4      Q. Okay. For what school year?
5      A. 2009/2010.
6      Q. Okay. So at the end of
7 08/09 -- June 1 of 09 would be the end
8 of the 08/09 school year?
9      A. Yes.
10      Q. So at the end of that school
11 year, you -- there was a contemplation
12 for Mrs. Smith to teach social studies
13 for the 09/10 school year?
14      A. Yes.
15      Q. Okay. Why, why was that
16 happening in the 09/10 school year?
17      A. Thank you for refreshing my
18 memory with that.
19      But that would be because we're
20 not -- she was not needed at the middle
21 school. And I would not need a
22 full-time social studies teacher that I
23 already had in Ms. Mazza. She was
24 capable by certification of teaching
25 social studies, so she was going to

**Page 533**

1 teach business in the morning and social
2 studies in the afternoon.
3      Q. Was there enough business
4 classes that she could have taught the
5 full load of business?
6      A. No.
7      Q. Okay. So --
8      A. Not unless I would have
9 extremely low numbers in those classes.
10      Q. Okay. So to meet reasonable
11 enrollment numbers in your business
12 classes, you had enough for half a day
13 of business classes?
14      A. Yes.
15      Q. Which left then another half
16 of time to fill for Mrs. Smith?
17      A. Yes.
18      Q. Given at least 28 years that
19 you observed her having seniority in the
20 school building, is it fair to say she
21 would have seniority over many other
22 teachers?
23      A. Yes.
24      Q. So it's not as if she would
25 not have something to teach during that

**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY

1.800.694.4787    www.cefgroup.com    fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 • 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 • 330.253.8119

Court Reporting • Video Conferencing • Legal Video Production • Investigations
Claims Services • Process Service • Record Retrieval • Document Management • Trial Graphics

## ARBITRATION - VOLUME II

### Page 534

1  other half of the day, if I understand
2  you correctly?
3  A. Correct. Which --
4  Q. What then happened with Ms.
5  Mazza? You mentioned Ms. Mazza.
6  A. Yeah, which leads to my
7  mention in the first paragraph. We had
8  another social studies teacher scheduled
9  for full time, but because she had less
10  seniority than Mrs. Smith, that's why I
11  mentioned that in the first paragraph.
12  Q. Okay. So Ms. Mazza, she had
13  been teaching social studies full-time?
14  A. Yes.
15  Q. And had less seniority than
16  Mrs. Smith?
17  A. Yes.
18  Q. Mrs. Smith as a more senior
19  teacher in the bargaining unit was
20  entitled to get a full day's worth of
21  work, so that's why she had the half
22  day of business and half day of social
23  studies?
24  A. Correct.
25  Q. Okay. Had Mrs. Smith taught

### Page 535

1  social studies in recent years?
2  A. Not at the high school.
3  Q. Okay. Had she taught it
4  anywhere else that you knew of?
5  A. I don't know the date, I
6  believe it was sometime at the middle
7  school.
8  Q. Social studies? You don't
9  know?
10  A. I don't know.
11  Q. Okay. What was it then you
12  were instructing her to do in the second
13  paragraph with respect to the teaching
14  of social studies at the high school?
15  A. I wanted her to do some
16  observation with teachers that were
17  currently teaching those classes. I
18  wanted her to be aware of how the class
19  period went, what the performance
20  indicators were with the State standards
21  and what the expectations of the social
22  studies department was for the teachers
23  that would be teaching social studies in
24  that department.
25  Q. Okay. Did you ask her to

### Page 536

1  observe a teacher's class?
2  A. Yes.
3  Q. What teachers' classes did
4  you ask her to observe?
5  A. On this paper I asked her to
6  observe Tim Obergefell and also I
7  believe Scott McVeigh, and to spend some
8  time with those teachers and the
9  department chair afterwards, after those
10  classes, so she could understand --
11  better understand the curriculum, get a
12  handle on it for the next year.
13  Q. Okay. To your knowledge did
14  she do what you had asked her to do?
15  A. She did go down and observe
16  the teachers.
17  Q. Okay. Did you receive any
18  reports from either Mr. McVeigh or
19  Mr. --
20  A. Obergefell.
21  Q. Obergefell. Regarding her
22  observation of their classes?
23  A. Yes.
24  Q. And what report did you
25  receive?

### Page 537

1  A. That she had been late to
2  one class, Mr. Obergefell's class. That
3  she had fallen asleep during Mr.
4  McVeigh's class. And that she had not
5  stayed to talk to them afterwards about
6  what her observations were of those
7  classes.
8  Q. Okay. Had she talked to
9  them about syllabus, benchmark,
10  performance indicators, those issues, do
11  you know?
12  A. I don't know.
13  Q. Okay. After you received
14  that report from Mr. McVeigh and Mr.
15  Obergefell, what did you do next?
16  A. I wrote a note the her, I
17  believe, because she had not followed
18  through on what I had asked her to do.
19  Q. If you could turn please to
20  Exhibit 33.
21  A. Yes.
22  Q. Is that the note to which
23  you're referring?
24  A. Yes.
25  Q. Okay. And what was the

**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY

1.800.694.4787    www.cefgroup.com    fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 • 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 • 330.253.8119

Court Reporting • Video Conferencing • Legal Video Production • Investigations
Claims Services • Process Service • Record Retrieval • Document Management • Trial Graphics

## ARBITRATION - VOLUME II

### Page 538

1  purpose -- first of all, tell me a
2  little bit about Exhibit 33, what is it
3  and what's this related to?
4  A. I thought that it was very
5  important that we take the time to
6  prepare for the following year. And in
7  my opinion that had not occurred.
8  I had conversation with one of
9  the department chairs that led to my
10  writing this note and needed to have a
11  conversation with her about it.
12  Q. Okay. And so this is a
13  letter to Mrs. Smith?
14  A. Yes.
15  Q. From you?
16  A. Yes.
17  Q. Dated June 5, 2009?
18  A. Correct.
19  Q. Okay. In the middle of that
20  first page you have a number of bullet
21  points. What are you discussing in
22  those bullet points?
23  A. She had been late to class
24  with Mr. Obergefell. And on the same
25  day during a video presentation in Mr.

### Page 539

1  McVeigh's class, he noted that she had
2  fallen asleep during the class. And on
3  both days that I'd asked her to be
4  there, she had not gone to speak with
5  them afterwards.
6  I do believe I also noted that I
7  probably made an incorrect date on June
8  3rd, because it didn't match up with the
9  Thursday and Friday dates.
10  Q. Okay. Did you -- other
11  than, you said, you received reports
12  from Mr. McVeigh and Mr. Obergefell, did
13  you receive any other feedback from
14  anyone in the social studies department?
15  A. Mr. Bores, the department
16  chair.
17  Q. If you could turn, please to
18  Exhibit 31.
19  A. Yes.
20  Q. Can you identify that
21  document?
22  A. That is an e-mail between
23  myself and Mr. Bores.
24  Q. Okay.
25  A. And also Mr. McVeigh at the

### Page 540

1  bottom.
2  Q. Okay. And at the bottom
3  that's an e-mail from you to Mr. Bores
4  and Mr. McVeigh?
5  A. Yes.
6  Q. And Joe, Scott, I still need
7  the communication I requested earlier
8  today?
9  A. Yes.
10  Q. What was the communication
11  you'd requested?
12  A. As I was out in the building
13  earlier in the day, I had a conversation
14  with Mr. Bores in the hallway about what
15  had occurred. And I don't like just
16  drive by memos in the hallway. I asked
17  him to put something in writing to me
18  and forward it to me later on in the
19  day.
20  And I had not received anything
21  by -- if my military time is correct,
22  that's about 3:30 in the afternoon. So
23  I sent an e-mail to both of them,
24  because they were both of the building
25  by that time, and that hence Joe sent a

### Page 541

1  7:13 response to me in the evening.
2  Q. Okay. And what was it that
3  -- what were the concerns that they
4  expressed to you?
5  A. They had had a conversation
6  with her, and she had mentioned the
7  three things that I -- that he listed
8  at the top. But I had not been a party
9  to that conversation, so that was new
10  information to me.
11  Q. Okay. And again what was
12  the nature of the concern, was it
13  regarding her teaching social studies?
14  A. Yeah, teaching, that -- yeah,
15  her conversation that she'd had with Mr.
16  McVeigh and Joe that, you know, it
17  wasn't her choice to do this. And that
18  she would be teaching half time, bumping
19  into the social studies -- these were
20  her options, take over the marketing
21  program. We had discussed number 3, but
22  she had no licensure or certification
23  and was not highly qualified to take
24  over the marketing program.
25  Q. Okay. And a teacher can't

**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY
1.800.694.4787   www.cefgroup.com   fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 • 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 • 330.253.8119

Court Reporting • Video Conferencing • Legal Video Production • Investigations
Claims Services • Process Service • Record Retrieval • Document Management • Trial Graphics

## ARBITRATION - VOLUME II

### Page 542

1  teach in an area they're not licensed
2  in?
3      A. Not by no child left behind,
4  not by our board policy, they're pretty
5  strict about that, that they want highly
6  qualified teachers.
7      Q. Okay. So as you understood
8  it, given Mrs. Smith's certifications
9  and the teaching needs of the school
10  district, the assignment that she had
11  been given, was the assignment
12  appropriate?
13      A. Yes.
14      Q. All right. The very last
15  line of that e-mail says, as per our
16  conversation prior, you are fully aware
17  of how the social studies department
18  feels about this situation. Were you
19  fully aware?
20      A. They had expressed to me
21  their concerns about her ability to
22  competently teach social studies at the
23  level that it was being taught at that
24  time by the department's teachers.
25      Q. Okay. Did that cause you

### Page 543

1  some concern?
2      A. Yes.
3      Q. Okay. What could be done
4  about that concern?
5      A. We were trying to set up the
6  opportunity for her to learn with those
7  teachers and take advantage of what was
8  offered. The training during the summer
9  offered them the opportunity to meet at
10  any time. She certainly took -- I
11  would make the time -- had made the
12  time available for her to meet with the
13  teachers of that department.
14      Q. Okay. You had written that
15  letter on June 5th to Mrs. Smith
16  regarding --
17      A. Which, was that 33?
18      Q. I'm sorry. Exhibit 33, yes,
19  regarding the concerns. The first line
20  says you request her presence at a
21  disciplinary conference on Tuesday, June
22  9?
23      A. Uh-huh.
24      Q. Did that disciplinary
25  conference occur?

### Page 544

1      A. Yes.
2      Q. Who was at that conference?
3      A. I believe it was myself,
4  Mrs. Smith, Mr. Gunner and Mr. Gerber.
5      Q. Okay. Mr. Gerber was the
6  union president at that time?
7      A. Mr. Gerber would have been
8  the union president.
9      Q. Okay. And what happened at
10  that meeting?
11      A. This letter -- there was a
12  letter that was presented to her at the
13  time we discussed the things. I do
14  believe I made note of the wrong date
15  as far as the June 3rd. And that there
16  would be some consequences taken as a
17  result of these actions.
18      Q. Okay. So there was a
19  discussion regarding these allegations
20  at that meeting?
21      A. Yes.
22      Q. Did Mrs. Smith or Mr. Gerber
23  have any response to those allegations?
24      A. I don't recall exactly. I'm
25  sure that she had a comment. I believe

### Page 545

1  that she had mentioned to me that she'd
2  met with a student prior to coming that
3  was responsible for her being late to
4  the class for Mr. Obergefell.
5      And I commented that, you know,
6  we have expectations to be on time and
7  in class and at appointments, but
8  certainly we have students as well, and
9  we don't want to shun those away.
10      Q. Okay. You mentioned a
11  moment ago that as a result of that
12  meeting you provided some written
13  feedback or conclusions?
14      A. That probably would have come
15  from Mr. Gunner, but I'm --
16      Q. If you would turn to Exhibit
17  34, please. Okay. So what is Exhibit
18  34?
19      A. It's a letter from me to
20  Carol as prior -- or after that time,
21  after that meeting, June 15th.
22      Q. The letter is dated June
23  15th --
24      A. Yeah.
25      Q. -- 2009?

Cefaratti Group
THE LITIGATION SUPPORT COMPANY
1.800.694.4787    www.cefgroup.com    fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 · 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 · 330.253.8119

Court Reporting · Video Conferencing · Legal Video Production · Investigations
Claims Services · Process Service · Record Retrieval · Document Management · Trial Graphics

## ARBITRATION - VOLUME II

Page 546

1    A. Yeah. And --
2    Q. I see it has typed Chris J.
3  Gasteier, but then above that, that's
4  not your signature?
5    A. No, it's not.
6    Q. Okay. Whose is that?
7    A. It looks to be Mr. Gunner's
8  signature, if I can read the
9  handwriting.
10    Q. On behalf of Chris Gasteier?
11    A. Yes.
12    Q. Were you actually physically
13  in the district on June 15th?
14    A. No, I was not.
15    Q. Where were you?
16    A. In Boston, Massachusetts
17  attending my nephew's wedding.
18    Q. Okay. So do I understand
19  that you had written this letter --
20    A. Yes.
21    Q. -- but asked Mr. Gunner to
22  sign it --
23    A. Yes.
24    Q. -- because you weren't there?
25    A. Yes.

Page 548

1  before.
2    Q. Okay. Did you have any
3  understanding whether she had been
4  disciplined in any other --
5    A. I believe that there had
6  been an incident at the middle school --
7    Q. Okay.
8    A. -- when she had been there,
9  yes.
10    Q. And you weren't involved in
11  that?
12    A. I was not involved, but I
13  was aware.
14    Q. Okay. And so because of
15  that --
16    A. This was another instance,
17  and I felt it needed to be documented.
18    Q. Okay. And then forwarded to
19  the superintendent?
20    A. Yes.
21    Q. Do you have any understanding
22  as to what discipline ultimately the
23  superintendent imposed?
24    A. I believe he gave me a copy
25  of that.

Page 547

1    Q. Okay. What was it that you
2  stated in this letter after follow-up on
3  that June 9 meeting?
4    A. Again once -- again talking
5  before the date being the 4th instead of
6  the 3rd for the Thursday, talking about
7  meeting with the student. And then
8  would recommend to the superintendent
9  that disciplinary action be taken for
10  the sleeping.
11    Q. Okay.
12    A. And when I was referring to
13  the discipline -- I can't necessarily
14  discipline a teacher in that way.
15    Q. In what way?
16    A. Suspending them.
17    Q. Okay.
18    A. I can recommend to the
19  superintendent.
20    Q. Did you have any
21  understanding as to whether Mrs. Smith
22  had been disciplined previous to this
23  incident for any misconduct?
24    A. Not in my building, aside
25  from the conversation that we had had

Page 549

1    Q. Turn to Exhibit 35. Is that
2  the copy of the discipline?
3    A. Yes.
4    Q. Okay. And what was the
5  discipline?
6    A. 10 day suspension from
7  school.
8    Q. Unpaid?
9    A. Unpaid.
10    Q. When was that 10 day unpaid
11  suspension served?
12    A. At the beginning of the
13  following school year.
14    Q. Okay. So she was not in
15  class for the first 10 days?
16    A. Correct. I believe it would
17  have started during the teacher days.
18    Q. Okay.
19    A. Which we have the staff days
20  that we have at the beginning of the
21  year.
22    Q. Okay.
23    A. So seven days of class,
24  three days of staff training.
25    Q. Okay. At the beginning of

**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY

1.800.694.4787   www.cefgroup.com   fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 • 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 • 330.253.8119

Court Reporting • Video Conferencing • Legal Video Production • Investigations
Claims Services • Process Service • Record Retrieval • Document Management • Trial Graphics

ARBITRATION - VOLUME II

Page 550

1  the school year, is there typically
2  communications between teachers and
3  administration as far as preparation for
4  class, setting up class, anything like
5  that?
6      A. Yes.
7      Q. Okay. And what is that
8  communication?
9      A. First of all, we go over the
10  handbook. We go over the contract
11  during our faculty meeting that we have.
12     Q. I guess. I'm sorry. Maybe
13  I'm not being clear in my question.
14     A. Well, in terms of that, it's
15  the expectations that I have of them
16  during the course of the year in terms
17  of lesson plans, deadline, am I --
18     Q. I guess, are you -- do you
19  typically hear from teachers to make
20  sure that they're going to be present at
21  class teaching?
22     A. Yes.
23     Q. Okay.
24     A. I've never had anybody not
25  talk to me -- I shouldn't say that.

