## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

CAROL ANN SMITH,   :

    Plaintiff  :

              :

-vs-      : No. 3:11-CV-00560

PERKINS BOARD OF  :
EDUCATION, et al.

    Defendants  :

- - - - -

Deposition of JIM GUNNER, a herein, taken by the Plaintiff as upon cross-examination before Brenda Huntley Roberts, Registered Merit Reporter and Notary Public in and for the State of Ohio, at Murray & Murray Co., L.P.A., 111 E. Shoreline Drive, Sandusky, Ohio on Friday, April 4, 2014 at 9:30 a.m. pursuant to stipulations of counsel.

- - - - -

## Page 2

```
 1          A P P E A R A N C E S
 2   FOR PLAINTIFFS CAROL ANN SMITH:
        MALONE, AULT & FARRELL
 3      BY:  Paul T. Belazis
             Attorney at Law
 4      7654 w. Bancroft Street
        Toledo, OH  43617
 5
 6
 7   FOR DEFENDANTS PERKINS BOARD OF EDUCTION:
        SPENGLER NATHANSON, P.L.L.
 8      BY:  Teresa L. Grigsby
             Attorney at Law
 9      Four SeaGate
        Suite 4000
10      Toledo, OH  43604-2622
11
12   ALSO PRESENT:
13      Steve Finn
14
15
16          - - - - -
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1            I N D E X
 2
     JIM GUNNER
 3      Cross-examination by Mr. Belazis       5
 4      Direct examination Ms. Grigsby       186
 5      Recross-examination by Mr. Belazis   220
 6      Redirect examination Ms. Grigsby     224
 7      Con't Recross-examination by Mr. Belazis 224
 8
 9          E X H I B I T S
10   MARKED PLAINTIFF'S
11   Exhibit 26, Board Notes        42
12   Exhibit 27, Memo, Danielle Fahning     63
13   Exhibit 28, Letter to Dr. Kale     82
14   Exhibit 29, Fit For Duty Exam      84
15   Exhibit 30, Administrator Eval     101
16   Exhibit 31, Teaching Schedule     112
17   Exhibit 32, Master Schedule       112
18   Exhibit 33, Letter 4/15/10        119
19   Exhibit 34, Resolution to Consider
     Termination                       120
20   Exhibit 35, Copy of Playgirl Harrison Ford 138
21   Exhibit 36, Playboy Barbara Streisand   138
22   Exhibit 37, Letter 11/11/10       150
23   Exhibit 38, Board Notes
24   Exhibit 39, Email                 169
25   Exhibit 40, Board Notes 4/17/10   173
```

## Page 4

```
 1   EXHIBITS REFERRED TO:
 2   PLAINTIFF'S
 3   Exhibit 25, Eval of Mrs. Smith       101
 4   Exhibit 2, Affidavit Mr. Gunner       21
 5   Exhibit 3, Disciplinary documents     45
 6   Exhibit 4, Letter from Mr. Zraik      55
 7   Exhibit 5, Letter from Mr. Gunner     55
 8   Exhibit 6, Letter from Mr. Gunner     55
 9   Exhibit 7, Disciplinary              73
10   Exhibit 8, 10-day Unpaid Suspension   75
11   Exhibit 22, Eval for Ms. Smith       104
12   Exhibit 10, Letters                  112
13   Exhibit 11, Sequence of Letters      116
14   Exhibit 13, Notes                    150
15   Exhibit 16, Photographs              151
16
17          INSTRUCTION NOT TO ANSWER
18              183
19          INSTRUCTION TO SEAL
20   Discussion in Executive Session Referred to  161
21
22
23
24
25
```

HUNTLEY REPORTING SERVICE
1.800.247.8360

Electronically signed by Brenda Huntley Roberts (201-220-072-3855)

5e0f9fa9-b8ff-42d1-8fb0-65b301d4a9dc

Page 5

1　　　　　　　Sandusky, Ohio
2　　　　　Friday, April 4, 2014
3　　　　　9:25 a.m. - 5:30 p.m.
4　　　　　　　　-oOo-
5
6　　　　　　　JIM GUNNER,
7　called as a witness on behalf of Defendants,
8　having been first duly sworn, was examined and
9　testified as follows:
10
11　　　　　　CROSS-EXAMINATION
12
13　　　　MR. BELAZIS:  Two preliminary matters
14　before we get going.  The first is the deposition
15　of Mr. Gasteier's taken a couple of weeks ago,
16　there was an Exhibit 25, which inadvertently
17　omitted a part of the exhibit, more specifically,
18　the evaluation of Mr. Gasteier that was performed
19　for the 2009-2010 school year.  And with consent
20　of both counsel, we are going to ask the court
21　reporter to include a copy of that with exhibit
22　25 right along with today.  All right.  So take
23　care of that.
24　　　　And then the second part of that with
25　respect to the exhibits in Mr. Gasteier's

Page 6

1　deposition the numbers count from No. 23 to No.
2　25.  There's no marked 23 and no marked 24, and
3　the reason is that the last exhibit, 25, is
4　actually marked 23, but it was misread during the
5　deposition, referred to as 25 and so we have now
6　marked it as 25.  So there is no Exhibit 23 and
7　no Exhibit 24 and that's the reason for the skip.
8　BY MR. BELAZIS:
9　Q　　Mr. Gunner, would you tell us a little bit about
10　your educational background?
11　A　　Educational background, I have a Bachelor's
12　degree in mathematics from Kenyon College, a
13　Master's degree in curriculum instruction from
14　the University of Toledo, a doctorate from the
15　Bowling Green State University in leadership
16　study.  I have also taken course work at the
17　University of Cincinnati.  That course work led
18　to certification as principal and also assistant
19　superintendent.
20　Q　　Okay.  And, by the way, I haven't gone through
21　all the formalities of explaining what a
22　deposition is about.  You were here for Mr.
23　Gasteier's deposition?
24　A　　No, I was not.
25　　　　MS. GRIGSBY:  He was not.

Page 7

1　　　　THE WITNESS:  I was here for Carol.
2　BY MR. BELAZIS:
3　Q　　Oh, that's right.  You were here for Carol's
4　deposition and you understand that I represent
5　Mrs. Smith in this litigation and you
6　understand the rules of deposition as explained
7　by your counsel during that deposition I take it?
8　A　　Yes, sir.
9　Q　　Okay.  And you're still employed as
10　superintendent in the Perkins School District?
11　A　　Yes.
12　Q　　And you began in, what was it, May of 2007?
13　A　　May 1, 2008.
14　Q　　Okay.  So that would have been at the conclusion
15　of the -- near the conclusion of the 2007-2008
16　school year?
17　A　　Yes.
18　Q　　And prior to that, where had you served?
19　A　　I started my career as a teacher in the Oregon
20　City School system as a junior high math and
21　computer science teacher.
22　Q　　Oregon?
23　A　　City Schools, Oregon, Ohio.
24　Q　　Oregon, Ohio.
25　A　　I taught math and computer science for

Page 8

1　3-1/2 years.  I then moved to the Benton-Carroll
2　School District in Oak Harbor, Ohio, I was their
3　director of technology.  I left the
4　Benton-Carroll School District and went to the
5　Forest Hills School District in Cincinnati Ohio
6　as their director of technology.  I was
7　reassigned my last several months in Forest Hills
8　to be assistant principal at one of their seven
9　to 12 high schools.  I then became principal at
10　Napoleon Area City Schools in their middle school
11　for four years.  I left Napoleon and became
12　principal in the Bryan City School District for
13　three years.  I was then promoted and selected as
14　their superintendent for seven years, and now I
15　have been six years here in Perkins as
16　superintendent as well.
17　Q　　What year did you graduate from Kenyon?
18　A　　1984, May.
19　Q　　They used to play Denison in basketball, didn't
20　they?
21　A　　Yes, they were both members of the Ohio Athletic
22　Conference.
23　Q　　Tell me a little bit about your, from your
24　perspective, your responsibilities as
25　superintendent?

2　(Pages 5 to 8)

Electronically signed by Brenda  Huntley Roberts (201-220-072-3855)　　　　　　　　　　5e0f9fa9-b8ff-42d1-8fb0-65b301d4a9dc

Page 9

1  A     Superintendent is the CEO of the school district.
2     They oversee the whole operations of the school
3     district other than the financial office.
4     Basically there are two employees who report
5     directly to the board; the superintendent and the
6     treasurer.  The treasurer oversees the financial
7     aspects of the school district; the
8     superintendent oversees everything else.  So
9     that's overseeing all employees outside of the
10    treasurer's office.  It's overseeing things such
11    as curriculum, student discipline, budgetary
12    matters for the district, maintenance and care
13    for the district, long-range planning.  You know,
14    pretty much anything and everything that isn't
15    financial ultimately falls under the authority of
16    the superintendent.
17  Q     And that, you may have mentioned this, but that
18    includes staff discipline?
19  A     Yes.
20  Q     Tell me a little bit about that process, how
21    you're involved in it.
22  A     It depends on the staff position and staff level.
23    But typically all employees report to either a
24    supervisor or a principal who is their immediate
25    supervisor in terms of day-to-day performance.

Page 10

1     That principal or supervisor would conduct
2     typically, annual evaluations of the performance.
3     They will also handle any immediate disciplinary
4     concerns from the staff members.  The
5     superintendent gets involved if there are repeat
6     offenses that ultimately elevate from the
7     supervisor upward.  That would be if the
8     supervisor or principal felt that the discipline
9     warranted a suspension or more because, by
10    contract, I'm the only one who can suspend an
11    employee from work.  Usually even on minor
12    infractions, the supervisors and principals are
13    making the superintendent aware if there's an
14    employee concern, and but not always, if it's
15    just a minor offense.  But certainly if it
16    elevates or repeats, there's an expectation of
17    communication at my level.  Ultimately, if an
18    employee has been verbally warned, has seen a
19    written reprimand and the behavior continues, we
20    typically have a progressive disciplinary policy
21    in both contracts that walks through a -- it
22    could be a non-verbal reprimand beginning, it
23    could be -- or a verbal reprimand, excuse me,
24    initially to a written reprimand.  If it elevates
25    to a point where a suspension, whether it's paid

Page 11

1     or not, that's generally referred to me.
2  Q     So when it comes to the investigation of alleged
3     infraction of rules, who ordinarily would be
4     responsible for that?
5  A     It depends what level it's at.  If it's at the
6     initial level, it's an initial infraction, an
7     initial concern, typically the supervisor or the
8     principal would handle that.  If the employee has
9     been reprimanded to the point of a suspension,
10    and it looks like a further suspension or more
11    serious, potential termination may be in order,
12    then usually, as superintendent, I would get
13    involved in that investigation.
14  Q     Okay.  And when you say you would get involved,
15    what level of -- what degree of involvement would
16    you have?
17  A     It could vary depending again on how much the
18    supervisor or principal has done.  I certainly
19    would follow up and have conversations with them
20    about what have they discovered, who they talked
21    to, how are they handling that process.  If there
22    were witnesses to interview, I would probably be
23    involved in interviewing those witnesses at that
24    stage if we were looking at serious discipline.
25  Q     And by serious discipline, what do you mean?

Page 12

1  A     Any kind of suspension and/or potential
2     termination when it reaches that level.  You
3     know, at that level, I pretty much would take
4     charge of the full investigation.
5  Q     What role, if any, would the principal have?
6  A     I usually would have them with me in the
7     interviews of any kind of a person involved in
8     the case.  I typically would have them sit in on
9     the disciplinary hearing with the employee.  We
10    consult with them about the previous behaviors
11    that led to the current investigation and current
12    situation.  They would be in more of a
13    sit-and-listen and consulting role with me at
14    that stage.
15  Q     By consulting, you mean they would offer their
16    input?
17  A     Offer their input.
18  Q     With respect to the investigation?
19  A     Offer their input in regards to --
20  Q     The whole process?
21  A     The entire process in terms of the questions that
22    may need to be asked, in terms of the answers
23    that are given, are they consistent with what the
24    principal knows to be true and is in heard in
25    their preliminary investigation or in

3  (Pages 9 to 12)

Electronically signed by Brenda  Huntley Roberts (201-220-072-3855)                    5e0f9fa9-b8ff-42d1-8fb0-65b301d4a9dc

Page 13

```
 1      conversations they have had and all the way
 2      through consultation about ultimately what, if
 3      any, discipline should be issued.
 4   Q  That's just the way you did it?
 5   A  Yes.
 6   Q  Consistently?
 7   A  Yes.
 8   Q  And can you think of any exceptions to that?
 9   A  Well, there are times when the principal is not
10      available. In this particular case, I can think
11      of an incident where Mr. Gasteier was out of town
12      and so I stepped in and handled the initial
13      investigation without him. When he returned, he
14      was brought into the investigation. So there are
15      times when the principal may not be available
16      that I proceed without them.
17   Q  Okay. But outside of that, you have
18      consistently, at least to the best of your
19      knowledge, consistently followed the process you
20      just described?
21   A  To the best of my knowledge.
22   Q  And that would include this particular incident?
23   A  Yes.
24   Q  By that you meant Carol Smith, right?
25   A  If you're referring to the sequence of
```

Page 14

```
 1      disciplinary actions regarding Carol Smith, yes.
 2   Q  Okay. Now, in the event that you decide that
 3      termination is appropriate, what steps do you
 4      follow?
 5   A  Well, if I believe a termination may be
 6      appropriate.
 7   Q  I'm sorry, let me ask one question before that.
 8      I'll withdraw that question. At any point prior
 9      to the point that you decide that you want --
10      that recommendation, is appropriate, I mean, that
11      termination is appropriate, do you have board
12      involvement in the decision-making?
13   A  In the decision-making, no; in keeping them
14      informed, yes.
15   Q  Okay.
16   A  But not on the decision-making.
17   Q  So at the point that you decide that the
18      termination is appropriate, what steps are
19      followed?
20   A  Well, if I determine that the termination I
21      believe is the appropriate step, the first thing
22      I do is call an attorney and I sit down and spend
23      a considerable amount of time going from
24      beginning to end, through all the information I
25      have with the attorney, to, again, get an opinion
```

Page 15

```
 1      whether termination would be appropriate and
 2      whether we have followed the proper procedures up
 3      to that stage to potentially look at termination.
 4      If the legal advice is yes at that stage, then
 5      usually what happens is the attorney will draft
 6      an initial letter to the employee indicating to
 7      them that I will be recommending termination at
 8      the next board meeting. That draft is certainly
 9      then reviewed between the attorney and myself
10      prior to being sent out to ensure its accuracy.
11      I usually make the board aware that I'm looking
12      at a termination proceeding and why, and that I
13      will be meeting with the attorney to review
14      everything before making a final decision. If
15      everything at that stage still leads towards a
16      termination, we would then send the letter out,
17      which allows that employee then to be notified
18      that a hearing is going to take place before the
19      board, that they have a right to be at that
20      hearing, and that they have the right to, again,
21      present evidence and their arguments to the board
22      at that point.
23          Typically, the employee does not show
24      up at that hearing. They typically wait until
25      the board takes action, either to support or not
```

Page 16

```
 1      support my recommendation for termination. They
 2      then -- usually we receive at that stage a
 3      notification from whatever union representative,
 4      whether it's teachers or not, that they are
 5      requesting a private termination hearing
 6      proceeding versus termination directly through
 7      the board. And then we start down that process.
 8   Q  Okay. The board doesn't, I take it, doesn't
 9      conduct its own investigation independently of
10      what you do?
11   A  They do not.
12   Q  So basically what they know about the
13      circumstances of a proposed termination is
14      information they receive from you during your
15      presentations to them?
16   A  Either during written documents to them and/or
17      conversations within executive session, yes.
18   Q  And by written, you mean written information that
19      you submit to the board about these
20      circumstances?
21   A  I typically send the board every Friday board
22      notes, and I'll give them highlights on whatever
23      is happening in the district. I shouldn't say
24      Friday, it's usually every weekend. And I might,
25      if there's an employee disciplinary issue concern
```

HUNTLEY REPORTING SERVICE
1.800.247.8360

Electronically signed by Brenda  Huntley Roberts (201-220-072-3855)          5e0f9fa9-b8ff-42d1-8fb0-65b301d4a9dc

Page 17

```
 1        going on, at least give them a brief overview in
 2        writing. I try not to put too many details in
 3        writing because those documents can be selected
 4        and requested as public documents. Normally,
 5        what I will say is that, you know, in our next
 6        board meeting I would like an executive session
 7        to discuss this in more detail with you and fill
 8        you in on the detail and allow you to ask
 9        questions and so on.
10   Q    Okay. So, but just to be clear, the written
11        information that you refer to that you might
12        submit to the board with regard to a particular
13        employee's disciplinary action or proposed
14        disciplinary action would be the board minutes?
15   A    No, not the board minutes, it would be in board
16        notes that I send them.
17   Q    I'm sorry. I misspoke, board notes?
18   A    Board notes that I send them.
19   Q    Okay.
20   A    It's my weekly way of communicating to the board
21        on a variety of things that are going on in the
22        district. They would receive, again, detailed
23        information then on executive session, I would
24        not share detailed information and/or notes.
25   Q    And by detailed information, do you mean that's
```

Page 18

```
 1        the information received from you during the
 2        executive session?
 3   A    Correct.
 4   Q    Tell me something about, let's talk about Carol
 5        Smith for just a moment.
 6   A    Uh-huh.
 7   Q    You said you arrived in early May, 2008. What
 8        information, if any, came to your attention about
 9        Carol?
10   A    None in 2008. I didn't know. I think I met her,
11        they had a -- they called it a Meet Jim Night as
12        sort of an opening night in the community to
13        introduce me as the superintendent. As I recall,
14        Carol was there. I had greeted her among
15        hundreds that I greeted that evening. Other than
16        that, I didn't know.
17   Q    So by 2008, you're referring to the 2007-2008
18        school year?
19   A    Correct.
20   Q    Okay. And there was only a month or so roughly
21        of the school year left by the time you arrived?
22   A    Correct.
23   Q    And then during that summer, did any information
24        about Carol Smith come to your attention?
25   A    Not about Carol, but about a schedule for Carol
```

Page 19

```
 1        because there was concern about how to build her
 2        schedule for the following year. As the high
 3        school and middle school were building their
 4        schedule, the high school principal at the time,
 5        Mr. Gasteier, informed me that the business
 6        classes selected by the students had diminished
 7        to the point where we only really needed, I
 8        believe, three classes taught in the business
 9        department. That would have meant a half time
10        position for Carol at that time. It might have
11        been for, but it was clearly not a full-time
12        position. So there was some concern,
13        conversation about what do we do with the rest of
14        her schedule. One of the directives the board
15        had given me was to look at all aspects of the
16        program for cost savings and certainly we
17        couldn't afford to have a teacher teach half time
18        and pay full-time. That led to a conversation
19        with Mr. Finn about possibilities of using her at
20        the middle school outside of the high school
21        schedule. And that ultimately led to the final
22        schedule for the 2007-2008 school year.
23   Q    There was some change in the keyboarding classes
24        that were taught at some point?
25   A    That, I don't know because, again, this would
```

Page 20

```
 1        have been my first year coming in to see the
 2        schedules. What I was aware of is that Mr. Finn
 3        had a need for someone to teach a sixth grade
 4        keyboarding class, and he did not have the
 5        staffing to cover that, when Carol being a
 6        business teacher, had taught the high school
 7        keyboarding classes for many years when we taught
 8        keyboarding, so it seemed to be a natural fit to
 9        assign that to her. And then to round out her
10        schedule, we had her supervising in-school
11        suspension outside of that.
12   Q    There was keyboarding, the keyboarding classes
13        were eliminated at some point?
14   A    The following year we eliminated the sixth grade
15        keyboarding class.
16   Q    And were there fewer business courses that were
17        taught during that 2008-2009 school year?
18   A    Similar. They were either three or four, enough
19        for a half-time position only at the high school.
20   Q    Were there previously more, a larger number of
21        classes offered?
22   A    Yes, it's my understanding that there were enough
23        to justify a full-time teacher previously. I
24        don't know exactly how many courses were offered
25        previously prior to my arrival, but it was my
```

5 (Pages 17 to 20)

Electronically signed by Brenda Huntley Roberts (201-220-072-3855)     5e0f9fa9-b8ff-42d1-8fb0-65b301d4a9dc

Page 21

1 understanding there were more.
2 Q   Okay.  So anything else that came to your
3 attention that summer about Carol Smith?
4 A   Not that I recall.
5 Q   Let me hand you what was marked previously as
6 Plaintiff's Exhibit 2.  By the way, did you have
7 an opportunity to review anything prior to
8 today's deposition?
9 A   I met with the board's attorney and so we
10 certainly had some conversations there in
11 preparation.  Within the last several weeks, I've
12 reviewed my testimony at the termination hearing,
13 I've reviewed other testimony at the termination
14 hearing, I've reviewed some of the documents that
15 have been used as exhibits at that time frame.
16 That was what I had done.
17 Q   Have you reviewed Mr. Gasteier's deposition
18 testimony?
19 A   Deposition testimony with you?
20 Q   Uh-huh.
21 A   Yes, I have.
22 Q   Okay.  And did you review the documents
23 associated, that were marked as exhibits during
24 his testimony?
25 A   I can't say that I reviewed every single one of

Page 22

1 them.  I didn't have those in front of me as I
2 read his testimony.  I don't know that there were
3 any references that I wasn't familiar with.
4 Q   Okay.  And at least the references you had
5 recently reviewed within the past few weeks?
6 A   Yes.
7 Q   Okay.  Now, let me hand you what's previously
8 marked as Plaintiff's Exhibit No. 2.  Do you
9 recognize that as an affidavit that you executed
10 in connection with an EEOC charge filed by Mrs.
11 Smith?
12 A   Yes.
13 Q   Okay.  And if you look at the third paragraph,
14 you state in your affidavit, "Shortly after I
15 became superintendent, I received reports of
16 teacher Carol Smith sleeping when she was
17 supposed to be teaching or otherwise supervising
18 students.  I was advised that this was a problem
19 since at least the 2007-2008 school year."  Do
20 you see that?
21 A   Yes, sir.
22 Q   And you also make reference to learning that Ms.
23 Smith's refusal to exit the high school during a
24 fire drill during the 2007-2008 school year
25 resulted in a citation against the district?

Page 23

1 A   Yes, sir.
2 Q   What was the -- when you say shortly after, when
3 was that?
4 A   That would have been in the fall of 2008, the
5 start of 2008-2009 school year.
6 Q   Okay.
7 A   I can't give you specific dates, but sometime in
8 the early fall.
9 Q   Okay.  So it would have been, for example, in
10 September or perhaps October?
11 A   The initial event that I recall is Mr. Finn
12 calling me with concerns about Carol sleeping in
13 four separate instances at the middle school, and
14 asking my advice as his new boss.  And following
15 up on that conversation with Mr. Gasteier, it's
16 my recollection I learned about other incidents
17 previously at the high school in the 2007-2008
18 school year or prior to that, and then also about
19 the fire alarm incident.  So it was all in that
20 same time frame in September, early October of
21 2008.
22 Q   What was it that you learned?
23 A   Mr. Dahlman informed me, if I recall correctly,
24 that there was a time that he felt that he had
25 walked in on Mrs. Smith, and that she was

Page 24

1 sleeping, and that there were rumors around the
2 high school about her sleeping in class.  Maybe,
3 I don't recall that any of them were confirmed or
4 any investigation had been done other than the
5 one specific incident I believe Mr. Dahlman
6 personally saw her.  And then specifically about
7 the failure to exit the building in the fire
8 drill.
9 Q   Okay.
10       MS. GRIGSBY:  I'm going to interpose an
11 objection simply because I think the record may
12 be unclear or I was unclear as to the time frame
13 that you were talking about.  And --
14       MR. BELAZIS:  Let me ask him to clarify
15 that.
16 BY MR. BELAZIS:
17 Q   The time frame, why don't you clarify the time
18 frame that you were just referring to.
19 A   It would have been, again, the beginning of the
20 2008-2009 school year.  It would have been right
21 around the time Mr. Finn first notified me of
22 concerns about Carol Smith, sometime in the early
23 fall, September, October, sometime frame.  I
24 don't recall the exact dates.
25 Q   Okay.  Did anything occur as a result of that

6 (Pages 21 to 24)

Electronically signed by Brenda  Huntley Roberts (201-220-072-3855)                                    5e0f9fa9-b8ff-42d1-8fb0-65b301d4a9dc

Page 25

```
 1          initial notification?
 2    A     Well, these are incidents in terms of my
 3          conversation with Mr. Dahlman, Mr. Finn, Mr.
 4          Gasteier, other than the ones that Mr. Finn was
 5          dealing.  So let me separate those.  The ones at
 6          the high school had happened well before I was
 7          there, so I didn't feel there was anything I
 8          could do about it retroactively at this point.
 9          So either, you know, they were appropriately
10          dealt with at the time or there wasn't sufficient
11          evidence to do anything with it.  So it was more,
12          I think, background information provided me by
13          the high school principal than anything else.
14    Q     And I guess my question is what prompted them to
15          provide you with this background information?
16    A     Because Carol taught in both buildings, I had a
17          conversations with them about, did they have any
18          similar concerns that had now been raised by Mr.
19          Finn.
20    Q     Okay.  So there wasn't any disciplinary action
21          going on at that point, it was just that Mr. Finn
22          had this concern and they related this
23          information to you?
24    A     Right.  Mr. Finn called me and expressed concern
25          about these four incidences that had occurred
```

Page 26

```
 1          very early on in the fall of the 2008-2009 school
 2          year.
 3    Q     So he had already notified you about that?
 4    A     We had already had a phone conversation about
 5          that.  In that phone conversation, he was asking
 6          my advice as superintendent, as a new boss, as a
 7          new superintendent, how should he proceed.  So we
 8          had a phone conversation where we looked at both
 9          board policy, we looked at contract negotiation
10          procedures and I advised him on how to move
11          forward.  And in essence, I advised him to invite
12          Carol into -- to send her a letter advising her
13          of the four specific concerns, and that there was
14          going to be a disciplinary hearing, that there
15          could be disciplinary consequences as a result of
16          hearing, and that she had a right to have union
17          representation present during the hearing.
18    Q     Okay.  So let me stop you there because I just
19          want to make sure that I'm real clear.
20    A     Uh-huh.
21    Q     Were you initially notified of the issues that
22          you described regarding Mrs. Smith prior to the
23          time that you were notified about these incidents
24          in September of 2009 or in connection with that?
25    A     They were after the phone call.  As I recall,
```

Page 27

```
 1          they were after the phone call from Mr. Finn.
 2    Q     Okay.
 3    A     They were the result of my reaching out to the
 4          high school principal and assistant principal
 5          were there any similar concerns of Mrs. Smith at
 6          the high school as she had previously taught
 7          there full-time and was teaching there part-time.
 8          So it's my recollection that they came out as a
 9          result of my following up from Mr. Finn's
10          concern.
11    Q     All right.  Now you mentioned the citation with
12          the fire marshal, I think, right?
13    A     Uh huh.  Uh-huh, yes.
14    Q     What did you learn about that?
15    A     At the time what I knew about it is that there
16          was a, you know, a standard fire drill, and in
17          that, Carol Smith did not exit the building as
18          required by standard procedure and law, and that
19          the fire marshal detected that at the time and
20          issued the school district a citation
21          specifically citing her remaining in the
22          building.
23    Q     Did you ask Mr. Gasteier why she didn't exit the
24          building?
25    A     I don't recall.
```

Page 28

```
 1    Q     Okay.  Is that something that you would have
 2          wanted to know?
 3    A     Again, it was something that happened prior to my
 4          being there.  It was dealt with at that time.  It
 5          was not something that I was going to address, it
 6          was not something that happened under my time
 7          frame as superintendent, so I did not actually
 8          request it.
 9    Q     So aside from the fact that it's background
10          information, you concluded that it was not
11          something that you could or would rely on in
12          connection with any future disciplinary
13          information?
14    A     It was background information.  It was certainly
15          a serious offense.  But, again, you know, it
16          wasn't something that I was going to ignore if I
17          saw a pattern of behavior out of an employee, but
18          it wasn't something I was going to go back and
19          reinvestigate and, you know, bring back up again
20          at that stage.  It was my thought and opinion
21          that whoever was in charge at that time would
22          have addressed it and had taken care of that
23          issue.
24    Q     Okay.  But I'm not sure you answered my question.
25          My question was, was it something that you felt
```

7 (Pages 25 to 28)

Electronically signed by Brenda  Huntley Roberts (201-220-072-3855)                    5e0f9fa9-b8ff-42d1-8fb0-65b301d4a9dc

Page 29

1   that you would be able to rely upon and take into
2   account in determining what, if any, future
3   disciplinary action might be appropriate or was
4   it something that you only considered background
5   information and that's why you didn't go into any
6   more detail?
7           MS. GRIGSBY: Objection. Asked and
8   answered.
9           THE WITNESS: I use all background
10  information as a reference for future discipline
11  if there's a pattern of behavior, so it certainly
12  was both, sir.
13  BY MR. BELAZIS:
14  Q   Okay. So fair enough. So then at any point, in
15      connection with any disciplinary action that you
16      took against Mrs. Smith, did you inquire about
17      why Mrs. Smith did not go out of the building
18      during that fire marshal -- or during that fire
19      drill?
20          MS. GRIGSBY: Objection. Asked and
21      answered.
22          THE WITNESS: Not that I recall.
23  BY MR. BELAZIS:
24  Q   Okay. If it's something that you're going to
25      rely upon in making a determination of future

Page 30

1   discipline, is the reason for her failure to exit
2   of any consequence to you?
3   A   At that stage, sir, no.
4   Q   So if she was sick, for example, and couldn't
5       leave the building because she was sick, that
6       wouldn't matter to you?
7   A   You're posing hypotheticals.
8   Q   Well, that's fine. Let's assume it's a
9       hypothetical. But if she were sick and she
10      couldn't leave the building because of some
11      medical condition, that wouldn't matter to you?
12          MS. GRIGSBY: Objection.
13          THE WITNESS: Sir, it wasn't the case;
14      she wasn't sick.
15  BY MR. BELAZIS:
16  Q   I'm just -- I'm asking you a question and the
17      question you can answer either yes or no. I
18      don't want you to speculate about whether she was
19      or whether she wasn't. I'm just asking you a
20      question. If her failure to leave was because of
21      a medical condition, is that something that you
22      would want to know?
23          MS. GRIGSBY: Objection.
24  BY MR. BELAZIS:
25  Q   Yes or no.