Page 551

1  But I have every expectation that a
2  teacher would tell me if they're not
3  going to be there.
4      Q. Okay. Had Mrs. Smith
5  contacted you in that lead --
6      A. No.
7      Q. -- up to the start of the
8  school year?
9      A. No.
10     Q. Did you have any concerns
11  because you had not heard from Mrs.
12  Smith prior to the start of the school
13  year?
14     A. I was aware that she had a
15  10 day suspension, but I was also aware
16  that she was coming back, but I'd heard
17  nothing from her with respect to that.
18     Q. Would you turn to Exhibit
19  47, please. What is Exhibit 47?
20     A. An e-mail, a series of
21  e-mails from myself to my secretary.
22  Down at the bottom I ask in the
23  original one, could you please contact
24  her, and return to her school tomorrow.
25  I have not heard from her in a couple

Page 552

1  of weeks.
2      Q. Okay. Again did that cause
3  you some concern?
4      A. Enough that I asked my
5  secretary to contact her, yes.
6      Q. Okay.
7      A. Because I wasn't sure if I
8  should get a sub for they next day,
9  since I had not heard.
10     Q. Okay. And it looks like you
11  forwarded it to the superintendent, as
12  well?
13     A. Yes. Because I didn't know
14  if he'd heard, if he had any
15  communication that I hadn't, so I just
16  wanted to make sure that we were all in
17  the loop.
18     Q. Okay. What room assignments
19  did Mrs. Smith have for the 2009/2010
20  school year?
21     A. She would have been in
22  business and accounting in 702, and in
23  -- social studies, modern world history
24  in room 605.
25     Q. Okay. If you could turn,

Page 553

1  please, to the very last document in
2  that book, Exhibit 101. And that folds
3  out.
4      It's my understanding that 702 is
5  on the second floor?
6      A. Yes, sir.
7      Q. Okay. And that would -- and
8  then that sort of refers on the bottom
9  right-hand side of the document, bottom
10  right-hand side?
11     A. I'm sorry? 702 here.
12     Q. Yes. Yeah.
13     A. Bottom right-hand side.
14     Q. Yes.
15     A. Yes. Okay. I see what
16  you're saying. Okay.
17     Q. Your other right.
18     A. Yeah, thank you.
19     Q. And but physically placing
20  that on the building 702 would be above
21  where the main office is?
22     A. Yeah, it would be -- yes.
23     Q. Okay.
24     A. Roughly where number 5 is
25  there.


Cefaratti Group
THE LITIGATION SUPPORT COMPANY

1.800.694.4787    www.cefgroup.com    fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 • 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 • 330.253.8119

Court Reporting • Video Conferencing • Legal Video Production • Investigations
Claims Services • Process Service • Record Retrieval • Document Management • Trial Graphics

## ARBITRATION - VOLUME II

### Page 554

1    Q. Okay. And then 605 is in
2  the top left-hand corner of the
3  document?
4    A. Correct.
5    Q. Okay. Had you ever observed
6  Mrs. Smith in the hallway late to her
7  5th period class in 605?
8    A. Yes.
9    Q. Okay. And do you recall
10  when that was?
11    A. Sometime during the fall of
12  the 2009/2010 school year.
13    Q. Okay. Did you --
14    A. I would say September,
15  October, sometime thereabouts. I don't
16  recall.
17    Q. Did you send any written
18  correspondence or e-mail to Mrs. Smith
19  about that?
20    A. I spoke to her in the
21  hallway.
22    Q. Okay. Could you turn to
23  Exhibit 48, please.
24    A. Yes.
25    Q. Can you identify that

### Page 555

1  document for me, please?
2    A. That's an e-mail written from
3  me to Mrs. Smith.
4    Q. Okay. And what was -- what
5  was the subject of this e-mail?
6    A. Very similar to what I spoke
7  to her in the hallway, that this is a
8  reminder that her 5th -- actually this
9  particular one was shortly after she
10  returned to school.
11    Q. Okay.
12    A. And she had not been present
13  in one of these periods, 5 A or B or
14  study hall. She was unclear as to when
15  she was supposed to be there and she
16  was late getting there.
17    Q. Okay.
18    A. And it was an e-mail to her
19  saying that she was the teacher who was
20  in the supervisory role and she should
21  be there.
22    Q. Okay. So this would have
23  been a separate incident from when you
24  spoke to her in the hall?
25    A. Yes.

### Page 556

1    Q. Okay. Did Mrs. Smith make
2  any request of you to change room
3  assignments?
4    A. Not at this time.
5    Q. Did she make a request at
6  another time to change room assignments?
7    A. No.
8    Q. Okay. Did you at some point
9  in the school year learn about an
10  incident involving a discussion of
11  pornography in her history class?
12    A. Yes.
13    Q. Who told you that?
14    A. Beth Martinez, our parapro.
15    Q. She's a paraprofessional?
16    A. She's a paraprofessional.
17    Q. And what is paraprofessional?
18    A. A paraprofessional in her
19  situation is a -- or is a person who's
20  assigned to a one on one with a
21  particular student who has an IEP.
22    Q. Okay. And IEP is an
23  individual educational plan?
24    A. An -- yes, sir.
25    Q. So that essentially is

### Page 557

1  someone to help with the education of a
2  student who might have some special
3  needs --
4    A. Yes, sir.
5    Q. -- with their education?
6    Okay. And what was it that Ms.
7  Martinez told you?
8    MR. SHOUB: Objection. Hearsay.
9    THE ARBITRATOR: Sustained.
10    Q. Okay. After Mrs. Martinez
11  spoke to you, what did you do next?
12    A. I took notes while I was
13  speaking with Mrs. Martinez. And at the
14  time that she came down, it was at the
15  end of the day, and I could not contact
16  the students that she had given to me,
17  the names. It was on a Friday, I
18  believe.
19    Q. Okay. The following week,
20  what was your schedule like?
21    A. It was very busy. I had
22  attended a funeral for the father of one
23  of our teachers. I was in Columbus on
24  Tuesday. And on Wednesday I left for
25  San Diego, California, with a number of

**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY
1.800.694.4787    www.cefgroup.com    fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 • 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 • 330.253.8119

Court Reporting • Video Conferencing • Legal Video Production • Investigations
Claims Services • Process Service • Record Retrieval • Document Management • Trial Graphics

## ARBITRATION - VOLUME II

### Page 558

1 other students -- or excuse me, a number
2 of other faculty members from the high
3 school.
4     Q. Did you have an opportunity
5 to investigate anything that you
6 discussed with Mrs. Martinez?
7     A. No, I did not.
8     Q. Okay. Are at some point,
9 however, the superintendent began to
10 investigate those allegations?
11     A. Correct.
12     Q. Did he speak with you about
13 the investigation?
14     A. He called me on my cell
15 phone while I was in San Diego.
16     Q. Did you have any
17 understanding as to whether he'd begun
18 an investigation while you were gone?
19     A. I'm sorry?
20     Q. Did you have any
21 understanding as to whether he'd begun a
22 investigation while you were in San
23 Diego?
24     A. Not until that point.
25     Q. Okay. When did you return

### Page 559

1 back to the district?
2     A. I don't think it was until
3 Friday or Saturday. I'm trying to
4 think. I'd have to look at my
5 calendar.
6     Q. If it was Friday, it would
7 have been after the school day?
8     A. Oh, yeah. Yeah. Because I
9 think -- let's see, Wednesday. No, it
10 had to be -- it had to be very late
11 Friday evening or Saturday.
12     Q. Or Saturday morning?
13     A. Because I think the
14 conference ended Friday, so it was
15 probably very late, yeah.
16     Q. Okay. Over the weekend, did
17 you and the superintendent have any
18 discussions about his investigation to
19 that point?
20     A. He had -- no. He had told
21 me that we would meet upon my return to
22 school on Monday.
23     Q. Okay. Did the two of you
24 then meet on Monday?
25     A. Yes.

### Page 560

1     Q. Okay. And as a result of
2 that meeting, what happened next?
3     A. I shared with him the notes
4 that I had taken. We discussed what he
5 had done the previous week and the
6 communication that he'd had. And we
7 determined that we needed to talk to the
8 students about the incident.
9     Q. Okay. Was there any
10 decision made with respect to whether
11 Mrs. Smith would continue to work in the
12 classroom during this investigation?
13     A. I was asked to go up and get
14 Mrs. Smith and have her come down to my
15 office where we would have that
16 discussion.
17     Q. Okay. And what happened as
18 a result of that discussion?
19     A. I asked her for her keys and
20 her entrance key into the building. And
21 explained to her that until the
22 investigation was over, that she was
23 going to be, I believe, I'm not sure,
24 on paid suspension.
25     Q. Okay. Was she relieved of

### Page 561

1 her duties with pay?
2     A. I believe so.
3     Q. Okay. If you could turn,
4 please, to Exhibit 55.
5     THE ARBITRATOR: 55?
6     MR. WILLIAMS: Yes.
7     Q. Can you identify Exhibit 55?
8     A. Yes.
9     Q. And what is it?
10     A. I had gone up to get Mrs.
11 Smith at the beginning of the school day
12 and asked her to come down to my
13 office. And this letter was given to
14 her at that time in my office with Mr.
15 Gunner, and I believe Mr. Gerber
16 present, as well.
17     Q. Okay.
18     A. With the building -- he
19 served as building rep, but he was also
20 PEA president.
21     Q. And the first line says, you
22 are hereby relieved from your duties
23 with pay pending the outcome of my
24 investigation into allegations that you
25 engaged in inappropriate discussions

**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY
1.800.694.4787    www.cefgroup.com    fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 · 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 · 330.253.8119

Court Reporting · Video Conferencing · Legal Video Production · Investigations
Claims Services · Process Service · Record Retrieval · Document Management · Trial Graphics

## ARBITRATION - VOLUME II

Page 562

1  with your high school social studies
2  class regarding pornography?
3       A. Yes.
4       Q. Okay. There's a handwritten
5  note on the side. Whose handwriting is
6  that?
7       A. It's not mine.
8       Q. Okay. Do you know whose it
9  is?
10      A. Well, it's not Mr. Gerber's,
11  either, so it's got to be Mr. Gunner's.
12      Q. Okay. But that's not your
13  handwriting?
14      A. That is not my handwriting.
15      Q. Okay.
16      A. But it -- no, it's not.
17      Q. Okay. Do you recall Mrs.
18  Smith being asked for lesson plans?
19      A. I had asked -- well, we had
20  asked for her laptop. And there were
21  -- it was asked if there were any
22  lesson plans present, since she was not
23  going to be there. And I believe she
24  said she was in the process of writing
25  them, and asked for a few moments to do

Page 563

1  that or finish grading some papers, one
2  of the two.
3       Q. Okay. Did you ever get any
4  lesson plans from Mrs. Smith?
5       A. No.
6       Q. The rest of the day, was
7  there any additional investigation done
8  of this matter?
9       A. Yes.
10      Q. And what was that
11  investigation?
12      A. Proceeded to call some
13  students done.
14      Q. Okay. Tell me how that
15  worked.
16      A. We -- let me get a drink
17  first. We got a roster of all the
18  students in her class, and broke it up
19  into threes or fours, so that we could
20  contact them, have them come down. They
21  would come into my office, where Mr.
22  Gunner and myself were present. We
23  would speak to them and told them that
24  we were looking -- is there something
25  beeping? Excuse me.

Page 564

1       Yeah. We asked them to come on
2  in and explained to them that we would
3  like them to speak to us, but write
4  something down first, okay, what they
5  saw, if anything was unusual in the
6  class that day.
7       And then we separated them, took
8  them outside. One was put in a desk
9  right outside my office, out of the way
10  of the office traffic. Another one was
11  put in what our records room was. And
12  another one was put in the cubby back
13  by the teachers' mailboxes.
14      Q. Okay. So that's three. Was
15  there a place for a fourth student to
16  go?
17      A. I think we just -- I can't
18  recall whether we called three or four
19  down at a time. But if -- the fourth
20  one would have -- we have another
21  student area desk off to the side or
22  guidance area.
23      Q. Okay.
24      MR. WILLIAMS: Can we go off the
25  record for a second.

Page 565

1       (Discussion off record.)
2       Q. After the students were
3  separated to write up their statements,
4  what would happen next as far as that
5  investigation?
6       A. One by one they were called
7  in. First of all, we told them, you
8  know, nobody is any trouble and we're
9  just here to find some things out.
10      And when we had them come in, we
11  would read what they had written. And
12  then they were asked if they'd noticed
13  anything unusual happen. And I believe
14  the date was March 19th. I could be
15  off, but it was thereabouts on that
16  particular day.
17      Q. Okay.
18      A. And asked them to describe
19  that.
20      Q. Okay. Did you ask them any
21  other questions, were any other
22  questions asked of them as part of that?
23      A. Depending upon what they
24  said, yes. If there was information
25  that they gave to us about that

**C** **Cefaratti Group**  1.800.694.4787  www.cefgroup.com  fax:216.687.0973
THE LITIGATION SUPPORT COMPANY  Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 • 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 • 330.253.8119

Court Reporting • Video Conferencing • Legal Video Production • Investigations
Claims Services • Process Service • Record Retrieval • Document Management • Trial Graphics

## ARBITRATION - VOLUME II

Page 566

1  particular instance, about pornography,
2  okay, because many of them did mention
3  that. Many of them went on to discuss
4  how it happened, the time that it
5  happened, what the setting of the class
6  was --
7       Q. Okay.
8       A. -- at that time.
9       Q. During the time that -- and
10  these students were questioned
11  individually?
12       A. Uh-huh, yes, sir.
13       Q. Okay. So there wasn't --
14  when you were questioning the students,
15  you weren't questioning them as a group?
16       A. Behind closed doors one at a
17  time.
18       Q. Okay. And you had their
19  statement at that point --
20       A. Yes.
21       Q. -- when you questioned them?
22       A. Yes.
23       Q. Had you and Mr. Gunner
24  reviewed that statement prior to
25  questioning them or as part of

Page 567

1  questioning them?
2       A. Mr. Gunner read it, and then
3  I would look at it when he was done.
4       Q. Okay. As the students were
5  being questioned that day, did either
6  you or Mr. Gunner take notes?
7       A. I did. Because we
8  determined that as we were going through
9  this -- well, I think Mr. Gunner took
10  notes, too. I took several notes just
11  on a sheet of paper, because he had
12  determined that he didn't think he was
13  going to be able to stay through
14  questioning of all the students. And so
15  I wanted to have a general guideline of
16  what the questioning was that he was
17  doing and that we were doing together.
18  And I did take a few notes, too, in
19  terms of similarities to what the
20  students were saying.
21       Q. Can you turn to Exhibit 54,
22  please. Can you identify Exhibit 54?
23       A. That is my handwriting.
24       Q. And --
25       A. From the 29th of March when

Page 568

1  we were questioning the students my
2  office.
3       Q. These were the notes you
4  were just referring to?
5       A. Yes, sir.
6       Q. Okay. Explain these notes,
7  please, to me.
8       A. My methodology there was the
9  question marks on the left-hand column
10  would be things that I would be asking
11  students or that we asked every student,
12  who said what, who did you speak to,
13  what type of work were you getting in
14  class, describe the incident down --
15  halfway down the page, et cetera.
16       And then I also started, while
17  the students were talking to us, I
18  started to make some marks, like you do
19  1, 2, 3, 4, slash 5 in terms of the
20  number of times -- that is me -- in
21  terms of the number of times that
22  students were repeating things,
23  different students were repeating
24  things.
25       Q. Okay. Toward the bottom

Page 569

1  there's some places where there's
2  question marks and there's some lines
3  where there's not, such as yellow
4  journalism, porn conversation at the end
5  of class. What were those two remarks
6  in particular, yellow journalism and
7  porn conversation at the end of the
8  class, what are those referring to?
9       A. Comments that students had
10  made.
11       Q. Okay.
12       A. And I stopped keeping --
13  those comments were made by a number of
14  students. I stopped keeping the little
15  slash marks early on.
16       Q. Okay. So you said that
17  these were your notes from that day, and
18  this would be March 29?
19       A. Yes.
20       Q. The superintendent you said
21  was also taking notes?
22       A. I believe so.
23       Q. And how was he doing that?
24       A. I believe on computer. I'm
25  not sure.

**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY

1.800.694.4787    www.cefgroup.com    fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 • 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 • 330.253.8119

Court Reporting • Video Conferencing • Legal Video Production • Investigations
Claims Services • Process Service • Record Retrieval • Document Management • Trial Graphics

## ARBITRATION - VOLUME II

### Page 570

1  Q. Did you see him with a
2  laptop computer?
3      A. Yes.
4  Q. Okay. And was he typing on
5  the laptop computer?
6      A. Yes.
7  Q. Okay. Did you finish all of
8  the student interviews on the 29th?
9      A. No.
10  Q. Okay. So what then happened
11  after the interviews that were done that
12  day, was there any further investigation
13  done?
14      A. I did a few the next
15  morning. I think I tried to -- I think
16  I completed them all the following
17  morning.
18  Q. Okay.
19      A. By myself, Mr. Gunner had
20  another appointment.
21  Q. Did you take notes of your
22  conversations with the students?
23      A. Yes. I took notes on paper
24  to give to Mr. Gunner later.
25  Q. Okay. If you could turn,

### Page 571

1  please, to Exhibit 81.
2      MR. SHOUB: I'm sorry, what
3  number?
4      MR. WILLIAMS: 81.
5      A. Yes.
6  Q. Can you identify Board
7  Exhibit 81?
8      A. That's my handwriting once
9  again. These questions I kind of took
10  from the sheet that we were just at to
11  put them in order to give me a rough --
12  excuse me -- sequence of questions to
13  ask the students.
14  Q. Okay. So you used this as
15  your guideline of how you were going to
16  question students that day?
17      A. Yes, sir.
18  Q. About how many students did
19  you interview on the 30th?
20      A. Roughly half a dozen. I
21  can't be sure of the exact number, but
22  it was roughly half a dozen I believe
23  that we still had left.
24  Q. Did you follow the same
25  procedure on the 30th as far as how

### Page 572

1  students were brought down?
2      A. Asked them to come down,
3  didn't ask them all at once. Broke
4  them up into two or three different
5  groups. And had them come in in a
6  small group, talked to them, and then
7  separate them out to write a statement.
8  And then bring them back individually
9  one on one in my office.
10  Q. Okay. And when you had them
11  in one by one, did you then interview
12  them?
13      A. After I read what they had
14  written, yes.
15  Q. Okay.
16      A. I asked some or all of these
17  questions of each one.
18  Q. Did you take notes of those
19  interviews?
20      A. Yes, I did.
21  Q. If you turn, please, to
22  Exhibit 82. Are you able to identify
23  what Exhibit 82 is?
24      A. This is a --
25      MR. SHOUB: I'm going to object.