Page 31

1           MS. GRIGSBY: Objection.
2           THE WITNESS: In the time frame that it
3   happened and given the fact that it was over a
4   year old, no, it was irrelevant to me at that
5   stage.
6   BY MR. BELAZIS:
7   Q   And maybe I already asked you this, did you at
8       any point find out the reason that Mrs. Smith
9       failed to exit?
10          MS. GRIGSBY: Objection. Asked and
11      answered.
12          THE WITNESS: I've heard multiple
13      reasons why she failed to exit.
14  BY MR. BELAZIS:
15  Q   And at what point did you finally start hearing
16      multiple reasons?
17  A   I don't know, sir. I honestly don't know.
18  Q   Did you at any point become aware that Carol
19      Smith suffered from diabetes?
20  A   Yes.
21  Q   And when did you first learn of that?
22  A   When I received a letter from her attorney at the
23      time, Thomas Zraik, informing me of that fact.
24  Q   Let me just go back for a second. During that
25      initial incident when you got a call from Mr.

Page 32

1   Finn?
2   A   Yes, sir.
3   Q   You already explained that you spoke with Mr.
4       Gasteier?
5   A   Uh-huh.
6   Q   Did Mr. Gasteier ever bring to your attention at
7       that point in time that he had been approached by
8       Mrs. Smith and that she had explained to him that
9       she had heard rumors that she was sleeping and
10      that she was not -- and to the extent that she
11      appeared to be sleeping was because of an eye
12      condition?
13  A   No, sir, not at that time.
14          MR. BELAZIS: Excuse me one second.
15          (Off the record.)
16  BY MR. BELAZIS:
17  Q   Mr. Gunner, you're familiar with diabetes and you
18      have some personal familiarity with it?
19  A   Yes, sir.
20  Q   And I understand you have a daughter who is
21      diabetic?
22  A   Yes, sir.
23  Q   So I suspect that you have studied the condition
24      for that reason pretty carefully?
25  A   No, sir.

8 (Pages 29 to 32)

Electronically signed by Brenda Huntley Roberts (201-220-072-3855)                    5e0f9fa9-b8ff-42d1-8fb0-65b301d4a9dc

Page 33

```
 1   Q    Okay.
 2   A    Like I say, my wife has studied the condition
 3        very carefully.
 4   Q    You understand though at least that if the
 5        condition is not controlled, that the person
 6        suffering from it can have excessive highs or
 7        excessive lows in their blood sugar?
 8   A    Yes, I do understand that.
 9   Q    And you understand that it's typically a chronic
10        condition; in other words, it's one that usually
11        may not go away, right?
12   A    Especially, I mean, there are multiple types of
13        diabetes.  Type 1, the pancreas shuts down
14        completely, does not go away.  Type 2, there's
15        sometimes it can be completely controlled through
16        diet and exercise.  It's not, the two types of
17        diabetes are entirely different.
18   Q    And your daughter's?
19   A    Is Type 1.
20   Q    Okay.  And in the case of Type 1, that doesn't go
21        away as you said?
22   A    Uh-huh.
23   Q    Okay.  And if not, if blood sugars are not
24        controlled, they can have a number of adverse
25        effects on other body systems; is that correct?
```

Page 34

```
 1        MS. GRIGSBY:  With respect to what
 2        type?
 3        BY MR. BELAZIS:
 4   Q    Type 1.
 5   A    Yes.  Understand, I'm no medical expert.
 6   Q    I'm just asking about your understanding.
 7   A    Yes.
 8   Q    And are you familiar with neuropathy?
 9   A    Yes.
10   Q    And what is that?
11   A    My understanding is neuropathy is damage to the
12        nerve endings, typically either in the
13        extremities, so typically fingers and toes and
14        the feet.
15   Q    Okay.  And if someone has a long-term
16        uncontrolled diabetic conditions, that's one of
17        the consequences potentially of neuropathy, is
18        that correct?
19        MS. GRIGSBY:  Again, his understanding.
20        THE WITNESS:  My understanding is that
21        that could be one of the consequences, yes.
22        BY MR. BELAZIS:
23   Q    And neuropathy can be a painful condition; is
24        that your understanding?
25   A    It is my understanding, yes.
```

Page 35

```
 1   Q    And to the extent it's in your lower extremities,
 2        in other words, in your feet, it can impair your
 3        mobility; is that your understanding?
 4   A    That, I don't know, sir.
 5   Q    Would you assume if you had a painful condition
 6        in your lower extremities, it might impair your
 7        abilities --
 8   A    Again, I don't know.
 9        MS. GRIGSBY:  Objection.
10        BY MR. BELAZIS:
11   Q    I'm asking about whether that makes sense to you.
12   A    I guess it would determine where and how much
13        pain and whether it does or doesn't, I don't
14        know.
15   Q    But it could, right?
16        MS. GRIGSBY:  Objection.
17        THE WITNESS:  There is a lot of things
18        that could happen, sir.
19        BY MR. BELAZIS:
20   Q    Okay.  This was a pretty simple question.  If the
21        pain was severe enough as a result of the
22        neuropathy that was in a diabetic individual, it
23        could impair mobility, is that fair enough?
24        MS. GRIGSBY:  Objection.
25        THE WITNESS:  Again, I've answered that
```

Page 36

```
 1        question.
 2        BY MR. BELAZIS:
 3   Q    Would you agree; would that be a fair conclusion?
 4        MS. GRIGSBY:  Objection.  Asked and
 5        answered.
 6        THE WITNESS:  No, I would not agree
 7        that's a fair conclusion.
 8        BY MR. BELAZIS:
 9   Q    Okay.  Why not?
10   A    Because there's a lot of different issues that go
11        into that.  The severity of the pain, the
12        location of the pain, the tolerance of the pain
13        in that individual, and I think you can
14        ultimately say that that's the case.
15   Q    So all of those things could come into play?
16   A    Absolutely.
17   Q    And depending on some of the answers to those
18        questions, it would determine whether or not it
19        might impair mobility; is that right?
20        MS. GRIGSBY:  Objection.
21        THE WITNESS:  Again, no, I wouldn't say
22        that either.  You know, just because a person is
23        in pain does not mean that it impairs their
24        ability for mobility.
25        BY MR. BELAZIS:
```

9  (Pages 33 to 36)

Electronically signed by Brenda  Huntley Roberts (201-220-072-3855)          5e0f9fa9-b8ff-42d1-8fb0-65b301d4a9dc

Page 37

1  Q   Okay. When did you meet Mrs. Smith?
2  A   I think I told you, I believe I met her the night
3      of the Meet the Superintendent, briefly at the
4      end of the presentation when I was greeting
5      hundreds of people from the community. I believe
6      she was there that evening.
7  Q   Okay. And when did you see her again?
8  A   I don't recall when the next meeting would have
9      been. You know, I'm in and out of the buildings
10     all the time. I could have run into her on a
11     variety of occasions in the building. I don't
12     recall any specific follow-up meeting or
13     follow-up interaction with her.
14  Q   When was the first time you met with her?
15  A   Again, I answered that. The first time I met
16     with her would have been the evening of the --
17  Q   I'm sorry?
18  A   The superintendent.
19  Q   Outside of that.
20  A   Again, I don't recall the next time I would have
21     met with her.
22  Q   I mean, in a formal meeting.
23  A   If you're talking about a formal meeting that,
24     you know, that would have entailed, you know, a
25     formal sit-down discussion, that would have been

Page 38

1      in this disciplinary process.
2  Q   And which one in particular?
3  A   The meeting with Mr. Zraik I believe would have
4     been the first time I formally met her.
5  Q   Did you, I assume, note Mrs. Smith's obesity
6     during the times that you saw her?
7  A   Again, I'm no medical expert. I don't know the
8     official medical definition of obesity. Did I
9     notice that she was heavy, was overweight, yes,
10     that's obvious.
11  Q   Okay. Did you detect any mobility impairments
12     during the times that you saw her; in other
13     words, any difficulty walking?
14  A   No.
15  Q   Did you make any effort to observe her walking?
16  A   No, I had no reason to.
17  Q   When you first became superintendent, one of your
18     jobs is to evaluate the principals?
19  A   Yes.
20  Q   And do you recall when you first met with your
21     principals to evaluate them after becoming
22     superintendent?
23  A   No, sir.
24  Q   There's a -- I saw one of your board notes
25     referring to meetings that you had for sort of

Page 39

1      preliminary evaluation purposes in the fall of
2      2009, do you recall that?
3  A   No, sir.
4  Q   Do you recall any concerns that you had about any
5     of your principals early in your administration?
6      MS. GRIGSBY: Paul, your last question
7     referred to 2009, was that what you intended?
8      MR. BELAZIS: Uh-huh.
9      MS. GRIGSBY: Okay. And now your
10     question is?
11  BY MR. BELAZIS:
12  Q   Did you have any concerns about any of your
13     principals, and particularly Mr. Finn or Mr.
14     Gasteier, did you express to them early in your
15     administration?
16  A   Yes.
17  Q   What were they?
18  A   In particular, all principals, I think I set an
19     expectation and the tone that, to use my, I think
20     the words I used at the time, were they needed to
21     be brutally honest in their evaluations. And
22     looking at brief evaluations from the principals,
23     I felt that they were giving the evaluation
24     process sort of a cursory part of their job, that
25     they were rubber-stamping everybody as an

Page 40

1      effective, or at least acceptable teacher in all
2      categories, in all areas as well as not just
3      teachers, their evaluations of other employees.
4      And I indicated that nobody is perfect, and that
5      it's my expectation that your evaluations are
6      honest, and that if there are concerns about
7      employees, that you document those concerns, and
8      you document ways that you can work with that
9      employee to improve in those areas. When we had
10     that conversation or when that expectation was
11     laid out, I can't tell you that, I don't recall
12     exact day. And it was probably multiple times as
13     we talked about evaluation process.
14  Q   What made you think that they were
15     rubber-stamping?
16  A   Some of it was a conversations with the board
17     about their feelings when they hired me in terms
18     of that we weren't -- we weren't holding all of
19     our employees to high expectations. Some of it
20     was looking through evaluations and reviewing
21     previous evaluations where every single mark on
22     an employee is marked as, you know, the exact
23     same category, it meets expectations. There were
24     no differentiations from one category to another,
25     and in the teachers evaluations there were, I

Electronically signed by Brenda  Huntley Roberts (201-220-072-3855)       5e0f9fa9-b8ff-42d1-8fb0-65b301d4a9dc

Page 41

1  don't know, 40 or 50 different line items you had
2  to evaluate a teacher on.  So when they are all
3  consistently marked the same, that concerns me.
4  They weren't really paying attention to the
5  individual themselves, when, you know, every
6  teacher in evaluations, that are done are all
7  marked that exact same way.  There's no
8  differentiation between one teacher and another,
9  and there's no differentiation with any teacher
10  of skills where they may be better at some skills
11  and need work or improvement on other skills.
12  Q    Okay.  So that's an expectation that you
13  articulated to administrators?
14  A    Very early in my career, you say 2009, I'm sure,
15  but it was an expectation that was, you know,
16  repeated every year as we would talk about and
17  get ready for the next year's evaluations.
18  Q    You made clear to them from the very beginning
19  that that was your expectation?
20  A    Yes.
21  Q    And I take it you also made clear to them that
22  they would be evaluated themselves on whether or
23  not they followed that directive?
24  A    That is correct.
25  Q    Oh, here we go.  You're right, I just spoke --

Page 42

1        MS. GRIGSBY:  Yes, I thought.
2        MR. BELAZIS:  Let's mark that.
3     (Plaintiff's Exhibit 26 was marked and attached.)
4        THE WITNESS:  I would have been
5     surprised if it wasn't in 2008, on this issue.
6     BY MR. BELAZIS:
7  Q    Okay.  You have been handed what's marked as
8     Plaintiff's Exhibit, what is that, 26?
9  A    Yes, sir.
10  Q    And you may note that you have scheduled
11     evaluation meetings on the last page for Mr.
12     Gasteier, Mr. Miller, Mr. Finn.  Those are all
13     administrators, at least Mr. Gasteier and Mr.
14     Finn, right?
15  A    Yes, and Ms. Miller.  She's our food service
16     supervisor.
17  Q    Okay.
18  A    And Mr. Strohl is our athletic director,
19     considered administrator as well, and Ms.
20     Leffler, all of those.
21  Q    So this would have been the first opportunity you
22     had to convey those thoughts that you just
23     remarked about earlier?
24  A    No, I don't know that I would say the first.  I
25     may have conveyed them earlier as well.  But

Page 43

1  certainly I would have conveyed them again
2  one-to-one in these pre-evaluation meetings.
3        MS. GRIGSBY:  Do you have another copy?
4        MR. BELAZIS:  Oh, I beg your pardon?
5        MS. GRIGSBY:  Yes.
6        MR. BELAZIS:  Yes, I do.
7        MS. GRIGSBY:  Thank you.
8     BY MR. BELAZIS:
9  Q    How was it that you happened to review
10     evaluations?
11  A    Well, part of my hiring process, the board raised
12     the issue of, you know, an expectation to raise
13     the overall competency level of our staff, and
14     that the brochure that they sent out advertising
15     for the position talked about taking a good
16     district to a great district, and in our
17     conversations about what they mean there.  As a
18     board they articulated to me that part of it was
19     holding all staff to high expectations and
20     holding staff accountable when they didn't live
21     up to those expectations.  So part of my
22     preparation and review for that process was to
23     begin to look at the personnel files and how we
24     evaluated staff in the past and what forms were
25     we using in what were sort of the historical

Page 44

1  patterns of evaluation.
2  Q    And did you begin reviewing personnel files in
3     the summer after you were hired?  In other words,
4     when did you start reviewing them?
5  A    Almost immediately.  I look at personnel files on
6     a regular basis.
7  Q    And in terms of evaluations, you pulled the
8     evaluations and began reviewing those, I take it,
9     from what you described?
10  A    I would have -- I wouldn't use the word pull, I
11     would take an employee's personnel file and I
12     would scan through it looking at, in particular,
13     the evaluation that they had undergone, and
14     anything, any other letters or anything else that
15     were in there that may have been of interest.
16     Normally those were the things I was looking at.
17  Q    Was there any record of evaluations?  Who has
18     been evaluated that is maintained other than the
19     hard copy that's in the personnel file?
20  A    Not that I'm aware of.
21  Q    Okay.
22        MR. BELAZIS:  Off the record for a
23     second.
24        (Off the record.)
25     (Plaintiff's Exhibit No. 3 was referred to.)

11  (Pages 41 to 44)

Electronically signed by Brenda  Huntley Roberts (201-220-072-3855)                    5e0f9fa9-b8ff-42d1-8fb0-65b301d4a9dc

Page 45

1    BY MR. BELAZIS:
2  Q    Handing you what's been marked as Plaintiff's
3       Exhibit No. 3.
4  A    Okay.
5  Q    You're referred to a series of incidents that had
6       occurred when you were contacted by Mr. Finn; is
7       that correct?
8  A    Yes, in September of 2008.
9  Q    Okay.  And I think you said there were four; is
10      that right?
11 A    Yes.
12 Q    And the documents that are a part of Plaintiff's
13      Exhibit 3 are the disciplinary related documents
14      that were issued by you in connection with that
15      series of events, right?
16 A    Some of them are disciplinary, some of them are
17      related to requests for accommodations.
18          MS. GRIGSBY:  You're referring to both
19      Exhibit 3 and 4?
20          MR. BELAZIS:  Is there a 4?
21          THE WITNESS:  I'm sorry.  So 3 is just
22      these pages then?
23      BY MR. BELAZIS:
24 Q    Yes.
25 A    Then, yes, these two letters are in reference to

Page 46

1       the disciplinary conditions for those four
2       incidents.
3  Q    Okay.  And let me look at it.  Were you present
4       for this disciplinary conference?
5  A    No, I was not.
6  Q    Did you ever talk to Mrs. Smith about it in the
7       course of these disciplinary proceedings?
8  A    No.
9  Q    Referenced by Plaintiff's Exhibit No. 3?
10 A    I had a conversation with Mrs. Smith and Mr.
11      Zraik regarding accommodations that referenced
12      these four incidents, but I was not involved in
13      that meeting, nor the discipline that was issued.
14 Q    Well, I think you said that Mr. Finn contacted
15      you about --
16 A    Uh-huh.
17 Q    -- these incidents?
18 A    Yes, we had conversations, yes.
19 Q    And did you offer input into the discipline that
20      should be taken based on what he told you?
21 A    No, Mr. Finn made the decision afterwards that
22      the first step in the negotiating agreement with
23      teachers would be -- let me backtrack for a
24      minute.
25          Yes, I did because I had informed him

Page 47

1       that, you know, that there were verbal
2       conversations regarding similar incidents at the
3       high school the previous year, so that if he felt
4       that the accusations were accurate, that the next
5       phase would be a written reprimand versus verbal.
6       So we did have a conversation like that.
7  Q    Okay.  So that was what you advised him what you
8       just described?
9  A    Right.  I didn't direct him to get a written
10      reprimand.  The conversation focused on that if
11      he felt the circumstances warranted discipline,
12      then the accusations had merit, that the
13      appropriate stage would be a written reprimand.
14 Q    What were the accusations from the previous year
15      that you were aware of?
16 A    Again, we previously discussed those.  The
17      failure to leave the classroom during the fire
18      drill, and also the previous accusations from Mr.
19      Dahlman of finding Mrs. Smith asleep at one time.
20 Q    Okay.  During a previous school year you're
21      talking about?
22 A    A previous year.  I don't know that that took
23      place in '07-'08, I just know that there was
24      reference to that in a previous year.  When that
25      was, I do not know.

Page 48

1  Q    And had you spoken to Mr. Dahlman about that
2       particular incident?
3  A    Mr. Dahlman and I had numerous conversations.  I
4       don't know.
5  Q    At that point in time, in other words, prior to
6       this conversation you had with Mr. Finn about
7       what disciplinary action to take, had you spoken
8       to Mr. Dahlman about that incident involving the
9       previous year?
10 A    Yes.  Yes, I was aware of that incident prior to
11      informing Mr. Finn that the appropriate
12      disciplinary step based on previous incidents
13      would be at least a written reprimand.
14 Q    I understand that you are aware, but you told me
15      Mr. Gasteier had made you aware; is that correct?
16 A    No, I had spoken to both Mr. Gasteier and Mr.
17      Dahlman both.
18 Q    And what exactly did Mr. Dahlman tell you?
19 A    Sir, I can't really remember.  He had referenced
20      multiple concerns and multiple issues related to
21      his interactions with Mrs. Smith in previous
22      years.  One of them being at one time finding her
23      asleep.
24 Q    And can you give me any details about how he knew
25      that she was asleep?

HUNTLEY REPORTING SERVICE
1.800.247.8360

Electronically signed by Brenda Huntley Roberts (201-220-072-3855)                5e0f9fa9-b8ff-42d1-8fb0-65b301d4a9dc

Page 49

1  A    Again, all that I recall in the conversation is
2       that he walked into her classroom and she was at
3       her desk asleep.
4  Q    And can you tell me how he knew that she was
5       asleep?
6  A    No, sir.  You would have to ask him that.
7  Q    Did you ask him that?
8  A    No, sir.  I took his word that when he said she
9       was asleep that she was asleep.
10 Q    Do you know whether Mrs. Smith was asked about
11      that?
12 A    I do not.
13          MS. GRIGSBY:  Objection.
14     BY MR. BELAZIS:
15 Q    Okay.  Did you give any direction to Mr. Finn to
16      ask her about that?
17 A    No, I did not.  Again, it was previous year, I
18      assume that it had been dealt with by the
19      previous administration.
20          MS. GRIGSBY:  Can we take just a
21     two-minute break?
22          MR. BELAZIS:  Sure.
23          (Off the record.)
24     BY MR. BELAZIS:
25 Q    Okay.  Other than this incident involving Mr.

Page 50

1       Dahlman that you have already referred to, were
2       there any other incidences, and of course you
3       mentioned the fire drill incident?
4  A    Uh-huh.
5  Q    Other than those two things, were there any
6       others that you were referring to a moment ago
7       when you referenced incidences from the previous
8       year?
9  A    I was aware of a conversation with Mr. Dahlman
10      that --
11 Q    You mean other incidences from conversations with
12      Mr. Dahlman?
13 A    No.  And, again, this general conversation, it
14      may have been more than one conversation with him
15      at that time, that he had an incident with Mrs.
16      Smith where he had a concern over a particular
17      movie that she had shown in class and whether she
18      had followed proper procedures in obtaining
19      permission to show that movie.
20 Q    Which movie was that?
21 A    I believe it was a movie titled "Witness."
22 Q    Okay.
23 A    I'm aware that Mr. Dahlman also had an incident
24      with Mrs. Smith as he was leaving her classroom
25      after a conversation with her, that she made a

Page 51

1       derogatory comment about Mr. Dahlman that he was
2       aware was made and confronted her and she
3       admitted to making, that he turned it over to Mr.
4       Dahlman.
5  Q    What?
6  A    I don't remember the exact word or words, but it
7       was --
8  Q    How do you know it was derogatory?
9  A    Just, that's my recollection in talking to Mr.
10      Dahlman.
11 Q    Okay.
12 A    It was something certainly that you would not say
13      to your supervisor that he took offense to.
14 Q    Was that documented in her personnel file?
15 A    No, sir, it was not.
16 Q    Okay.  Anything else?
17 A    There may have been a couple of other minor
18      things, but I don't recall instances.
19 Q    Okay.  Did you draw any conclusions prior to the
20      time that -- well, prior to the time -- strike,
21      withdraw that question.
22          Prior to the time that you spoke with
23      Mr. Finn about this disciplinary action that you
24      and he discussed, had there been any discussion
25      about Ms. Smith's diabetic condition?

Page 52

1  A    No, sir, not that I'm aware of.
2  Q    Okay.  So at some point you got a letter from Mr.
3       Zraik; is that right?
4  A    Yes.  Multiple letters from Mr. Zraik.
5  Q    All right.  And he brought up the issue of her
6       diabetic condition; is that right?
7  A    Yes, sir.
8  Q    Now, if you look at the second page of what's
9       been marked as Exhibit 3.
10 A    Yes, sir.
11 Q    In the next to the last paragraph Mr. Finn refers
12      to the fact that, during the conference, the
13      question of Ms. Smith's diabetes came up as an
14      issue, right?
15 A    He indicates that, yes.
16 Q    Okay.  Did Mr. Finn make you aware of that?
17 A    I received a copy of this letter.
18 Q    Did you speak with Mr. Finn between the time that
19      this September 29, 2008 letter, in other words,
20      the first page of Exhibit 3, was issued and the
21      October 6, 2008?
22 A    Yes.  I'm normally in conversations with my
23      principals almost daily.
24 Q    Okay.  So sometime in between that, those two
25      letters, did you discuss the question of Ms.

13  (Pages 49 to 52)

Electronically signed by Brenda  Huntley Roberts (201-220-072-3855)                    5e0f9fa9-b8ff-42d1-8fb0-65b301d4a9dc

Page 53

1    Smith's diabetes?
2  A  No, sir.
3  Q  Did he make you -- I assume you became aware that
4     her diabetes was an issue?
5  A  When I received this letter.
6  Q  Which one?
7  A  The one dated October 6th, and also about the
8     same time I received the letter from Thomas
9     Zraik.
10  Q  Okay.
11  A  They both came about, I can't guarantee the same
12     day, but pretty close to the same day.
13  Q  Prior to that time, Mr. Finn had not said
14     anything to you about diabetes being an issue in
15     the conduct for which Mrs. Smith was being
16     considered for discipline?
17  A  Not that I recall.
18  Q  Would you consider that an important factor if
19     he's going to discuss with you potential
20     disciplinary action?
21  A  I certainly think it is. I think he addressed it
22     in the letter.
23  Q  Would you have given him any different
24     information about your own conclusions if you had
25     known about the diabetes issue?

Page 54

1  A  It depends on my -- what do you mean by my own
2     conclusion?
3  Q  Well, you described earlier the views that you
4     imparted, that you imparted to Mr. Finn about
5     what disciplinary action might be appropriate
6     under the circumstances.
7  A  Uh-huh.
8  Q  My question is, would that have been any
9     different if you had known about the issue of
10     diabetes?
11     MS. GRIGSBY: Objection. Calls for
12     speculation.
13     THE WITNESS: If, in Mr. Finn's
14     opinion, she was actually sleeping and not
15     supervising kids during one or more of these
16     instances, that she was not fully awake and fully
17     aware of the responsibility she has in a
18     classroom, then she needed to be held accountable
19     for that as a disciplinary issue. If, what
20     caused that was diabetes and/or a medical
21     condition, then we are willing, and he offered,
22     the opportunity to sit down and discuss that
23     medical condition and to make an opportunity for
24     her to take a leave if necessary to get better
25     for that.

Page 55

1    (Plaintiff's Exhibits 4 and 5 were referred to.)
2  BY MR. BELAZIS:
3  Q  Okay. Now let's go to Exhibit 5. I'm sorry,
4     Exhibit 4. You've already referenced that you
5     received some letters from Mr. Zraik advising
6     that Mrs. Smith suffered from diabetes, correct?
7  A  Yes.
8  Q  And he explains in that correspondence, which I
9     have now handed to you.
10  A  Yes.
11  Q  That, in fact, she may appear to be sleeping when
12     she is not is a secondary consequence of her
13     diabetic condition; is that right?
14     MS. GRIGSBY: Are you referencing a
15     particular part of the letter?
16     THE WITNESS: Please, yes.
17  BY MR. BELAZIS:
18  Q  Let's have a look. Let's look, for example, at
19     her letter of October 14, 2008. He says, "At
20     times," in the second full paragraph. "At times,
21     particularly when she is experiencing any
22     elevated blood sugar, Mrs. Smith may appear to be
23     sleeping even though she is awake and fully aware
24     of her surroundings?" Do you see that?
25  A  Let me see what he says in the letter, yes.

Page 56

1  Q  Okay. So that letter was directed to you; is
2     that right?
3  A  This one is directed to Principal Finn.
4  Q  But you got a copy of it?
5  A  I believe so, yes, because it went in her,
6     Carol's personnel file.
7  Q  Okay. And, in fact -- well, here. He sent the
8     letter at the same time, also dated October 15th
9     to you, and he says the same thing, right?
10     "Because of her elevated blood sugar may at times
11     appear to be sleeping even though she is fully
12     awake and aware of her surroundings," right,
13     that's what it says?
14  A  That is what he says in the second, the end of
15     the second paragraph, yes.
16  Q  Okay. Now, and you got a copy of that letter,
17     right?
18  A  Yes.
19  Q  Okay. So once that was brought to your
20     attention, what, if anything, did you do to
21     determine whether or not the incidences of which
22     Mrs. Smith was being accused as laid out in
23     Exhibit 3, the September 29, 2008 letter, where,
24     in fact, it appears in which she was suffering
25     from an elevated or excessively low blood sugar,

14  (Pages 53 to 56)

Electronically signed by Brenda  Huntley Roberts (201-220-072-3855)                     5e0f9fa9-b8ff-42d1-8fb0-65b301d4a9dc

Page 57

1    and whether, in fact, she was fully alert?
2 A   I had a conversation with Mr. Finn regarding his
3    investigation and also the conversation during
4    the disciplinary hearing that he held.  It is my
5    recollection that on two of the three occasions
6    that are referenced in the letter, Mr. Finn
7    himself personally witnessed her sleeping and was
8    sure that she was sleeping.  And on a third
9    occasion, Mr. Quizno, who was the assistant
10    principal, witnessed her sleeping and was
11    positive that she was sleeping, that she wasn't
12    simply resting her eyes as this alludes to.  And
13    then on a fourth occasion, a teacher was positive
14    she was sleeping and not simply resting her eyes.
15    So given that information, I felt the
16    disciplinary action taken by Mr. Finn was
17    warranted.
18 Q   Okay.  Did you personally speak with Mr. Quizno
19    about that?
20 A   Mr. Quizno?
21 Q   Uh-huh.
22 A   I have, I don't know in that time frame.
23 Q   Okay.
24 A   Certainly since then I have.  I don't know that I
25    can swear that I have spoken to him at that time.