### Page 573

1  I think some foundation needs to be laid
2  for this before he can answer any
3  questions about.
4      THE ARBITRATOR: Well, you can
5  answer. Answer. You can answer the
6  question. And then we'll see where your
7  objection is going to go.
8      A. Could you repeat your
9  question, please.
10  Q. Can you identify Exhibit 82?
11      A. These are students'
12  statements that they've written in my
13  response to my calling them down that
14  day.
15  Q. Okay. Do you know who this
16  statement was from?
17      A. I know the student, yes.
18  Maddie Torres --
19  Q. Okay.
20      A. -- is a student in her 5th
21  period class.
22  Q. Okay. Did you interview
23  Maddie Torres?
24      A. I don't recall having her
25  come in.

**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY

1.800.694.4787    www.cefgroup.com    fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 • 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 • 330.253.8119

Court Reporting • Video Conferencing • Legal Video Production • Investigations
Claims Services • Process Service • Record Retrieval • Document Management • Trial Graphics

## ARBITRATION - VOLUME II

Page 574

1 **Q.** Okay. Would there have been
2 a reason why you would not have
3 interviewed her?
4 **A.** She might not have been
5 available. She might have left early.
6 I don't know.
7 **Q.** Okay. What time of the day
8 did you have students come down on the
9 30th?
10 **A.** First thing in the morning.
11 But students leave at all times of the
12 day --
13 **Q.** Okay.
14 **A.** -- for appointments or
15 otherwise.
16 **Q.** So she might have left, and
17 because of that, you then didn't
18 interview her --
19 **A.** That's correct.
20 **Q.** -- is that your reason for
21 that?
22 Okay. Did you do anything with
23 this statement after you received it?
24 **A.** I believe I forwarded it to
25 Mr. Gunner.

Page 575

1 **Q.** Okay. Did you do anything
2 further with it?
3 **A.** No.
4 **Q.** Okay. Did you review it or
5 take any action?
6 **A.** I read it.
7 **Q.** Okay. Did you take any
8 action based upon it other than forward
9 it to Mr. Gunner?
10 **A.** Not that I recall.
11 **Q.** Okay.
12 THE ARBITRATOR: Your objection
13 is as to what, as to what's contained
14 in the statement? Let's get your
15 objection on the record.
16 MR. SHOUB: Well, number 1,
17 there's no evidence, I have not heard
18 any evidence that he knows that this is,
19 in fact, Maddie Torres' statement.
20 THE ARBITRATOR: You don't
21 believe that you interviewed this
22 student?
23 THE WITNESS: I don't recall,
24 sir.
25 THE ARBITRATOR: Okay. On that

Page 576

1 basis, I'm going to sustain his
2 objection.
3 MR. WILLIAMS: I guess I don't
4 understand. That this has not been
5 authenticated by him?
6 THE ARBITRATOR: Correct.
7 **Q.** Are you able to state that
8 this is Maddie --
9 **A.** Well, she was called down,
10 otherwise she wouldn't have written a
11 statement.
12 **Q.** Okay. Are you able to say
13 that this is Maddie Torres' statement to
14 you?
15 **A.** To the best of my knowledge,
16 yes.
17 **Q.** Do you have any reason to
18 think that it's not her statement?
19 **A.** No.
20 THE ARBITRATOR: Well, when you
21 say to the best of your knowledge, you
22 don't remember asking her any questions?
23 THE WITNESS: I remember speaking
24 with her at the beginning when I met
25 with the group of students.

Page 577

1 THE ARBITRATOR: Okay.
2 THE WITNESS: But I don't
3 remember speaking with her individually
4 afterwards.
5 THE ARBITRATOR: Well, didn't you
6 testify initially that the students were
7 asked to write a statement?
8 THE WITNESS: Yes. Yeah.
9 THE ARBITRATOR: And then you
10 would interview them?
11 THE WITNESS: Yes.
12 THE ARBITRATOR: All right. So
13 you said you remembered speaking to her
14 initially?
15 THE WITNESS: When I would have
16 three students come in at a time, and
17 then asked them to leave and go write
18 their statements.
19 THE ARBITRATOR: All right. So
20 you remember her coming in?
21 THE WITNESS: Yes.
22 THE ARBITRATOR: But you don't
23 remember anything after that?
24 THE WITNESS: No, I don't.
25 THE ARBITRATOR: All right. Is

**Cefaratti Group** 1.800.694.4787 www.cefgroup.com fax:216.687.0973
THE LITIGATION SUPPORT COMPANY Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 • 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 • 330.253.8119

Court Reporting • Video Conferencing • Legal Video Production • Investigations
Claims Services • Process Service • Record Retrieval • Document Management • Trial Graphics

## ARBITRATION - VOLUME II

### Page 578

1  this how you're going to attempt to get
2  every statement in of these witnesses?
3       MR. WILLIAMS:  This is for this
4  one.  I don't have interview notes for
5  this one.  The next one I do have
6  interview notes for and was going to
7  discuss it.
8       MR. SHOUB:  I will raise the
9  objection now.  And my objection is, the
10  statements are hearsay of the students.
11  The notes appear to be taken by either
12  Mr. Gasteier or Mr. Gunner, have not yet
13  testified, but I assume that you're
14  going to offer testimony of his notes.
15  Those are hearsay.
16       MR. WILLIAMS:  I guess I would
17  disagree the notes are hearsay.  The
18  individual who took the notes is here to
19  testify as to those notes.  Those are
20  not hearsay.
21       MR. SHOUB:  But notes about
22  statements made by a witness who's not
23  going to be here to testify.
24       MR. WILLIAMS:  If I can respond.
25  Part of the principal's or

### Page 579

1  superintendent's job in conducting the
2  investigation is to take notes of that
3  investigation.  That's what Mr. Gasteier
4  just spent five minutes testifying to as
5  to how he conducted this investigation,
6  the set for the investigation, what was
7  asked as part of that investigation and
8  the reason for the investigation.
9       THE ARBITRATOR:  You know what, I
10  -- in an administrative hearing I can
11  take hearsay.  Obviously it's not going
12  to get the value or the amount of
13  emphasis of other evidence where the
14  witnesses come in live.
15       However, both parties are free to
16  subpoena these witnesses, if you want
17  them to come in and testify with regard
18  to these statements.
19       MR. SHOUB:  Well --
20       THE ARBITRATOR:  Go on.
21       MR. SHOUB:  I mean, Mrs. Smith
22  doesn't have the burden of proof in this
23  case.  It's not our obligation to
24  subpoena these students in to testify in
25  support of their case.

### Page 580

1       I mean, this is -- I understand
2  -- well, my objection is that the notes
3  are hearsay.  The statements are
4  hearsay.  And it's not credible evidence
5  to use in a case of this seriousness in
6  which a teacher's career is at stake.
7  That's my objection.
8       THE ARBITRATOR:  All right.  I
9  absolutely agree with you.  These are
10  hearsay, if the people are not coming
11  in.  I'm going to give them the value
12  that I wish to place on them.
13       MR. SHOUB:  I understand.  I'm
14  just making a record.
15       THE ARBITRATOR:  Right.  No, I
16  know.
17       MR. SHOUB:  I just want to be
18  sure the record is protected and make
19  the objection.  And I don't need to
20  make it for each exhibit, is that fair?
21       THE ARBITRATOR:  No, I agree.
22  No, you don't have to make it for --
23       MR. SHOUB:  I fully protected my
24  record, that if these -- these documents
25  are going to be admitted, I want my

### Page 581

1  objection about them straight up right
2  now that they're not admissible as
3  hearsay.  And I understand --
4       THE ARBITRATOR:  I agree with
5  you.
6       MR. SHOUB:  Okay.
7       THE ARBITRATOR:  I'm taking them
8  for the limited purpose of what I wish
9  to place on them as far as being
10  hearsay statements.
11       MR. WILLIAMS:  And if I can just
12  respond in part to the hearsay evidence
13  objection, and part of my reason for
14  asking Mr. Gasteier for what he relied
15  upon this, to the extent that there --
16  this is not being used as far as what
17  it states in here, but to testify as to
18  what reliance or what actions were taken
19  by the administrators in making the
20  recommendations.  It shows their state
21  of mind and goes to their state of mind
22  as to whether they had a basis for
23  taking certain actions or making certain
24  recommendations.  And I think that is
25  not a hearsay issue, but is an issue as

**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY

1.800.694.4787     www.cefgroup.com     fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 • 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 • 330.253.8119

Court Reporting • Video Conferencing • Legal Video Production • Investigations
Claims Services • Process Service • Record Retrieval • Document Management • Trial Graphics

## ARBITRATION - VOLUME II

### Page 582

1  to what Mr. Gasteier did something with
2  this or if Dr. Gunner did something with
3  this.
4        MR. SHOUB: That's absolutely not
5  true. They're using these statements
6  for the very purpose that they assume
7  that they're true, to terminate Mrs.
8  Smith.
9        THE ARBITRATOR: Well, you're
10  stating to me that as far as I'm
11  concerned, you're not offering these for
12  the truth of what's contained in these
13  statements for these witnesses who are
14  not appearing?
15        MR. WILLIAMS: For this one we're
16  on right now, Maddie Torres, that's the
17  one we're talking about, I don't have
18  her here. She is not testifying. I
19  wanted to get at what the high school
20  principal had done in response to
21  receiving this statement.
22        THE ARBITRATOR: All right. Let
23  me put on the record, also, most of
24  these statements to me are not legible.
25  All right. So as far as what weight

### Page 583

1  I'm going to put on these, I can't read
2  half of these statements.
3        So for both parties, if you want
4  me to consider and put any weight on
5  any of these statements, I strongly
6  suggest that you bring in these
7  witnesses. Okay.
8        MR. WILLIAMS: Uh-huh.
9        THE ARBITRATOR: Am I clear on
10  this?
11        MR. SHOUB: Yes, I understand.
12        THE ARBITRATOR: I'm telling you
13  right now on the record, I'm going to
14  put next to nothing weight on these
15  statements. I'll let them come in, but
16  I'm going to put next to nothing weight
17  because, number 1, I can't read them.
18  And number 2, I think these witnesses
19  should come in if you want to offer
20  these, these statements.
21        MR. SHOUB: My objection is not
22  in any way intended to be disrespectful.
23  I just want to be sure that Mrs.
24  Smith's record in this case is
25  protected. You know, if they're not

### Page 584

1  being offered for the truth, then
2  they're irrelevant. But either way
3  they're, hearsay. And I understand your
4  ruling.
5        MR. WILLIAMS: Well, he said with
6  regard to this statement, he's not
7  offering it with regard to the truth of
8  the statement.
9        MR. SHOUB: It's irrelevant.
10        MR. WILLIAMS: And I would
11  disagree as to the relevancy, because
12  part of what the issue that comes to
13  the recommendation of termination is
14  whether or not there was a basis to
15  make that recommendation, did the
16  individuals making that recommendation
17  have a basis for making that
18  recommendation.
19        THE ARBITRATOR: All right. Go
20  on. I've made my ruling. Go on.
21  Let's go on with the questioning.
22        Q. Mr. Gasteier, if you would
23  turn to Exhibit 83, please.
24        A. Yes.
25        Q. And can you identify Exhibit

### Page 585

1  83, the first page?
2        A. These are notes that I took
3  for a student who came in when I called
4  her down.
5        Q. And who is that student?
6        A. Bri Whitcomb.
7        Q. Okay. And these notes are
8  based upon what, your interview with
9  her?
10        A. Yes, sir.
11        Q. And what did you do with
12  these interview notes? What did you do
13  with these interview notes?
14        A. I forwarded them to Mr.
15  Gunner. Looked at them and then
16  forwarded them to Mr. Gunner.
17        Q. Okay. And the document
18  behind your notes, what is that, if you
19  can identify it?
20        A. That was the statement that
21  Bri Whitcomb gave to me prior to my
22  interview with her.
23        Q. Okay. And what did you do
24  with that statement?
25        A. Forwarded that to Mr. Gunner

**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY

1.800.694.4787    www.cefgroup.com    fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 · 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 · 330.253.8119

Court Reporting · Video Conferencing · Legal Video Production · Investigations
Claims Services · Process Service · Record Retrieval · Document Management · Trial Graphics

## ARBITRATION - VOLUME II

**Page 586**

1  as a result of my part of the
2  investigation.
3      Q.  Okay.  If you would turn to
4  Exhibit 84, please.  Can you identify
5  that first page, please?
6      A.  Those are my notes from I
7  believe it's Sydney Wirsche.
8      Q.  Okay.  And your interview
9  with Ms. Wirshe?
10      A.  Yes.
11      Q.  And that was an interview on
12  -- it's not dated.  Was that on March
13  30th, as well?
14      A.  It would have been the date
15  that I asked -- I asked all the
16  students when they -- yes, it is.
17      Q.  Okay.  And then the second
18  page of that exhibit?
19      A.  That would be her statement
20  that I asked her to write up --
21      Q.  Okay.
22      A.  -- on March 30th.
23      Q.  On March 30th.  Okay.
24      Exhibit 85, can you identify the
25  first page of that document?

**Page 587**

1      A.  My notes from Amanda Wolf on
2  March 30th during my interview with her.
3      Q.  Okay.  And the document
4  behind that?
5      A.  Amanda notes -- statement
6  from March 30th.
7      Q.  Okay.  And then Exhibit 86?
8      A.  Jeremy Wright's statement
9  from March 30th about 3-19.
10      Q.  Okay.  And your interview of
11  him?
12      A.  My interview notes, yes, sir.
13      Q.  Okay.  And then the document
14  behind that?
15      A.  Jeremy Wright's statement
16  from that day.
17      Q.  Okay.
18      A.  March 30th.
19      Q.  All right.  Were those
20  interview notes, and there's a series of
21  other interview notes and statements
22  that we've not had you look at, to your
23  recollection was every student in that
24  class spoken to or interviewed or asked
25  to provide a statement as far as what

**Page 588**

1  happened at that time?
2      A.  All but one.
3      Q.  Okay.  When I say that
4  class, I'm referring to 5th period?
5      A.  5th period, modern world
6  history.
7      Q.  Okay.  And which was the one
8  student that was not asked for a
9  statement or interview?
10      A.  Her grandson, Brian Kurtz.
11      Q.  Okay.  And why was he not
12  asked for a statement or interview?
13      A.  In my role as high school
14  principal, being around for 28 years, I
15  had a conversation with Mr. Gunner, I
16  know the names of the students a little
17  bit better than he does at this point
18  in time, although he's learning them
19  rapidly.  And I informed him that this
20  was her grandson, and in my opinion I
21  didn't think we needed to bring him into
22  this.
23      Q.  Okay.  So if I understand it
24  then, it wasn't as if you and the
25  superintendent selected just a couple of

**Page 589**

1  students?
2      A.  No, we went through the
3  entire roster.
4      Q.  Okay.  Other than of course
5  Brian?
6      A.  Well, his name was on the
7  roster, but we made that decision
8  mutually not to do that.
9      THE ARBITRATOR:  What's his name,
10  Brian?
11      THE WITNESS:  Brian Kurtz,
12  K U R T Z.  Brian with a -- B R I A N.
13      THE ARBITRATOR:  Okay.  Thank
14  you.
15      THE WITNESS:  Yes, sir.
16      Q.  Based upon the interviews
17  that occurred and the statements that
18  were taken from the students, do you
19  have an understanding as to what
20  happened next with respect to Mrs.
21  Smith?
22      A.  We determined that the
23  conversation of the 19th had occurred
24  from a number of students.  And also a
25  number of students had told us, you

**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY
1.800.694.4787   www.cefgroup.com   fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 · 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 · 330.253.8119

Court Reporting • Video Conferencing • Legal Video Production • Investigations
Claims Services • Process Service • Record Retrieval • Document Management • Trial Graphics

## ARBITRATION - VOLUME II

**Page 590**

1  know, that she was late to class.
2  Several students talked about her
3  sleeping in class. And those were items
4  that then the superintendent and I
5  discussed and that there would have to
6  be follow through on.
7      Q.  Okay. And did you or he
8  ultimately follow through on that?
9      A.  At this point in time it was
10  the superintendent, I believe.
11      Q.  Okay.
12      A.  My contact with her after
13  that was not very much.
14      Q.  Okay.
15      A.  Can I get some ice?
16      THE ARBITRATOR: Sure.
17      MR. WILLIAMS: Actually I don't
18  have any further questions, Mr.
19  Gasteier, at this point.
20      MR. SHOUB: Do you want to
21  break, Mr. Taich? I'm going to be a
22  while obviously with him.
23      THE ARBITRATOR: Yeah, you know
24  what, why don't we take -- is it 12:00?
25  Why don't we go to lunch and then come

**Page 591**

1  back and do the cross-examine.
2      MR. SHOUB: That's fine.
3      THE ARBITRATOR: Is that all
4  right?
5      (Recess had.)
6      THE ARBITRATOR: Before we start,
7  let me just reiterate my position again
8  on some of those statements, these
9  hearsay documents. I am willing to, if
10  we need an extra day, if you want to
11  call other witnesses, if the district --
12  you know, as far as the district is
13  concerned, if you want to take part of
14  the first day or take all of the first
15  day from Grant's case, we'll make other
16  arrangements to come for an additional
17  day.
18      But if you basically want me to
19  consider some of the testimony of these
20  hearsay statements -- I mean, truthfully
21  I've read through the statements. I
22  would venture a guess that a large
23  portion of the statements, the evidence
24  is totally irrelevant to the
25  specifications in this case.