Page 58

1 Q   And the teacher, who was the teacher?
2 A   Danielle Fahning if I remember correctly.
3 Q   And did you personally talk with the teacher?
4 A   No, I did not.
5 Q   But from your point of view, the teacher had
6    express absolute certainty that Mrs. Smith was
7    sleeping?
8 A   My conversation with Mr. Finn, he was positive
9    himself, he shared with me that Mr. Quizno was
10    positive, and he shared with me that in his
11    conversation with the teacher, the teacher was
12    positive that she was sleeping.  I did not, at
13    that time, recall talking directly to Mr. Quizno
14    or to Ms. Fahning.
15      MR. BELAZIS:  Do you mind if I take
16    just a five-minute break?
17      MS. GRIGSBY:  Sure.
18      (Off the record.)
19    BY MR. BELAZIS:
20 Q   Okay.  Mr. Gunner, would you agree with me that
21    if Mrs. Smith was suffering from a diabetic high
22    or a diabetic low and didn't feel good and had
23    her eyes closed because of that, that it might be
24    difficult for either Mr. Quizno or Mr. Finn to
25    determine with certainty whether or not she was

Page 59

1    asleep?
2      MS. GRIGSBY: Objection.
3      THE WITNESS:  No, I do not.
4    BY MR. BELAZIS:
5 Q   Why is that?
6 A   Again, in my conversation with Mr. Finn, he
7    walked into the classroom, walked over to where
8    her desk was, she never made any acknowledgment
9    of someone coming into the classroom and, you
10    know, did not recognize at all that anybody had
11    entered the room.  If I'm resting my eyes as a
12    teacher as she claims and that door opens, I'm
13    going to be opening my eyes to clearly see what's
14    going on in the classroom, and why somebody has
15    entered my room.  And the second observation is
16    the same thing, in Mr. Quizno's it's the exact
17    same.  In fact, Mr. Quizno has indicated that he
18    walked into the classroom, all the way over to
19    her desk, she never moved, and she was way back
20    in a sort of a lay-back prone position, eyes
21    clearly closed, mouth wide-open, and remained in
22    that position the entire time he walked into the
23    room, walked over to her desk, and as he walked
24    out and exited the room, never once made any
25    acknowledgment that he had been in the room at

Page 60

1    all.  So, and if I recall Danielle Fahning's
2    comments to Mr. Finn that were relayed to me, it
3    was that, you know, at some point after she
4    entered the room, that Ms. Fahning -- or Mrs.
5    Smith had sort of a startled wake as you would
6    wake up from a sleep, and that it was very
7    noticeable to Mrs. Fahning, that there was some
8    reaction versus simply observing her sleeping.
9 Q   But you didn't talk to her yourself?
10 A   I did not.  These are conversations I had with
11    Mr. Finn.
12 Q   One of the symptoms of blood sugar that's not
13    within the normal range, in other words, when it
14    gets either too high or too low, may be
15    difficulty concentrating; is that your
16    understanding?
17      MS. GRIGSBY:  Objection.
18      THE WITNESS:  Again, I'm not a medical
19    expert, but it is my understanding that
20    sometimes, yes.
21    BY MR. BELAZIS:
22 Q   Okay.  So if an individual is experiencing a very
23    high or very low blood sugar and is having
24    difficulty concentrating and is feeling poorly
25    and closing their eyes as a result of that, you

15  (Pages  57  to  60)

Electronically signed by Brenda  Huntley Roberts (201-220-072-3855)      5e0f9fa9-b8ff-42d1-8fb0-65b301d4a9dc

Page 61

1  still think that you would be able to determine
2  whether or not they are asleep with certainty?
3  A  Given the description of these four incidents and
4  what took place, yes, I believe it clearly, and
5  in these circumstances presented to me, it was
6  clear that she was sleeping.
7  Q  Was there any effort to confer with a medical
8  professional to determine whether the
9  observations that any of those individuals made
10  might be related to a diabetic condition?
11  A  There was later a request and a demand for a
12  medical evaluation of Mrs. Smith.
13  Q  I'm just talking about at that time, prior to the
14  time that the disciplinary action was taken
15  against Mrs. Smith for these four incidents that
16  you're referring to in Plaintiff's Exhibit No. 3,
17  was any effort to confer with a medical
18  professional to determine whether the
19  observations which the district was relying in
20  order to impose the disciplinary actions might
21  have been related to Mrs. Smith's medical
22  condition?
23  A  No, sir.
24  Q  Let's see.  It's here somewhere.
25  A  If I could amend that last answer just in the

Page 62

1  following way:  The district did offer Mrs. Smith
2  the opportunity to take a medical examination,
3  and to take a medical leave of absence should
4  that be causation for these incidents.
5  Q  Mr. Gasteier, where in that correspondence,
6  either Exhibit 3 or Exhibit 4, does it refer to a
7  medical examination with respect to that?
8  MS. GRIGSBY:  Mr. Gunner.
9  MR. BELAZIS:  What did I say?
10  MS. GRIGSBY:  Gasteier.
11  MR. BELAZIS:  Oh, I'm sorry.
12  THE WITNESS:  If you refer to
13  Exhibit 3, the second letter from, or the letter
14  from Mr. Finn, and the second to the last
15  paragraph, second sentence says, "We would
16  encourage you to seek medical attention for any
17  condition that may be impacting your ability to
18  teach and to supervise students effectively.  The
19  Perkins School District will support a medical
20  leave of absence if prescribed by your treating
21  physician until such time that your medical
22  condition would not interfere in your ability to
23  properly teach and supervisor students."
24  BY MR. BELAZIS:
25  Q  That's what she was told, right?

Page 63

1  A  That was what was offered to her, yes.
2  Q  Now, what's been marked Plaintiff's Exhibit 27,
3  and do you recognize that?
4  A  Yes.
5  Q  When did you first see it?
6  A  I believe during the termination hearing.
7  Q  Okay.  And did Ms. Fahning testify at the
8  termination hearing?
9  A  I do not recall.  I'm not positive.
10  Q  You don't remember her testimony?
11  A  There were multiple teachers who testified.  I
12  don't believe Danielle did, but I'm not positive.
13  Q  She doesn't say anything about Mrs. Smith jumping
14  with startle as you described, does she?
15  A  No, she does not.
16  Q  She just says she took some time to collect
17  herself and get up, right?
18  A  It specifically says it took several minutes for
19  Mrs. Smith to regroup and move along to her seven
20  period assignment.
21  Q  Do you know what she meant by regroup?
22  A  No, sir, I did not speak to her.
23  Q  And, again, if she was experiencing either a high
24  or low blood sugar and was feeling poorly and
25  closed her eyes, would Ms. Fanning be in a

Page 64

1  position to know the difference?
2  MS. GRIGSBY:  Objection.
3  THE WITNESS:  It's my information,
4  again, through Mr. Finn, and Mrs. Fahning was
5  emphatic that she was sleeping, and that she was
6  startled awake, and that's how she knew she was
7  sleeping, in her conversation with Mr. Finn, that
8  was what was relayed to me.
9  BY MR. BELAZIS:
10  Q  Okay.
11  (Plaintiff's Exhibits 5 and 6 were referred to.)
12  BY MR. BELAZIS:
13  Q  I want you to have a look at what's been marked
14  as Plaintiff's Exhibit No. 5.
15  A  Okay.
16  Q  Before we get to that, I'm back to Exhibit 4 for
17  a moment, the correspondence that you received
18  from Mr. Zraik, I think it may have been attached
19  to the letter to Mr. Finn that we talked about a
20  minute ago on which you were copied, included
21  some information from Ms. Smith's medical
22  provider at Northern Ohio Medical Specialists
23  Health Care; is that correct?
24  A  It was a letter to Mr. -- to the middle school
25  from Northern Ohio Medical Center regarding Carol

Electronically signed by Brenda  Huntley Roberts (201-220-072-3855)                    5e0f9fa9-b8ff-42d1-8fb0-65b301d4a9dc

Page 65

1   Smith and diabetes.
2 Q   Okay. And that was, that accompanied the
3   October 14, 2009 letter to Mr. Finn; is that
4   correct?
5 A   Sir, I'm not sure.
6 Q   Well, there's a reference to it.
7 A   But Finn may have. I did not receive that
8   letter, Mr. Finn did.
9 Q   Hold on just a second. There's a reference to,
10   in the second full paragraph, it says, "See
11   attached letter from Certified Nurse
12   Practitioner, Michelle Poulos of Northern Ohio
13   Medical Specialists," right?
14 A   Yes, that is it.
15 Q   Okay. So the letter to Mr. Finn references the
16   information from Ms. Poulos that is also part of
17   the exhibit, right?
18 A   Yes.
19 Q   And you were copied with that same letter; is
20   that correct?
21 A   Yes, I believe I was.
22 Q   So, you would have received the information from
23   Ms. Poulos as well, right?
24 A   Yes.
25 Q   And I take it you didn't question Ms. Smith's

Page 66

1   diabetic condition or any of the information that
2   was provided by Ms. Poulos?
3 A   It says, "Your blood sugars have been fairly well
4   controlled over the past several years."
5 Q   Okay. Now, Ms. Poulos also indicates that, "When
6   sugars are too high she may become lethargic and
7   disoriented; when it's too low, may sweat, shake
8   and experience mood changes or irritability." Do
9   you see that?
10 A   Yes, sir.
11 Q   All right. And she also indicates, "Please be
12   aware that she, Mrs. Smith, may experience some
13   of the above symptoms." Do you see that?
14 A   Yes, sir.
15 Q   And you didn't have any reason to question that,
16   did you?
17 A   No, sir.
18 Q   Okay. And she also indicates that, "If blood
19   sugars are too low, Mrs. Smith may sweat, shake
20   and experience" -- I'm sorry, we already went
21   through that.
22   Okay now, so let's go back to Exhibit
23   5. Tell me what that is, please.
24 A   Exhibit 5 contains two letters that I wrote. The
25   first one is requesting Mrs. Smith to appear at a

Page 67

1   disciplinary conference on Tuesday, March 31st,
2   and the second one is giving her my results after
3   having met with her on the disciplinary meeting
4   on March 31st.
5 Q   Okay. Tell me what the issue was.
6 A   February 25th, Mrs. Smith failed to show up at
7   middle school for part of her assigned duties in
8   the afternoon. She was seen in her car in the
9   parking lot by a custodian, and the second letter
10   basically confirms that she admits that she
11   missed part of her assigned duties and it was her
12   fault, and that I issued her a three-day
13   suspension without pay and the dates of those,
14   the suspension notice.
15 Q   Okay. Did you personally meet with Mrs. Smith
16   with this?
17 A   Yes, I did.
18 Q   What did she explain to you?
19 A   She had explained to me that she had gotten
20   confused over the schedule between the high
21   school and the middle school that day and as a
22   result missed her assigned duties at the middle
23   school.
24 Q   Okay. Did she explain to you how or why she got
25   confused?

Page 68

1 A   My recollection was this was a two-hour delay, or
2   a two-hour early dismissal day, so the schedules
3   are slightly different, and though we had had at
4   least three or four of these previous to this
5   day, so this wasn't a unique or new situation for
6   Mrs. Smith, but because of that she said she got
7   confused on when she was supposed to be at the
8   middle school.
9 Q   Okay. Did she tell you anything about her -- any
10   recent medical procedures that she had had?
11 A   She did not.
12 Q   Did she tell you that she had just returned from
13   bariatric surgery?
14 A   No, she did not.
15 Q   Did you learn that information from anyone else?
16 A   At some point I did not -- I can't tell you
17   exactly when.
18 Q   Okay. Did you have any idea that Mrs. Smith was
19   on any kind of a medical leave?
20 A   Yes, I knew she had been out.
21 Q   Okay. And did you find out, did you learn any
22   information about when she had returned from her
23   medical leave?
24 A   No, I did not know the exact date of her return.
25 Q   Did you ask her about any explanation about what

17  (Pages 65 to 68)

Electronically signed by Brenda  Huntley Roberts (201-220-072-3855)                    5e0f9fa9-b8ff-42d1-8fb0-65b301d4a9dc

Page 69

```
 1        might have caused her confusion other than the
 2        change in schedule?
 3    A    I asked her to explain why she had missed her
 4        assignment in the middle school and that's the
 5        explanation she gave me.
 6    Q    Are you familiar at all with bariatric surgery?
 7    A    No, sir.
 8    Q    Do you know what it is?
 9    A    I know it's some sort of medical procedure to
10        help address obesity.  Other than that, I don't
11        know.  I don't know what the procedure is, I
12        don't know what they do.  I just know it's meant
13        to help address obesity.
14    Q    Okay.  And would you agree with me that any kind
15        of surgery on someone who is 69 or 70 years old
16        is never very easy?
17            MS. GRIGSBY:  Objection.
18            THE WITNESS:  No, I wouldn't.  I've got
19        a 88-year old father-in-law who has gone through
20        surgery and who has come out fine.
21    BY MR. BELAZIS:
22    Q    Okay.
23    A    So, no, it depends on obviously the surgery and
24        the complications and the overall health and
25        well-being of that individual.
```

Page 70

```
 1    Q    That's right.  And at least some individuals
 2        having surgery may be pretty difficult, right?
 3            MS. GRIGSBY:  Objection.
 4            THE WITNESS:  There are always
 5        possibilities with surgery of potential problems
 6        and potential difficulties.
 7    BY MR. BELAZIS:
 8    Q    When did you find out about the bariatric
 9        surgery?
10    A    I don't remember, sir.
11    Q    Okay.  Let's have a look at --
12        (Plaintiff's Exhibits 6, 7 and 8 were referred
13        to.)
14    BY MR. BELAZIS:
15    Q    Would you look at exhibits marked, previously
16        marked 6, 7 and 8?
17    A    Okay.
18    Q    Are you familiar with these documents?
19    A    Yes, sir.
20    Q    Okay.  Tell me what you know about them.
21            MS. GRIGSBY:  Objection.  Can you be
22        more specific in your question?
23            MR. BELAZIS:  If he doesn't understand
24        the question, he can ask me to clarify.
25            THE WITNESS:  The three documents
```

Page 71

```
 1        center around the disciplinary conference and
 2        issue of an unpaid ten-day suspension to Mrs.
 3        Carol Smith in June of 2009.
 4        (Plaintiff's Exhibit 6 was referred to.)
 5    BY MR. BELAZIS:
 6    Q    Okay.  And what, if any, involvement did you
 7        have?
 8    A    I had a conversation with Mr. Gasteier prior to
 9        the first letter.
10    Q    The letter?
11    A    Exhibit 6.
12    Q    Okay.
13    A    Mr. Gasteier called me, similar to what we had
14        discussed similar to Mr. Finn, that some concerns
15        were raised regarding Mrs. Carol Smith, and he
16        wanted to be sure he proceeded properly and he
17        handled it in a manner that, one, met the
18        contract; two, met the law; and three, met my
19        expectations.
20    Q    And what were your expectations?
21    A    Similar as I described before, that he needed to
22        write a written letter to Mrs. Smith, invite her
23        into a disciplinary hearing, be very clear about
24        what the infractions were, what the concerns
25        were, in terms of her violations or disciplinary,
```

Page 72

```
 1        that might warrant discipline, that he should
 2        make sure that he referenced previous issues,
 3        that he should make sure that he reviewed
 4        previous issues from the middle school that had
 5        happened earlier, and that three, that she was
 6        reminded that she could have a union
 7        representative present, actually, two union
 8        representatives present by contract.
 9    Q    Okay.  So you had that conversation with Mr.
10        Gasteier before the June 5, 2009 letter was
11        issued?
12    A    Yes.
13    Q    And then what, if any, involvement did you have
14        after that?
15    A    Mr. Gasteier shared a draft of the letter.  I
16        made some --
17    Q    You're referring to the June 5th letter?
18    A    The June 5th letter, the Exhibit 6, I made some
19        suggestions, slight changes, modifications,
20        nothing of substance.  He subsequently decided
21        whether to accept those or not in the final
22        letter.  I was then made aware by Mr. Gasteier
23        that, after the hearing on June 9th, that he felt
24        that disciplinary action against Mrs. Smith was
25        warranted, that in his investigation, she had
```

18  (Pages 69 to 72)

Electronically signed by Brenda  Huntley Roberts (201-220-072-3855)                    5e0f9fa9-b8ff-42d1-8fb0-65b301d4a9dc

Page 73

1   been asleep again while supposed to be on
2   professional duty.  There were two other
3   accusations in the letter that he acknowledged.
4   There may have been mitigating circumstances that
5   did not warrant discipline of those other two
6   references, but certainly he felt discipline was
7   warranted based upon the sleeping.  He felt,
8   given the previous series of discipline, that the
9   next step, since she had already been suspended,
10  would be a suspension at my level, or more
11  serious, and so his recommendation was to turn it
12  over to me for actual disciplinary action.
13  Q    Okay.  And then what actions, if any, did you
14       take after that?
15       (Plaintiff's Exhibit 7 was referred to.)
16       THE WITNESS:  I recommended to Mr.
17  Gasteier that he send a letter to Mrs. Smith
18  regarding what he told me articulating exactly
19  what he told me, and that he -- you know, in
20  essence referred it to me for a further
21  suspension or further disciplinary action, which
22  is the Exhibit 7.  At that time, Mr. Gasteier was
23  out of Ohio if I remember correctly, I believe he
24  was in California.
25  BY MR. BELAZIS:

Page 74

1   Q    I'm sorry, you're referring to Exhibit 7?
2   A    Yes.
3   Q    Okay.
4   A    Okay.  And so he emailed me the narrative of the
5        letter.  I copied it onto district letterhead,
6        signed on his behalf and noted that I was signing
7        on his behalf, that this was a letter written
8        from him to her, but due to the circumstances of
9        that time frame, my contract, we had to notify
10       her and he was out of town, that I was signing
11       the letter as opposed to him.  I then reviewed
12       all the information that Mr. Gasteier had
13       collected, including several conversations with
14       him, both while he was in California, and I
15       believe even after he returned, and specifically
16       while he was in California.  I believe I also had
17       a conversation with Mr. McVeigh about what he
18       observed, to confirm what Mr. Gasteier was
19       telling me as far as the Social Studies classroom
20       observation of Mrs. Smith sleeping.  I then
21       drafted the June 19th letter, which is Exhibit 8,
22       where I issued a ten-day unpaid suspension due to
23       the -- again, sequence of disciplinary actions
24       that occurred with Mrs. Smith since September of
25       2008.

Page 75

1   (Plaintiff's Exhibit 8 was referred to.)
2   BY MR. BELAZIS:
3   Q    You said, "I believe I had a conversation with
4        Mr. McVeigh."  What do you mean you believe?
5   A    I'm sure I did.  I don't remember the specific
6        details of where and when, but I know that I
7        spoke to Mr. McVeigh about what had happened in
8        his classroom.
9   Q    What did he say?
10  A    He indicated that Mrs. Smith was sleeping in his
11       classroom, that the kids drew attention to her,
12       they were laughing, they were pointing at her,
13       that she was, again, thrown back in a chair, head
14       back, mouth wide-open, eyes closed for an
15       extended period of time.
16  Q    You were at the hearing, at the disciplinary,
17       termination hearing?
18  A    Termination hearing, yes, sir.
19  Q    And you heard Mr. McVeigh's testimony?
20  A    Yes, sir.
21  Q    Do you recall that he testified that Mrs. Smith
22       was sitting straight up with her eyes closed?
23       MS. GRIGSBY:  Objection.
24       THE WITNESS:  There were two separate
25  times Mrs. Smith was in the classroom.

Page 76

1   BY MR. BELAZIS:
2   Q    Yes.
3   A    Asleep and it's my recollection that one of them
4        he describes as sitting up with her eyes closed
5        and the other one in the prone position when he
6        talked to me.
7   Q    If I told you that his testimony was that it was
8        the same thing both times, do you recall that?
9        MS. GRIGSBY:  Objection.
10       THE WITNESS:  No, I do not recall it.
11  BY MR. BELAZIS:
12  Q    But your recollection is that now --
13  A    In my conversation with him.
14  Q    Based on your belief.
15       MS. GRIGSBY:  Wait, wait.
16       MR. BELAZIS:  Let me finish my
17  question.
18       MS. GRIGSBY:  Let him finish his
19  question.
20  BY MR. BELAZIS:
21  Q    Let me finish my question.  Let me finish my
22       question and then I'll let you finish yours.
23       Your recollection is, not withstanding
24  the sworn testimony during the hearing that he
25  told you something different, that she was

19  (Pages  73 to 76)

Electronically signed by Brenda  Huntley Roberts (201-220-072-3855)                    5e0f9fa9-b8ff-42d1-8fb0-65b301d4a9dc

Page 77

1    leaning back with her mouth open?
2         MS. GRIGSBY: Objection. If you're
3    going to ask him about the substance of a
4    transcript, I would ask that you put the
5    transcript before him.
6         MR. BELAZIS: Let's have a look at it.
7    Okay. We can mark this --
8         MS. GRIGSBY: No, that's okay.
9         MR. BELAZIS: -- as an exhibit.
10   BY MR. BELAZIS:
11   Q    Let's have a look at, why don't you have a look
12        at page 444 of Volume I. You may want to show it
13        to --
14        MS. GRIGSBY: I'm going to object. I
15   think he needs to take time to read the entirety
16   of Mr. McVeigh's testimony if you're going to --
17   rather than take a portion of it out of context.
18        MR. BELAZIS: You can ask him to do
19   that, but let's just start with what I'm showing
20   him.
21        MS. GRIGSBY: And my instruction to you
22   is to read the entirety of his testimony before
23   you offer any comment on it.
24   BY MR. BELAZIS:
25   Q    You're looking at page 444 of his testimony,

Page 78

1    correct?
2    A    I am.
3    Q    What it says in his testimony is she was sitting
4         straight up in her chair, is that right, with her
5         eyes closed?
6         There's a question pending. Is that
7    what it says?
8         MS. GRIGSBY: He's entitled to review
9    it so he can answer the question after he feels
10   comfortable doing so. And I would also state an
11   objection on the record that obviously the
12   transcript and the testimony that's recorded
13   there speaks for itself, it doesn't require his
14   comment.
15        THE WITNESS: Okay.
16        MS. GRIGSBY: I think I might have
17   forgotten the question.
18   BY MR. BELAZIS:
19   Q    Well, let me ask it again. In his testimony
20        during the hearing, which was sworn, Mr. McVeigh
21        testifies that he saw Mrs. Smith sitting up in
22        her chair with her eyes closed both times, right;
23        is that correct?
24        MS. GRIGSBY: The document will speak
25   for itself. The document says what the document

Page 79

1    says.
2         THE WITNESS: His exact words are yes,
3    or yay, basically straight up, maybe a little
4    slumped backwards.
5    BY MR. BELAZIS:
6    Q    It doesn't say anything about her mouth open,
7         right?
8    A    Not in answering the questions and the testimony
9         that day, no.
10   Q    It doesn't say anything about leaning back in her
11        chair, right?
12   A    Not that I see in the testimony that day.
13   Q    Do you think he lied to you when he called him
14        and talked to him about it?
15   A    No.
16   Q    So during this conversation you had with McVeigh,
17        was there anything else that was said either by
18        you or by him that you can recall?
19   A    No.
20   Q    Did you, at any point in connection with this
21        disciplinary action, ask Mrs. Smith to provide --
22        strike that.
23        You were aware that Mrs. Smith had had
24        eye surgery by this time; is that right? In
25        other words, that she had a medical problem with

Page 80

1    her eyes?
2         MS. GRIGSBY: Well, objection to your
3    question. What is your question? Is he aware
4    that she had eye surgery or is your question that
5    she had a medical problem with her eyes?
6    BY MR. BELAZIS:
7    Q    Let me ask it again. At this point in time when
8         these disciplinary actions were in process, you
9         were aware that Mrs. Smith had a medical problem
10        with her eyes?
11   A    I was made aware during that time by Mr. Gasteier
12        as part of his investigation, I believe, on
13        June 9th.
14   Q    Okay.
15   A    That Mrs. Smith made some reference to eye
16        problems, yes.
17   Q    Okay. And, in fact, you refer to it in your
18        letter to here?
19   A    I believe so, yes.
20   Q    Imposing discipline, correct?
21   A    Yes.
22   Q    Did you, at any point during this process, before
23        you issued your disciplinary letter, request that
24        Mrs. Smith provide you with medical documentation
25        from her treating physician confirming that the

HUNTLEY REPORTING SERVICE
1.800.247.8360

Electronically signed by Brenda Huntley Roberts (201-220-072-3855)                5e0f9fa9-b8ff-42d1-8fb0-65b301d4a9dc

Page 81

1        light sensitivity caused her to close her eyes?
2    A   No.
3    Q   Did you disbelieve her assertion that light
4        sensitivity caused her to close her eyes?
5    A   I did not have that assertion made.  What I was
6        told by Mr. Gasteier, I believe, if I recall
7        correctly, is that she was 80 percent blind in
8        one eye and had to rest her eyes at times or
9        close her eyes at times.
10   Q   Okay.  And did you disbelieve that?
11   A   No.
12   Q   Did you ask for any medical documentation to
13       confirm her treating physician to confirm that
14       fact?
15   A   No, sir, not at that time.  I believe though in
16       the ten-day suspension I requested a medical
17       evaluation be conducted before she would be
18       allowed to return to work.
19   Q   Okay.  Now --
20   A   And just to amend that, I put that in writing,
21       that in the ten-day suspension letter that I
22       required her to.
23   Q   I got that.  In your ten-day suspension letter?
24   A   Exhibit 8?
25   Q   You demand pursuant to union contract,

Page 82

1        specifically, Article 7.10 that's referenced, as
2        you point out in Exhibit 8, you demand or require
3        her to undergo a physical examination to
4        determine whether she is fit to return to work
5        following her suspension, right?
6    A   Yes, sir.
7    Q   Okay.  And as part of that you sent her to see a
8        physician, right, that you picked out?
9    A   Yes, sir.
10       (Plaintiff's Exhibit 28 was marked and attached.)
11       BY MR. BELAZIS
12   Q   All right.  You have been handed what's been
13       marked as Plaintiff's Exhibit 28.  And if you can
14       identify that for me, I would appreciate it.
15   A   This is a letter I sent to a Dr. Larry Kale
16       acknowledging his acceptance to do a medical
17       evaluation upon Carol Smith.
18   Q   Okay.  And in this letter you provide him
19       information that you want him to take into
20       account about Mrs. Smith's history, and
21       particularly the issue of her sleeping in class
22       from your perspective, right?
23   A   Yes, brief history of what's happened over the
24       past year.
25   Q   And, again, you indicate that what you want to

Page 83

1        know from him is whether Mrs. Smith's medical
2        conditions preclude her to continuing to teach at
3        this time, that's the task you've assigned to
4        him, right?
5    A   Where are you referencing, sir?
6    Q   Last paragraph, first sentence.
7    A   That is correct.
8    Q   You also indicate up above in the previous
9        paragraph on the second page, second line, that
10       Mrs. Smith indicates that she gets tired easily.
11       Do you see that?
12   A   Yes, sir.
13   Q   How did you find that out?  Did she tell you?
14   A   Quite honestly, sir, I don't remember.
15   Q   Okay.
16   A   I don't recall.
17   Q   And what did that mean, she gets tired easily?
18   A   Again, I don't recall the setting where I was
19       informed of that or why I learned of that, so I'm
20       not sure exactly what the reference was.
21   Q   But at some point you found out and thought it
22       significant enough to include in your letter to
23       doctor --
24   A   Kale.
25   Q   Kale, correct.

Page 84

1    A   Yes.
2    Q   By the way, were you aware that Mrs. Smith had a
3        handicapped sticker; in other words, that she
4        parked in handicap parking at the school?
5    A   No, sir.
6    Q   All right.  Then, let me see here.
7            MR. BELAZIS:  I don't know if we marked
8        it or not, we are going to mark it now.
9        (Plaintiff's Exhibit 29 was marked and attached.)
10       BY MR. BELAZIS:
11   Q   Okay.  Are you done reading it?
12   A   Yes, sir.
13   Q   So you've seen that before, I take it?
14   A   Yes, I have.
15   Q   And that is the report from Dr. Kale in response
16       to your response for a Fitness For Duty
17       Examination, right?
18   A   Yes, sir?
19   Q   And how did you happen to find Dr. Kale, by the
20       way?
21   A   I only had the one phone conversation with his
22       office, I never spoke to him directly.
23   Q   How did you happen to find him?
24   A   You know, I don't recall.  It may have been one
25       of my board members who made the recommendation.

21  (Pages 81 to 84)

Electronically signed by Brenda  Huntley Roberts (201-220-072-3855)                    5e0f9fa9-b8ff-42d1-8fb0-65b301d4a9dc

Page 85

1  Q   Okay.  But he was somebody with whom, at least
2      somebody either you or someone that you trusted,
3      had confidence, otherwise, you wouldn't have sent
4      her to him?
5  A   I don't recall conversations with my attorney.  I
6      have a couple board members who are doctors.  I
7      did not select Dr. Kale personally.
8  Q   All I'm asking is you sent her.
9  A   We chose Dr. Kale, yes.
10 Q   The district chose Dr. Kale and sent Mrs. Smith
11     to see him because someone within the district
12     had confidence in him?
13 A   That would be accurate.  I don't know who that
14     person is.
15 Q   But you would agree with me that's why he was
16     selected?
17 A   Yes, I would agree with it.
18 Q   And he was also an expert in occupational
19     medicine; is that right?
20 A   I don't know.
21 Q   That's his field, isn't it?
22 A   I'm assuming, yes.
23 Q   All right.  And you've already told him that in
24     your letter, that she has been, at least from the
25     district's point of view, sleeping on six

Page 86

1      separate occasions, right?
2  A   Yes.
3  Q   Okay.  And in this letter, or in this report, he
4      indicates that he was, that Mrs. Smith explained
5      to him that she was in fact shielding her eyes
6      from glaring light due to problems that she had
7      had for several years secondary to an eye
8      infection in response to the issue of her
9      sleeping in class; is that right?
10 A   Yes, she makes that claim to him.
11 Q   And she also refers to her difficulty maintaining
12     her blood sugars; is that right?
13 A   Yes, sir.
14 Q   Now, his conclusion is that she can return to
15     work, right?
16 A   His conclusion, there wasn't sufficient evidence
17     to show that she has any current propensity to
18     fall asleep while supervising and instructing
19     students, and therefore, I cannot appropriately
20     recommend removal from her work activities.
21 Q   You've got your own physician here who has
22     examined her.  Did you ever ask him whether, in
23     his medical opinion, that the need to shield her
24     eyes from light secondary to her vision problem
25     would explain the fact that her eyes were closed

Page 87

1      when she was observed by staff that we have been
2      talking about?
3          MS. GRIGSBY:  Objection.
4          THE WITNESS:  I never had a
5      conversation with Mr. Kale.
6  BY MR. BELAZIS:
7  Q   Okay.  Now, at this point, again, it's brought to
8      your attention that, from Mrs. Smith's point of
9      view, what's going on in addition to her diabetes
10     is that she is shielding her eyes from glaring
11     light resulting from problems secondary to an eye
12     infection; is that right?
13 A   She shared this with the doctor who put it in his
14     report.  This is the first time I was made aware
15     of that claim by Mrs. Smith.
16 Q   Okay.  So whether it's the first time or not,
17     you're not aware of it by reading this report?
18 A   Correct.
19 Q   You read it when you got it?
20 A   Yes.
21 Q   And having gotten this, did you request any
22     additional documentation from Mrs. Smith,
23     documentation from her medical providers,
24     indicating that it was her eye impairment that
25     was causing her to close her eyes?