**Page 592**

1      I'm not going to get into judging
2  whether Mrs. Smith, her teaching
3  techniques, as far as whether she
4  lectures too much, doesn't lecture
5  enough, the things of that nature, those
6  aren't in the specifications. And the
7  majority of these statements deal with
8  points that aren't even relevant to this
9  case.
10      So once again I want to say that
11  if you want to call additional witnesses
12  as some of these students, let me know
13  and let him know that, you know, as far
14  as when he can have his witnesses
15  available.
16      As far as the statements going to
17  the issue of whether or not the district
18  conducted an investigation, they're
19  admissible for that purpose. That the
20  principal and the superintendent met
21  with these kids and took statements from
22  them and questioned them. I have no
23  problem with them coming in on that
24  basis. But as far as the truth in the
25  statements or in the notes, it's not

**Page 593**

1  really that relevant of evidence to be
2  honest with you.
3      So I'm just leaving that, I'm
4  throwing it out there for both of you.
5  If you want to call more witnesses, we
6  can add an extra day, we can stay
7  later, I'll come earlier, whatever you
8  guys want. But you know how I feel
9  with regard to those statements right
10  now. And that goes for the teacher's
11  case, also, if you're planning on
12  introducing something without bringing
13  the people in here.
14      With that let's go to the
15  cross-examination. Unless either of you
16  has a comment you want to put on the
17  record with regard to it. I don't
18  know. It's up to you.
19      MR. WILLIAMS: My only comment,
20  thank you, would be I understand the
21  ruling of the referee on the issue of
22  the students' statements. I understand
23  and appreciate the referee's comments
24  with respect to the statements
25  evidencing an investigation performed,

**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY
1.800.694.4787    www.cefgroup.com    fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 • 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 • 330.253.8119

Court Reporting • Video Conferencing • Legal Video Production • Investigations
Claims Services • Process Service • Record Retrieval • Document Management • Trial Graphics

**Page 594**

1    And the board's position is
2    that's the primary purpose for
3    introducing all of the statements. I'm
4    sure we've all been aware of cases where
5    there's an allegation that there was an
6    insufficient investigation, maybe all
7    students weren't questioned. And
8    there's inferences that someone tries to
9    draw from them.
10    The board is attempting to show
11    that all students, save one in that
12    class, the teacher's grandson were
13    questioned as part of this
14    investigation. That statements were
15    taken and that interviews were conducted
16    of most of those students. And to show
17    the thoroughness of that investigation
18    is the primary purpose for introducing
19    these statements.
20    MR. SHOUB: Just again I think I
21    made my position clear about the
22    statements in my earlier objection. The
23    only other thing I would note for the
24    record is, I don't think they're
25    admissible for the purpose of showing

**Page 595**

1    that the school district conducted an
2    investigation of this. I mean, there's
3    been testimony that they did.
4    Again I don't see the relevance
5    of those statements. And given the
6    prejudicial -- potential prejudicial
7    effect on Mrs. Smith's case, I again
8    think that none of the statements should
9    be admitted into the record, statements
10    or the notes, I'm sorry.
11    THE ARBITRATOR: Okay. With
12    that, let's go to cross-examination.
13    EXAMINATION OF CHRIS J. GASTEIER
14    BY MR. SHOUB:
15    Q. Mr. Gasteier, I'm going to
16    ask you a fair amount of questions.
17    And if at some point you don't
18    understand what I'm asking or if the
19    question just doesn't make sense, and
20    that's certainly possible, please tell
21    me, and I'll attempt to rephrase it.
22    Is that okay?
23    A. Okay. I'm going to --
24    Q. That's fine.
25    A. I'm going to look at you,

**Page 596**

1    but I feel like I'm in a tennis court.
2    Q. Well, pull the chair back,
3    if you want.
4    A. Okay.
5    Q. I don't -- I have no desire
6    to make you uncomfortable have to
7    testify looking back and forth, so.
8    THE ARBITRATOR: Yes, as long you
9    speak up loud enough.
10    THE WITNESS: Let me know if you
11    can't hear me.
12    Q. Whatever you want to do,
13    that's fine with me.
14    One of your responsibilities and
15    roles, as I understand it, as an
16    administrator like any other
17    administrator at Perkins Local School
18    District is to evaluate teachers, is
19    that correct?
20    A. Yes, sir.
21    Q. And you have had the
22    occasion a couple of times to evaluate
23    Mrs. Smith's job performance, is that
24    correct, as well?
25    A. Yes, sir.

**Page 597**

1    Q. You have two books in front
2    of you. The blue, yes, the blue
3    notebook, if you don't mind, if you
4    would open that to Teacher's Exhibit 21.
5    Let me just make sure that I
6    understand the various rating standards.
7    There's four ratings standards for a
8    teacher's performance. One is exceeds
9    the district standards, and that's
10    referenced by the letter E, is that
11    right?
12    A. Yes.
13    Q. Meets the district standards,
14    that's referenced by the letter M?
15    A. Yes.
16    Q. Meets the district standards,
17    but improvement is recommended, and that
18    is an M/IR?
19    A. Yes.
20    Q. And the last category is
21    unacceptable, improvement required, and
22    that's designated as U/IR --
23    A. Yes.
24    Q. -- is that correct? Okay.
25    Can you identify for me what is

**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY

1.800.694.4787    www.cefgroup.com    fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 • 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 • 330.253.8119

Court Reporting • Video Conferencing • Legal Video Production • Investigations
Claims Services • Process Service • Record Retrieval • Document Management • Trial Graphics

## ARBITRATION - VOLUME II

Page 598

1 marked as T-21?
2 A. I'm sorry, could you, T --
3 Q. Yes. Exhibit 21.
4 A. Oh, okay. This?
5 Q. Yes. You see in the
6 right-hand corner, yes, the whole
7 document --
8 A. Okay.
9 Q. -- the right-hand corner.
10 A. It's our observation
11 evaluation form.
12 Q. Okay.
13 A. For Perkins schools.
14 Q. And is this a form that you
15 filled out on or about June 6th of 2007
16 regarding Carol Smith?
17 A. Yes.
18 Q. And is this your evaluation
19 of Mrs. Smith?
20 A. Yes.
21 Q. Let me finish the question
22 first.
23 A. Okay. Sorry.
24 Q. Is this your evaluation of
25 Mrs. Smith for the 2006/2007 school

Page 599

1 year?
2 A. Yes.
3 Q. And she taught keyboarding
4 that year --
5 A. Yes.
6 Q. -- is that correct?
7 A. That was one of the classes
8 that she taught.
9 Q. What else did she teach that
10 year?
11 A. Business, accounting,
12 business law, maybe intro to business.
13 Q. Okay. But this evaluation,
14 nobody observed the class in
15 keyboarding, the evaluation is meant to
16 be an evaluation of her job performance
17 in all areas for the 2006/2007 school
18 year?
19 A. In our observation form it
20 states that even though it's primarily
21 one class, and many -- much of it's
22 taken or it can be taken over the
23 entire performance of the teacher, yes.
24 Q. Okay. And this is the form
25 that you filled out, T-21, the exhibit?

Page 600

1 A. Yes.
2 Q. Okay. And is that your
3 signature on the last page of the
4 document?
5 A. Yes.
6 Q. And it's fair to say that in
7 none of the categories that you rated
8 Mrs. Smith for the 2006/2007 school
9 year, was any area of her job
10 performance determined to be
11 unacceptable?
12 A. The categories that were
13 marked with an X.
14 Q. I'm sorry?
15 A. Could you repeat the --
16 Q. Sure. In looking through
17 the document, and please take as much
18 time as you need, it's my understanding
19 in the 2006/2007 school year, there were
20 no areas of Mrs. Smith's job performance
21 as a school teacher at Perkins Local
22 Schools that you found to be
23 unacceptable?
24 A. Not noted on this form, no.
25 Q. Well, this is where it

Page 601

1 should be noted, correct?
2 A. It was not noted on this
3 form. Yes.
4 Q. If it was going to be noted,
5 and if you were going to find she was
6 unacceptable in some level of
7 performance, this would be the form
8 where that would appear?
9 A. Let me qualify. You asked
10 me about the Xs. There are things for
11 recommendations that also appear on
12 there.
13 Q. Right. My only -- I'm
14 trying to ask a simple question, and I
15 don't mean to be confusing. There's no
16 areas of her job performance that you
17 found or rated to be unacceptable?
18 A. Correct.
19 Q. Okay. Can you turn to
20 Exhibit 22, T-22, the next exhibit in
21 that book, the book in front of you.
22 A. Yes.
23 Q. Did you have any role in
24 recommending or any involvement in Mrs.
25 Smith being appointed as the senior

**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY

1.800.694.4787    www.cefgroup.com    fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 • 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 • 330.253.8119

Court Reporting • Video Conferencing • Legal Video Production • Investigations
Claims Services • Process Service • Record Retrieval • Document Management • Trial Graphics

ARBITRATION - VOLUME II

Page 602

1 class advisor for the Perkins High
2 School in 2007/2008?
3     A. I generally fill out green
4 forms for all supplementals.
5     Q. And what is a green form?
6     A. That is the recommendation
7 for a supplemental position to be
8 offered to either a lay person or a
9 teacher.
10     Q. Do you recall filling out a
11 green form for Mrs. Smith to be the
12 senior class advisory in 2007/2008?
13     A. Quite frankly, no, I do not,
14 sir.
15     Q. Okay. Any reason to believe
16 that you didn't?
17     A. At one point in time we were
18 not required to fill out green forms.
19     Q. Okay. Any recollection of
20 taking -- taking the position that Mrs.
21 Smith should not get this supplemental
22 limited contract for 2007/2008 as the
23 senior class advisor?
24     A. The position was RIF'd
25 earlier in the decade when we went

Page 603

1 through some hard financial times.
2     Q. But you didn't oppose Mrs.
3 Smith being appointed or selected as the
4 senior class advisor?
5     A. We already had a senior
6 class advisor in Mrs. -- Mr. Pawlowski.
7 And there was only one paid position.
8 I did not oppose her splitting the
9 position, if that was the choice, with
10 Mr. P., Pawlowski.
11     Q. Okay. Maybe I'm not asking
12 the question clearly enough. In terms
13 of the actual position, whether it was
14 full-time or half time, in terms of
15 Carol Smith serving as the senior class
16 advisor at the high school in the
17 2007/2008 school year, you did not
18 oppose her selection for that position?
19     A. I did not oppose it.
20 Can I add? I don't think I -- I
21 don't recall recommending it.
22     Q. Fair enough.
23     A. Okay.
24     Q. Exhibit 23, the next exhibit
25 in the book. Do you recall recommending

Page 604

1 or opposing Mrs. Smith being selected as
2 on a 50 percent basis, half time basis
3 as the academic challenge advisor?
4     A. I believe I recommended that.
5     Q. Okay. And that's something
6 she had done for quite a number of
7 years, correct?
8     A. I'm trying to think.
9 Probably, yeah.
10     Q. Okay.
11     A. A number being more than
12 three, yes.
13     Q. Okay. And as I understand
14 it, the academic challenge team is made
15 up of gifted and talented students that
16 compete academically, I assume in
17 Northwest, Northeast Ohio against other
18 high schools in competitions?
19     A. I don't know if I'd go
20 gifted and talented. But the general
21 idea is, yes, they compete against other
22 schools. And it is a highly sought
23 after position by the intelligent
24 students of our district.
25     Q. Okay. And typically it's

Page 605

1 the high -- the students with high
2 grades --
3     A. Typically, yes.
4     Q. -- and the highest test
5 scores --
6     A. I'd say yes, typically.
7     Q. -- that are on this team?
8     THE NOTARY: I'm sorry. One at
9 a time, please.
10     Q. Typically it's the students
11 with the high test scores and the high
12 grades that make the academic challenge
13 team?
14     A. Yes.
15     Q. And as I understand it, this
16 team has been quite successful over the
17 years in terms of winning competitions
18 and being an overall successful
19 competitor in the area, is that a fair
20 statement?
21     A. They do well.
22     Q. Okay.
23     A. I was the academic advisor
24 at one time, so successful would be a
25 term that I would --

Cefaratti Group
THE LITIGATION SUPPORT COMPANY
1.800.694.4787    www.cefgroup.com    fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 • 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 • 330.253.8119

Court Reporting • Video Conferencing • Legal Video Production • Investigations
Claims Services • Process Service • Record Retrieval • Document Management • Trial Graphics

ARBITRATION - VOLUME II

Page 606

1    Q. Well, do they actually
2 compete and win things or not?
3    A. Occasionally, yes.
4    Q. Okay.
5    A. Yes.
6    Q. And they've done that?
7    A. Yes.
8    Q. While Mrs. Smith was one of
9 the advisors?
10    A. Yes.
11    Q. Okay. If you could look at
12 Exhibit 24, Mr. Gasteier. Is this an
13 evaluation that you did of Carol Smith
14 on -- on or about November 18th, 2008?
15    A. Yes.
16    Q. And the same standards apply,
17 the four grade levels, for lack of a
18 better phrase, the E, the M, the IR --
19    A. Yes.
20    Q. -- and the U/IR?
21    Okay. And this is the class --
22 this is a class you observed, accounting
23 1?
24    A. Yes.
25    Q. Okay. And is that your

Page 607

1 signature on the back of that exhibit?
2    A. Yes.
3    Q. And it's dated, looks like,
4 December 2nd of 2008, correct?
5    A. Yes.
6    Q. And again in looking through
7 this evaluation, it's fair to say that
8 in no level of Mrs. Smith's job
9 performance for the 2007/2008 school
10 year, in none of the areas that you
11 evaluated her in was her job performance
12 found to be unacceptable?
13    A. Correct.
14    Q. That's the last evaluation
15 that's in Mrs. Smith's personnel file,
16 I'm sorry, from the high school. Are
17 you aware of any other evaluations of
18 her job performance while she taught at
19 Perkins High School since, since
20 November of 2008?
21    A. I'm not aware.
22    Q. Okay. Do you have any
23 recollection of evaluating her after
24 November of 2008?
25    A. Not right now I don't, sir.