Page 88

1  A   No, sir.
2  Q   Now, this also indicates on page 2 -- I'm sorry,
3      page 3.
4          MR. BELAZIS:  I'm sorry, I think we
5      have a missing page here.  It goes --
6          MS. GRIGSBY:  Yes, you're right.
7          MR. BELAZIS:  That's a problem we have
8      to correct.  Let's go off the record.
9          MS. GRIGSBY:  Okay.
10         (Off the record.)
11 BY MR. BELAZIS:
12 Q   So we determined that there was a page missing
13     from this, and you have had a chance to -- page 2
14     is missing and now that's been included in the
15     exhibit and we have had a chance to review that
16     as well?
17 A   Yes.
18 Q   Okay.  And you've revised what you have said so
19     far about this exhibit, having read page 2?
20 A   I would have to go back and look at the testimony
21     to know on that.
22 Q   If you look at page 2 -- well, let's go to page 3
23     of this.  Dr. Kale refers to the fact that Mrs.
24     Smith has suffered from shortness of breath.  Do
25     you see that?

22  (Pages 85 to 88)

Electronically signed by Brenda  Huntley Roberts (201-220-072-3855)                    5e0f9fa9-b8ff-42d1-8fb0-65b301d4a9dc

Page 89

```
 1   A    The first paragraph, yes.
 2   Q    Right. And he indicates that it's decreased
 3        substantially because of her efforts to improve
 4        her health, but it doesn't say it's gone away,
 5        does it. Has it?
 6   A    He indicates that she says that it's decreased.
 7   Q    Right. And now you're aware of that because
 8        you've read this, right?
 9   A    Yes.
10   Q    Okay. And he also indicates under his physical
11        examination, same page, next to the last
12        paragraph toward the bottom that he found that
13        she had slight diminished sensation at the toes,
14        do you see that?
15   A    Yes.
16            MS. GRIGSBY: Are you on page 2?
17            THE WITNESS: Three.
18   BY MR. BELAZIS:
19   Q    Page 3.
20   A    Second from the last paragraph, second from the
21        last sentence.
22            MS. GRIGSBY: Oh, the sentence that
23        says, "She has slight diminished sensation at the
24        toes, but otherwise normal at the legs."
25   BY MR. BELAZIS:
```

Page 90

```
 1   Q    Do you see that?
 2   A    Yes.
 3   Q    And diminished sensation would be consistent with
 4        neuropathy; is that your understanding of it?
 5   A    I don't know that.
 6   Q    All right. On page 2 she indicates that as a
 7        result of high blood sugars, she's had a history
 8        of having very severe headaches, do you see that?
 9   A    Third paragraph down?
10   Q    Right.
11   A    Yes.
12   Q    Do you have any reason to doubt that?
13            MS. GRIGSBY: Objection.
14            THE WITNESS: She never indicated that
15        to me.
16   BY MR. BELAZIS:
17   Q    Did you have any reason to doubt it?
18   A    I have no reason to doubt she reported that to
19        the doctor that day.
20   Q    Do you have any reason to doubt that her high
21        blood sugars were causing tremendous headaches?
22   A    I don't know, sir, she never reported that to me.
23   Q    Okay. But now that you have seen this, you're
24        aware that that's what her belief is, right?
25   A    I'm aware that she is reporting that to the
```

Page 91

```
 1        doctor, yes.
 2   Q    Did you ever ask for any documentation from her
 3        medical provider to confirm that she had
 4        tremendous headaches secondary to her high blood
 5        sugars?
 6            MS. GRIGSBY: I'm going to object. I
 7        think you're taking the language out of context,
 8        but you can answer if you can.
 9   BY MR. BELAZIS:
10   Q    Let me rephrase it. Once you got this report
11        from Dr. Kale, did you request that Mrs. Smith
12        provide you with medical documentation from her
13        treating physician about headaches associated
14        with her diabetes?
15   A    Sir, as part of this assessment of evaluation and
16        part of what we asked this treating physician was
17        to request her medical records and she refused to
18        provide him. So given that information, no, I
19        did not request medical records from her again.
20   Q    I understand that. All I'm asking is this: You
21        asked her to perform, to undergo a Fitness for
22        Duty Evaluation to see whether she could return
23        to work, right?
24   A    Yes.
25   Q    Aside from this, did you ever ask, once you
```

Page 92

```
 1        became aware that she suffered from headaches
 2        associated with high blood sugar, did you ever
 3        ask for confirmation from her treating, that she
 4        provided you with confirmation from her treating
 5        physician related to the need for -- let me ask
 6        this a little differently.
 7            Did you ever request -- and I guess the
 8        answer is self evident -- did you ever request
 9        that she provide you with anything from her
10        treating physician, outside of your attempt to
11        determine whether she could come back to work?
12   A    As part of this request, we requested that.
13   Q    That's right. And that request was made for the
14        purpose of determining whether she could come
15        back to work, right?
16   A    It was made as part of the request to look at her
17        medical complaints and the evaluation performed
18        by Dr. Kale.
19   Q    Let's read what you said to her again. Let's go
20        back to -- let's see, which one is it? In your
21        letter to her you indicate that you're asking,
22        pursuant to Article VII of the Collective
23        Bargaining Agreement, you're asking for --
24        requiring her to undergo a physical examination
25        to determine her physical and mental capacity to
```

23 (Pages 89 to 92)

Electronically signed by Brenda Huntley Roberts (201-220-072-3855)    5e0f9fa9-b8ff-42d1-8fb0-65b301d4a9dc

Page 93

```
 1         continue to teach, right?
 2    A    Yes, sir.  That's what it says.
 3    Q    And this provision of the Collective Bargaining
 4         Agreement relates to Fitness for Duty
 5         Examinations, doesn't it?
 6    A    Yes, sir.
 7    Q    And your letter to Dr. Kale -- or Kale, excuse
 8         me.  What did I do with that?  Do you have it
 9         there?  Do you have the letter to Kale?
10    A    Yes, the one to Dr. Kale.
11    A    Okay.
12    A    It's right there.
13    Q    Okay.  Your letter to Kale says, "The district
14         has asked for this independent medical evaluation
15         to determine if Mrs. Smith's medical condition
16         precludes her to continue to teach," right?
17         That's what it says?
18    A    Then it goes on to say, "Her current propensity
19         to fall asleep while responsible for the
20         supervision and instruction of students at worst
21         places the school district at risk, while at best
22         cheats our students out of quality instruction."
23    Q    Nowhere in that document did you ask her for
24         medical documentation from her treating
25         physicians to confirm her need for an
```

Page 94

```
 1         accommodation, did you?
 2    A    We asked for complete medical records that she
 3         refused to provide.
 4    Q    Answer my question.
 5    A    I did answer it.
 6    Q    Nowhere in that document did you ask her for
 7         medical documentation to confirm her need for
 8         accommodation, did you?
 9    A    We did not specifically ask to confirm her need
10         for accommodations, we specifically did ask for
11         all of her medical documents and records that
12         she, again, refused to supply.
13    Q    And, in fact --
14    A    For any reason.
15    Q    And, in fact --
16         MS. GRIGSBY:  Wait, wait.  Let him
17         finish his answer before you ask your next
18         question.
19         BY MR. BELAZIS:
20    Q    And, in fact, you didn't even mention
21         accommodations, did you?
22    A    Mention it in what capacity, sir?
23    Q    In any capacity, did you mention accommodations,
24         in any of the correspondence that you sent to the
25         doctor or to Mrs. Smith, was there any mention of
```

Page 95

```
 1         accommodations?
 2    A    Yes, there are.
 3    Q    Where?
 4    A    Letter to Dr. Kale, third paragraph.
 5    Q    No.  No.
 6         MS. GRIGSBY:  You just asked him.
 7         THE WITNESS:  You just asked me that,
 8         okay?  You asked about accommodations.
 9         BY MR. BELAZIS:
10    Q    Keep your voice down.
11    A    Okay.
12    Q    You don't need to yell.
13    A    All right.
14    Q    You don't need to yell.
15    A    Then let me answer the question.  You asked, did
16         anyplace --
17    Q    If you can please lower your voice.
18    A    You asked if anyplace did I respond or request
19         for Dr. Kale or mention to Dr. Kale about
20         accommodations.  It's clearly here in writing.
21         In the third paragraph of the letter to Dr. Kale,
22         it says, "We also offered accommodations should
23         she feel a reaction to a low or high blood sugar
24         level coming on, she has never taken advantage of
25         accommodations offered nor has she brought up her
```

Page 96

```
 1         diabetes to him again."
 2    Q    That's what you said to him, right?
 3    A    That is correct.
 4    Q    Okay.  That's not my question.
 5    A    It was your question.
 6         MS. GRIGSBY:  It was your question.
 7         BY MR. BELAZIS:
 8    Q    Well, then, let me ask it again.  Did you ever
 9         tell or request from Mrs. Smith copies of any
10         medical documentation for the purpose of
11         verifying her need for accommodations?
12         MS. GRIGSBY:  That question has been
13         asked and answered.
14         THE WITNESS:  My overall request for
15         medical documentation was for all purposes,
16         including that.  Did I specifically request
17         that of her in writing or in any way, no, I asked
18         for her records.
19         BY MR. BELAZIS:
20    Q    Okay.
21    A    She refused.
22    Q    By the way, at the point that this examination
23         was undertaken by Dr. Kale, he indicates that she
24         was 5'1" and weighed, slowly after losing
25         80 pounds, still weighed 227 pounds; is that
```

Electronically signed by Brenda  Huntley Roberts (201-220-072-3855)                    5e0f9fa9-b8ff-42d1-8fb0-65b301d4a9dc

Page 97

1    right?
2  A    On page 3 he indicates she is 5'1" inches tall
3    and weighs 227-1/2 pounds.
4  Q    And you would agree with me that that would fall
5    under the category of extreme obesity, wouldn't
6    it?
7        MS. GRIGSBY: Objection.
8        THE WITNESS: Again, I don't know the
9    definition of obesity, we went over that.
10       MS. GRIGSBY: How long do you think?
11   I'm thinking --
12       MR. BELAZIS: Do you want to take a
13   break?
14       MS. GRIGSBY: Well, if you're going to
15   be 4 or 5 hours I think lunch is order, but --
16       MR. BELAZIS: I'm not going to be 4 to
17   5 hours, but if you want to take a break we can.
18       MS. GRIGSBY: I'm trying that plan the
19   day. So you do intend to get to Steve?
20       MR. BELAZIS: I will, yes.
21       MS. GRIGSBY: Okay. And your estimate
22   for Jim is?
23       MR. BELAZIS: Let me see. I would
24   guess another hour.
25       MS. GRIGSBY: Then let's take

Page 98

1    45 minutes for lunch and come back if that's okay
2    with you.
3        MR. BELAZIS: Sure, that's fine.
4        (Off the record and a lunch break was
5    taken.)
6  BY MR. BELAZIS:
7  Q    Okay. Going back to Exhibit 5, there was --
8    there was another allegation that was made prior
9    to the issuance of that disciplinary action as I
10   recall related to Mrs. Smith being in her car
11   asleep. Do you recall that?
12  A    Yes.
13  Q    What can you tell me about your recollection?
14  A    My recollection is that it was a middle school
15   custodian reported to Mr. Finn that on the
16   particular day in question, February 25th, that
17   he witnessed Carol Smith in her car in the
18   parking lot at the middle school during the time
19   frame she should have been in class.
20  Q    Do you know who that custodian was?
21  A    I do not know the name off the top of my head, I
22   do not.
23  Q    Anybody you spoke to?
24       MS. GRIGSBY: I'm sorry?
25  BY MR. BELAZIS:

Page 99

1  Q    Did you speak to him?
2  A    I did not, no, this came to me from Mr. Finn.
3  Q    Okay. And when you made -- when you say that
4    during the time that she was supposed to be in
5    class, she was supposed to be over at the middle
6    school at that point?
7  A    That was my understanding, yes.
8  Q    That was based on the shortened schedule?
9  A    Yes.
10  Q    And that's because it was a shortened schedule --
11   well, strike that. I think you answered it
12   already.
13       Mrs. Smith was -- let me start again.
14   I'm sorry. You would perform periodic
15   evaluations of the administrators? I think we
16   already talked about that earlier in the
17   deposition.
18  A    At least usually once a year or sometimes twice.
19  Q    Okay.
20  A    In a written format.
21  Q    Right. Would you describe the process that you
22   went through when you prepared those evaluations?
23  A    Typically, I would meet with the administrators
24   at some point throughout the year, have a
25   conversation with them about their area of

Page 100

1    responsibility. If it was the building principal
2    of a particular building, any goals or changes or
3    aspirations they wanted to have for that year,
4    any concerns they had about their
5    responsibilities that they wanted me to be aware
6    of, I would lay out to them that, you know, that
7    the evaluation process and the time frame I was
8    looking to evaluate them in. Usually I would, at
9    some point in that, whatever that window that I
10   laid out, would write up an evaluation in draft
11   format. I typically would send it to the
12   administrator, ask them to review it and schedule
13   a meeting with me. We would then sit down and
14   meet and discuss the draft evaluation and make
15   notes. Sometimes on the evaluation itself
16   comments they made that ultimately would be
17   reflected in the final evaluation that would get
18   filed. Subsequent to meeting with them, I would
19   then modify the evaluation potentially if I saw,
20   or in the conversation with them, felt that there
21   was more information than particular areas that
22   might need to be reflected, and then I would send
23   them a final evaluation and ask them to sign it.
24   And also remind them that they had every right to
25   add their own rebuttal to anything that was

25  (Pages 97 to 100)

Electronically signed by Brenda  Huntley Roberts (201-220-072-3855)                    5e0f9fa9-b8ff-42d1-8fb0-65b301d4a9dc

Page 101

1    written in the evaluation.
2        (Plaintiff's Exhibit 25 was referred to.)
3        BY MR. BELAZIS:
4    Q    Let me just take an example here.  It looks like
5    you -- let me hand you this, it has already been
6    marked as an exhibit, but let me just hand you
7    what I think is marked as Exhibit 25 from Mr.
8    Gasteier's deposition.  And it states, it says
9    it's an evaluation and it's dated June --
10   A    9, 2009.
11   Q    9, 2009, right?
12   A    Yes, sir.
13        MR. BELAZIS:  And let me mark this.
14       (Plaintiff's Exhibit 30 was marked and attached.)
15       BY MR. BELAZIS:
16   Q    And it looks like you, looking at what's been now
17   marked at Plaintiff's Exhibit 30, it looks like
18   you evaluated Mr. Finn at the same time?
19   A    Yes, sir.
20   Q    So the date here, for example, on Mr. Gasteier's
21   evaluation, what does that reflect?  Had you sent
22   him the draft before that?
23   A    Yes.  That would reflect the date that I had
24   completed the final written evaluation, forwarded
25   it back to him for signature.

Page 102

1    Q    Okay.  So by that time you would have sent them
2    your draft evaluation, indicated the areas of
3    strength and weakness that you saw and sat and
4    met with them to discuss it?
5    A    In a typical evaluation, yes.
6    Q    Okay.
7    A    That may not have happened at every single
8    evaluation, but typically that's what I would do.
9    Q    Do you have a recollection that, anything
10   different happened with respect to these two
11   evaluations?
12   A    I don't recall anything differently on these.
13   Q    All right.  And I don't know if I asked you to
14   confirm that this is an evaluation, the
15   evaluation you prepared for Mr. Finn for June,
16   dated June 9, 2009.  Maybe an easier way is to
17   see if that's your signature at the end.
18   A    Yes, it is.  What I don't know is why it's signed
19   in October versus dated June 9th.
20   Q    Okay.
21   A    I don't know why.
22   Q    As I recall, there was also a -- let's see here.
23   By the way, when you say that you prepared a
24   draft and then sent it to the -- to your
25   principal ahead of time, how long would that

Page 103

1    process normally take; in other words, how long
2    in advance of the final draft.
3    A    It varies because I didn't typically
4    give a time frame for the principal to respond to
5    that.  Some of them it would be a few days, some
6    of them it would be several months.
7    Q    But I'm talking about the draft version.
8    A    In terms of them meeting with them on the draft
9    version?
10   Q    Yes?
11   A    From the time I sent it to them?
12   Q    Yes.
13   A    Usually a month.
14   Q    A month?
15   A    Yes, usually.  Then again, not always.  And not
16   always did I hold the meeting.  Sometimes the
17   administrator would send it back and they would
18   say everything looks good, sign it and send it
19   back.
20   Q    This is already marked.
21   A    Are you looking for a different one?
22   Q    Yes.  I'm sorry.
23        MS. GRIGSBY:  25 perhaps.  The wrong
24   marked 25?
25        MR. BELAZIS:  No, it's different.

Page 104

1    BY MR. BELAZIS:
2    Q    If you look at what was previously marked as
3    Exhibit 22, what was identified as an evaluation
4    of Mrs. Smith.  It was prepared by Mr. Finn in
5    March of 2009?
6    A    Okay.
7    Q    Do you recall having any discussion with Mr. Finn
8    prior to his preparation of that evaluation, ask
9    him that he perform one?
10   A    No, I do not.
11   Q    Do you remember anything in particular about Mrs.
12   Smith's March, 2009 evaluation?
13   A    Not off the top of my head, I do not.
14   Q    Dr. Gunner, with respect to both Mr. Finn and Mr.
15   Gasteier, it looks to me as though you were not
16   satisfied with the extent to which they appraised
17   and evaluated teachers under their supervision.
18   Do you see that?
19   A    Yes, I marked in both cases that they need
20   improvement in that area.
21   Q    And do you recall the details; in other words, in
22   what respect you found those lacking?
23   A    Normally I would comment on those and the next
24   page where we are talk about any comments I would
25   add.  So in the case of Mr. Finn, I make a

HUNTLEY REPORTING SERVICE
1.800.247.8360

Electronically signed by Brenda  Huntley Roberts (201-220-072-3855)                    5e0f9fa9-b8ff-42d1-8fb0-65b301d4a9dc

Page 105

1    comment second from the bottom bulletin item, it
2    says, "Ensure the teacher is up for contract
3    renewal or with any areas of concern are to0
4    evaluate honestly each year.  If there are areas
5    of concern, make sure you document a plan for
6    improvement and what help and resources the
7    school district will provide in this area."
8  Q    You're looking at Mr. Finn?
9  A    Yes, sir.
10 Q    Can you think of any respect in which Mr. Finn
11   had been deficient in that area at the time?
12 A    Again, I think there was an overall evaluation
13   technique in the district to not give adequate
14   time to the evaluate process and to evaluate
15   staff sort of superficially, that everything was
16   okay.  And this was another reminder on my part
17   that I expected honest evaluations of staff.
18 Q    In other words, he was being too nice?
19        MS. GRIGSBY: Objection.
20        THE WITNESS:  That's not my words.
21   Honest is what I want.
22 BY MR. BELAZIS:
23 Q    Let me just a couple more things about your
24   knowledge and understanding of diabetes based on
25   your just your general knowledge and perhaps your

Page 106

1    experience with your daughter.  Are there certain
2    things that are important for diabetics to do in
3    order to maintain their stability in terms of
4    their sugar levels?
5        MS. GRIGSBY: Objection.
6        MR. BELAZIS: I'm just asking for his
7    understanding.
8        THE WITNESS:  I can reference it to my
9    understanding to my daughter only.  Regular blood
10   glucose checks to determine where your blood
11   sugar is, consistency in terms of recording that
12   information so that you can look for patterns in
13   terms of what may be affecting diabetes because
14   it's my understanding that diabetes impacts
15   different individuals differently and it's a
16   difficult disease to regulate because of that
17   fact.  And as, in our case, my daughter, as she
18   grows and matures and goes through puberty and
19   all of those things impact her ability to
20   maintain a level, blood sugar glucose level.
21 Q    Okay.  What about in terms of nutrition, are
22   these particular things that are important?
23 A    It used to be the misnomer that you couldn't eat
24   sweets, couldn't have anything to do with sugar.
25   That's not the case.  It's more about balance,

Page 107

1    it's more about a good nutritious diet like any
2    other student, or any other individual would
3    have.
4  Q    What about regularity of meals?
5  A    Again, that depends on individual diabetics and
6    how it impacts.  The more consistent you can be,
7    the more you can monitor what's going on in your
8    own body, the more you can get a handle on when
9    you're likely to have high blood sugar, low blood
10   reactions.
11 Q    By consistent you mean consistency in terms of
12   your meals?
13 A    Consistency in terms of meals, in terms of
14   exercise, in terms of sleep, in terms of
15   activity, just general activity.  All of that
16   interplays is my understanding on control of
17   diabetes.
18 Q    Okay.  Do you know who had involvement in
19   establishing the schedule for Carol Smith during
20   the 2008-2009 school year where she was half day
21   at the high school and half day at the middle
22   school?
23 A    I believe the final decision was mine, but I
24   think it was a consultation between Mr. Finn, Mr.
25   Gasteier and myself.

Page 108

1  Q    And by final decision you mean you reviewed the
2    schedule and where she would be when and then
3    approve that?
4  A    I looked at the high school needs for her, and
5    when her schedule was open for other assignments.
6    In a conversation with Mr. Gasteier and Mr. Finn,
7    we looked, and also noticed that he needed an
8    assistants that could be complementary to the
9    high school schedule and I made the final
10   decision and assigned Carol to those duties.
11 Q    And there was a schedule, I think, that was --
12   you guys -- the high school keeps track of each,
13   what each teacher's schedule will be in terms of
14   the courses they will teach and what times those
15   would be, etc.?
16 A    Yes, yes.
17        MR. BELAZIS:  And I want to mark these
18   two.  Let's mark that one.
19        MS. GRIGSBY:  Okay, do you want to go
20   ahead?  Do you want me to pull the top sheet
21   off --
22   (Plaintiff's Exhibits 31 and 32 were marked and
23   attached.)
24 BY MR. BELAZIS:
25 Q    So can you confirm, Dr. Gunner, that that's the

HUNTLEY REPORTING SERVICE
1.800.247.8360

Electronically signed by Brenda  Huntley Roberts (201-220-072-3855)                    5e0f9fa9-b8ff-42d1-8fb0-65b301d4a9dc

Page 109

```
 1        schedule for Carol Smith that related to various
 2        school years? I think it was submitted as an
 3        exhibit during the disciplinary hearing.
 4     A    I have no knowledge of her schedule during 2007
 5        and 2008 and I came in right at the end of the
 6        year. I'm assuming that this came from the high
 7        school is accurate, but I don't know that
 8        personally.
 9     Q    But this is the kind of information you would
10        have reviewed in order to prepare her schedule
11        for high school?
12     A    No. I would have reviewed the entire block
13        schedule from the high school that had every
14        teacher on it and what assignment that they had,
15        and when they were opened, and I would have
16        looked at this same type of document from the
17        middle school. This is specific to Carol alone.
18        And it does provide that she had the three
19        classes at the high school in the 2008-2009
20        school year that I mentioned earlier and the
21        conference period was also provided at the high
22        school. So from the end of fourth period on,
23        contractually she needed lunch and then any
24        travel time between the two buildings.
25     Q    Okay. And so if I understand correctly, what you
```

Page 110

```
 1        did is you had a larger block schedule for the
 2        high school and then you kind of put Carol in
 3        there to see where she would fit to make sure
 4        that --
 5     A    I did not. The two schedules came to me already
 6        pretty much complete.
 7     Q    And then you just reviewed them?
 8     A    I reviewed them. Took a look that Carol
 9        basically was blocked solid in the morning but
10        had her entire afternoon free. I looked at Mr.
11        Finn's and saw what he needed was in the
12        afternoon, and that Carol is qualified to teach
13        that keyboarding class in the afternoon. Made
14        the decision to assign her to it.
15     Q    And the way that it was blocked is what you
16        received?
17     A    Correct. I did not ask them to go back and
18        change what they had already done.
19     Q    Okay. Now, Mrs. Smith's lunch was during period
20        5-A, did I read this correctly?
21     A    That's what this says, yes.
22     Q    And then after her 5-A lunch period, she would be
23        required to be at Briar starting at 11:30, right?
24     A    That's what this says. I don't know the exact
25        starting time that Mr. Finn needed her at.
```

Page 111

```
 1     Q    Assuming that's correct.
 2     A    Correct.
 3     Q    Assuming this was provided to me by -- well, go
 4        ahead.
 5     A    Assuming this is correct, what the high school
 6        was saying, in essence, and this is -- we need
 7        her for these three teaching periods. We can
 8        provide her her conference and her lunch block.
 9        Starting at 11:30, we will have met all of those
10        requirements. Middle school, you can have her at
11        11:30, knowing that she has had lunch and knowing
12        that she has had her conference. Now, I don't
13        know if the middle school started her right away
14        at 11:30.
15     Q    Okay. So if you look at the -- was there a
16        difference between the starting times for the
17        high school and middle school?
18     A    High school and middle school ran different times
19        and also different schedules. High School had a
20        nine period day if I remember correctly, and I
21        believe Briar had a seven or an eight period day.
22        But regardless of the number of periods, they did
23        not -- they didn't sync up, the start and end
24        time of a class at the high school was not the
25        identical start and ending time of a class at
```

Page 112

```
 1        Briar.
 2        (Plaintiff's Exhibit 32 was marked and attached.)
 3        BY MR. BELAZIS:
 4     Q    Okay. Let me hand you what's been marked as
 5        Plaintiff's Exhibit 34, I'm sorry.
 6     A    32.
 7     Q    Yes, 32.
 8     A    Okay.
 9     Q    Can you tell me what that is?
10     A    This looks like at one time a master schedule for
11        the high school. It looks like the schedule for
12        the high school during 2009 and '10. And on this
13        particular year, it looks like they had seven
14        periods, plus a seminar.
15     Q    So this varied from year to year; is that what
16        you're saying?
17     A    Yes, they changed schedules.
18     Q    Okay. Put here what was marked so we've got it
19        as an exhibit. Let's see here.
20        (Plaintiff's Exhibit 10 was referred to.)
21        BY MR. BELAZIS:
22     Q    Okay. Let me hand you what's been marked as
23        Plaintiff's Exhibit 10 during Mr. Gasteier's
24        deposition.
25     A    Okay.
```

HUNTLEY REPORTING SERVICE
1.800.247.8360

Electronically signed by Brenda Huntley Roberts (201-220-072-3855)                     5e0f9fa9-b8ff-42d1-8fb0-65b301d4a9dc

Page 113

1  Q    Can you tell me what your involvement was with
2       respect to this exhibit? First of all, what is
3       it?
4  A    There are two letters here, one dated July 19,
5       2009, the other one dated July 8, 2009. The
6       first one is an invitation to a disciplinary
7       conference to be held on July 7th at 3:00 in my
8       office related to accusations of Carol Smith
9       sleeping during professional training in the
10      summer. And the second is my disposition
11      indicating that I believe that she was sleeping,
12      again, and that I docked her an hour's pay for
13      each of the two days in question.
14 Q    Okay. And, by the way, I asked your counsel
15      about whether you had any notes associated with
16      your various disciplinary conferences and
17      meetings involving Mrs. Smith, and I think she
18      had indicated that you didn't think you had any.
19      But have you been able to located any?
20 A    I do not have any notes.
21 Q    Okay.
22 A    Uncharacteristic for me to take notes during the
23      meeting.
24 Q    All right. So can you tell me please what the
25      extent of your involvement was with respect to

Page 114

1       disciplinary proceedings or references to these
2       letters?
3  A    I was contacted by, I believe, Mr. Dahlman, the
4       assistant principal at the high school, that he
5       had been approached by two teachers with Carol's
6       sleeping during the technology training and that
7       they were embarrassed by her behavior as fellow
8       teachers. And he provided to me a written
9       statement from one of the teachers. I spoke to
10      the other teacher. I also spoke to the
11      independent trainer who we were paying who was
12      not a Perkins employee and all them confirmed
13      that Carol was sleeping at least on two
14      occasions. Once each day, again, usually during
15      what they termed the project time, which was
16      after they had broken for lunch and they were to
17      come back and work in groups on whatever had been
18      taught during that morning. Given that
19      information, I invited Carol into a meeting. I
20      met with her in that meeting with John Gerber
21      present. I went through the allegations as
22      presented. Carol denied that she was asleep,
23      indicated she was simply resting her eyes, she
24      was fully aware of everything that was going on
25      in the training. I asked her, as I have in most

Page 115

1       of these meetings again, specifically was there
2       any medical condition, including her diabetes,
3       that was contributing to the perception or
4       reality that she was falling asleep in these
5       ongoing situations. She indicated no. I asked
6       her again if there was anything like that, did
7       she need any assistance, any help, is there any
8       medical condition, anything at all that,
9       ultimately, you know, we could assist her with
10      that would stop the perception or stop the
11      reality of her sleeping in class. And, again,
12      she indicated very vociferously that she wasn't
13      sleeping, that she was simply resting her eyes
14      and she was fine and she knew everything that was
15      going on in the classroom. Given the statements
16      of the other adults in the case, I did not
17      believe Carol and I believed that she was
18      sleeping. And as a result, I proceeded forward
19      with docking her an hour for each of those, and I
20      also made it very, very clear that if there are
21      any further incidents like this, that instead of
22      may result, that I would recommend her
23      termination, that there were going to be no more
24      chances.
25 Q    Was anyone else present during this meeting?