Page 608

1    Q. Okay. You testified that
2 Mr. Bores and I think Mr. McVeigh and
3 perhaps some others had a lot of concern
4 or angst about Mrs. Smith coming in and
5 being a social studies teacher for
6 2009/2010, correct?
7    A. Yes.
8    Q. And I -- they put that in
9 the context that they were worried that
10 somehow their OGT scores would be
11 lowered, because Mrs. Smith was coming
12 in as a teacher?
13    A. I can't refer exactly to the
14 specific OGT test scores. I think that
15 that is always a concern of my staff.
16 And they may have made that comment,
17 yes.
18    Q. Is the compensation of Mr.
19 Bores or Mr. McVeigh linked in any way
20 to how well the students do on the OGT
21 scores, tests?
22    A. No, sir. No, sir.
23    Q. In light of those concerns
24 that Bores and McVeigh had, was there
25 any period of time in the 2009/2010

Page 609

1 school year that you observed Mrs. Smith
2 in the classroom actually teaching
3 social studies?
4    A. Not officially in terms of
5 the observation that we just looked at.
6 But I did enter her classroom a number
7 of times, yes.
8    Q. For what purpose?
9    A. To walk around the building
10 and enter a classroom like I would any
11 other teacher's classroom. We -- it
12 was --
13    Q. And did that include both
14 the social studies, the 5th period
15 social studies class as well as the
16 study hall?
17    A. Yes.
18    Q. And at the time times that
19 you entered her room in 2009/2010, she
20 wasn't sleeping, right?
21    A. No.
22    Q. How many times have you
23 entered the room during that period of
24 time?
25    A. I would say it would have to

**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY

1.800.694.4787    www.cefgroup.com    fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 • 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 • 330.253.8119

Court Reporting • Video Conferencing • Legal Video Production • Investigations
Claims Services • Process Service • Record Retrieval • Document Management • Trial Graphics

## ARBITRATION - VOLUME II

### Page 610

1   be more than half a dozen, less than
2   two dozen. I really don't know.
3         Q. Okay. Somewhere between six
4   and 12?
5         A. That's a fair --
6         Q. I assume those are
7   unannounced?
8         A. Yes.
9         Q. I mean, she doesn't know
10  that you're coming?
11        A. I can't refer to every
12  instance. I may have called down and
13  told her I was coming.
14        Q. Generally you don't, correct?
15        A. Correct.
16        Q. Okay. At no time in either
17  of those two classes did you see her
18  asleep with her eyes closed or, quote,
19  unquote, dozing off?
20        A. Not in either of those two
21  classes.
22        Q. Okay. And prior to March
23  19th of 2010, you had no complaints --
24  in the 2009/2010 school year, let me
25  make sure I have a reference point here,

### Page 611

1   in the 2009/2010 school year, prior to
2   March of 2010, you had no complaints
3   about Mrs. Smith sleeping in class,
4   correct?
5         A. Could you repeat that again.
6         Q. Sure.
7         MR. SHOUB: Would you read that
8   back.
9         (Record read.)
10        A. In the 2009/2010 school year?
11        Q. Yes.
12        A. Not that I'm aware of.
13        Q. Okay.
14        A. Not that I can recollect.
15        Q. If you could open the other
16  exhibit book, Mr. Gasteier, the board's
17  exhibits. Exhibits 49 and 50, are those
18  notes of yours?
19        A. 49 and 50?
20        Q. Yes, sir.
21        A. Yes.
22        Q. Were you keeping a separate
23  file of documents regarding Carol Smith
24  in the 2009/2010 school year?
25        A. Just no more than I would

### Page 612

1   keep any notes for anybody else on my
2   desktop, on my desk.
3         Q. Did you have them in a
4   separate folder for Carol Smith?
5         A. No.
6         Q. How were they are filed or
7   how were they kept?
8         A. These are half sheets, Ohio
9   STEM. I had a little pad on my desk.
10        Q. But what did you -- I mean,
11  does the pad have one page maybe about
12  Carol Smith and another pad page --
13        A. Would be a phone call or
14  something else that I got for somebody
15  else.
16        Q. What was the purpose of
17  keeping it?
18        A. In this particular case
19  probably a note that I should at some
20  point try to talk to Carol, and let her
21  know that if -- and I did talk to her
22  about this. That if she's moving --
23  just in passing, I did not write
24  anything down to her, it was not a memo
25  or an e-mail. But if she's going to

### Page 613

1   move from a room, we need to know, so
2   that a teacher who's moved their
3   classroom and has a student in there and
4   a parent calls, we need to know where
5   they're at.
6         Q. Your testimony is you were
7   not keeping and did not have a separate
8   file of documents that you maintained
9   regarding Carol Smith?
10        A. I have a file with teacher
11  concerns and student concerns.
12        Q. Okay.
13        A. That I would put things in.
14        Q. Things like Exhibit 49 and
15  -- or Exhibit 49 and 50?
16        A. Yes.
17        Q. Relating to teachers?
18        A. And students.
19        Q. Okay. Are you familiar with
20  the collective bargaining agreement
21  between the Perkins Education
22  Association and the school district?
23        A. Yes.
24        Q. I think it's Joint Exhibit 1
25  there in front of you, Mr. Gasteier.

**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY
1.800.694.4787   www.cefgroup.com   fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 • 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 • 330.253.8119

Court Reporting • Video Conferencing • Legal Video Production • Investigations
Claims Services • Process Service • Record Retrieval • Document Management • Trial Graphics

## ARBITRATION - VOLUME II

### Page 614

1 If you could turn to page 21, and the
2 personnel files. Just let me know when
3 you get there.
4     A. I'm on page 21.
5     Q. Okay. If you turn to page
6 22, section 901 G. Are you familiar
7 with that part of the contract?
8     A. Yes.
9     Q. Did you notify Carol Smith
10 of all of the documents and notations
11 you had regarding her during the
12 2009/2010 school year?
13     A. I notified her of some. I
14 can't be sure that everything that I
15 took a note on that was told to me by
16 everybody I spoke to her about.
17     Q. So there may be documents
18 that you were maintaining regarding
19 Carol Smith that were not shared with
20 her, and that she had no opportunity to
21 either respond to or be aware of, is
22 that a fair statement?
23     A. I would say document 50 --
24     Q. Okay.
25     A. -- would be one.

### Page 615

1     Q. That was not shared with
2 her?
3     A. Yes.
4     Q. Okay. Are you aware of any
5 others?
6     A. Not at this time, no.
7     Q. Did you have a discussion
8 with Mr. Bores and/or Mr. McVeigh in
9 December of 2009 regarding Carol Smith
10 and her job performance?
11     A. Her job performance?
12     Q. Or issues relating to her
13 job performance?
14     A. I could have.
15     Q. Did you take notes about
16 that conversation?
17     A. I don't recall.
18     Q. You didn't share any of that
19 information with Carol Smith, correct?
20     A. I don't recall the
21 conversation to recall.
22     Q. Fair enough. Okay. No
23 recollection of discussing with Carol
24 Smith any conversations you had with
25 Bores or McVeigh regarding Carol's job

### Page 616

1 performance?
2     A. I don't recall.
3     Q. Okay. Prior to March 19th
4 of 2010, Mrs. Smith was not under
5 investigation for anything, right?
6     A. Not that I'm aware of, sir.
7     Q. You had no complaints, as I
8 understand it, that school year up until
9 March of 2010 about her sleeping in
10 class or in study hall?
11     A. I had something that was
12 anonymous, but anonymous is anonymous.
13     Q. Did you share that with
14 Carol Smith?
15     A. No, because it was anonymous.
16     Q. Okay. You disregarded it?
17     A. I can't follow up with
18 anonymous.
19     Q. Okay. So the answer is,
20 leaving aside this anonymous complaint,
21 there were no complaints from anyone in
22 the 2009/2010 school year about Carol
23 Smith sleeping in class or in study
24 hall?
25     A. Not that I recall.

### Page 617

1     Q. And you never observed it?
2     A. Correct.
3     Q. Was Mr. Dahlmann in and out
4 of her classroom and study hall during
5 the 2009/2010 school year?
6     A. I would assume so, but you'd
7 have to get that from Mr. Dahlmann.
8     Q. Fair enough. Fair enough.
9 Did he ever come to you with any
10 complaints during the 2009/2010 school
11 year about Carol Smith sleeping in class
12 or in study hall?
13     A. Not that I recall.
14     Could you -- could you repeat the
15 question about if I was aware of anybody
16 coming -- did you ask me if anybody --
17     Q. Well, I think what I asked
18 you, and let me -- let me say what I
19 thought your answer was. I'm perfectly
20 content to ask you again.
21     I asked you, I thought, did you
22 have any complaints from anyone during
23 the 2009/2010 school year prior to March
24 19th about Carol Smith sleeping in class
25 or study hall?

**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY

1.800.694.4787   www.cefgroup.com   fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 • 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 • 330.253.8119

Court Reporting • Video Conferencing • Legal Video Production • Investigations
Claims Services • Process Service • Record Retrieval • Document Management • Trial Graphics

ARBITRATION - VOLUME II

Page 618

1 A. Okay.
2 Q. You mentioned the one
3 anonymous complaint that you dismissed,
4 because it was anonymous. And you said
5 you couldn't recall any others?
6 A. I do recall another one.
7 Q. Okay.
8 A. And that was by an employee
9 of the school who refused to follow up
10 on it. And I asked him to put it in
11 writing, and they did not.
12 Q. So was that treated the same
13 as an anonymous complaint from your
14 standpoint?
15 A. I couldn't do much about it
16 without a statement.
17 Q. You couldn't even go and
18 approach Mrs. Smith and say, I'm hearing
19 these things, there's something going
20 on?
21 A. Mrs. Smith and I had had
22 that conversation prior to that school
23 year at another time.
24 Q. I'm talking now just about
25 2009/2010 school year though.

Page 620

1 believe he was.
2 Q. And he could have
3 investigated this, if somebody had
4 determined it was serious enough,
5 correct?
6 A. That's possible.
7 Q. Okay. That did not occur?
8 A. Not to my knowledge.
9 Q. Mrs. Smith was not removed
10 from her class on March 19th after you
11 first became aware of the allegation,
12 correct?
13 A. Correct.
14 Q. And it wasn't even -- the
15 fact of the matter is, it was never --
16 prior to Mrs. Smith being relieved of
17 her duties on the morning of March 29th
18 of 2010, the allegation about what did
19 or did not occur in the classroom on
20 March 19th was never brought to Mrs.
21 Smith's attention and then her having an
22 opportunity to respond to it, correct?
23 A. Not by me.
24 Q. Okay. Are you aware of
25 anybody else?

Page 619

1 A. I did not approach her.
2 Q. Fair enough. Now, as I
3 understand it, was it on March 19th of
4 2010 when you first became aware of some
5 allegation regarding pornography in Mrs.
6 Smith's 5th period social studies class?
7 A. Was that a Friday?
8 Q. It was a Friday.
9 A. Yes.
10 Q. And then as I understand
11 your testimony, from Friday, March 19th,
12 until Monday morning, March 29th, 2010
13 there was no investigation conducted by
14 you or anybody under your direct
15 supervision regarding that allegation?
16 A. That's correct.
17 Q. Mrs. Smith was permitted to
18 teach the entire week of March 19th,
19 correct, yes?
20 A. Yes. Sorry.
21 Q. Okay. I know that you said
22 you were out of town for part of that
23 period of time. Was Mr. Dahlmann still
24 in school?
25 A. I was not at school, but I

Page 621

1 A. I'm not aware.
2 Q. Okay. Now, as I understand
3 it, at some point during that week, I
4 can't remember, did you tell me it was
5 -- did you testify that it was March
6 25th, a Thursday, that you got a call
7 from Dr. Gunner? You don't remember.
8 A. I can't recall.
9 Q. That's fine.
10 A. I can't recall the date.
11 Q. Fair enough.
12 A. All I know is I was in San
13 Diego.
14 Q. Okay. Was that an angry
15 call from him?
16 A. No.
17 Q. Okay. I mean, was he sort
18 of matter of fact, I just found out
19 about this allegation about something
20 that happened March 19th?
21 A. He knew I was on a trip to
22 see High Tech High.
23 Q. Right.
24 A. And I knew that if he was
25 calling me, there was something that he

Cefaratti Group
THE LITIGATION SUPPORT COMPANY

1.800.694.4787    www.cefgroup.com    fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 · 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 · 330.253.8119

Court Reporting · Video Conferencing · Legal Video Production · Investigations
Claims Services · Process Service · Record Retrieval · Document Management · Trial Graphics

ARBITRATION - VOLUME II

Page 622

1    wanted to talk about.
2        Q. Okay. But he wasn't angry
3    with you about anything?
4        A. He had some questions for
5    me, but no, I don't believe he --
6    that's not how he operates.
7        Q. The questions being, why
8    wasn't something done about this sooner?
9        A. No, what transpired.
10       Q. What happened?
11       A. To my knowledge.
12       Q. Okay. Did he tell you he
13   got a call or an e-mail message from a
14   board member, and that's what led him to
15   call you?
16       A. I don't recall the exact
17   scenario.
18       Q. Okay. He did not share that
19   with you?
20       A. He might have.
21       Q. Fair enough.
22       A. He said that he had some
23   information that he was following up on.
24       Q. Okay. And was it your
25   understanding from that conversation

Page 623

1    that Dr. Gunner was then initiating an
2    investigation regarding this matter?
3        A. He had some questions for
4    me.
5        Q. Okay. But all you knew was
6    what you were told on the 19th of
7    March, right?
8        A. From -- all I knew --
9        Q. Whoever it is that came in
10   to talk to you?
11       A. Yes.
12       Q. I heard a name of Beth
13   Martinez.
14       A. Yes. Yes.
15       Q. And that was the limit of
16   your knowledge about this?
17       A. At that point, yes.
18       Q. Okay. All right.
19       A. Prior to his phone call.
20       Q. Okay. Were you involved at
21   all in the decision to relieve Mrs.
22   Smith of her duties on March 29th?
23       A. I was present, I believe.
24       Q. I understand.
25       A. The date --

Page 624

1        Q. The decision making process,
2    I'm just asking you, were you involved
3    in that, did Dr. Gunner consult you, ask
4    you your opinion?
5        A. Yes.
6        Q. Okay.
7        A. I believe.
8        Q. And it was that morning? Or
9    was it before, before Monday the March
10   -- when was the decision made to your
11   recollection?
12       A. I can't really recall the
13   timeline at that point.
14       Q. Okay.
15       A. We had discussed a number of
16   things. But at that time I was walking
17   up some steps, not when we -- it was on
18   the telephone, so.
19       Q. The steps at the school or
20   somewhere else?
21       A. California.
22       Q. Okay. Were you there the
23   whole weekend?
24       A. No.
25       Q. Okay. So you must have had

Page 625

1    a conversation with him on Friday then
2    about this?
3        A. It was the same conversation.
4        Q. Okay. Did he tell you he
5    was going to relieve Mrs. Smith of her
6    duties on Monday, the 29th?
7        A. We -- I don't recall the
8    exact conversation. It might have been
9    discussed what their -- with the
10   process.
11       Q. Okay. So you get to school
12   on Monday, the 29th of March. And
13   you're told to have Mrs. Smith come down
14   to the office by Dr. Gunner?
15       A. Yes.
16       Q. Did you know at that point
17   that she was going to be relieved of
18   her duties?
19       A. Yes.
20       Q. Okay. Were you present when
21   she came down to the office?
22       A. Yes.
23       Q. And as I understand it, she
24   was given the letter by Dr. Gunner that
25   basically said, turn in your keys, give

**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY

1.800.694.4787   www.cefgroup.com   fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 • 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 • 330.253.8119

Court Reporting • Video Conferencing • Legal Video Production • Investigations
Claims Services • Process Service • Record Retrieval • Document Management • Trial Graphics

ARBITRATION - VOLUME II

## Page 626

1 us your laptop and go home?
2     A. There was some discussion
3 about her doing grades I think at that
4 particular time, yes --
5     Q. But no --
6     A. -- basically.
7     Q. No questions of her about
8 what the -- what alleged -- what was
9 alleged to have occurred on the March --
10 on March 19th?
11     A. I can't recall the exact
12 conversation. I don't want to
13 speculate.
14     Q. Okay. That's fair. And she
15 did -- she gave you -- did she give you
16 the laptop or did she give it to Dr.
17 Gunner?
18     A. I believe that she was
19 allowed some time to work with the
20 laptop, because I'm pretty sure there
21 was something about grades. There was a
22 request for lesson plans, et cetera, and
23 keys. She gave me the keys and the
24 laptop before she left that day.
25     Q. Was the laptop examined to

## Page 627

1 be sure there wasn't any pornography on
2 the laptop?
3     A. I didn't examine it.
4     Q. Do you know if it ever was,
5 did anybody ever do a forensic
6 evaluation of the laptop to be sure she
7 wasn't maintaining pornography on the
8 laptop?
9     A. That would not be for me to
10 do that.
11     Q. You never heard that that
12 occurred?
13     A. I never heard that.
14     Q. Okay. And after Mrs. Smith
15 was sent home, that's when you started
16 bringing down the students from her
17 class --
18     A. Yes.
19     Q. -- is that correct?
20 As I understand it, at no time
21 during this investigation were any of
22 Mrs. Smith's students in the other two
23 social studies classes that she taught,
24 they've never been interviewed, correct?
25     A. That's correct, sir.

## Page 628

1     Q. There's no evidence
2 whatsoever of any allegations or
3 suggestions that Mrs. Smith was sleeping
4 or dozing off in the other two social
5 studies classes that she taught?
6     A. We did not call anybody down
7 to ask.
8     Q. Nobody asked to find out if
9 Mrs. Smith was, quote, unquote, teaching
10 pornography or discussing inappropriate
11 matters in those two classes?
12     A. I did not.
13     Q. Do you know if anybody did?
14     A. I don't. It's not for me to
15 say.
16     Q. But it is fair to say that
17 none of the students in either of those
18 two social studies classes were ever
19 interviewed by you?
20     A. Correct.
21     Q. And you're not aware of them
22 being interviewed by anybody else?
23     A. I'm not aware.
24     Q. And then she taught other
25 classes, as well. And I assume that

## Page 629

1 the other classes that she taught,
2 nobody interviewed those students to see
3 if she was discussing pornography in
4 class or had mentioned Playboy or
5 Playgirl in class?
6     A. I did not.
7     Q. Okay. Are you aware of
8 anybody that did?
9     A. I'm not aware.
10     Q. When you bring these -- when
11 you brought these students down on the
12 morning of March 29th, as I understand
13 it, they came down in groups of three
14 or four, is that right?
15     A. Yes, sir.
16     Q. Okay. Who did the talking
17 when they came in the room, was that
18 you or Dr. Gunner?
19     A. Dr. Gunner for the most
20 part, but I would occasionally say
21 something. But it was --
22     Q. Okay. Were they told, look,
23 we're investigating Mrs. Smith, she's
24 done something wrong and we need to know
25 what you know about that?