Page 116

1  A    John Gerber, the PEA president.
2  Q    The individuals that you said you talked to were
3       the trainer?
4  A    Uh-huh. The Apple provided a trainer, a
5       professional developer.
6  Q    That was one. Any others?
7  A    Nancy Kinsel, who was the teacher that brought it
8       to Mr. Dahlman, and Shannon LaRose Smith who was
9       another teacher who reported to Mr. Dahlman as
10      well that she saw what had taken place.
11 Q    And I take it that you did not, in relationship
12      to that series of disciplinary actions, request
13      that Mrs. Smith provide you with any
14      documentation, again, from any physician
15      confirming that her -- that the resting of her
16      eyes, or that the closing of her eyes related to
17      any medical condition such as her visual issues?
18 A    I did not request documentation.
19      (Plaintiff's Exhibit 11 was referred to.)
20      BY MR. BELAZIS:
21 Q    Okay. Let's have a look at what's been marked as
22      Plaintiff's Exhibit 11.
23 A    Okay.
24 Q    Can you identify what's previously been marked as
25      Plaintiff's Exhibit 11?

29 (Pages 113 to 116)

Electronically signed by Brenda  Huntley Roberts (201-220-072-3855)                    5e0f9fa9-b8ff-42d1-8fb0-65b301d4a9dc

Page 117

1   A     These are a sequence of letters that I wrote to
2         Mrs. Smith regarding an incident that happened in
3         March of 2010 regarding allegations and Mrs.
4         Smith teaching pornography in her Social Studies
5         classes at Perkins High School.  And ultimately
6         these letters invite her to a series of meetings
7         with me to discuss the allegations against her,
8         which are ultimately not only just inappropriate
9         discussions, but, again, sleeping or dozing off
10        while supervising kids, repeatedly arriving
11        tardy, and falling asleep during an academic team
12        practice, which is an extracurricular activity
13        that she taught.
14  Q     Okay.  I'm sorry, going back to, I just wanted to
15        make sure I had it right.  During the previous
16        disciplinary conference you had following the
17        training, you told me who was present for that.
18        Who did you say, if anyone?
19  A     The ones that I remember were Carol, John Gerber
20        and myself.
21  Q     Oh, Mr. Gerber, that's right.
22  A     Right.
23  Q     Okay.  Now, with respect to what's been marked as
24        Exhibit 11.
25  A     Uh-huh.

Page 118

1   Q     That ultimately resulted in your -- in an
2         investigation with which you were involved; is
3         that correct?
4   A     Yes.
5   Q     And following that investigation, and you were
6         assisted by a Mr. Gasteier; is that correct?
7   A     Yes.
8   Q     And following that investigation you recommended
9         Mrs. Smith's termination, right?
10  A     Yes.
11  Q     And there were three separate grounds?
12  A     Ultimately, there were three separate groups,
13        yes.
14  Q     Well, your recommendation included three separate
15        grounds; is that correct?
16  A     Yes.  At one point, there was a fourth concern
17        that I did not include in the file.
18  Q     Okay.  And the three issues were?
19  A     The date of the last letter dated April 14th at
20        the bottom, "The specifications of grounds for
21        this recommendation is as follows: No. 1, you're
22        engaging in inappropriate discussions with your
23        high school Social Studies class regarding
24        pornography.  Two, your repeated dozing off for
25        several minutes at a time while supervising

Page 119

1         students during 5-D Study Hall, thereby
2         continuing a pattern of sleeping on the job and
3         engaging in unprofessional conduct.  And 3, your
4         repeatedly arriving tardy to your fifth period
5         history class, thereby, A, leaving your students
6         unattended; and B, continuing a pattern of being
7         tardy for assigned duties and engaging in an
8         unprofessional manner."
9   Q     Ultimately, there was a recommendation by the
10        Board of Education to terminate Mrs. Smith's
11        contract, right?
12  A     Yes.
13        (Plaintiff's Exhibit No. 33 was marked and
14        attached.)
15        THE WITNESS:  Yes, sir.
16        BY MR. BELAZIS:
17  Q     You have been handed what's been marked as
18        Plaintiff's Exhibit 33.  This is basically the
19        notice that you gave to Mrs. Smith advising her
20        of the board action?
21  A     My treasurer give it to her.
22  Q     Okay.  And you recognize this document as being
23        that?
24  A     Yes.
25  Q     34?

Page 120

1         (Plaintiff's Exhibit 34 was marked and attached.)
2         BY MR. BELAZIS:
3   Q     You've also been handed what's been marked as
4         Plaintiff's Exhibit 34.  And can you confirm
5         that's the Board's resolution adopting your
6         recommendations?
7   A     Yes.
8         MR. BELAZIS:  Just take a quick break?
9         THE WITNESS:  Yes.
10        (Off the record.)
11        BY MR. BELAZIS:
12  Q     Okay.  Now, your investigation included what?
13        MS. GRIGSBY:  Investigation?
14        BY MR. BELAZIS:
15  Q     We were last -- I'm sorry, we were last talking
16        about the fact that you had conducted an
17        investigation related to these charges that were
18        brought up in your letter of March 29th, 2010?
19  A     Okay.
20  Q     Marked as Exhibit 11, right?
21  A     11, right.  I was emailed by my vice president of
22        the Board of Education, Steve Schuster, who had
23        been contacted by one of our teachers with
24        allegations that Carol had had a conversation in
25        class, fifth period history class in particular

Electronically signed by Brenda  Huntley Roberts (201-220-072-3855)                    5e0f9fa9-b8ff-42d1-8fb0-65b301d4a9dc

Page 121

1   on Friday, March something -- 19, that rings a
2   bell, but I'm not sure if that's right. And that
3   the conversation made the paraprofessional in the
4   classroom uncomfortable and made several students
5   uncomfortable, and he wanted to know if I knew
6   anything about it. I was out of the district at
7   that time on a professional meeting I believe in
8   Marion, Ohio. I indicated to Mr. Schuster that I
9   would look into it when I got back, which would
10  be the next day, Friday the 29th, I believe of --
11  or no, that would have been the 26th of March,
12  the Friday before. So sometime Friday afternoon
13  I went down to the high school to see the
14  paraprofessional who had originally brought the
15  concern up. Unfortunately, she had left early
16  that day and was not available. I asked to see
17  Mr. Gasteier, not remembering that he was out of
18  town at professional development in California.
19  I then met with Mr. Dahlman, the assistant
20  principal. I asked him if he had been aware of
21  any such allegations against Carol or had heard
22  any similar type of comment regarding a recently
23  taught history class, and he indicated he had
24  not. I then asked if he would look at Carol
25  Smith's fifth period history class, randomly

Page 122

1   select three or four students and bring them down
2   to the office so I could talk to them. He
3   brought four students down. I sat them in Mr.
4   Gasteier's office around a circular table that he
5   has. I introduced myself to them, told them
6   what, you know, who I was and what my role was in
7   the district. Told them that I had been made
8   aware of an allegation regard one of their
9   teachers. One of the young ladies started
10  laughing right away and she said, "You mean Carol
11  Smith?" And I said, "What can you tell me about
12  Carol Smith?" She proceeded to tell me that,
13  "Oh, she was talking pornography in class." And
14  then she proceeded to tell me that she also
15  doesn't have -- her words were, not identical,
16  but it's a characterization of her words would be
17  the class is completely out of control, unruly,
18  she falls asleep in class, she's regularly 5, 10,
19  15 minutes late to class.
20  Q    This is the Social Studies class?
21  A    Yes. Not learning anything in this class. I
22  wish I had a different teacher. I turned to the
23  other three girls present and just asked them
24  generally, again, the original question about,
25  did they know of any concerns regarding a

Page 123

1   particular teacher they had. I didn't mention
2   Carol by name at that point. They proceeded to
3   follow-up with the conversation from the first
4   girl, confirmed that there was a conversation
5   about pornography, confirmed that in their mind
6   that classroom was not under effective control,
7   especially during the study hall period.
8   Confirmed that, and, again, I can't say all three
9   confirmed every single issue, but generally
10  confirmed all the allegations that, yes, she was
11  regularly tardy to class, and not unusual for her
12  to fall asleep for several minutes at a time, and
13  particularly in study hall, the D section of the
14  class when they return from lunch. I thanked the
15  girls. I asked them to please not share our
16  conversation with anybody at that point. The
17  girl who initiated the conversation did tell me
18  that she was not present on the Friday of the
19  pornography conversation, she was absent from
20  class, but she had heard it from other
21  classmates. But the other things that she saw
22  herself that she alleged to me. At that point it
23  was 3:00 in the afternoon, the high school was
24  ending for the week, so I had no further ability
25  to continue to interview the rest of the

Page 124

1   students. I proceeded to make a phone call to
2   Mr. Gasteier at that point and fill him in on the
3   allegations that had taken place in the
4   investigation that I had started, told him I
5   wanted to meet with him first thing Monday
6   morning, and that we obviously needed to continue
7   this investigation. Asked him, prior to his
8   trip, had he been aware of any rumor or any
9   allegation regarding this particular incident.
10  My recollection is he said, vaguely, but nothing
11  concrete, nothing where it was, you know, a
12  teacher or a particular student that came
13  forward, just in general, almost like rumor mill.
14  Q    Who is that?
15  A    He didn't allude to who the person was.
16  Q    Who is he?
17  A    Mr. Gasteier when I talked to him. And he said
18  he hadn't had a chance to look into it because it
19  happened right prior to his departure for
20  California. I then proceeded to call our
21  attorney and discuss the situation with our
22  attorney.
23       MS. GRIGSBY: And I'm going to instruct
24  you not to disclose the contents of any
25  communications with your attorney.

HUNTLEY REPORTING SERVICE
1.800.247.8360

Electronically signed by Brenda  Huntley Roberts (201-220-072-3855)                    5e0f9fa9-b8ff-42d1-8fb0-65b301d4a9dc

Page 125

1    THE WITNESS: Coming out of that, I
2  made the decision to meet with Carol first thing
3  Monday morning when she arrived. I handed her
4  the first letter that you referenced in
5  Exhibit 11, which is relieving her of all duties
6  pending the outcome of the investigation. Met
7  with her probably 7:30-ish Monday morning in Mr.
8  Gasteier's office with Mr. Gasteier present, Mr.
9  Gerber present, informed her of the allegations,
10  handed her the letter, gave her a chance to read
11  it. Asked her for her laptop, asked her for her
12  keys, her electronic file to get in the building.
13  I asked her for copies of her lesson plans. She
14  indicated that she didn't -- it was grade
15  reporting time. She didn't have her grades
16  completely finished, could she have a few minutes
17  to finish her grades? We allowed her to finish
18  her grade input before we took the computer from
19  her, she said she didn't have her lessen plans
20  with her. That her husband could bring them into
21  us. We said that would be fine, that we would
22  like to have them brought into us. We then
23  walked her out of the building. I then, in
24  re-entering the high school, had Mr. Gasteier
25  pull a list of all the students in Carol Smith's

Page 126

1  fifth period history class and we started calling
2  them down in groups of three to four. We would
3  pull them in the office for just a general
4  cursory conversation, which would be, again, I
5  would introduce myself as superintendent to make
6  sure they knew who I was. I would explain to
7  them that one of my jobs was to follow-up on any
8  allegations against teachers, that unfortunately
9  we have had an allegation against one of their
10  teachers and that they were being brought down to
11  share with us whatever they knew, and then told
12  them that the allegation was against Mrs. Smith,
13  and an incident took place on, I believe, again,
14  Friday, March 19th, where there was a discussion
15  of pornography in her history class. We told the
16  students that we were going to separate them, sit
17  them out in the office area at three to four
18  different locations, give them a pad of paper and
19  a pen and ask them to write down statements
20  regarding specifically what did they remember or
21  recall about the discussion of pornography, and
22  then to answer or tell us any other concerns or
23  issues they felt we ought to know about Mrs.
24  Smith and her Social Studies classroom.
25  BY MR. BELAZIS:

Page 127

1  Q    This was as a group you mean, this is what you
2       told them?
3  A    We told them all of this as a group, three or
4       four at a time.
5  Q    You told them all the same thing?
6  A    Told them all the same thing. Each time a new
7       group would come down, I would reiterate that
8       sort of four to five-minute introduction as to
9       why they were there.
10            We would then escort them from the
11  office, place them at three to four different
12  desks that we had set up in the large office
13  complex where they could be observed by the
14  secretaries, but could not talk to each other.
15  And as soon as one was finished, we would bring
16  them in one at a time. I would read their
17  statement. I had my laptop open, and I told them
18  that I would -- I was going to follow up with
19  some follow-up questions about their statement,
20  and then also that I would be taking notes during
21  the time frame. I reminded them it was critical
22  that they be a hundred percent honest.
23  Q    Had you taken notes during your initial
24       questioning of them?
25            MS. GRIGSBY: You mean --

Page 128

1            THE WITNESS: The first group, I do not
2  believe so. I do not believe I took notes at
3  that time.
4  BY MR. BELAZIS:
5  Q    You mean in the office?
6  A    Right.
7            MS. GRIGSBY: Are you talking about the
8  prior day?
9  BY MR. BELAZIS:
10  Q    When you first brought down the first four, you
11       were taking notes?
12  A    I do not believe I took notes. I can't remember
13       for sure.
14  Q    But when you started bringing down kids?
15  A    Individually I took notes.
16  Q    Individually you took notes of what they said?
17  A    Correct.
18  Q    Okay. And that was on your laptop?
19  A    That is correct. That is correct. I would start
20       out very generally, can you tell me about your
21       written statement in just sort of an open-ended
22       question and allow them to tell me what they
23       wanted to tell me. I would then specifically
24       talk about the pornography incident which
25       initiated this whole investigation, and they

32 (Pages 125 to 128)

Electronically signed by Brenda Huntley Roberts (201-220-072-3855)          5e0f9fa9-b8ff-42d1-8fb0-65b301d4a9dc

## Page 129

1  would proceed to tell me some, you know, comments
2  where, you know, Mrs. Smith talked about viewing
3  pornography when she was a student their age and
4  that she knew that they all did it, that it was
5  common. She made -- and, again, different kids
6  made different references, but the gist of the
7  references were, you know, that pornography
8  initially came up either from Mrs. Smith or
9  potentially from a student who made a comment,
10  you mean porn when Mrs. Smith was talking about
11  yellow journalism and sensationalism. I'm not
12  sure whether the student initiated the
13  conversation by saying porn or whether Mrs. Smith
14  did. She claimed she did not. The students are
15  all over the board on that issue. Most of the
16  students readily acknowledged the conversation
17  regarding porn, acknowledged feeling either
18  uncomfortable or silly with a woman of Mrs.
19  Smith's age talking about pornography to them,
20  didn't get how it fit with her Social Studies
21  classroom, didn't get the connection she was
22  trying to make, admitted the conversation was 5
23  to 10 minutes maximum in length, that it wasn't a
24  long drawn-out conversation, acknowledged that
25  some students tried to egg it on with comments,

## Page 130

1  that Mrs. Smith acknowledged her own viewing of
2  pornography in particular portraits of Nick Nolte
3  and Burt Reynolds that were common at the time.
4  Usually when we finished with the pornography
5  question, I would, again, review their statement.
6  Sometimes there were additional comments about
7  unruliness in the class, tardiness, Mrs. Smith
8  sleeping, sometimes there were not. Regardless
9  of whether there were or not, I pursued
10  conversations on those avenues with every
11  student. Those who had written it down, I would
12  reference what they had written and say, you
13  indicated, you know, Mrs. Smith was sleeping in
14  class, can you tell me more about that? Would
15  that be in her Social Studies class? Would
16  that be in her study hall? Would it be in both? How
17  do you know she was asleep? Was it, you know,
18  just a few seconds at a time, was it, you know,
19  at length, was it, you know, only once, was it
20  multiple times you would observe this? And try
21  to get some sense from the kids of what they
22  meant by that. When they talked about tardiness,
23  again, the same sequence and types of questions,
24  was this a one-time deal, was she walking in when
25  the bell rang? Was this every day, was this two

## Page 131

1  or three times a week, was it two minutes,
2  10 minutes, 15 minutes. Usually there were
3  comments about how long it took her even after
4  she entered to get the class under control to
5  start teaching. We pursued some conversations
6  about the length there and what she would do to
7  get the class back under control. Some students
8  would say, you know, I never saw her sleeping, I
9  don't have anything to tell you. Okay. Thank
10  you. Some would say, saw her sleeping, but
11  didn't necessarily comment on the tardy. It
12  varied from student to student. The majority,
13  the preponderance of the kids acknowledged that
14  the class was typically out of control,
15  especially during study hall. They described
16  events with kids who are standing up shooting
17  plastic bottles in the waste paper can where Mrs.
18  Smith appeared to be completely asleep and
19  unaware of what was going on. They described,
20  you know, kids watching movies from their
21  laptops, kids blasting music on their laptops and
22  that Mrs. Smith took no intervention to have the
23  kids under control. They described being able to
24  freely leave the classroom during the D study
25  hall, and come back without even her

## Page 132

1  acknowledging or knowing that they had left the
2  classroom. Again, not every kid certainly was,
3  it was not a uniform consistency to every
4  statement, but overwhelmingly the students'
5  comments echo what I just described to you. I
6  would thank the students, and as each one of them
7  left, I would remind them to please keep that
8  confidential, that I had many more students to
9  talk to, and that it was important that I be able
10  to talk to the students without them hearing
11  anything from the students that we had
12  interviewed. We continued that process all day
13  long. Sometime in late afternoon, I don't know
14  the exact time, 1:30, 2:00, I had another
15  appointment that I had absolutely had to be at.
16  We were down to four or five students that we had
17  not interviewed yet. I asked Mr. Gasteier to
18  finish the interviews with those four or five
19  students. I asked him to make sure he conducted
20  them the exact same way that I had so that there
21  was consistency in that. And then I asked him to
22  take notes during that process of what the
23  students said, and, again, allow each student to
24  write their independent statement first. He
25  concluded those, we met Tuesday morning and began

33  (Pages 129 to 132)

Electronically signed by Brenda  Huntley Roberts (201-220-072-3855)                    5e0f9fa9-b8ff-42d1-8fb0-65b301d4a9dc

Page 133

1    to review those notes.
2  Q   Anything else?
3  A   You know, at that time, again, after looking at
4    all of that information --
5  Q   I mean, as far as your investigation.
6  A   As far as investigation in terms of that
7    particular classroom at that time, I remember a
8    follow-up conversations with, again, our attorney
9    about what I had discovered.
10         MS. GRIGSBY:  And, again, don't
11    disclose the content of those communications.
12         THE WITNESS:  I won't.
13    BY MR. BELAZIS:
14  Q   I'm sorry.
15  A   I'm just trying to think if there were other -- I
16    believe at that particular time that concluded
17    what I know.
18  Q   Was there any other, as far as investigations or
19    anything else that you did, other than talking
20    with Mrs. Smith?
21  A   Certainly we gave Mrs. Smith the opportunity to
22    talk to us on a couple of different occasions.
23    And I don't know which Social Studies teacher.  I
24    had a conversation with one of the other Social
25    Studies teachers and with Mr. Gasteier about

Page 134

1    yellow journalism sensationalism, and would they,
2    in their mind, ever connect that in any way,
3    shape or fashion to Playboy or to pornography,
4    just to, you know, I'm not a Social Studies
5    major, I don't make that connection, I just
6    wanted to make sure I wasn't missing something
7    here where that may be a valid connection to be
8    made.  And, again, I don't remember which Social
9    Studies teacher I spoke to, but Mr. Gasteier is a
10    former Social Studies teacher and I know that he
11    and I had that conversation.  I certainly had
12    kept my board informed of what was going on.
13  Q   Okay.  All I want to know about is whether there
14    was any other investigative activity on your part
15    other than talking to Mrs. Smith.
16  A   I don't recall any at this time.
17  Q   Okay.  With respect to the issue of pornography,
18    I think you mentioned that at some point the
19    kids, the kids told that you Mrs. Smith talked
20    about Playboy and Playgirl; is that right?
21  A   Yes.
22  Q   And Mrs. Smith acknowledged that she talked about
23    Playboy and Playgirl?
24  A   Yes.
25  Q   And you, of course, thought that would be

Page 135

1    inappropriate?
2  A   Yes.
3  Q   All right.  And at some point, at least based on
4    your understanding from what the kids told you
5    and from what Mrs. Smith told you, she
6    acknowledged that at some point at a younger age
7    she had viewed Playgirl or Playboy, right?
8  A   I don't remember if Mrs. Smith acknowledged that
9    particular itemization or not.
10  Q   But the kids told you that?
11  A   The kids told me that.  I do believe she
12    acknowledged mentioning the two actors as
13    examples of pornography in her era.  I don't know
14    that she ever acknowledged actually viewing it
15    herself.
16  Q   And your understanding was that, from Mrs.
17    Smith's point of view, that the discussion of
18    Playboy and Playgirl was made in relationship to
19    the more general discussion of journalistic
20    sensationalism?
21  A   Yes.
22  Q   There were a couple of photographs that were
23    marked as exhibits.
24  A   Yes.
25  Q   Last time.

Page 136

1  A   I forgot about those.
2  Q   How did the district come upon those?
3  A   In those individual interviews with students.
4  Q   Uh-huh.
5  A   Two students in particular indicated they had
6    photos of Carol sleeping in that Social Studies
7    class.
8  Q   And then they supplied those photos afterwards?
9  A   Then we asked them, do you still have them?  And
10    they said yes and then they supplied them to us.
11  Q   And who did they give them to physically?  Did
12    they give them to you or to someone else?
13  A   I believe they gave them to me that day, but I
14    can't swear to that.
15  Q   Did they email them to you or did they actually
16    print them out and hand them to you, or what?
17  A   Again, I can't remember for sure how we were
18    given them.
19  Q   But somehow from the kids, either you or someone
20    received copies of these photographs?
21  A   I believe they were emailed, but I can't swear to
22    that.  I would have to go back and check, but I
23    believe they were.  But somehow, yes, two
24    students provided them to us.
25  Q   All right.  Now, as part of your investigation,

HUNTLEY REPORTING SERVICE
1.800.247.8360

Electronically signed by Brenda  Huntley Roberts (201-220-072-3855)                    5e0f9fa9-b8ff-42d1-8fb0-65b301d4a9dc

Page 137

```
 1        did you look at either Playboy or Playgirl to
 2        determine whether, in your mind, they were --
 3        those publications were pornographic?
 4    A     No, I did not.
 5    Q     Had you, at some point -- were you already
 6        familiar with Playboy and/or Playgirl?
 7    A     Yes.
 8    Q     Had you, at some point prior to that time,
 9        personally viewed either Playboy and/or Playgirl?
10              MS. GRIGSBY: Objection. Irrelevant.
11              THE WITNESS: Yes.
12        BY MR. BELAZIS:
13    Q     Had you reviewed both or just one?
14    A     Just one.
15    Q     Which one?
16              MS. GRIGSBY: Objection. Continuing
17        objection.
18              THE WITNESS: Playboy.
19        BY MR. BELAZIS:
20    Q     Okay. And based on your inspection of Playboy,
21        by the way, how many times had you inspected a
22        Playboy?
23    A     I don't have a clue.
24    Q     More than once?
25    A     More than once. It would have been when I was a
```

Page 138

```
 1        young man.
 2    Q     Okay. And how young do you think you were when
 3        you first inspected a Playboy?
 4              MS. GRIGSBY: Continuing objection.
 5              THE WITNESS: Late high school. Maybe
 6        college, somewhere in that time frame.
 7        BY MR. BELAZIS:
 8    Q     You're not sure?
 9    A     Not exactly sure, no, sir.
10    Q     And you've never seen Playgirl?
11    A     Other than in a news stand display where it's on
12        display in a magazine rack, never opened one up,
13        never looked at one.
14    Q     But whatever they contained, you drew the
15        conclusion that they were pornographic?
16    A     Yes.
17    Q     Okay. Why don't we just --
18        (Plaintiff's Exhibit 35 and 36 were marked and
19        attached.)
20        BY MR. BELAZIS:
21    Q     Now, the first -- by the way, one of the things
22        that Mrs. Smith explained to you was that
23        sometimes well-known actors would pose, at least
24        your explanation of how it related to
25        journalistic sensationalism, is well-known actors
```

Page 139

```
 1        would pose for magazines like Playboy or Playgirl
 2        early in their careers in order to get publicity,
 3        to jump-start their careers?
 4    A     Yes, she did make that claim.
 5    Q     Okay. Now, looking at Exhibit 32, this first one
 6        is Harrison Ford, right?
 7              MS. GRIGSBY: 35?
 8              MR. BELAZIS: 35.
 9              THE WITNESS: Yes, seems to be.
10        BY MR. BELAZIS:
11    Q     Can we, just glancing through these, can we agree
12        that these appear to be cover pages of Playgirl
13        magazines going back some years?
14    A     Having not looked at Playgirl magazines, I would
15        assume they are, but I don't know.
16    Q     Okay. And first one is a pic of Harrison Ford on
17        the cover; is that right?
18    A     Uh-huh.
19    Q     Well-known porn star, right?
20    A     Not to my knowledge.
21    Q     Paul Newman, do you regard him as a porn star?
22              MS. GRIGSBY: I'm going to object to
23        this line of questioning.
24              MR. BELAZIS: That's fine, you can
25        object.
```

Page 140

```
 1        BY MR. BELAZIS:
 2    Q     Do you regard him as a porn star?
 3    A     Again, my knowledge of Paul Newman, no.
 4    Q     How about Chevy Chase, he's depicted in the next
 5        one, right?
 6    A     That is Chevy Chase, yes.
 7    Q     You wouldn't regard him as a porn star?
 8    A     Not to my knowledge.
 9    Q     Robert Redford, you wouldn't regard him as a porn
10        star?
11    A     Again, not to my knowledge.
12    Q     What's his name? Burt Reynolds, you wouldn't
13        regard him as a porn star?
14    A     I'm aware that Burt Reynolds has posed in some
15        risque photographs.
16    Q     But you wouldn't regard him as a porn star, would
17        you?
18    A     I would say that he is on the borderline in terms
19        of some of the things he's done.
20    Q     Where have you seen those?
21    A     Actually, Tony Packo's.
22    Q     Tony Packo's restaurant?
23    A     Yes.
24    Q     Another well-known hangout for porn stars, right?
25    A     That's right, yes.
```

HUNTLEY REPORTING SERVICE
1.800.247.8360

Electronically signed by Brenda  Huntley Roberts (201-220-072-3855)                    5e0f9fa9-b8ff-42d1-8fb0-65b301d4a9dc

Page 141

| | | |
|---|---|---|
| 1 | Q | How about Warren Beatty, do you regard him as a |
| 2 | | porn star? |
| 3 | A | I don't know Warren Beatty. |
| 4 | Q | You're not that young. |
| 5 | A | Seriously, I don't know him. |
| 6 | Q | How about John Travolta, you're familiar with |
| 7 | | him? |
| 8 | A | I'm familiar with John Travolta. |
| 9 | Q | Would you regard him as a porn star? |
| 10 | A | Not to my knowledge. |
| 11 | Q | All of these people we are naming, by the way, |
| 12 | | are all so far depicted on the cover page of |
| 13 | | Playgirl magazine, right? |
| 14 | A | Yes. |
| 15 | Q | How about John Ritter, are you familiar with him? |
| 16 | A | Yes. |
| 17 | Q | Do you regard him as a porn star? |
| 18 | A | No. |
| 19 | Q | How about Steve Reeves -- I'm sorry, Chris |
| 20 | | Reeves? |
| 21 | A | I'm not real familiar with Chris Reeves other |
| 22 | | than Superman. |
| 23 | Q | He played the part of Superman? |
| 24 | A | Yes. |
| 25 | Q | You wouldn't regard him as a porn star? |

Page 142

| | | |
|---|---|---|
| 1 | A | No, I wouldn't, not what I know about him. |
| 2 | Q | How about Robin Williams, he's a well-known porn |
| 3 | | star, isn't he? |
| 4 | A | Again, not that I'm aware of. |
| 5 | Q | All right. But he's depicted on this cover page |
| 6 | | also? |
| 7 | A | Yes, he is. |
| 8 | Q | All right. Jane Fonda, a little risque for you? |
| 9 | A | I don't know a whole lot about Jane Fonda. |
| 10 | Q | How about Jon Voight? |
| 11 | A | Again, I don't know a lot about Jon Voight. |
| 12 | Q | Dustin Hoffman and Meryl Streep, there's a porn |
| 13 | | couple if anybody ever saw one, right? Do you |
| 14 | | regard either one of them as porn stars? |
| 15 | A | Not to my knowledge. |
| 16 | Q | Meryl Streep, eight time Academy Award nominee, |
| 17 | | right? |
| 18 | A | I don't know. |
| 19 | Q | Right there in Playgirl magazine. Nick Nolte, |
| 20 | | he's one of the ones that was referenced by Mrs. |
| 21 | | Smith, isn't he? |
| 22 | A | Yes. |
| 23 | Q | Okay. Do you regard him as a porn star? |
| 24 | A | Not to my knowledge. |
| 25 | Q | Jack Nicholson, do you regard him as a porn star? |

Page 143

| | | |
|---|---|---|
| 1 | A | Not to my knowledge. |
| 2 | Q | Okay. How about Dudley Moore, or Liza Minnelli? |
| 3 | A | Not to my knowledge. |
| 4 | Q | So far, well-known, well-respected actors, right? |
| 5 | A | Most of member, I can't attest to some of them. |
| 6 | Q | Tom Selleck? |
| 7 | A | Not to my knowledge. |
| 8 | Q | Okay. Not to your knowledge, that he was either |
| 9 | | a risque actor or porn star, right? |
| 10 | A | That's correct. |
| 11 | Q | Sally Fields, now there's one, one would question |
| 12 | | her integrity, right? |
| 13 | A | I'm not questioning Sally's integrity. |
| 14 | Q | Do you regard her as a porn star? |
| 15 | A | Not to my knowledge. |
| 16 | Q | Do you think her appearance in Playgirl magazine |
| 17 | | is pornographic? |
| 18 | A | Do I think her appearance? |
| 19 | Q | Yes. |
| 20 | A | The picture you're showing me now? |
| 21 | Q | Well, do you think the fact that she appeared in |
| 22 | | Playgirl magazine as pornographic? |
| 23 | A | No. |
| 24 | Q | Who is this? Dan Aykroyd, would you regard him |
| 25 | | as -- |