Cefaratti Group
THE LITIGATION SUPPORT COMPANY
1.800.694.4787    www.cefgroup.com    fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 • 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 • 330.253.8119

Court Reporting • Video Conferencing • Legal Video Production • Investigations
Claims Services • Process Service • Record Retrieval • Document Management • Trial Graphics

ARBITRATION - VOLUME II

Page 630

1    A. No.
2    Q. Okay. Well, tell me exactly
3  what -- from your recollection exactly
4  what these students were told?
5    A. Thank you for saying that,
6  my recollection.
7    Q. That's fair enough.
8    A. But I don't know exactly
9  what was said.
10    Q. I understand.
11    A. The first thing was to tell
12  the students that you're not in trouble.
13    Q. Of course.
14    A. Okay. Because whenever they
15  get called to the principal's office,
16  that's their immediate thought.
17    Q. Let me stop you there. This
18  is a big deal for -- well, it's a big
19  deal for any high school kid, let alone
20  a freshman, to be called, number 1, to
21  the principal's office, and then find
22  the superintendent sitting there as,
23  well, right? It's a fair assumption?
24    A. Speculating on what a big
25  deal is, but coming down to the

Page 631

1  principal's office is not the normal
2  course of the day, yes.
3    Q. I'm old, but I recall being
4  called down before, and it's not
5  particularly pleasant, and it's somewhat
6  anxiety producing.
7    A. Well, not always to my
8  office.
9    Q. All right. Fair enough.
10    A. Okay. And I try not to
11  operate my school that way, so that it's
12  an unpleasant ordeal, but.
13    Q. Fair enough.
14    A. But my role in this is to
15  put my students at ease.
16    Q. Okay.
17    A. And Dr. Gunner I think also
18  did that in speaking to the intent of
19  what the process was going to be to
20  them. That his job is to evaluate
21  teachers and principals, and -- excuse
22  me. And when he gets an allegation, he
23  has to investigate that.
24    And that was going to be the
25  role that they -- we were going to take

Page 632

1  that day.
2    Q. Was that the phrase he used,
3  it was his job to evaluate teachers?
4    A. No.
5    Q. All right. Okay.
6    A. It's --
7    Q. I'm just asking.
8    A. -- my job.
9    Q. I didn't mean you versus
10  him, but did he mention the phrase
11  evaluate teachers?
12    A. No.
13    Q. Okay.
14    A. In terms of the overall
15  district.
16    Q. Okay. Were the students
17  told that these -- writing these
18  statements out was voluntary or not?
19    A. If I could just go back to
20  the next question or previous question,
21  sir. To investigate, it would have
22  been, not to evaluate.
23    Q. Fair enough. All right.
24  That's fine.
25    Were the students told that

Page 633

1  writing out these statements was
2  voluntary?
3    A. I do believe we told them
4  that we would like them to. We didn't
5  ever say that it was mandatory. We
6  would like them.
7    Q. And when a principal and the
8  superintendent of schools tells a high
9  school freshman that you'd like them to
10  write a statement out, typically they're
11  going to write a statement out, right,
12  in your experience?
13    A. There were some, one, to my
14  recollection, I don't know who, that
15  said I prefer not to, and we said,
16  that's okay.
17    Q. Who was that?
18    A. I don't recall. I just
19  recall there was one instance.
20    Q. So --
21    A. They did end up writing
22  something out after they left.
23    Q. Okay. You just don't know
24  the name of the student?
25    A. No.

**Cefaratti Group**  1.800.694.4787    www.cefgroup.com    fax:216.687.0973
THE LITIGATION SUPPORT COMPANY  Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 • 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 • 330.253.8119

Court Reporting • Video Conferencing • Legal Video Production • Investigations
Claims Services • Process Service • Record Retrieval • Document Management • Trial Graphics

## Page 634

1  Q. Was that turned in?
2  A. I don't recall.
3  Q. Okay. Was there any
4  consideration given to calling the
5  parents of any students informing them
6  that their child was being asked to
7  write a statement out or participate in
8  an investigation about a school teacher?
9  A. Not at this time.
10  Q. Well, that's the only time
11  that they were interviewed, was it not?
12  A. Yes.
13  Q. Okay. So the answer is no?
14  A. Yes.
15  Q. The parents weren't called or
16  the parents were not informed, correct?
17  A. Yes.
18  Q. Okay.
19  A. I'm sorry.
20  Q. That's all right.
21  A. I nodded my head.
22  Q. That's all right. Did you
23  tell the students what day it is --
24  what day it was that this alleged
25  discussion or discussion occurred about

## Page 635

1  in which pornography was mentioned in
2  Mrs. Smith's class?
3  A. I'm trying to think, sir.
4  Q. Okay.
5  A. I think we might have
6  mentioned the 19th or the previous
7  Friday.
8  Q. Okay. That was sort of my
9  question. Do you recall saying it was
10  the previous Friday, which would have
11  been the 26th?
12  A. Previous -- no.
13  Q. All right.
14  A. The 19th.
15  Q. Okay.
16  A. Sorry.
17  Q. That's fine. I assume one
18  of the impressions that you took away
19  from this meeting with the students was
20  that these kids were laughing and
21  giggling about this when Mrs. Smith was
22  discussing or mentioning Playboy and
23  Playgirl?
24  A. Some, but not all.
25  Q. The vast majority?

## Page 636

1  A. No, I wouldn't characterize
2  it as that.
3  Q. Okay. If you can go back
4  and look at Board Exhibit 3. It's that
5  teacher's handbook.
6  A. Number 3, sir?
7  Q. Yes, please. The back of
8  that page is what you were talking about
9  earlier during the testimony regarding
10  study hall. Just let me know when
11  you've found it.
12  A. Okay.
13  Q. You have it?
14  A. Yes.
15  Q. Am I correct in that it's in
16  bold type, it says, all electronic
17  devices are unacceptable. Do you see
18  that?
19  A. Yes, sir.
20  Q. That does not include
21  computers, right?
22  A. No.
23  Q. Kids were --
24  A. Yes, that's correct, it does
25  not include computers when we're one to

## Page 637

1  one.
2  Q. Okay. So kids were all
3  issued their own individual computer.
4  Was it this past school year or the
5  year before?
6  A. The 2009/2010 school year.
7  Q. Okay. Every high school
8  student at Perkins High School was
9  issued his or her own personal computer?
10  A. Yes.
11  Q. Through the school district?
12  A. Yes.
13  Q. And when it says, electronic
14  devices are unacceptable in study halls,
15  that was not meant to mean that the
16  kids could not have their computers in
17  study hall?
18  A. Students could have their
19  computer in study hall.
20  Q. Okay. And use the computer?
21  A. Yes.
22  Q. Okay. If you could go two
23  pages back.
24  A. In the same handbook?
25  Q. Yes. Yes, sir?

Cefaratti Group
THE LITIGATION SUPPORT COMPANY
1.800.694.4787    www.cefgroup.com    fax:216.687.0973
Cleveland: 4608 St.Clair Avenue, Cleveland, Ohio 44103 • 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 • 330.253.8119

Court Reporting • Video Conferencing • Legal Video Production • Investigations
Claims Services • Process Service • Record Retrieval • Document Management • Trial Graphics

## ARBITRATION - VOLUME II

**Page 638**

1    A. Back as in toward the back?
2    Q. Yes, toward the back.
3  Telephone usage?
4    A. Yes.
5    Q. One of Mrs. Smith's
6  responsibilities when she had to move
7  from the second floor of room --
8    A. 702.
9    Q. -- 702 at the end of 4th
10  period and make her way down to room
11  605 for 5th period, one of her
12  responsibilities before she left that
13  room after the bell rang, she had to be
14  sure that all the students were out of
15  the room, and then she's required to
16  lock the door, correct?
17    A. That would be the appropriate
18  behavior, yes.
19    Q. And that's consistent with,
20  although it's under telephone use, it's
21  consistent with if you're not in your
22  room, lock the door?
23    A. Yes.
24    Q. Okay. Are you aware of any
25  other teachers, other than Carol Smith,

**Page 639**

1  in the 2009/2010 school year that had to
2  move from classroom to classroom between
3  bells?
4    A. Let me stop and think for a
5  minute.
6    Q. Of course.
7    A. We have, yes, our inclusion,
8  our special needs teachers.
9    Q. And that would include Ms.
10  Malott that was in Mrs. --
11    A. Ms. Malott, Mrs. Belavich.
12    Q. Okay.
13    A. Do you want me to name them
14  all?
15    Q. No. But as I understand it,
16  those teachers were sort of in and out
17  of the room during class, and they had
18  no responsibilities, they're not the
19  primary classroom teacher, so when the
20  bell rang, they're free to go, generally
21  speaking?
22    A. Generally speaking. But you
23  asked me there if there were any other
24  teachers --
25    Q. I did ask you that. You're

**Page 640**

1  right.
2    I'm just trying to understand
3  what their responsibility was versus the
4  classroom teacher's responsibility.
5    A. Let me think. Spanish,
6  social studies.
7    I had Mrs. Fry who moved, sir,
8  on your map.
9    Q. Yes.
10    A. She only moved in the 600
11  across the hallway.
12    Q. Okay.
13    A. But she did move from room
14  to room.
15    Q. Like of 601 to 602?
16    A. No, 604 to 603.
17    Q. Okay. Right across the
18  hall?
19    A. Yeah, because she had sewing
20  in one room and she was --
21    Q. And I think Mrs. Salzgeber
22  had to move from --
23    A. She -- gym.
24    Q. Gym?
25    A. PE to, yeah, the gym, to

**Page 641**

1  801.
2    Q. 801, that's right across the
3  hall, too?
4    A. Well, it's up a ramp and
5  around the corner.
6    Q. Fair enough. Okay. You're
7  not aware of any other teachers in the
8  2009/2010 school year that had to walk
9  the distance that Mrs. Smith did from
10  702 to 605 --
11    A. Not this school year.
12    Q. -- between bells?
13    A. In -- not this school this
14  year.
15    Q. Okay.
16    A. In previous years, yes, but
17  not this school year.
18    Q. Okay. Now, you had
19  testified this morning, you had some
20  knowledge of Mrs. Smith's eye surgery on
21  her right eye, and she had discussed
22  with you the limitations of the right
23  eye?
24    A. I've never looked at her
25  records or had an in depth conversation

**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY
1.800.694.4787    www.cefgroup.com    fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 • 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 • 330.253.8110

Court Reporting • Video Conferencing • Legal Video Production • Investigations
Claims Services • Process Service • Record Retrieval • Document Management • Trial Graphics

ARBITRATION - VOLUME II

Page 642

1 about any of her medical history. But,
2 yes, we had had a conversation that she
3 was -- she wore an eye patch at one
4 time.
5 **Q.** Okay. And that was
6 following some surgery, as you
7 understand it?
8 **A.** As I understand it.
9 **Q.** And she told you back in the
10 2008/2009 school year that there were
11 times when she would close both eyes,
12 because the left eye would get tired,
13 the right eye she couldn't see much of
14 anything out of?
15 **A.** This is what she told me.
16 **Q.** Okay. Do you have any
17 reason to disbelieve that?
18 **A.** The conversation was in
19 regards to her sleeping in class.
20 **Q.** Okay.
21 **A.** And, you know, I've not seen
22 her myself. But again I, you know, had
23 heard various rumblings from other
24 people. So it was a concern, which was
25 why we took the time to address it.

Page 643

1 But on the other hand, since she
2 was wearing a patch, I knew she had
3 surgery. It's hard for me to tell
4 whether somebody's resting when their
5 eyes are closed or whether they're
6 sleeping.
7 **Q.** She did offer an explanation
8 to you what was going on --
9 **A.** That was the explanation she
10 gave me.
11 **Q.** -- relating to her eye?
12 Okay.
13 THE NOTARY: One at a time,
14 please.
15 **Q.** You understand that Mrs.
16 Smith was relieved of her duties on
17 March 29th of this -- of this year
18 because of allegations of teaching
19 inappropriate material in her class? I
20 mean, that was the justification for
21 sending her home, correct?
22 **A.** I believe that was part of
23 it. I'd have to refer exactly to
24 the --
25 **Q.** Was there an incident, and I

Page 644

1 don't know when it was, within the
2 recent, you know, past few years where
3 Mr. Obergefell showed a movie in class
4 of a hostage beheading? Do you recall
5 that, the actual film of someone --
6 **A.** A video.
7 **Q.** -- beheading an individual?
8 **A.** Yes.
9 **Q.** Do you recall that?
10 **A.** Yes.
11 **Q.** Was he sent home?
12 **A.** He came down and told me.
13 **Q.** Okay.
14 **A.** And I took that to the
15 superintendent.
16 **Q.** My question --
17 **A.** I don't recall whether he
18 was sent home. That was a number of
19 years ago.
20 **Q.** That certainly was not
21 appropriate for him to do that, correct?
22 **A.** There was disciplinary action
23 that followed.
24 **Q.** Okay. He wasn't terminated?
25 **A.** No, he was not.

Page 645

1 **Q.** You don't even know if he
2 was relieved of his duties at all?
3 **A.** I don't recall.
4 **Q.** Okay. It certainly was not
5 appropriate for him to show that to a
6 class?
7 **A.** That's what we determined,
8 yes.
9 **Q.** And as I understand it, it
10 was the actual beheading of a human
11 being by someone?
12 **A.** I never saw the video.
13 **Q.** Okay. If you could look at
14 exhibits -- look at Exhibit 34, Mr.
15 Gasteier. It's a letter you sent to
16 Mrs. Smith on June 15th, 2009.
17 **A.** Yes, sir.
18 **Q.** This was prior to her
19 receiving a 10 day suspension from
20 school. And she had been accused or
21 alleged that she had been late to attend
22 Mr. Obergefell's class, and that she was
23 perhaps going to be disciplined because
24 she had not gone to Mr. McVeigh's study
25 hall class as part of her observation of

**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY
1.800.694.4787     www.cefgroup.com     fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 • 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 • 330.253.8119

Court Reporting • Video Conferencing • Legal Video Production • Investigations
Claims Services • Process Service • Record Retrieval • Document Management • Trial Graphics

## ARBITRATION - VOLUME II

Page 646

1   his social studies teaching.
2        And as I understand it from
3   looking at your letter, she did explain
4   to you, and I think you testified this
5   morning, that with regard to being late
6   to Mr. Obergefell's class, she was
7   stopped in the hallway by a student who
8   had a question for her regarding a test.
9   Do you recall that?
10       A. I recall the testimony, and
11  I recall her stating that.
12       Q. Okay.
13       A. I never asked to know who
14  the student was, but that's what she had
15  told me. And I --
16       Q. I thought I understood your
17  testimony this morning that those things
18  happen. And I think the phrase you
19  used was when students come up to
20  teachers in the hallway, you don't want
21  the teachers to sort of shun them away?
22       A. That's correct.
23       Q. So it was not inappropriate
24  for Mrs. Smith to stop and talk to her or her
25  student and try and answer his or her

Page 647

1   question that morning?
2        A. I believe I testified that
3   way. I still agree.
4        Q. Okay.
5        A. I did also testify that we
6   expected her to be on time.
7        Q. I understand. But there's
8   also times when that just can't occur --
9        A. It happens.
10       Q. -- because of a student's
11  needs, and you don't want to offend the
12  student?
13       A. It happens.
14       Q. Okay. And you agreed,
15  looking at the bottom of this letter,
16  you also agreed that Mrs. Smith was not
17  specifically instructed to remain in Mr.
18  McVeigh's 5th period study hall?
19       A. Not -- not specifically
20  instruction.
21       I thought the implication is that
22  she would stay to remain to talk to the
23  teachers who were instructing the class.
24       Q. Okay.
25       A. But no, I never recall

Page 648

1   saying to her --
2        Q. All right.
3        A. -- you need to stay for the
4   study hall period.
5        Q. Fair enough. During the
6   2009/2010 school year did Mrs. Smith
7   ever ask you if she could stay up in
8   room 702 to teach the social studies
9   class?
10       A. Not that I recall.
11       Q. Okay. Would she have been
12  permitted to do that or not?
13       A. We had asked her and
14  instructed her to teach in room 605,
15  because that's where all the materials
16  were for the class, the SMART board and
17  the projection unit and the other
18  materials. And the teacher was there,
19  as well.
20       Q. I'm just asking --
21       A. And the room was available.
22       Q. I'm just asking, was room
23  702 available during 5th period, as
24  well?
25       A. Yes, sir.