Page 144

| | | |
|---|---|---|
| 1 | A | I don't know a lot about Dan Aykroyd. |
| 2 | Q | You've never seen the Ghostbusters? |
| 3 | A | I'm saying, I don't know much about Dan Aykroyd. |
| 4 | Q | One of the great movies of all time. |
| 5 | A | In your opinion maybe. |
| 6 | Q | Let's see. Richard Geer, on the cover of |
| 7 | | Playgirl magazine. |
| 8 | A | Uh-huh. |
| 9 | Q | Another risque fellow? |
| 10 | A | He's done some risky things in his life. |
| 11 | Q | Clint Eastwood? |
| 12 | A | Uh-huh. |
| 13 | Q | Pretty risky also? |
| 14 | A | Not to my knowledge. |
| 15 | Q | All right. How about Ted Danson and Shelly Long |
| 16 | | from the show Cheer's? |
| 17 | A | Uh-huh. |
| 18 | Q | Do you remember that? |
| 19 | A | Yes. |
| 20 | Q | Okay. Would you regard their appearance in |
| 21 | | Playgirl magazine as being pornographic? |
| 22 | A | No. Not from the picture you're showing me. I |
| 23 | | don't know what's inside each of these magazines. |
| 24 | Q | How about Matt Dillon? |
| 25 | A | I don't know. |

36  (Pages 141 to 144)

Electronically signed by Brenda Huntley Roberts (201-220-072-3855)          5e0f9fa9-b8ff-42d1-8fb0-65b301d4a9dc

Page 145

| | | |
|---|---|---|
| 1 | Q | Don't know him? |
| 2 | A | Not much. |
| 3 | Q | Mel Gibson, well-known porn star? |
| 4 | A | Not to my knowledge. |
| 5 | Q | Let's see, who is that?  David Burn, do you know |
| 6 | | him? |
| 7 | A | No. |
| 8 | Q | I'm sorry, maybe it's Rob Lowe.  I don't know |
| 9 | | him.  Kevin Bacon? |
| 10 | A | It's Kevin Bacon. |
| 11 | Q | Right.  Do you regard his appearance in Playgirl |
| 12 | | magazine as being pornographic? |
| 13 | A | Again, based upon the photo you're showing me, |
| 14 | | no. |
| 15 | Q | James Brolin? |
| 16 | A | Based upon the photo you're showing me, no. |
| 17 | Q | Brad Pitt? |
| 18 | A | Again, not that I'm aware of. |
| 19 | Q | Matt Damon? |
| 20 | A | (Nod indicating no.) |
| 21 | Q | No?  Leonardo DiCaprio? |
| 22 | A | I don't know, I don't know much about him. |
| 23 | Q | He was in twice. |
| 24 | A | Good for him. |
| 25 | Q | Michael J. Fox? |

Page 146

| | | |
|---|---|---|
| 1 | A | That's who that is. |
| 2 | Q | Okay.  And then if we can look at what's been |
| 3 | | marked as Exhibit 36. |
| 4 | A | Uh-huh. |
| 5 | Q | You're of course familiar with Barbara Streisand, |
| 6 | | right? |
| 7 | A | Yes. |
| 8 | Q | Okay.  So it's fair to say, of course, that the |
| 9 | | actors that we just went through in these two |
| 10 | | exhibits are among the most well-known actors of |
| 11 | | our generation? |
| 12 | | MS. GRIGSBY:  Objection. |
| 13 | | THE WITNESS:  I don't know.  There is a |
| 14 | | lot -- there are hundred and thousands of actors. |
| 15 | | BY MR. BELAZIS: |
| 16 | Q | And would you agree with me that their presence, |
| 17 | | that their decision to be depicted in Playgirl or |
| 18 | | Playboy magazine, the ones that we reviewed here |
| 19 | | would reflect some effort to further their |
| 20 | | career? |
| 21 | | MS. GRIGSBY:  Objection. |
| 22 | | THE WITNESS:  I don't have any clue as |
| 23 | | to why each of those individuals would have |
| 24 | | chosen to do that. |
| 25 | | BY MR. BELAZIS: |

Page 147

| | | |
|---|---|---|
| 1 | Q | Okay.  And would you agree that their decision to |
| 2 | | be depicted in these magazines would be an |
| 3 | | example of sensationalistic journalism? |
| 4 | A | No. |
| 5 | | MS. GRIGSBY:  Objection. |
| 6 | | BY MR. BELAZIS: |
| 7 | Q | Do you want to take a look -- |
| 8 | A | You didn't bother to pull the centerfold out from |
| 9 | | each of these magazines and show those. |
| 10 | Q | I'll leave that to you. |
| 11 | A | Oh. |
| 12 | Q | Okay.  Up until the point that you decided to |
| 13 | | interview these students -- by the way, did you |
| 14 | | interview Danielle Mallot as part of your |
| 15 | | investigation, that you can recall? |
| 16 | A | I do not believe we did. |
| 17 | Q | Okay.  She's faculty, right? |
| 18 | A | She is. |
| 19 | Q | Not a student? |
| 20 | A | No. |
| 21 | Q | Okay.  And you're aware that she was assigned to |
| 22 | | this Social Studies class?  In fact, she's the |
| 23 | | one that you say brought it to your attention? |
| 24 | A | Correct. |
| 25 | Q | Up until that point was there any other class in |

Page 148

| | | |
|---|---|---|
| 1 | | which you interviewed all the students in |
| 2 | | connection with some investigation involving a |
| 3 | | teacher at Perkins Schools? |
| 4 | A | No. |
| 5 | Q | Oh, of course, last, but not please, I almost |
| 6 | | forgot, you, of course, are aware by now that the |
| 7 | | 1984 yearbook, Perkins High School had a photo in |
| 8 | | it, and would you confirm that we are looking at |
| 9 | | the 1984 yearbook for Perkins High School? |
| 10 | A | As far as I know, I've never seen it before. |
| 11 | Q | As far as you know, that's what it is, right? |
| 12 | A | Yes. |
| 13 | Q | Certainly appears to be, right? |
| 14 | A | It appears to be. |
| 15 | Q | And would you describe for the record what's |
| 16 | | depicted on page 50 in the bottom left-hand |
| 17 | | corner? |
| 18 | A | A group of students looking at, it looks like a |
| 19 | | copy of a Playgirl magazine with Harrison Ford on |
| 20 | | the cover that you previously showed me. |
| 21 | Q | And what are the girls doing? |
| 22 | A | Covering their mouth as if in shock or surprise |
| 23 | | of the picture they were looking at. |
| 24 | Q | And the magazine, and the picture depicted is |
| 25 | | open, correct? |

37  (Pages 145 to 148)

Electronically signed by Brenda  Huntley Roberts (201-220-072-3855)                    5e0f9fa9-b8ff-42d1-8fb0-65b301d4a9dc

Page 149

1   A    I cannot tell what they are looking at.
2   Q    That's what it looks like?
3   A    It doesn't show.  I don't know if they have the
4        full magazine there, they have a part of the
5        magazine there, whether it's open or whether it's
6        closed, you know, it's hard to tell.
7   Q    And do you regard this as pornographic?
8            MS. GRIGSBY:  What, the picture of the
9        girls looking at it?
10           MR. BELAZIS:  Right.
11           THE WITNESS:  The picture of the girls
12       looking at it, no.
13  BY MR. BELAZIS:
14  Q    Do you regard the decision to include that
15       photograph in the 1984 yearbook as being
16       pornographic?
17           MS. GRIGSBY:  Objection.  Relevancy.
18           THE WITNESS:  The answer is yes, I
19       would not have permitted it.
20  BY MR. BELAZIS:
21  Q    Are you aware of whether there was any
22       ramifications, concern, complaint related to
23       this?
24  A    I have no idea.  That was 24 years before I
25       arrived in Perkins.

Page 150

1   Q    Would you agree that this would reflect what the
2        Perkins community regards as being appropriate
3        and inappropriate?
4            MS. GRIGSBY:  Objection.
5            THE WITNESS:  No, I would not.
6   BY MR. BELAZIS:
7   Q    By the way, whenever it was that you asked for --
8        that you viewed Playboy magazine, did you ask
9        your parents' permission before looking at it?
10           MS. GRIGSBY:  Objection.
11           THE WITNESS:  No, sir.
12       (Plaintiff's Exhibit 37 was marked and attached.)
13           MS. GRIGSBY:  I'm sorry, what's the
14       number on that?
15           THE WITNESS:  37.
16  BY MR. BELAZIS:
17  Q    You know, I'm sorry, I don't remember, but I
18       just -- just for the record, I may have already
19       done this, I'm sorry, because I have a mind like
20       a seal.
21       (Plaintiff's Exhibit 13 was referred to.)
22  BY MR. BELAZIS:
23  Q    What's marked as Plaintiff's Exhibit 13, could
24       you identify that as containing your notes?  I
25       believe, Mr. Gasteier already identified his

Page 151

1        portion of it.
2   A    These look like the notes that I typed as I
3        interviewed individual students on the Friday
4        night and the copies of the pictures that were
5        provided, and it looks like some handwritten
6        notes that Mr. Gasteier took where he concluded
7        the interviews that day.
8   Q    And do you also have access to Mr. Gasteier's
9        notes?
10  A    Yes, sir.  And then I also concluded, it looks
11       like, written statements, copies of the written
12       statements of each of the students.
13  Q    And you have those?
14  A    Yes.
15       (Plaintiff's Exhibit 16 was referred to.)
16  BY MR. BELAZIS:
17  Q    And, again for the record, the photographs that
18       we have been talking about that are of the
19       students, are those marked as Plaintiff's
20       Exhibit 16; is that correct?
21  A    To the best of my knowledge, these look like the
22       photos that day.
23  Q    Okay.  All right.  So now we just marked another
24       exhibit.  What was it?
25  A    37.

Page 152

1   Q    All right.  So directing your attention to
2        Plaintiff's Exhibit 37, can you tell me what that
3        is?
4   A    The first page is a letter to Mrs. Smith from the
5        Perkins Board of Education, signed by the
6        treasurer of the Board of Education indicating
7        the board took action at its November 10th
8        meeting to adopt a resolution accepting the
9        recommendation of Referee Harry A. Taich and
10       ultimately the resolution to terminate her
11       teaching contract effective immediately.  The
12       following three pages are the actual formal
13       resolution itself.
14  Q    Just going back, I'm sorry, for a moment.  With
15       regard to the question of her being late to class
16       every day to her Social Studies class on somewhat
17       of a regular basis, you're aware, of course, that
18       she had to travel some distance from her class in
19       room, I think, 702 I think is what it was or
20       right around there, down to Room 61?
21  A    I'm aware of the allegations.
22  Q    Right.
23  A    But the allegations mostly from the students
24       pertained to late to study hall at times and also
25       to class, it wasn't just the beginning of that

HUNTLEY REPORTING SERVICE
1.800.247.8360

Electronically signed by Brenda  Huntley Roberts (201-220-072-3855)                    5e0f9fa9-b8ff-42d1-8fb0-65b301d4a9dc

## Page 153

1    class where she had to make that travel.
2  Q    Okay.  Well, we can look at your notes and see
3    what they say about that, but --
4         Okay.  And in your disciplinary
5    citation, it doesn't make any reference to study
6    hall, does it?  It just refers to fifth period
7    study -- fifth period history class.  You can
8    look at it if you want.
9  A    I don't think I have that copy.
10  Q    Okay.  Look at it.  So I do.
11  A    No, it does not.  It doesn't distinguish it as
12    the study hall.
13  Q    Not only does it not distinguish it, it specifies
14    that she is charged with being tardy to her fifth
15    period history class, right?
16  A    Correct.
17  Q    History class is different than study hall,
18    right?
19  A    It's all part of the same period when she has the
20    kids.  She's responsible for the entire --
21  Q    Well --
22         MS. GRIGSBY:  Let him finish.
23         THE WITNESS:  She's responsible for the
24    entire fifth period.  On the schedule it says
25    fifth period history, it doesn't distinguish

## Page 154

1    study hall from that class.
2  BY MR. BELAZIS:
3  Q    Okay.
4         MR. BELAZIS:  Can we take break again?
5         (Off the record.)
6  BY MR. BELAZIS:
7  Q    Okay.  Now, looking just briefly again at
8    Exhibit 11, that's the -- is that 11?
9  A    Yes.
10  Q    Those are the charges that you composed or
11    issued?
12  A    Well, 11 is the original letter that I relieved
13    her, the first letter.
14  Q    Right.
15  A    I was relieving her of her duties.  And the only
16    allegation of that is inappropriate discussions
17    regarding class pornography.
18  Q    Well, I'm sorry, the second page?
19  A    All right.
20  Q    The allegations that were made involved your,
21    first of all, your allegation related to
22    discussion of pornography, right?
23  A    Yes.
24  Q    And secondly, your allegation that she dozed off
25    for several minutes while supervising students in

## Page 155

1    5-D study hall, correct?
2  A    Yes.
3  Q    You specified 5-D study hall, correct?
4  A    Uh-huh.
5  Q    And then your, finally your allegation that she
6    arrived tardy to her fifth period history class,
7    right?
8  A    That is correct.
9  Q    Again, it doesn't say anything about 5-D study
10    hall, this refers to history class?
11  A    That is correct.
12  Q    And I take it that study hall is not part of --
13    well, withdraw that.
14         And then on April 5, part of the same
15    exhibit, you then specify the disciplinary items
16    of which she's charged, right, on the first page?
17  A    Yes.
18  Q    And, again, you refer to dozing off while
19    supervising students in 5-D study hall, right?
20  A    Yes.
21  Q    And, again, you refer to arriving tardy during
22    her fifth period history class, right?
23  A    Yes.
24  Q    And then your April 13th letter, it specified
25    that grounds for termination that you would

## Page 156

1    recommend to the board, you specify, in addition
2    to the pornography issue, dozing off in 5-D study
3    hall, right?
4  A    Yes.
5  Q    And, again, you reference alleged tardiness in
6    fifth period history class, right?
7  A    Yes.
8  Q    No reference to 5-D study hall, right?  Correct?
9  Q    Previous reference to 5-D study hall.
10  Q    With respect to the issue of tardiness.
11  A    Not specifically delineated as 5-D study hall,
12    no.
13  Q    And in your subsequent letter the next day dated
14    April 14th, same thing, right?
15  A    Correct.
16  Q    Okay.  So then we were looking at what's been
17    marked as Plaintiff's Exhibit?
18  A    37.
19  Q    37.  And I think you've already identified this.
20    Why don't you identify it again just to make
21    sure.
22  A    The first page is a letter sent to Carol Smith by
23    the Board of Education, Lisa Crescimano, the
24    treasurer, signed it, informing Carol that the
25    board met on November 10th, 2010, adopted a

HUNTLEY REPORTING SERVICE
1.800.247.8360

Electronically signed by Brenda  Huntley Roberts (201-220-072-3855)                    5e0f9fa9-b8ff-42d1-8fb0-65b301d4a9dc

Page 157

1    resolution accepting the Report of Recommendation
2    of Referee Harry A. Taich, dated October 9, 2010,
3    concerning her teaching contract and basically
4    the resolution also terminated her teaching
5    contract effective immediately.  The next three
6    pages are a copy of the board resolution that day
7    signed by the then president and also the
8    treasurer, Lisa Crescimano.
9  Q    Okay.
10 A    The president being Brian Printy, Dr. Brian
11    Printy.
12 Q    Tell me what the process was in the -- at the
13    board level when the board voted on the
14    recommendations that you had made for
15    termination?
16        MS. GRIGSBY:  Prior to the termination
17    hearing?
18    BY MR. BELAZIS:
19 Q    Yes.  And that would have been referenced in
20    exhibit, it was referred to initially as Exhibit
21    11, and it's also referred to, I think, in
22    Exhibits 33 and 34.  11 was your recommendation
23    to the board and then 33 and 34 I think are the
24    documents reflecting the board action.
25 A    Okay.

Page 158

1  Q    Yes?
2  A    Exhibit 33 is basically a letter to Mrs. Smith
3    indicating that -- "On April 14, 2010 the Board
4    of Education adopted a resolution regarding its
5    intent to consider the termination."  And
6    Exhibit 34 is that Resolution of Intent.  And if
7    you're referring back then to article, or
8    Exhibit 11, the letter dated April 14th is a
9    letter that I wrote to her and hand delivered and
10    indicated that it was my intent to recommend the
11    board to take that action.
12 Q    Okay.  And so describe the process that occurred
13    in connection with the board vote?
14 A    On the agenda is a section for superintendent
15    recommendations both on personnel, and there's
16    another section on non-personnel items.  Under
17    the section under personnel, there was a brief
18    description of my recommendation to the board to
19    basically begin the process for the termination
20    of the teaching contract of Carol Smith.  When
21    that -- in a typical board meeting, when that
22    section comes up, the board president will read
23    the introduction to the section and then turn it
24    over to me to explain any items on the agenda.
25    There may be one, there may be several.  And in

Page 159

1    this particular agenda, I don't remember whether
2    this was the sole item under that area or there
3    were others, they briefly commented to the board
4    that you were aware that we had had ongoing
5    disciplinary concerns regarding Carol Smith, and
6    unfortunately, after multiple disciplinary
7    efforts haven't changed the behavior, that it is
8    with regret that I recommend you to begin the
9    process of terminating her employment.  The
10    board --
11 Q    This is the discussion during executive session?
12 A    This would have been a public session.
13 Q    Oh, public, okay.
14 A    Yes.  The board I don't believe asked any, in
15    this particular instance, asked any serious
16    questions publicly out of respect to Carol.  And
17    also feeling that they had been well informed
18    throughout the process by me, and ultimately then
19    took a vote to pass that segment of the agenda;
20    in particular, this resolution.  If I recall
21    correctly, I think it was Mr. Kosior who, as it's
22    indicated here, who moved the adoption for the
23    resolution.  And Mr. Reddaway who seconded it and
24    it was a unanimous vote of the board to adopt the
25    resolution.

Page 160

1  Q    Okay.  And then following, there was a
2    disciplinary hearing as you know, right?
3  A    There was a termination hearing, yes.
4  Q    And you were present for that?
5  A    Yes.
6  Q    Every day?
7  A    Yes.
8  Q    You were basically the board's representative or
9    the district's representative?
10 A    Correct.
11 Q    And following that termination hearing there was
12    a recommendation by the hearing officer to
13    terminate; is that right?
14 A    Yes.
15 Q    But on fewer grounds than what was originally
16    adopted by the board; is that correct?
17 A    The hearing officer's recommendations, as I
18    recall it, indicated the board had proven all
19    three grounds, that it was the hearing officer's
20    opinion that Mrs. Smith was guilty of all three,
21    but that the single allegation of pornography was
22    not, in his mind, enough to justify termination,
23    but the allegations of repeated tardiness and
24    sleeping were.  And so his recommendation was for
25    termination under, I see it referenced as Items B

40  (Pages 157 to 160)

Electronically signed by Brenda  Huntley Roberts (201-220-072-3855)          5e0f9fa9-b8ff-42d1-8fb0-65b301d4a9dc

Page 161

1   and C, which were the references to sleeping and
2   excessive tardiness.
3   Q    And then same thing, describe the process that
4        the board agreed to with regard to that?
5   A    You know, that would have been in November of
6        2010. It would have been my understanding that
7        there was an executive session to discuss
8        discipline of employee at that stage.
9            MS. GRIGSBY: And with respect to the
10       communications in executive session, Paul, you
11       and I have discussed this, I believe that to be
12       privileged, and I do not want to waive that
13       privilege at this point because it's not my
14       privilege to waive. And so at this point I think
15       I'm going to instruct you not to disclose the
16       contents of the executive session.
17           MR. BELAZIS: I thought we agreed, we
18       simply agreed that there would be testimony about
19       it and then --
20           MS. GRIGSBY: Or seal it so long as by
21       doing so, you're not going to later assert there
22       has been a waiver.
23           MR. BELAZIS: I think you just
24       preserved your right to contest it at a later
25       time.

Page 162

1            MS. GRIGSBY: So do we have an
2        understanding that if he talks about it, that if
3        I permit him to disclose the contents of the
4        executive session, that portion of the testimony
5        would be under seal, and subject to later ruling
6        on the applicability or decision to waive that
7        privilege?
8            MR. BELAZIS: That was our discussion
9        and that's our agreement.
10           MS. GRIGSBY: Okay, very good.
11           THE WITNESS: In relationship to the
12       executive session that day, quite frankly my
13       recollection is it was a very short discussion.
14       The board reviewed in particular the summary from
15       Referee Taich, that they had previously reviewed
16       a copy of electronically. There was, I think, a
17       general reference from board president, Dr.
18       Printy, to each individual board member, do any
19       of you have concerns about taking this action, do
20       you support the action? And then within a, I
21       think it was a very, very short period of time, I
22       can't give you a time length, we came right back
23       out of executive session and the board took
24       action to approve the recommendation from Referee
25       Taich.

Page 163

1   Q    Okay.
2   A    Again, I believe that was a 5-0 vote. If I
3        recall correctly there, I believe Mr. Chapman
4        made the initial reference or the initial
5        adoption of the resolution and, again, my memory
6        is -- I'm not sure if it was Mr. Kosior who
7        seconded or not.
8   Q    All right. With respect to the initial adoption
9        of your recommendations, there was just a single
10       vote on all three charges, in other words, they
11       didn't vote on them separately?
12   A   That is correct, they did not.
13   Q    And there was no determination as to whether or
14       not each one of them was separately sufficient to
15       justify termination?
16   A   No, there was not.
17   Q    Okay. And that would be true also with respect
18       to their subsequent vote to adopt the referee's
19       decision?
20   A   That is correct.
21   Q    All right. Just going back for a second to the
22       question of her -- of Mrs. Smith's tardiness to
23       fifth period history class.
24   A   Uh-huh.
25   Q    I started to ask you earlier about, there has

Page 164

1        been quite a bit of testimony already, but the
2        fact that she had to travel some distance in
3        order to get from 702 down to 601, and you were
4        at the hearing; again, you recall that?
5   A    I recall there was some testimony on that, yes.
6   Q    Okay. And you're aware that she had to travel
7        from 601 to 702? I may be off by a door, but
8        it's --
9   A    I was aware during the hearing. I don't know
10       that I was aware prior to that.
11   Q    That was my question. Mr. Gasteier never brought
12       that to your attention?
13   A   Not that I recall.
14   Q    And he never brought to your attention that Mrs.
15       Smith had previously told him that, because of
16       her physical condition, she was unable to manage
17       that distance to get there on time every day?
18           MS. GRIGSBY: Objection.
19           THE WITNESS: My recollection is I
20       learned about that in the termination hearing. I
21       don't recall a previous conversation.
22       BY MR. BELAZIS:
23   Q    And with respect to the information that you
24       conveyed during the following hearing and/or in
25       connection with it, what exactly did you convey

41  (Pages 161 to 164)

Electronically signed by Brenda  Huntley Roberts (201-220-072-3855)          5e0f9fa9-b8ff-42d1-8fb0-65b301d4a9dc

## Page 165

```
 1        to the -- strike that.  Let me start again.
 2             You were obviously, you've already
 3     said, present during the termination hearing,
 4     correct.
 5   A   Yes.
 6   Q   Do you recall what, if any, information you
 7     conveyed in executive session to the board
 8     regarding the testimony of the termination
 9     hearing?
10             MS. GRIGSBY:  Subject to the same
11     parameters we spoke of, you can answer that
12     question.
13     BY MR. BELAZIS:
14   Q   Yes?
15   A   I don't believe I informed them of any specific
16     testimony at all.  I would give them a brief
17     verbal overview of how my perception of the
18     testimony was going or how the hearing was going.
19     I may have, you know, but I don't recall
20     specifically pointing out individual testimonies.
21   Q   Okay.  What about in general, do you recall
22     describing in general terms to them what the
23     testimony had been at the hearing?
24   A   In general terms, yes.
25   Q   What did you tell them?
```

## Page 166

```
 1   A   To my best recollection, again, most of this
 2     would have been verbal in executive session,
 3     would be that I thought the hearing was going
 4     well, I thought that the testimonies were strong
 5     and positive in terms of the Board's position,
 6     that both the students, and we had many students
 7     testify, that they had done a very good job of,
 8     in a very difficult situation, of testifying.  I
 9     expressed to the board that some of their parents
10     were not happy with us because we ultimately
11     required them to testify, that the teacher
12     testimonies were fairly favorable in support,
13     that overall I felt that our attorney had
14     presented a fairly strong case.
15   Q   Anything else you can think of?
16   A   You know, I don't know if I did, or at what
17     length I would have had a conversation.  I know I
18     was disappointed in Mr. Gasteier's testimony.
19   Q   And so what was it that you cited about Mr.
20     Gasteier's testimony to the board?
21   A   I can't remember specifics.  My recollection of
22     the disappointment was there was certainly
23     evidence prior to my arrival in 2008 of some
24     concerns with Carol that he failed to act on,
25     that were brought to him in particular by his
```

## Page 167

```
 1     assistant principal Mark Dahlman, and there's no
 2     evidence that he acted on them at all.  There's
 3     no evidence in the personnel file, there's no
 4     evidence in her evaluations.  That frustration is
 5     that he was very evasive in his answers, and
 6     instead of being, what I felt would be, you know,
 7     direct and upfront and honest, it was, the
 8     testimony seemed to be a lot of I don't know, I
 9     don't remember, I can't recall throughout the
10     testimony as I remember it.
11   Q   And so he wasn't as -- your disappointment was he
12     was not as direct as you expected he would be or
13     you expected he should be?
14   A   Disappointed was two-fold.  The more I found out
15     about the history of some of the things that had
16     happened prior to my arrival that had not been
17     addressed, the more disappointed I became in his
18     leadership in not addressing them, you know,
19     before they ended up in my lap.  And the sense of
20     frustration of that's how Mr. Gasteier was in his
21     leadership, is afraid to take a stand, try to
22     please everybody.  Many times a decision was made
23     simply not to make a decision and to allow, in
24     essence, employees to draw their own conclusions
25     about how to proceed on issues.  And more and
```

## Page 168

```
 1     more sitting in the hearing I recall remembering
 2     a lot more concern about that.  And I know I
 3     expressed that to the board.  I don't know if I
 4     expressed it to the board in that time frame or
 5     in subsequent evaluations or what, I'm not sure.
 6             MR. BELAZIS:  Unfortunately I don't
 7     have a copy of this, so we'll just have to mark
 8     one and we can certainly make a copy.
 9             MS. GRIGSBY:  I'm going to stand and
10     look over your shoulder.  We can make the copy
11     later.
12             THE WITNESS:  I assume you want me to
13     pay particular attention to what you've
14     highlighted here?
15     BY MR. BELAZIS:
16   Q   I just want to ask you whether you recognize
17     those as among the board minutes that you
18     prepared and submitted to the board.
19   A   These are my board notes that I, part of what I
20     would do on a weekly basis, yes.
21   Q   Okay.  You subsequently removed Mr. Gasteier from
22     his position as principal of the high school?
23   A   I gave him an ultimatum and an alternative, yes.
24   Q   Okay.  And the alternative was to become
25     communications director?
```

HUNTLEY REPORTING SERVICE
1.800.247.8360

Electronically signed by Brenda  Huntley Roberts (201-220-072-3855)                5e0f9fa9-b8ff-42d1-8fb0-65b301d4a9dc

Page 169

1    A    Yes.
2    Q    So that he would retire and then become
3         communications director?
4    A    Yes.
5    Q    Was there a position of communications director
6         prior to the time it was offered to him?
7    A    No, there was not.
8    Q    You created that position for him?
9    A    Yes, I did.
10   Q    Did Mr. Gasteier ever personally ask you for any
11        accommodations for disability?
12   A    No, sir.
13   Q    So I guess, just to go back to the point, other
14        than what you've already described to me, there
15        wasn't anything else in executive session that
16        you related to the board about the testimony at
17        the disciplinary hearing?
18   A    You know, again, I don't recall specific
19        conversations with the board.  In general, I
20        remember giving them a general overview.
21        (Plaintiff's Exhibit 39 was marked and attached.)
22        MS. GRIGSBY:  The single copy was
23   marked as 38, so this would be 39?
24        THE WITNESS:  Yes.
25        MS. GRIGSBY:  Okay.

Page 170

1         BY MR. BELAZIS:
2    Q    Okay.  You have been handed what's been marked as
3         Plaintiff's Exhibit 39, do you recognize it?
4    A    Yes.
5    Q    And what is it?
6    A    The cover page and the first page is an email
7         from myself to the Board of Education, and Lisa
8         Crescimano indicating that the document that
9         follows or is attached was prepared by the media
10        consultant to assist the board in addressing
11        answers to questions regarding Carol Smith and
12        the particular case at that time.
13   Q    Okay.  Who was the media consultant?
14   A    Off the top of my head, sir, I do not remember.
15   Q    And who retained the media consultant?
16   A    As I believe, sir, it was our attorney who
17        recommended somebody.
18   Q    Who was the person that met with the media
19        consultant?
20   A    There was no face-to-face meeting.  I had a phone
21        conversation with the media consultant, one time.
22   Q    And you provided her with information that she
23        used to develop these key messages, talking
24        points?
25   A    He had --

Page 171

1    Q    Is it a he or she?
2    A    It's a he.  That much I don't remember.  I don't
3         remember his name.  He had had a previous
4         conversation with our attorney who was well aware
5         of the circumstances surrounding the case.  Most
6         of the information was obtained in that
7         conversation.  The conversation with me was more
8         about, again, media relations, how do you move
9         forward, here are some of the key questions
10        you're likely to be asked and let me draft some
11        generic answers for you and the board.
12   Q    Okay.  So these were eventually transmitted to
13        you and then you reviewed them and transmitted
14        them to the board?
15   A    Yes.
16   Q    On the first page it indicates as one answer to
17        provide in connection with questions about Ms.
18        Smith's termination, "The district has
19        recommended and made accommodations for any
20        medical issue she might have and has counseled
21        her on her behavior."
22   A    Where are you referring to, sir?
23   Q    Page 1.
24   A    Okay.  Down at the last question.
25   Q    Right.  So what accommodations were made from

Page 172

1         your prospective from the district and for what
2         medical issues?
3    A    It was my understanding that the letter I had
4         sent her making accommodations for her diabetes,
5         and those were the only accommodations that she
6         had ever asked me for.
7    Q    Okay.  There were some issues about parents, as I
8         understand it, who had taken the position that
9         their children were forced to give statements
10        during your investigation of the final
11        disciplinary issue that arose when you
12        interviewed students?
13   A    Uh-huh.
14   Q    How many parents, as far as you became aware, how
15        many parents made that kind of an allegation?
16   A    I was aware of one parent who had some concerns.
17        There may have been more.  There was only one
18        parent who I believe approached me directly.
19   Q    Who was that?
20   A    I don't recall who it was, sir.
21   Q    What did they say?
22   A    They just voiced concerns about the process of,
23        you know, two adults with a 14, 15-year-old
24        student asking them questions without the parent
25        having the right to be there.