Page 649

1        Q. I'm just asking what -- was
2   there any reason why she couldn't have
3   just stayed in 702 to teach social
4   studies?
5        A. The reasons that I just
6   gave, in terms of the materials were
7   available in 605, the electronic
8   equipment for her to use.
9        Q. Okay. And that equipment
10  was not available in 702?
11       A. No.
12       Q. Okay. Looking at Board
13  Exhibit 51, Mr. Gasteier, the last page
14  of that exhibit.
15       THE ARBITRATOR: What was the --
16       MR. SHOUB: 51.
17       Q. Do you see that handwriting
18  on the left-hand outside the margin at
19  the bottom of the page on the left-hand
20  side?
21       A. You're looking at -- you're
22  looking at 51, the last page?
23       Q. The last page of 51.
24       A. And it's got two underlines
25  underneath?

**Cefaratti Group**  1.800.694.4787   www.cefgroup.com   fax:216.687.0973
THE LITIGATION SUPPORT COMPANY  Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 • 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 • 330.253.8119

Court Reporting • Video Conferencing • Legal Video Production • Investigations
Claims Services • Process Service • Record Retrieval • Document Management • Trial Graphics

## ARBITRATION - VOLUME II

1   Q. Yes.  What was that word?
2   A. I have no idea.
3   Q. That's not your handwriting?
4   A. No.
5   Q. Oh, okay.  Do you know whose
6  handwriting that is?
7   A. Not offhand, no.
8   Q. Okay.  So you don't know
9  whose handwriting pages 2, 3 and 4 are
10 of Exhibit 51?
11   A. No.
12   Q. Okay.
13   A. I -- if I look at it and I
14 read it, I can give you an idea,
15 assume, but not from the handwriting
16 itself.
17   Q. No, that's fine.  That's
18 fine.  I'm just asking if you know.  We
19 don't need to do that.
20   Do you have any -- were you
21 involved at all in the decision to
22 suspend Mrs. Smith pending a termination
23 hearing that we're about today?
24   A. Only through the conversation
25 that I've had with Mr. Gunner when I

1  part of the conversation we had in
2  California.  Again I'm standing on the
3  steps walking with my phone going up,
4  not taking notes during the
5  conversation.
6   Q. I understand.  Did you have
7  any other discussions after you got back
8  from California, and after you
9  interviewed or participated in these
10 interviews with the students, did you
11 have any further discussion with Dr.
12 Gunner about Mrs. Smith being suspended
13 pending termination?
14   A. I'm going to ask you, after
15 I got back from California?  Excuse me.
16 After the --
17   Q. I'm sorry.  Go ahead.
18   A. After I talked to the
19 students?
20   Q. Yes.  Let's just use March
21 29th, 2010 as the date.
22   A. That Monday?
23   Q. Yeah, from that Monday on,
24 did you have any discussions with Dr.
25 Gunner about suspending Mrs. Smith

1  was in California, in terms of what
2  might be the possible outcomes of an
3  investigation.
4   Q. Well, tell me about that
5  conversation.  What was said about
6  suspending Mrs. Smith pending
7  termination?
8   A. Well, I don't know -- let me
9  stop and think.  If there's any
10 investigation, there are certain
11 procedures to go through as per the
12 collective bargaining agreement.
13   Q. Okay.
14   A. And depending upon the
15 allegations or investigation as it goes
16 forward, that there might be certain
17 steps taken under the progressive
18 discipline area.
19   Q. I guess my question is, did
20 you have a specific discussion with Dr.
21 Gunner prior to March 29th about Mrs.
22 Smith being suspended pending
23 termination?
24   A. Could have had it during
25 that conversation, it could have been

1  pending a termination hearing?
2   A. We discussed the time that I
3  had talked to the students without Dr.
4  Gunner and what my findings had been,
5  and finding them fairly consistent with
6  all the other student interviews that
7  had been conducted while he and I were
8  there and what the possible next steps
9  would be in regards to Mrs. Smith.
10   Q. Right.  And I'm -- you
11 answered a question, but not the
12 question I asked you.  My question to
13 you was, after -- on March 29th, from
14 that date forward, did you have any
15 discussions with Dr. Gunner specifically
16 about Mrs. Smith being suspended pending
17 termination?
18   A. More than I gave you before,
19 I don't recall.
20   Q. Okay.  Did you have any
21 discussions with any school board
22 members about any of these matters
23 relating to the March 19th allegation
24 and any allegations that arose out of
25 the investigation?

**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY

1.800.694.4787   www.cefgroup.com   fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 • 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 • 330.253.8119

Court Reporting • Video Conferencing • Legal Video Production • Investigations
Claims Services • Process Service • Record Retrieval • Document Management • Trial Graphics

## ARBITRATION - VOLUME II

### Page 654

1  A. Not to my knowledge.
2  Q. Did Dr. --
3  A. It wouldn't -- go ahead.
4  Q. Well, it sounds like you
5 have an answer. Do you want to give me
6 some more answer?
7  A. No, I just -- I don't recall
8 ever having a conversation with a school
9 board member in regards to a
10 disciplinary hearing with a teacher.
11  Q. Okay. Well, specifically
12 Carol Smith.
13  A. Yeah, well, any.
14  Q. All right. Were you asked
15 to make a recommendation about whether
16 or not Mrs. Smith should be suspended
17 pending termination?
18  A. I don't believe that that's
19 my role in the collective bargaining
20 agreement and I wouldn't want to
21 supersede that.
22  Q. I didn't ask that. I'm just
23 asking if you were. Were you asked to
24 give a recommendation?
25  A. I don't know why I would be.

### Page 655

1  Q. Simple question.
2  A. No.
3  Q. Were you asked?
4  A. Not that I recall.
5  But if you'll allow me, the
6 conversation that occurs between the
7 superintendent and the principal, at
8 least in our situation, is a give and
9 take over what has transpired. Okay.
10 So we may have discussed it.
11  Q. That's what I'm getting at
12 that. Yeah. That's what I'm asking.
13  A. But I don't recall any
14 particular time --
15  Q. Okay.
16  A. -- the superintendent asking
17 me, Mr. Gasteier, would you recommend
18 that she be terminated.
19  Q. Did you -- do you recall
20 saying or expressing an opinion about
21 whether or not Mrs. Smith should be
22 suspended pending termination?
23  A. Again that's not for me to
24 say. But I would say that these are
25 serious allegations, and we need to

### Page 656

1 follow the progressive discipline.
2  Q. I'm just asking, regardless
3 of whether it's the proper role or not
4 proper role, whatever the collective
5 bargaining agreement says, I'm not
6 asking that question.
7  I'm just asking, did you ever say
8 to Dr. Gunner, I think Carol should be
9 suspended pending termination or I don't
10 think that she should be suspended
11 pending termination?
12  A. I might have to answer I
13 don't recall, sir.
14  Q. Okay. There's a number of
15 typewritten notes in the board's
16 exhibits, I think starting with -- if we
17 look at Board Exhibit 57, Mr. Gasteier.
18 And, you know, sort of on back through
19 there, into the 60s, are these -- these
20 aren't your typewritten notes, right?
21  A. You just want me to glance
22 through all of them?
23  Q. If you need to glance
24 through them all, that's fine.
25  A. They go from where to where,

### Page 657

1 because I'm getting the understanding
2 here --
3  Q. 57 all the way back to --
4  A. And you're --
5  Q. Hang on a second. Let me
6 make sure I have the question right.
7  And through 80, at the beginning
8 of each of those exhibits there are
9 typewritten notes. My question to you
10 is, once you've had a chance to look at
11 them, did you type any of those?
12  A. If I can answer without
13 looking at each one?
14  Q. No. Please, look at each
15 one then, if you need to.
16  A. Okay.
17  No, I did not type any of these.
18  Q. I'm sorry. The answer is
19 no?
20  A. Correct.
21  Q. Okay. Do you know, was Mrs.
22 Smith -- in the 2009/2010 school year,
23 there was a special ed. teacher that
24 would have been in her 5th period social
25 studies class along with the students,

**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY
1.800.694.4787   www.cefgroup.com   fax:216.687.0973
Cleveland: 4608 St.Clair Avenue, Cleveland, Ohio 44103 • 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 • 330.253.8119

Court Reporting • Video Conferencing • Legal Video Production • Investigations
Claims Services • Process Service • Record Retrieval • Document Management • Trial Graphics

## ARBITRATION - VOLUME II

**Page 658**

1 and that was Mrs. Malott?
2     **A.** Correct.
3     **Q.** Okay. Was that -- was she
4 in that class every day, was that your
5 understanding?
6     **A.** I can't specify every day,
7 but that would be her normal assignment.
8     **Q.** Okay.
9     **A.** Because as a rule there were
10 a number of other students on IEPs --
11     **Q.** Right.
12     **A.** -- individual education
13 plans.
14     **Q.** Okay. So Mrs. Malott at
15 least on a -- can we agree on a fairly
16 regular basis or consistent basis would
17 have been in the 5th period social
18 studies class?
19     **A.** Yes.
20     **Q.** And she never came to you
21 during the 2009/2010 school year and
22 said, Carol Smith is sleeping in class?
23     **A.** Not that I recall. She
24 might have observed it, but I don't
25 know.

**Page 659**

1     **Q.** She didn't tell you?
2     **A.** I don't recall her saying
3 that.
4     **Q.** All right. And the person
5 that Mrs. Smith bumped out of that job,
6 Mrs. Mazza, was a pretty good friend of
7 Ms. Malott's, right, or do you know
8 that?
9     **A.** They teach in the same
10 hallway, but other than that, I don't
11 know their --
12     **Q.** Was Mrs. Mazza a pretty
13 popular teacher? Well, did Bores and
14 McVeigh like her?
15     **A.** Again those are questions
16 that I don't feel --
17     **Q.** That's fine.
18     **A.** -- I'm capable to answer.
19     **Q.** Fair enough. That's fine.
20 For the 2009/2010 school year, Mr.
21 Gasteier, did you ask -- is there a
22 school nurse at the high school?
23     **A.** At the beginning of the year
24 we had a nurse for four hours a week.
25     **Q.** Okay.

**Page 660**

1     **A.** There is a nurse there who
2 is assigned to an individual student.
3     **Q.** Okay. For that full -- for
4 that full four hours?
5     **A.** No, sir.
6 Can I?
7     **Q.** Yes, please.
8     **A.** We had -- we share a nurse
9 from the county, and that nurse
10 circulates throughout the district. At
11 the beginning of that year that nurse
12 was there for four hours one day a
13 week. But this other nurse was there
14 for a particular student who needs
15 services, and she was there most of the
16 day every day.
17     **Q.** For the 2009/2010 school
18 year, did you ask either any school
19 nurse or school nurse that was there for
20 the four hours a day at the beginning
21 of the school year to have any --
22 conduct any informational sessions with
23 the students that Mrs. Smith knows
24 regarding diabetes and insulin control
25 and things like that?

**Page 661**

1     **A.** No, sir.
2     **Q.** Okay. And prior to this
3 allegation of what occurred on March
4 19th of 2010, there's been no prior
5 allegations whatsoever that Mrs. Smith
6 has either ever taught an inappropriate
7 subject in any of her classes or had
8 discussed pornography in any of her
9 classes, other than this one incident?
10     **A.** I would say the pornography.
11 But as far as -- I would be speculating
12 to say at any other time prior to this
13 time over her career.
14     **Q.** None that you're aware of?
15     **A.** Well, I've had issues with
16 parents. They've had concerns.
17     **Q.** About what she teaches?
18     **A.** No.
19     **Q.** Or the demeanor?
20     **A.** The interaction with their
21 children.
22     **Q.** Demeanor, as opposed to
23 substance?
24     **A.** Yes.
25     **Q.** Yes. Okay.

**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY
1.800.694.4787   www.cefgroup.com   fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 • 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 • 330.253.8119

Court Reporting • Video Conferencing • Legal Video Production • Investigations
Claims Services • Process Service • Record Retrieval • Document Management • Trial Graphics

## ARBITRATION - VOLUME II

**Page 662**

1       A. Do you mind if I get more
2 ice while you're looking?
3       Q. I'm sorry.
4       A. May I get more ice?
5       MR. WILLIAMS: Mr. Gasteier, do
6 you need a break?
7       THE WITNESS: No just more ice.
8       (Discussion off record.)
9       MR. SHOUB: Actually that's all
10 the questions I have, Mr. Gasteier.
11 Thank you.
12       THE WITNESS: Okay.
13       THE ARBITRATOR: Do you have any?
14       MR. WILLIAMS: A couple.
15       EXAMINATION OF CHRIS J. GASTEIER
16 BY-MR.WILLIAMS:
17       Q. Mr. Gasteier, there was a
18 question of you about Mr. Obergefell?
19       A. Obergefell.
20       Q. I am never going to be able
21 to say that name. Obergefell. And a
22 video that he had shown in his class
23 which allegedly depicts a beheading, I
24 think is what Mr. Shoub's question to
25 you addressed.

**Page 663**

1       Do you recall when that was, what
2 school year?
3       A. Not offhand, but I would say
4 that it would have been -- it was
5 during Mrs. -- I've to go by
6 superintendents. Okay. So it was
7 before Mr. Gunner. It was before Mr.
8 Rectenwald. It was the beginning of
9 Mrs. Buccieri tenure. It would have
10 been around 2004/2005, I would think.
11 Maybe a little earlier. I'm guessing.
12 I don't recall.
13       Q. Okay. And how was it that
14 you learned about this incident?
15       A. He came and told me.
16       Q. Okay. So he came to your
17 office and admitted to you?
18       A. He came to me in the hallway
19 while -- between classes at -- towards
20 the end of the day.
21       Q. And admitted to you that
22 this had happened?
23       A. He told me the sequence that
24 had happened, yes.
25       Q. Okay. What was his purpose

**Page 664**

1 for coming to tell you this?
2       A. I think that he felt that it
3 wasn't something that was normal. And
4 it might be perceived, and that I might
5 get a phone call from parents or
6 students or someone.
7       Q. He was concerned he had made
8 a mistake?
9       A. Yes, sir.
10       Q. Okay. Due to his admission,
11 did you then have to interview all the
12 students in his classroom to find out
13 what had happened?
14       A. No. I took him at his word.
15       Q. Had he been previously
16 disciplined for showing inappropriate
17 movies?
18       A. No.
19       Q. Had he had any previous
20 discipline that you recall?
21       A. Not that I recall.
22       Q. And he had only taught in
23 your building up to that point?
24       A. Yes, sir.
25       Q. Okay. Did he tell you why

**Page 665**

1 he had shown that video?
2       A. Yes. And, you know, this
3 has been a number of years, so I'm
4 going to recollect as best I can.
5       He taught current affairs class.
6 It was something about the Middle East,
7 as I recall. Some students said that
8 they had seen it and wanted to view it.
9 He gave the students an option whether
10 to stay or to leave. And then they
11 proceeded to show it to the best of my
12 recollection.
13       Q. Okay.
14       A. And I can't recall, I think
15 maybe one or two students left and went
16 to another classroom, but I can't be
17 sure. I know he told me he gave them
18 the option of that.
19       Q. So that as a result of that
20 incident, you imposed some sort of
21 discipline upon him?
22       A. I talked to the
23 superintendent, yes. And we determined
24 that there would be some -- according to
25 the collective bargaining agreement, we

**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY

1.800.694.4787    www.cefgroup.com    fax:216.687.0973
Cleveland: 4608 St.Clair Avenue, Cleveland, Ohio 44103 • 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 • 330.253.8119

Court Reporting • Video Conferencing • Legal Video Production • Investigations
Claims Services • Process Service • Record Retrieval • Document Management • Trial Graphics

## ARBITRATION - VOLUME II

### Page 666

1 would follow the progressive discipline.
2 Q. Okay. So what did that mean
3 in that particular instance for him?
4 A. I don't recall. I'm sure it
5 was a letter of reprimand. I don't
6 know if there was -- I don't recall a
7 suspension, but there could have been.
8 I don't recall whether there was or not.
9 Q. Okay. Had you had any
10 complaints about him sleeping in class
11 prior to that?
12 A. No, sir.
13 Q. Or being tardy to class?
14 A. No, sir.
15 Q. Okay. And he hadn't been
16 suspended for three days prior to that?
17 A. No, sir.
18 Q. Or suspended for 10 days
19 prior to that?
20 A. No, sir.
21 Q. You testified regarding
22 teachers who moved from one room to
23 another room during the school day in
24 the 2009/2010 school year. Are there
25 teachers who move from classroom to

### Page 667

1 other assigned duties during the school
2 day, such as the lunchroom?
3 A. Yes, sir.
4 Q. Okay.
5 A. Excuse me. Yes, sir.
6 Q. And explain how that happens.
7 THE ARBITRATOR: Crunch your ice
8 first.
9 THE WITNESS: Thank you. That
10 almost came out on the table. I'm
11 sorry. Thank you.
12 A. If you look at -- can I --
13 Q. Yeah.
14 A. -- refer to the --
15 Q. Exhibit 101.
16 A. Yeah, the thing at the very
17 back, the map.
18 Q. Yes.
19 A. The cafeteria is in upper
20 right-hand corner.
21 Q. Yes.
22 A. And the -- I can give you
23 some examples of who our lunchroom
24 supervisors were.
25 Q. Okay.