Electronically signed by Brenda  Huntley Roberts (201-220-072-3855)          5e0f9fa9-b8ff-42d1-8fb0-65b301d4a9dc

Page 173

1    MR. BELAZIS: And let me -- again, I'll
2  make a copy of this, I'm sorry, but we can make
3  one, let's mark that.
4  (Plaintiff's Exhibit No. 40 was marked and
5  attached.)
6  BY MR. BELAZIS:
7  Q   Show it to your counsel first, Mr. Gunner.
8    MS. GRIGSBY: Did you mean this to be
9  part of that?
10    THE WITNESS: Yes, that's part of it.
11  That's usually how I entered my notes, trying to
12  get it in calendar format.
13  BY MR. BELAZIS:
14  Q   So, first of all, if you could identify that, are
15  those your board notes?
16  A   These are my board notes to the board dated
17  April 17, 2010.
18  Q   And it is marked as?
19  A   Exhibit 40.
20  Q   And those are notes that you transmitted to the
21  board at that point in time?
22  A   Yes, sir.
23  Q   And based on your board notes at least there were
24  three parents who came forward and indicated that
25  their children had been forced to provide

Page 174

1  information in connection with your
2  investigation?
3  A   Again, the way this is that Steve Schuster,
4  who was a board member at the time, shared with
5  Lisa, who was my treasurer, who then shared with
6  me, the three parents had approached the Sandusky
7  Register and made that complaint. To my
8  recollection, only one parent spoke to me.
9  Q   Now, following Mrs. Smith's termination, the
10  district submitted some information to the Board
11  of Education?
12  A   Yes.
13  Q   I'm sorry, the Ohio Department of Education?
14  A   Yes. I have an obligation to report potential
15  misconduct to the Ohio Department of Education,
16  yes.
17  Q   What's your understanding of the type of
18  misconduct that is required to be reported?
19  A   Certainly anything where the employee has been
20  convicted of a felony, anything where an employee
21  has been involved in a drug conviction, any
22  action taken by the board that would include the
23  termination of an employee, are all reportable to
24  the Ohio Department of Education.
25  Q   So basically anytime there is a termination, it's

Page 175

1  reported?
2  A   Yes, absolutely.
3  Q   And then did you subsequently meet with
4  representatives of the Ohio Department of
5  Education?
6  A   Yes, I believe he did.
7  Q   And I take it that you conveyed to them
8  information about the allegations against Mrs.
9  Smith from your perspective?
10  A   I don't recall the context of the meeting. I
11  know I was contacted by representatives from ODE
12  after notifying them. I know that they received
13  a full copy of Referee Taich's hearing decision
14  and also full copies of the entire termination
15  hearing. I know that those were in their
16  possession.
17  Q   But did you provide them with information about
18  facts that you believed to have been uncovered
19  during your investigation?
20  A   Nothing that was not presented in that entire
21  line as well, nothing different or unique to
22  them.
23  Q   I guess my question is whether you provided them
24  with -- regardless of whether you reviewed the
25  Referee's decision, did you provide them with

Page 176

1  information?
2    MS. GRIGSBY: Do you mean apart from
3  the documents he spoke of?
4    MR. BELAZIS: The only document he
5  spoke of was the Referee's decision.
6    THE WITNESS: Well, the complete
7  transcript of the hearing is my recollection.
8  BY MR. BELAZIS:
9  Q   Okay. So they apparently had that, that was your
10  understanding anyway?
11  A   Right.
12  Q   Okay. So aside from that, did you supply them
13  with information?
14  A   I remember a phone conversation with them. I
15  don't remember specifically handing them any
16  documents or, you know, I would have answered
17  whatever questions they asked me at that time.
18  Q   Okay. Did you become aware of a member of the
19  faculty who had, during his Social Studies class,
20  shown a video of someone who was being beheaded
21  by -- well, someone being beheaded?
22  A   I became aware during the termination hearing.
23  It was an accusation made against a Tim
24  Obergefell in a Social Studies classroom the year
25  prior to my arrival of showing such a video, yes.

44 (Pages 173 to 176)

Electronically signed by Brenda Huntley Roberts (201-220-072-3855)          5e0f9fa9-b8ff-42d1-8fb0-65b301d4a9dc

Page 177

```
 1   Q      And did you follow up in any way to what you
 2          found out?
 3   A      Again, it happened prior to my arrival.  I assume
 4          that the previous administration had handled and
 5          addressed the issue.  I was told, though I don't
 6          believe I ever saw it, that there was a written
 7          reprimand issued to him at the time by my
 8          predecessor, but I don't recall ever seeing it.
 9   Q      Okay.  Do you have any information about what the
10          nature of the -- I mean, anymore specific
11          information about the nature of the video?
12   A      No.
13   Q      Who it depicted?
14   A      It had to do obviously with the crisis going on
15          in the Mid East at that time, and, you know, the
16          television news was displaying similar types of
17          video.  So they had something to do with the Mid
18          East.  I don't know any more than that.
19   Q      Okay.  There was a decision made to hire a new
20          business teacher during the 2010-2011 school
21          year, that was when the new business teacher
22          began; are you aware of that?
23   A      I'm just trying to recall the time frame if
24          that's accurate.
25   Q      Whenever it was, you recall that there was --
```

Page 178

```
 1          that a new business teacher was hired?
 2   A      Yes, yes.
 3   Q      And do you recall if that teacher was hired
 4          full-time?
 5   A      Yes.
 6   Q      And do you know what classes that teacher taught?
 7   A      Off the top of my head, I do not.
 8   Q      And do you recall why a determination was made to
 9          hire a full-time business teacher?
10   A      The intent was to try to rebuild the business
11          program from the limited business classes we had
12          as part of an effort as we were moving forward
13          with the progression towards STEM academies, or
14          at least three or four different academies.  At
15          the time we were considering business as a
16          separate focal academy for students, and we felt
17          that if we could find the right person, we could
18          build student interest enough to warrant it
19          full-time and possibly even more business
20          teachers.
21                   (Off the record.)
22          BY MR. BELAZIS:
23   Q      Is there any reason why the same objectives could
24          not have been achieved with Mrs. Smith?
25   A      The department itself had significantly decreased
```

Page 179

```
 1          in size under Ms. Smith's leadership.
 2   Q      Okay.  And now?
 3   A      Actually looking at the numbers for next year,
 4          and just to step back a second, last year
 5          reductions, we reduced the business position back
 6          to half time.  So currently, it is a half time
 7          position.  Based upon student's signup for next
 8          year, it looks like the position will be restored
 9          to full-time.
10   Q      So last year would have been --
11   A      This current school year, I'm sorry.
12   Q      So that's 2013-2014?
13   A      Correct.
14   Q      Okay.  So your new teacher came in, if I --
15   A      '11 and '12.
16   Q      For the record, '11 and '12?
17   A      Uh-huh.
18   Q      And then '12-'13, she was reduced to a part-time
19          position?
20   A      Yes.
21   Q      And this year she's again a part-time position?
22   A      No.  We reduced her to a part-time position in
23          this year, '13-'14.  She was full-time '11-'12,
24          '12-'13.
25   Q      But after two years the numbers were still too
```

Page 180

```
 1          low to justify a full-time position?
 2   A      That is correct.
 3   Q      But you maintained her on a full-time basis
 4          anyway for those two years?
 5   A      For those two years, yes, sir.
 6   Q      And, let's see, when is registration for next
 7          year?
 8   A      Registration typically starts in the January and
 9          February time frame.
10   Q      And what does it continue until?
11   A      Usually it continues up through the first day of
12          school honestly, but typically, we make final
13          staffing decisions in the May time frame at the
14          latest.
15   Q      Okay.  Does the district have an EEO policy?
16   A      Yes, sir.
17                   MR. BELAZIS:  I have asked for that a
18          few times.
19                   MS. GRIGSBY:  You know, I have learned
20          that there's such a policy and I will get it to
21          you.
22          BY MR. BELAZIS:
23   Q      And was it in effect when you arrived at the
24          Perkins School District?
25   A      Yes, sir.
```

45  (Pages 177 to 180)

Electronically signed by Brenda  Huntley Roberts (201-220-072-3855)                    5e0f9fa9-b8ff-42d1-8fb0-65b301d4a9dc

Page 181

1      MR. BELAZIS:  I have to -- once I get
2  it?
3      MS. GRIGSBY:  You may need to ask
4  questions of him about that.
5      MR. BELAZIS:  Yes.
6      MS. GRIGSBY:  I understand.
7      THE WITNESS:  I'm not sure why you
8  don't have it already.
9  BY MR. BELAZIS:
10  Q    Too many moving parts.
11  A    You've asked for a lot of documents, that's for
12  sure.
13  Q    When you -- you've looked at Ms. Smith a number
14  of times in the course of your encounters with
15  her; in other words, you've seen her face?
16  A    Yes.
17  Q    And I take it you've noticed that one of her two
18  eyes is frequently closed?
19      MS. GRIGSBY:  Objection.
20      THE WITNESS:  I would say that I have
21  noticed that one of her two eyes is -- I wouldn't
22  say closed, but certainly squinting or certainly
23  obviously not fully open.
24  BY MR. BELAZIS:
25  Q    And do you know why that is?

Page 182

1  A    I attribute it to her diabetes, that's the only
2  complaints she ever brought forward to me.
3  Q    The other eye when you see her is open?
4  A    Most of the time, frequently, yes.
5  Q    Okay.  And what do you mean by most of the time?
6  A    There are times in the hearings I have had with
7  her that she would be like this, it's hard to see
8  her eyes.
9  Q    In other words, and just for the record, you were
10  being, had your hand above your brow and
11  indicating that she was covering her eyes
12  partially with her hand, right?  I mean, that's
13  what you just showed.  I'm just asking you if
14  that accurately characterizes what you did.
15  A    I don't know if she was covering her eyes or if
16  she was resting her hand, but it certainly was,
17  from another person sitting at the table, made it
18  difficult to observe her eyes during those time
19  frames.
20  Q    Okay.  But my -- all I asked you was this.  I
21  want the record to be clear about what you did a
22  moment ago when you described what you saw Mrs.
23  Smith do during the hearings.
24  A    Right.
25  Q    And what you did was to put your elbow on the

Page 183

1  table?
2  A    Correct.
3  Q    You put your hand above your brow?
4  A    Correct.
5  Q    And covered your eyes in part, correct, with your
6  hand?
7  A    Well, the hand was above the brow, and I didn't
8  deliberately try to cover my eyes.  I was trying
9  to demonstrate how she sometimes appeared during
10  the hearings.
11  Q    Okay.  And did you observe her during the
12  hearings with both eyes either closed or
13  partially closed?
14  A    I don't recall anytime during the hearing where
15  both eyes were closed, no.
16  Q    All right.  Would you agree with me that if one
17  eye was closed or partially closed and the other
18  eye open for an extended period of time, that
19  that might cause either the open eye or both eyes
20  to become fatigued?
21      MS. GRIGSBY:  Objection.
22      THE WITNESS:  I have no knowledge of
23  what that would cause.
24  BY MR. BELAZIS:
25  Q    Well, let's try for a second.

Page 184

1      MS. GRIGSBY:  Objection.
2      THE WITNESS:  Go ahead.
3  BY MR. BELAZIS:
4  Q    No, I'm serious.  Close your eyes.
5      MS. GRIGSBY:  No, don't.
6  BY MR. BELAZIS:
7  Q    Would you do it for me?  I would like you to
8  close one eye and just open the other?
9      MS. GRIGSBY:  I'm going to object and
10  I'm going instruct you not to engage in that kind
11  of demonstration.
12      MR. BELAZIS:  Why is that?
13      MS. GRIGSBY:  I don't think it's
14  appropriate.  I don't think it's a fair question
15  and I don't think the record is going to pick it
16  up.  I just -- you're here to ask questions, not
17  to have him perform physical acts.
18      MR. BELAZIS:  Okay.
19  BY MR. BELAZIS:
20  Q    During the computer training that resulted in a
21  discipline against Carol based on allegations
22  that she had been sleeping during the training,
23  were you present at all during that training
24  session?
25  A    The initial day of training I was there for the

46  (Pages 181 to 184)

Electronically signed by Brenda  Huntley Roberts (201-220-072-3855)                    5e0f9fa9-b8ff-42d1-8fb0-65b301d4a9dc

Page 185

1    first half hour, 45 minutes.  I introduced the
2    trainer, welcomed the staff to be there, thanked
3    them for their time.  And then I may have popped
4    my head in once or twice just very briefly as a
5    general observation.
6  Q    Okay.  Were you there again at the end?
7  A    I came in the last day at approximately 3:00 if I
8    recall right as the training was ending.  And
9    that was due to the accusations that had been
10   made.
11 Q    Okay.
12 A    And Carol had already left at that point.
13 Q    Who was the trainer, do you recall?
14 A    Jordie, I don't remember Jordie's last name,
15   Jordie Williams maybe.  Jordie was his first
16   name, he was from Apple Computer Supply.
17 Q    Where are they located?
18 A    Cupertino, California.
19 Q    Did he fly in for that?
20 A    I don't know where Jordie resides.  He could have
21   flown in, he could have driven in.  We had
22   multiple trainers and multiple sessions all
23   summer long.  We had, I think, ten different
24   four-day sessions throughout the summer that
25   teachers signed up for voluntarily.  I originally

Page 186

1    scheduled five.  The demand was so great I had to
2    add, I believe, five more, so I think there were
3    ten in the final numbers, so that every teacher
4    who wanted to could go throughout training.
5  Q    I'm sorry, was there more than one training
6    session?
7  A    Oh, yes.
8  Q    Okay.
9  A    Yes, yes.  The one went on all summer long, so
10   different teachers at different times, groups of
11   about 15 together at a time.
12       MR. BELAZIS:  Okay, I think that's all
13   I have.  Thank you.
14       MS. GRIGSBY:  I have some follow-up
15   questions, just a few, following up on certain
16   things that Mr. Belazis has raised today.
17       CROSS-EXAMINATION OF JIM GUNNER
18 BY MS. GRIGSBY:
19 Q    You were asked, I think, about Exhibits 4 and 5.
20   4 being some correspondence from Attorney Tom
21   Zraik.  Strike the reference to 5, but
22   specifically about Exhibit 4.
23 A    Okay.
24 Q    Various documents that had been exchanged between
25   you and Mr. Zraik.  And based upon those

Page 187

1    documents, it appears that there was, I believe
2    you testified that there was a meeting with you
3    and Mr. Zraik.
4  A    Yes.
5  Q    Is that correct?
6  A    Yes.
7  Q    Could you tell me who all was at that meeting?
8  A    Mr. Zraik, myself, Carol Smith, and John Gerber,
9    PEA president?
10 Q    Can you describe as accurately as you can the
11   conversation that occurred during that meeting?
12 A    Sure.  Mr. Zraik entered with his wife and I
13   believe his assistance dog.  It was obvious that
14   Mr. Zraik was blind.  He came in, we helped him
15   seat himself, his wife made sure he was
16   comfortable, and then she took the dog and left.
17   We were in a conference room at the
18   administrative service center about this size
19   around a table of similar size.  Mr. Zraik sat
20   where Mr. Finn would be at the head of one side
21   with Mr. Gerber to his right and Carol Smith to
22   his left, and I sat at the other end of the table
23   for the proceedings.  I introduced myself to Mr.
24   Zraik.  He had already previously met Mrs. Smith
25   and John Gerber as her union representative and

Page 188

1    introduced himself as well.  I then referenced
2    his letter of accommodations and said that, you
3    know, today's meeting was to discuss his request
4    for us to consider accommodations for Carol, and
5    that we would try to do what we could to address
6    any concerns that he or Carol had.  We talked
7    through a variety of items from simple things
8    like Carol felt uncomfortable giving blood sugar
9    tests, glucose tests, and especially insulin
10   shots in front of students, and wanted a
11   different location to have that shot.  We agreed
12   that we would provide her access to the nurse's
13   office when at Briar, and the conversation -- let
14   me back up -- started with Mr. Zraik explaining
15   that Carol had diabetes, and that there were
16   obviously some concerns about diabetes impacting
17   her wellness on any particular day, that there
18   are certainly highs and lows with diabetes.  I
19   think that we talked a little bit about the fact
20   that I am aware somewhat of the disease because
21   of my daughter, and I may have also mentioned
22   that my father was Type 2 diabetic, to try to
23   explain it, you know.  I didn't feel Mr. Zraik
24   had necessarily given me an indepth detailed
25   description of diabetes.  That led to Mr.

47  (Pages 185 to 188)

Electronically signed by Brenda  Huntley Roberts (201-220-072-3855)          5e0f9fa9-b8ff-42d1-8fb0-65b301d4a9dc

Page 189

```
 1        Zurich's letter where he had listed
 2    accommodations that were, I don't want to say
 3    proposed, he listed them as possible or
 4    reasonable accommodations, and we went down the
 5    list and we talked about each one of those
 6    accommodations.  We discussed, you know,
 7    utilizing the nurse's office for taking insulin
 8    shots.  Mrs. Smith indicated that many times she
 9    gave them in her abdomen and that she just was
10    not at all comfortable giving them in her
11    classroom.  She expressed concerns that this
12    particular keyboarding class was after lunch, and
13    that she tended to have more concerns with
14    diabetes at that time, that her blood sugar
15    tended to go higher after eating, and she agreed
16    that the nurses office would be an acceptable
17    alternative.  We discussed that if she needed to
18    give herself a shot or at any time felt ill or,
19    you know, where she was lethargic, or in any way
20    being affected by the diabetes, that if she
21    called down to the office, the office would send
22    somebody up immediately to cover for her.  And we
23    got to Item 3 on his list, that Mr. Zurich's list
24    which talked about asking us to basically have
25    somebody, anytime that she appeared to be
```

Page 190

```
 1    sleeping, lethargic, clothing her eyes, out of
 2    it, that he wanted a kid, an adult, to approach
 3    her and wake her up and ask if she was okay.  And
 4    I said, in a classroom setting, that's just
 5    really unreasonable, that, 1, it would be
 6    unreasonable to have a student do that, and I
 7    can't guarantee there's an adult in every
 8    classroom at all times.  We did discuss, we
 9    assigned educational aides to students who have
10    medical issues or educational issues, the
11    possibility, I offered the possibility of
12    assigning an aide to that class so that there
13    would be an adult there.  If we would assign the
14    aide and the aide would work with the students,
15    from the student's perspective, that the aide was
16    no different than they would see it in any other
17    classroom, that the students wouldn't know that
18    the aide was there necessarily to assist with
19    Carol.  Mrs. Smith absolutely refused.  She said
20    she would be embarrassed to have another adult
21    there and know and that, again, she adamantly
22    denied that she was ever unaware of what was
23    going on in the classroom and felt that she
24    didn't need that.  In fact, told Mr. Zraik that
25    she really didn't need this kind of accommodation
```

Page 191

```
 1    at all, that if she could have juice with her or
 2    a candy bar with her in the classroom or some
 3    sort of snack, that that's all she would need
 4    because she would feel that issue coming on well
 5    enough in advance to be able to offset it.  We
 6    left the meeting I thought under good terms.  I
 7    thought that everybody had agreed to a few
 8    modifications that I then later put in writing in
 9    terms of, as a follow-up to Mr. Zraik and Mrs.
10    Smith.  And to today, other than through the
11    termination hearing, or in the proceedings that
12    followed that, I have never had Mrs. Smith ask me
13    again for any other accommodations or inform me
14    that the accommodations that I agreed to that day
15    and directed the middle school to put in place
16    were either not working or ineffective or that
17    she needed anything beyond what we agreed to that
18    day.
19  Q    Okay.  During the course of that meeting, did Mr.
20    Zraik or Mrs. Smith make any statements about
21    having complications from eye surgery or an eye
22    injection that caused her a particular problem?
23  A    No.
24  Q    There was also discussion about some discipline
25    that was imposed on Mrs. Smith in the time frame
```

Page 192

```
 1    of March, 2009, and was there a meeting held at
 2    which you were present and Mrs. Smith was present
 3    at which those disciplinary issues were
 4    discussed?
 5  A    Yes, is there a document I can refer to?
 6  Q    Yes.
 7  A    A series of documents I'm sure in here.
 8  Q    I direct your attention to Exhibit 5.
 9  A    March of 2009, Exhibit 5 has two letters in it.
10    I was made aware by Mr. Finn that on
11    February 25th, that Carol Smith had failed to
12    show up at the middle school for her assigned
13    duties, and that through a subsequent process of
14    communicating with Mrs. Smith, he learned that
15    she was confused over the schedule for that day,
16    and because it was an early release day, so the
17    time schedules for the two buildings changed a
18    little bit.  Even though we had done it multiple
19    times before that year, Mrs. Smith was confused
20    and failed to supervise the two in-school
21    suspension classes that day.  It's my
22    understanding that she did eventually show up for
23    the sixth grade keyboarding class.
24  Q    Now, did you have a meeting face-to-face with
25    Mrs. Smith at any time in connection with that
```

48  (Pages 189 to 192)

Electronically signed by Brenda  Huntley Roberts (201-220-072-3855)                    5e0f9fa9-b8ff-42d1-8fb0-65b301d4a9dc

Page 193

```
 1         discipline?
 2   A     Yes. Mr. Finn at that time felt that he had
 3         already gone through a disciplinary hearing
 4         earlier within the year where he had given her a
 5         written reprimand. Prior to that, she had had
 6         verbals from the high school staff. He felt that
 7         the -- again, the consequences for this one were
 8         going to be some sort of suspension. So he
 9         referred it to me based upon the negotiating
10         agreements language that indicates the
11         superintendent is the only one who can suspend an
12         employee. So based upon all of that, I sent the
13         first letter dated March 27, 2009 to Mrs. Smith
14         requesting a disciplinary conference to be held
15         in my office on March 31st at 3:00, and then,
16         again, gave her an education of why, and also
17         that she could have union representation present
18         at the meeting.
19   Q     And the meeting was indeed held?
20   A     The meeting was indeed held. Present at the
21         meeting was Mrs. Smith, John Gerber, her union
22         representative, and myself. Again, same scenario
23         in terms of seating as described earlier. My
24         conversation with Mrs. Smith that day, I asked
25         her about, one, I reminded her there was a
```

Page 194

```
 1         disciplinary hearing, and that anything she said
 2         and anything that I discovered could lead to
 3         disciplinary action, and that I wanted to ask her
 4         a few questions about what happened that day and
 5         was she willing to answer those, and she
 6         responded was. I asked her, in her own words
 7         to tell me what had happened. She readily said
 8         that she got confused over the change in the time
 9         schedules. She indicated that she had spoken to
10         a secretary at the high school who told her that
11         in essence she was done at the high school and
12         wasn't needed at the middle school, may have
13         referenced her normal time. I don't recall.
14         She, to my knowledge, I don't know that she
15         followed up with the middle school to be sure,
16         but in essence, admitted that she had missed the
17         two classes. There was also an accusation at the
18         time that she was sleeping in her car, or at
19         least in her car in the parking lot between
20         Perkins High School and Briar Middle School. As
21         we discussed earlier, one of the middle school
22         custodians informed Mr. Finn of that. She
23         indicated she was in her car, she wasn't
24         sleeping, that she had chosen to give herself an
25         insulin injection at that time in her car. She
```

Page 195

```
 1         then proceeded over to the sixth grade
 2         keyboarding class. I asked her -- there was an
 3         accusation about, that she might have been seen
 4         at Wendy's that afternoon during that time frame.
 5         She became really defensive and adamantly denied,
 6         that there was no way she was at Wendy's, that
 7         she had just had some surgery, she didn't allude
 8         to what type of surgery, but she had just had
 9         some surgery, and there was no way I could be
10         eating Wendy's at this time. Based upon that
11         conversation, I asked her, this was the first
12         that I was aware that she had had any surgery. I
13         then asked her again, was there any medical
14         condition, including diabetes or any other
15         medical condition that may have been causing her
16         to miss these classes, there may have been a
17         reason for her to miss these classes, that I
18         needed to be aware of them. She adamantly denied
19         it, said she simply screwed up. She messed up
20         the time schedule, and it had nothing to do with
21         anything that may or may not be wrong with her
22         medically. At that point I thanked her and then
23         made the decision that I reflected in the
24         April 2nd letter, which was to issue her a
25         three-day unpaid suspension to be served
```

Page 196

```
 1         April 21st, 22nd and 23rd.
 2   Q     Did she make any statements in that meeting with
 3         respect to an eye condition or an infection
 4         subsequent to eye surgery which may have some
 5         lingering adverse medical effects upon her?
 6   A     No.
 7   Q     Did she tell you in that meeting or the prior
 8         meeting we just spoke of that she had some kind
 9         of eye condition that caused her to be sensitive
10         to light?
11   A     No.
12   Q     Now, we spoke earlier, or you spoke earlier about
13         the investigation that you did with regard to the
14         allegations of inappropriate discussion of
15         pornography?
16   A     Yes.
17   Q     Were there meetings with Mrs. Smith, I believe
18         you did indicate that there were meetings with
19         Mrs. Smith in the wake of that investigation in
20         which that matter was discussed with her; is that
21         correct?
22   A     Yes.
23   Q     Was there one or more than one meeting?
24   A     There were two meetings to my recollection.
25   Q     Tell me who was present at the first meeting.
```

Electronically signed by Brenda  Huntley Roberts (201-220-072-3855)                    5e0f9fa9-b8ff-42d1-8fb0-65b301d4a9dc

Page 197

1  A    First meeting was Carol Smith, Erica Clay, who is
2       an OEA representative, and John Gerber, who is
3       again, a local POE representative.
4  Q    By OEA, you're referring to --
5  A    The Ohio Education Association.
6  Q    Was she based here locally or from Columbus?
7  A    I believe she was a regional rep, somewhere in
8       the Cleveland area. I don't know exactly where
9       she came from, more regional than Columbus.
10 Q    Can you tell me roughly when that meeting took
11      place?
12 A    I believe it was April 1st.
13 Q    Okay. Tell me what you recall being said by the
14      various participants in the meeting.
15 A    Okay. Again, same sort of process. I had sent
16      her this letter informing her what the
17      allegations were. I brought her in. They sat at
18      one end around the table, I sat at other end. I
19      proceeded to ask her questions about each of the
20      allegations. And in reference to the
21      pornography, she readily agreed that there was a
22      conversation about pornography in the classroom,
23      that her recollection was that it was initiated
24      by a student, same porn or something to that
25      effect, and she was discussing yellow journalism

Page 198

1       and sensationalism. She then took that comment
2       to use pornography in her mind as a sample of
3       sensationalism or yellow journalism. She readily
4       admits to a conversation where she talked about
5       or used the terms Playboy and Playgirl readily
6       indicating that she knew that the students read
7       or have seen those magazines or something
8       similar. She denied that she herself personally
9       had ever looked at those magazines or told the
10      kids that she had, but she did admit to
11      referencing Burt Reynolds and -- I'm drawing a
12      blank on the other actor's name, but another
13      famous actor who had appeared in some of the
14      covers of Playgirl that were shown to us earlier.
15      She -- her recollection was similar to the
16      students' in that it was a 5 to 10-minute
17      conversation maximum. And then she redirected
18      them back to a more indepth conversation about
19      yellow journalism and sensationalism. I then
20      talked -- and I asked her about the students'
21      statement regarding dozing off or sleeping,
22      especially during study hall time frame. I asked
23      multiple times, multiple ways, things like, were
24      you ever asleep for even, you know, 30 seconds?
25      Did you close your eyes for a minute or two at

Page 199

1       the time when the kids may have perceived you to
2       be sleeping; were you fully aware of everything
3       going on in the classroom during the study hall
4       time frame. And every time she denied that she
5       was ever sleeping, that she ever dozed off. Her
6       words were, sometimes I have to rest my eyes,
7       they get tired, they ache. I contributed that to
8       our previous conversation about diabetes and
9       maybe become some reference to the medical
10      condition that she had shared with me earlier.
11      In fact, Erica Clay, her representative at that
12      point, interrupted and asked Carol, "Are you
13      saying that your diabetes makes you tired, and
14      you have to close your eyes?" And Carol got
15      angry and said, "Absolutely not. I told you I
16      wasn't closing my eyes. I may rest them for a
17      few seconds, but I'm fully aware of everything
18      going on in the classroom at the time." So I
19      asked her questions like, if you're fully aware
20      of what's going on in the classroom, would you
21      permit students to be playing, you know,
22      basketball with empty plastic Gatorade containers
23      in your classroom, is that an acceptable behavior
24      to allowed in a classroom? And the answers were
25      no. And I said, so would it surprise you to say