### Page 668

1 A. Mr. Schultz in 401. Mrs.
2 Andaraus -- 401 would be right below the
3 cafeteria.
4 Q. Okay.
5 A. Mrs. Andaraus would be 501.
6 Q. 501?
7 A. The lower left, the lower
8 left-hand corner.
9 Q. Okay. That's all the way on
10 the other side of the building?
11 A. Yes. Yes, sir.
12 Mr. McVeigh in 504. I'm trying
13 to think.
14 Mr. Crabtree was in the main gym,
15 actually where it looks like number 1
16 there to the right of the main gym,
17 that's an office area, that's where he
18 would be.
19 I'm trying to think who some of
20 the other ones were. Mr. Majoy in room
21 407. And I'm sure there were others, I
22 can't think of them right now.
23 But they were -- Mrs. Fry also
24 was in 604 -- no, she was not. She was
25 not lunchroom supervisor this year. We

### Page 669

1 asked her to come down for 15 minutes
2 occasionally, but not full-time.
3 Q. Let's talk, if we could,
4 what procedure there would be for a
5 teacher who had lunchroom duty. Would
6 they have to lock their classroom before
7 going down to lunchroom duty?
8 A. The expectation was and Mrs.
9 Andaraus -- her name is Hensley now.
10 She changed her name -- 501. She's an
11 art teacher. You have to have cleanup
12 duties. Everything should be cleaned
13 up. She has cleanup ahead of time.
14 Get the students out, lock the door and
15 go on down.
16 Q. Okay. And how much time
17 does a teacher have to go from the
18 classroom to the cafeteria, the same,
19 four minutes?
20 A. Same as, yeah.
21 Q. Okay. Because as I
22 understand it's a four minute period of
23 time?
24 A. It's a passing time of four
25 minutes, yes.

**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY

1.800.694.4787    www.cefgroup.com    fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 · 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 · 330.253.8119

Court Reporting • Video Conferencing • Legal Video Production • Investigations
Claims Services • Process Service • Record Retrieval • Document Management • Trial Graphics

## Page 670

1  Q. Okay. So these teachers,
2  say, in 501 for 504, for example, they
3  would have had the obligation to lock
4  their classroom doors, make sure -- make
5  sure there's no more students left in
6  the classroom, shut the lights off, lock
7  the door and then walk down to the
8  cafeteria in four minutes?
9  A. Yes.
10  Q. And given your familiarity
11  with the high school, would you say that
12  the distance from 501 or 504 to the
13  cafeteria is roughly the same, if not
14  greater, than the distance between room
15  702 and 605?
16  A. Yes.
17  Q. Did you have any complaints
18  regarding the teachers in 501 or 504
19  being late to the cafeteria on a regular
20  basis?
21  A. Occasionally, but not on a
22  regular basis.
23  Q. Okay. Not two, three times
24  a week?
25  A. No.

## Page 671

1  Q. Or once a week even?
2  A. No.
3  Q. You had also indicated in
4  prior years there had been teachers who
5  had room assignments which were
6  different rooms and were as far away as
7  the room assignments that Mrs. Smith
8  had?
9  A. Yes.
10  Q. Can you think of any
11  examples?
12  A. Again Mrs. Hensley, Andaraus
13  from 501 at one time was teaching
14  Spanish in room 207. 501, left-hand
15  side. 207, all the way to the right by
16  the exit, exit number 5 on the
17  right-hand side.
18  I've had -- I'm trying to think
19  if there's any others. We've been
20  fortunate in past years to be able to
21  not have a lot of switching, but that's
22  where the Spanish equipment was. That's
23  where we had her go.
24  Q. Can you think of any other
25  examples as you sit here right now?

## Page 672

1  A. I'm trying to. Aside from
2  other special ed. teachers and, of
3  course, Mrs. Smith.
4  Our 801 teacher is a PE and
5  health teacher. We have teachers who
6  will occasionally go from the English
7  wing to the auditorium. But that's not
8  on a regular basis, that's on an as
9  needed basis.
10  Q. Where is the English wing?
11  A. The 200 hallway on the
12  right-hand side.
13  Q. Okay.
14  A. Our specials or our elective
15  classes are usually the only ones that
16  have to change.
17  Q. Okay.
18  A. Mrs. Andaraus was part-time
19  Spanish -- or half Spanish, half art
20  teacher.
21  Also our study hall teachers.
22  You asked me in previous years?
23  Q. Yes.
24  A. Our study hall teachers all
25  had to -- by way of explanation, this

## Page 673

1  year we had one study hall monitor and
2  one ISI monitor. But in previous years
3  we had to have teachers go from all
4  over the building to monitor study hall.
5  And we also had to have teachers
6  -- and I'm looking, 709 is in the lower
7  right-hand corner, that would have been
8  our ISI room. And I believe Mrs. Smith
9  was one of those teachers who probably
10  had ISI at times. We had a lot of
11  teachers that would take it for a
12  period, sometimes over lunch it might
13  have been 30 minutes.
14  Q. Okay.
15  A. And there would have been
16  teachers from the science hallway, the
17  English hallway, every hallway probably
18  but social studies.
19  Q. Okay. Which would be the
20  600 wing?
21  A. 500, sir.
22  Q. 500 is the social studies?
23  A. Yeah, social studies and art.
24  Q. Okay. And in those
25  situations, did you receive complaints



Cefaratti Group
THE LITIGATION SUPPORT COMPANY

1.800.694.4787    www.cefgroup.com    fax:216.687.0973
Cleveland: 4608 St. Clair Avenue,Cleveland,Ohio 44103 • 216.696.1161
Akron: One Cascade Plaza, Suite 905,Akron,Ohio 44308 • 330.253.8119

Court Reporting • Video Conferencing • Legal Video Production • Investigations
Claims Services • Process Service • Record Retrieval • Document Management • Trial Graphics

## ARBITRATION - VOLUME II

### Page 674

1 that those teachers were tardy to their
2 study hall or ISI duties?
3     A. No, because they had to be
4 there, because many times that was
5 either the lunch period or the class
6 period that the other teacher had to
7 leave to go to.
8     Q. Okay.
9     A. So.
10     Q. And some of those teachers
11 would have had comparable distance to
12 the distance traveled by Mrs. Smith?
13     A. Yes, sir.
14     Q. Okay. Now --
15     A. Oh, one other. I'm sorry.
16     Q. That's okay. Please.
17     A. And this goes back to Mr.
18 Shoub, that I forget when he asked me.
19 Ms. Malott did have ISI duty this year
20 for a half an hour. So she would have
21 been a traveling teacher. She would
22 have been the only teacher that we had
23 this year that had ISI.
24     Q. Okay. Now, if you could,
25 please -- if I may approach the

### Page 675

1 witness --
2     A. Sure.
3     Q. -- with my highlighter.
4     If you could please, we've talked
5 about where the 700 wing is. If you
6 could draw on this Exhibit 101 where
7 this 700 wing would be above on the
8 main floor plan.
9     A. Okay. It's going to be --
10     MR. SHOUB: Is it all right if
11 I --
12     THE WITNESS: Yeah, sure.
13     A. But pardon my drawing skills.
14 Let's see. We've got -- and I may be
15 off a little bit here. But it goes
16 back to, there's a -- this, where are
17 we, 700 here? There's a storage area
18 back here, okay, up top. And then
19 here's the steps.
20     Q. Okay. So these steps along
21 with those steps?
22     A. Yeah, this, if I could say,
23 A and B.
24     Q. Yeah.
25     A. A, and B.

### Page 676

1     Q. Okay. Thank you.
2     A. Uh-huh.
3     MR. WILLIAMS: I don't have any
4 further redirect. Thank you.
5     EXAMINATION OF CHRIS J. GASTEIER
6 BY-THE-ARBITRATOR:
7     Q. I've got a couple questions.
8     A. Sure.
9     Q. The sequence of events, I
10 have it as the 3-19-10 incident. Okay.
11 Then you talked to the superintendent
12 while you were in California. And that
13 was during the week of the 22nd to the
14 27th?
15     A. If that's the corresponding
16 Monday through Friday.
17     Q. Yeah.
18     A. Yes, sir.
19     Q. And then on the 29th, she
20 was removed from her duties due to the
21 pornography allegations?
22     A. Yes.
23     Q. And then the investigation
24 with the students took place?
25     A. That I was part of, yes.

### Page 677

1     Q. All right. But I'm saying
2 she was removed of her duties, then you
3 spoke to the students, okay?
4     A. Yes.
5     Q. All right. That's one
6 thing.
7     The second thing is, did you ever
8 look at or consider Mrs. Smith's room
9 assignments prior to the 09/10 school
10 year, as far as how much travel she
11 would have to do? I mean, is that
12 something the principal looks at, room
13 assignments, did you look at this?
14     A. Well, yeah, two things.
15 One, yes, I do look at room assignments
16 as principal.
17     Q. Okay.
18     A. In terms of Mrs. Smith, I
19 didn't think it would be an issue at
20 that time. She seemed to be in better
21 health than she had been in previous
22 years.
23     Q. So basically it was your
24 consideration that she should be able to
25 make it in the four minutes?

**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY

1.800.694.4787    www.cefgroup.com    fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 • 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 • 330.253.8119

Court Reporting • Video Conferencing • Legal Video Production • Investigations
Claims Services • Process Service • Record Retrieval • Document Management • Trial Graphics

Page 678

1     **A.** Yes, sir.
2     **Q.** Okay. I think you've
3 answered this before a couple of times.
4 Did she ever ask you to change rooms
5 during the 09/10 school year?
6     **A.** Not to my recollection, no.
7     **Q.** She never asked you that?
8     **A.** No.
9     **Q.** The last question is, how
10 did the investigation of pornography
11 move to topics of her being tardy and
12 sleeping on the job?
13     **A.** We had asked the students
14 when we called them in in the group,
15 before we called them in individually,
16 we had asked the students to tell us
17 what happened on that date, 3-19.
18     Okay. And then is there any --
19 and talk -- well, no. We asked them
20 first originally, is there anything that
21 goes on in Mrs. Smith's class. And the
22 thought was that we didn't want to plant
23 seeds in their mind. .
24     **Q.** About the pornography?
25     **A.** About anything.

Page 679

1     **Q.** Okay.
2     **A.** Okay. And I'm not an
3 attorney, but I didn't want to prejudice
4 what they were going to say to us by
5 planting something in their mind to get
6 them to talk about that specifically.
7     So when we talked to them, is
8 there something -- talk to us about Mrs.
9 Smith's class.
10     **Q.** I thought you said originally
11 that you asked them to give you
12 statements before you talked to them?
13     **A.** Yes. Yes.
14     **Q.** All right. So they gave you
15 statements?
16     **A.** Yes.
17     **Q.** Now, are you saying to me
18 that some of the statements had stuff
19 about her being tardy and late to class?
20     **A.** Yes.
21     **Q.** Sleeping in class?
22     **A.** Well, that I don't recall in
23 terms of the sleeping in class.
24     I can't be sure on the tardy.
25 I'd have to go back and look at each

Page 680

1 one.
2     **Q.** All right. So you're saying
3 there were things in the statements that
4 then --
5     **A.** That related to other -- I'm
6 sorry.
7     **Q.** -- led you to other
8 allegations that you wanted to get into?
9     **A.** No, that led us to other
10 questions. There were things in the
11 statements that led to other questions.
12     **Q.** Okay. All right. So
13 basically I am correct, the statements
14 went first, then the questioning. And
15 there were certain things in the
16 statements that led you to ask other
17 questions about the --
18     **A.** That's my recollection, yes,
19 sir.
20     **Q.** Okay. So basically when you
21 first started this, you weren't even
22 looking at sleeping or tardiness?
23     **A.** When we first started with
24 this particular class, we were looking
25 at what happened in there that day.

Page 681

1     **Q.** The pornography --
2     **A.** Yes.
3     **Q.** -- on the 19th?
4     THE ARBITRATOR: Okay. All
5 right. Anyone else have anything?
6     MR. SHOUB: I might.
7     EXAMINATION OF CHRIS J. GASTEIER
8 BY-MR.SHOUB:
9     **Q.** You basically said to these
10 students, tell us if you have any other
11 concerns about Mrs. Smith's class?
12     **A.** Not in those terms, no.
13 Talk to us about Mrs. Smith's class.
14     **Q.** Essentially --
15     **A.** On a normal day, what
16 happens, is there anything on that date
17 that stands out.
18     **Q.** Basically asking the students
19 to evaluate her?
20     **A.** No.
21     **Q.** Wouldn't you as a principal
22 of a high school, if Mrs. Smith was
23 tardy to her social studies class three
24 times a week, 15 to 20 minutes late
25 each time, and was sleeping in study

**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY
1.800.694.4787   www.cefgroup.com   fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 • 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 • 330.253.8119

*Court Reporting • Video Conferencing • Legal Video Production • Investigations*
Claims Services • Process Service • Record Retrieval • Document Management • Trial Graphics

## ARBITRATION - VOLUME II

### Page 682

1  hall and sleeping in class, you would
2  have heard about that prior to March of
3  2010, wouldn't you, or expect to have
4  heard about it?
5      A.  I'm not going to comment on
6  those specific times and numbers.
7      Q.  Well, I'm not asking you to
8  comment. I'm asking you to answer the
9  question. I'm just saying, if Mrs.
10  Smith had been -- let's break it down.
11      If Mrs. Smith had been tardy
12  three times a week as much 15 or 20
13  minutes each time, I mean, you certainly
14  would have expected to have heard about
15  that before March of 2010 during that
16  school year last year?
17      MR. WILLIAMS:  And I'm going to
18  object because this re-cross goes
19  beyond the scope of either my redirect
20  or the referee's --
21      MR. SHOUB:  Well, I think it's.
22      MR. WILLIAMS:  -- or the
23  referee's questions.
24      THE ARBITRATOR:  Well, I'm going
25  to overrule your objection.

### Page 683

1      But I don't know if I would go
2  along with your characterization of what
3  he would have heard. I think --
4      MR. SHOUB:  Well, there's been
5  testimony.
6      THE ARBITRATOR:  I know, there
7  has been some testimony. Okay. If
8  there's been a decent amount of
9  testimony about a period of lateness by
10  a teacher and a teacher falling asleep
11  in class, wouldn't you have heard about
12  this before March 19th?
13      THE WITNESS:  I did have a
14  conversation with Mrs. Smith at one
15  point in the hallway. You know, I was
16  going to my office, coming from the 600,
17  500 wing down. She was going to her
18  classroom. And just, got to get to
19  class. She said, yeah. And we talked
20  about, you know, there might have been
21  some student or somebody there. But I
22  reiterated, it's important to supervise.
23  This would have been after the memo I
24  had sent to her earlier in the year.
25      As far as, if I can respond to,

### Page 684

1  you know, 15 to 20 minutes.
2      THE ARBITRATOR:  Sure.
3      THE WITNESS:  I -- nobody had
4  ever come to me and told me that, to my
5  recollection, that that was going on.
6  Yes, I would have -- I would think I
7  would hope that I would have addressed
8  that, if it was 15 to 20 minutes late.
9      Q.  I wasn't asking so much
10  about addressing it, but just hearing
11  about it?
12      A.  Well, I would --
13      THE ARBITRATOR:  Yeah, go on.
14      A.  Nobody ever told me, to my
15  knowledge, that we were talking 15 to 20
16  minutes. To me that would be --
17      Q.  Nobody came and complained to
18  you, other than those two anonymous
19  people that you referred to earlier in
20  your testimony, about Mrs. Smith
21  sleeping in class or study hall prior to
22  March 2010, right? During that last
23  school year I'm talking about.
24      A.  I can't give you a name
25  right now, no, sir, during the last

### Page 685

1  school year.
2      MR. SHOUB:  Okay. That's all
3  the questions I have.
4      THE ARBITRATOR:  Thank you very
5  much. You're done.
6      THE WITNESS:  Okay. That's what
7  I wanted to make sure I heard before I
8  left the area.
9      (Off the record at 2:20 p.m.)
10      - - - - -
11  .
12  .
13  .
14  .
15  .
16  .
17  .
18  .
19  .
20  .
21  .
22  .
23  .
24  .
25  .

**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY
1.800.694.4787    www.cefgroup.com    fax:216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, Ohio 44103 · 216.696.1161
Akron: One Cascade Plaza, Suite 905, Akron, Ohio 44308 · 330.253.8119

Court Reporting · Video Conferencing · Legal Video Production · Investigations
Claims Services · Process Service · Record Retrieval · Document Management · Trial Graphics