Page 200

1       that the kids said during study hall that's
2       something, that's the actions they took. She
3       said that never happened in my study hall. I
4       would have seen that. I asked her, you know,
5       would you allow students to play movies on their
6       laptops during class or during study hall and she
7       said, no, the only movies would be that I showed
8       them that were tied to the curriculum. And I
9       said, what were your expectations of students
10      during study hall? And it was that, you know,
11      that they should be working independently or
12      sometimes in small groups. And if they were in
13      small groups I would let them talk and work. So
14      I said, would it surprise you that many students
15      said that they were free to watch movies whenever
16      they wanted, that they were free to play their
17      music, and sometimes so loud that other students
18      would yell across the room to have one student
19      turn down the music. She said that there's no
20      way I would have known that was happening and I
21      wouldn't have permitted that. I asked her about
22      the diabetes, I said, "Carol is there any way,
23      again, diabetes, any medical issue that may be in
24      any way causing these episodes or the perception
25      from now students and staff that you are sleeping

HUNTLEY REPORTING SERVICE
1.800.247.8360

Electronically signed by Brenda  Huntley Roberts (201-220-072-3855)                    5e0f9fa9-b8ff-42d1-8fb0-65b301d4a9dc

Page 201

```
1    in class or unaware of what's going on in class,
2    even for short periods of time and she got
3    adamant again and said, "I told you, I was never
4    sleeping, I'm aware of everything that's going on
5    in the class.  The only time I ever slept was the
6    one time I told you for a few seconds in ISI when
7    there were no students present at the middle
8    school.  I then went on to talk about the tardy
9    issue and her claim was that maybe once or twice
10   she might have been tardy, but tardy is simply
11   walking in the class as the bell was ringing,
12   never 5, 10, 15 minutes tardy as the kids
13   explained, and not certainly every week or two or
14   three times a week.  I asked her, I usually do at
15   the end, is there anything else that I need to
16   know, anything that I should consider before I
17   make a decision on how do I handle this?  And I
18   asked Erica, her representative, John Gerber, her
19   representative, and Carol, all that same
20   question, is there anything else you want to tell
21   me, anything else I should know before I make
22   this decision, and they all said no.
23  Q     And when you asked her point blank about medical
24        conditions that might be giving the appearance
25        that she might be sleeping or cause somebody to
```

Page 202

```
1    believe that, did she say anything about an eye
2    condition or a consequence, a lingering
3    consequence from complications of eye surgery?
4    A    No.
5    Q    Now you said that there was a second meeting?
6    A    Yes, when I started talking about student
7         statements and student -- my interviews with
8         students, Erica Clay, her union representative
9         objected because they had not had a chance to see
10        those, they had not had an opportunity review
11        them.  They asked to have copies of those.  I
12        shared with them that I needed to consult with
13        legal counsel before I gave them copies of
14        statements by students that had students' names
15        in them.  Erica indicated that she would agree --
16             MR. BELAZIS:  Could we -- I'm sorry to
17        interrupt.  There are some possible issues of
18        privilege pertaining to discussions involving
19        representatives in a union-related proceeding and
20        I would like to object to the testimony.  Nothing
21        I can do to keep him from testifying obviously,
22        but I would like to preserve my objection to
23        privilege for the record.
24             MS. GRIGSBY:  I understand.  So noted.
25             THE WITNESS:  I indicated to Ms. Clay
```

Page 203

```
1    that, again, I would check with legal counsel, as
2    and long as legal counsel was comfortable, I
3    would be glad to provide them the documents, the
4    statements of the students as requested.  I also
5    agreed that, due to that fact, that I would meet
6    with him a second time after they had a chance to
7    review them before making any decision on how to
8    proceed.
9         MS. GRIGSBY:  So I'm going to then ask
10   you about a next meeting, but the court reporter
11   would like to take a break.
12        (Off the record.)
13   BY MS. GRIGSBY:
14  Q     And you were about to tell us, Dr. Gunner, about
15        the second meeting that you had with Carol and
16        others following your investigation of the
17        accusations that were made in the spring of 2010.
18  A     After the April 1st meeting, I consulted for
19        legal advice and was given the okay to release
20        the records as requested by the OEA
21        representative, Erica Clay, to go ahead and
22        redact the student names.  In fact, we went one
23        step further and took all of my notes and
24        produced those with redacted student names even
25        though they had not been specifically requested
```

Page 204

```
1    to ensure that they had all the information we
2    had in regard to my investigation.
3         MR. BELAZIS:  Excuse me, just so I
4    don't interrupt Dr. Gunner testimony, is it okay
5    if I have a continuing objection on the issue of
6    privilege?
7         MS. GRIGSBY:  Yes, sir.
8         MR. BELAZIS:  Thank you.
9         THE WITNESS:  From that, I then sent
10   them a letter April 5th scheduling a second
11   meeting for Monday April 12 at 4:00 in my office.
12   When I say them, I mean Carol Smith and John
13   Gerber and Erica Clay.  I sent all of the
14   requested documents to Erica Clay's law office,
15   and I waited on April 12th for them to arrive.
16   Nobody showed up.  I then assumed that maybe
17   after reviewing the documents, they did not want
18   to meet with me further, so I sent a letter
19   April 13th indicating that it was my intent to
20   recommend the termination process beginning to
21   the board at our April 14th board meeting that
22   month.  I actually hand delivered that to Carol
23   Smith's house to ensure that it got delivered
24   before the board meeting and I also made sure
25   that I sent it both, you know, mail and by email
```

Page 205

1     to Erica Clay and I noticed that she received it
2   because she called me within 5 or 10 minutes of
3   it arriving by email and claiming that they knew
4   nothing about the April 12th meeting, that she
5   had never been informed.  And I indicated, well,
6   I sent to you a letter with documents, all the
7   documents you requested, and in that letter I
8   indicated that we would meet again on the 12th.
9   And she said, well, I never received the letter.
10   Put me on hold, asked to put me on hold a second.
11   Came back and apologized and said, we did receive
12   your letter last Thursday in my office,
13   unfortunately, I didn't see it.  Could you and
14   would you agree to meet with us prior to going to
15   the board.  And I said, as long as you would
16   agree to meet with me prior to the 6:00 p.m.
17   April 14th board meeting, I will give you another
18   meeting.  We agreed to meet at 1:00 on
19   April 14th.  And we held another meeting that
20   day.  Present that day was Carol Smith, Erica
21   Clay, and Tom Kinsel.  For some reason, John
22   Gerber, PEA representative, was not present.  We
23   began, again, to have another conversation about
24   the three grounds or specifications for seeking
25   her termination, really not a whole, it was

Page 206

1   actually a really short meeting, half hour, maybe
2   45 minutes.  There was, again, a conversation
3   where Erica Clay brought up Carol's diabetes and
4   offered to Carol, "Carol is some of what's going
5   on here related to your ability to control your
6   diabetes?"  Carol immediately got upset and cut
7   her off, and again said, "I've told you, I've
8   never fallen asleep in this class.  I was awake
9   at all times, it has nothing to do with my
10   diabetes."  I then stepped in, started to ask the
11   question again:  "Is there any medical condition,
12   including your diabetes or others?"  Erica cut me
13   off, we had sort of a tit-for-tat for a couple of
14   seconds, and then finally I told Erica, "This is
15   my meeting, not yours.  I'm going to ask the
16   question, and whether your client choses to
17   answer or not, that's up to you, but I'm going to
18   ask it."  So I asked again, "Carol is there any
19   medical condition, including your diabetes, is
20   there anything at all that is causing these
21   episodes, that is prohibiting you from fulfilling
22   your full duties as a teacher?"  And the answer
23   again was no, I told you, I wasn't sleeping, I
24   was aware, you know, the only one time I was
25   sleeping, again" -- and she pointed back to the

Page 207

1   one incident at the middle school.  We concluded
2   the meeting with the understanding that I was
3   going to proceed with recommending her
4   termination to the board that evening.  I asked
5   them to wait a few minutes while I modified the
6   letter so that I could hand deliver it to all of
7   them before they left, and I did that indicating
8   that I would be recommending her termination to
9   the board that evening at 6:00.
10   BY MS. GRIGSBY:
11 Q   And we talked earlier, Mr. Belazis asked you some
12   questions about the two incidents that occurred,
13   well, one at the end of the prior school year and
14   one during the summer of that school year, one
15   involving allegations of sleeping in the
16   observation of a Social Studies class, and the
17   other allegation of sleeping with respect to
18   attendance at a technology seminar.  Now, were
19   you present in a meeting with respect to the
20   first one, the Social Studies allegation, the
21   allegations of sleeping while observing the
22   Social Studies class?
23 A   No, Chris Gasteier held that meeting.  I had
24   verbal conversations with him afterwards.  He
25   felt that there was ample evidence that she was

Page 208

1   sleeping, felt that, based upon the history, that
2   it was going to warrant disciplinary action or
3   the suspension or greater so he referred it to
4   me.  I chose to suspend Carol for ten days unpaid
5   at that time, and also to request a medical
6   evaluation of her as permitted by contract.  But
7   I never met with her on that one.
8 Q   Referring then to Exhibit 8, which I believe you
9   looked at earlier today, and the last bullet
10   point on page 1 of that document.
11 A   Yes.
12 Q   It indicates, it says, "Your denial of being
13   asleep while directed to observe Social Studies
14   classes instructed by your colleagues and you
15   claim that you have 80 percent blindness in your
16   right eye and were simply resting your eyes and
17   were totally aware of all class activity during
18   the time in question."  Is it your testimony that
19   she did not make that statement to you
20   personally, but you're reporting what Mr.
21   Gasteier told you?
22 A   That is correct.  I was not in this meeting, Mr.
23   Gasteier told me that that was a comment that she
24   made to him.
25 Q   And in these various conversations that you had

Electronically signed by Brenda  Huntley Roberts (201-220-072-3855)      5e0f9fa9-b8ff-42d1-8fb0-65b301d4a9dc

Page 209

1     with Carol in which she indicated that she had no
2     medical conditions that was causing these
3     episodes of apparent sleeping, did she bring this
4     issue up?
5  A    She did not.  She would bring up resting her
6     eyes, but she never brought up, you know,
7     80 percent blindness or anything to that effect.
8     I made the assumption based upon the only claim
9     that she brought to me medically, was diabetes,
10    that this was all related somehow to the
11    diabetes.
12  Q    And I believe we talked earlier today about the
13    fact that you were present in a meeting with
14    Carol in which you discussed the incident of
15    alleged sleeping in the technology seminars?
16  A    Right.  Again, same process, I invited her to a
17    hearing in the middle of the summer, I want to
18    say July 7th without the documents in front of
19    me.  Present at that time, again, if my memory is
20    correct, was Carol, John Gerber and myself.
21    Confronted her with the evidence of her
22    colleagues, Nancy Kinsel, Sharon LaRose Smith,
23    the instructor that day from Apple.  She, again,
24    claims that, you know, she was not sleeping, she
25    might have been resting her eyes, it would have

Page 210

1     been short duration, and that she was fully aware
2     of everything that was going on in the class.  I
3     made the determination that she was in fact
4     sleeping based upon the evidence I had from the
5     other teachers and the instructor.  I issued her
6     a dock in pay of one hour for each day of the
7     training, but more importantly, at the end, I
8     changed my final sentence in these documents
9     where that should there be any future incidents,
10    it was no longer -- I may seek her termination,
11    but that I would seek her termination of
12    employment, and I bold-faced that to make sure
13    she understood that I had reached my limit.
14  Q    Following any of these conversations, did Mrs.
15    Smith ever bring to you any kind of medical
16    evidence or medical proof that she suffers from
17    some kind of physical condition that was causing
18    the perception of apparent sleeping that was
19    noted by these people who had brought those
20    concerns to your attention?
21  A    The only evidence Mrs. Smith ever brought to me
22    directly was the diabetes claim with Mr. Zraik.
23    I was aware of the NOMS note that also indicated
24    diabetes as a possible cause of lethargy and
25    tiredness that she had, the nurse practitioner

Page 211

1     from NOMS provided Mr. Finn.  Other than that,
2     until the termination hearing I was not aware of
3     any other medical conditions with Mrs. Smith
4     beyond, again, this sort of generic surgery she
5     had in January, I believe, of 2009, that I was
6     not aware of what the surgery was at the time.
7  Q    You were referring to a portion of Exhibit 4 when
8    you said the NOMS document?
9  A    Yes.
10  Q    And that is the letter addressed to the Perkins
11    Middle School signed by Michelle Poulos on behalf
12    of the Northern Ohio Medical Specialists Group?
13  A    Yes.
14  Q    And a part from that document, which is part of
15    Exhibit 4, did Mrs. Smith ever provide you any
16    kind of written information or evidence or
17    documentation suggesting that she had some kind
18    of medical condition that would require some kind
19    of accommodation?
20  A    Never.  Not even in the diabetes conversation was
21    there ever any medical evidence produced.  This
22    document came after that.  And in a subsequent to
23    email, or in a subsequent letter to Steve Finn
24    that arrived in my office after I had met with
25    her, I took her for her word that she did have

Page 212

1     diabetes and -- but that was the only medical
2     condition she ever raised with me at any time
3     during this process.
4  Q    Did she ever indicate that, gee, the
5    accommodations that you have provided with
6    respect to diabetes aren't sufficient, I need
7    something more, I need something different, I
8    need something additional?
9  A    No.  It was my understanding that the
10    accommodations we had put in place were, one,
11    falling in place and fully functioning.  I was
12    not aware that there were some concerns on her
13    part that at times we did have somebody to send
14    up to her classroom or, you know, to either
15    relieve her to do a shot or a blood test.  That
16    did not come to my attention until, I want to
17    say, the actual termination hearing.  I was not
18    aware.  In fact, I was quite surprised when that
19    information was shared.
20  Q    Okay.  Can you explain to me how her fifth period
21    class period was segmented in the final year of
22    her teaching?
23  A    Yes.  That particular year the high school
24    decided to have four lunch periods over what they
25    titled fifth period.  So it was period A, B, C,

HUNTLEY REPORTING SERVICE
1.800.247.8360

Electronically signed by Brenda Huntley Roberts (201-220-072-3855)         5e0f9fa9-b8ff-42d1-8fb0-65b301d4a9dc

Page 213

```
 1          D, and two of those you would teach, you would
 2     have a classroom instruction.  In Carol's case,
 3     that would be A and B.  So the first
 4     approximately hour of that two-hour time frame
 5     would be direct instruction to students and the
 6     Social Studies class.  In Carol's case, the third
 7     one, or C, the third half hour was lunchtime.  So
 8     the kids would leave her classroom, go down and
 9     eat lunch.  That was Carol's lunchtime.  So she
10     also could leave and go to the faculty lounge and
11     eat lunch, and she really was free to do anything
12     at that time.  And then the last half hour the
13     students would return to those classes, and it
14     would be a study hall, so that they had time to
15     work on their homework from her class, any class
16     in particular, but it was always a structured
17     study hall.  So every student was given,
18     basically, a 30-minute study hall during that
19     block of time, either A, B, C, or D.
20  Q       When you had conversations with students in the
21     wake of these allegations of an inappropriate
22     discussion of pornography and they spoke of her
23     being late or tardy to class, did they refer to
24     only the instructional portion of Period 5 or did
25     they refer to other portions of Period 5?
```

Page 214

```
 1  A       Most of the time in those conferences with
 2     students, they would simply refer to Fifth
 3     Period.  At the time I was interviewing them, I
 4     wasn't aware of the dynamics of Carol's Fifth
 5     Period classes to when she had class, when she
 6     had lunch, when she had study hall.  It was
 7     through the subsequent investigation that I found
 8     that out.  So I didn't really probe them on
 9     specifically was it, you know, to the beginning
10     of the class or was it the study hall.  I would
11     say that my recollection is the majority of them
12     were referring to class, that initial period, but
13     there were some that indicated study hall as
14     well.
15  Q       Okay.  Referring to Exhibit 28, which I believe
16     was marked today.
17  A       What am I looking for?
18  Q       You're looking for your letter to Dr. Kale.
19  A       I don't know, it may be over here.
20  Q       Okay.
21  A       Okay.
22  Q       It appears in this letter that you're trying to
23     brief Dr. Kale on some of the information that
24     you have concerning Mrs. Smith's medical
25     condition; is that correct?
```

Page 215

```
 1  A       Yes.  I had a conversation with a nurse or
 2     receptionist from St. Luke's Hospital
 3     Occupational Health Clinic when I set this up and
 4     she -- I had asked if I could speak to Dr. Kale
 5     to provide him, you know, some of the background
 6     of why we were requesting this assessment and she
 7     indicated that Dr. Kale was way too busy to have
 8     a phone conversation with me, but if I would
 9     please send them something in writing, that he
10     would certainly look at that prior to doing the
11     evaluation, and that's what prompted this.
12  Q       You state in this letter that Mrs. Smith
13     indicated she has a disability and needed
14     accommodations for her diabetes.  Was it your
15     intent to be as thoroughly as possible about your
16     description of Mrs. Smith's statements concerning
17     her medical condition in this letter to Dr. Kale?
18          MR. BELAZIS:  Isn't that a little bit
19     leading?
20          MS. GRIGSBY:  Could be.
21          MR. BELAZIS:  Okay, I object.
22          MS. GRIGSBY:  Let me rephrase the
23     question.
24  BY MS. GRIGSBY:
25  Q       What was your purpose in sending this letter to
```

Page 216

```
 1     Dr. Kale?
 2  A       I was trying to give him background information
 3     about why the school district was requesting this
 4     evaluation, and that there had been a series of
 5     incidences and that there had been this claim
 6     from Mrs. Smith about her diabetes, and in
 7     essence, I was trying to give Dr. Kale as much
 8     information as possible to thoroughly evaluate
 9     Mrs. Smith's ability to continue to teach.
10  Q       Did you omit any information that's relevant to
11     Mrs. Smith's physical condition from this letter
12     that you had been made aware of?
13  A       Not that I'm aware of at that time.  I mean,
14     again, the only conversation I had with Carol
15     Smith regarding her medical condition was the one
16     meeting with Tom Zraik and John Gerber and Carol
17     Smith.
18  Q       There was some discussion of an episode involving
19     Tim Obergefell which occurred prior to your
20     arrival as superintendent of Perkins, and you
21     mentioned that you thought that there had been a
22     written reprimand, but you had never seen it in
23     the file.  Could it be that that document may
24     have been removed as a result of some contractual
25     obligation?
```

HUNTLEY REPORTING SERVICE
1.800.247.8360

Electronically signed by Brenda  Huntley Roberts (201-220-072-3855)                    5e0f9fa9-b8ff-42d1-8fb0-65b301d4a9dc

## Page 217

```
 1           MR. BELAZIS: Leading.
 2           THE WITNESS:  I will say that, the only
 3    thing I can say for certain is I've never seen it
 4    if it was not in Tim Obergefell's file.  In
 5    reference to the contract, all I can say is there
 6    is a clause in the contract that teachers can
 7    request the removal of any disciplinary
 8    documentation after 24 months.  I have no
 9    knowledge of whether Mr. Obergefell did that, nor
10    do I have any direct knowledge of whether he ever
11    had a letter in his file.  I was told there was
12    one there.
13    BY MS. GRIGSBY:
14  Q    Could you take a look at Exhibit 33?  It's this.
15  A    Oh.
16  Q    35, I'm sorry.
17  A    That makes sense.  It's 36.
18  Q    That's it.
19  A    That says 18.
20  Q    That's from the prior.
21  A    I don't see it here.
22  Q    Okay.  Is it in that stuff down there?
23  A    That's what I thought, but it's not there.  At
24    least I didn't see it.
25           MS. GRIGSBY: Do you have Exhibit 35?
```

## Page 218

```
 1           THE WITNESS:  It's your Playgirl stack?
 2           MR. BELAZIS:  Do I have it?  Well,
 3    nothing would surprise me.
 4           MS. GRIGSBY:  Okay.
 5           THE WITNESS:  Okay, I have it.
 6    BY MS. GRIGSBY:
 7  Q    Okay.  Dr. Gunner, looking at the first page of
 8    Exhibit 35 which appears to be a copy of the
 9    cover of a Playgirl magazine with Harrison Ford
10    on the front.
11  A    Yes.
12  Q    Would you read the title of the article under
13    bonus which, I believe --
14  A    "Rick James Gets Funky About Sex."
15  Q    And then would you read the little caption that
16    appears under the smaller picture of the young
17    man in the lower right-hand corner?
18  A    "Dallas, New Heartthrob, Christopher Atkins in a
19    Nude Pictorial."
20  Q    Would you consider a discussion of a periodical
21    that includes articles about a gentleman getting
22    funky about sex and appearing in a nude pictorial
23    to be pornographic?
24  A    Yes.
25  Q    And based upon your experience, would folks in
```

## Page 219

```
 1    the Perkins educational community view it in the
 2    same way?
 3  A    Yes.
 4  Q    And turning to page 2, would you read the title
 5    of the first article that's referenced on the
 6    left-hand side?
 7  A    "What Men Really Want From Women."
 8  Q    Would you consider a discussion of a periodical
 9    that contains articles about what men really want
10    from women to be appropriate for a Social Studies
11    class?
12  A    No.
13  Q    Would you view it to be pornographic?
14  A    From the title, I don't know that I would
15    ultimately say that, it depends on the content of
16    the article, but it could be.
17  Q    What were the age of the students in Mrs. Smith's
18    Fifth Period Social Studies class?
19  A    Typically 15 years old.
20  Q    And what grade was that, again?
21  A    I believe most of them were sophomores, there may
22    have been a few freshman, but I think most of
23    them were sophomores.
24  Q    And turning to the third page, would you read the
25    title of the two articles, the last two articles
```

## Page 220

```
 1    on the left-hand side?
 2  A    "Facts About Foreplay Most Men and women Don't
 3    Know But Should." "Special Nude Pictorial of the
 4    Rich, Sexy and Powerful Men of Wall Street."
 5  Q    Do you consider discussion of a periodical which
 6    contained articles about those topics to be
 7    appropriate for a Tenth Grade Social Studies
 8    class?
 9  A    Absolutely not.
10  Q    And would you consider them to be pornographic?
11  A    Yes.
12  Q    Foreplay?
13           MS. GRIGSBY:  I don't think I need to
14    go further with that.
15           Those are all the questions I have at
16    this time.
17           RECROSS-EXAMINATION OF JIM GUNNER
18    BY MR. BELAZIS:
19  Q    I just have one question.  Would you mind going
20    through Exhibit 15 and show me where each
21    instance in which there's some documentation in
22    your notes that a student indicated that Mrs.
23    Smith was late for study hall?
24           MS. GRIGSBY:  Is that 14, Paul?
25           THE WITNESS:  13.
```

HUNTLEY REPORTING SERVICE
1.800.247.8360

Electronically signed by Brenda  Huntley Roberts (201-220-072-3855)                    5e0f9fa9-b8ff-42d1-8fb0-65b301d4a9dc

## Page 221

```
 1          MS. GRIGSBY: 13.
 2          THE WITNESS:  In the second one it
 3   indicates she comes in five minutes late, it
 4   doesn't indicate whether it was class or study
 5   hall, but it was on a discussion about study
 6   hall.
 7   Q    Show me where you're pointing.
 8   A    Right here in the center.  Gina Bing.  I don't
 9   know from that reference in my notes whether that
10   was class or study hall or not.
11          Elyse Deer references "Tardy a few
12   times.  No, let's just say she's late every day."
13   No reference to class and/or study hall.
14          Max Funk, "Tardy a lot of class, they
15   won't stop talking.  She has to yell, arrives
16   when the bell rings or after."  No reference
17   specifically to study hall.
18          Josh Roulus references, "Pretty much
19   late daily.  Sometimes on time, maybe late once a
20   week.  Again, doesn't indicate whether that's,
21   in my notes, study hall or class.
22          There's an unnamed one, I'm not sure
23   what the student's name is, "Talks about mostly
24   late a period or two at the beginning of class,
25   kids are just sitting around, takes a few
```

## Page 222

```
 1   minutes, she yells at everybody."  Again, no
 2   reference to study hall in that particular case.
 3          Bryon Logan, "Tardy to class every day
 4   or she walks in with the bell."
 5          Rachel Moseley, "Tardy to class often,
 6   5 to 10 minutes.  When she does arrive we have to
 7   wait another 5 to 10, very unorganized."
 8          Paige Miller, "Usually thirty seconds
 9   or so after the bell."
10          Cole Newman, "She's late pretty much
11   every day, maybe two or three minutes."
12          Kory Newman, "Tardy, late every day,
13   two to three minutes late every single day,
14   almost always tardy to class, about two minutes
15   after the bell."
16          This is from Devin O'Brien.  "Loud,
17   constant threats to get our attention."
18          Nathan Parrett, "Tardy usually one or
19   two, maybe three minutes tops, moving around,
20   usually takes ten minutes to get things going."
21          Nathan Parthemore, "Usually walking in
22   the bell rings, but sometimes is late."
23          Anthony Pepitone, "Usually arrives a
24   little late, gets out a book, either reads from
25   the book or she gives worksheet."
```

## Page 223

```
 1          Kendall Satler, "No, she's at least --
 2   well, she comes in two or three minutes after the
 3   bell rings."
 4          Michael Snyder, "Usually she's not in
 5   until after bell, a minute or two or so after the
 6   bell, sitting, talking, walking around."
 7          Troy Spore, "She's present give or take
 8   a few minutes."
 9          Erin Sullivan, "Either comes in when
10   the bell rings or a minute or two after."
11          Dominic Thompson, "Doesn't make it
12   before the bell because she's all the way
13   upstairs and how old she is.  Kids are talking to
14   each other."
15          George Toldy, "She's usually a little
16   late, kids are mostly playing games, mostly
17   Tetris."
18          And I'm to Mr. Gasteier's notes at this
19   point.
20   Q    Okay.  No reference to study hall, right?
21   A    Not specifically, most of the references are to
22   being late, without a specific reference to class
23   or study hall.
24          MR. BELAZIS:  That's all, thank you.
25          ///
```

## Page 224

```
 1          REDIRECT EXAMINATION OF JIM GUNNER
 2   BY MS. GRIGSBY:
 3   Q    Just one follow-up on that very topic, which is,
 4   it appears, based upon your review, that you did
 5   not record one way or the other whether you were
 6   talking about study hall or the actual
 7   instructional period.  Do you have a recollection
 8   of people telling you that she was tardy in the
 9   study hall period of that fifth, the broader
10   Fifth Period segment?
11   A    Yes, I do.
12          MS. GRIGSBY:  I have nothing further.
13          MR. BELAZIS:  No further questions for
14   me.
15          MS. GRIGSBY:  We'll reserve signature.
16          (Off the record.)
17          MR. BELAZIS:  Back on the record.
18   BY MR. BELAZIS:
19          CON'T RECROSS-EXAMINATION OF JIM GUNNER
20   BY MR. BELAZIS:
21   Q    Dr. Gunner, which students told you that Mrs.
22   Smith was late for study hall?
23   A    I don't recall, sir, I couldn't tell specific
24   names.
25   Q    How many students told you that?
```

56 (Pages 221 to 224)

Electronically signed by Brenda  Huntley Roberts (201-220-072-3855)          5e0f9fa9-b8ff-42d1-8fb0-65b301d4a9dc

Page 225

1   A    Again, I can't give you specific numbers.  As I
2        stated earlier, certainly more indicated class
3        than study hall.
4   Q    But you can't think of a single student that said
5        that she was late for study hall?
6   A    No, sir, I cannot.  By name, no, I cannot.
7            MR. BELAZIS:  Off the record.
8        (Depositions proceedings were concluded at 5:10
9        p.m.)
10           /s/_____
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 226

1            DEPONENT'S CHANGES OR CORRECTIONS
2        Note:  If you are adding to your testimony, print
3        the exact words you want to add.  If you are
4        deleting from your testimony, print the exact
5        words you want to delete.  Specify with "Add" or
6        "Delete" and sign this form.
7
8        DEPOSITION OF:  JIM GUNNER
9        CASE:  CAROL ANN SMITH vs. PERKINS BOARD OF
10       EDUCATION, et al.
11       DATE OF DEPOSITION:  Friday, April 4, 2014
12       Page  LINE   CHANGE/ADD/DELETE
13       ____  ____   _____
14       ____  ____   _____
15       ____  ____   _____
16       ____  ____   _____
17       ____  ____   _____
18       ____  ____   _____
19       ____  ____   _____
20       ____  ____   _____
21       ____  ____   _____
22       ____  ____   _____
23       ____  ____   _____
24       ____  ____   _____
25       ____  ____   _____

Page 227

1                   CERTIFICATE
2        STATE OF OHIO  )
                       ) ss.
3        COUNTY OF ERIE )
4
5            I, Brenda Huntley Roberts, Registered Merit
         Reporter and Notary Public within and for the
         State aforesaid, duly commissioned and qualified,
6        do hereby certify that the within named JIM
         GUNNER was by me, before the giving of his
7        deposition, first duly sworn to testify the
         truth, the whole truth and nothing but the truth
8        in the cause aforesaid; that the deposition as
         above set forth was reduced to writing by me by
9        means of Computer-Aided Transcription; that the
         said deposition was taken pursuant to Notice and
10       was completed without adjournment; that I am not
         a relative or attorney of either party or
11       otherwise interested in the eventual outcome of
         this action.
12
13           IN WITNESS WHEREOF, I have hereunto set my hand
         and seal of office at Sandusky, Ohio this
14            day of         , 2014.
15
16
17       HUNTLEY REPORTING SERVICE
         Brenda H. Roberts, RMR, CRR, CBC
         CSR 13676
18       Notary Public
         P. O. Box 1067
19       Sandusky, Ohio  44870
20       My commission expires 3/15/16
21
22
23
24
25

Page 228

1                   CERTIFICATE
2        STATE OF OHIO
3        COUNTY OF
4
5            I certify that this deposition was
6        signed in my presence by JIM GUNNER on the
7            day of         , 2014.
8            IN WITNESS WHEREOF, I have hereunto set my
9        hand and affixed my seal of office at         ,
10       Ohio on this    day of         , 2014.
11
12
13
                   Notary Public
14
15
16
17
18
19
20
21
22
23
24
25

57 (Pages 225 to 228)

HUNTLEY REPORTING SERVICE
1.800.247.8360

Electronically signed by Brenda  Huntley Roberts (201-220-072-3855)          5e0f9fa9-b8ff-42d1-8fb0-65b301d4a9dc